JOSEPH W. COTCHETT (36324)
jcotchett@cpmlegal.com
NANCY L. FINEMAN (124870)
nfineman@cpmlegal.com
STEVEN N. WILLIAMS (175489)
swilliams@cpmlegal.com
NEIL SWARTZBERG (215133)
nswartzberg@cpmlegal.com
DOUGLAS Y. PARK (233398)
dpark@cpmlegal.com
COTCHETT, PITRE & McCARTHY
San Francisco Airport Center
804 Malcolm Road
Burlingame, CA 94010
Telephone:     (650) 697-6000
Facsimile:     (650) 697-0577

*Interim Lead Counsel for Direct Purchaser Class*

## UNITED STATES DISTRICT COURT

## NORTHERN DISTRICT OF CALIFORNIA – OAKLAND DIVISION

| | |
|---|---|
| IN RE STATIC RANDOM ACCESS MEMORY (SRAM) ANTITRUST LITIGATION | Case No. M:07-cv-1819 CW<br><br>MDL No. 1819<br><br>**DIRECT PURCHASER PLAINTIFFS' NOTICE OF MOTION, MOTION AND MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF CLASS CERTIFICATION -- REDACTED**<br><br>**ORAL ARGUMENT REQUESTED** |
| This Document Relates To:<br><br>    All Direct Purchaser Actions | Time:     2:00 p.m.<br>Date:     September 18, 2008<br>Judge:    Hon. Claudia Wilken<br>Courtroom: 2 |

TABLE OF CONTENTS

NOTICE OF MOTION AND MOTION .......................................................................... 1

STATEMENT OF ISSUES TO BE DECIDED .............................................................. 1

MEMORANDUM OF POINTS AND AUTHORITIES ................................................ 1

I.   INTRODUCTION ................................................................................................ 2

II.  FACTUAL BACKGROUND .............................................................................. 5

    A.  The SRAM Industry ...................................................................................... 5

        1.  SRAM – Categories and Uses ............................................................ 5

        2.  SRAM is a commodity ........................................................................ 6

        3.  The SRAM Market – Defendants' Significant Market Power, Low Price Elasticity, and High Barriers to Entry ................................. 6

        4.  SRAM Customers and Contract Sales .............................................. 7

        5.  SRAM Pricing Moves in Tandem ...................................................... 7

    B.  Conclusions of Dr. Noll – Common Proof of Harm To Competition and Damages .................. 7

    C.  Parallels Between the SRAM and the DRAM Markets Favor Class Treatment ........... 8

III. ARGUMENT ........................................................................................................ 8

    A. Legal Standard – Class Certification Under Rule 23 ................................ 8

    B. Class Certification is Especially Appropriate in Horizontal Price-Fixing Cases ...... 9

    C. The Requirements of Rule 23(a) Are Satisfied ......................................... 10

        1. The Class Is Sufficiently Numerous (Rule 23(a)(1)) ...................... 10

        2. The Case Involves Common Questions of Law and Fact (Rule 23(a)(2)) ...... 11

        3. The Named Plaintiff's Claims Are Typical of the Claims of the Class (Rule 23(a)(3)) ............... 12

        4. The Named Plaintiff Will Fairly and Adequately Represent the Class (Rule 23(a)(4)) ............... 14

    D.  The Class Satisfies the Requirements of Rule 23(b)(3) ........................... 15

        1. Common Questions of Law and Fact Predominate Over Individual Questions ...... 16

            a. Common Liability Issues Predominate ....................................... 17

i

b. Common Impact Issues Predominate ........................................ 18

c. Common Damages Issues Predominate .................................... 21

2. A Class Action Is Superior to Other Available Methods for the Fair and
Efficient Adjudication of This Case ............................................ 23

E.    The Court Should Appoint Interim Lead Counsel as Class Counsel ...... 25

IV.  CONCLUSION ........................................................................................ 25

DIRECT PURCHASER PLAINTIFFS' NOTICE, MOTION & MPA ISO CLASS CERTIFICATION
Case No. M:07-cv-1819 CW; MDL No. 1819

TABLE OF AUTHORITIES

**CASES**

*Amchem Prods. v. Windsor*, 521 U.S. 591 (1997)........................................................................ 4, 16

*Baby Neal v. Casey*, 43 F.3d 48 (3d Cir. 1994) ............................................................................. 14

*Blackie v. Barrack*, 524 F.2d 891 (9th Cir. 1975), *cert. denied*, 429 U.S. 816 (1976) ............... 9, 11

*Bogosian v. Gulf Oil Corp.*, 561 F.2d 434 (3d Cir. 1977)................................................................ 18

*Carnegie v. Household Int'l, Inc.*, 376 F.3d 656, (7th Cir. 2004) ..................................................... 24

*Daniel v. Am. Bd. of Emergency Med.*, 269 F. Supp. 2d 159, (W.D.N.Y. 2003) ............................ 19

*Dukes v. Wal-Mart*, 509 F.3d 1168 (9th Cir. 2007),
    *superseding*, 474 F.3d 1214 (9th Cir. 2007) ........................................................................ passim

*Eisen v. Carlisle & Jacquelin*, 417 U.S. 156 (1974) .......................................................................... 9

*Farley v. Baird, Patrick & Co., Inc.* 1992 WL 321632 (S.D.N.Y. 1992) ......................................... 25

*Hanlon v. Chrysler Corp.*, 150 F.3d 1011 (9th Cir. 1998)........................................... 11, 12, 14, 23

*Harrington v. City of Albuquerque*, 222 F.R.D. 505 (D.N.M. 2004) ............................................... 25

*Hawaii v. Standard Oil Co.*, 405 U.S. 251 (1972) .......................................................................... 10

*Hilao v. Estate of Ferdinand Marcos*, 103 F.3d 767 (9th Cir. 1996)............................................... 25

*In re Abbott Labs Norvir Antitrust Litig.*, Case No. 04-1511CW,
    2007 WL 1689899 (N.D. Cal., June 11, 2007).......................................................................... 3

*In re Auction Houses Antitrust Litig.*, 193 F.R.D. 162 (S.D.N.Y. 2000) .................................. 10, 18

*In re Brand Name Prescription Drugs Antitrust Litig.*, Case Nos. 94-897,
    MDL 997, 1994 WL 663590 (N.D. Ill. Nov. 18, 1994) ............................................................ 10

*In re Bulk (Extruded) Graphite Products Antitrust Litig.,* Case No. 02-6030WHW,
    2006 WL 891362 (D.N.J., Apr. 4, 2006)............................................................................ 14, 22

*In re Carbon Black Antitrust Litig.*, Case Nos. 03-10191DPW, MDL 1543, 2005 WL 102966 (D.
    Mass., Jan. 15, 2005)................................................................................................................ 10

*In re Cardizem CD Antitrust Litig.,* 200 F.R.D. 297 ( E.D. Mich. 2001)................................... 18, 19

*In re Chlorine & Caustic Soda Antitrust Litig.*, 116 F.R.D. 622 (E.D. Pa. 1987).......................... 13

*In re Citric Acid Antitrust Litig.*, Case No. 95-1092FMS,
    1996 WL 655791 (N.D. Cal., Oct. 2, 1996) .......................................................................... passim

*In re Disposable Contact Lens Antitrust Litig.*, 170 F.R.D. 524 (M.D. Fla. 1996)........................ 10

*In re Dynamic Random Access Memory (DRAM) Antitrust Litig.*, Case No. 02-1486PJH,
    2006 WL 1530166 (N.D. Cal., June 5, 2006)....................................................................... passim

*In re Flat Glass Antitrust Litig.*, 191 F.R.D. 472 (W.D. Pa. 1999) ............................................ passim

*In re Folding Cartons Antitrust Litig.*, 75 F.R.D. 727 (N.D.Ill. 1977)............................ 19

*In re Industrial Diamonds Antitrust Litig.*, 167 F.R.D. 374 (S.D.N.Y. 1996) .......................... 10, 19

*In re Linerboard Antitrust Litig.*, 203 F.R.D. 197 (E.D. Pa. 2001) ("*Linerboard I*").............. passim

*In re Linerboard Antitrust Litig.*, 305 F.3d 145 (3d Cir. 2002) ("*Linerboard II*").......................... 10

*In re Live Concert Antitrust Litig.*, 247 F.R.D. 98, (C.D. Cal. 2007)................................ 18

*In re Lorazepam & Clorazepate Antitrust Litig.*, 202 F.R.D. 12 (D.D.C. 2001) ...................... 16

*In re Magnetic Audiotape Antitrust Litig.*, Case No. 99-1580LMM,

   2001 WL 619305 (S.D.N.Y., Jun. 6, 2001)................................................ 10

*In re Master Key Antitrust Litig.*, 528 F.2d 5 (2d Cir. 1975) ............................................ 18

*In re Mercedes-Benz Antitrust Litig.*, 213 F.R.D. 180 (D.N.J. 2003) ............................ 16

*In re NASDAQ Market-Makers Antitrust Litig.*, 169 F.R.D. 493 (S.D.N.Y. 1996) ................. passim

*In re Northwest Airlines Corp. Antitrust Litig.*, 208 F.R.D. 174 (E.D. Mich. 2002) ...................... 19

*In re Polypropylene Carpet Antitrust Litig.*, 93 F. Supp. 2d 1348 (N.D. Ga. 2000) ........................ 10

