1  FRANCIS O. SCARPULLA (41059)
   CRAIG C. CORBITT (83251)
2  CHRISTOPHER T. MICHELETTI (136446)
   PAMELA E. WOODSIDE (226212)
3  QIANWEI FU (242669)
   JANE YI (257893)
4  ZELLE HOFMANN VOELBEL & MASON LLP
   44 Montgomery Street, Suite 3400
5  San Francisco, CA 94104
   Telephone:    (415) 693-0700
6  Facsimile:    (415) 693-0770
   fscarpulla@zelle.com
7  ccorbitt@zelle.com

8  *Interim Lead and Liaison Counsel for*
   *Indirect Purchaser Class*
9

10              **UNITED STATES DISTRICT COURT**

11            **NORTHERN DISTRICT OF CALIFORNIA**

12                   **OAKLAND DIVISION**

| | |
|---|---|
| 13  IN RE STATIC RANDOM ACCESS MEMORY (SRAM) ANTITRUST | Case No. M:07-CV-01819-CW |
| 14  LITIGATION | MDL No. 1819 |
| 15  | **INDIRECT PURCHASER PLAINTIFFS' MEMORANDUM IN SUPPORT OF** |
| 16  | **MOTION FOR CLASS CERTIFICATION** |
| 17  This Document Relates to: | Hearing Date: April 16, 2009 Time: 2:00 p.m. |
| 18  ALL INDIRECT PURCHASER ACTIONS | Courtroom: 2, 4th Floor Judge: Hon. Claudia Wilken |
| 19  | |

20

21

22

23

24

25

26

27

28

INDIRECT PURCHASER PLAINTIFFS' MEMORANDUM
IN SUPPORT OF MOTION FOR CLASS CERTIFICATION – Case No. M:07-cv-01819-CW

**TABLE OF CONTENTS**

I.      STATEMENT OF ISSUES ....................................................................................1

II.     INTRODUCTION ...............................................................................................1

III.    FACTUAL BACKGROUND .................................................................................4

    A.      The SRAM Industry .................................................................................4

    B.      The SRAM and Products Containing SRAM At Issue Here ...............................5

    C.      Distribution Channels for Products Containing SRAM ...............................5

    D.      Numerous Market Factors Support A Showing of Pass-Through Here .................5

    E.      Common Proof of Impact and Damages ..................................................6

IV.     ARGUMENT .....................................................................................................6

    A.      Standard for Class Certification ..............................................................6

    B.      Class Plaintiffs Satisfy the Rule 23(a) Requirements ...............................7

        1.      Class Members Are Sufficiently Numerous ................................7

        2.      The Case Involves Common Issues of Law and Fact ................................7

        3.      The Proposed Class Representatives' Claims Are Typical........................8

        4.      The Representative Plaintiffs Will Adequately Represent the Class..........9

    C.      Plaintiffs Satisfy the Requirements of Rule 23(b) ................................10

        1.      Overview of Rule 23(b)(3).....................................................10

        2.      Defendants' Price-fixing Conspiracy is a Common Issue That Predominates Over Individual Issues ...........................................................10

        3.      Indirect Purchaser Plaintiffs Have Adequately Shown Common Proof of Impact at the Class Certification Stage ......................................12

        4.      Indirect Purchaser Plaintiffs Have Adequately Shown Common Proof of Damages at the Class Certification Stage ...................................16

        5.      Class Plaintiffs Have Demonstrated That Common Issues Predominate Under the State Laws Identified in the Complaint....................................18

            a.      Unjust Enrichment ......................................................18

            b.      California .......................................................................19

i

c.      The Arizona Class Satisfies the Predominance Requirement........22

d.      The Arkansas Class Satisfies the Predominance Requirement......22

e.      The District of Columbia Class Satisfies the Predominance
        Requirement ...................................................................................23

f.      The Florida Class Satisfies the Predominance Requirement .........24

g.      The Hawaii Class Satisfies the Predominance Requirement .........25

h.      The Iowa Class Satisfies the Predominance Requirement.............26

i.      The Kansas Class Satisfies the Predominance Requirement.........26

j.      The Maine Class Satisfies the Predominance Requirement ..........27

k.      The Massachusetts Class Satisfies the Predominance
        Requirement ...................................................................................28

l.      The Michigan Class Satisfies the Predominance Requirement .....29

m.      The Minnesota Class Satisfies the Predominance Requirement....29

n.      The Montana Class Satisfies the Predominance Requirement ......30

o.      The Nevada Class Satisfies the Predominance Requirement. .......31

p.      The New Mexico Class Satisfies the Predominance
        Requirement....................................................................................31

q.      The New York Class Satisfies the Predominance
        Requirement....................................................................................32

r.      The North Carolina Class Satisfies the Predominance
        Requirement....................................................................................33

s.      The North Dakota Class Satisfies the Predominance
        Requirement....................................................................................34

t.      The Pennsylvania Class Satisfies the Predominance
        Requirement....................................................................................35

u.      The Puerto Rico Class Satisfies the Predominance
        Requirement....................................................................................35

v.      The Rhode Island Class Satisfies the Predominance
        Requirement....................................................................................35

w.      The South Dakota Indirect Purchaser Class Satisfies the
        Predominance Requirement ...........................................................36

ii

x.    The Tennessee Class Satisfies the Predominance Requirement...................................................................37

y.    The Utah Class Satisfies the Predominance Requirement.............38

z.    The Washington Class Satisfies the Predominance Requirement...................................................................38

aa.    The West Virginia Class Satisfies the Predominance Requirement....................................................................38

bb.    The Wisconsin Class Satisfies the Predominance Requirement...................................................................39

6.    A Class Action Is a Superior Method of Resolving This Controversy......39

D.    To Avoid Future Harm, an Nationwide Class Should Be Certified Under Rule 23(b)(2) ........................................................................................40

1.    Injunctive Relief Is Necessary to Prevent Further Injury .........................40

2.    The Court Should Certify an Equitable Relief Class ................................41

E.    Courts Regularly Certify Both 23(b)(3) Damages Classes and 23(b)(2) Equitable Relief Classes in the Same Case ........................................................41

F.    The Court Should Appoint Plaintiffs' Interim Lead Counsel As Class Counsel...43

V.    CONCLUSION...........................................................................................44

1

**TABLE OF AUTHORITIES**

2

3  <u>**CASES**</u>

4

*Amchem Products, Inc. v. Windsor,*
  521 U.S. 591 (1997)................................................................................................................ 10

*Ames v. Oceanside Welding and Towing Co., Inc.,*
  767 A.2d 677 (R.I. 2001) ........................................................................................................ 36

*Arroyo-Melecio v. Puerto Rican American Ins. Co.,*
  398 F.3d 56 (1st Cir. 2005) ..................................................................................................... 36

*Bellinder v. Microsoft Corp.,*
  2001 WL 1397995 (Kan. Dist. Ct. Sept. 7, 2001) .................................................................. 27

*Blackie v. Barrack,*
  524 F.2d 891 (9th Cir. 1975) .................................................................................................... 6

*Blake v. Abbott Labs., Inc.,*
  1996 WL 134947 (Tenn. Ct. App. Mar. 27, 1996) ................................................................. 38

*Bruno v. Super. Ct.,*
  127 Cal. App. 3d 120 (1981) ................................................................................................... 21

*Bunker's Glass Co. v. Pilkington PLC,*
  75 P.3d 99 (2003)..................................................................................................................... 22

*B.W.I. Custom Kitchen v. Owens-Illinois, Inc.,*
  191 Cal. App. 3d 1341 (1987) ........................................................................................... 12, 21

*California v. ARC America Corp.,*
  490 U.S. 93 (1989)................................................................................................................... 12

*Ciardi v. F. Hoffman La Roche, Ltd.,*
  436 Mass. 53 (2002) ................................................................................................................ 29

*Cohen v. Chicago Title Ins. Co.,*
  2007 WL 1067034 (E.D. Pa. Apr. 5, 2007) ............................................................................ 42

*Comes v. Microsoft Corp.,*
  696 N.W.2d 318 (Iowa 2005) ........................................................................................... 12, 26

*Comes v. Microsoft Corp.,*
  646 N.W. 2d 440 (Iowa 2002) .......................................................................................... 26, 36

*Computer Economics, Inc. v. Gartner Group, Inc.,*
  50 F. Supp. 2d 980 (S.D. Cal. 1999)....................................................................................... 13

*Corbett v. Super. Ct.,*
  101 Cal. App. 4th 649 (2002) .................................................................................................. 20

*Corwin v. Los Angeles Newspaper Service Bureau, Inc.,*
  4 Cal. 3d 842 (1971) ................................................................................................................ 20

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

*Cox v. Microsoft Corp.*,
   2005 WL 3288130 (N.Y. Supr. Ct. N.Y. Cty. July 29, 2005) ................................................. 33, 34

*Cox v. Microsoft Corp.*,
   809 N.Y.S.2d 480 (N.Y. Sup. Ct. 2005) ................................................................................. 12

*Cruz v. All Saints Healthcare System, Inc.*,
   625 N.W.2d 344 (Wis. App. 2001) ........................................................................................ 40

*Cummings v. Connell*,
   316 F.3d 886 (9th Cir. 2003), *cert. denied,* 529 U.S. 927 (2003) ........................................ 9

*Discover Bank v. Super. Ct.*,
   36 Cal. 4th 148 (2005) ...................................................................................................... 21, 22

*Dukes v. Wal-Mart, Inc.*,
   509 F.3d 1168 (9th Cir. 2007) .............................................................................................. 7

*Eisen v. Carlisle and Jacquelin*,
   417 U.S. 156 (1974) ............................................................................................................ 6

*Ellis v. Costco Wholesale Corp.*,
   240 F.R.D. 627 (N.D. Cal. 2007) ....................................................................................... 43

*First Atlantic Management Corp. v. Dunlea Realty Co.*,
   507 S.E.2d 56, 131 N.C.App. 242 (1998) ............................................................................ 34

*Four B Corp. v. Daicel Chemical Industries, Ltd.*,
   253 F. Supp. 2d 1147 (D. Kan. 2003) ................................................................................. 27

*Freeman v. San Diego Ass'n of Realtors*,
   322 F.3d 1133 (9th Cir. 2003) ............................................................................................ 41

*Friends of the Earth, Inc. v. Laidlaw Environmental Servs. (TOC), Inc.*,
   528 U.S. 167 (2000) ............................................................................................................ 41

*Friedman v. Microsoft Corp.*,
   141 P.3d 824 (Ariz. App. 2006) ......................................................................................... 22

*Gordon v. Microsoft Corp.*,
   2001 WL 366432 (Minn. Dist. Ct. Mar. 30, 2001), *review denied*, 645 N.W.2d 393 (Minn. 2002) ............................................................................................................................... 12, 30

*Gordon v. Microsoft Corp.*,
   2003 WL 23105552 (Minn. Dist. Ct. Mar. 14, 2003) ........................................................ 12

*Goshen v. Mut. Life Ins. Co.*,
   98 N.Y.2d 314 (2002) ......................................................................................................... 33

*Hanlon v. Chrysler Corp.*,
   150 F.3d 1011 (9th Cir. 1998) .................................................................................... 7, 8, 10, 18

*Holder v. Archer Daniels Midland Co.*,
   1998 WL 1469620 (D.C. Super. Ct. Nov. 4, 1998) ............................................................ 24

*Hopkins v. De Beers Centenary AG,*
    2005 WL 1020868 (SF Super. Ct. Apr. 15, 2005) ........................................................ 21

*Howe v. Microsoft Corp.,*
    656 N.W.2d 285 (N.D. 2003) .................................................................................... 12, 35

*Hyde v. Abbott Labs.,*
    123 N.C. App. 572  (N.C. Ct. App. 1996) ....................................................................... 34

*Illinois Brick Co. v. State of Illinois,*
    431 U.S. 720 (1977)......................................................................................................... 41

*In re Abbott Labs. Norvir Antitrust Litig.,*
    2007 WL 1689899 ..................................................................................................... 11, 19

*In re Bulk [Extruded] Graphite Prod. Antitrust Litig.,*
    2006 WL 891362 (D.N.J. 2006) ........................................................................................ 8

*In re Cardizem CD Antitrust Litig.,*
    105 F. Supp. 2d 618 (E.D. Mich. 2000)........................................................................... 19

*In re Cardizem CD Antitrust Litig.,*
    200 F.R.D. 297 (E.D. Mich. 2001) ..................................................................... 15, 16, 30

*In re Catfish Antitrust Litig.,*
    826 F. Supp. 1019 (N.D. Miss. 1993).................................................................. 13, 14, 15

*In re Cement and Concrete Antitrust Litig.,*
    1979 WL 1595 (D. Ariz. 1979)........................................................................................ 13

*In re Citric Acid Antitrust Litig.,*
    1996 WL 655791 (N.D. Cal. 1996) ...................................................................... 9, 15, 16

*In re Cree, Inc. Securities Litig.,*
    219 F.R.D. 369 (M.D.N.C. 2003) .................................................................................... 44

*In re Domestic Air Transportation Antitrust Litig.,*
    137 F.R.D. 677 (N.D. Ga. 1991)...................................................................................... 17

*In re Dynamic Random Access Memory (DRAM) Antitrust Litig.,*
    2006 WL 1530166 (N.D. Cal. 2006) ............................................................................... 15

*In re Fla. Microsoft Antitrust Litig.,*
    2002 WL 31423620 (Fla. Cir. Ct. Aug. 26, 2002)..................................................... 12, 25

*In re Flat Glass Antitrust Litig.,*
    191 F.R.D. 472 (W.D. Pa. 1999) ................................................................................ 8, 14

*In re G-Fees Antitrust Litig.,*
    2008 WL 4761888 (D.D.C. 2008) ................................................................................... 19

*In re Indus. Gas Antitrust Litig.,*
    100 F.R.D. 280 (N.D. Ill. 1983)....................................................................................... 15

*In re Industrial Diamonds Antitrust Litig.*
    167 F.R.D. 374 (S.D.N.Y. 1996) ..................................................................................... 14

*In re Linerboard Antitrust Litig.*,
   203 F.R.D. 197 (E.D. Pa. 2001) .................................................................... 7

*In re NASDAQ Market-Makers Antitrust Litig.*,
   169 F.R.D. 493  (S.D.N.Y. 1996) ................................................................. 15

*In re Pharmaceutical Industry Average Wholesale Price Litigation*,
   233 F.R.D. 229 (D. Mass. 2006) .................................................................. 33

*In re Potash Antitrust Litig.*,
   159 F.R.D. 682 (D. Minn. 1995) ................................................... 10, 16, 18

*In re Pressure Sensitive Labelstock Antitrust Litig.*,
   2007 WL 4150666 (M.D. Pa. 2007) ..................................................... 8, 17

*In re Relafen Antitrust Litig.*,
   221 F.R.D. 260 (D. Mass. 2004) ........................................................... *passim*

*In re Rubber Chemicals Antitrust Litig.*,
   232 F.R.D. 346 (N.D. Cal. 2005) ......................................................... 7, 16

*In re S.D. Microsoft Antitrust Litig.*,
   657 N.W.2d 668 (S.D. 2003) .............................................................. 12, 37

*In re Static Random Access (SRAM) Antitrust Litig.*,
   2008 WL 4447592 (N.D. Cal. Sept. 29, 2008) ................................... *passim*

*In re Tableware Antitrust Litig.*,
   241 F.R.D. 644 (N.D. Cal. 2007) ............................................................... 7

*In re Terazosin Hydrochloride*,
   220 F.R.D. 672 (S.D. Fla. 2004) ................................................. 19, 20, 31

*In re TFT-LCD (Flat Panel) Antitrust Litig.*,
   2008 WL 3916309 (N.D. Cal. Aug. 25, 2008) ......................................... 24

*In re Universal Service Fund Telephone Billing Practices Litig.*,
   219 F.R.D. 661 (D. Kan. 2004) ................................................................ 11

*In re Vitamins Antitrust Litig.*,
   209 F.R.D. 251 (D.D.C. 2002) .......................................................... 13, 24

*In re Wayfarin Sodium Antitrust Litig.*,
   391 F.3d 516 (3d Cir. 2004) ...................................................................... 18

*In re Wirebound Boxes Antitrust Litigation*,
   128 F.R.D. 268  (D. Minn. 1989) .............................................................. 16

*Jefferson v. Ingersoll lnt'l Inc.*,
   195 F.3d 894 (7th Cir. 1999) .................................................................... 42

*Klussman v. Cross Country Bank*,
   134 Cal. App. 4th 1283 (2005) ................................................................. 22

*Lockheed Martin Corp. v. Super. Ct.,*
  29 Cal. 4th 1096 (2003) ................................................................................ 21

*Lohman v. Daimler-Chrysler Corp.,*
  2007, 142 N.M. 437, 166 P.3d 1091, *cert. denied* 142 N.M. 434 P.3d 1088 ............................ 32