*In re Potash Antitrust Litig.*, 159 F.R.D. 682 (D. Minn. 1995)............................................ 10, 18, 21

*In re Relafen Antitrust Litig.*, 218 F.R.D. 337 (D. Mass. 2003)............................................ 16, 25

*In re Rubber Chemicals Antitrust Litig.*, 232 F.R.D. 346 (N.D. Cal. 2005) ............................ passim

*In re School Asbestos Litig.*, 789 F.2d 996 (3d Cir. 1986) ............................................ 16

*In re Sugar Industry Antitrust Litig.,* 1976 WL 1374 (N.D. Cal., May 21, 1976) .................... 10, 16

*In re Sugar Industry Antitrust Litig.*, 73 F.R.D. 322, 352 (E.D. Pa. 1976) ...................................... 21

*In re Tableware Antitrust Litig.*, 241 F.R.D. 644 (N.D. Cal. 2007)........................................ 3, 4, 10

*In re Visa Check/Master Money Antitrust Litig.*, 280 F.3d 124 (2d Cir. 2001) .............................. 10

*In re Vitamins Antitrust Litig.*, 209 F.R.D. 251 (D.D.C. 2002)................................ 10, 12, 13, 22

*Lozano v. AT&T Wireless Servs., Inc.*, 504 F.3d 718 (9th Cir. 2007)............................ 14

*Northwestern Fruit Co. v. A. Levy & J. Zentner Co.*, 116 F.R.D. 384 (E.D. Cal. 1986) ................ 11

*Oregon Laborers-Employers Health & Welfare Trust Fund v. Philip Morris, Inc.*,

   188 F.R.D. 365 (D. Ore. 1998)................................................ 11, 13, 15

*Perma Life Mufflers v. Int'l Parts Corp.*, 392 U.S. 134 (1968),

   overruled on other grounds by *Copperweld Corp. v. Indep. Tube Corp.*,

   467 U.S. 752 (1984) ................................................ 10

*Pillsbury Co. v. Conboy*, 459 U.S. 248 (1983)................................................ 10

*Reiter v. Sonotone Corp.*, 442 U.S. 330 (1979)................................................ 10

*Rossi v. Standard Roofing*, 156 F.3d 452 (3d Cir. 1998) ................................................ 21

iv

*Thomas & Thomas Rodmakers, Inc. et al. v. Newport Adhesives and Composites, Inc. et al.,*
    209 F.R.D. 159 (C.D. Cal. 2002) ................................................................. 21

**STATUTES**

15 U.S.C. § 15 ..................................................................................................... 2

15 U.S.C. § 26 ..................................................................................................... 2

**RULES**

Fed. R. Civ. P 23 ........................................................................................... passim

Fed. R. Civ. P. 23(a) .............................................................................. 3, 4, 8, 9

Fed. R. Civ. P. 23(a)(1) ........................................................................... 4, 10, 11

Fed. R. Civ. P. 23(a)(2) ............................................................................. 3, 11, 12

Fed. R. Civ. P. 23(a)(3) ........................................................................... 4, 12, 14

Fed. R. Civ. P. 23(a)(4) ................................................................................. 4, 14

Fed. R. Civ. P. 23(b) ..................................................................................... passim

Fed. R. Civ. P. 23(b)(3) ................................................................................. passim

Fed. R. Civ. P. 23(c)(1)(B) ................................................................................. 25

Fed. R. Civ. P. 23(g) ........................................................................................... 25

Fed. R. Civ. P. 23(g)(1)(C) ................................................................................. 25

**TREATISES**

6 Alba Conte & Herbert B. Newberg, *Newberg On Class Actions* (4th ed. 2002) ............... 11, 12, 17

1    **NOTICE OF MOTION AND MOTION**

2    **TO THE PARTIES AND THEIR ATTORNEYS OF RECORD,**

3    **PLEASE TAKE NOTICE** that on September 18, 2008, at 2:00 p.m., before the Honorable

4    Claudia Wilken, in the above-entitled Court, Direct Purchaser Plaintiff Westell Technologies Inc.

5    ("Plaintiff") will and does hereby move this Court, pursuant to Federal Rule of Civil Procedure 23

6    ("Rule 23"), for an Order certifying a plaintiff class (the "Class") defined as follows:

7    > All persons and entities who, during the period November 1, 1996
>    through December 31, 2005, purchased: (1) "fast" SRAM in the

8    > United States directly from Defendants or any subsidiaries or
>    affiliates thereof; or, (2) "slow" SRAM in the United States directly

9    > from Defendants or any subsidiaries or affiliates thereof. Excluded
>    from the Class are Defendants, their parent companies, subsidiaries

10   > and affiliates, any co-conspirators, and all governmental entities.

11   This motion is based upon this Notice, Motion and Memorandum of Points and Authorities,

12   the Expert Report of Roger G. Noll, the Declaration of Joseph W. Cotchett, all exhibits and

13   appendices to such documents, the pleadings and other documents on file in this case, and all other

14   argument that may be presented to this Court.[1]

15   **STATEMENT OF ISSUES TO BE DECIDED**

16   1.  Whether the proposed class of direct purchasers should be certified under Rule 23; and,

17   2.  Whether interim Lead Counsel should be appointed Lead Counsel for the Class.

18   **MEMORANDUM OF POINTS AND AUTHORITIES**

19   **I.    INTRODUCTION**

20   This is a horizontal price-fixing class action brought by direct purchasers of Static Random

21   Access Memory ("SRAM"), a memory chip used in computers and mobile electronic devices.

22   Defendants are the leading SRAM manufactures who are responsible for billions of dollars of

23   United States SRAM sales during the class period.

24

25

26   ---

[1] Portions of this brief and certain supporting papers contain information that certain Defendants
have designated as "CONFIDENTIAL" OR "HIGHLY CONFIDENTIAL." Therefore, Plaintiff

27   has made this filings under seal, as appropriate, pending the Court's ruling on a motion to seal
under Local Rule 79-5. The portions herein subject to the motion to seal are **REDACTED**

28   ----
1

1        Plaintiff[2] alleges that Defendants[3] violated Section 1 of the Sherman Act by combining and

2    conspiring to artificially raise, fix, maintain, and stabilize the price of SRAM from November 1,

3    1996 through December 31, 2005 (the "Class Period").  (Consolidated Class Action Complaint

4    (Docket No. 286, hereinafter "Complaint," cited as "DPC") ¶¶ 1-14, 58, 75-174, 175-181.)

5    Defendants furthered their conspiracy by the following means:  agreeing to set SRAM prices and

6    directly coordinating SRAM pricing (DPC ¶¶ 11, 76, 80, 85, 101); directly exchanging recent and

7    future SRAM prices (DPC ¶¶ 5, 8, 10, 11, 76, 85, 92, 100, 101, 104); directly exchanging other

8    "highly confidential" SRAM pricing and production plans (DPC ¶¶ 11-12, 93-96, 102); policing

9    each others' SRAM pricing practices (DPC ¶¶ 8, 76, 100); and, seeking to control the supply of

10    SRAM (DPC ¶ 8, 94-98, 102).  Additionally, several Defendants and/or their key employees who

11    had responsibility for SRAM sales entered criminal guilty pleas or were amnesty applicants in

12    connection with a conspiracy to price-fix dynamic random access memory (DRAM) – a related

13    memory product.  (DPC ¶¶ 117-124, 126, 128-129).

14        Named Plaintiff and all members of the class are direct purchasers of SRAM.  (DPC ¶ 21.)

15    Plaintiff seeks injunctive relief and treble damages pursuant to Sections 4 and 16 of the Clayton

16    Act, 15 U.S.C. §§ 15 and 26.  (DPC, Prayer for Relief ¶¶ C-D.)

17        Plaintiff requests that this Court certify a class of direct purchasers of SRAM and appoint

18    class counsel pursuant to Rule 23.  The proposed class is defined as follows:

19
20
21

> All persons and entities who, during the period November 1, 1996
> through December 31, 2005, purchased: (1) "fast" SRAM in the
> United States directly from Defendants or any subsidiaries or
> affiliates thereof; or, (2) "slow" SRAM in the United States directly

22    [2] The Complaint named three plaintiffs.  Lead Counsel has determined that one plaintiff, Westell

23    Technologies Inc., is the most appropriate class representative.
[3] Cypress Semiconductor, Inc. ("Cypress"); Etron Technology, Inc., Etron Technology America,

24    Inc. (collectively "Etron"); Hitachi, Ltd., Hitachi America, Ltd. (collectively "Hitachi"); Hynix
Semiconductor, Inc., Hynix Semiconductor America, Inc. (collectively "Hynix"); Integrated

25    Silicon Solution, Inc. ("ISSI"); Micron Technology, Inc., Micron Semiconductor Products, Inc.
(collectively "Micron"); Mitsubishi Electric Corporation, Mitsubishi Electric & Electronics USA,

26    Inc. (collectively "Mitsubishi"); NEC Electronics Corporation, NEC Electronics America, Inc.
(collectively "NEC"); Renesas Technology Corporation, Renesas Technology America, Inc.