*Lorix v. Crompton Corp.,*
  736 N.W.2d 619 (Minn. 2007)........................................................................ 30

*Mack v. Bristol Myers Squibb,*
  673 So. 2d 100  (Fla. 1st DCA 1996) ................................................................ 25

*Massachusetts Mutual Life Ins. Co. v. Super. Ct.,*
  97 Cal. App. 4th 1282 (2002) ........................................................................ 20

*Mazza v. American Honda Motor Co.,*
  2008 WL 5256432 (C.D. Cal. 2008)................................................................ 7

*McDevitt v. Guenther,*
  522 F. Supp. 2d 1272 (D.Haw. 2007) .............................................................. 26

*Meijer, Inc. v. Abbott Labs.,*
  2008 WL 4065839 (N.D. Cal. Aug. 27, 2008) .................................................. 15

*Melo Tone Vending, Inc. v. Sherry, Inc.,*
  39 Mass. App. Ct. 315 (1995).......................................................................... 29

*Meyers v. Bayer AG,*
  2006 WL 1228957 (Wis. App. May 9, 2006) .................................................... 40

*Microsoft I-V Cases,*
  2000 WL 35568182 (Cal. Super. Ct. Aug. 29, 2000) .................................... 12, 16, 21

*Mill Pond Associates, Inc. v. E & B Gift Ware, Inc.,*
  751 F. Supp. 299 (D. Mass. 1990) .................................................................. 29

*Molski v. Gleich,*
  318 F.3d 937 (9th Cir. 2003) .................................................................... 41, 42, 43

*Olson v. Microsoft Corp.,*
  CDV-200-219 (Mt. Super., Feb. 15, 2001) ...................................................... 31

*Olstad v. Microsoft Corp.,*
  700 N.W.2d 139 (Wis. 2005)...................................................................... 39, 40

*Oswego Laborers' Local 214 Pension Fund v. Marine Midland Bank, N.A.,*
  85 N.Y.2d 20 (N.Y. Ct. App. 1995)................................................................ 33

*Park v. Ford Motor Co.,*
  844 A.2d 687 (R.I. 2004) .............................................................................. 36

*Probe v. State Teachers' Ret. Sys.,*
  780 F.2d 776 (9th Cir. 1986) ........................................................................ 42

*Rees v. Souza's Milk Transp., Co.,*
  2006 WL 738987 (E.D. Cal. 2006) ................................................................ 20

*Richmond v. Dart Indus., Inc.,*
  29 Cal. 3d 462 (1981) ........................................................................... 22

*Robinson v. EMI Music Dist., Inc.,*
  1996 WL 495551 (Tenn. Cir. Ct. July 8, 1996) ........................... 12, 28, 31

*Romero v. Philip Morris Inc.,*
  109 P.3d 768 (N.M. App. 2005) ............................................................ 12

*Romero v. Philip Morris Incorporated,*
  137 N.M. 229, 109 P. 3d 768  (N.M. Ct. App. 2005) ............................ 32

*Rosack v. Volvo of Am. Corp.,*
  131 Cal. App. 3d 741 (1982), *cert. denied*, 460 U.S. 1012 (1983) ................................. 12, 20, 21

*Sea Land Service, Inc. v. Atlantic Pacific Intern., Inc.,*
  61 F. Supp. 2d 1092 (D. Haw. 1999) .................................................... 26

*Sherwood v. Microsoft Corp.,*
  2003 WL 21780975 (Tenn. Ct. App. July 31, 2003) ............................ 38

*Singer v. AT&T Corp.,*
  185 F.R.D. 681 (S.D. Fla. 1998) ............................................................ 18

*Small v. Lorillard Tobacco Co.,*
  94 N.Y.2d 43 (N.Y. Ct. App. 1999) ...................................................... 33

*Smilow v. Sw. Bell Mobile Sys., Inc.,*
  323 F.3d 32 (1st Cir. 2003) .................................................................... 10

*State of California v. Levi Strauss & Co.,*
  41 Cal. 3d 460 (1986) ........................................................................... 22

*Staton v. Boeing Co.,*
  327 F.3d 938 (9th Cir. 2003) .................................................................. 9

*Stetser v. TAP Pharmaceutical Products, Inc.,*
  165 N.C. App. 1 (2004) ......................................................................... 34

*Stutman v. Chemical Bank,*
  95 N.Y.2d 24 (2000) .............................................................................. 33

*Thomas & Thomas Rodmakers, Inc. v. Newport Adhesives & Composites, Inc.,*
  209 F.R.D. 159 (C.D. Cal. 2002) ...................................................... 8, 11

*Union Carbide Corp. v. Super. Ct.,*
  36 Cal. 3d 15 (1984) ............................................................................. 12

*Van Voorhees v. Dodge,*
  679 A.2d 1077 (1996) ........................................................................... 28

*Yaffe v. Powers,*
  454 F.2d 1362 (1st Cir. 1972) ............................................................... 41

ix

*Zenith Radio Corp. v. Hazeltine Research,*
    395 U.S. 100 (1969) ................................................................................................................. 41

## STATUTES AND RULES

15 U.S.C. § 1 ..................................................................................................................... 1, 3, 18
15 U.S.C. § 16 ............................................................................................................................... 1
15 U.S.C. § 26 ....................................................................................................................... 41, 43
15 U.S.C. § 41 ............................................................................................................................. 18
15 U.S.C. § 45(a)(1) ................................................................................................................... 28
28 U.S.C. §1332(d) ..................................................................................................................... 11

Ariz. Rev. Stat. § 44-1402 .......................................................................................................... 22
Ariz. Rev. Stat. § 44-1408(b) ..................................................................................................... 22
Ariz. Rev. Stat. § 44-1401 .......................................................................................................... 22
Ark. Code Ann. § 4-75-212(b) .................................................................................................... 23
Ark. Code Ann. § 4-88-101 ........................................................................................................ 23
Cal. Bus. & Prof. Code § 16700 ........................................................................................... 19, 20
D.C. Code § 28-3901 .................................................................................................................. 24
D.C. Code § 28-4502 .................................................................................................................. 24
D.C. Code § 28-4508 .................................................................................................................. 24
D.C. Code § 28-4501 .................................................................................................................. 24
D.C. Code § 28-4509(a) .............................................................................................................. 24
F.S.A. § 501.201 ......................................................................................................................... 25
F.S.A. § 501.202 ......................................................................................................................... 25
F.S.A. § 501.211(2) ..................................................................................................................... 25
Haw. Rev. Stat. § 480-13 ............................................................................................................ 26
Haw. Rev. Stat. § 480 4(a) .......................................................................................................... 25
Haw. Rev. Stat. § 480-1 .............................................................................................................. 25
Haw. Rev. Stat. § 480-2(a) .......................................................................................................... 25
Haw. Rev. Stat. § 480-3 .............................................................................................................. 25
Iowa Code Ann § 553.4 ............................................................................................................... 26
Iowa Code Ann § 553.12 ............................................................................................................. 26
Iowa Code Ann § 553.5 ............................................................................................................... 26
Kan. Stat. Ann. § 50-112 ............................................................................................................ 27
Kan. Stat. Ann. § 50-115 ............................................................................................................ 27
Kan. Stat. Ann. § 50-161(b) ....................................................................................................... 27
Kan. Stat. Ann. § 50-623 ............................................................................................................ 27
Minn. Stat § 325D.51 .................................................................................................................. 30
Minn. Stat. § 325D.49 ................................................................................................................. 30
Minn. Stat. § 325D.57 ................................................................................................................. 30
Mont. Code § 30-14-222 ............................................................................................................. 31
N.C. Gen. Stat. § 75 .................................................................................................................... 34
N.C. Gen. Stat. § 75-1 ................................................................................................................. 34
N.D. Cent. Code § 51-08.1-02 .................................................................................................... 34
N.D. Cent. Code § 51-08.1-08 ............................................................................................... 34, 35
N.D. Cent. Code §§ 51-08.1-01 .................................................................................................. 34
N.M. Stat. Ann. §57-1-1 ............................................................................................................. 32
N.M. Stat. Ann. §57-1-3(A) .................................................................................................. 32, 33
N.M.S.A. 1978 § 57-1-1 .............................................................................................................. 32
N.M.S.A. 1978 § 57-12-1 ............................................................................................................ 32
N.R.S. 598A.050 ................................................................................................................... 31, 32
N.R.S. 598A.060 ......................................................................................................................... 31
N.R.S. 598A.210 ......................................................................................................................... 31
R.I. Gen. Laws § 6-13.1-1 ........................................................................................................... 36

1    S.D.C.L. § 37-1-3.1 ................................................................................................ 37
     S.D.C.L. § 37-1-14.3 .............................................................................................. 37
2    Tenn. Code Ann. § 47-25-101 ................................................................................ 38
     Tenn. Code Ann. § 47-25-106 ................................................................................ 38
3    Tenn. Code Ann. § 47-25-101 ................................................................................ 37
     Utah Code Ann. § 76-10-914 .................................................................................. 38
4    Utah Code Ann. § 76-10-919 .................................................................................. 38
     Utah Code Ann. § 76-10-911 .................................................................................. 38
5    Utah Code Ann. § 76-10-919(7) ........................................................................ 13, 39
     W. Va. Code § 47-18-3(a) ...................................................................................... 39
6    W. Va. Code § 47-18-3(b) ...................................................................................... 39
     W. Va. Code §47-18-1 ............................................................................................ 39
7    Wis. Stat. § 133.03(1) ............................................................................................ 39
     Wis. Stat. § 133.18(1)(a) ........................................................................................ 39
8 **OTHER AUTHORITIES**

9

10   2 Alba Cone & Herbert B. Newberg, *Newberg on Class Actions* § 4.14 (4th ed. 2002) ................ 42
     3 Alba Cone & Herbert B. Newberg, *Newberg on Class Actions* § 10.3 (4th ed. 2002) .......... 17, 19
11   6 Alba Cone & Herbert B. Newberg, *Newberg on Class Actions* § 3.3 (4th ed. 2002) .................. 10

12   Mass. Gen. Laws ch. 93A, § 9 ............................................................................ 28

13
14
...

xi

I.   **STATEMENT OF ISSUES**

A.      Whether the proposed nationwide class of Indirect-Purchaser ("IP") Plaintiffs seeking injunctive relief should be certified under Fed. R. Civ. P. 23(b)(2);

B.      Whether certification of the 27 IP subclasses, pursuant to Fed. R. Civ. P. 23(b)(3), for claims under the antitrust and/or consumer protection statutes of each of those jurisdictions, and/or under common law principles of unjust enrichment recognized in those jurisdictions, is appropriate; and

C.      Whether the Court should appoint IP Plaintiff Interim Lead Counsel as Lead Counsel for the Class.

II.  **INTRODUCTION**

This is a straightforward horizontal price-fixing action in which plaintiffs allege that Defendants[1] conspired to fix the price of Static Random Access Memory ("SRAM"), including PSRAM (defined below).  The IP Plaintiffs are individuals and entities that indirectly purchased SRAM for their own use and not for resale during the period November 1, 1996 through December 31, 2006 (the "Class Period").  IP Plaintiffs allege injuries incurred as a result of Defendants' conduct and seek (i) injunctive relief pursuant to Section 16 of the Clayton Act, 15 U.S.C. § 16, for Defendants' violations of Section 1 of the Sherman Act, 15 U.S.C. § 1; (ii) damages or restitution under relevant state antitrust, consumer protection and unjust enrichment laws; (iii) and  the costs of suit, including reasonable attorneys' fees.

Defendants are the leading manufacturers of SRAM, and their sales of SRAM and/or products containing SRAM into the United States exceeded $10 billion during the Class Period.  IP Plaintiffs allege that Defendants conspired to artificially raise, fix, maintain and/or stabilize the price of SRAM during the Class Period.  *See* IP Plaintiffs' Third Amended Consolidated Class Action Complaint ("Compl.") ¶197.  In furtherance of their conspiracy, Defendants: (i)

---

[1] Samsung Electronics, Company. Ltd., Samsung Electronics America, Inc., Samsung Semiconductor, Inc., Hynix Semiconductor, Inc., Hynix Semiconductor America, Inc., Micron Technology, Inc., Micron Semiconductor Products, Inc., NEC Electronic Corporation, NEC Electronics America, Inc., Cypress Semiconductor, Inc., Mitsubishi Electric Corporation, Mitsubishi Electric & Electronics USA, Renesas Technology Corporation, Renesas Technology

participated in surreptitious meetings where they agreed upon and coordinated the prices charged
for SRAM; (ii) exchanged highly confidential competitive information regarding pricing, product
roadmaps and production plans; and (iii) monitored each others' participation in the conspiracy.
Compl. ¶¶160-163.  Because Defendants' collusive manipulation caused higher prices for SRAM
than would have existed in a competitive market, IP Plaintiffs paid millions of dollars more than
they should have for SRAM and products containing SRAM during the Class Period.  Compl.
¶¶189-195.

The IP Plaintiffs seek certification under Rule 23(b)(2) of a nationwide class seeking
injunctive relief under the Sherman Act and certification under Rule 23(b)(3) of 27 IP state
subclasses seeking damages or restitution under state antitrust, consumer protection and/or unjust
enrichment laws.  Each of these separate, state-wide classes is listed in the Notice of Motion and
Motion for Class Certification (the "Motion") filed herewith, and are referred to collectively as the
Indirect State Classes.  As detailed below, all of these proposed classes meet the requirements of
Rule 23.

This Court already has certified a class of Direct Purchaser ("DP") Plaintiffs asserting
damages claims against the Defendants.  *In re Static Random Access (SRAM) Antitrust Litig.*, 2008
WL 4447592, at *6 (N.D. Cal. Sept. 29, 2008).  Because the claims of the IP Plaintiffs arise out of
the same wrongful conduct as is alleged in the DP Plaintiffs' case, certification of the proposed IP
Plaintiff classes is also appropriate.

As the Court determined in the DP Plaintiff's motion (*SRAM*, 2008 WL 4447592, at *3-4),
the requirements of Rule 23(a) are all met here.  There is no question that joinder of all members in
each class would be impractical, and that there are questions of law and fact common to the class.
The claims asserted by the proposed class representative plaintiffs—who are listed in Appendix A
hereto—are typical; they are based on the same conduct by Defendants and their claims are
reasonably co-extensive with those of absent class members.  Finally, neither the proposed class

America, Inc., Toshiba Corporation, Toshiba America Electronic Components, Inc., Etron
Technology America, Inc.

1 representative plaintiffs nor their counsel has any conflicts with other class members, and they will

2 adequately represent the class.

3        As for Rule 23(b)(3) prerequisites, the Court already determined that with regard to the DP

4 Plaintiffs' claims, common issues predominate over any individualized issues pertaining to the

5 existence of a conspiracy to fix SRAM prices; whether plaintiffs sustained antitrust injury or the

6 "impact" of Defendants' conspiracy; and the amount of damages sustained. *SRAM*, 2008 WL

7 4447592, at *4-7. The IP Plaintiffs' state-law antitrust, consumer protection and unjust enrichment

8 claims, like the Sherman Act claims of the DP Plaintiffs, allege and rely upon the same SRAM

9 price-fixing conspiracy; thus, the Court's determination there that "common issues predominate as

10 to the element of antitrust violation" (*id*. at *5) applies with equal force here.

11        The Court has also determined that with regard to injury to and the amount of damages

12 incurred by the DP Plaintiffs, common issues predominate over any individual issues. Again,

13 there is no reason for a different result here. Many of the state antitrust and consumer protection

14 statutes and related court decisions upon which the IP Plaintiffs rely recognize that indirect

15 purchasers bear the brunt of such price-fixing conspiracies because inflated prices are invariably

16 passed-through to consumers. As a result, many of the state laws expressly provide for indirect

17 purchaser claims and/or class actions, and some even presume impact and damage to indirect

18 purchasers resulting from horizontal price-fixing conspiracies. These legislative and judicial

19 pronouncements supporting consumers' and other end-users' right to recover for such wrongs

20 militate strongly in favor of certification of the state subclasses sought here. Moreover, as shown

21 through the declarations of Michael J. Harris, Ph.D. and Mark Dwyer, Ph.D., IP Plaintiffs have

22 offered well-established methodologies for proving injury and damages on a class-wide basis.

23        Finally, a class action is superior to other available methods for the fair and efficient

24 adjudication of this case. Indeed, a class action is the only feasible way to vindicate the rights of

25 the thousands of class members that IP Plaintiffs seek to represent. Accordingly, IP Plaintiffs'

26 proposed classes should be certified.