27    (collectively "Renesas"); Samsung Electronics Company Ltd., Samsung Electronics America,
Samsung Semiconductor, Inc. (collectively "Samsung"); Toshiba Corporation, Toshiba America,

28    Inc., Toshiba America Electronic Components, Inc. (collectively "Toshiba").  (DPC ¶¶ 22-55.)

from Defendants or any subsidiaries or affiliates thereof. Excluded from the Class are Defendants, their parent companies, subsidiaries and affiliates, any co-conspirators, and all governmental entities.[4]

Issues regarding conspiracy and injury in horizontal price-fixing cases brought by direct purchaser are overwhelmingly common. In fact, the dominant judicial view favors class certification in antitrust cases where plaintiffs seek to recover conspiratorial overcharges. Indeed, it is well-established that price-fixing actions like this one are appropriate for class certification. *See, e.g., In re Abbott Labs Norvir Antitrust Litig.*, Case No. 04-1511CW, 2007 WL 1689899 (N.D. Cal., June 11, 2007); *In re Tableware Antitrust Litig.*, 241 F.R.D. 644 (N.D. Cal. 2007); *In re Rubber Chemicals Antitrust Litig.*, 232 F.R.D. 346 (N.D. Cal. 2005); *In re Citric Acid Antitrust Litig.*, Case No. 95-1092FMS, 1996 WL 655791 (N.D. Cal., Oct. 2, 1996).

As Judge Hamilton observed in the DRAM price-fixing case – a case that included several of the same Defendants now before this Court:

> [I]t has long been recognized that class actions play an important role in the private enforcement of antitrust laws. Accordingly, when courts are in doubt as to whether certification is warranted, courts tend to favor class certification.

*In re Dynamic Random Access Memory (DRAM) Antitrust Litig.*, Case No. 02-1486PJH, 2006 WL 1530166, at *3 (N.D. Cal., June 5, 2006) (internal citations omitted).

This action readily satisfies the requirements for class certification under Rule 23. The requirements of Rule 23(a)(2) and Rule 23(b)(3) – common questions of law and fact that predominate over individual issues – are readily met because Plaintiff will use class-wide evidence

---

[4] As set forth in the Complaint (DPC ¶ 18), "As used herein, the term SRAM includes all types of static random access memory sold during the Class Period. For purposes of this Complaint, SRAM excludes all types of DRAM sold during the Class Period, including SDRAM." In this definition of SRAM, Plaintiff includes PSRAM (or pseudoSRAM), a hybrid memory chip that includes a DRAM core and an SRAM interface. (Noll at ¶¶ 17, 57.)

**REDACTED**

Direct purchasers of PSRAM are (and should be) part of the Class. Plaintiff, however, anticipates that Defendants will challenge the inclusion of such purchasers in the Class. Therefore, to the extent this Court believes that the Complaint should further reflect the inclusion of such purchasers in the Class, Plaintiff respectfully requests leave to make such an amendment. This motion for class certification is drafted to include direct purchasers of PSRAM.

3

1   to prove that Defendants conspired to fix the prices of SRAM and that class members were

2   overcharged as a result of that conspiracy.  The central issues of liability (i.e. existence of the

3   conspiracy), impact, and damages will be proven through common evidence.  That common

4   evidence would not differ if this action were brought by a single plaintiff or several plaintiffs, so

5   common issues will predominate over any individual issues. *See Rubber Chemicals,* 232 F.R.D. at

6   351. ("Courts have stressed that price-fixing cases are appropriate for class certification.");

7   *Amchem Prods. v. Windsor*, 521 U.S. 591, 625 (1997) ("Predominance [of common issues] is a test

8   readily met in certain cases alleging … violations of the antitrust laws.").

9          Especially in the context of a class action based on allegations of conspiracy, class

10   certification is proper when there exist means to prove impact on a common, class-wide basis. *See*

11   *DRAM*, 2006 WL 1530166, at *8; *Tableware*, 241 F.R.D. at 652; *Rubber Chemicals*, 232 F.R.D. at

12   353.  Here, as fully set forth in the Expert Report of Roger Noll[5] ("Noll"), the issues of impact and

13   damages to be proved at trial will use the same economic methods regardless of whether the action

14   is pursued by a single plaintiff, several plaintiffs, or the entire Class.  (Noll ¶¶ 9-11).

15          The remaining requirements under Rule 23 – numerosity (Rule 23(a)(1)), typicality (Rule

16   23(a)(3)), adequacy of representation (Rule 23(a)(4)), superiority of proceeding by class action

17   (Rule 23(b)(3)) – are also satisfied.

18          This action is ideal for class treatment.  There are no significant aspects of this case that

19   warrant a departure from the standard practice of granting class certification in a horizontal price-

20   fixing case. *DRAM*, 2006 WL 1530166, at *11.  Indeed, without a certified class action there is no

21   practical and feasible way to vindicate the rights of the hundreds, if not thousands, of class

22   members who directly purchased SRAM in the United States during the Class Period.

23

24

25   [5] Dr. Noll is a professor of economics at Stanford University, where he also serves as Director of
     the Stanford Center for International Development.  He has acted as an expert witness in numerous

26   antitrust and high-technology cases, including the *DRAM* antitrust case and three cases involving
     Microsoft.  He has also served as a consultant to the Antitrust Division of the U.S. Department of

27   Justice, the Federal Trade Commission, and the Senate Subcommittee on Antitrust and Monopoly.
     Professor Noll's *curriculum vitae* is attached as Appendix A to his report.

28                                                                                    4

## II.   FACTUAL BACKGROUND

### A.   The SRAM Industry

#### 1.   SRAM – Categories and Uses

SRAM is a type of volatile semiconductor memory chip that retains its contents as long as power remains applied. SRAM is a higher performance memory than DRAM and is used in a variety of applications, including servers, hard drives, mobile wireless technology, modems, game consoles, and high-speed data caching. (DPC ¶ 18.) SRAM chips do contain certain differences, including: (1) the time required to transfer information from the SRAM chip to the microprocessor – SRAM chips are thus categorized as "fast" or "slow;" (2) the specific technological distinctions in SRAM chips due to advancements in technology during the Class Period; and, (3) the particular features of SRAM chips, such as the memory capacity (e.g. 256K vs. 512K). (Noll ¶¶ 18a-19.) For present purposes, however, SRAM consists of two categories – "fast" and "slow" SRAM – "The differences among standard SRAM products within either the fast or slow category do not create the type of product differentiation that undermines the commonality of the economic evidence regarding liability and damages." (Noll ¶ 20; *see also* DPC ¶ 70.)[6]

At the beginning of the Class Period, "fast" SRAM, which consumes a relatively high amount of power, was used primarily as a form of "cache memory" in computers, and currently several high-end computer products (e.g. work stations and Internet routers) still use "fast" SRAM. (Noll ¶ 53.) Increasingly during the Class Period "slow" SRAM, which consumes a relatively low amount of power, was used in mobile electronic devices, such as cell phones. (Noll ¶ 54.) "The divergent needs of computers and mobile telephones have led to two distinct product categories: SRAM for computers (typically called fast or high power) and SRAM for mobile phones and other hand-held devices that contain a microprocessor (typically called slow or low power)." (Noll ¶ 55.) Significantly, however, all standard SRAM within those two categories are commodity

---

[6] Custom SRAM (i.e. SRAM that is designed and produced for use in a particular product (sometimes with the SRAM manufacturer assisting in the R&D to design the SRAM) *and* that requires no more than minimal changes to already-existing, mass-produced SRAM), may not be proper for class action treatment, but also likely constitutes only a small portion of SRAM sales during the Class Period. (*See* Noll ¶¶ 17, 26.)

1  products and perform the same key functions for the computer, cell phone, or other electronic

2  device. (DPC ¶ 70 ("SRAMs have long been a standard, commodity-type product, filling memory

3  needs of applications ranging from computer electronics to supercomputers. SRAM is designed to

4  fill two needs: (1) to provide a direct interface with the CPU (central processing unit) at speeds not

5  attainable by DRAMs; and, (2) to replace DRAMs in systems that require very low battery

6  consumption."); *see also* Noll ¶ 20.)

7  **2.  SRAM is a commodity**

8

9  REDACTED

10

11  (Noll ¶ 63 and documents cited therein).

12

13

14  REDACTED

15

16

17  **3.  The SRAM Market – Defendants' Significant Market Power, Low Price Elasticity, and High Barriers to Entry**

18  Several SRAM market factors bear on Defendants' ability to implement an effective price-

19  fixing conspiracy.  REDACTED

20

21

22  (Noll ¶¶ 35-37, Table 1; *see also* Noll ¶ 37)

23  Second, because an SRAM chip is

24  typically only a small fraction of the total cost of a finished product containing SRAM, there is low

25  elasticity of demand; i.e. purchasers of SRAM are unlikely to significantly reduce their volume of

26  purchases of SRAM even in the face of price increases. (Noll ¶ 42.) Third, the substantial fixed

27

28

1    operating costs (billions of dollars) and the significant applied technical knowledge necessary to

2    manufacture SRAM create high barriers to entry to the SRAM market.  (Noll ¶¶ 38-41.)

3         **4.**      **SRAM Customers and Contract Sales**

4

5

6                         REDACTED

7

8        (Noll ¶¶ 48-50, Exhibit 3.)

9

10                        REDACTED

11

12               (Noll ¶¶ 44-47, Exhibit 1.)