27

28

## III.   FACTUAL BACKGROUND

### A.   The SRAM Industry

SRAM is a type of volatile semiconductor memory chip that retains its contents as long as power remains applied.  It consists of two general types of memory often designated as either "fast" or "slow" based on the time required to transfer information from the SRAM chip to the microprocessor.  SRAM also consists of "Pseudo" SRAM or "PSRAM," which combines SRAM qualities with those of Dynamic Random Access Memory ("DRAM"), *i.e.*, low power consumption, fast speed and higher densities.  SRAM is used in a variety of product categories including: (i) the communications market, such as in cell phones and Voice Over Internet Protocol (VOIP) technology; (ii) the computer market, particularly in servers, mainframes, high-end computer workstations, and personal digital assistants ("PDAs") and smart phones—the latter two of which were historically viewed as handheld computers; and (iii) the networking communications market, comprising products such as routers, switches, proxy and gateway devices, modems, storage area networks and firewalls.  *See* Declaration of Michael J. Harris, Ph.D. In Support of Plaintiffs' Motion for Class Certification ("Harris Decl."), ¶¶8-17.  While "fast" and "slow" SRAM and PSRAM are used in different products, all SRAM within these categories are commodity products and perform the same key functions for computers, networking devices, and communications devices.  Compl. ¶146; Harris Decl. ¶¶10-22, 27.

During the class period, Defendants dominated SRAM manufacturing; they possessed over 60 percent market share of total SRAM sales in 1996 and 1999, which increased to over 70 percent by 2005.  Harris Decl. ¶¶23-24.  This market concentration, in conjunction with the high barriers to entry to the SRAM market and low elasticity of demand for SRAM chips, facilitated effective collusion among Defendants.  Harris Decl. ¶¶27, 31.  Additionally, the nature and terms of the contracts between direct purchasers of SRAM and Defendants are such that they keep SRAM prices elevated.  Harris Decl. ¶27.  Finally, a preliminary analysis performed by the DP Plaintiffs' expert, Roger Noll, shows that the average prices across manufacturers and across purchaser type (OEM and distributor) are significantly correlated.  Harris Decl. ¶¶28, 31 (citing, relying upon and adopting Prof. Noll's opinions and conclusions).

1

**B.      The SRAM and Products Containing SRAM At Issue Here**

2

The Nationwide Class comprises all persons and entities residing in the United States who,

3

during the Class Period, purchased SRAM in the United States indirectly from the Defendants for

4

their own use and not for resale.  *See* Motion at 1-2.  The Indirect State Classes comprise all

5

persons in each state who indirectly purchased products containing Defendants' SRAM, for end

6

use and not for resale; those products are limited to handheld computer devices (also known as

7

personal digital assistants ("PDAs") and smart phones), desktop computers (with separate level 2

8

cache memory), servers, mainframes, Voice-Over Internet Protocol Systems, routers, switches,

9

modems, storage area networks and firewalls.  *See* Motion at 2 n.1; Harris Decl. ¶32; Declaration

10

of Mark Dwyer, Ph.D. In Support of Motion ("Dwyer Decl.").

11

**C.      Distribution Channels for Products Containing SRAM**

12

SRAM manufactured by the Defendants can be purchased by an SRAM distributor and

13

resold to an original equipment manufacturer ("OEM") or purchased by a contract manufacturer.

14

SRAM distributors sell to contract manufacturers and OEMs.  Contract manufacturers manufacture

15

individual SRAM components and finished products containing SRAM for OEMs.  OEMs

16

purchase SRAM directly from SRAM manufacturers (*i.e.*, the Defendants here), distributors and

17

contract manufacturers.  Harris Decl.¶¶41-47.

18

Once the OEM has manufactured a product containing SRAM, the OEM sells it directly to

19

a consumer, or to a consumer through a value added reseller, distributor or retailer.  For business

20

customers, the distribution chain is simplified, as the retailer segment of the distribution channel is

21

often eliminated.  For example, business customers purchase servers, mainframes, VOIP phone

22

systems and networking products almost entirely from distributors, value added resellers or OEMs

23

directly.  Harris Decl. ¶¶48-50.  The primary OEMs, distributors and value added resellers and

24

retailers are identified in the Harris Decl., and there are a significant number of common entities

25

that manufacture, distribute, resale or retail products containing SRAM.  *Id.* ¶¶39-40.

26

**D.      Numerous Market Factors Support A Showing of Pass-Through Here**

27

There is widespread and intense competition across the markets for each of the products

28

containing SRAM.  Harris Decl. ¶¶54-55.  Consumers of these products may freely migrate

between firms offering the most competitive prices, which in turn imposes a high degree of competitive discipline on the manufacturing, pricing, distribution and marketing of SRAM products.  Harris Decl. ¶¶75-78.  Robust competition in these markets also causes pricing decisions to be based on cost.  As a result, the overcharge will be passed through to consumers sooner and at a higher rate.  These and other market characteristics are consistent with and show that the market for SRAM and products containing SRAM exhibits a high degree of pass-through of price increases imposed by Defendants.  Harris Decl. ¶¶64-67.

### E.    Common Proof of Impact and Damages

Based upon the above and other analyses, Dr. Harris concluded as follows:

> "[T]he facts, evidence, econometric models, and analysis used to determine whether (a) Defendants imposed supra-competitive prices on the direct purchasers and the amount of any such direct overcharges and (b) whether Defendants' overcharge was passed-through, and ultimately resulted in damages to indirect purchasers, are common to class members. . .. [A]ny one class member . . . would necessarily be required to employ the same facts, evidence, and analytical models to show impact and damages as those required for the class in its entirety.  [And] there exist, standard, widely-accepted statistical methods to model the magnitude of the direct overcharge and the extent of pass-through for the various products purchased by class members . . . , [and] the statistical methods which will be employed and the data related to the volume and type of SRAM impacted provide a straightforward means for calculating class-wide damages."  (Harris Decl. ¶7.)

Consistent with Dr. Harris, Dr. Dwyer also concluded that the extent to which the Defendants' overcharge is passed through to class members can be tested empirically using standard, widely-accepted econometric methods, and that these methods will both assess the impact of the alleged conspiracy on SRAM and products containing SRAM, and compute the total overcharge to IP Plaintiff class members.  Dwyer Decl. ¶¶6-11.

## IV.    ARGUMENT

### A.    Standard for Class Certification

Certification is appropriate if the four subsections of Rule 23(a) are satisfied and at least one subsection of Rule 23(b) is also satisfied.  Fed. R. Civ. P. 23.  In deciding a class certification motion, it is not appropriate to consider the merits of plaintiffs' claims; "[r]ather, the court must take the substantive allegations of the complaint as true."  *SRAM*, 2008 WL 4447592, at *2 (citing

*Blackie v. Barrack*, 524 F.2d 891, 901 (9th Cir. 1975)).  The Court's analysis focuses not on the merits of the case, but on the prerequisites of Rule 23.  *Eisen v. Carlisle and Jacquelin*, 417 U.S. 156, 178 (1974).  Thus, for example, issues as to the validity of an expert's ultimate conclusion are to be resolved at the "merits stage of the litigation," not on a class certification motion.  *Dukes v. Wal-Mart, Inc.*, 509 F.3d 1168, 1179 (9th Cir. 2007).  Additionally, because class actions "play an important role in the private enforcement of antitrust actions . . . courts resolve doubts . . . in favor of certifying the class."  *SRAM*, 2008 WL 4447592, at *2 (citing *In re Rubber Chemicals Antitrust Litig.*, 232 F.R.D. 346, 350 (N.D. Cal. 2005)).  *See also In re Tableware Antitrust Litig.*, 241 F.R.D. 644, 648 (N.D. Cal. 2007) (in "antitrust cases, courts tend to favor class certification when in doubt").

### B.      Class Plaintiffs Satisfy the Rule 23(a) Requirements

#### 1.      Class Members Are Sufficiently Numerous

Rule 23(a)(1) requires that the proposed class be so numerous that joinder of all class members is impracticable.  Where "the exact size of the class is unknown, but general knowledge and common sense indicate that it is large, the numerosity requirement is satisfied."  *SRAM*, 2008 WL 4447592, at *3 (quotations omitted).  Total sales of products containing SRAM during the Class Period amount to billions of dollars.  Harris Decl. ¶38.  Indeed, the Court previously found that the direct purchasers of SRAM products are sufficiently numerous under Rule 23(a)(1).  *See SRAM*, 2008 WL 4447592, at *3.  Because indirect purchasers of SRAM undoubtedly outnumber direct purchasers, the same result is warranted here.

#### 2.      The Case Involves Common Issues of Law and Fact

To satisfy Rule 23(a)(2), "[t]he existence of shared legal issues with divergent factual predicates is sufficient, as is a common core of salient facts coupled with disparate legal remedies within the class."  *Hanlon v. Chrysler Corp.*, 150 F.3d 1011, 1019 (9th Cir. 1998).  "Only one significant issue of law or fact need be demonstrated to meet this requirement."  *Mazza v. American Honda Motor Co.*, 2008 WL 5256432, at *5 (C.D. Cal. 2008).  "Antitrust, price-fixing conspiracy cases, by their nature, deal with common legal and factual questions about the existence, scope and effect of the alleged conspiracy.  Whether defendants participated in the

1  actions alleged is a common question." *In re Linerboard Antitrust Litig.*, 203 F.R.D. 197, 206

2  (E.D. Pa. 2001) (citation and quotation marks omitted).

3        This case involves many common questions of law and fact, including whether Defendants

4  conspired to inflate and fix the prices of SRAM; how long Defendants' conspiracy lasted; whether

5  Defendants' conduct violated Section 1 of the Sherman Act as well as the state antitrust and unfair

6  competition laws identified in the complaint; the extent to which Defendants' conduct injured the

7  class members; the appropriate measure of damages; and whether the class members are entitled to

8  injunctive relief.  Compl. ¶138(d).

9              **3.      The Proposed Class Representatives' Claims Are Typical**

10       Rule 23(a)(3) requires only that "the claims and defenses of the representative parties are

11 typical of the claims or defenses of the class."  The typicality requirement is "liberally construed"

12 and the "representative claims are 'typical' if they are reasonably co-extensive with those of absent

13 class members; they need not be substantially identical."  *Hanlon*, 150 F.3d at 1019-20.  *See also*

14 *Thomas & Thomas Rodmakers, Inc. v. Newport Adhesives & Composites, Inc.*, 209 F.R.D. 159,

15 164 (C.D. Cal. 2002) (typicality met where "each class member's claim arises from the same

16 course of events that led to the claims of the representative parties and each class member makes

17 similar legal arguments to prove the defendant's liability") (quotations omitted).  Differences as to

18 "the various products purchased and the . . . amount of damage sustained by individual plaintiffs

19 do not negate a finding of typicality, provided the cause of action arises from a common wrong."

20 *Id*. (quotations omitted).  Thus, "[t]ypicality is usually satisfied in a horizontal antitrust conspiracy

21 case, even though a plaintiff may have purchased different product types or quantities or received

22 different prices, or a plaintiff purchased from one defendant but not another."  *In re Pressure*

23 *Sensitive Labelstock Antitrust Litig.*, 2007 WL 4150666, at *10 (M.D. Pa. 2007).[2]

24

25

26 [2] *Accord In re Bulk [Extruded] Graphite Prod. Antitrust Litig.*, 2006 WL 891362, at *5 (D.N.J.
   2006) (certifying class in which named plaintiffs represented only one customer category of three,
27 because prices in all categories were allegedly inflated by the same price-fixing conspiracy); *In re
   Flat Glass Antitrust Litig.*, 191 F.R.D. 472, 480 (W.D. Pa. 1999) ("the various products purchased
28 and the different amount of damage sustained by individual plaintiffs do not negate a finding of
   typicality, provided the cause of action arises from a common wrong").

1    Here, each of the IP Plaintiffs are indirect purchasers of SRAM who allege a that

2 Defendants engaged in an anticompetitive conspiracy.[3]  As the Court recognized when it certified

3 the DP Plaintiff Class, here "the overarching price-fixing scheme is the linchpin of Plaintiff's

4 complaint, regardless of the product purchased, the market involved or the price ultimately paid."

5 *SRAM*, 2008 WL 4447592, at *3.  Because the same is true here, the typicality requirement is met.

6              **4.      The Representative Plaintiffs Will Adequately Represent the Class**

7    The adequacy requirement of Rule 23(a)(4) combines two inquiries:  "(1) do the

8 representative plaintiffs and their counsel have any conflicts of interest with other class members,

9 and (2) will the representative plaintiffs and their counsel prosecute the action vigorously on behalf

10 of the class?"  *Staton v. Boeing Co.*, 327 F.3d 938, 958 (9th Cir. 2003).  "The mere potential for a

11 conflict of interest is not sufficient to defeat class certification; the conflict must be actual, not

12 hypothetical."  *SRAM*, 2008 WL 4447592, at *4.  In the Ninth Circuit, there is no conflict in the

13 absence of "evidence that class members actually possess opposing views."  *Cummings v. Connell*,

14 316 F.3d 886, 896 (9th Cir. 2003), *cert. denied*, 529 U.S. 927 (2003).

15    The proposed class representatives (listed in Appendix A hereto) have no interests that are

16 antagonistic to the other class members.  To the contrary, all of the class representatives and absent

17 class members are end-user purchasers of SRAM, whether businesses or individuals, and share a

18 strong and identical interest in establishing liability and impact, and in preventing future violations

19 by Defendants.  In sum, the proposed class representatives have "sufficient incentive to present

20 evidence that will establish the existence of the alleged conspiracy and its effect on the prices of all

21 of the products purchased by the class members."  *In re Citric Acid Antitrust Litig.*, 1996 WL

22 655791, at *6 (N.D. Cal. 1996).

23    Additionally, the class has been well served by existing class counsel, Zelle Hofmann

24 Voelbel & Mason LLP, who have devoted considerable time and resources to prosecuting this

25 litigation vigorously since its inception.  They have overseen the briefing and argument of

26 motions, the issuance of third-party subpoenas, document review, and work with experts.  As

28 [3] *See* Appendix A; *see also* Indirect Purchaser Plaintiffs' Motion to Substitute Plaintiffs, Exh. 1 (filed herewith).  *See also* Compl. pp. 3-15.

discussed below (*see* §IV.F), Zelle Hofmann is prepared to serve as class counsel under Rule 23(g).

**C.     Plaintiffs Satisfy the Requirements of Rule 23(b)[4]**

**1.     Overview of Rule 23(b)(3)**

Rule 23(b)(3) requires that "questions of law or fact common to the members of the class predominate over any questions affecting only individual members, and that a class action is superior to other available methods for the fair and efficient adjudication of the controversy."  Fed. R. Civ. P. 23(b)(3).  "The core purpose of Rule 23(b)(3) is to vindicate the claims of consumers and other groups of people whose individual claims would be too small to warrant litigation. . . . Rule 23(b) requires merely that common issues predominate, not that all issues be common to the class." *Smilow v. Sw. Bell Mobile Sys., Inc.,* 323 F.3d 32, 39, 41 (1st Cir. 2003).  Common issues "do not have to be dispositive of the litigation" for predominance to exist.  *Lorazepam & Clorazepate*, 202 F.R.D. at 29.  The Ninth Circuit has held that "when common questions present a significant aspect of the case and they can be resolved for all members of the class in a single adjudication, there is clear justification for handling the dispute on a representative rather than an individual basis."  *Hanlon*, 150 F.3d at 1022 (internal quotation marks and citation omitted).

Indeed, "[p]redominance is a test readily met in certain cases alleging consumer or securities fraud or violations of the antitrust laws."  *Amchem Products, Inc. v. Windsor*, 521 U.S. 591, 625 (1997).  Proof of a price-fixing conspiracy will be central to this case, and "common liability issues such as conspiracy or monopolization have, almost invariably, been held to predominate over individual issues."  6 Alba Cone & Herbert B. Newberg, *Newberg on Class Actions* § 3.3 (4th ed. 2002) ("*Newberg*") § 18.25.  Numerous courts have applied the "general rule in antitrust price-fixing cases" that "questions common to the members of the class will predominate over questions affecting only individual members."  *In re Potash Antitrust Litig.,* 159 F.R.D. 682, 693 (D. Minn. 1995).

Defendants' Price-fixing Conspiracy is a Common Issue That Predominates Over Individual Issues

---

[4] Plaintiffs seek certification under Rule 23(b)(2) and Rule 23(b)(3).  The latter is addressed first.

1       Here, as in the direct purchasers' action, Plaintiffs' claims share a factual predicate—

2   Defendants' conspiracy—proof of which will necessarily focus on Defendants', not individual

3   Plaintiff's, conduct.  *See Thomas*, 209 F.R.D. at 167; *In re Universal Service Fund Telephone*

4   *Billing Practices Litig.*, 219 F.R.D. 661, 673 (D. Kan. 2004).  Plaintiffs expect to show that

5   Defendants agreed to engage in anticompetitive acts through a combination of documentary

6   evidence, testimony from Defendants, and analysis from distinguished economists.