13         **5.**      **SRAM Pricing Moves in Tandem**

14                       REDACTED

15

16        (*see* Noll Exhibit 3.1),

17                      (Noll ¶¶ 63-77, Tables 2a-2b,

18    Exhibit 3.)

19

20                        REDACTED

21

22                      (Noll ¶ 22)

23    **B.**    **Conclusions of Professor Noll – Common Proof of Harm To Competition and Damages**

24        Based on the above, and other matters set forth in his report, Professor Noll concluded that:

25

26           [C]ommon factors affect prices of all standard [SRAM] products.  If the alleged collusion did affect price and thereby harmed consumers, the effect would not be limited to a subset of buyers or sellers within a product type.  Moreover, the evidence that is needed to show that

27

28

1  collusion was effective and thereby harmed consumers is common to
   all members of the class;

2

3  (Noll ¶ 81.)

4  REDACTED

5

6  REDACTED

7

8  (Noll ¶¶ 83-92.)[7]

9

10 **C. Parallels Between the SRAM and the DRAM Markets Favor Class Treatment**

11     The key characteristics of the DRAM market which led Judge Hamilton to certify a class of

12 direct purchasers of DRAM are equally present in the SRAM market. These characteristics,

13 identified by Judge Hamilton in her Order of June 5, 2006, include:

14   • Defendants' combined market shares in excess of 50% – often in excess of 70%;
     • DRAM is a commodity;
15   • Several major channels of distribution, including sales for OEMs and distributors;
     • Contracts to OEMs and distributors that track market prices;
16   • DRAM prices are highly correlated, meaning that "...the resulting effect of the
       conspiracy on all prices paid for DRAM would be common to all class members.";
17   • There are many different types of DRAM, and DRAM is sold through various sales
       channels, but the claims of the class are typical "...despite the differences in
18     DRAM, customer categories ... and sales channels." *DRAM,* 2006 WL 1530166.

19 **III.   ARGUMENT**

20 **A.   Legal Standard – Class Certification Under Rule 23**

21     Rule 23 provides that a court should certify an action as a class action when, as here,

22 plaintiffs satisfy the four prerequisites of Rule 23(a), and one of the criteria set forth in Rule 23(b).

23 Rule 23(a) provides that a class may be certified if:

24   (1)   the class is so numerous that joinder of all members is
             impracticable;
25
     (2)   there are questions of law or fact common to the class;
26

27 ────────────────
   [7] Professor Noll also discusses other accepted methods to calculate damages, but concludes that a
   "before-after" method is the most appropriate. (Noll ¶¶ 93-105.)

28 ────────────────
                                        8
   DIRECT PURCHASER PLAINTIFFS' NOTICE, MOTION & MPA ISO CLASS CERTIFICATION
   Case No. M:07-cv-1819 CW; MDL No. 1819

    (3)    the claims or defenses of the representative parties are typical of the claims or defenses of the class; and

    (4)    the representative parties will fairly and adequately protect the interests of the class.

Fed. R. Civ. P. 23(a).

Rule 23(b), in turn, provides that a class may be certified if:

the court finds that the questions of law or fact common to the members of the class predominate over any questions affecting only individual members, and that a class action is superior to other available methods for the fair and efficient adjudication of the controversy.

Fed. R. Civ. P. 23(b)(3).

At the class certification stage, the District Court's role is not to decide the merits, but rather to only make a determination of whether the requirements of Rule 23 have been met. *Eisen v. Carlisle & Jacquelin*, 417 U.S. 156, 177-78 (1974); *Blackie v. Barrack*, 524 F.2d 891, 901 (9th Cir. 1975), *cert. denied*, 429 U.S. 816 (1976).  In particular, the validity of an expert's ultimate conclusions is not to be resolved on a class certification motion, but should instead await the "merits stage of the litigation." *Dukes v. Wal-Mart*, 509 F.3d 1168, 1179 (9th Cir. 2007), *superseding*, 474 F.3d 1214 (9th Cir. 2007).  In other words, the District Court cannot "weigh in on the merits of plaintiffs' substantive arguments, and must avoid engaging in a battle of expert testimony." *DRAM*, 2006 WL 1530166, at *9.

Additionally, while this Court must accept as true the factual allegations stated in the Complaint (*see Blackie*, 524 F.2d at 901 n.17; *DRAM*, 2006 WL 1530166, at *3; *Rubber Chemicals*, 232 F.R.D. at 350), it may consider matters beyond the pleadings to ascertain whether Plaintiff's claims are susceptible to resolution on a class-wide basis. *See Blackie*, 524 F.2d at 901 n.17; *DRAM*, 2006 WL 1530166, at *3.

**B.**    **Class Certification is Especially Appropriate in Horizontal Price-Fixing Cases**

Well-established public policy and case law make it particularly appropriate to certify a class when, as here, direct purchasers allege they have been injured in the form of price overcharges resulting from a horizontal price-fixing conspiracy among competitors.  The Supreme

9

1    Court has long recognized that private antitrust actions, in general, are the most critical component

2    of antitrust enforcement, and that class actions, in particular, are an especially important tool in the

3    arsenal of antitrust enforcement. *See Perma Life Mufflers v. Int'l Parts Corp.*, 392 U.S. 134, 139

4    (1968), *overruled on other grounds by Copperweld Corp. v. Indep. Tube Corp.*, 467 U.S. 752

5    (1984); *Pillsbury Co. v. Conboy*, 459 U.S. 248, 262-63 (1983); *Hawaii v. Standard Oil Co.*, 405

6    U.S. 251, 266 (1972); *Reiter v. Sonotone Corp.*, 442 U.S. 330, 344 (1979); *Rubber Chemicals*, 232

7    F.R.D. at 350; *Citric Acid*, 1996 WL 655791, at *8. Because of the critical role that private class

8    actions play in the enforcement of antitrust laws, courts in this district (and others) regularly certify

9    classes in cases involving allegations of anticompetitive agreements to artificially inflate prices.

10   The almost identical DRAM price-fixing case is illustrative. *See DRAM*, 2006 WL 1530166. *See*

11   *also Tableware*, 241 F.R.D. 644; *Rubber Chemicals*, 232 F.R.D. 346; *Citric Acid*, 1996 WL

12   655791.[8]

13        **C.    The Requirements of Rule 23(a) Are Satisfied**

14        **1.    The Class Is Sufficiently Numerous (Rule 23(a)(1))**

15        The first requirement for class certification under Rule 23 is that the class be "so numerous

16   that joinder of all members is impracticable." Fed. R. Civ. P. 23(a)(1). To satisfy this requirement,

17   plaintiffs do not need to allege the precise number of class members, nor do plaintiffs need to

18   provide the identities of the class members; instead, a finding of numerosity need only be

19   supported by "common sense assumptions." *Rubber Chemicals,* 232 F.R.D. at 346; *In re Sugar*

20   *Industry Antitrust Litig.,* 1976 WL 1374, at *12 (N.D. Cal., May 21, 1976); *Citric Acid,* 1996 WL

21   _____

22   [8] *See also In re Linerboard Antitrust Litig.*, 305 F.3d 145 (3d Cir. 2002) ("*Linerboard II*"),
     *aff'g In re Linerboard Antitrust Litig.*, 203 F.R.D. 197 (E.D. Pa. 2001) ("*Linerboard I*"); *In re*

23   *Visa Check/Master Money Antitrust Litig.*, 280 F.3d 124 (2d Cir. 2001); *In re Carbon Black*
     *Antitrust Litig.*, Case Nos. 03-10191DPW, MDL 1543, 2005 WL 102966 (D. Mass., Jan. 15, 2005);

24   *In re Vitamins Antitrust Litig.*, 209 F.R.D. 251 (D.D.C. 2002); *In re Magnetic Audiotape Antitrust*
     *Litig.*, Case No. 99-1580LMM, 2001 WL 619305 (S.D.N.Y., Jun. 6, 2001); *In re Auction Houses*

25   *Antitrust Litig.*, 193 F.R.D. 162 (S.D.N.Y. 2000); *In re Polypropylene Carpet Antitrust Litig.*, 93 F.
     Supp. 2d 1348 (N.D. Ga. 2000); *In re Flat Glass Antitrust Litig.*, 191 F.R.D. 472 (W.D. Pa. 1999);

26   *In re NASDAQ Market-Makers Antitrust Litig.*, 169 F.R.D. 493 (S.D.N.Y. 1996); *In re Industrial*
     *Diamonds Antitrust Litig.*, 167 F.R.D. 374 (S.D.N.Y. 1996); *In re Disposable Contact Lens*

27   *Antitrust Litig.*, 170 F.R.D. 524 (M.D. Fla. 1996); *In re Potash Antitrust Litig.*, 159 F.R.D. 682 (D.
     Minn. 1995); *In re Brand Name Prescription Drugs Antitrust Litig.*, Case Nos. 94-897, MDL 997,
     1994 WL 663590 (N.D. Ill. Nov. 18, 1994).

28                                                    10

1    655791, at *3.  Courts generally find that the numerosity requirement is met when class members

2    exceed forty.  6 Alba Conte & Herbert B. Newberg, *Newberg On Class Actions* §18:4 (4th ed.

3    2002); *see also Oregon Laborers-Employers Health & Welfare Trust Fund v. Philip Morris, Inc.*,

4    188 F.R.D. 365, 373 (D. Ore. 1998).