7       "In price-fixing cases, courts repeatedly have held that the existence of the conspiracy is

8   the predominant issue and warrants certification even where significant individual issues are

9   present."  *Thomas*, 209 F.R.D. at 167 (citation and internal quotation marks omitted).  Federal

10  courts have certified classes of indirect purchasers on antitrust claims even though certain

11  members of the class may have purchased goods through different mechanisms or incurred varying

12  damages.  In *Norvir*, this Court certified a class of end-purchasers of a prescription drug.  The

13  complaint alleged that the defendant had imposed a price increase on the drug to gain an unlawful

14  advantage.  The Court held that "the variations among some States' unjust enrichment laws do not

15  significantly alter the central issue or the manner of proof.  Common to all class members and

16  provable on a class-wide basis is whether Defendant unjustly acquired additional revenue or

17  profits by virtue of an anti-competitive premium on the price of Norvir."  2007 WL 1689899, at

18  *9.  In the *In re Relafen Antitrust Litigation*, the court certified classes of end-purchasers in

19  California, Tennessee, Arizona, Vermont, and Massachusetts.  The complaint alleged an unlawful

20  monopolization scheme and asserted state-law antitrust, consumer protection, and unjust

21  enrichment claims.  221 F.R.D. 260, 288 (D. Mass. 2004).

22      Notwithstanding these and other cases, the body of federal case law addressing class

23  certification of indirect purchasers' antitrust claims is relatively small because, before 2005, when

24  Congress enacted the Class Action Fairness Act ("CAFA"), 28 U.S.C. §§ 1332(d), 1453, 1711-

25  1715, such claims proceeded mainly in state court.[6]  For many years, therefore, it was left to state

26

27  [5] Plaintiffs seek certification under Rule 23(b)(2) and Rule 23(b)(3).  The latter is addressed first.

28  [6] *Illinois Brick Co. v. Illinois*, 431 U.S. 720 (1977), held that only direct purchasers could pursue an overcharge claim arising from a violation of the federal antitrust laws.  After this decision, a number of states enacted Illinois Brick "repealer" statutes that explicitly permitted indirect

11

1   courts to certify classes of indirect purchasers asserting antitrust claims.  *See, e.g.*, *B.W.I. Custom*

2   *Kitchen v. Owens-Illinois, Inc.,* 191 Cal. App. 3d 1341 (1987); *Rosack v. Volvo of Am. Corp*., 131

3   Cal. App. 3d 741 (1982), cert. denied, 460 U.S. 1012 (1983); *Romero v. Philip Morris Inc*., 109

4   P.3d 768 (N.M. App. 2005); *Robinson v. EMI Music Dist., Inc.,* No. L-10462, 1996 WL 495551

5   (Tenn. Cir. Ct. July 8, 1996).  *See also* Appendix B hereto (listing, among other cases, pre-2005

6   state court cases certifying indirect purchaser classes).

7          Particularly relevant here, numerous state courts certified antitrust class actions brought by

8   indirect purchasers against Microsoft based on its anticompetitive monopolization of computer

9   hardware and software.  Like the case at bar, in the *Microsoft* cases, OEMs, retailers, and others

10  purchased a component subject to an alleged overcharge and resold it, ultimately to consumers and

11  other end-users.  *See, e.g.*, *Microsoft I-V Cases*, 2000 WL 35568182 (Cal. Super. Ct. Aug. 29,

12  2000); *Cox v. Microsoft Corp*., 809 N.Y.S.2d 480 (N.Y. Sup. Ct. 2005); *In re Fla. Microsoft*

13  *Antitrust Litig.*, 2002 WL 31423620 (Fla. Cir. Ct. Aug. 26, 2002); *Comes v. Microsoft Corp.*, 696

14  N.W.2d 318 (Iowa 2005); *Gordon v. Microsoft Corp.*, 2001 WL 366432 (Minn. Dist. Ct. Mar. 30,

15  2001), review denied, 645 N.W.2d 393 (Minn. 2002), opinion on remand, 2003 WL 23105552

16  (Minn. Dist. Ct. Mar. 14, 2003); *Howe v. Microsoft Corp.*, 656 N.W.2d 285 (N.D. 2003); *In re*

17  *S.D. Microsoft Antitrust Litig*., 657 N.W.2d 668 (S.D. 2003).

18         Because the existence of Defendants' price-fixing conspiracy and anticompetitive acts

19  require common proof of Defendants' conduct, common issues predominate as to the element of

20  antitrust violation under the Sherman Act, as well as under the state antitrust, consumer protection

21  and unjust enrichment laws discussed below.  *See* §IV.C.5, *infra*.

             **2.     Indirect Purchaser Plaintiffs Have Adequately Shown Common Proof**
22                    **of Impact at the Class Certification Stage**

23         The IP Plaintiffs' complaint differs from the DP Plaintiffs' complaint in that it asserts

24  claims under state law.  As a result, "the Court must examine the end payor plaintiffs' claims

25

26  ───────────────────

27  purchaser standing in antitrust actions.  *See, e.g., Union Carbide Corp. v. Super. Ct.,* 36 Cal. 3d 15,
    19-20 (1984); *Comes v. Microsoft Corp*., 646 N.W.2d 440, 448 (Iowa 2002).  Rejecting a
28  challenge to these "repealer" statutes, the Supreme Court held that federal antitrust laws do not
    preempt state antitrust laws and that state laws may permit indirect purchasers to recover damages
    on antitrust claims.  *California v. ARC America Corp*., 490 U.S. 93 (1989).

under governing state law. . . . [which] defines the elements of the end payor plaintiffs' claims and in turn, proves relevant to determining the demonstration of common injury necessary for certification" of a Rule 23(b)(3) class. *Relafen*, 221 F.R.D. at 276; *see In re Vitamins Antitrust Litig.*, 209 F.R.D. 251, 256 (D.D.C. 2002) (at class certification, "it is necessary to identify the substantive law issues which will control the outcome of the litigation"); *Computer Economics, Inc. v. Gartner Group, Inc.*, 50 F. Supp. 2d 980, 990 (S.D. Cal. 1999) ("State rules that define the elements of a cause of action, affirmative defenses, presumptions, burdens of proof, and rules that create or preclude liability are so obviously substantive that their application in diversity actions is required.").

Under all the relevant states' laws, the indirect purchasers' complaint establishes a clear basis for common injury. California law requires a court to presume common impact when evidence points to a price-fixing conspiracy. *See* §IV.C.5.b, *infra*; *see also* Utah Code Ann. §76-10-919(7) (presuming that indirect purchasers incurred damage). Federal courts recognize the same presumption. *See In re Cement and Concrete Antitrust Litig.*, 1979 WL 1595, at *3 (D. Ariz. 1979) ("Courts have consistently held that an illegal price-fixing scheme presumptively impacts upon all purchasers of a price fixed product in a conspiratorially affected market.") (citing cases); *In re Catfish Antitrust Litig.*, 826 F. Supp. 1019, 1041 (N.D. Miss. 1993) ("In an illegal price-fixing scheme, there is a presumption that all purchasers will be impacted/injured by having to pay the higher price.").

As to any state laws that do not incorporate this presumption, the complaint itself, together with the analyses conducted by Plaintiffs' experts, Dr. Harris and Dr. Dwyer, demonstrate that Defendants' manipulation of SRAM prices harmed all of the members of the classes in a common fashion. According to the complaint, direct purchasers of SRAM and intermediate entities in the chain of distribution transferred the additional cost resulting from Defendants' price-fixing to end purchasers in the form of higher prices at the cash register and on the internet. Direct purchasers of SRAM had "very thin net margins" and were therefore "at the mercy of their component costs, so that increases in component costs, such as the price of SRAM, led to quick, corresponding price increases in the end-use products." Compl. ¶147; *see also* Harris Decl. ¶65-67. OEMs "could not

absorb any part of the increased cost of SRAM," and "[i]f the cost that an OEM pays for SRAM increases, that directly affects the prices of the products sold by the OEM."  Compl. ¶¶ 148-50.

The complaint sets out the consensus among economists that "in a multiple-level chain of distribution"—as in the SRAM industry—passing on overcharges to end purchasers "is not the exception: it is the rule."  *Id.* ¶ 189.  *See generally* Areeda & Hovenkamp, *Antitrust Law: An Analysis of Antitrust Principles and Their Application*, Vol. IIIA, ¶ 346k, at 189 (3d ed. 2007) ("The obvious difficulty with denying damages for consumers buying from an intermediary is that they are injured, often more than the intermediary").

A jury could reasonably conclude that each end-purchaser suffered injury if the evidence supports the complaint's allegations that the starting point for negotiations concerning the ultimate price paid by class members would have been lower in a competitive market.  *See* Compl., ¶¶ 147-51, 185-91.[7]  Whether Plaintiffs can prove such price inflation is not an issue for class certification.  Instead, what matters is whether Plaintiffs' proposed methods rely on common data to establish that Defendants' price inflation affected the class.

Dr. Harris first analyzes the market factors that underlie the concept of pass-through— which apply in a common fashion to all class members—and concludes that the SRAM products markets "would exhibit a high degree of pass-through."  *See* Harris Decl. ¶67.  The market factors that Dr. Harris reviews and that an individual plaintiff or numerous plaintiffs would need to address include:  Defendants' market power (Harris Decl. ¶¶23, 27); elasticity of demand (*id.*); categories of resellers in the distribution chain (*id.* ¶39-52); the degree of competition among intermediaries in the distribution channels (*id.* ¶54-55); and pricing practices such as timing, mark-up policies and impact of costs (*id.* ¶64).

Dr. Harris and Dr. Dwyer also analyze and propose several legitimate methodologies to

---

[7] *See In re Industrial Diamonds Antitrust Litig.* 167 F.R.D. 374, 383 (S.D.N.Y. 1996) (gathering authority, stating that "[i]n a number of price-fixing cases concerning industries where discounts and individually negotiated prices are common, courts have certified classes where the plaintiffs have alleged that the defendants conspired to set an artificially inflated base price from which negotiations for discounts began."); *Flat Glass*, 191 F.R.D. at 486 ("even though some plaintiffs negotiated prices, if plaintiffs can establish that the base price from which these negotiations occurred was inflated, this would establish at least the fact of damage, even if the extent of the damage by each plaintiff varied.").

1  show class-wide injury. These methods will be based upon an analysis of component cost and

2  other data and information supplied by third parties, upon assumptions regarding marginal costs

3  and degree of competition in these products markets, and from fitting demand functions to end-

4  user prices. Dwyer Decl. ¶¶6-10. As shown by Dr. Harris's and Dr. Dwyer's economic analyses

5  and proposed models, Plaintiffs' attempt to prove injury will involve common issues, and nothing

6  more is required. *See In re Dynamic Random Access Memory (DRAM) Antitrust Litig.*, 2006 WL

7  1530166, at *9 (N.D. Cal. 2006).[8] On a class certification motion, this suffices to establish

8  common impact under all the state laws described below in Section IV.C.5.

9           That some class members paid higher or lower prices for SRAM products in a relatively

10  complicated market does not preclude certification. As many courts have held, "[n]either a variety

11  of prices nor negotiated prices is an impediment to class certification if it appears that plaintiffs

12  may be able to prove at trial that . . . the price range was affected generally." *NASDAQ*, 169

13  F.R.D. at 523. In *Meijer, Inc. v. Abbott Labs.,* 2008 WL 4065839 (N.D. Cal. Aug. 27, 2008), this

14  Court rejected the proposition that certification was unwarranted simply because class members

15  incurred varying levels of damages, stating that this notion "has uniformly been rejected by the

16  courts." 2008 WL 4065839, at *9 (citing *In re Cardizem CD Antitrust Litig.*, 200 F.R.D. 297, 318-

17  19 (E.D. Mich. 2001)). Likewise, in the *In re Citric Acid Antitrust Litigation*, Judge Smith

18  certified a class on a price-fixing claim despite "[c]ontentions of infinite diversity of product,

19  marketing practices, and pricing"—contentions that the court noted "have been made in numerous

20  cases and rejected." 1996 WL 655791, at *7 (N.D. Cal. 1996) ("Diversity of products and pricing

21  does not necessarily mean that plaintiffs cannot show class-wide impact") (citation omitted). In

22  the *In re Wirebound Boxes Antitrust Litigation*, the court certified a class on price-fixing claims

23  where class members individually negotiated different prices for different products. 128 F.R.D.

24  268, 272 (D. Minn. 1989).

25

26

---

27  [8] Courts regularly certify antitrust classes where plaintiffs' economists propose statistical models
    to show that an overcharge affected all consumers on a market-wide basis. *See, e.g., In re*
28  *NASDAQ Market-Makers Antitrust Litig.,* 169 F.R.D. 493, 521-22 (S.D.N.Y. 1996); *In re Indus.*
    *Gas Antitrust Litig.*, 100 F.R.D. 280, 306 (N.D. Ill. 1983); Relafen, 221 F.R.D. at 275.

Under these authorities, the class members need not show that they paid identical prices for SRAM products, that they possessed equal bargaining power, or that the products were similar. Nor must Plaintiffs show that Defendants' alleged misconduct harmed every single class member. "[At] class certification, it is not necessary for Plaintiffs to show that every single class member was injured by the alleged price-fixing conspiracy." *Rubber Chemicals*, 232 F.R.D. at 352-53. "Even if common impact cannot be proven, the Court may certify the class. The great weight of authority suggests that the dominant issues in cases like this are whether the charged conspiracy existed and whether price-fixing occurred." *Citric Acid*, 1996 WL 655791, at *8.

In light of the above, the predominance requirement has been satisfied with regard to the injury element of the IP Plaintiffs' claims.

### 3. Indirect Purchaser Plaintiffs Have Adequately Shown Common Proof of Damages at the Class Certification Stage

The IP Plaintiffs will be able calculate their damages on a common basis. Under state and federal law, "the Court's inquiry is limited to whether or not the proposed methods are so insubstantial as to amount to no method at all." *See, e.g., Potash*, 159 F.R.D. at 697; *Microsoft I-V Cases*, 2000 WL 35568182. Drs. Harris's and Dr. Dwyer's damage methodologies are sufficient.

In *Cardizem*, the court certified an antitrust class of end-payors whose proposed damages method analyzed available industry data on an aggregate basis. The court explained that "[a]t the class certification stage, it is not necessary to identify specific benchmarks or methodology to ascertain the amount of damages. . . . 'It is sufficient to note at this stage that there are methodologies available, and that Rule 23(c)(1) and (d) allow ample flexibility' to deal with the individual damages issues that may develop." 200 F.R.D. at 348-49 (quoting *NASDAQ*, 169 F.R.D. at 522). *See also Rubber Chems.*, 232 F.R.D. at 353 (damages theory based on correlation analysis held sufficient for purposes of grant of class certification in price-fixing case); 3 Newberg § 10.3 ("Aggregate class proof of monetary relief may also be based on sampling techniques or other reasonable estimates . . ..").

Dr. Harris and Dr. Dwyer discuss several well-accepted methods by which damages can be calculated on a class-wide basis from Defendants' alleged overcharges using readily available data

16

sources.  For example, Dr. Dwyer explains that the "'before-after' methodology can be efficiently

implemented, given transactions data of SRAM sales by defendants, contracts governing

relationships between defendants and direct purchasers, and information regarding the subperiods

in which the alleged conspiracy was likely to have been effective."  Dwyer Decl. ¶17.  Dr. Dwyer

then explains that, depending upon the data supplied by OEMs, distributors, value-added resellers

and retailers[9], he can perform "reduced form" or "structural" pass-through analyses using

regression analyses that are used and accepted in the field of economics.  Dwyer Decl. ¶¶36-49

(explaining "reduced form pass-through analysis") and ¶¶50-55 (explaining "structural pass-

through analysis").[10]  Dr. Dwyer concludes that use of a combination of the "before-after" test and

regression analyses using third party data will "allow direct computation of per-unit overcharges to

indirect SRAM purchasers."  Dwyer Decl. ¶63.

These methods withstand the low level of scrutiny appropriate on class certification—and

such a finding cannot be affected by Defendants' submission of opposing expert affidavits.  As the

Court has noted, "at this stage in the litigation, we must avoid engaging in a battle of the expert

testimony."  *SRAM*, 2008 WL 4447592, at *6 (citation and quotation marks omitted).  *See*

*Pressure Sensitive*, 2007 WL 4150666, at *16 ("[t]he parties have presented a classic 'battle of the

experts,' which need not and will not be resolved at the class certification stage."); *In re Domestic*

*Air Transportation Antitrust Litig.*, 137 F.R.D. 677, 692 (N.D. Ga. 1991) ("It is not the function of

the Court at this time to determine whether [the expert] is correct.  The weight to be given his

testimony and its effect is for the fact finder in assessing the merits of plaintiffs' claims . . .").

The Court deemed adequate the methods for calculating aggregate damages that were

proposed by the DP Plaintiffs' economist.  *SRAM*, 2008 WL 4447592, **6-7.  The same result is

---

[9] These data include "Bill of Materials" reflecting the total cost of components of the end-use product; the cost of the SRAM component(s) in the end-use product; the type and/or specification of SRAM in the end-use product; the performance specifications of the end-use product; and transaction information including price, quantity, date and purchaser type of the end-use product. *See* Dwyer Decl. ¶33.