5            Here, Defendants' documents and information confirm that there are hundreds, if not

6    thousands, of class members from throughout the United States who purchased SRAM from

7    Defendants.  (Cotchett Decl. ¶ 4.)

8            Therefore, the proposed Class easily meets Rule 23(a)(1)'s numerosity requirement.

9            **2.        The Case Involves Common Questions of Law and Fact (Rule 23(a)(2))**

10           The second requirement for class certification under Rule 23 is that "there are questions of

11   law or fact common to the class."  Fed. R. Civ. P. 23(a)(2).  In this Circuit, the commonality

12   requirement is construed "permissively," so that the existence of common facts *or* even common

13   legal remedies may alone suffice. *Dukes*, 509 F.3d at 1177 (quoting *Hanlon v. Chrysler Corp.*, 150

14   F.3d 1011, 1019 (9th Cir. 1998); *see also id.* ("the commonality test is qualitative rather than

15   quantitative;" "one significant issue common to the class may be sufficient to warrant

16   certification.").  Other courts have approached the commonality test by asking if "the class is

17   united by a common interest in determining whether a defendant's course of conduct is in its broad

18   outlines actionable." *Blackie*, 524 F.2d at 902.

19           In horizontal price-fixing cases, such as that alleged here (and in *DRAM*), courts have

20   consistently answered that question in the affirmative.  "Courts have consistently held that the very

21   nature of a conspiracy antitrust action compels a finding that common questions of fact and law

22   exist." *DRAM*, 2006 WL 1530166, at *3-4 (quoting *Rubber Chemicals*, 232 F.R.D. at 351); *see

23   also Oregon Laborers-Employers*, 188 F.R.D. at 373 ("[w]hen the party opposing the class has

24   engaged in some course of conduct that affects a group of persons and gives rise to a cause of

25   action, one or more of the elements of that cause of action will be common to all of the persons

26   affected") (internal citations omitted); *Northwestern Fruit Co.*, 116 F.R.D. 384, 386 ("In the

27   absence of class certification, . . . each individual Plaintiff would have to prove the same

28

1    conspiracy, and would necessarily resort to the same evidence to do so"). As the leading class

2    action treatise explains: "In an antitrust action on behalf of purchasers who have bought the

3    defendants' products at prices that have been maintained above competitive levels by unlawful

4    conduct, the courts have held that the existence of an alleged conspiracy or monopoly is a common

5    issue that will satisfy the Rule 23(a)(2) prerequisite." *Newberg on Class Actions*, § 3:10 at 278.

6         Here, there are numerous questions of law and fact common to the class which is at the

7    heart of this case. They include:

8            (1) Whether Defendants engaged in a contract, combination, and/or
     conspiracy to fix, raise, maintain, or stabilize prices of SRAM sold in
9            the United States;

10           (2) Whether the conspiracy violated Section 1 of the Sherman Act;

             (3) What was the duration of the conspiracy;
11
             (4) Whether Defendants' conduct caused the prices of SRAM sold in
12           the United States to be at artificially high and noncompetitive levels;

             (5) Whether class members were injured by Defendants' conduct,
13           and, if so, the appropriate class-wide measure of damages for class
             members; and,
14
             (6) Whether class members are entitled to injunctive (or other
15           equitable) relief.

          These questions constitute a common core that focuses on the central issue of the existence
16
     and effect of Defendants' alleged SRAM price-fixing, and thus satisfies Rule 23(a)(2). *See DRAM*,
17
     2006 WL 1530166, at *3-4; *Flat Glass*, 191 F.R.D. at 479 ("[g]iven plaintiffs' allegation of a § 1
18
     conspiracy, the existence, scope and efficacy of the alleged conspiracy are certainly questions that
19
     are common to all class members.")
20
     **3.     The Named Plaintiff's Claims Are Typical of the Claims of the Class (Rule**
21   **        23(a)(3))**

22        The third requirement for class certification under Rule 23 is that "the claims or defenses of

23   the representative parties [be] typical of the claims or defenses of the class." Fed. R. Civ. P.

24   23(a)(3). Under Rule 23's "'permissive standards,' representative claims are 'typical' if they are

25   reasonably coextensive with those of absent class members; they need not be substantially

26   identical." *Dukes*, 509 F.3d at 1184 (quoting *Hanlon*, 150 F.3d at 1220); *see also Vitamins*, 209

27   F.R.D. at 261 ("typicality requirement does not mandate that products purchased, methods of

28

1   purchase, or even damages of the named plaintiffs must be the same as those of the absent class

2   members"). Indeed, all that is needed to meet the typicality requirement is that "each class

3   member's claim arises from the same course of events that led to the claims of the representatives."

4   *Id.* at 260. (quotation omitted); *see also Oregon Laborers-Employers*, 188 F.R.D. at 373-74

5   ("Typicality determines whether a sufficient relationship exists between the injury to the named

6   Plaintiff and the conduct affecting the class, so that the court may properly attribute a collective

7   nature to the challenged conduct.") (internal quotations and citations omitted).

8       As with commonality, courts have generally found the typicality requirement to be satisfied

9   in cases involving horizontal price-fixing conspiracies. As explained in *In re Chlorine & Caustic*

10  *Soda Antitrust Litig.*:

> Plaintiffs seek to recover treble damages from defendants measured
> by the alleged overcharge resulting from defendants' conspiracy to
> fix prices. In order to prevail on the merits in this case the plaintiffs
> will have to prove the same major elements that the absent members
> of the class would have to prove. Those elements are a conspiracy,
> its effectuation and resulting damages. As such, the claims of the
> plaintiffs are not antagonistic to and are typical of the claims of the
> other putative class members.

116 F.R.D. 622, 626 (E.D. Pa. 1987); *see also Rubber Chemicals,* 232 F.R.D. at 352; *Citric Acid*,

1996 WL 655791, at *3 ("Because plaintiffs and all class members share these claims and this

theory [defendants' conspiracy to fix prices], the representatives' claims are typical of all").

       Even if the named plaintiffs purchased different products at different prices from other class

members, the typicality requirement is not defeated. In such cases:

> The overarching scheme is the linchpin of plaintiffs' . . . complaint,
> regardless of the product purchased, the market involved or the price
> ultimately paid. Furthermore, the various products purchased and the
> different amount of damage sustained by individual plaintiffs do not
> negate a finding of typicality, provided the cause of those injuries
> arises from a common wrong.

*Flat Glass*, 191 F.R.D. at 480.

       In fact, in *DRAM*, the Court rejected defense arguments to the contrary, as well as defense

arguments that named plaintiffs' claims were not sufficiently typical because of differing customer

types and/or sales channels: "[T]here is substantial legal authority holding in favor of a finding of

13

1    typicality in price fixing conspiracy cases, even where differences exist between plaintiffs and

2    absent class members with respect to pricing, products, and/or methods of purchasing products"

3    2006 WL 1530166, at *5. *See also Lozano v. AT&T Wireless Servs., Inc.*, 504 F.3d 718, 734 (9th

4    Cir. 2007) ("not necessary that all class members suffer the same injury as the class

5    representative"); *In re Bulk (Extruded) Graphite Products Antitrust Litig.,* Case No. 02-

6    6030WHW, 2006 WL 891362, at *5 (D.N.J., Apr. 4, 2006) (quoting *Baby Neal v. Casey*, 43 F.3d

7    48, 55 (3d Cir. 1994) ("A finding of typicality will generally not be precluded even if there are

8    'pronounced factual differences' where there is a strong similarity of legal theories.").

9         Named Plaintiff here is a direct purchaser of SRAM who alleges a conspiracy among

10   Defendants to fix, raise, maintain and stabilize the price of SRAM. (DPC ¶ 21.)  Plaintiff's claims

11   are based on the same legal theories that would be brought by absent class members.  The named

12   Plaintiff will also have to prove the same elements that absent members would have to prove (i.e.

13   the existence, duration, and actual impact of the price-fixing conspiracy).  Just as in *Flat Glass*

14   (and *DRAM*), the same price-fixing scheme that is the "lynchpin" of the named Plaintiff's claim,

15   would also be the "lynchpin" to the absent class members' claims.  Thus, Rule 23(a)(3)'s typicality

16   requirement is met.

17        **4.      The Named Plaintiff Will Fairly and Adequately Represent the Class (Rule
                 23(a)(4))**

18
19        The fourth requirement for class certification under Rule 23 is that the named plaintiffs

20   "fairly and adequately protect the interests of the class."  Fed. R. Civ. P. 23(a)(4).  To satisfy this

21   requirement, the named plaintiffs must:  (1) not have interests which are antagonistic to or in

22   conflict with the interests of the class; and, (2) be represented by counsel who are able to

23   vigorously prosecute the interests of the class. *Hanlon*, 150 F.3d at 1020.

24        Here, there are no actual or potential conflicts of interest between the named Plaintiff and

25   the class members.   Plaintiff, like each class member, is a direct purchaser of SRAM (DPC ¶¶ 21,

26   58) who was overcharged as a result of Defendants' price-fixing conspiracy, and has a mutual

27   interest in establishing Defendants' liability and recovering damages (DPC ¶¶ 1-4). The very nature

28

14

of the allegations against Defendants is such that the alleged injuries to both the named Plaintiff and the class members were incurred in the same manner.  The named Plaintiff, therefore, seeks relief that is substantially identical to the relief that would be sought by all class members.  The interests of the named Plaintiff and the class members in recovering the overcharges are, therefore, both aligned and non-antagonistic.