[10] Regression analysis, the before-and-after test, and the yardstick test are viable and credible methods for calculating damages in antitrust litigation.  *See NASDAQ*, 169 F.R.D. at 520-22 ("yardstick" and "before and after" methods, in conjunction with "analysis of the defendant's costs and profits," constitute "widely accepted means of measuring damages in antitrust cases") (citing cases)

warranted here, as the IP Plaintiffs proposed methods of showing class-wide damages cannot be said to be "so insubstantial as to amount to no method at all." *Id.* (quoting *Potash*, 159 F.R.D. at 697). Accordingly, individual issues do not predominate with respect to the IP Plaintiffs' proof of the damages element of their antitrust and other claims.

### 4. Class Plaintiffs Have Demonstrated That Common Issues Predominate Under the State Laws Identified in the Complaint

For the reasons just presented, the Indirect State Classes identified in the Motion should be certified consistent with their respective states' relevant legal standards detailed below.[11]

#### a. Unjust Enrichment

Plaintiffs assert claims under the common law doctrine of unjust enrichment on behalf of classes in 23 states and the District of Columbia. Compl. ¶¶ 260-63.[12] Unjust enrichment is a "universally recognized cause[] of action that [is] materially the same throughout the United States." *Singer v. AT&T Corp.*, 185 F.R.D. 681, 692 (S.D. Fla. 1998); *see also* RESTATEMENT (FIRST) OF RESTITUTION § 1 & cmt. a (1937) (listing general elements of unjust enrichment). The Court agreed with this in *Norvir*, noting that "the variations among some States' unjust enrichment laws do not significantly alter the central issue or the manner of proof." 2007 WL 1689899, at *9 (N.D. Cal. 2007).[13] The unjust enrichment cause of action applies to price-fixing violations, whereby defendants unjustly gain a pecuniary benefit as a result of concerted anticompetitive acts. *See, e.g., In re G-Fees Antitrust Litig.*, 2008 WL 4761888, at **15-16 (D.D.C. 2008). Further, the remedy for unjust enrichment—restitution based on the benefit

---

[11] There is a virtual identity between state antitrust and consumer protection laws, which are almost uniformly patterned after the Sherman Antitrust Act, 15 U.S.C. § 1, *et seq.,* and the FTC Act, 15 U.S.C. § 41, *et seq.,* respectively. Given IP Plaintiffs' overarching conspiracy allegations, any "idiosyncratic differences between state consumer protection laws are not sufficiently substantive to predominate over the shared claims." *Hanlon*, 150 F.3d at 1022-23; *see also In re Wayfarin Sodium Antitrust Litig.*, 391 F.3d 516, 525-30 (3d Cir. 2004) ("the fact that there may be variations in the rights and remedies available to injured class members under the various laws of the fifty states in this matter does not defeat commonality and predominance").

[12] Arizona, Arkansas, California, District of Columbia, Florida, Hawaii, Iowa, Kansas, Maine, Massachusetts, Michigan, Minnesota, Montana, Nevada, New Mexico, New York, North Carolina, Pennsylvania, Rhode Island, South Dakota, Tennessee, Washington, West Virginia, Wisconsin

[13] "Whether or not the benefit is directly conferred on the defendant is not the critical inquiry; rather, the plaintiff must show that his detriment and the defendant's benefit are related and flow from the challenged conduct." *In re Cardizem CD Antitrust Litig.,* 105 F. Supp. 2d 618, 671 (E.D. Mich. 2000) (citing RESTATEMENT (FIRST) OF RESTITUTION § 1, cmt. b).

18

defendants unjustly received—is well-suited for multi-state class treatment by virtue of its uniform availability and its focus on the defendants' gain. *See* 3 Newberg § 10.3 ("restitution lends itself inherently to easier calculation of classwide monetary relief"); *In re Terazosin Hydrochloride*, 220 F.R.D. 672, 697-98 (S.D. Fla. 2004) (certifying state unjust enrichment classes of indirect purchasers because "the same common operative facts that form the basis for each of the state classes' antitrust claims forms the basis for the unjust enrichment claims"); Relafen, 221 F.R.D. at 279-80, 288 (certifying state classes of indirect purchasers on unjust enrichment and other claims and holding that unjust enrichment claims may "accompany and supplement those for tortious injury"). Accordingly, the Court should certify all of the Indirect State Classes in the Motion that assert unjust enrichment claims.

### b.   California

California's antitrust law, the Cartwright Act, Cal. Bus. & Prof. Code § 16700, *et seq.*, prohibits combinations between two or more persons to "[a]gree in any manner to keep the price of [a product] . . . at a fixed or graduated figure," or to "[e]stablish or settle the price of any [product] . . ., so as directly or indirectly to preclude a free and unrestricted competition among themselves, or any purchasers or consumers in the sale or transportation of [the product]." *Id.* § 16720(e)(2) and (3). The California Supreme Court has specifically identified "price-fixing" as among the business practices "which because of their pernicious effect on competition and lack of any redeeming virtue are conclusively presumed to be unreasonable and therefore illegal without elaborate inquiry as to the precise harm they have caused or the business excuse for their use." *Corwin v. Los Angeles Newspaper Service Bureau, Inc.*, 4 Cal. 3d 842, 853 (1971) (quoting *Northern Pac. R. Co. v. United States*, 356 U.S. 1, 5 (1958)).

When the legislature enacted the Cartwright Act, it delivered "a mandate to avoid unnecessary procedural barriers to indirect purchasers' prosecution of California antitrust suits" and "to retain the availability of indirect-purchaser suits as a viable and effective of means of enforcing California's anti-trust laws." *Union Carbide*, 36 Cal. 3d at 21-22. The California Supreme Court clarified that "indirect purchasers are persons 'injured' by illegal overcharges passed on to them in the chain of distribution." *Id.* at 20. Courts regularly certify classes of

19

1    indirect purchasers on Cartwright Act claims.  *See, e.g., Rosack*, 131 Cal. App. 3d at 760-62;

2    *Terazosin Hydrochloride*, 220 F.R.D. at 695, 702.

3        California's Unfair Competition Law ("UCL"), Cal. Bus. & Prof. Code, § 17200, *et seq.*,

4    defines "unfair competition" to include "any unlawful, unfair or fraudulent business act or

5    practice."  *Id.* § 17200.  The UCL extends to antitrust violations such as price-fixing, and UCL

6    claims are commonly certified for class treatment.  *See Corbett v. Super. Ct*., 101 Cal. App. 4th

7    649, 654-55 (2002); *Massachusetts Mutual Life Ins. Co. v. Super. Ct.*, 97 Cal. App. 4th 1282, 1292

8    (2002) ("plaintiffs' UCL claim presents common legal and factual issues which were plainly

9    suitable for treatment as a class action.*"); Rees v. Souza's Milk Transp., Co.*, 2006 WL 738987, at

10    *9 (E.D. Cal. 2006) (certifying class on UCL claim); Relafen, 221 F.R.D. at 283 (certifying

11    California end-purchaser class under UCL).

12        With respect to the class certification analysis, the alleged existence of an anticompetitive

13    conspiracy constitutes a predominating common issue in California that justifies certification of an

14    indirect purchaser class.  This principle was applied in *Rosack*, where the Court of Appeal

15    explained that "contentions of infinite diversity of product, marketing practices, and pricing have

16    been made in numerous cases and rejected.  Courts have consistently found the conspiracy issue

17    the overriding, predominant question."  *Id.* at 760 (citation omitted).

18        Common impact is presumed in antitrust class actions brought under California law.  In

19    *B.W.I.*, the Court of Appeal held that

20
21
22
23
24
25

> when a conspiracy to fix prices has been proven and plaintiffs have
> established they purchased the price-fixed goods or services, the jury
> can *infer* plaintiffs were damaged. . . . "This inference eliminates the
> need for each class member to prove individually the consequences
> of the defendants' actions to him or her.  Accordingly, impact can be
> treated as a common question for certification purposes."  It should
> also be emphasized that courts have applied these principles to
> markets, such as this one, characterized by individually negotiated
> prices, varying profit margins, and intense competition.

26    191 Cal. App. 3d at 1350-51 (emphasis in original) (quoting Rosack, 131 Cal. App. 3d at 760).

27        If the damage methodologies proposed by the class representative for establishing the

28    amount of damages are not "so insubstantial that they amount to no method at all," common issues

1   predominate.  *Microsoft I V Cases*, 2000 WL 35568182.[14]   Thus, the Court of Appeal held in

2   *Rosack* that "[s]peculative problems with regard to computation of damages" were insufficient to

3   preclude class certification.  131 Cal. App. 3d at 762.  *See Bruno v. Super. Ct.*, 127 Cal. App. 3d

4   120, 129 n.4 (1981) ("In many cases such an aggregate calculation will be far more accurate than

5   summing all individual claims.").

6          California supports the fullest and most flexible use of class actions.  "Any doubt as to the

7   appropriateness of class treatment should be resolved in favor of class certification, subject to later

8   modification if necessary."  Hopkins, 2005 WL 1020868, at *2.  The certification question does

9   not turn on whether an action is legally or factually meritorious.  *Lockheed Martin Corp. v. Super.*

10  *Ct.,* 29 Cal. 4th 1096, 1120 (2003) (citing *Linder v. Thrifty Oil Co*., 23 Cal. 4th 429, 439-40

11  (2000)).

12         These rules derive from a recognition that class actions protect consumers, prevent

13  repetitive claims, and deter irresponsible corporate behavior.  *See Linder*, 23 Cal. 4th at 445.  To

14  achieve these salutary purposes, the California courts embrace class actions.  *See, e.g., Discover*

15  *Bank v. Super. Ct.*, 36 Cal. 4th 148, 156 (2005); *Richmond v. Dart Indus*., Inc., 29 Cal. 3d 462

16  (1981).  "The right to seek classwide redress is more than a mere procedural device in California";

17  rather, California's express public policy is to encourage the class action as an "essential tool for

18  the protection of consumers against exploitative business practices."  *Klussman v. Cross Country*

19  *Bank,* 134 Cal. App. 4th 1283, 1296 (2005)*; State of California v. Levi Strauss & Co.*, 41 Cal. 3d

20  460, 471 (1986).  "A company which wrongfully exacts a dollar from each of millions of

21  customers will reap a handsome profit; the class action is often the only effective way to halt and

22  redress such exploitation.  The problems which arise in the management of a class action involving

23  numerous small claims do not justify a judicial policy that would permit the defendant to retain the

24  benefits of its wrongful conduct and to continue that conduct with impunity."  *Discover Bank*, 36

25  _____

26  [14] Addressing indirect purchasers' ability to recover damages, the court in Microsoft quoted the
    plaintiffs' expert with approval:  "As is well known in economic theory and practice, at least some
27  of the overcharge will be passed on by distributors to end consumers.  When the distribution
    markets are highly competitive, as they are here, all or nearly all of the overcharge will be passed
28  through to ultimate consumers. . . . This general phenomenon of cost pass through is well
    established in antitrust law and economics as well."  2000 WL 35568182.

Cal. 4th at 156 (citation omitted).

In light of the foregoing principles, it is clear that under California law, the issues of whether Defendants engaged in a price-fixing conspiracy, whether class members were injured, and the amount of those damages, are subject to generalized proof, not individualized proof.  *See also* §§IV.C.2.-4, *supra*.  Numerous courts have certified indirect purchaser classes in California (*see* Appendix B), and the Court should do so here as well.

### c.     The Arizona Class Satisfies the Predominance Requirement

The proposed Arizona IP Class asserts causes of action under the Arizona Uniform Antitrust Act, Ariz. Rev. Stat. §§ 44 1401, *et seq.*  Compl. ¶221.  The Arizona Uniform Antitrust Act states that "[a] contract, combination or conspiracy between two or more persons in restraint of, or to monopolize, trade or commerce, any part of which is within this state, is unlawful."  A.R.S. § 44 1402.  Damages available to individuals under the Act include injunctive relief, money damages, and attorneys' fees and costs.  A.R.S. § 44 1408(b).  An indirect purchaser of goods has standing to bring an action under the Act to recover damages resulting from the alleged price-fixing by the manufacturers of those goods.  *Bunker's Glass Co. v. Pilkington PLC,* 75 P.3d 99, 102 (2003); *Friedman v. Microsoft Corp.*, 141 P.3d 824, 828 (Ariz. App. 2006) ("it [is] clear that Arizona indirect purchasers [can] recover for antitrust violations under Arizona law.").

For the same reasons as set forth above in sections IV.C.2 and IV.C.3, whether an SRAM conspiracy exists under Arizona antitrust law, and whether the class members were injured can be shown with predominantly generalized evidence.  Additionally, as set out in section IV.C.4, the IP Plaintiffs proffered sufficient methodologies for calculating damages on a class-wide basis.  Numerous courts have certified claims under the Arizona Antitrust Act in cases brought by indirect purchasers.  *See* Appendix B.  The same result is appropriate here.

### d.     The Arkansas Class Satisfies the Predominance Requirement

The proposed Arkansas IP Class asserts causes of action under the Arkansas Deceptive Trade Practices Act ("DTPA"), Ark. Code Ann. §§ 4-88-101, *et seq.*  Compl. ¶248.  The Arkansas DTPA states that eleven enumerated acts, including "any . . . unconscionable, false, or deceptive act or practice in business, commerce, or trade" as well as other unfair trade practices actionable at

1  common law, are deceptive trade practices. § 4-88-107 (10). Unlawful acts also include: "(1) the

2  act, use, or employment by any person of any deception, fraud, or false pretense; or (2) the

3  concealment, suppression, or omission of any material fact with intent that others rely upon the

4  concealment, suppression, or omission." *Id.* § 4-88-108. Remedies available to individuals under

5  the Arkansas DTPA include injunctive relief, actual damages, and attorneys' fees and costs. *Id.* §

6  4-88-113. An indirect purchaser of goods has standing to bring an action under the DTPA to

7  recover damages resulting from the alleged price-fixing by the manufacturers' of those goods. *See*

8  *id*. Ark. Code Ann. § 4-75-212(b).

9       For the Arkansas IP Class, common issues predominate as to the liability element of

10  whether Defendants' engaged in a price-fixing conspiracy, and whether that conspiracy constitutes

11  an unlawful act under the Arkansas DTPA. Additionally, as set out in sections IV.C.3-4, whether

12  the Arkansas IP Class members suffered damage as a result of those unlawful acts is subject to

13  predominantly common proof, and the IP Plaintiffs proffered sufficient methodologies for

14  calculating damages on a class-wide basis. Finally, claims under Arkansas law have been certified

15  for class treatment in cases brought by indirect purchasers. *See* Appendix B. Certification of the

16  Arkansas IP Class is therefore appropriate.

17              **e.    The District of Columbia Class Satisfies the Predominance**
                        **Requirement**

18       The proposed District of Columbia IP Class alleges violations of the District of Columbia

19  Consumer Protection Procedures Act ("CPPA"), D.C. Code § 28-3901, *et seq.*, and the District of

20  Columbia Antitrust Act, D.C. Code §28-4501 *et seq.* ("DCAA"). Compl. ¶¶223, 250. The DCAA

21  provides that "[e]very contract, combination in the form of a trust or otherwise, or conspiracy in

22  restraint of trade or commerce all or any part of which is within the District of Columbia is

23  declared to be illegal" (D.C. Code § 28-4502), and expressly provides a cause of action for indirect

24  purchasers (D.C. Code §28-4509(a)). Indeed, the District of Columbia legislators "deliberately

25  chose to reject the gloss put on the Clayton Act by Illinois Brick and to provide a contrasting

26  antitrust scheme for the District of Columbia." *Holder v. Archer Daniels Midland Co.*, 1998 WL

27  1469620, *3 (D.C. Super. Ct. Nov. 4, 1998); *see also In re TFT-LCD (Flat Panel) Antitrust Litig.*,

28

2008 WL 3916309, *13 (N.D. Cal. Aug. 25, 2008) (noting that the CPPA protects consumers from a broad spectrum of deceptive trade practices).

For the same reasons as set forth above in section IV.C.2., the issue of whether there was a conspiracy to fix the prices of SRAM in violation of the DCAA or CCPA, is subject to generalized proof, not individualized proof, so Rule 23(b)(3) is satisfied.  Also, the other elements of the claims, injury and damages, are also subject to generalized proof, and the DCAA expressly provides for such class-wide proof.[15]  Indeed, District of Columbia courts addressing impact recognize that "[a]t the class certification stage, plaintiffs need only demonstrate that they intend to use generalized evidence which is common to the class and will predominate over individualized issues with respect to proving impact."  *In re Vitamins Antitrust Litig*., 209 F.R.D. 251, 266 (D.D.C. 2002).  Thus, Rule 23(b)(3) is met with regard to impact and damages.  *See* §IV.C.3-C.4., *supra*.  A number of courts have certified classes of indirect purchasers under District of Columbia law (*see* Appendix B), and for the reasons set forth above, this Court should do so here.