Finally, the named Plaintiff has retained highly capable and well-recognized counsel with extensive experience in antitrust cases.  Counsel have successfully prosecuted numerous antitrust class actions on behalf of injured purchasers throughout the United States.  Indeed, interim lead counsel and counsel who are members of the steering committee here were intimately involved in the direct purchaser DRAM case, as either lead counsel or as a member of the steering and/or discovery committee.  Settlements with every defendant in the direct purchaser DRAM case were reached, in a total amount of $217 million.  Cotchett Decl. ¶ 3.  Counsel are capable of, and committed to, prosecuting this action vigorously on behalf of the class.[9]

The named Plaintiff, therefore, satisfies the requirements of Rule 23(a)(4).

### D.   The Class Satisfies the Requirements of Rule 23(b)(3)

After a court determines that a proposed class satisfies the requirements of Rule 23(a), class certification is proper if, under Rule 23(b)(3), the court further finds that:  (1) "the questions of law or fact common to the members of the class predominate over any questions affecting only individual members;" and, (2) "a class action is superior to other available methods for the fair and efficient adjudication of the controversy."  Fed. R. Civ. P. 23(b)(3).  "Judicial economy and fairness are the focus of the predominance and superiority requirements."  *Oregon Laborers-Employers*, 188 F.R.D. at 375.

---

[9] Interim Lead Counsel (as well as counsel who serve on the Steering Committee) submitted declarations attesting to their qualifications and experience in connection with the motions to appoint interim lead counsel.  (Case No. 4:06-cv-06511-CW, Docket Nos. 25-27, 31, 33)  If the court so wishes, Counsel can submit further information as to their ability to effectively prosecute this action.

1          **1.      Common Questions of Law and Fact Predominate Over Individual Questions**

2          The predominance requirement is "readily met" when all of the class members' claims are

3    based on a common scheme of anticompetitive conduct. *See Amchem*, 521 U.S. at 625

4    ("predominance is a test readily met in certain cases alleging ... violations of the antitrust laws").

5    In the particular context of a horizontal price-fixing conspiracy, such as that alleged here, the

6    overwhelming weight of authority is that the predominance requirement is easily satisfied. *DRAM*,

7    2006 WL 1530166, at *7; *Rubber Chemicals*, 232 F.R.D. at 352; *In re Lorazepam & Clorazepate*

8    *Antitrust Litig.*, 202 F.R.D. 12, 29 (D.D.C. 2001) ("Antitrust actions involving common question[s]

9    of liability for ... price-fixing have frequently been held to predominate for the preliminary stage

10   of class certification."); *see also Flat Glass*, 191 F.R.D. at 484 (evidence about conspiracy is

11   common to all members of the class); *NASDAQ*, 169 F.R.D. at 518 ("Since a single conspiracy is

12   alleged, the relevant proof of this will not vary among class members and clearly presents a

13   common question fundamental to all class members."). This is due to the recognition that "the

14   focus . . . should be principally on issues of liability." *Sugar Industry*, 1976 WL 1374, at *22;

15   *DRAM*, 2006 WL 1530166, at *7; *Citric Acid*, 1996 WL 655791, at *6.

16         Moreover, plaintiffs are only required to make a threshold showing that at trial common or

17   "generalized proof" will predominate with respect to the key elements of their antitrust claims. *See*

18   *DRAM*, 2006 WL 1530166, at *9; *Linerboard I*, 203 F.R.D. at 214; *In re Mercedes-Benz Antitrust*

19   *Litig.*, 213 F.R.D. 180, 190 (D.N.J. 2003); *In re Relafen Antitrust Litig.*, 218 F.R.D. 337, 344 (D.

20   Mass. 2003). Even when there are individual issues as to certain class members, that fact will not

21   defeat class certification -- the "common issues must only predominate; they do not have to be

22   dispositive of the litigation." *Lorazepam*, 202 F.R.D. at 29; *see also In re School Asbestos Litig.*,

23   789 F.2d 996, 1010 (3d Cir. 1986) (even a few common issues may satisfy predominance

24   requirement if resolution of such issues "will so advance the litigation that they may fairly be said

25   to predominate"); *Flat Glass*, 191 F.R.D. at 484 ("Where many significant questions are common

26   to the class, predominance is satisfied."). Stated otherwise, the predominance standard is met

27

28
                                                   16

1    "unless it is clear that individual issues will overwhelm the common questions and render the class

2    action valueless." *NASDAQ*, 169 F.R.D. at 517.

3                    **a.    Common Liability Issues Predominate**

4               Plaintiff's allegations of Defendants' misconduct are straight-forward and in themselves

5    demonstrate why this action, like most other price-fixing actions, has common issues that

6    predominate among all class members.  The Complaint claims that Defendants' conspiratorial

7    agreement was aimed at fixing the price of SRAM by controlling both price and supply (DPC ¶¶ 1-

8    4), and effected through means including directly exchanging recent and future SRAM prices and

9    other "highly confidential" SRAM pricing and production information, policing each others'

10   SRAM pricing practices, and, controlling the supply of SRAM (DPC ¶¶ 5, 8, 10-12, 76, 85, 92-98,

11   100-02, 104).  Such conduct constituted an unreasonable restraint of trade and violated Section 1 of

12   the Sherman Act. (DPC ¶ 15-16, 175-81.)  The proof of liability for the class claims will, therefore,

13   be common to all members of the Class. In other words, if Defendants' conduct in connection with

14   the pricing of SRAM violated Section 1 as to any class member, that same conduct will have

15   violated Section 1 as to all other class members – no individualized inquiry is necessary.

16               As already noted above, in price fixing cases, the existence of the conspiracy itself is

17   consistently recognized as the overriding common issue.  As Judge Jenkins noted in *Rubber*

18   *Chemicals*, "the great weight of authority suggests that the dominant issues in cases like this are

19   whether the charged conspiracy existed and whether price fixing occurred." 232 F.R.D. at 352

20   (quoting *Citric Acid*, 1996 WL 655791, at *8) (internal quotation marks omitted); *see also*

21   *Newberg on Class Actions*, § 18:28 at 102 ("As a rule, the allegation of a price-fixing conspiracy is

22   sufficient to establish predominance of common questions.").  And in the highly-analogous *DRAM*

23   case, Judge Hamilton explained:  "Common issues predominate in proving an antitrust violation

24   when the focus is on the defendants conduct and not on the conduct of the individual class

25   members." *DRAM*, 2006 WL 1530166, at *7 (internal quotation omitted).

26

27

28
                                                     17

1

        b.    **Common Impact Issues Predominate**

2           At trial, in order to show the impact of the conspiracy (i.e. antitrust injury), Plaintiffs will

3    only need to prove that class members paid more for SRAM than they would have in the absence

4    of Defendants' price-fixing agreement. *See Bogosian v. Gulf Oil Corp.*, 561 F.2d 434, 455 (3d Cir.

5    1977) (antitrust plaintiff "could prove fact of damage [impact] simply by proving that the free

6    market prices would be lower than the prices paid and that he made some purchases at the higher

7    price") (emphasis added); *In re Master Key Antitrust Litig.*, 528 F.2d 5, 12 n.11 (2d Cir. 1975) ("If

8    the appellees establish … that the defendants engaged in an unlawful national conspiracy which

9    had the effect of stabilizing prices above competitive levels, and further establish that the appellees

10   were consumers of that product, we would think that the jury could reasonably conclude that

11   appellants' conduct caused injury to each appellee.").

12          On a motion for class certification, however, named plaintiffs are not required to prove that

13   class members actually suffered antitrust impact from the pricing conspiracy.  Rather, there is a

14   presumption of common impact and plaintiffs are only required to provide a "seemingly realistic"

15   methodology to show the impact on a class-wide basis. *See DRAM*, 2006 WL 1530166, at *8;

16   *Rubber Chemicals*, 232 F.R.D. at 353 (quoting *Potash*, 159 F.R.D. at 695) ("[B]ecause the

17   gravamen of a price-fixing claim is that the price in a given market is artificially high, there is a

18   presumption that an illegal price-fixing scheme impacts upon all purchasers of a price-fixed

19   product in a conspiratorially affected market."); *In re Auction Houses Antitrust Litigation*, 193

20   F.R.D. 162, 166 (S.D.N.Y. 2000) ("[p]rice fixing conspiracies, at least to the extent they succeed in

21   fixing prices, almost invariably injure everyone who purchases the relevant goods or services."); *In*

22   *re Live Concert Antitrust Litig.*, 247 F.R.D. 98, 144-47 (C.D. Cal. 2007) ; *Linerboard I*, 203 F.R.D.

23   at 220; *Cardizem*, 200 F.R.D. at 307; *Citric Acid*, 1996 WL 655791, at *6-8.  Therefore, the named

24   Plaintiff need not make a threshold showing that SRAM prices were actually higher than they

25   should have been – that is a merits issue.