### f.      The Florida Class Satisfies the Predominance Requirement

The proposed Florida IP Class asserts a cause of action under the Florida Deceptive and Unfair Trade Practices Act ("DTPA"), F.S.A. § 501.201 *et seq.*  Compl. ¶251.  The Florida DTPA expresses a primary policy "[t]o protect the consuming public from those who engage in unfair methods of competition, or unconscionable, deceptive, or unfair acts or practices in the conduct of any trade or commerce," and provides that the act "shall be construed liberally to promote [such] policies... ."  F.S.A. § 501.202.  Florida courts have expressly held that an indirect purchaser action alleging a price-fixing conspiracy is actionable under the Florida DTPA.  *See Mack v. Bristol Myers Squibb*, 673 So. 2d 100, 108 (Fla. 1st DCA 1996) ("we read subsections 501.202(2), 501.211(2) and 501.204(1) of the Florida DPTA as a clear statement of legislative policy to protect consumers through the authorization of such indirect purchaser actions."); *see also In re Florida Microsoft Antitrust Litig, No. 99* 27340, 2002 WL 31423620 (Fla. Cir. Ct, Aug. 26, 2002).  A

---

[15] "In any class action brought under this section by purchasers or sellers, the fact of injury and the amount of damages sustained by the members of the class may be proven on a class-wide basis, without requiring proof of such matters by each individual member of the class." D.C. Code § 28-4508 (c).

24

consumer who has suffered a loss as a result of a DTPA violation may bring an action for actual damages, attorney fees and costs. F.S.A. § 501.211(2).

For the same reasons as set forth above in sections IV.C.2.-4., the issues of whether there was a conspiracy to fix the prices of SRAM in violation of Florida law, whether the Florida IP Class members suffered damage, and proof of the amount of damages sustained on a class-wide basis are subject to generalized proof, not individualized proof, so Rule 23(b)(3) is satisfied.  As set forth in Appendix B attached hereto, numerous courts have certified claims under the Florida DTPA in cases brought by indirect purchasers, and the same result is warranted here.

### g.        The Hawaii Class Satisfies the Predominance Requirement

The proposed Hawaii IP Class asserts causes of action under the Hawaii Revised Statutes, H.R.S. §§ 480-1, *et seq.*  Compl. ¶224.  Hawaii antitrust law prohibits "[u]nfair methods of competition and unfair or deceptive acts or practices in the practice of any trade or commerce" (H.R.S. §480-2(a)); it further provides that "every contract, combination in the form of trust or otherwise, or conspiracy, in restraint of trade or commerce in the State, or in any section of this State is illegal" (H.R.S. § 480 4(a)).  Thus, in terms of liability, §480 4(a) mirrors the Sherman Act §1.  H.R.S. §480-3 further states:  "This chapter shall be construed in accordance with judicial interpretations of similar federal antitrust statutes, except that lawsuits by indirect purchasers may be brought as provided in this chapter."  *See McDevitt v. Guenther*, 522 F.Supp.2d 1272, 1289 (D.Haw. 2007).  An indirect purchaser of goods has standing to bring an action under Hawaii law to recover treble damages, attorneys' fees and costs, resulting from the alleged price-fixing by the manufacturers of those goods.  *See* H.R.S §§ 480-13; 480-13.3; *see also Sea Land Service, Inc. v. Atlantic Pacific Intern., Inc.*, 61 F. Supp. 2d 1092, 1097 (D. Haw. 1999).

For all of the same reasons as outlined above in sections  IV.C.2.-4., the issues of whether there was a conspiracy to fix the prices of SRAM in violation of Hawaii antitrust law, whether the Hawaii IP Class members suffered damage, and proof of the amount of damages sustained on a class-wide basis are subject to generalized proof, not individualized proof, so Rule 23(b)(3) is satisfied.  Consumer claims have been certified for class treatment under Hawaii law (*see* Appendix B), and the same result is warranted here.

**h.      The Iowa Class Satisfies the Predominance Requirement**

The proposed Iowa IP Class asserts a cause of action under the Iowa Competition Law ("ICL"), I.C.A. § 553.4.  Compl. ¶225.  The ICL provides that "a person shall not attempt to establish, maintain, or use a monopoly of trade or commerce in a relevant market for the purpose of excluding competition or of controlling, fixing or maintaining prices."  Iowa Code § 553.5. Under the ICL, "a person who is injured ... by conduct prohibited under this chapter may bring suit to:  ... [r]ecover actual damages resulting from conduct prohibited under this chapter."  Iowa Code § 553.12.  In *Comes v. Microsoft*, 646 N.W. 2d 440, 447 (Iowa 2002), the Iowa Supreme Court held that indirect purchasers may recover damages under the ICL.

All of the elements of the statutory claim (*i.e.*, conspiracy, impact and the amount of damages) can be established through common proof.  *See* §§ IV.C.2.-4., supra.  Indeed, not only has the Iowa Supreme Court has held that class treatment is appropriate in indirect purchaser actions based on antitrust misconduct, but it has also held that common issues on liability would predominate even without a finding of commonality as to impact and damages.  *See Comes v. Microsoft Corporation*, 696 N.W.2d 318, 323 (Iowa 2005).  The Court also found that plaintiffs' expert's opinion as to common impact and damages based on economic theory was more than sufficient to support certification.  *Id.* at 324 325.  Moreover, a number of other courts have certified claims under the ICL in cases brought by indirect purchasers (*see* Appendix B), lending further support to certification here.

**i.      The Kansas Class Satisfies the Predominance Requirement**

The proposed Kansas IP Class asserts causes of action under the Kansas antitrust statute, K.S.A. § 50-112, and the Kansas Consumer Protection Act, K.S.A. § 50-623 et. seq.  Compl. ¶¶226, 252.  The Kansas antitrust statute prohibits "arrangements, contracts, agreements, trusts, or combinations between persons with a view or which tend to prevent full and free competition." K.S.A. § 50-112.  A private right of action exists under the statute for any person injured or damaged directly or indirectly by any such arrangement, contract, agreement, trust or combination. *See* K.S.A. § 50-115; K.S.A. § 50-161(b); *see also Four B Corp. v. Daicel Chemical Industries, Ltd.*, 253 F. Supp. 2d 1147, 1150, 1152 (D. Kan. 2003) (indirect purchasers have standing under

1    this statute to sue for antitrust misconduct).

2          All of the elements of the Kansas antitrust claim (*i.e.*, conspiracy, injury and the amount of

3    damages) can be established through common proof.  *See* §§ IV.C.2.-4., supra.  Indeed, in

4    *Bellinder v. Microsoft Corp.*, the court certified a class of indirect purchasers of computer software

5    based upon expert testimony very similar to that presented here.  2001 WL 1397995 *6 (Kan. Dist.

6    Ct. Sept. 7, 2001) (the expert, citing economic literature, opined that "some increase in price or

7    overcharge is almost always passed on to the end user" and offered three "standard, yardstick

8    methodologies" from which the amount of the overcharge passed to indirect purchasers could be

9    calculated, showing common proof of impact.).  A number of other state and federal courts have

10   certified indirect purchaser classes asserting claims under the Kansas antitrust statute.  *See*

11   Appendix B.  Certification of the Kansas IP Class is similarly warranted here.

12                    **j.        The Maine Class Satisfies the Predominance Requirement**

13         The proposed Maine IP Class asserts causes of action under the Maine antitrust act, 10

14   M.S.R.A. § 1101, *et seq.*, and the Maine Unfair Trade Practices Act, 5 M.S.R.A. § 207, *et seq.*

15   Compl. ¶¶227, 253.  The Maine antitrust act prohibits "[e]very contract, combination in the form

16   of trusts or otherwise, or conspiracy, in restraint of trade or commerce." 10 M.S.R.A. § 1101.  A

17   private right of action for damages, including treble damages, costs and attorneys' fees and

18   equitable relief, is available to "[a]ny person...injured directly or indirectly in its business or

19   property" by reason of conduct in violation of  "section 1101, 1102 or 1102 A."  *Id.* § 1104.[16]

20         For all of the same reasons as detailed above in sections IV.C.2.-4., the elements of the

21   Maine antitrust claim (*i.e.*, conspiracy, injury and the amount of damages) can be established

22   through common proof.  Indeed, several courts have certified Maine classes of indirect purchasers

23   under the Maine antitrust and consumer protections statutes (*see* Appendix B at), and the Court

24   should do so here as well.

25   _____

26   [16] The Maine Unfair Trade Practices Act similarly provides that, "[u]nfair methods of competition
     and unfair or deceptive acts or practices in the conduct of any trade or commerce are declared
27   unlawful."  5 M.S.R.A. § 207.  Consumers have a private right of action under the statute for
     actual damages, restitution and equitable relief.  *Id.* § 213(1).  A plaintiff who has suffered an
28   injury by way of loss of money or property can recover where at least a portion of her damages
     resulted from the conduct in violation of Section 207.  *Van Voorhees v. Dodge*, 679 A.2d 1077,
     1082 (1996).

**k.      The Massachusetts Class Satisfies the Predominance Requirement**

The proposed Massachusetts IP Class asserts causes of action under the Massachusetts consumer protection act, Massachusetts General Laws, chapter 93A, § 9. Compl. ¶254. The Massachusetts consumer protection act provides that "[u]nfair methods of competition and unfair or deceptive acts or practices in the conduct of any trade or commerce are hereby declared unlawful." G.L., c. 93A, § 2(a). The Massachusetts legislature further provided that, in construing the latter provision, "the courts will be guided by the interpretations given by the Federal Trade Commission and the Federal Courts to section 5(a)(1) of the Federal Trade Commission Act (15 U.S.C. 45(a)(1)), as from time to time amended." G.L. c. 93A, § 2(b). Section 9 of c. 93A provides a private right of action for "[a]ny person, . . ., who has been injured by another person's use or employment of any method, act or practice declared unlawful by section two." G.L. c. 93A, § 9. The statute also provides for the recovery of statutory minimum damages of $25 per violation, or actual damages, whichever is greater. G.L. c. 93A, § 9(3). Additionally, "G.L. c. 93A allows indirect purchasers to bring a cause of action for anticompetitive conduct that would be precluded under the [Massachusetts] Antitrust Act." *Ciardi v. F. Hoffman La Roche, Ltd.*, 436 Mass. 53, 64, n.18 (2002).

For the same reasons as set forth above in sections IV.C.2.-4., the issues of whether there was a conspiracy to fix the prices of SRAM in violation of Massachusetts law, whether the Massachusetts IP Class members were injured, and proof of the damages sustained on a class-wide basis are all subject to generalized proof, not individualized proof, so Rule 23(b)(3) is satisfied.[17] Numerous Massachusetts indirect purchaser claims under c. 93A have been certified by state and federal courts (*see* Appendix B), providing further support for certification here.

---

[17] Moreover, in lieu of calculating actual damages, Massachusetts IP Class members can recover statutory damages in the sum of $25 for each Class member, making the calculation even simpler. Additionally, the Massachusetts IP Class can recover a share of the Defendants' profits under a disgorgement theory, removing the need to calculate actual damages for each class member. This theory has been applied to claims under c. 93A. *See Melo Tone Vending, Inc. v. Sherry, Inc.*, 39 Mass. App. Ct. 315 (1995); *Mill Pond Associates, Inc. v. E & B Gift Ware, Inc.*, 751 F. Supp. 299 (D. Mass. 1990).

28

**l.        The Michigan Class Satisfies the Predominance Requirement**

The proposed Michigan IP Class asserts causes of action under the Michigan Antitrust Reform Act ("MARA"), MCLS § 445.772, *et seq.* Compl. ¶228.  The MARA provides that "[a] contract, combination, or conspiracy between 2 or more persons in restraint of, or to monopolize, trade or commerce in a relevant market is unlawful."  MCLS § 445.772.  MARA provides that: "It is the intent of the legislature that in construing all sections of this act, the courts shall give due deference to interpretations given by the federal violations and the rule of reason." MCLS § 445.784(2).  Section 445.778(2) provides that:

> [a]ny other person threatened with injury or injured directly or indirectly in his or her business or property by a violation of this act may bring an action for appropriate injunctive or other equitable relief against immediate, irreparable harm, actual damages sustained by reason of a violation of this act . . ..

For the same reasons as set forth above in sections IV.C.2.-4., the issues of whether there was a conspiracy to fix the prices of SRAM in violation of MARA, whether the Michigan IP Class members were injured, and proof of the damages sustained on a class-wide basis are subject to generalized proof, not individualized proof, so Rule 23(b)(3) is satisfied.  A number of courts have certified classes of Michigan indirect purchasers in similar contexts. *See e.g.*, *Cardizem*, 200 F.R.D. 326.[18]  *See also* Appendix B.

**m.       The Minnesota Class Satisfies the Predominance Requirement**

The proposed Minnesota IP Class asserts causes of action under the Minnesota Antitrust Law, Minn. Stat. § 325D.49, et. seq.  Compl. ¶229.  Under the Minnesota antitrust statute, "A contract, combination or conspiracy between two or more persons in unreasonable restraint of trade or commerce is unlawful." Minn. Stat § 325D.51.  Furthermore, "any person... injured

---

[18] In *Cardizem*, plaintiffs sought to certify claims under MARA against the manufacturer of Cardizem CD for entering into an agreement with a generic drug manufacturer to delay the introduction of the generic drug into the market, allowing the defendant to maintain Cardizem CD prices at supra competitive levels.  To prove overcharge to indirect purchasers, plaintiffs offered expert testimony opining on the price differentials between brand name drugs and their generic equivalents.  200 F.R.D. at 345.  The Court certified the class, accepting the proof offered by the plaintiffs' expert as demonstrating that class-wide impact could be shown with common proof and declining to require the plaintiffs to offer a specific method of tracing the overcharge at every step of the distribution chain to show pass-through. *Id.* at 344, 346.

29

1   directly or indirectly by a violation of [section 325D.5 1] shall recover three times the actual

2   damages sustained, together with costs and disbursements, including reasonable attorneys' fees."

3   Minn. Stat. § 325D.57.

4         "Minnesota antitrust law expressly provides damages for indirect purchasers injured by

5   antitrust violations." *Gordon v. Microsoft Corp.*, 2001 WL 366432 at *2 (Minn. Dist. Ct., Mar. 30,

6   2001).  *See also Lorix v. Crompton Corp.*, 736 N.W.2d 619 (Minn. 2007).  In *Gordon*, the court

7   certified a class consisting of indirect purchasers of operating system software produced by

8   Microsoft.  In finding certification to be superior to other methods of adjudication, the court stated

9   that "based on Plaintiffs' proposed methods of determining an overcharge to direct purchasers and

10  a percentage pass through to individual consumers, the court does not find manageability problems

11  sufficient to deny certification of the class."  *Id.* at *12.

12        For the same reasons as set forth above in sections IV.C.2.-4., the issues of whether there

13  was a conspiracy to fix the prices of SRAM in violation of Minnesota antitrust law, whether the

14  Minnesota IP Class members were injured, and proof of the damages sustained on a class-wide

15  basis are subject to generalized proof, not individualized proof, so Rule 23(b)(3) is satisfied.  In

16  addition to *Gordon v. Microsoft*, at least two other courts have certified classes of Minnesota

17  indirect purchasers in similar cases.  *See* Appendix B.

18                    **n.      The Montana Class Satisfies the Predominance Requirement**

19        The proposed Montana class asserts causes of action under the Montana Unfair Trade

20  Practices Act, Montana Code, § 30-14-201 *et seq.*  Compl. ¶255.  Under Section 14-205, it is

21  unlawful for a person or group of persons, directly or indirectly:

22                 (1) to enter an agreement for the purpose of fixing the price or
                   regulating the production of an article of commerce; (2) for the
23                 purpose of creating or carrying out any restriction in trade, to: (a)
                   limit productions; (b) increase or reduce the price of merchandise or
24                 commodities; (c) prevent competition in the distribution or sale of
                   merchandise or commodities; and (d) fix a standard or figure
25                 whereby the price of an article of commerce intended for sale, use,
                   or consumption will be in any way controlled...
26

27  The Montana Act grants standing broadly, permits claims for damages by indirect

28  purchasers asserting price-fixing claims, and has been construed in a manner similar to the

                                        30

1   Sherman Act.  *See Olson v. Microsoft Corporation*, No. CDV-200-219 (Mt. Super., Feb. 15,

2   2001); Mont. Code §30-14-222.

3        For all of the same reasons as detailed above in sections IV.C.2.-4., the elements of the

4   Montana price-fixing claim (*i.e.*, a conspiracy, injury and the amount of damages) can be

5   established through common proof, and the requirements of Rule 23(b)(3) are met here.

6                **o.      The Nevada Class Satisfies the Predominance Requirement.**

7        The proposed Nevada IP Class alleges violations of Nevada Revised Statute §§ 598A, *et

8   seq.* (the "UTPA").  Compl. ¶232.  The Nevada UTPA specifically prohibits price-fixing

9   conspiracies, and provides that indirect purchasers may sue for such violations.  *See* N.R.S.