26          At this time, the named Plaintiff is only required to present a method of proof to show

27   antitrust injury that is predominantly common. *See also NASDAQ*, 169 F.R.D. at 523 ("Even if it

28

                                              18

could be shown that some individual class members were not injured, class certification, nevertheless, is appropriate where the antitrust violation has caused widespread injury to the class."); *Cardizem*, 200 F.R.D. at 320-21 (same); *In re Northwest Airlines Corp. Antitrust Litig.*, 208 F.R.D. 174, 225 (E.D. Mich. 2002) ("It is not necessary, at the class certification stage, for Plaintiffs to show that each and every class member could satisfy an individualized standing inquiry.")[10]  In sum, in price-fixing cases such as here, common issues are deemed to predominate with respect to impact (i.e. antitrust injury) if either common evidence or a common methodology exists for demonstrating widespread effect on the class.[11]

Here, although Plaintiff could rely solely on the presumption of common impact, the expert report of Professor Noll further demonstrates that the determination of impact can be proved with evidence and methods that are common to the entire Class.  Questions of impact, whether proven by a single plaintiff or numerous plaintiffs, directly involve an analysis of the entire SRAM market. The key common factors that need to be addressed include:  Defendants' market power (Noll ¶¶ 35-37, Table 1); elasticity of demand (i.e. how much purchasers reduce their volume of purchases in the face of price increases) (Noll at ¶ 42); barriers to entry (Noll at ¶¶ 38-41); categories of direct purchasers; (Noll ¶¶ 48-50, Exhibit 3); and the effect of purchasing contracts (Noll ¶¶ 44-47, Exhibit 1).  Further, actual prices charged for the SRAM products sold during the Class Period (i.e. SRAM sales reflected in Defendants' transactional data), also goes to the issue of impact and the characteristics of the SRAM market (Noll ¶¶ 68-77, Tables 2a-b, Exhibit 3).  In sum, these types of common factors go to the common issue of Defendants' ability to effectively price-fix, and not to the examination of any particular SRAM purchaser.

---

[10] As with issues of typically, courts routinely certify classes notwithstanding defense arguments that the complexity of the market precludes common proof of impact. *See, e.g. DRAM*, 2006 WL 1530166, at *5.  "Contentions of infinite diversity of product, marketing practices, and pricing have been made in numerous cases and rejected." *Citric Acid*, 1996 WL 655791, at *6 (quoting *In re Folding Cartons Antitrust Litig.*, 75 F.R.D. 727, 734 (N.D.Ill. 1977)).

[11] *See also Daniel v. Am. Bd. of Emergency Med.*, 269 F. Supp. 2d 159, 188-89 (W.D.N.Y. 2003) ("Questions regarding class certification should be resolved in favor of and not against the maintenance of class action."); *Industrial Diamonds*, 167 F.R.D. at 378 ("[B]ecause of the important role that class actions play in the private enforcement of the antitrust statutes, courts resolve doubts about whether a class should be created in favor of certification.").

Based on his analysis of information available to date, Professor Noll has concluded that all purchasers within two identifiable subgroups (i.e. purchasers of "fast" SRAM and "slow" SRAM) would have been impacted by Defendants' conspiracy to price-fix SRAM:

> I conclude that predominantly common factors affect prices of all standard products. If the alleged collusion did affect price and thereby harmed consumers, the effect would not be limited to a subset of buyers or sellers within a product type. Moreover, the evidence that is needed to show that collusion was effective and thereby harmed consumers is common to all members of the class.

(Noll ¶ 81.) Professor Noll's conclusion is based on, among other things:

**REDACTED** (Noll ¶¶ 35-37, Table 1); a low elasticity of demand for SRAM that would prevent a significant decrease in demand even as prices increase (Noll at ¶ 42); high barriers to entry in the SRAM market (Noll at ¶¶ 38-41); the fact that price discrimination among various categories of direct purchasers (e.g. OEMs and distributors) would undermine the efficacy of the conspiracy; (Noll ¶¶ 48-50, Exhibit 3); and,

(Noll ¶¶ 44-47, Exhibit 1).   REDACTED

REDACTED

(Noll ¶¶ 68-77, Tables 2a-b, Exhibit 3.)   In other words, as the prices to OEMs go up, so do the prices to distributors.

Such correlations provide "an adequate basis from which to conclude that the proof plaintiffs will adduce to establish defendants' conspiracy to fix prices, and the resulting effect of the conspiracy on all prices paid for DRAM would be common to all class members." *DRAM*, 2006 WL 1530166, at *9.

REDACTED

(Noll ¶ 77.)

---

DIRECT PURCHASER PLAINTIFFS' NOTICE, MOTION & MPA ISO CLASS CERTIFICATION
Case No. M:07-cv-1819 CW; MDL No. 1819

1    Professor Noll's analysis presents "seemingly realistic methodologies" to show common

2    impact.  Indeed, such evidence and analysis is exactly the kind of methodology that courts have

3    endorsed as sufficient to satisfy plaintiffs' burden at the class certification stage.  *See, e.g., DRAM*,

4    2006 WL 1530166, at *8-10; *Linerboard I*, 203 F.R.D. at 220.  In short, Plaintiff has demonstrated

5    that there is a method of proving its claim through predominantly class-wide proof, and that is all

6    Rule 23 requires.  *DRAM*, 2006 WL 1530166, at *9 ("Plaintiffs need only advance a plausible

7    method to demonstrate that antitrust injury can be proven on a class-wide basis."); *see also Thomas*

8    *& Thomas Rodmakers, Inc. et al. v. Newport Adhesives and Composites, Inc. et al.,*  209 F.R.D.

9    159, 163 (C.D. Cal. 2002); *Flat Glass*, 191 F.R.D. at 487.

10            **c.     Common Damages Issues Predominate**

11            The actual measure of the damages to the named Plaintiff and class members can also be

12    determined using common, class-wide evidence and methodologies.  On this issue, too, Plaintiff's

13    burden at this stage of the proceedings is "limited."  *DRAM*, 2006 WL 1530166, at *10 (citing

14    *Rubber Chemicals*, 232 F.R.D. at 354; *Potash*, 159 F.R.D. at 697).[12]  As Judge Hamilton explained

15    in *DRAM*:  "Plaintiffs need not supply a 'precise damage formula,' but *must simply offer a*

16    *proposed method for determining damages that is not 'so insubstantial as to amount to no method*

17    *at all.'" Id.*, 2006 WL 1530166, at *10 (quoting *Rubber Chemicals*, 232 F.R.D. at 354; *Potash*, 159

18    F.R.D. at 697)) (emphasis added); *see also Linerboard I*, 203 F.R.D. at 217-19; *NASDAQ*, 169

19    F.R.D. at 522 ("The Court need not decide at this juncture what approach is best suited to the

20    particularities of this case. It is sufficient to note at this stage that there are methodologies

21    available.").

22            Moreover, even if the amount of damages sustained by each class member is an individual

23    issue, the denial of class certification is not warranted – especially when the determination of

24    individual damages can be done by using a largely mechanical computation.  *See DRAM,* 2006 WL

25    1530166, at *9 ("even if some individual issues may arise in calculating damages, this fact alone

26    _____

27    [12] Indeed, even at the merits stage of the case, plaintiffs are still not required to provide a precise
     calculation of antitrust damages. *See Rossi v. Standard Roofing*, 156 F.3d 452, 484 (3d Cir.
     1998); *In re Sugar Industry Antitrust Litig.*, 73 F.R.D. 322, 352 (E.D. Pa. 1976).

28

1    does not defeat class certification") (citing *Bulk Graphite*, 2006 WL 891362, at *15); *Vitamins,* 209

2    F.R.D. at 268 ("Many courts have held that individual issues with respect to the amount of

3    damages incurred by class members will not defeat certification where common issues predominate

4    with respect to the alleged antitrust conspiracy and impact.").  In price-fixing cases in particular,

5    courts have repeatedly rejected defense arguments that individual questions predominate with

6    respect to the measure of damages (or the impact of the conspiracy).  *See Sugar Industry*, 73 F.R.D.

7    at 354 ("If this Court were to adopt defendants' argument and deny [the] class [action] because the

8    computation of damages on . . . an individual basis destroys the 'predominance' requirement of

9    Rule 23 (b)(3), it would be tantamount to encourage wrongdoers to commit great antitrust

10   violations on many consumers in small amounts so as to raise the spectre of unmanageability to

11   defeat a class action."); *see also Rubber Chemicals*, 232 F.R.D. at 352; *Linerboard I,* 203 F.R.D. at

12   217 n.13; *Citric Acid*, 1996 WL 655791, at *6-8.

13           Professor Noll proposes three methodologies to calculate damages on a class-wide basis.

14   (Noll ¶¶ 82-105.)  The first, and preferred, method compares SRAM prices before and after the

15   period of the price-fixing conspiracy.  This before-after method can be used to compare SRAM

16   prices on an industry-wide basis and for specific SRAM products, as well as for the type of direct

17   purchaser (e.g. OEM or distributor).  (Noll ¶¶ 83-92.)  This before-after method also can take into

18   account various factors, other than price-fixing, that impacted SRAM prices, such as changing

19   product demand and concentration of manufactures.  (Noll ¶¶ 84-89.)  In the end, this comparative

20   price analysis would result in a formula for determining the overcharge damages incurred by each

21   class member.  (Noll ¶¶ 90-92.)

22           The second method compares SRAM prices during the class period with prices for

23   comparable products (i.e. memory chips).  (Noll ¶¶ 93-95.)  The existence of DRAM price-fixing

24   during the Class Period, including among several Defendants, makes this method less preferable.