10  598A.060; N.R.S. 598A.210; *In re Terazosin Hydrochloride*, 220 F.R.D. 672 (S.D.Fla. 2004) (an

11  indirect purchaser of goods has standing under the UTPA to recover damages for price-fixing by

12  the manufacturers of those goods).  Finally, the Nevada UTPA "shall be construed in harmony

13  with prevailing judicial interpretations of the federal antitrust statutes."  N.R.S. 598A.050.

14       The Nevada Class satisfies the predominance requirement because all of the elements of

15  the Nevada UTPA claim (*i.e.*, conspiracy, impact and damages) can be established through

16  common proof.  *See* §§ IV.C.2.-4., *supra*.  Other courts have certified claims in cases brought by

17  indirect purchasers under the Nevada UTPA (*see* Appendix B), and this Court should do so here.

18               **p.      The New Mexico Class Satisfies the Predominance Requirement.**

19       The proposed New Mexico IP Class alleges violations of the New Mexico Trade Practices

20  Act, N.M.S.A. 1978 § 57-1-1 *et seq.* (also known as the "New Mexico Antitrust Act") and the

21  New Mexico Unfair Practices Act, N.M.S.A. 1978 § 57-12-1 *et seq.* ("NMUPA").  Compl. ¶¶233,

22  257.  Under the New Mexico Antitrust Act, "[e]very contract, agreement, combination or

23  conspiracy in restraint of trade or commerce, any part of which or trade or commerce is within this

24  state, is unlawful."  N.M. Stat. Ann. §57-1-1.  Additionally, the NMUPA expressly provides that

25  indirect purchasers who are "threatened with injury or injured" have standing to assert such a

26

27

28

1  claim.  *See* N.M. Stat. Ann. §57-1-3(A); s*ee also Romero v. Philip Morris Incorporated*, 137 N.M.

2  229, 231-32, 109 P. 3d 768, 770-71 (N.M. App. 2005).[19]

3      For all of the same reasons as detailed above in sections IV.C.2.-4, the elements of the

4  claim under New Mexico's Antitrust Act (*i.e.*, a price-fixing conspiracy, injury and the amount of

5  damages) can be established through common proof, and the New Mexico IP Class satisfies the

6  predominance requirement of Rule 23 (b)(3).  Indeed, claims under the New Mexico Antitrust Act

7  have been certified for class treatment in cases brought by indirect purchasers in both state and

8  federal courts.  *See* Appendix B.

9      The Court should also certify the claim of the New Mexico Class under the State's Unfair

10  Practices Act.[20]  A class of indirect purchasers under the NMUPA was certified in *In re*

11  *Pharmaceutical Industry Average Wholesale Price Litigation*, 233 F.R.D. 229, 230 (D. Mass.

12  2006).  Indeed, multiple courts have certified indirect purchaser classes under New Mexico law.

13  *See* Appendix B.  A similar result is warranted here.

14              **q.     The New York Class Satisfies the Predominance Requirement**

15      The proposed New York IP Class asserts a cause of action for actual damages under New

16  York General Business Law (GBL) § 349(h).  Compl. ¶258.  The prima facie elements of a § 349

17  claim are: (1) a showing that defendant is engaging in an act or practice that is deceptive or

18  misleading in a material way, and (2) that plaintiff has been injured as a result.  *Goshen v. Mut.*

19  *Life Ins. Co*., 98 N.Y.2d 314, 324 (2002) (citing Oswego Laborers' Local 214 *Pension Fund v.*

20  *Marine Midland Bank, N.A*., 85 N.Y.2d 20, 25 (1995)).  Reliance is not an element of the claim.

21  See *Stutman v. Chemical Bank*, 95 N.Y.2d 24, 29 (2000) (citing *Small v. Lorillard Tobacco Co*.,

22  94 N.Y.2d 43, 55-56 (1999)).  In addition, as this Court ruled in its June 27, 2008 Order (p. 4), IP

23  _____

24  [19] As the court recognized in Romero, "[a]s a rule of thumb, a price-fixing antitrust conspiracy
    model is generally regarded as well suited for class treatment." *Id.*, 137 N.M. at 254, 109 P. 3d at

25  793 (quoting *In re Catfish Antitrust Litig.*, 826 F. Supp. at 1039).

26  [20] Section 57-12-3 of the NMUPA provides that "[u]nfair or deceptive trade practices and
    unconscionable trade practices in the conduct of any trade or commerce are unlawful."  NMUPA

27  section 57-12-10 provides that any person who suffers any loss of money or property as a result of
    any such unlawful act may bring an action to recover actual damages or $100, whichever is
    greater, and may seek treble damages or $300 for willful violations.  A claim under NMUPA does

28  not require a direct representation by the defendant to the plaintiff. *Lohman v. Daimler-Chrysler
    Corp.*, 2007, 142 N.M. 437, 166 P.3d 1091, certiorari denied 142 N.M. 434, 166 P.3d 1088.

Plaintiffs must show that Defendants' conduct was "consumer-oriented" in that their misrepresentations were directed at the IP Plaintiffs.

Each of the elements of a claim under §349 can be established through common proof. The issue of whether Defendants made public statements about the price of SRAM that were directed to the New York IP Class and were misleading is the same for one, 20 or 10,000 class members. Additionally, as established above in section IV.C.2, whether New York IP Class members were injured is subject to common proof. This case is similar to *Cox v. Microsoft Corp*., 2005 WL 3288130 (N.Y. Supr. Ct. N.Y. Cty. July 29, 2005). In *Cox*, the New York lower court certified a class under § 349 where, as here, the defendant "was able to charge inflated prices for its products as a result of its deceptive actions and that these inflated prices passed to consumers." 2005 WL 3288130 at * 5. The court in Cox found that certain questions of pass through, such as whether intermediaries did not raise their prices on computer packages when the price of Microsoft products increased, involved the amount of dollar damages that individual class members suffered and was not determinative of the question of class certification. *Id.* at *5.

Additionally, New York courts, like many other states, permit aggregate proof of damages when establishing common impact. *Id.* Other courts have similarly certified indirect purchaser classes alleging price-fixing claims under New York law. *See* Appendix B. Accordingly, the New York IP Class claims satisfy the predominance requirement of Rule 23(b)(3).

### r.   The North Carolina Class Satisfies the Predominance Requirement

The proposed North Carolina IP Class asserts causes of action under North Carolina's Monopolies, Trusts, and Consumer Protection Act, N.C. Gen. Stat. § 75, *et seq.* (the "N.C. Act"). Compl. ¶259. Under the N.C. Act, any "conspiracy in restraint of trade or commerce" is illegal. N.C. Gen. Stat. § 75-1. To prevail under the Act, Plaintiffs must show: (1) defendants committed an unfair or deceptive act or practice; (2) in or affecting commerce; and (3) that plaintiff was injured thereby. *Stetser v. TAP Pharmaceutical Products, Inc*., 165 N.C.App. 1 (2004); *First Atlantic Management Corp. v. Dunlea Realty Co.,* 507 S.E.2d 56, 131 N.C.App. 242 (1998). "A trade practice is 'unfair' if it is immoral, unethical, oppressive, unscrupulous, or substantially injurious to consumers." *First Atlantic*, 507 S.E.2d at 63 (citation omitted). The N.C. Act also

33

provides standing for individual plaintiffs (§75-16), which right was specifically extended to indirect purchasers in *Hyde v. Abbott Labs*, 123 N.C. App. 572, 584 (N.C. Ct. App. 1996).

All of the elements of a claim under the N.C. Act (*i.e.*, conspiracy, impact and the amount of damages) can be established through common proof. *See* §§IV.C.2.-4, *supra*. Indeed, the North Carolina IP Class members claims are analogous to a number of other cases where courts have certified indirect purchaser claims under N.C. Gen. Stat. § 75, *et seq. See* Appendix B.

s.      **The North Dakota Class Satisfies the Predominance Requirement**

The proposed North Dakota IP Class alleges violations of the North Dakota Antitrust Act, N.D. Cent. Code §§ 51-08.1-01 *et seq.* Compl. ¶235. The North Dakota Antitrust Act provides that, "[a] contract, combination, or conspiracy between two or more persons in restraint of, or to monopolize, trade or commerce in a relevant market is unlawful." N.D. Cent. Code § 51-08.1-02. The statute expressly provides a cause of action for indirect purchasers, who may obtain injunctive relief and/or recover damages. N.D. Cent. Code § 51-08.1-08.

As explained above, all of the elements of a claim under the North Dakota Antitrust Act (*i.e.*, conspiracy, impact and the amount of damages) can be established through common proof. *See* §§IV.C.2.-4, *supra*. Indeed, a number of state and federal courts have certified classes of indirect purchasers in several cases under the North Dakota Antitrust Act. In *Howe v. Microsoft Corp.*, 656 N.W. 2d 285, 295-296 (N.D. 2003), for example—which involved indirect purchasers of Microsoft Windows operating system software—the court certified a class of indirect purchasers of Microsoft Windows operating system software, accepting the plaintiff's proffered expert affidavits as sufficient to show common proof of impact. 656 N.W.2d. at 296. Plaintiff's expert in *Howe* relied upon economic theories to establish the "pass-through" of the alleged overcharge through various channels of distribution, and the defendant attacked plaintiff's expert for failing to present "real world" evidence in support of these theories. *Id.* at 290. The court, disapproved of trial courts delving into the merits of a case at the class certification stage, and stated that the expert's evidence may be considered in determining whether to certify the class, as long as the expert's analysis is not "blatantly flawed." *Id.* at 295-296. Here, plaintiffs' experts have clearly presented evidence and methodologies sufficient to show that impact and damages

34

can be established using common proof.  Various other courts have certified for class treatment

indirect purchaser claims under the North Dakota Antitrust Act (*see* Appendix B), and a similar

result is appropriate here.

### t.        The Pennsylvania Class Satisfies the Predominance Requirement

The proposed Pennsylvania IP Class asserts only a claim for unjust enrichment.  It should

be certified for the reasons presented above in section IV.C.5.a.

### u.        The Puerto Rico Class Satisfies the Predominance Requirement

The proposed Puerto Rico IP Class alleges violations of the Puerto Rico Antitrust Act, 10

L.P.R.A. §§ 257 *et seq.*  Compl. ¶236.  The Puerto Rico Antitrust Act prohibits "[e]very contract,

combination in the form of trust or otherwise, or conspiracy in unreasonable restraint of trade or

commerce in the Commonwealth of Puerto Rico . . .."  10 L.P.R.A. § 258.  The Act expressly

provides a cause of action for persons injured by such unlawful acts and permits them to seek

injunctive relief and/or recover damages.  10 L.P.R.A. §268.  Moreover, the Puerto Rico

Legislature has specifically recognized the right of consumers, as indirect purchasers of goods and

services, to bring class actions under the Puerto Rico Antitrust Act.  32 L.P.R.A. § 3342.  Finally,

courts have identified Puerto Rico as among the jurisdictions expressly permitting antitrust actions

by indirect purchasers.[21]

For all of the same reasons as detailed above in sections IV.C.2.-4, the elements of the

Puerto Rico antitrust claim (*i.e.*, a conspiracy, injury and the amount of damages) can be

established through common proof.  Indeed, courts have certified Puerto Rico indirect purchaser

antitrust claims previously (*see* Appendix B), and this Court should do so here as well.

### v.        The Rhode Island Class Satisfies the Predominance Requirement.

The Rhode Island IP Class alleges violations of Rhode Island General Laws §§ 6-13.1-1, *et*

*seq.* ("RIDPA").  Compl. ¶261.  The RIDPA prohibits "[u]nfair methods of competition and unfair

---

[21] *See e.g., Arroyo-Melecio v. Puerto Rican American Ins. Co.,* 398 F.3d 56, 72 ( 1st Cir. 2005)
(under the Puerto Rico Antitrust Act, "consumers are presumptively favored as appropriate
plaintiffs to assert antitrust injury"); *Comes v. Microsoft Corp.*, 646 N.W.2d 440, 448 (Iowa 2002)
("In total, nineteen states, the District of Columbia, and Puerto Rico have statutes explicitly
authorizing indirect purchasers to maintain an antitrust suit.").

1    or deceptive acts or practices."  As this Court recognized, the determination of whether a practice

2    is "unfair" under the UTPCA examines, *inter alia*, whether the practice at issue "offends public

3    policy," whether it is "unscrupulous" and whether it causes "substantial injury to consumers."  *See*

4    Court's June 27, 2008 Order, p. 8 (citing *Ames v. Oceanside Welding and Towing Co., Inc.*, 767

5    A.2d 677, 681 (R.I. 2001)).  Section 6-13.1-5.2(a) of RIDPA "provides a private right of action to

6    any person who suffers 'any ascertainable loss' as the result of an illegal act or practice." *Park v.*

7    *Ford Motor Co.*, 844 A.2d 687, 693 (R.I. 2004).  Individuals may "recover actual damages or two

8    hundred dollars ($200), whichever is greater."  R. I. Gen. Laws § 6-13.1-5.2(a).

9           Here, the issues to be determined in assessing whether defendants' practices—namely,

10   defendants' price-fixing conspiracy and secret meetings and agreements to artificially maintain

11   prices--were "unfair", "offend public policy" and/or were "unscrupulous," are undoubtedly subject

12   to common proof.  Additionally, as established above in sections IV.C.3 and IV.C.4, proof of

13   injury to consumers and the amount of damage are also subject to common proof.  Other courts

14   have certified a class of consumer indirect purchasers under R. I. Gen. Laws § 6-13.1-1, *et seq.*

15   *See* Appendix B.  Thus, this Court should certify the Rhode Island IP Class's RIDPA claim.

16              **w.    The South Dakota Indirect Purchaser Class Satisfies the
                         Predominance Requirement**

17          The proposed South Dakota Indirect Purchaser Class asserts causes of action under the

18   South Dakota antitrust statute.  S.D. Codified Laws, § 37-1-3.1, et. seq.  Compl. ¶ The South

19   Dakota antitrust statute declares unlawful, "[a] contract, combination, or conspiracy between two

20   or more persons in restraint of trade or commerce any part of which is within this state S.D.C.L. §

21   37-1-3.1.  Under the statute, any person injured directly or indirectly by an antitrust violation may

22   recover treble damages.  S.D.C.L. §§ 37-1-14.3, 37-1-33.

23          The South Dakota Indirect Purchaser Class satisfies the predominance requirement of Rule

24   23(b)(3).  As discussed above in section IV.C.2, whether the Defendants engaged in a conspiracy

25   in restraint of trade is clearly subject to common proof on behalf of the South Dakota Indirect

26   Purchaser Class.  Proof of such conduct would establish a violation of Section 37-1-3.1 on a class-

27   wide basis for the South Dakota Indirect Purchaser Class.

28

---

36

In certifying indirect purchaser classes, South Dakota courts have addressed the amount and type of proof required to show common proof of impact. *See e.g., In re South Dakota Microsoft Antitrust Litig.*, 657 N.W. 2d 668, 670 (SD 2003). There, the court noted that plaintiffs did not need to prove the merits of the case at the class certification stage. *Id.* at 673. In *South Dakota Microsoft*, the plaintiffs' expert proposed several "standard, yardstick methodologies" for calculating the amount of injury experienced by each class member (*id.* at 676), and the court noted that the question of whether or not the conclusions of plaintiffs' expert as to impact were correct was properly determined by a jury at a later date. Similarly, as established above in sections IV.C.3 and IV.C.4, impact and damages for the South Dakota Indirect Purchaser Class can be determined on a class-wide basis, so Rule 23(b)(3) is therefore satisfied. In addition to the *South Dakota Microsoft* decision discussed above, indirect purchaser claims under the South Dakota statute have been certified for class treatment in several other cases. *See* Appendix B.

### x. The Tennessee Class Satisfies the Predominance Requirement

The proposed Tennessee IP Class asserts causes of action under the Tennessee Unfair Trade Practices Act, Tennessee Code Ann. §§47-25-101 *et seq.* Compl. ¶238. The Tennessee Unfair Trade Practices Act declares unlawful and void "[a]ll arrangements, contracts, agreements, trusts or combinations between persons or corporations designed, or which tend, to advance, reduce, or control the price or the cost to the producer or the consumer of any such product or article." Tenn. Code Ann. § 47-25-101. Persons injured by any such arrangement may recover "the full consideration or sum… for any goods, wares, merchandise, or articles, the sale of which is controlled by such combination or trust." Tenn. Code Ann. §47-25-106. In *Sherwood v. Microsoft Corp.*, 2003 WL 21780975, at *29 (Tenn. Ct. App. July 31, 2003), the Tennessee Court of Appeal held that indirect purchasers have standing to bring an action under the Act to recover damages resulting from the alleged price-fixing. *See also Blake v. Abbott Labs., Inc.*, 1996 WL 134947, at **3-4 (Tenn. Ct. App. Mar. 27, 1996).