25           The third method uses Defendants' cost data to estimate what competitive prices for SRAM

26   should have been.  (Noll ¶¶ 96-103.)  This method, too, results in a formula that can be applied to

27   each class member.  (Noll ¶ 98-103.)

28
                                              22
        DIRECT PURCHASER PLAINTIFFS' NOTICE, MOTION & MPA ISO CLASS CERTIFICATION
        Case No. M:07-cv-1819 CW; MDL No. 1819

1    These methods – particularly the before-after method -- can be successfully employed to

2    determine class-wide damages and is based on proof common to all class members.  Such common

3    proof would primarily be information about the SRAM market and Defendants' transactional data,

4    not proof related to individual plaintiffs.  (Noll ¶¶ 104-05.)  Therefore, as in *DRAM*, it cannot be

5    said that Professor Noll's proposed methodology to calculate damages on a class-wide basis is "so

6    insubstantial as to amount to no method at all." *Id.*, 2006 WL 1530166, at \*10 (internal quotation

7    marks omitted); *see also Citric Acid*, 1996 WL 655791, at \*7 (upholding before-after approach).[13]

* * *

8    In sum, common questions of law and fact predominate with respect to:  (1) the existence

9    and scope of the alleged conspiracy; (2) the conspiracy's impact on all class members; and, (3)

10   methodologies to prove damages.  Therefore, the "predominance" requirement of Rule 23 (b)(3) is

11   satisfied here.

12

13   **2.   A Class Action Is Superior to Other Available Methods for the Fair and Efficient Adjudication of This Case**

14   In order to deal with the legal and factual issues raised by this case, a class action is far

15   superior to, and more manageable than, any other available procedure.  Each class member has

16   suffered damages in the form of overcharges as a result of Defendants' SRAM price-fixing

17   conspiracy.  It would be a substantial waste of resources to force each class member to prove in

18   separate trials: (1) the nucleus of the alleged misconduct (i.e. the price-fixing conspiracy); (2) the

19   impact of that misconduct (i.e. the effect of the conspiracy on prices); and, (3) the resulting

20   damages (i.e. the amount of the price overcharges).  Additionally, if a class action were not

21   available, some class members would not be able to pursue relief because their individual claims

22   would be too small to justify the high costs of complex litigation. *See Hanlon*, 150 F.3d at 1023

23   (individual claims would "not only unnecessarily burden the judiciary, but would prove

24   uneconomic for potential plaintiffs"); *Carnegie v. Household Int'l, Inc.*, 376 F.3d 656, 661 (7th

25

26

27   [13] It is worth noting that even if class members brought their claims individually, they would still need to use one of the above methods to establish their damages.

28
                                                     23

1    Cir. 2004) ("The *realistic* alternative to a class action is not 17 million individual suits, but zero

2    individual suits, as only a lunatic or a fanatic sues for $30.") (emphasis in original).

3        Further, when class members are purchasers who rely on a small number of defendant

4    manufactures to timely furnish them with products that are essential for them to compete in highly

5    competitive markets, such as the computer and telecommunications market, those class members

6    are often reluctant to bring individual lawsuits directly against such manufactures.  For better or

7    worse, purchasers  who have an ongoing relationship with defendant manufacturers, cannot afford

8    to jeopardize those relationships – in some cases, even if it means foregoing the right to recover for

9    conspiratorial overcharges.  Due to fear of retaliation,  many class members simply will not bring

10   individual actions.

11        Another factor that weighs in favor of a finding of superiority is the fact that the SRAM

12   price-fixing cases were consolidated in MDL proceedings.  As Judge Hamilton observed in the

13   *DRAM* case:

14            given the purpose and function of MDL proceedings, which is to
            streamline the prosecution of cases involving multiple actions and

15            parties, it is inconceivable that allowing a class action to proceed in
            such circumstances would *not* promote manageability . . . . the only

16            difficulties likely to be encountered in this case would result from not
            certifying the class, given the incredible expenditure of time and

17            resources that would result – from both the court's and the parties'
            perspectives – in requiring each class member's action to proceed

18            independently.

19   *Id.*, 2006 WL 1530166, at *11 (emphasis in original)

20        To date, this litigation has proceeded smoothly, no manageability problems have arisen, and

21   there is little reason to believe that manageability issues will arise.  This case certainly presents less

22   case management issues than other actions that have been certified as class actions.  For example,

23   in *Dukes*, the Ninth Circuit affirmed certification of "the largest class certified in history," and

24   specifically rejected defense arguments that Judge Jenkins' two-stage trial plan, with multiple tasks

25   in each stage, rendered the case unmanageable and contrary to due process. *Id.*, 509 F.3d at 1190.

26   In particular, the court held that where "there exists at least one method of managing this large

27   class action that, albeit somewhat imperfect, nonetheless protects the due process rights of all

28

24

DIRECT PURCHASER PLAINTIFFS' NOTICE, MOTION & MPA ISO CLASS CERTIFICATION
Case No. M:07-cv-1819 CW; MDL No. 1819

1  involved parties," there is no manageability-based reason to deny class certification. *Id.* at 1193;

2  *see also Hilao v. Estate of Ferdinand Marcos*, 103 F.3d 767, 782-87 (9th Cir. 1996).

3       In any event, "[c]ourts are generally loath to deny class certification based on speculative

4  problems with case management." *NASDAQ*, 169 F.R.D. at 527; *see also Flat Glass*, 191 F.R.D. at

5  490 ("court is confident that whatever problems may arise … can be satisfactorily resolved");

6  *Relafen*, 231 F.R.D. at 71 ("class action has to be unwieldy indeed before it can be pronounced an

7  inferior alternative").

8       For all of these reasons, the "superiority" requirement of Rule 23(b)(3) is satisfied here.

9  **E.**    **The Court Should Appoint Interim Lead Counsel as Class Counsel**

10       Rule 23(c)(1)(B) states that "[a]n order certifying a class action … must appoint class

11  counsel under Rule 23(g)." Fed. R. Civ. P. 23(c)(1)(B).  Rule 23(g)(1)(C) states that "[i]n

12  appointing class counsel, the court (i) must consider:  [1] the work counsel has done in identifying

13  or investigating potential claims in the action, [2] counsel's experience in handling class actions,

14  other complex litigation, and claims of the type asserted in the action, [3] counsel's knowledge of

15  the applicable law, [4] the resources counsel will commit to representing the class." Fed. R. Civ. P.

16  23(g)(1)(C).

17       Current lead counsel, Cotchett, Pitre & McCarthy ("CPM"), seeks appointment as Class

18  Counsel.  CPM has served as Lead Counsel thus far and, working with counsel that now serve on

19  the steering committee, are willing and able to vigorously prosecute this action and to devote all

20  necessary resources to obtain the best possible result.  The work done to date, including conducting

21  extensive discovery and prevailing against a motion to dismiss, supports the conclusion that they

22  should be appointed as Lead Counsel for the Class. *See, e.g., Harrington v. City of Albuquerque*,

23  222 F.R.D. 505, 520 (D.N.M. 2004).  CPM asserts that it is qualified under Rule 23(g)(1)(C)(i).

24  *See supra*, n. 10; *Farley v. Baird, Patrick & Co., Inc.* 1992 WL 321632, *5 (S.D.N.Y. 1992)

25  ("[c]lass counsel's competency is presumed absent specific proof to the contrary by defendants").

26  **IV.**    **CONCLUSION.**

27       For the foregoing reasons, Plaintiffs respectfully submit that the class should be certified.

28

Dated:  May 15, 2008

Respectfully submitted,

Joseph W. Cotchett
Nancy L. Fineman
Steven N. Williams
Neil Swartzberg
Douglas Y. Park
COTCHETT, PITRE & McCARTHY
804 Malcolm Road
Burlingame, CA 94010
*Interim Lead Counsel for Direct Purchaser Class*

*Steering Committee for Direct Purchaser Class*

Guido Saveri
Cadio Zirpoli
SAVERI & SAVERI, INC.
111 Pine Street, Suite 1700
San Francisco, CA  94111-5619
Telephone:  (415) 217-6810
Facsimile:  (415) 217-6813

Anthony D. Shapiro
George W. Sampson
HAGENS BERMAN SOBOL SHAPIRO LLP
1301 Fifth Avenue, Suite 2900
Seattle, Washington  98101
Telephone: (206) 623-7292
Facsimile No.: (206) 623-0594

Michael J. Freed
Steven A. Kanner
William H. London
Douglas A. Millen
FREED KANNER LONDON & MILLEN LLP
2201 Waukegan Road, Suite 130
Bannockburn, Illinois 60615
Phone: 224-632-4500
Fax: 224-632-4521

Steven J. Greenfogel
Daniel B. Allanoff
MEREDITH COHEN GREENFOGEL &
SKIRNICK P.C.
1521 Locust Street, 8th Floor
Philadelphia, PA  19102
Phone: 215-564-5182

26
DIRECT PURCHASER PLAINTIFFS' NOTICE, MOTION & MPA ISO CLASS CERTIFICATION
Case No. M:07-cv-1819 CW; MDL No. 1819

1

2          Robert S. Green
           Brian Umpierre
3          GREEN WELLING
           595 Market Street, Suite 2750
4          San Francisco, CA 94105
           Tel: (415) 477-6700
5          Fax: (415)477-6710

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28                                   27