For the same reasons as set forth above in sections IV.C.2 and IV.C.3, the issues of whether an SRAM conspiracy exists under Tennessee antitrust law, and whether the class members were injured thereby predominate over individual ones. Additionally, as set out in

1  section IV.C.4, the IP Plaintiffs proffered sufficient methodologies for calculating damages on a

2  class-wide basis.  Numerous courts have certified claims under the Tennessee Antitrust Act in

3  cases brought by indirect purchasers.  See Appendix B.  The same result is appropriate here.

4           **y.       The Utah Class Satisfies the Predominance Requirement**

5           The proposed Utah IP Class alleges violations of the Utah Antitrust Act, Utah Code Ann.

6  §§ 76-10-911 *et seq.*  Compl. ¶240.  The Utah Antitrust Act proscribes "[e]very contract,

7  combination in the form of a trust or otherwise, or conspiracy in restraint of trade or commerce,"

8  as well as monopolies, attempts to monopolize, and conspiracies to monopolize any part of trade

9  or commerce.  Utah Code Ann. § 76-10-914.  The Utah Antitrust Act expressly authorizes indirect

10  purchaser claims, and potential remedies thereunder include injunctive relief, money damages,

11  treble damages and attorneys' fees and costs.  Utah Code Ann. § 76-10-919.

12          The proposed Utah IP Class satisfies the predominance requirement of Rule 23(b)(3).  As

13  discussed above in sections IV.C.2.-4, defendants' price-fixing conspiracy, proof of injury to class

14  members and the amount of damages are all subject to generalized proof.  Indeed, the Utah Act

15  expressly provides for a rebuttable presumption that indirect purchasers incurred at least one-third

16  of the damages (Utah Code Ann. §76-10-919(7)), and expressly permits the filing of a class action

17  for indirect purchasers (*id.* §76-10-919(9)).

18          **z.       The Washington Class Satisfies the Predominance Requirement**

19           The proposed Washington IP Class asserts only a claim for unjust enrichment.  .  It should

20  be certified for the reasons presented above in section IV.C.5.a.

21          **aa.     The West Virginia Class Satisfies the Predominance**
                     **Requirement.**

22

23          The proposed West Virginia IP Class alleges violations of the West Virginia Antitrust Act,

24  West Virginia Code §47-18-1, *et seq.* (Compl. ¶241), which provides that "Every contract,

25  combination in the form of trust or otherwise, or conspiracy in restraint of trade or commerce in

26  this State shall be unlawful."  W.Va. Code §47-18-3(a).  The Act enumerates additional specific

27  acts that constitute a violation of the statute, such as a conspiracy to fix prices, limit production,

28

1    and allocate customers or markets.  W.Va. Code §47-18-3(b).  Section §47-18-9 thereof authorizes

2    "any person" injured by reason of such a violation to bring suit for damages and other remedies.

3            For all of the same reasons as detailed above in sections IV.C.2.-4, the elements of the

4    West Virginia antitrust claim (*i.e.*, a price-fixing conspiracy, injury and the amount of damages)

5    can be established through common proof.  Indeed, state and federal courts previously have

6    certified West Virginia indirect purchaser antitrust claims like those asserted here (*see* Appendix

7    B), and this Court should do so as well.

8                          **bb.    The Wisconsin Class Satisfies the Predominance Requirement**

9            The proposed Wisconsin Class alleges violations of the Wisconsin Antitrust Act, Wis. Stat.

10   §133.03(1).  Compl. ¶242.  The Wisconsin antitrust statute provides that "[e]very contract,

11   combination in the form of trust or otherwise, or conspiracy, in restraint of trade or commerce is

12   illegal."  Wis. Stat. §133.03(1). Any person injured directly or indirectly by an antitrust violation

13   may recover treble damages.  Wis. Stat. §133.18(1)(a).

14           In *Olstad v. Microsoft Corp*., 700 N.W.2d 139 (Wis. 2005), the Wisconsin Supreme Court

15   held that a plaintiff may bring suit under the Wisconsin antitrust act when, as here, "the conduct

16   complained of 'substantially affects' the people of Wisconsin and has impacts in this state, even if

17   the illegal activity resulting in those impacts occurred predominantly or exclusively outside of the

18   state."  *Id.* at 263 (citation omitted); *See also Meyers v. Bayer AG*, No. 2003AP2840, 2006 WL

19   1228957 (Wis. App. May 9, 2006).

20           For all of the same reasons as detailed above in sections IV.C.2.-4, the elements of the

21   Wisconsin antitrust claim (*i.e.*, a price-fixing conspiracy, injury and the amount of damages) can

22   be established through common proof.   Indeed, Wisconsin courts have approved the use of

23   aggregate proof of damages in class actions.  *Cruz v. All Saints Healthcare System, Inc.*, 625 N.W.

24   2d 344, 348 (Wis. App. 2001).  Claims under the Wisconsin antitrust statute have been certified for

25   class treatment in numerous cases in state and federal courts.  *See* Appendix B.

26                          **5.    A Class Action Is a Superior Method of Resolving This Controversy**

27           Rule 23(b)(3) also requires that class resolution be "superior to other available methods for

28   the fair and efficient adjudication of the controversy."  Fed. R. Civ. P. 23(b)(3).  "[I]f common

1    questions are found to predominate in an antitrust action, . . . courts generally have ruled that the

2    superiority prerequisite of Rule 23(b)(3) is satisfied."  Wright & Miller § 1781, at 254-55.

3    As this Court noted in its analysis of the Direct Purchasers' class certification motion: "In antitrust

4    cases such as this, . . . damages . . . are likely to be too small to justify litigation, but a class action

5    would offer those with small claims the opportunity for meaningful redress."  SRAM, 2008 WL

6    4447592, at *7.  Additionally, the prosecution of separate actions by individual indirect purchasers

7    would create the risk of inconsistent rulings, and could result in prejudice to Plaintiffs.  For these

8    reasons, the superiority requirement is satisfied.

9    **D.    To Avoid Future Harm, an Nationwide Class Should Be Certified Under Rule 23(b)(2)**

10

11   The IP Plaintiffs seek certification of a Nationwide Class under Fed. R. Civ. P. 23(b)(2).

12   This class seeks to enjoin Defendants from engaging in conduct that continues to cause prices for

13   SRAM to be fixed at supracompetitive levels.  Compl. ¶ 1; *id.*, Prayer for Relief, Section F.  They

14   also request a declaration that Defendants' conspiracy to fix prices for SRAM at supra-competitive

15   levels violates Sherman Act §1, as well as various state antitrust, consumer protection, and unjust

16   enrichment laws.  Compl., Prayer for Relief, Section B.

17   **1.    Injunctive Relief Is Necessary to Prevent Further Injury**

18   Congress expressly provided for injunctive relief in private antitrust cases through Section

19   16 of the Clayton Act, 15 U.S.C. § 26, and such relief is warranted in this case.  To qualify for

20   injunctive relief, Plaintiffs "need only demonstrate a significant threat of injury from an impending

21   violation of the antitrust laws or from a contemporary violation likely to continue or recur."  *Zenith*

22   *Radio Corp. v. Hazeltine Research*, 395 U.S. 100, 130 (1969).  The Supreme Court's decision in

23   *Illinois Brick*, 431 U.S. at 720, does not bar indirect purchasers from securing nationwide equitable

24   relief under Section 16.  *See Freeman v. San Diego Ass'n of Realtors*, 322 F.3d 1133, 1146 (9th

25   Cir. 2003).

26   Defendants' conspiratorial activities constitute an ongoing violation of antitrust laws that

27   threatens to cause the IP Plaintiffs to pay supra-competitive prices for SRAM indefinitely.  *See*

28   Compl. ¶¶161-85.  None of the Defendants has claimed that this conspiratorial activity has ended,

---

40

1    in their motions to dismiss or elsewhere.[22]   Thus, Plaintiffs are just as likely to be injured by

2    Defendants' practices in the future as in the past.  Given this significant threat of future harm,

3    injunctive relief under the Clayton Act is proper.

### 2.    The Court Should Certify an Equitable Relief Class

5    "Under Rule 23(b)(2), an action may be certified as a class action if it fulfills the

6    prerequisites of Rule 23(a), and the requirement that the 'the party opposing the class has acted or

7    refused to act on grounds generally applicable to the class, thereby making' broad injunctive

8    and/or declaratory relief appropriate."  *Molski v. Gleich*, 318 F.3d 937, 947 (9th Cir. 2003).  A

9    Rule 23(b)(2) class "is defined by the actions which a defendant has taken toward the class, and

10   which should arguably be enjoined."  *Yaffe v. Powers*, 454 F.2d 1362, 1367 (1st Cir. 1972).

11   "Action or inaction is directed to a class within the meaning of this subdivision even if it has taken

12   effect or is threatened only as to one or a few members of the class, provided it is based on

13   grounds which have general application to the class."  Rule 23(b)(2) Advisory Committee Notes

14   (1966 Amendment).

15   In the complaint, Plaintiffs allege that Defendants acted uniformly toward all class

16   members.  *See* Compl. ¶ 138(i) ("Defendants have acted, and refused to act, on grounds generally

17   applicable to the Class, thereby making appropriate final injunctive relief with respect to the Class

18   as a whole.").  Like other antitrust cases alleging price-fixing conspiracies, this case presents "a

19   classic (b)(2) class" (*NASDAQ*, 169 F.R.D. at 515-516)), because Defendants' price-fixing

20   threatens to injure all members of the Nationwide Class by causing them to pay supra-competitive

21   prices for SRAM.

### E.    Courts Regularly Certify Both 23(b)(3) Damages Classes and 23(b)(2) Equitable Relief Classes in the Same Case

24   It is neither inconsistent nor unusual for courts to certify both an equitable relief class

25   under Rule 23(b)(2) and a damages class under Rule 23(b)(3).  "Class actions certified under Rule

---

27   [22] Even if defendants have voluntarily ceased any conduct in furtherance of that conspiracy, this
28   would not moot a claim for injunctive relief.  *Friends of the Earth, Inc. v. Laidlaw Environmental Servs.* (TOC), Inc., 528 U.S. 167, 174 (2000) ("A defendant's voluntary cessation of allegedly unlawful conduct ordinarily does not suffice to moot a case.").

41

23(b)(2) are not limited to actions requesting only injunctive or declaratory relief, but may include cases that also seek monetary damages." *Probe v. State Teachers' Ret. Sys.*, 780 F.2d 776, 780 (9th Cir. 1986). In fact, "monetary relief has been granted on a classwide basis in Rule 23(b)(2) actions." 2 *Newberg* § 4.14. *See Jefferson v. Ingersoll lnt'l Inc.*, 195 F.3d 894, 898 (7th Cir. 1999) ("It is possible to certify the injunctive aspects of the suit under Rule 23(b)(2) and the damage aspects under Rule 23(b)(3), achieving both consistent treatment of class-wide equitable relief and an opportunity for each affected person to exercise control over the damage aspects."); *NASDAQ*, 169 F.R.D. at 515 (observing that nothing in Rule 23 precludes certifying both types of classes); *Cohen v. Chicago Title Ins. Co.*, 2007 WL 1067034, at *5 (E.D. Pa. Apr. 5, 2007) (certifying damages class under Rule 23(b)(3) and injunctive class under Rule 23(b)(2)).

For a class to be certified under Rule 23(b)(2) when both damages and equitable relief are sought, "the claim for monetary damages must be secondary to the primary claim for injunctive or declaratory relief." *Molski*, 318 F.3d at 947 (citations omitted). Courts assess whether equitable relief predominates by focusing on the language of Rule 23(b)(2) and the intent of the plaintiffs, examining the facts and circumstances of each case (including whether defendants acted in a manner generally applicable to the class). *Id.* at 950.

The IP Plaintiffs' Complaint is replete with allegations that Defendants conspired and otherwise acted in a manner generally applicable to the class. Plaintiffs' intent is evident from the very first Complaint paragraph, which states: "This complaint is filed under Section 16 of the Clayton Act, 15 U.S.C. §26, to obtain injunctive relief. . . ." Compl. ¶ 1. Indeed, members of the Nationwide Class are far more numerous than the members of the Indirect State Classes. The Nationwide Class includes persons in all fifty states, the District of Columbia, and Puerto Rico who indirectly purchased SRAM products. *See* Motion at 2. The Indirect State Classes comprise only a subset of states. *See generally* Motion. Thus, the plain language of the complaint—and the number of class members and the anticipated impact upon them—dictate that the Nationwide Class is primary.

Not only is the Nationwide Class broader than the Indirect State Classes in terms of numerosity and geography, but the long-lasting effect of an injunction would far eclipse the effects

of damages awards.  *See Ellis v. Costco Wholesale Corp.*, 240 F.R.D. 627, 643 (N.D. Cal. 2007) (certifying Rule 23(b)(2) class where injunction would have "far-reaching" effects on defendant's promotion practices and would "benefit class members in the same way").  Products containing SRAM—computers, networking devices, and other devices—are integral to Plaintiffs' personal and professional lives.  Unless Defendants are enjoined from perpetuating their price-fixing scheme, Plaintiffs will continue to spend more for these frequently-purchased products than they would have spent in a competitive market.

Even if Plaintiffs in the damages class are awarded monetary relief, injunctive and declaratory relief will still be reasonable and appropriate.  Defendants' activities as alleged in the Complaint are, and have been, *per se* illegal under Section 1 of the Sherman Act.  When the participants in a conspiracy will continue to reap anticompetitive benefits to the detriment of a class, certification under Rule 23(b)(2) is warranted.  *NASDAQ*, 169 F.R.D. at 516 (certifying a class under Rule 23(b)(2) and (3)).  Monetary relief covers only past damages.  Without equitable relief, Defendants could simply continue to sell their products at supra-competitive prices, forcing Plaintiffs to bring repetitious litigation.  Accordingly, the Court should certify a Nationwide Class under Rule 23(b)(2) to ensure efficiency and deterrence.

**F.    The Court Should Appoint Plaintiffs' Interim Lead Counsel As Class Counsel**

Rule 23(g)(1)(A) sets forth the factors the court should consider in appointing Class Counsel.  Zelle Hofmann previously described its qualifications to serve as Class Counsel when it sought to serve as Interim Co-Lead Counsel.  Zelle Hofmann has extensive experience in prosecuting antitrust class actions, has sufficient resources to prosecute this case, and have vigorously pursued this case on behalf of the IP Plaintiffs since for over two years.  *See id*. For the foregoing and all other reasons previously articulated at the time of its interim appointment, Zelle Hofmann should be appointed Class Counsel here.  *See In re Cree, Inc. Securities Litig.*, 219 F.R.D. 369, 373 (M.D.N.C. 2003).

1  **V.       CONCLUSION**

2          For the foregoing reasons, Indirect Purchaser Plaintiffs' Motion for Class Certification

3  should be granted.

4  Dated: January 29, 2009                        Respectfully submitted

5                                                 ,_____/s/ Craig C. Corbitt_____
                                                        Craig C. Corbitt
6
                                               FRANCIS O. SCARPULLA (41059)
7                                              CRAIG C. CORBITT (83251)
                                               CHRISTOPHER T. MICHELETTI (136446)
8                                              PAMELA E. WOODSIDE (226212)
                                               QIANWEI FU (242669)
9                                              JANE YI (257893)
                                               ZELLE HOFMANN VOELBEL &
10                                             MASON LLP
                                               44 Montgomery Street, Suite 3400
11                                             San Francisco, CA  94104
                                               Telephone:    (415) 693-0700
12                                             Facsimile:     (415) 693-0770
                                               fscarpulla@zelle.com
13                                             ccorbitt@zelle.com

14                                             *Interim Lead and Liaison Counsel for Indirect-*
                                               *Purchaser Class*
15

16                                             WYATT B. DURRETTE, JR.
                                               CHRISTINE A. WILLIAMS
17                                             DURRETTE BRADSHAW PLC
                                               Main Street Centre, 20th Floor
18                                             600 East Main Street
                                               Richmond, VA  23219
19                                             Telephone:    (804) 775-6900
                                               Facsimile:     (804) 775-6911
20
                                               MICHELE C. JACKSON (SB NO. 90807)
21                                             JOSEPH R. SAVERI (SB NO. 130064)
                                               LIEFF CABRASER HEIMANN
22                                             & BERNSTEIN, LLP
                                               Embarcadero Center West
23                                             275 Battery Street, Suite 3000
                                               San Francisco, CA 94111
24                                             Telephone:    (415) 956-1000
                                               Facsimile:     (415) 956-1008
25

26

27

28

NATALIE FINKELMAN BENNETT
SHEPHERD FINKELMAN MILLER & SHAH, LLC
35 East State Street
Media, PA 19063
Telephone:      (610) 891-9880
Facsimile:      (610) 891-9883

*Steering Committee For Indirect Purchaser Plaintiffs*

3215711

---
INDIRECT PURCHASER PLAINTIFFS' MEMORANDUM
IN SUPPORT OF MOTION FOR CLASS CERTIFICATION-Case No. M:07-cv-01819-CW