1   Robert B. Pringle (CA Bar No. 051365)
    Paul R. Griffin (CA Bar No. 083541)
2   Patrick M. Ryan (CA Bar No. 203215)
    Jonathan E. Swartz (CA Bar No. 203624)
3   WINSTON & STRAWN LLP
    101 California Street
4   San Francisco, CA 94111-5894
    Telephone:    415-591-1000
5   Facsimile:    415-591-1400
    rpringle@winston.com
6   pgriffin@winston.com
    pryan@winston.com
7   jswartz@winston.com

8   Attorneys for Defendants
    NEC ELECTRONICS CORPORATION and
9   NEC ELECTRONICS AMERICA, INC.

10  [*Other Counsel and Defendants Appear on Signature Page*]

11              **UNITED STATES DISTRICT COURT**

12              **NORTHERN DISTRICT OF CALIFORNIA**

13                    **OAKLAND DIVISION**

14  IN RE STATIC RANDOM ACCESS          ) Case No.: M:07-cv-1819 CW
    MEMORY (SRAM) ANTITRUST             )
15  LITIGATION                          ) MDL No. 1819
                                        )
16  This Document Relates To:           ) **DEFENDANTS' OPPOSITION TO**
                                        ) **INDIRECT PURCHASER PLAINTIFFS'**
17      All Indirect Purchaser Actions  ) **MOTION FOR CLASS CERTIFICATION**
                                        )
18                                      )
                                        )
19                                      ) **DOCUMENT FILED UNDER SEAL**
                                        )
20                                      ) Date:      June 11, 2009
                                        ) Time:      2:00 p.m.
21                                      ) Location:  Courtroom 2, 4th Floor
                                        ) Judge:     Hon. Claudia Wilken
22                                      )

23

24

25

26

27

28

Winston & Strawn LLP
101 California Street
San Francisco, CA 94111-5894

DEFENDANTS' OPPOSITION TO INDIRECT PURCHASER
PLAINTIFFS' MOTION FOR CLASS CERTIFICATION (M:07-cv-1819 CW)

Winston & Strawn LLP
101 California Street
San Francisco, CA 94111-5894

**TABLE OF CONTENTS**

I.     INTRODUCTION AND SUMMARY OF OPPOSITION......................................... 1

II.    STATEMENT OF FACTS ......................................................................................... 3
       A.    Divergent Distribution Chains for SRAM and SRAM-Containing Products............ 4
       B.    Divergent Pricing and Sales Practices ..................................................................... 5
             1.    Fixed-Term Pricing or Set-Price Contracts................................................ 6
             2.    *De Minimis* SRAM Cost ............................................................................ 6
             3.    Transactional Costs That May Outweigh SRAM Cost Increases.................... 7
             4.    Bundled Pricing ........................................................................................ 7
             5.    Loss Leaders ............................................................................................. 8
             6.    Secondary Markets for Used and Refurbished Products ............................. 8
       C.    Divergent Products That Allegedly Contain SRAM ................................................. 9
       D.    Divergent Proposed Class Members ...................................................................... 10

III.   PLAINTIFFS' MOTION SHOULD BE DENIED.................................................... 11
       A.    Plaintiffs' Motion Cannot Withstand a "Rigorous Analysis." ................................ 11
       B.    There are Dispositive Differences between Direct and Indirect Purchaser
             Classes.................................................................................................................... 14
       C.    Because Plaintiffs' Proposed Class Definitions Are Not Precise and the
             Identity of Class Members Is Not Objectively Ascertainable, Class
             Certification Must Be Denied. ............................................................................... 15
             1.    Determining Whether the Products At Issue Contain SRAM Would
                   Require Individual Merits Inquiries.......................................................... 16
             2.    Determining If the Products at Issue Contain SRAM Manufactured
                   or Sold By a Defendant Would Require Individual Merits
                   Inquiries. ................................................................................................. 18
       D.    Common Issues Do Not Predominate Over Individual Issues as Required by
             Rule 23(b). ............................................................................................................. 19
             1.    Impact Cannot Be Proven on a Class-Wide Basis Using Common
                   Proof......................................................................................................... 19
                   (a)    The Methodologies of Plaintiffs' Experts Are Neither Realistic
                          Nor Sufficiently Plausible for Proving Pass-Through (Impact). ........ 21
                          (i)    Dr. Harris, the Sole Pass-Through Expert, Bases His
                                 Unsupported Economic Theory on Erroneous Claims. .......... 21
                          (ii)   The Models Are Fatally Defective Because They Can
                                 Indicate Significant Pass-Through When No Pass-
                                 Through Occurred.............................................................. 26

-i-

(1) The Reduced Form Model Is Inappropriate in this Case. ................................................................ 27

(2) The Structural Model Is Inappropriate in This Case. ................................................................ 29

(3) Averaging Data Yields False-Positive Pass-Through. ................................................................ 31

(b) Plaintiffs' Experts' Methodologies Are Neither Realistic Nor Sufficiently Plausible Because They Do Not Account For Divergent Variables. ................................................................ 32

(i) Divergent Distribution Chains Require Individualized Proof of Impact. ................................................................ 34

(ii) Divergent Pricing and Sales Practices Require Individualized Proof of Impact. ................................................................ 37

(1) Fixed-Term Pricing Models and Set-Price Contracts Require Individualized Proof of Impact. ................................................................ 37

(2) The Proportionally *De Minimis* Cost of SRAM Requires Individualized Proof of Impact. ................................................................ 39

(3) Transactional Costs That May Outweigh SRAM Cost Increases Require Individualized Proof of Impact. ................................................................ 40

(4) Bundled Pricing Requires Individualized Proof of Impact. ................................................................ 41

(5) Loss Leaders Require Individualized Proof of Impact. ................................................................ 42

(6) Resale Markets Require Individualized Proof of Impact. ................................................................ 42

(iii) Divergent Products Require Individualized Proof of Impact. ................................................................ 43

(iv) Divergent Class Members With Varying Degrees of Negotiating Power Require Individualized Proof of Impact. ................................................................ 45

(v) Ineffective Subperiods of Alleged Conspiracy Require Individualized Proof of Impact. ................................................................ 46

(c) Common Impact Cannot Be Presumed In This Case. ................................................................ 47

2. Plaintiffs Do Not Show Predominance of Common Issues Under State Laws. ................................................................ 48

Winston & Strawn LLP
101 California Street
San Francisco, CA 94111-5894

-ii-

E.  A Myriad of Subclasses Would Be Required, Rendering The Case Unmanageable............................................................................................ 49

    1.  Date of Product Purchases ...........................................................50

    2.  Product Types or Variations within a Product Type....................51

    3.  The Complexity of the Distribution Chains Involved..................51

    4.  Different Pricing and Sales Practices of Different Distributors and Resellers.....................................................................................52

    5.  Varying Degrees of Negotiating Power of End Users .................52

    6.  Multiple Levels of Subclasses Would Be Required Within Each State...............................................................................................53

    7.  A Subclass Menagerie Would Be Unmanageable. ........................54

F.  Damages Cannot Be Proven On a Class-Wide Basis Using Common Proof. ........... 54

G.  Plaintiffs Have Failed to Satisfy The Rule 23(a) Prerequisites to Class Certification. ........................................................................................ 55

    1.  Several Named Plaintiffs' Claims and Defenses Are Not Typical.................55

    2.  Several Named Plaintiffs Will Not Adequately Represent the Proposed Class.............................................................................57

    3.  Class Certification Should Be Denied in Several States With No Adequate and Typical Proposed Class Representative....................58

H.  Plaintiffs' Motion for Certification of a Nationwide Injunctive Class Should Be Denied Because There Is No Threat of Future Harm........................................... 59

IV.  CONCLUSION.................................................................................... 60

Winston & Strawn LLP
101 California Street
San Francisco, CA 94111-5894

# TABLE OF AUTHORITIES

**CASES**                                                    **PAGE(S)**

*A & M Supply Co. v. Microsoft Corp.*,
654 N.W.2d 572 (Mich. Ct. App. 2002) ................................................25, 32, 33, 37

*Aiken v. Obledo*,
442 F. Supp. 628 (E.D. Cal. 1977).........................................................................15

*Alabama v. Blue Bird Body Co., Inc.*,
573 F.2d 309 (5th Cir. 1978) ..................................................................................20

*Allied Orthopedic Appliances, Inc. v. Tyco Healthcare Group L.P.*,
247 F.R.D. 156 (C.D. Cal. 2007) ............................................................................55

*Am. Booksellers Ass'n v. Barnes & Noble, Inc.*,
135 F. Supp. 2d 1031 (N.D. Cal. 2001) ..................................................................32

*Am/Comm Systems, Inc. v. Am. Tel. and Tel. Co.*,
101 F.R.D. 317 (E.D. Pa. 1984).............................................................................56

*Amchem Prod., Inc. v. Windsor*,
521 U.S. 591 (1997).......................................................................................1, 20, 49

*B.W.I. Custom Kitchen v. Owens-Ill., Inc.*,
235 Cal. Rptr. 228 (Cal. Ct. App. 1987) .................................................................48

*Bell Atl. Corp. v. AT&T Corp.*,
339 F.3d 294 (5th Cir. 2003) ..................................................................................20

*Bhan, C.R.N.A. v. NME Hosps., Inc.*,
772 F.2d 1467 (9th Cir. 1985) ................................................................................44

*Blackie v. Barrack*,
524 F.2d 891 (9th Cir. 1975) ..................................................................................12

*Blades v. Monsanto*,
400 F.3d 562 (8th Cir. 2005) .............................................................................12, 20

*Brooke Group Ltd. v. Brown & Williamson Tobacco Corp.*,
509 U.S. 209 (1993)...........................................................................................1, 14, 21

*Burkhalter Travel Agency v. MacFarms Int'l, Inc.*,
141 F.R.D. 144 (N.D. Cal. 1991).......................................................51, 52, 53, 58

*Butt v. Allegheny Pepsi-Cola Bottling Co.*,
116 F.R.D. 486 (E.D. Va. 1987) .............................................................................47

Winston & Strawn LLP
101 California Street
San Francisco, CA 94111-5894

*California v. Infineon Tech. AG*,
   No. C 06-4333 PJH, 2008 WL 4155665 (N.D. Cal. Sept. 5, 2008) ................................ passim

*Campbell v. PricewaterhouseCoopers, LLP*,
   253 F.R.D. 586 (E.D. Cal. 2008) .......................................................................................15

*City of St. Paul v. FMC Corp.*,
   Civ. No. 3–89–0466, 1990 WL 259683 (D. Minn. Nov. 14, 1990) ..................................35

*Cohen v. Beneficial Industrial Loan Corp.*,
   337 U.S. 541 (1949) ............................................................................................................58

*Cordes & Co. Fin. Servs. v. A.G. Edwards & Sons, Inc.*,
   502 F.3d 91 (2d Cir. 2007) .................................................................................................12

*Crosby v. Social Sec. Admin.*,
   796 F.2d 576 (1st Cir. 1986) ..............................................................................................11

*Davis v. Astrue*,
   250 F.R.D. 476 (N.D. Cal. 2008) ...................................................................................1, 15

*Derzon v. Appleton Papers, Inc.*,
   No. 96–cv–3678, 1998 WL 1031504 (Wis. Cir. Ct. July 7, 1998) ...............................25, 33

*Dukes v. Wal-Mart, Inc.*,
   509 F.3d 1168 (9th Cir. 2007) ............................................................................................12

*Dukes v. Wal-Mart, Inc.*,
   556 F.3d 919 (9th Cir. 2009) ..............................................................................................12

*Dukes v. Wal-Mart Stores, Inc.*,
   No. 04-16688 (9th Cir. Feb. 20, 2007) ...............................................................................12

*Dumas v. Albers Med., Inc.*,
   No. 03-0640-CV-W-GAF, 2005 U.S. Dist. LEXIS 33482 (W.D. Mo. 2005) .....................18

*Durden v. Abbott Labs.*,
   No. CV 93–663, 1996 WL 34391966 (Ala. Cir. Ct. Jan. 16, 1996) ...............................25, 42

*Eisen v. Carlisle & Jacquelin*,
   417 U.S. 156 (1974) ............................................................................................................12

*Execu-Tech Bus. Sys., Inc. v. Appleton Papers, Inc.*,
   743 So. 2d 19 (Fla. Dist. Ct. App. 1999) ...........................................................................33

*Exhaust Unlimited, Inc. v. Cintas Corp.*,
   223 F.R.D. 506 (S.D. Ill. 2004) .........................................................................................46

*Fagan v. Honeywell MO, Inc.*,
   No. 04-4903- BLS2, slip op. (Mass. Super. Ct. Feb. 5, 2008) ...........................................24

Winston & Strawn LLP
101 California Street
San Francisco, CA 94111-5894

-v-

*Ford Motor Co. Ignition Switch Prods. Liab. Litig.*,
   174 F.R.D. 322, 350 (D.N.J. 1997)..................................................................................54

*Friends of the Earth, Inc. v. Laidlaw Envtl. Serv. (TOC), Inc.*,
   528 U.S. 167 (2000)..........................................................................................................60

*Gen. Tel. Co. of Sw. v. Falcon*,
   457 U.S. 147 (1982).............................................................................................11, 12, 56

*Gest v. Bradbury*,
   443 F.3d 1177 (9th Cir. 2006) ..........................................................................................60

*Global Minerals & Metals Corp. v. Sup. Ct.*,
   7 Cal.Rptr.3d 28 (Cal. Ct. App. 2003) .............................................................................13

*Grillasca v. Hess Corp.*,
   No. 8:05-cv-1736-T-17-TGW, 2007 WL 2121726 (M.D. Fla. July 24, 2007) ......................11

*Hanon v. Dataproducts Corp.*,
   976 F.2d 497 (9th Cir. 1992) ........................................................................................11, 12

*Ilhardt v. A.O. Smith Corp.*,
   168 F.R.D. 613 (S.D. Ohio 1996) .....................................................................................14

*In re Abbott Labs. Norvir Antitrust Litig.*,
   No. C 04-1511 CW, Consolidated Case No. C 04-4203 CW,
   2007 WL 1689899, at *2 (N.D. Cal. June 11, 2007) ....................................................11, 12

*In re Agricultural Chems. Antitrust Litig.*,
   1995-2 Trade Cas. (CCH) P71, 197 (N.D. Fla. 1995) ......................................................13

*In re Catfish Antitrust Litig.*,
   826 F. Supp. 1019 (N.D. Miss. 1993)................................................................................48

*In re Cipro Cases I & II*,
   17 Cal. Rptr. 3d 1 (Cal. Ct. App. 2004) ...........................................................................48

*In re Credit Suisse First Boston Corp. Analyst Secs. Litig.*,
   250 F.R.D. 137 (S.D.N.Y. 2008) .......................................................................................14

*In re Dynamic Random Access Memory (DRAM) Antitrust Litig.*,
   516 F. Supp. 2d 1072 (N.D. Cal. 2007) ............................................................................44

*In re Dynamic Random Access Memory (DRAM) Antitrust Litig.*,
   No. M01-1486 PJH, 2006 U.S. Dist. LEXIS 39841 (N.D. Cal. June 5, 2006)..................12

*In re Graphics Processing Units Antitrust Litig.*,
   253 F.R.D. 478 (N.D. Cal. 2008) ("*GPU*") ................................................................. passim

Winston & Strawn LLP
101 California Street
San Francisco, CA 94111-5894

-vi-

*In re Hydrogen Peroxide Antitrust Litig.*,
    552 F.3d 305 (3d Cir. 2009)............................................................................12

*In re Indus. Diamonds Antitrust Litig.*,
    167 F.R.D. 374 (S.D.N.Y. 1996) ..................................................................20

*In re Initial Pub. Offering Secs. Litig.*,
    471 F.3d 24 (2d Cir. 2006)............................................................................12

*In re Live Concert Antitrust Litig.*,
    247 F.R.D. 98 (C.D. Cal. 2007) ....................................................................14

*In re Methionine Antitrust Litig.*,
    204 F.R.D. 161 (N.D. Cal. 2001)............................................................ passim

*In re Methionine Antitrust Litig.*,
    No. 00-1311, 2003 WL 22048232 (N.D. Cal. Aug. 26, 2003) .................. passim

*In re Multidistrict Vehicle Air Pollution*,
    538 F.2d 231 (9th Cir. 1976) .......................................................................60

*In re New Motor Vehicles Canadian Exp. Antitrust Litig.*,
    522 F.3d 6 (1st Cir. 2008)........................................................................12, 13

*In re OSB Antitrust Litig.*,
    No. 06-826, 2007 WL 2253425 (E.D. Pa. Aug. 3, 2007) .........................23, 24, 40

*In re Paxil Litig.*,
    212 F.R.D. 539 (C.D. Cal. 2003)..............................................................50, 54

*In re Paxil Litig.*,
    218 F.R.D. 242 (C.D. Cal. 2003)..................................................................60

*In re Phenylpropanolamine (PPA) Products Liability Litig.*,
    214 F.R.D. 614 (W.D. Wash. 2003) ...............................................................18

*In re PolyMedica Corp. Secs. Litig.*,
    432 F.3d 1 (1st Cir. 2005).............................................................................12

*In re Rubber Chems. Antitrust Litig.*,
    232 F.R.D. 346 (N.D. Cal. 2005)...........................................................1, 13, 20

*In re Static Random Access Memory (SRAM) Antitrust Litig.*,
    No. 07-0819, 2008 WL 4447592 (N.D. Cal. 2008) ......................................11, 13

*In re Telectronics Pacing Systems, Inc.*,
    168 F.R.D. 203 (S.D. Ohio 1996) ..................................................................50

*In re Wireless Tel. Servs. Antitrust Litig.*,
    385 F. Supp. 2d 403 (S.D.N.Y. 2005).............................................................41

Winston & Strawn LLP
101 California Street
San Francisco, CA 94111-5894

DEFENDANTS' OPPOSITION TO INDIRECT PURCHASER
PLAINTIFFS' MOTION FOR CLASS CERTIFICATION (M:07-cv-1819 CW)

*Jaroslawicz v. Safety Kleen Corp.*,
    151 F.R.D. 324 (N.D. Ill. 1993) ......................................................................................57

*Keating v. Philip Morris, Inc.*,
    417 N.W. 2d 132 (Minn Ct. App. 1987) ......................................................................33, 37

*Koenig v. Benson*,
    117 F.R.D. 330 (E.D.N.Y. 1987) ....................................................................................58

*Latson v. GC Servs.*,
    No. H-98-0488, 2000 U.S. Dist. LEXIS 6295 (S.D. Tex. Feb. 15, 2000) ..............................14

*Lerwill v. Inflight Motion Pictures, Inc.*,
    582 F.2d 507 (9th Cir. 1978) ....................................................................................15, 57

*London v. Wal-Mart Stores, Inc.*,
    340 F.3d 1246 (11th Cir. 2003) ..................................................................................57, 58

*Lozano v. AT&T Wireless Services, Inc.*,
    2007 DJDAR 14749 (9th Cir. Sept. 20, 2007) ..................................................................60

*Melnick v. Microsoft Corp.*,
    No. CV-99-752, 2001 WL 1012261 (Me. Super. Ct. Aug 4, 2001) ....................................25, 33

*Molski v. Gleich*,
    318 F.3d 937 (9th Cir. 2003) ........................................................................................60

*Moore v. Hughes Helicopters, Inc.*,
    708 F.2d 475 (9th Cir. 1983) ....................................................................................11, 12

*Multi-Ethnic Immigrant Workers Organizing Network v. City of Los Angeles*,
    246 F.R.D. 621 (C.D. Cal. 2007) ....................................................................................15

*O'Connor v. Boeing N. Am.*,
    184 F.R.D. 311 (C.D. Cal. 1998) ....................................................................................15

*O'Shea v. Littleton*,
    414 U.S. 488 (1974) ....................................................................................................60

*Ortiz v. Fibreboard Corp.*,
    527 U.S. 815 (1999) ..........................................................................................1, 49, 50

*Oshana v. The Coca-Cola Co.*,
    225 F.R.D. 575 (N.D. Ill. 2005) ........................................................................................1

*Pattillo v. Schlesinger*,
    625 F.2d 262 (9th Cir. 1980) ........................................................................................57

*Peridot, Inc. v. Kimberly-Clark Corp.*,
    No. MC 98–012686, 2000 WL 673933 (D.C. Minn. 2000) ........................................... passim

Winston & Strawn LLP
101 California Street
San Francisco, CA 94111-5894

-viii-

*Phillips Petroleum Co. v. Shutts*,
   472 U.S. 797 (1985)................................................................................48

*Piggly Wiggly Clarksville, Inc. v. Interstate Brands Corp.*,
   100 F. App'x 296 (5th Cir. 2004) ........................................21, 34, 46, 55

*Poulos v. Caesars World, Inc.*,
   379 F.3d 654 (9th Cir. 2004) ................................................................19

*Ren v. Philip Morris Inc.*,
   No. 00-004035-CZ, 2002 WL 1839983 (Mich. Cir. Ct. June 11, 2002) ................................25

*Robinson v. Tex. Auto. Dealers Ass'n*,
   387 F.3d 416 (5th Cir. 2004) ................................................................46

*Rodriguez v. Gates*,
   No. cv99-13190 GAF, 2002 U.S. Dist. LEXIS 10654 (C.D. Cal. May 31, 2002) ................11

*Rosack v. Volvo of Am. Corp.*,
   182 Cal. Rptr. 800 (Cal. Ct. App. 1982) ................................................48

*Weisfeld v. Sun Chem. Corp.*,
   210 F.R.D. 136 (D.N.J. 2002), *aff'd* (3rd Cir. 2004) ................................13

*Weisfeld v. Sun Chem. Corp.*,
   84 Fed. App'x 257 (3d Cir. 2004)................................................................26

*Weisgram v. Marley Co.*,
   528 U.S. 440 (2000)................................................................1, 14, 21

*West v. Prudential Secs. Inc.*,
   282 F.3d 935 (7th Cir. 2002) ................................................................12

*Whiteway v. FedEx Kinko's Office & Print Servs., Inc.*,
   No. C 05-2320 SBA, 2006 WL 2642528 (N.D. Cal. Sept. 14, 2006)................................1

*Windham v. Amer. Brands, Inc.*,
   565 F.2d 59 (4th Cir. 1977) ................................................................20, 26

*Zinser v. Accufix Research Inst., Inc.*,
   253 F.3d 1180 (9th Cir. 2001), amended, 273 F.3d 1266 (9th Cir. 2001)................11, 50, 54


**OTHER AUTHORITIES**

*Econometrics*, 2005 ABA Sec. Antitrust 22 ................................................................32

Fed. R. Civ. P. 23 ................................................................ passim

Winston & Strawn LLP
101 California Street
San Francisco, CA 94111-5894

Fed. R. Civ. P. 23(a) ................................................................................11, 12, 56, 59

Fed. R. Civ. P. 23(a)(3) .......................................................................................56

Fed. R. Civ. P. 23(a)(4) ...................................................................................57, 58

Fed. R. Civ. P. 23(b) ......................................................................................11, 19

Fed. R. Civ. P. 23(b)(2) .................................................................................59, 60

Fed. R. Civ. P. 23(b)(3) .............................................................................11, 19, 20

Fed. R. Civ. P. 23(c)(4)(B) ..............................................................................1, 49

Donghun Kim and Ronald W. Cotterill, *Cost Pass through in Differentiated Product Markets: The Case of U.S. Processed Cheese*, 56 J. Indus. Econ. 32–48 (2008)...................30

Robert G. Harris and Lawrence A. Sullivan, *Passing on the Monopoly Overcharge: A Comprehensive Policy Analysis*, 128 U. Pa. L. Rev. 269 (1979) ............................................22

**Winston & Strawn LLP**
101 California Street
San Francisco, CA 94111-5894

DEFENDANTS' OPPOSITION TO INDIRECT PURCHASER
PLAINTIFFS' MOTION FOR CLASS CERTIFICATION (M:07-cv-1819 CW)

## I.   INTRODUCTION AND SUMMARY OF OPPOSITION

Indirect purchaser plaintiffs ("Plaintiffs") seek to certify a national federal injunctive class and 27 subclasses under separate state laws composed of indirect purchasers of a wide variety of products, ranging in price and complexity from low-end smart phones to high-end servers, which might contain Defendants' SRAM.  Plaintiffs' motion for certification should be denied if: (1) the identity of class members is not objectively ascertainable without reliance on fact-intensive inquiries;[1] (2) Plaintiffs fail to advance a "realistic" and "sufficiently plausible" methodology for proving impact (pass-through of an alleged overcharge) on a class-wide basis using common proof;[2] (3) indisputable record facts render Plaintiffs' experts' opinions on common proof of impact unrealistic or implausible;[3] or (4) conflicting interests among class members require too many subclasses for the action to be manageable.[4]  Here, as with Judge Breyer's *Methionine* decisions, and Judge Hamilton's *Infineon* decision, dispositive differences between direct and indirect purchasers of SRAM make clear that for each of the following four reasons, class certification should be denied.[5]

First, unlike in the direct purchaser action where the plaintiffs' and defendants' own records identified who was in the class, here, to determine who is a class member under Plaintiffs' class

---

[1]    *Davis v. Astrue*, 250 F.R.D. 476, 484 (N.D. Cal. 2008) ("[A]n implied prerequisite to certification is that the class must be sufficiently definite[, and a] defined class should be precise, objective, and presently ascertainable" (internal quotation marks and citations omitted)); *Whiteway v. FedEx Kinko's Office & Print Servs., Inc.*, No. C 05-2320 SBA, 2006 WL 2642528, at *3 (N.D. Cal. Sept. 14, 2006) ("The Court must be able to determine class members without having to answer numerous fact-intensive questions."); *Oshana v. The Coca-Cola Co.*, 225 F.R.D. 575, 580 (N.D. Ill. 2005) ("[A]n identifiable class does not exist if . . . contingent on a particular state of mind").  Here, whether a class member purchased "for end use and not resale" is a state-of-mind inquiry.

[2]    *In re Rubber Chems. Antitrust Litig.*, 232 F.R.D. 346, 353-54 (N.D. Cal. 2005) (requiring plaintiffs to show that their proposed method is realistic); *California v. Infineon Tech. AG*, No. C 06-4333 PJH, 2008 WL 4155665, at *9 (N.D. Cal. Sept. 5, 2008) (class certification denied where "plaintiffs' expert . . . failed to come forward with a sufficiently plausible methodology").

[3]    *See Weisgram v. Marley Co.*, 528 U.S. 440, 454 (2000) (expert testimony is of no value when "it is not supported by sufficient facts to validate it in the eyes of the law, or when indisputable record facts contradict or otherwise render the opinion unreasonable") (quoting *Brooke Group Ltd. v. Brown & Williamson Tobacco Corp.*, 509 U.S. 209, 242 (1993)).

[4]    *Ortiz v. Fibreboard Corp.*, 527 U.S. 815, 856 (1999) (a class with subcategories of weaker and stronger claims "requires division into homogeneous subclasses under Rule 23(c)(4)(B), with separate representation to eliminate conflicting interests of counsel") (citing *Amchem Prod., Inc. v. Windsor*, 521 U.S. 591, 627 (1997)); *In re Seagate Tech. II Secs. Litig.*, 843 F. Supp. 1341, 1362 (N.D. Cal. 1994) ("[R]econciliation of these conflicts would require so many class representatives and subclasses that a class action would become utterly unworkable.").

[5]    *Infineon*, 2008 WL 4155665, at *9; *In re Methionine Antitrust Litig.*, 204 F.R.D. 161 (N.D. Cal. 2001) ("*Methionine I*"); *In re Methionine Antitrust Litig.*, No. 00-1311, 2003 WL 22048232 (N.D. Cal. Aug. 26, 2003) ("*Methionine II*").

Winston & Strawn LLP
101 California Street
San Francisco, CA 94111-5894

definitions, the Court would have to engage in fact-intensive inquiries regarding whether: for example, (a) the products purchased by putative class members actually contain SRAM as opposed to one of several interchangeable memory substitutes; and (b) the products purchased contain SRAM "manufactured or sold by a defendant," as opposed to SRAM manufactured by one of many non-Defendant manufacturers. This information is not only crucial to determining the identities of class members, but it also helps explain why Plaintiffs' experts cannot identify or obtain sufficient data to reliably assess pass-through. But Plaintiffs' experts, despite contrary evidence, ignore these issues; instead, they assume that all putative class members purchased products with Defendants' SRAM.

Second, unlike direct purchasers, indirect purchasers must show that any overcharge passed through various levels of commerce in order to prove impact. Thus, in order for an analysis to be "realistic" and "sufficiently plausible," individualized data and evidence from numerous third parties, at every level of the distribution chains, must be analyzed to account for divergent issues affecting whether pass-through has occurred. Such divergent issues, which give rise to myriad individualized inquires, include: (a) varying degrees of negotiating power among those who purchased (b) a wide range of SRAM-containing products from (c) many different intermediate resellers in (d) different distribution chains, pursuant to (e) divergent pricing and sales practices at each level, including a comparison of actual costs to prices. Rather than address these issues, Plaintiffs' experts ignore each of them and assume, despite volumes of evidence to the contrary, that all firms at the various levels of the distribution chain raise prices in tandem with cost increases, thus assuming that all firms pass through overcharges at every level of commerce. Their conclusions are fatally flawed as exemplified by the fact that Plaintiffs' experts' models — using economic slight of hand — can indicate that pass-through occurred for a set of transactions even when the indisputable evidence actually establishes that pass-through was impossible.

Third, the indisputable evidence shows that any alleged overcharge was not passed through to millions of putative class members. Among many examples, fixed-term pricing models and set-price contracts among intermediate firms entirely blocked pass-through from traveling down the chain of commerce to millions of putative class members. But Plaintiffs' experts do not account for any such circumstances in formulating their opinions. Indeed, Plaintiffs' experts' proposed

Winston & Strawn LLP
101 California Street
San Francisco, CA 94111-5894

-2-

methodologies can generate a result that indicates a significant positive pass-through in a given data pool, even though there was no pass-though in a substantial number of transactions in the same data pool. This false-positive pass-through conclusion can occur, because Plaintiffs' models: (1) fail to take into account actual cost data, which would show no pass-through; (2) ignore entire distribution chains and ignore entire levels in all of the distribution chains, which would show that pass-through has been blocked; and (3) aggregate data across transactions and distribution chains, which can mask no-pass-through transactions by lumping them together with potentially high pass-through transactions. An expert methodology that can indicate significant pass-through where pass-through is impossible for a substantial amount of the transactions is neither realistic nor sufficiently plausible. As Judges Breyer and Hamilton held, where plaintiffs fail to advance a sufficiently plausible and realistic methodology for proving impact on a class-wide basis using common proof, the court should deny class certification to indirect purchasers, even after certifying a direct class.[6]

Fourth, the proposed 27 state indirect purchaser subclasses each contain subcategories of members with varying strengths and weaknesses of claims based on differences including product type, purchase date, pricing and sales practices, and negotiating power. The menagerie of subclasses, class counsel, and class representatives required to avoid conflicts would overwhelm the jury with varied legal instructions and indisputable factual issues, making it impossible for Plaintiffs to present a realistic trial plan, ultimately rendering the class unmanageable.

## II.     STATEMENT OF FACTS

The facts in this case are exceedingly important because they demonstrate that numerous and complex individualized inquiries are necessary, rendering this case unsuitable for class treatment. This complexity is exemplified by Plaintiffs' proposed class definitions, which encompass those "who indirectly purchased products containing SRAM, for end use and not for resale, that were manufactured and/or sold by one or more of the Defendants during the Class Period . . . ."[7] These broad definitions encompass divergent products, purchasers, pricing and sale models, distribution

---

[6]     *Infineon*, 2008 WL 4155665, at *9-11; *Methionine I*, 204 F.R.D. at 164; *Methionine II*, 2003 WL 22048232, at *4-5.

[7]     Notice of Motion and Motion of Indirect Purchaser Plaintiffs for Class Certification, January 29, 2009 ("Motion"). Plaintiffs seek certification of 27 state classes yet propose class definitions for only 25. Plaintiffs have no proposed class definitions for North Dakota and Puerto Rico.

Winston & Strawn LLP
101 California Street
San Francisco, CA 94111-5894

-3-

Winston & Strawn LLP
101 California Street
San Francisco, CA 94111-5894

1    chains, and contracts.  This is the quintessential complex indirect purchaser case.

2    **A.    Divergent Distribution Chains for SRAM and SRAM-Containing Products**

3    Defendants' SRAM is[8] distributed through myriad distribution paths before reaching end

4    users.  (Expert Report of Michelle Burtis ¶10, 33, 57 ("Burtis").)  One of the simplest distribution

5    chains involves the sale of SRAM directly from a Defendant to an original equipment manufacturer

6    ("OEM")that also manufactures and sells its products directly to end users.  (Burtis ¶51.)  But in

7    many cases multiple distribution-chain levels separate Defendants and end users.  (Burtis ¶36, 48.)

8    For example, SRAM may move from (1) SRAM manufacturer to (2) distributor to (3) intermediate

9    component manufacturer to (4) another distributor to (5) contract manufacturer to (6) original

10   equipment manufacturer to (7) retailer, and finally to (8) end purchaser, who may or may not resell

11   the product on the secondary market to (9) secondary end purchaser. (Exhibit 13 ("Ex").)[9]

12   At each link in the chains, distribution paths fork in vastly different directions based on

13   various factors, including firm type, market conditions, unique cost considerations, negotiating

14   power, exchange rates, contractual relationships, and pricing strategies — all of which affect if any

15   overcharge is passed through.  (*Id.* ¶37, Ex 13.)  The distribution chains can merge since many

16   entities are at multiple levels.  (*Id.*; Burtis ¶43, 47.)  For instance, some distributors resell not only

17   SRAM, but also intermediate components and end products containing SRAM.  (Burtis ¶47.)

18   **Redacted**

19

20   As the chains fork and merge, it becomes increasingly difficult to trace

21   whose SRAM makes it into a particular product and if any overcharge was passed through.  (Burtis

22   ¶36, 37, 40.)

23   Based on Defendants' transactional data, the first link in distribution chains is the only

24   _____

25   [8]    Though the Class Period is from November 1, 1996 to December 31, 2006, the facts generally are discussed in the present tense.  Defendants do not discuss their position that an

26   overcharge to direct purchasers cannot be shown using common proof, but reserve the right to so argue in the future.  Defendants also reserve the right to present additional argument and/or evidence

27   on this and any other issues related to the appropriateness of class certification in briefing, presentation, and testimony before this Court at the class certification hearing.

28   [9]    Exhibit numbers indicate exhibits attached to the Expert Report of Michelle Burtis.  Exhibit letters indicate exhibits attached to the Declaration of Patrick M. Ryan.

decipherable one.  And the diversity and numerosity of direct SRAM purchasers add another level of complexity near the top of the distribution chains.  Original equipment manufacturers are one direct purchaser, which produce their products using Defendant and non-Defendant SRAM, and others, such as IBM, sometimes produced SRAM in-house.  Contract manufacturers purchase SRAM or SRAM-containing components for end products produced under contracts with original equipment manufacturers.  Intermediate component producers directly purchase SRAM die that may be incorporated into components, such as multi-chip packages ("MCPs"), which are used in products, including motherboards, and then resold as components to other manufacturers.  (Burtis ¶45.)

Many direct purchasers, such as Sony, are also indirect purchasers.  And many intermediaries purchase SRAM from yet another category of direct purchasers, distributors, who resell SRAM purchased from SRAM manufacturers or other distributors.  (Burtis ¶32.)  For example, Cisco not only purchases SRAM to place into its products, but also purchases SRAM-containing products, such as servers, for internal use, making Cisco an indirect purchaser, as well.  (Burtis ¶46.)

**Redacted**

And some contract manufacturers produce SRAM-containing intermediate components and end products.  (Burtis ¶¶32, 43.)

Plaintiffs' sole common-impact expert, Dr. Harris, admitted that Dr. Dwyer's models do not take into account what can happen at each level of the complex distribution chains.  (Ex B, Harris Dep. 100:24–101:4.)  He also stated that his report did not address competition in the distribution market.  (*Id.* at 197:23–24.)

**B.    Divergent Pricing and Sales Practices**

Prices of SRAM and SRAM-containing products are affected by the individual pricing and sales practices of each entity and market in the various distribution chains.  Not only do these divergent practices result in widely varying prices for comparable products, but also in different prices (and thus, different potential pass-through rates) for identical SRAM-containing products sold by the same entity at the same time to different customers.  (Burtis ¶¶88–89.)  Divergent pricing and sales practices, which Plaintiffs' experts have not considered, include: (1) fixed-term pricing and set-price contracts; (2) the *de minimis* cost of SRAM in relation to the overall cost of SRAM-containing

Winston & Strawn LLP
101 California Street
San Francisco, CA 94111-5894

-5-

products; (3) SRAM cost increases outweighed by transactional costs associated with raising prices; (4) bundled pricing; (5) loss leaders; and (6) secondary-market pricing.

### 1. Fixed-Term Pricing or Set-Price Contracts

**Redacted**

These pricing structures absorbed or blocked pass-through from traveling down the distribution chain in numerous situations. (Burtis ¶137.)

**Redacted**

Additionally, some vendors entered into contracts that prevented them from passing through any potential overcharge to their customers. (Burtis ¶124.)

**Redacted**

Dr. Harris testified that under such a scenario there is no pass-through, but did not consider this in his analysis. (Ex B, Harris Dep. 41:10–19; 53:18–54:20.)

### 2. *De Minimis* SRAM Cost

The SRAM cost is often a *de minimis* portion of the overall cost of SRAM-containing products, many of which contain hundreds of components. (Burtis ¶67.)

**Redacted**

The proportional amount of the SRAM component cost in more expensive products, such as servers, was equally miniscule. (Burtis ¶67; Ex 12.)

**Redacted**

---

[10]  According to Dr. Harris "Personal Digital Assistants (PDA) and Smart Phones are, in essence, computers that fit in your hand. PDAs are small computers that are sometimes called palmtops and are a way to store telephone numbers, email addresses, access the Internet, make calculations, keep a digital calendar and play games. Smart Phones perform *some* or all of the functions of a PDA but add the ability of a cellular telephone to make and receive phone calls and text messages." (Harris ¶34 (emphasis added).)

Winston & Strawn LLP
101 California Street
San Francisco, CA 94111-5894

**Redacted**

### 3. Transactional Costs That May Outweigh SRAM Cost Increases

The evidence in this case — as Dr. Harris agrees — shows that vendors will not increase their prices in reaction to cost increases if to do so would be more costly than absorbing the cost increase. Dr. Harris stated that if the cost associated with increased prices of products is greater than the overcharge then "the rational response to that would be not to change your price because it's not financially in your best interest" (Ex B, Harris Dep. 82:15–17. *See also id.* 9:23–90:7, 158:14–25) and that end purchasers of such products will "suffer no impact from the overcharge."[11]

The data and the indisputable evidence show that any overcharges would have represented a *de minimis* amount of the total cost of a product and that in many cases firms did not increase prices in reaction to the increased cost of SRAM since to do so would have cost more than absorbing any increased cost.

**Redacted**

### 4. Bundled Pricing

Many products allegedly containing SRAM are sold as parts of bundled deals with other goods and/or services. (Burtis ¶¶83–85; Ex 15.) The prices paid for the bundles include products or services outside the proposed class definitions. (Burtis ¶83.) For example, numerous smart phones sold were bundled with long-term carrier contracts. (Burtis ¶84.)[12] As part of the service contracts, the smart phones were heavily discounted or subsidized by the carriers. (*Id.*;

**Redacted**

For example, in 2006, the Palm Treo 700w smart phone was available from Verizon wireless with a "$100 instant rebate with a two-year service agreement when accompanied by [particular plans]." (Burtis ¶84.)

**Redacted**

---

[11]   Ex B, Harris Dep. 83:14–18.  *See also id.* 89:13–90:7; 158:14–159:2; 171:23–172:10.
[12]   Several proposed class representatives purchased smart phones bundled with service contracts.  Ex E, Kicia Dep. 57:20–58:7; Ex F, Brooks Dep. 49:12–18; Ex G, Sterenberg Dep. 55:11–56:10, 60:7–15; Ex H, Culver Dep. 33:3–7; Ex I, Munoz Dep. 29:1–21; Ex J, Edwards Dep. 24:2–25:7, 30:5–15, 32:3–19.

Winston & Strawn LLP
101 California Street
San Francisco, CA 94111-5894

**Redacted**

Large firms report receiving substantial discounts on purchases of smart phones in exchange for volume service contracts. (Burtis ¶84.) For example, in exchange for a multi-year service contract, a former procurement officer of a large firm reported purchasing 400 Blackberries from T-Mobile for $50 each during the proposed Class Period, when such phones retailed for roughly $300. (*Id.*)

**Redacted**

Other bundles included networking systems containing different hardware components made by different manufacturers, and combination products, such as the Westell "tri-link", which combines a modem, a wireless gateway, and a VOIP-enabled device. (Burtis ¶85.)

**5.      Loss Leaders**

Retailers sell SRAM-containing products below cost as "loss leaders," for sales and marketing reasons. Loss leaders are priced to increase customer traffic in stores, which means prices can be set without reference to actual cost. (Burtis ¶121.) The third-party data shows numerous retailers often sell well below cost, indicating that a loss-leader pricing is being employed. (*Id.*) For example, on "Black Friday," the day after Thanksgiving, many retailers offer a limited quantity of "door busters," priced to lure customers into their stores. Dr. Harris agrees that loss leaders can result in no pass-through to end customers. (Ex B, Harris Dep. 208:2–209:11, 208:23–209:11.).

**6.      Secondary Markets for Used and Refurbished Products**

There are highly developed secondary markets for used electronics, including many products at issue. (Burtis ¶¶40, 70.) In 2002, the secondary market for used IT equipment was $20 billion, with 2,000 different companies operating to recover and resell the equipment. (Burtis ¶70.) Forty percent of the revenue of Hewlett-Packard's Financial Services division in 2001 was from the secondary market. (Burtis ¶70.) Dell's revenue from used equipment increased from $0 in 1999 to $200 million in 2001. (Burtis ¶70.) Less sophisticated products such as smart phones, PDAs, routers, and modems are often bought by consumers and later resold on eBay. (Burtis ¶71.) Proposed class representative Stargate Films purchased refurbished Dell products at substantial discounts. (Ex K, Stargate Films Dep. 78:6–18; 79:19–80:3.) Plaintiffs' broad class definitions

Winston & Strawn LLP
101 California Street
San Francisco, CA 94111-5894

-8-

1   appear to include purchasers of refurbished and used products. Their experts, however, have not

2   taken into account secondary-market sales[13] and have "no idea how [they would] determine"

3   whether putative class members actually resold their products and passed through any overcharges to

4   secondary purchasers. (Ex B, Harris Dep. 216:14–217:1; 220:13–20.)

5   **C.   Divergent Products That Allegedly Contain SRAM**

6        Plaintiffs seek to recover based on four broad product purchase categories: computers,

7   phone-systems, networking, and network appliances. (Harris ¶32.) Each category is comprised of

8   subcategories of products, including PDAs, smart phones, desktop computers (with separate level 2

9   cache memory), servers and mainframes, voice-over Internet protocol ("VOIP") systems, routers,

10  switches, modems, communications infrastructure equipment, storage area networks, and firewalls,

11  sold by entirely different sets of companies. (Harris ¶32.) The products within each subcategory are

12  sold at widely different prices through many different and complicated distribution chains. (Burtis

13  ¶90.) They are not interchangeable, do not fall within the same relevant product markets, and cannot

14  be analyzed by the same pass-through model. (Burtis ¶¶77–81.)

15       Dr. Harris testified that he thinks that there are at least 14 separate relevant product markets.

16  (Ex B, Harris Dep. 134:4–13, 135:4–19.) He also testified that he has done no actual product-market

17  analysis as part of his methodology for determining whether and how pass-through occurs. (Ex B,

18  Harris Dep. 136:24–137:2.) Dr. Dwyer stated that the models could be used interchangeably for

19  products as divergent as routers and chocolate bars. (Ex L, Dwyer Dep. 57:15:24.)

20       Further, each product subcategory encompasses diverse products, subject to a variety of

21  factors that may impact whether pass-through has occurred. For instance, the "servers" subcategory

22  encompasses a variety of products that serve different markets. Some servers manage resources on

23  "local areas networks" within contained areas such as buildings, while others manage resources

24  within "wide area networks" that may include geographically dispersed locations, and "web servers"

25  manage information flowing between users and the Internet. (Burtis ¶80.) These divergent servers

26  are sold at divergent prices to customers with distinctly different negotiating power through vastly

27  different distribution chains. **Redacted**

28  ―――――――――
    [13]   Plaintiffs' experts also did not consider sales of new products on the secondary market.

Winston & Strawn LLP
101 California Street
San Francisco, CA 94111-5894

**Redacted**

Similarly, the "routers" subcategory includes products used for a variety of purposes and sold at varying prices. (Burtis ¶79.)

**Redacted**

**D.     Divergent Proposed Class Members**

The putative class members are incredibly diverse.  For example, the class definition encompasses: (1) an individual consumer who purchased a smart phone for personal use; (2) a small business that purchased inexpensive servers; (3) an entity, such as a law firm that purchased thousands of computers and smart phones, and hundreds of routers and switches; and (4) a massive enterprise, such as Google, that purchased millions of dollars in servers and networking equipment yearly.  The divergent class members and their attributes are significant to determining whether individual issues, rather than common issues, predominate.  Negotiating power is an attribute that gives rise to individual inquiries.  Colossal variances exist between small businesses and corporate behemoths with huge computing, data storage, and networking requirements.  Proposed Florida representative John Pharr d/b/a/ JP Micro, for example, purportedly purchased two servers during the class period, while Google purchased more than 450,000 servers and Microsoft purchased more than 200,000.  (Ex N, 4:28–5:3; Burtis ¶64; Ex O.)  Dr. Harris admits his methods cannot account for scenarios when there is no pass-through due to negotiating power as his data cannot detect it and he acknowledges that such inquiry would be too individualized.  (Ex B, Harris Dep. 278:18–279:10.)

---

[14]     Defendants sold hundreds, sometimes thousands, of different types of SRAM in a given year.  Different types of SRAM are for different applications or products and varied based on their: (1) voltage; (2) configuration; (3) speed; (4) density; and (5) whether they are synchronous or asynchronous.  These differences prevent interchangeability of SRAM across different components and end products.  Many SRAM purchasers required custom SRAM, where they designed or collaborated with SRAM manufacturers to design specific SRAM for use in components or end products.  Custom SRAM is designed for a particular customer, suited only to that customer's needs, and varies drastically from SRAM wafers, which could be processed and sliced in various ways for use in various components.  Defendants sold SRAM in forms other than chips (*i.e.*, wafers, multi-chip packages, and embedded SRAM).  Determining if products purchased by Plaintiffs contained SRAM chips, as opposed to other forms, is very difficult.  (Burtis ¶¶20, 22.)

-10-

Winston & Strawn LLP
101 California Street
San Francisco, CA 94111-5894

### III.   PLAINTIFFS' MOTION SHOULD BE DENIED.

Plaintiffs bear the burden of meeting each of the requirements of Rule 23(a) — numerosity, common issues, typicality, and adequacy of representation — along with at least one requirement of Rule 23(b).[15]  For monetary relief, Plaintiffs must meet the requirements of Rule 23(b)(3), including proof that common issues predominate and that the proposed class is superior to alternative means of adjudicating the controversy.  For the nationwide injunctive class, the Court must have Article III jurisdiction to enter an injunction against Defendants, and Plaintiffs must not be primarily seeking monetary relief.  In addition, a "class action is possible only when the class definition provides a court with tangible and practicable standards for determining who is and who is not a member of the class."[16]  A court must deny certification if any of the requirements are not met.

### A.   Plaintiffs' Motion Cannot Withstand a "Rigorous Analysis."

The Court must conduct a "rigorous analysis" and "probe behind the pleadings" to determine whether Plaintiffs have met their burden of meeting each of Rule 23's requirements.[17]  "Some inquiry into the substance of [the] case may be necessary to ascertain satisfaction of [Rule 23's] requirements."[18]  As this Court acknowledged, "The court need not accept conclusory or generic allegations regarding the suitability of the litigation for resolution through class action."[19]  The Court is "at liberty to consider evidence which goes to the requirements of Rule 23 even though the evidence may also relate to the underlying merits of the case."[20]  Matters beyond the pleadings

---

[15]   *Zinser v. Accufix Research Inst., Inc.*, 253 F.3d 1180, 1186 (9th Cir. 2001), amended, 273 F.3d 1266 (9th Cir. 2001).

[16]   *Grillasca v. Hess Corp.*, No. 8:05-cv-1736-T-17-TGW, 2007 WL 2121726, at *3 (M.D. Fla. July 24, 2007); *Crosby v. Social Sec. Admin.*, 796 F.2d 576, 580 (1st Cir. 1986) (class certification denied because identifying putative members posed an "insurmountable difficulty"); *Rodriguez v. Gates*, No. cv99-13190 GAF, 2002 U.S. Dist. LEXIS 10654, at *32 (C.D. Cal. May 31, 2002) ("Requiring an objectively ascertainable class is important because without one, it will be unclear who is bound by the judgment and who has standing to enforce any resulting injunction against the defendant."); 5 James W. Moore, et al., Moore's Federal Practice, ¶23.21 [1], at 23–48 (3d ed. 1997) ("A class action is possible only when the class definition provides a court with tangible and practicable standards for determining who is and who is not a member of the class.").

[17]   *Gen. Tel. Co. of Sw. v. Falcon*, 457 U.S. 147, 160-61 (1982).

[18]   *In re Abbott Labs. Norvir Antitrust Litig.*, No. C 04-1511 CW, Consolidated Case No. C 04-4203 CW, 2007 WL 1689899, at *2 (N.D. Cal. June 11, 2007) (quoting *Moore v. Hughes Helicopters, Inc.*, 708 F.2d 475, 480 (9th Cir. 1983)).

[19]   *Abbott Labs.*, 2007 WL 1689899, at *2; *In re Static Random Access Memory (SRAM) Antitrust Litig.*, No. 07-0819, 2008 WL 4447592, at *2 (N.D. Cal. 2008) (citations omitted).

[20]   *Hanon v. Dataproducts Corp.*, 976 F.2d 497, 509 (9th Cir. 1992) (quotation marks omitted).

-11-

Winston & Strawn LLP
101 California Street
San Francisco, CA 94111-5894

Winston & Strawn LLP
101 California Street
San Francisco, CA 94111-5894

1   should be considered "to ascertain whether the asserted claims or defenses are susceptible of

2   resolution on a class wide basis."[21]  And, as this Court also recognized, "the court may consider

3   supplemental evidentiary submissions of the parties."[22]

4        Here, a "rigorous analysis" calls for consideration of all the evidence submitted by Plaintiffs

5   and Defendants on the class certification issues.[23]  Accordingly, even though some district courts

6   applying current Ninth Circuit jurisprudence[24] have refused to entertain a "battle of the experts," the

7   Court should evaluate the issues and evidence presented, including expert opinions, if they impact

8   Rule 23's requirements.  (*Blackie v. Barrack*, 524 F.2d 891, 897 (9th Cir. 1975) ("[determinations

9   of] common questions, typicality, conflicts, and adequacy of representation . . . may require review

10  of the same facts and the same law presented by review of the merits."); *In re Graphics Processing

11  Units Antitrust Litig.*, 253 F.R.D. 478, 492–93 (N.D. Cal. 2008) ("*GPU*") ("This inquiry necessarily

12  touches on evidence relating to the merits of the case, namely, the proposed methodology of

---

13  [21]    *In re Dynamic Random Access Memory (DRAM) Antitrust Litig.*, No. M01-1486 PJH, 2006
    U.S. Dist. LEXIS 39841, at *27 (N.D. Cal. June 5, 2006).

14  [22]    *Abbott Labs.*, 2007 WL 1689899, at *2 (citing *Methionine I*, 204 F.R.D. at 165 (denying
15  certification since plaintiffs' expert failed to take into account the numerous variables that could
    impact whether and how much an overcharge gets passed down the chain of commerce)).

16  [23]    *See Hanon*, 976 F.2d at 509 (citations omitted); *In re Initial Pub. Offering Secs. Litig.*, 471
    F.3d 24, 42 (2d Cir. 2006) (holding that court must assess all relevant evidence admitted at the class
17  certification stage and determine whether each Rule 23 requirement has been met even if the issue is
    identical to an issue that will be determined on the merits); *Abbott*, 2007 WL 1689899, at *2 (citing
18  *Moore*, 708 F.2d at 480 (noting that "some inquiry into the substance of a case may be necessary to
    ascertain satisfaction of the commonality and typicality requirements of Rule 23(a)").

19  [24]    On March 24, 2009, an *en banc* panel of the Ninth Circuit Court of Appeal reheard *Dukes v.
    Wal-Mart*, Inc., 509 F.3d 1168 (9th Cir. 2007).  (*Dukes v. Wal-Mart, Inc.*, 556 F.3d 919 (9th Cir.
20  2009).)  One issue of which Wal-Mart sought *en banc* review was whether courts must avoid any
    inquiry into the merits when evaluating class certification.  (Petition for Rehearing En Banc, *Dukes
21  v. Wal-Mart Stores, Inc.*, No. 04-16688 (9th Cir. Feb. 20, 2007).)  There is a clear tension between
    the Supreme Court's admonition to avoid a preliminary inquiry into the merits at the class
22  certification phase, (*Eisen v. Carlisle & Jacquelin*, 417 U.S. 156, 177 (1974).), and the Court's
    subsequent instruction to conduct a "rigorous analysis" and "probe behind the pleadings" to
23  determine whether class certification is appropriate.  (*Falcon*, 457 U.S. at 160-61.)  In *Blackie v.
    Barrack*, the Ninth Circuit explained that, though courts must accept the substantive allegations as
24  true at the certification stage, "the class issue [is not] separable from the merits in all cases . . . [and
    determinations of] common questions, typicality, conflicts, and adequacy of representation . . . may
25  require review of the same facts and the same law presented by review of the merits."  *Blackie*, 524
    F.2d 891, 897, 901 (9th Cir. 1975).  In *Dukes*, the Ninth Circuit may join the national trend of
26  resolving this tension by requiring an inquiry into the merits of some aspects of the plaintiff's case,
    including expert testimony.  (*In re Hydrogen Peroxide Antitrust Litig.*, 552 F.3d 305, 323 (3d Cir.
27  2009) (citing *Blades v. Monsanto*, 400 F.3d 562, 575 (8th Cir. 2005); *West v. Prudential Secs. Inc.*,
    282 F.3d 935, 938 (7th Cir. 2002).  *See also Cordes & Co. Fin. Servs. v. A.G. Edwards & Sons, Inc.*,
28  502 F.3d 91, 106–07 (2d Cir. 2007); *In re PolyMedica Corp. Secs. Litig.*, 432 F.3d 1, 5–6, 19 (1st
    Cir. 2005); *In re New Motor Vehicles Canadian Exp. Antitrust Litig.*, 522 F.3d 6, 26 (1st Cir. 2008).)

-12-

1    [plaintiff's expert]."*).) As part of a rigorous analysis, courts "cannot ignore the evidence that shows

2    that [for] some . . . class members . . . overcharge[s] [were] not passed along . . . ."[25]

3    　　　Indeed, courts deny class certification in antitrust cases where the plaintiffs rely on factually

4    unsupported economic expert opinions.[26] When reviewing experts' "complex theory as to injury, as

5    the predominance inquiry does in this case, the district court must engage in a searching inquiry into

6    the viability of that theory and the existence of the facts necessary for the theory to succeed."[27]

7    　　　In this case, expert opinions do impact several of Rule 23's requirements, and a review of

8    Plaintiffs' experts' opinions reveals patent deficiencies with regard to Rule 23's elements, including

9    typicality, adequacy, and whether common issues predominate over individual issues. For example,

10   Plaintiffs' experts have not put forward a methodology that permits a showing of impact based on

11   common proof; thus, individual proof will be required by individual class members, which will

12   result in a predominance of individual over common issues. Taking into account the evidence and

13   opinions submitted by both parties, before certifying a class based on an expert impact theory of

14   common proof, courts are required to determine whether plaintiffs' expert opinions are realistic and

15   sufficiently plausible.[28] Further, in an indirect purchaser case, plaintiff's experts must provide a

16   "sufficiently concrete methodology" to show that pass-through can be shown with generalized

17   proof.[29] Here, Plaintiffs have failed to present credible and admissible evidence that its experts'

18   opinions are realistic and sufficiently plausible.

19   　　　Even if plaintiffs' experts' opinions seem reasonable, the Court may not give them credence

20

21   ───────────────────────
     [25]    *Methionine I*, 204 F.R.D. at 166-67.
22   [26]    *Weisfeld v. Sun Chem. Corp.*, 210 F.R.D. 136, 143-44 (D.N.J. 2002), *aff'd*, (3rd Cir. 2004)
     (unpublished) (affirming denial of certification); *In re Agricultural Chems. Antitrust Litig.*, 1995-2
23   Trade Cas. (CCH) P71, 197 (N.D. Fla. 1995) (denying certification); *Global Minerals & Metals
     Corp. v. Sup. Ct.*, 7 Cal.Rptr.3d 28, 46-47 (Cal. Ct. App. 2003) (vacating class certification).
24   [27]    *In re New Motor Vehicles*, 522 F.3d at 26 (reversing certification of 20 state subclasses,
     remanding for review of plaintiffs' expert's theory of common impact).
25   [28]    The standard for predominance for impact is greater than for damages. (*See SRAM*, 2008
     WL 4447592, at *5–6 (evaluating predominance as to injury according to whether plaintiffs establish
26   a plausible methodology, but predominance for damages as to whether the proposed method is not so
     insubstantial as to amount to no method at all); *Infineon*, 2008 WL 4155665, at *6 n.9; *Infineon*,
27   2008 WL 4155665, at *9 (class certification denied where "plaintiffs' expert . . . failed to come
     forward with a sufficiently plausible methodology"); *In re Rubber Chems. Antitrust Litig.*, 232
     F.R.D. at 353-54 (requiring plaintiffs to show that their proposed method is realistic).)
28   [29]    *Infineon*, 2008 WL 4155665, at *11.

     ───────────────────────
     -13-

Winston & Strawn LLP
101 California Street
San Francisco, CA 94111-5894

1   if defendants present indisputable evidence showing their unreasonableness.[30]  As the Supreme

2   Court recognized, expert testimony is of no value when it "is not supported by sufficient facts to

3   validate it in the eyes of the law, *or when indisputable record facts contradict or otherwise render*

4   *the opinion unreasonable.*"[31]  Plaintiffs' experts' opinions are not "facts" and, when unsupported by

5   evidence, cannot establish Rule 23's requirements.  Courts are not at liberty to ignore indisputable

6   evidence that discredits plaintiffs' experts' opinions.[32]  The Supreme Court also stated: "Expert

7   testimony is useful as a guide to interpreting market facts, but it is not a substitute for them."[33]

8          As shown, on their face, Plaintiffs' experts' opinions fail.  But even if Plaintiffs' experts'

9   opinions seemed facially realistic, the fact that many class members suffered no price impact from

10  the alleged overcharges provides indisputable evidence contradicting their economic theories,

11  rendering their opinions unrealistic.  Thus, under the standard articulated by the Supreme Court of

12  the United States, Plaintiffs' experts' opinions are of no value.  As with any moving party with an

13  evidentiary burden, Plaintiffs must prove each element of Rule 23's requirements, including the

14  predominance of common issues, by a preponderance of the evidence.[34]  A "rigorous analysis"

15  makes clear that Plaintiffs have failed to meet that burden.

**B.     There are Dispositive Differences between Direct and Indirect Purchaser Classes.**

17         Because the nature of an indirect purchaser action is dispositively different from a direct

18  purchaser action, a court may deny certification to indirect purchasers after granting certification to

19  direct purchasers regarding the same alleged conspiracy.[35]  The dispositive differences include the

20  following.  (1) The identities of indirect purchasers are not readily identifiable from records

21  possessed by Plaintiffs or Defendants.  The complexities in attempting to determine which proposed

---

22  [30]   *See Weisgram*, 528 U.S. at 454.

23  [31]   *Id.* (emphasis added) (citations omitted).
    [32]   *Id.*; *In re Live Concert Antitrust Litig.*, 247 F.R.D. 98, 107 n.10 (C.D. Cal. 2007) ("If

24  evidence is not in dispute, the Court is permitted to rely on evidence submitted by the defendant
    even if such evidence also relates to the merits of the case.").

25  [33]   *Brooke Group*, 509 U.S. at 242.
    [34]   *In re Credit Suisse First Boston Corp. Analyst Secs. Litig.*, 250 F.R.D. 137, 140 (S.D.N.Y.

26  2008) (decertifying class and noting that "the Court must determine whether Plaintiff has carried his
    burden of demonstrating that each element of Rule 23 is met by a preponderance of the evidence");

27  *Latson v. GC Servs.*, No. H-98-0488, 2000 U.S. Dist. LEXIS 6295, at *11 (S.D. Tex. Feb. 15, 2000)
    (same); *Ilhardt v. A.O. Smith Corp.*, 168 F.R.D. 613, 617 (S.D. Ohio 1996) (same).

28  [35]   *Infineon*, 2008 WL 4155665, at *11-12; *Methionine I*, 204 F.R.D. at 164; *Methionine II*,
    2003 WL 22048232, at *5.

-14-

Winston & Strawn LLP
101 California Street
San Francisco, CA 94111-5894

class members meet the class definitions make it administratively infeasible to objectively determine whether a given individual is a class member.  (2) Indirect purchasers must show that any overcharge passed through various levels of commerce in order to prove impact.[36]  Plaintiffs' experts have not and cannot advance a methodology for proving impact on a class-wide basis that accounts for the myriad of divergent factors affecting pass-through in this case.  (3) The proposed indirect purchaser classes each contain subcategories of members with varying strengths and weaknesses. The menagerie of subclasses, class counsel, and class representatives required to avoid conflicts would overwhelm the jury with varied legal instructions and indisputable factual issues, making it impossible for Plaintiffs to present a realistic trial plan, ultimately rendering the class unmanageable.

**C.     Because Plaintiffs' Proposed Class Definitions Are Not Precise and the Identity of Class Members Is Not Objectively Ascertainable, Class Certification Must Be Denied.**

"In order to warrant certification, the proposed class must be sufficiently definite."[37]  And "the description [should be] definite enough so that it is administratively feasible for the court to ascertain whether an individual is a member."[38]  Thus, the Court must be able to ascertain class members without having to answer numerous fact-intensive inquiries.  (*See* n.1.)  Plaintiffs seek to certify 27 state subclasses, generally defined as "All persons and entities in [X state] who indirectly purchased ***products containing SRAM***, for end use and not for resale, that were ***manufactured and/or sold by one or more of the Defendants*** during the Class Period."[39]  These subclasses are not sufficiently definite to warrant certification as there is no feasible way to objectively identify class members without conducting numerous fact-intensive inquiries.  Even if the Court conducted such inquiries, in some situations, it would be impossible to ascertain who is properly in the class.

---

[36]   *Infineon*, 2008 WL 4155665, at *6.

[37]   The "class definition should be precise, objective, and presently ascertainable."  (*O'Connor v. N. Am.*, 184 F.R.D. 311, 319 (C.D. Cal. 1998) (citations omitted); *Aiken v. Obledo*, 442 F. Supp. 628, 658 (E.D. Cal. 1977); *Davis*, 250 F.R.D. at 484  ("an implied prerequisite to certification is that the class must be sufficiently definite") (citations omitted); *Multi-Ethnic Immigrant Workers Organizing Network v. City of Los Angeles*, 246 F.R.D. 621, 629 (C.D. Cal. 2007).)

[38]   *Campbell v. PricewaterhouseCoopers, LLP*, 253 F.R.D. 586, 593 (E.D. Cal. 2008) ("An adequate class definition specifies 'a distinct group of plaintiffs whose members [can] be identified with particularity.'") (quoting *Lerwill v. Inflight Motion Pictures, Inc.*, 582 F.2d 507, 512 (9th Cir. 1978); *O'Connor v. Boeing N. Am.*, 184 F.R.D. 311, 319 (C.D. Cal. 1998) (citations omitted); *Aiken*, 442 F. Supp. 628 at 658 ("[A] class will be deemed sufficiently definite if it is administratively feasible to determine if a given individual is a member of the class.").)

[39]   Motion at 2 (emphasis added).

Winston & Strawn LLP
101 California Street
San Francisco, CA 94111-5894

Winston & Strawn LLP
101 California Street
San Francisco, CA 94111-5894

### 1.   Determining Whether the Products At Issue Contain SRAM Would Require Individual Merits Inquiries.

Plaintiffs' proposed class definitions are limited to "products containing SRAM."[40]  But not all of the products in Plaintiffs' definitions, and manufactured during the proposed class period, contain SRAM memory chips. **Redacted** [41]  As Plaintiffs' own expert explained, desktop computers often do not contain SRAM chips, but instead contain SRAM circuitry embedded in a microprocessor.[42]  Also, cell phones and PDAs contain multi-chip packages ("MCPs"), where SRAM die are stacked or bundled together with other types of memory products and encased into a single package.  (Burtis ¶24.)  And certain products for which Plaintiffs bring suit use DRAM instead of SRAM.  (Burtis ¶29.)

As shown below, Plaintiffs have been unable to figure out whether the proposed class representatives are even properly in the class because they have no idea if they purchased products with Defendants' SRAM.  If Plaintiffs cannot figure this out for 47 people, how do they propose to do it for hundreds of millions?  Indeed, virtually every named Plaintiff deposed testified that he/she did not conduct any independent investigation to confirm whether his/her product(s) contains SRAM.[43]  Most testified that their belief that their product contains SRAM was based solely on their counsel's statements[44] or from reading the Complaint,[45] and many admitted that they did not actually

---

[40]     Plaintiffs define "products containing SRAM" as "handheld computer devices (also known as personal digital assistants ('PDAs') and smart phones), desktop computers (with separate level 2 cache memory), servers, mainframes, Voice-Over Internet Protocol Systems, routers, switches, modems, storage area networks and firewalls."  Motion 2 n.1.

[41]     Ex P. 5:2–12.

[42]     Harris ¶34(2).  This embedded circuitry is also used to replace standalone SRAM chips in certain routers, switches, and modems.  Burtis ¶97.

[43]     *E.g.*, Ex Q, Allen Dep. 41:18–42:7; Ex F, Brooks Dep. 43:9–11; Ex R, Cater Dep. 107:23–109:3; Ex S, CHP Media, Inc. Dep. 23:21–24; Ex H, Culver Dep. 50:11–24; Ex T, JP Micro Dep. 38:2–39:3; Ex E, Kicia Dep. 54:17–55:18; Ex U, Markey Dep. 43:13–22, 45:8–16; Ex V, Mudlin Dep. 22:23–23:3, 33:10–19; Ex I, Munoz Dep. 45:1–3; Ex W, Reclaim Center, Inc.  Dep. 55:20–56:6; Ex X, Solo Dep. 37:5–10; Ex K, Stargate Films Inc. Dep. 42:15–43:11, 56:16–57:12; Ex G, Sterenberg Dep. 49:17–21; Ex Y, UFCW Local 8 Dep. 41:25–42:4, 44:12–15, 50:3–4; Ex Z, Yohalem Dep. 58:24–59:15, 76:14–16, 89:11–13.

[44]     *E.g.*, Ex Q, Allen Dep. 25:1–22; Ex F, Brooks Dep. 54:25–55:3; Ex AA, Culinary Workers Union Local 226 Dep. 44:7-12; Ex J, Edwards Dep. 33:4–34:10, 42:8–11; Ex BB, Giauque Dep. 21:11–17, 29:21–25; Ex U, Markey Dep. 43:16–22, 46:25–47:8, 55:4–12; Ex V, Mudlin Dep. 32:12–18; Ex I, Munoz Dep. 41:22–25; Ex CC, nXio Dep. 17:16–21, 23:24–25:10, 39:20–24; Ex DD, Penobscot Eye Care Dep. 29:13–17; 71:12–16; Ex EE, Perez Dep. 48:5–12; Ex W, Reclaim Center, Inc. Dep. 53:10–54:5; Ex X; Ex G, Sterenberg Dep. 31:3–17, 49:10–16, 62:14–25, 70:12–19.

-16-

Winston & Strawn LLP
101 California Street
San Francisco, CA 94111-5894

1  know whether their product contains SRAM.[46]  And all class representatives have refused to permit

2  inspection of their products to determine whether they contain SRAM at all, and if so, whether it is a

3  Defendant's SRAM.[47]  Indeed, several of the proposed class representatives purchased products that

4  the indisputable evidence shows *did not contain SRAM*.[48]

5  It would involve numerous individual fact inquiries for the Court to determine if particular

6  products "contain SRAM."  Plaintiffs' Complaint proposes tracing SRAM by looking at identifying

7  information on SRAM, (Third Consol. Amended Compl. ¶147.), but inspecting SRAM will often not

8  be possible.  Many indirect purchasers, including some of the proposed representatives, do not have

9  the products they purchased during the proposed class period — which began over twelve years

10  ago.[49]  Even if a putative class member still possesses a product allegedly containing SRAM and

11  produces it, inspection may not be possible without destroying the product and/or breaching its

12  warranty terms.[50]  And disassembling a memory chip to inspect the die inside could damage the

13  module.  (Burtis ¶101, n. 164.)  More importantly, in some cases, physical inspection will prove

14  fruitless in determining whether a particular product "contains SRAM," since not all SRAM have

15  easily identifiable part numbers.  (Burtis ¶103.)  Thus, an inspection will not yield the identity of

16  who manufactured the SRAM contained within a product.  While Plaintiffs allege that identifying

17  SRAM by observing the manufacturer name and part number located on the SRAM contained in a

18  product is a relatively straightforward exercise, one of the three devices pictured in Plaintiffs'

19  Complaint is not even SRAM, but rather DRAM.  (Burtis ¶101, n. 164.)

---

[45]  *E.g.*, Ex H, Culver Dep. 39:5–40:7; Ex J, Edwards Dep. 36:18–22, 42:8–11, Ex CC, nXio Dep. 17:16–21; 23:24–25:10, 39:20–24; Ex K, Stargate Films Inc. Dep. 47:23–48:3; Ex Z, Yohalem Dep. 58:15–23.

[46]  *E.g.*, Ex Q, Allen Dep. 40:20–24, 91:8–13; Ex F, Brooks Dep. 39:21–40:1; Ex FF, Gatti Dep. 45:4–46:9; Ex GG, Hogue Dep. 41:18–20; Ex E, Kicia Dep. 80:24–81:14; Ex V, Mudlin Dep. 21:15–18, 33:14–19; Ex I, Munoz Dep. 54:23–55:4; Ex CC, nXio Dep. 31:25–33:15; Ex DD, Penobscot Eye Care Dep. 48:12–23, 60:6-15; Ex EE, Perez Dep. 53:25–54:4, 56:12-14; Ex W, Reclaim Center, Inc. Dep. 46:18–20; Ex Y, UFCW Local 8 Dep. 26:24–27:5, 34:5–12; Ex HH, UFCW Local 99 Dep. 33:17–24.

[47]  Ex KK, Plaintiffs' Objections to NEC Defendants' Request for Inspection.

[48]  Appx E (listing representatives who purchased ███Redacted███

[49]  *E.g.*, Ex F, Brooks Dep. 41:10–25, 49:22–50:4, 53:2–8; Ex CC, Ex CC, nXio Dep. 52:9–14, 61:15–18; Ex II, Harmon Dep. 28:24–25:9; Ex GG, Hogue Dep. 37:18–21, 52:18–21; Ex E, Kicia Dep., 44:21–45:12; Ex JJ, O'Donnell Dep. 24:13–22; Ex X, Solo Dep. 34:4–12; Ex G, Sterenberg. Dep. 46:15–21, 71:6–9, 81:23–82:13, 89:19–25.

[50]  Ex CC, nXio Dep. 64:21–65:10; Ex K, Stargate Films Inc. Dep. 42:24–43:11.

-17-

Because the threshold matter of determining if a product "contains SRAM" would be a difficult, sometimes an impossible task, involving fact-intensive inquiries and document and product inspections, the class is not objectively ascertainable and class certification should be denied.

**2.   Determining If the Products at Issue Contain SRAM Manufactured or Sold By a Defendant Would Require Individual Merits Inquiries.**

Courts often deny certification when it cannot be readily determined whether potential class members purchased a defendant's product.  (*See e.g.*, *Peridot, Inc. v. Kimberly-Clark Corp.*, No. MC 98–012686, 2000 WL 673933 at *6 (D.C. Minn. 2000).)[51]  In *Peridot*, the court denied certification where, as here, a distribution chain created problems in determining whether plaintiffs bought products manufactured by defendant.  (*Id.*)  *Peridot* explained, "[m]ultiple levels of the distribution chain are not only problematic for devising a mechanical calculation to determine class-wide damages . . . but its impact on ascertaining class membership is even stronger."  (*Id.* at *5.)  In such cases, the only way to establish if a plaintiff purchased defendant's product would be "to trace back along the distribution chain the actual [products] that were shipped to the first-tier business entities."  (*Id.* at *6.)  And even when distributors have records of what stock went to what customer, each purchase would have to be individually analyzed to determine class membership, requiring "a series of mini-trials just to determine whether a business entity was in the class."  (*Id.* at *6.)

Non-Defendant companies produced more than 33% of the SRAM sold during the proposed period.  (Burtis ¶19.)  While Plaintiffs' class definitions are limited to SRAM "manufactured and/or sold by one or more of the Defendants," Plaintiffs provide no evidence that the products on which they base their claims contain SRAM that was produced by a Defendant.  In fact, many proposed representatives testified that they do not know who manufactured the SRAM allegedly contained in their product.[52]  **Redacted**

---

[51]    *See Dumas v. Albers Med., Inc.*, No. 03-0640-CV-W-GAF, 2005 U.S. Dist. LEXIS 33482, *17 (W.D. Mo. 2005) (named plaintiff testified he was unsure whether pills he received were sold by defendant). *See also In re Phenylpropanolamine (PPA) Products Liability Litig.*, 214 F.R.D. 614, 618 (W.D. Wash. 2003) (class certification denied where plaintiffs could not determine if the products they bought contained the offending ingredient and "the identification process would be fraught with uncertainty").

[52]    *E.g.*, Ex. Q, Allen Dep. 42:22–43:2; Ex. F, Brooks Dep. 55:7–9; Ex. J, Edwards Dep. 39:13–18, 39:23–40:16; Ex. CC, nXio Dep. 56:14–57:5; Ex. LL, Kelley Dep. 29:4–22; Ex. E, Kicia Dep. 53:5–54:19, 56:7-18; Ex. U, Markey Dep. 47:9–13, 55:14–23; Ex. K, Stargate Films Dep. 56:16–

-18-

Winston & Strawn LLP
101 California Street
San Francisco, CA 94111-5894

**Redacted**   Memory module and

board makers, contract manufacturers, and original equipment manufacturers, likewise, bought

SRAM from non-defendants, such as GSI, IDT, Sharp, Alliance, G-Link, IBM, ICSI, Motorola,

Sony, and ST Microelectronics.  (*Id.* ¶103.)  Plaintiffs provide no way to determine if a product

contains a Defendant's SRAM, let alone how they would obtain class-wide proof.

Even if a particular Plaintiff still has a product alleged to contain SRAM, consents to

inspection, and it is found to contain SRAM, it will often be impossible to determine whether the

SRAM is a Defendant's or a non-Defendant's SRAM sold in the same distribution chains.  Even an

examination of the individual SRAM chip contained in the product (some of which might be from

defendants and some not) might not resolve this question, because not all SRAM is easily

identifiable by a part number and manufacturer's name.  (Burtis ¶42.)  For example, some SRAM

was sold in the form of wafers, which were not yet cut into individual SRAM chips.  (*Id.*)  Thus, it

will often be difficult to trace the SRAM's origin.

Determining if the products contain Defendants' SRAM would require myriad individual

inquiries and product and document inspections, many of which would prove to be fruitless.  Thus,

as in *Peridot*, "ascertaining the class would be a highly complex and difficult, if not impossible, task,

neither managerially nor administratively feasible."[53]  Since the class definitions are not sufficiently

definite and the class members are not readily identifiable, certification should be denied.

**D.      Common Issues Do Not Predominate Over Individual Issues as Required by Rule 23(b).**

      **1.      Impact Cannot Be Proven on a Class-Wide Basis Using Common Proof.**

To satisfy their burden to obtain certification under Rule 23(b)(3), Plaintiffs must

demonstrate that issues subject to common class-wide proof will predominate over issues involving

individualized proof.[54]  Plaintiffs assert that the existence of the conspiracy is the predominant issue

and that they can establish a conspiracy with common proof.  (Memo 11:7–8.).  But liability issues

in antitrust cases include not only the question of violation, but also the question of fact of injury, or

---

58:3; Ex. I, Munoz Dep. 46:14–16; Ex. JJ, O'Donnell Dep. 25:18–21; Ex. G, Sterenberg Dep. 50:10–20, 62:18-25, 70:24–71:4.

[53]      *Peridot*, 2000 WL 673933 at *6.

[54]      *Poulos v. Caesars World, Inc.*, 379 F.3d 654, 664 (9th Cir. 2004).

Winston & Strawn LLP
101 California Street
San Francisco, CA 94111-5894

Winston & Strawn LLP
101 California Street
San Francisco, CA 94111-5894

impact."[55]  "[T]he critical inquiry is whether injury is an issue common to the class and subject to generalized proof or is an issue unique to each class member."[56]  Proof of impact on a common basis requires "common proof adequately demonstrat[ing] some damage to each individual member of the class."[57]  Whether or not impact can be proven on a common basis depends on the circumstances of each case.[58]  And it involves a "particularized analysis of the *specific industry* and *chain of distribution*."[59]  When impact cannot be shown on a class-wide basis with common proof, certification should be denied.[60]

        In indirect purchaser cases, plaintiffs must show that common proof can show that defendants' alleged overcharges were "passed through" to class members through each intermediate layer in divergent procurement chains.[61]  Plaintiffs must come forward with a methodology for proving class-wide impact that is realistic[62] and sufficiently plausible.[63]  In *Infineon*, Judge Hamilton stated that in an indirect purchaser case, plaintiff's experts must provide a "sufficiently concrete methodology" to show that pass-through can be shown with generalized proof.  Importantly, Judge Hamilton also made clear that "each divergent factor — [including] customer size, type, procurement channel, product, [and] distribution step — is a factor that increases the likelihood that proof of pass-through can only be shown with resort to individualized proof."[64]

---

[55]  *Alabama v. Blue Bird Body Co., Inc.*, 573 F.2d 309, 320 (5th Cir. 1978).
[56]  *Infineon*, 2008 WL 4155665, at *5 (internal quotation marks omitted); *Windham v. Amer. Brands, Inc.*, 565 F.2d 59, 66 (4th Cir. 1977) (the "gravamen of the complaint is not the conspiracy; the crux of the action is injury, individual injury . . .").
[57]  *Infineon*, 2008 WL 4155665, at *6 (internal quotation marks and citations omitted).
[58]  *GPU*, 253 F.R.D. at 478 (quoting *In re Indus. Diamonds Antitrust Litig.*, 167 F.R.D. 374, 382 (S.D.N.Y. 1996)).
[59]  *GPU*, 253 F.R.D. at 89 (emphasis added).
[60]  *Amchem Prods.*, 521 U.S. at 623-25; *Blades v. Monsanto*, 400 F.3d at 566,572 (affirming denial of class certification where plaintiffs "cannot prove classwide injury with proof common to the class"); *Bell Atl. Corp. v. AT&T Corp.*, 339 F.3d 294, 302 (5th Cir. 2003) ("[W]e have repeatedly held that where fact of damage cannot be established for every class member through proof common to the class, the need to establish antitrust liability for individual class members defeats Rule 23(b)(3) predominance."); *Methionine I.*, 204 F.R.D. at 164-67 (denying certification on indirect purchaser class where conspiracy proof was common, but injury proof was not).
[61]  *Infineon*, 2008 WL 4155665, at *6.  *See also Peridot*, 2000 WL 673933, at *4 ("[W]here evidence shows that defendant's alleged price-fixing action was not always 'passed on' to all putative class members, however, proof of impact and damages as to each plaintiff becomes too individualized a task to make a class action feasible.").
[62]  *In re Rubber Chems. Antitrust Litig.*, 232 F.R.D. 346, 353–354 (N.D. Cal. 2005).
[63]  *Infineon*, 2008 WL 4155665, at *9.
[64]  *Id.* at *11.

-20-

1    Expert testimony is of no value when it "is not supported by sufficient facts to validate it in

2 the eyes of the law, or when indisputable record facts contradict or otherwise render the opinion

3 unreasonable."[65]  Courts refuse to certify classes when a methodology would not actually work in

4 practice.[66]  As Judge Breyer explained, courts cannot ignore "evidence that shows that some of the

5 class members . . . may not have been injured by the antitrust conspiracy because the overcharge was

6 not passed along or because the class member itself passed along the full amount of the overcharge

7 to its customers.  To do so would violate the Supreme Court's command that the Court "rigorously

8 analyze" whether plaintiff has demonstrated that the requirements of Rule 23 have been met."[67]

9        **(a)    The Methodologies of Plaintiffs' Experts Are Neither Realistic Nor**

10                **Sufficiently Plausible for Proving Pass-Through (Impact).**

11            **(i)    Dr. Harris, the Sole Pass-Through Expert, Bases His Unsupported**

12                    **Economic Theory on Erroneous Claims.**

13    Plaintiffs claim that they can prove pass-through (impact) on a class-wide basis using

14 common proof.  (Memo 5–6, 13–14.)  Though Plaintiffs filed two expert reports, Dr. Harris is the

15 sole expert on the pass-through issue.[68]  But Dr. Harris does not opine that "the entire class in this

16 action did in fact suffer pass-through."[69]  Rather, he claims that the "facts, evidence, econometric

17 models and analysis," necessary to determine whether an individual proposed class member suffered

18 pass-through is the same set of "facts, evidence, econometric models, and analysis" necessary to

19 determine whether the proposed class of individuals suffered pass-through.  (Harris Report ¶7.)  His

20 opinion, it turns out, is nothing more than an "expectation" that pass-through will occur.  (*Id.* ¶67.)

21 In formulating his expectation theory, Dr. Harris relies primarily on an economics paper from 1979

22 by Robert Harris and Lawrence Sullivan ("H&S Paper").[70]  Dr. Harris quotes from the H&S Paper,

23 out of context, for the proposition that "pass-through is the rule not the exception."  (Harris ¶67.)

Winston & Strawn LLP
101 California Street
San Francisco, CA 94111-5894

---

24   [65]    *Weisgram*, 528 U.S. at 454 (2000) (quoting *Brooke Group*, 509 U.S. at 242).

25   [66]    *GPU*, 253 F.R.D. at 491 (citing *Piggly Wiggly Clarksville, Inc. v. Interstate Brands Corp.*, 100 F. App'x 296, 300 (5th Cir. 2004)).

26   [67]    *Methionine I*, 204 F.R.D. at 166–67.
     [68]    Dr. Dwyer has no "separate and independent opinion of [his] own regarding whether pass-through can be shown by common proof in this case."  Ex L, Dwyer Dep. 205:1–8.

27   [69]    Burtis ¶129 (citing Ex B, Harris Dep. 108:13–24).
     [70]    Ex MM, Robert G. Harris and Lawrence A. Sullivan, *Passing on the Monopoly Overcharge:*

28 *A Comprehensive Policy Analysis*, 128 U. Pa. L. Rev. 269 (1979) ("H&S Paper").

-21-

The H&S Paper reveals that Dr. Harris's approach, however, is patently erroneous and contradicted by the Paper's language.  For example, Dr. Harris admits that he did not analyze pass-through at each level of the distribution chains.  (Ex B, Harris Dep. 101:2–4.)  But the H&S Paper mandates: "***Before the incidence of an overcharge can be traced, one must be able to identify the distribution chain <u>and</u> follow transactions down the chain***."  (Ex MM, 315 (emphasis added).)  Dr. Harris does neither.

First, Dr. Harris made no attempt to identify the divergent distribution chains for SRAM-containing products and instead assumes a "generic" and grossly simplified downstream distribution chain.  (Harris ¶48.)  This is evident when comparing Dr. Harris's "generic representation" (*id.*) to a simplified depiction of the actual divergent distribution chains in this case.  (Ex 13.)  Second, Dr. Harris does not "follow the transactions down the chain," as the H&S Paper requires, to trace any overcharge.  He testified: "Our models are testing pass-through to class members, ***not pass-through from an OEM to a distributor***."  (Ex B, Harris Dep. 101:2–4 (emphasis added).)  If Dr. Harris had followed transactions down the chain and analyzed costs and prices charged at each intermediate level, it would have revealed numerous zero pass-through situations.

The H&S Paper states that one must have "knowledge of commercial pricing practices" to apply the economic theory set forth in the paper.  (Ex MM, 336.)  But Dr. Harris did no empirical analysis of the "commercial pricing practices" of intermediate resellers in the distribution chains and admitted that he had not "review[ed] any contracts from the SRAM chain of commerce to determine whether there are any pricing models or terms in those contracts that would preclude or reduce pass-on to the end users."  (Ex B, Harris Dep. 94:16–95:1.)  Ironically, if he had looked at the complex distribution chains involved, he would have had to conclude to that tracing pass-through is impossible.  The H&S Paper, relied upon by Dr. Harris, states that very complex distribution chains can "become ***hopelessly obscure***," and "when such chains are encountered, ***tracing [of an overcharge] beyond the point at which obscurity sets in is impossible***."  (Ex MM, 315 (emphasis added).)  But, as shown in Ex 13, the distribution chains here are "hopelessly obscure," making it impossible to trace the alleged overcharge for SRAM-containing products.

How does one prove pass-through from the beginning of the chain to the end without doing

-22-

Winston & Strawn LLP
101 California Street
San Francisco, CA 94111-5894

any empirical analysis of the various levels of the chain? Dr. Harris claims it is doesn't matter because he assumes all firms in the SRAM distribution chains sell "commodity-like" products and operate in "competitive markets;" therefore, he expects and assumes that that all firms, regardless of where they are in a distribution chain, will respond to cost increases by increasing the prices of the products they sell.[71] Dr. Harris's premises that lead to these assumptions are fallacious. First, Dr. Harris defines a "commodity" as "a product with substitutes." (Ex B, Harris Dep. 138:25–139:8.) But he admits that he did no "formal analysis of each product market;" and has no support for his position.[72] Second, his claim that markets for SRAM-containing products are "competitive" is based solely on market chatter and news articles.[73] But the news articles Dr. Harris relied on do not support his position. (Burtis ¶¶140–157.) And Dr. Burtis and common sense tell us that routers, servers, and mainframes are not homogenous, interchangeable commodities. (Burtis n. 191.)

Since Dr. Harris did no empirical analysis (Ex B, Harris Dep. 137:5–14), he does not know if his theory, which expects and assumes pass-through, works in the real world. Rather, he uses his theory to justify ignoring nearly all of the distribution chains and levels between Defendants and proposed class members. (*Id.* 13:14–14:2; 14:14–15:2; 100:20–101:4.) Dr. Harris's position cannot stand, because real-world factors such as divergent markets, distribution chains, and pricing models show that complex distribution chains are often so obscured that tracing pass-through is impossible, or that it has been entirely blocked by firms in a part of the chain not considered by Dr. Harris.

Plaintiffs' expert's reliance on an unsupported economic theory, which ignores real-world markets and distribution chains, is not only criticized by the very paper Dr. Harris relies upon, it is the type of opinion that has been roundly rejected by numerous courts. For example, in *In re OSB Antitrust Litig.*, No. 06-826, 2007 WL 2253425 (E.D. Pa. Aug. 3, 2007), plaintiffs sought to certify an indirect class composed of retail purchasers of oriented strand board ("OSB"), as well as home buyers who bought houses that included OSB. The court rejected the expert's opinion that he could use common proof to establish pass-through because he "relied almost entirely on economic theory and generalizations about market competitiveness and 'elasticities' of supply and demand, without

Winston & Strawn LLP
101 California Street
San Francisco, CA 94111-5894

---

[71]   Ex B Harris Dep. 107:16-108:3, 16:1-14,16:24-17:9.
[72]   *Id.* at 23:15-24:6.
[73]   Ex B, Harris Dep. 16:24-17:9.

-23-

1    analyzing the competitiveness or elasticities of actual [] markets." (*Id.* at *11.)

2    In addition, the court also rejected the plaintiffs' expert because he failed to take into account

3    data and appropriate variables, finding that without "identifying either the data or appropriate

4    variables, [the expert could not] establish on a classwide basis that an increase in the price of OSB

5    actually caused an increase in home prices." *Id.* at 11.  More specifically, the court explained:

6    [the] opinion regarding pass-through has little probative value because [the

7    expert] *has not conducted any analysis of the "real economic world."* . . .

8    [H]e *has not identified the variables* he would need to include in his theory;

9    he has not determined whether he could obtain the data for these variables

10   even if he knew what they were.  He has relied almost entirely on economic

11   theory and generalizations about market competitiveness and "elasticities" of

12   supply and demand, without analyzing the competitiveness or elasticities of

13   actual housing markets . . . .  In these circumstances, *Plaintiffs have not*

14   *offered a valid method of establishing through common proof economic*

15   *impact to the home buyer segment of the proposed class*.

16   (*Id.* (citations omitted) (emphasis added). *See also Fagan v. Honeywell MO, Inc.*, No. 04-4903-

17   BLS2, slip op. at 22–25, 28 (Mass. Super. Ct. Feb. 5, 2008) (denying certification when opinion did

18   not account for variable or rely on empirical analysis, but instead relied on economic theory, which

19   was contradicted by defendant's evidence).)  Here, Dr. Harris did not consider numerous variables

20   that can impact whether pass-through can occur.

21   The court in *OSB* also found that the expert's theories were flawed because he had no way to

22   exclude putative class members who may not have been impacted.  (*Id.* at 9.)  Similarly here,

23   Dr. Harris proposes no method to exclude the millions of people who have not been impacted.  He

24   admits, "I didn't undertake an effort to survey all of the markets and try to find an exception to a

25   rule." (Ex B, Harris Dep. 41:16–18 (referring to the out-of-context rule in the H&S Paper, discussed

26   above, that "pass through is the rule not the exception").)

27   The court in *A & M Supply Co.* rejected similar shallow tactics by an expert.  There, the

28   expert stated that he was relying on "'basic economic principles,' . . . 'extensive economics

-24-

Winston & Strawn LLP
101 California Street
San Francisco, CA 94111-5894

1   literature,' 'sound, accepted economic and statistical methodologies,' 'relatively simple statistical

2   estimation[s],' and . . . 'statistical tools.'" (*A & M Supply Co. v. Microsoft Corp.*, 654 N.W.2d 572,

3   638–39 (Mich. Ct. App. 2002).)  The court found that the absence of any meaningful analysis in the

4   expert's report rendered these "***slogans, not methods of proof***." (*Id.* (emphasis added).  *See also*

5   *Derzon v. Appleton Papers, Inc.*, No. 96–cv–3678, 1998 WL 1031504, at *8 (Wis. Cir. Ct. July 7,

6   1998) (rejecting indirect purchaser plaintiffs' expert's method of proof of impact because

7   "[c]onstructing economic models in order to reach generalized conclusion[s] about economic

8   behavior is one thing; using such theories to prove that *every* class member has suffered a loss *and*

9   *the amount of that loss* is quite another.") (emphasis in original).)[74]

10        One court found that expert analysis amounts to nothing more than unreliable "***evidentiary***

11   ***voodoo***" when it relies on untested economic theories to show pass-through and the evidence and

12   empirical data show that "real-world" evidence and factors, such as negotiating power and loss

13   leaders, can preclude or reduce pass-through.  (*Durden v. Abbott Labs.*, No. CV 93–663, 1996 WL

14   34391966, at *3–4 (Ala. Cir. Ct. Jan. 16, 1996) (rejecting as "evidentiary voodoo" and "gross

15   speculation" plaintiffs' expert's pass-through theories, which ignored real-world factors, denying

16   class certification, and stating "The Court is of the opinion that … life's experiences, common sense

17   and the evidence presented in this case clearly show that ***the increase may or may not be passed on***

18   ***to the purchaser*** of the item or items on which prices were increased.") (emphasis added).)

19        Similarly here, Drs. Harris and Dwyer rely on generalizations and economic slogans about

20   pass-through and the market, and, as discussed elsewhere, fail to account for the myriad individual

21   real-world data and variables that significantly affect pass-through.  Further, their argument that they

22   can later incorporate variables is insufficient as a matter of law to satisfy Plaintiffs' burden to

23   produce evidence of a common method to demonstrate impact to all class members,[75] and Plaintiffs

---

[74]     *Ren v. Philip Morris Inc.*, No. 00-004035-CZ, 2002 WL 1839983, at *5, *10 (Mich. Cir. Ct. June 11, 2002) (denying class certification to indirect purchasers; "reference to economic theory alone is insufficient to establish" common proof of "a pass on of an overcharge"); *Melnick v. Microsoft Corp.*, No. CV-99-752, 2001 WL 1012261, at *16 (Me. Super. Ct. Aug 4, 2001) (denying class certification to indirect purchasers; "plaintiffs must show that they are armed with more than general, untried economic theory.  They are required to show that their proposed methods are workable with real world facts.").

[75]     *Weisfeld v. Sun Chem. Corp.*, 84 Fed. App'x 257, 262–64 (3d Cir. 2004) (predominance requirement not satisfied where expert merely "proposes" a model that does "not take into account

Winston & Strawn LLP
101 California Street
San Francisco, CA 94111-5894

have not shown that they can obtain the data necessary to account for variables needed to run their models.[76]  Finally, they have not tested their methodology and indisputable evidence of numerous zero-pass-through distribution chains shows that their theories are nothing more than economic "voodoo" and should be cast aside by this Court.

> (ii)    **The Models Are Fatally Defective Because They Can Indicate Significant Pass-Through When No Pass-Through Occurred.**

Though Dr. Harris's report refers to the models discussed in Dr. Dwyer's report, nowhere does Dr. Harris state that Dr. Dwyer's opinions or models establish that the fact of injury (pass-through) can be shown on a class-wide basis using common proof.  Indeed, Dr. Dwyer acknowledges that he does not have a "separate and independent opinion of [his] own regarding whether pass-through can be shown by common proof in this case."  (Ex L, Dwyer Dep. 205:1–8.)  Thus, the only opinion offered by Plaintiffs to support their claim that impact can be shown on a class-wide basis using common proof is Dr. Harris's fallacious economic theory.  Nevertheless, Defendants will debunk Dr. Dwyer's proposed models, even though it is unclear for what purpose they are being proposed.

Dr. Dwyer proposes two different types of regression models: a "reduced form model" and a "structural model."  (Burtis ¶162.)  Dr. Harris claims Dr. Dwyer's models are "tests" of impact, but he has no substantive familiarity with how the models will work, and both experts acknowledge that they have no prior experience using the two proposed models.  (*Id.*; Ex B, Harris Dep. 67:3-68:2; Ex L, Dwyer Dep. 206:11-13.)  Meanwhile, Dr. Dwyer has no opinion of his own regarding whether pass-through can be shown by common proof using his models.  (Burtis ¶132.)  Neither model is appropriate for use in this case because: (1) both models *fail to take into account actual SRAM cost data*; (2) both models ignore entire distribution chains and ignore entire levels in all of the

Winston & Strawn LLP
101 California Street
San Francisco, CA 94111-5894

---

all relevant variables"); *Windham v. Am. Brands, Inc.*, 565 F.2d 59, 70 (4th Cir. 1977) (court should not certify class "merely on the assurance" that "some solution will be found").

[76]     Harris ¶70 ("As of the writing of this report, I and Dr. Dwyer had not yet received the data necessary to complete our models but have been advised it is forthcoming.")  And, at a recent hearing before Special Master Smith, Plaintiffs' counsel admitted that their experts may not be able to run their models. "I don't know as I sit here today whether or not Drs. Harris and Dwyer will present or will be able to present any regression analysis, in any way, shape or form in a reply in response to an opposition." Ex NN, Hr'g Tr. 23:12-15, April 9, 2009.

Winston & Strawn LLP
101 California Street
San Francisco, CA 94111-5894

1  distribution chains, which prevents the models from being able to take into account data and

2  evidence that show that pass-through has been partially absorbed or completely blocked in some

3  instances; thus, the models can yield a positive pass-through result when there has been none; and

4  (3) both models aggregate data across transactions and distribution chains, which means that they

5  can yield positive pass-through results for a given set of transactions, even though a substantial

6  number of such transactions included no pass-through.

7           **(1)    The Reduced Form Model Is Inappropriate in this Case.**

8        With the reduced form models, Dr. Dwyer proposes to find a relationship between the price

9  an end user pays for a product and the cost, or bill of materials ("BoM"), of the last-level supplier.[77]

10  A BoM includes a list of components and materials that are used to produce a product and *estimates*

11  of cost for each material, but not the actual costs. A BoM may contain hundreds of different

12  components besides SRAM.[78] Dr. Dwyer intends to use the total BoM or total materials cost in his

13  reduced form model, not the estimated cost of the SRAM in the BoM. (Burtis ¶163.) According to

14  Dr. Dwyer, a BoM is a "proxy" for the actual cost of SRAM and SRAM component cost variation is

15  reflected one-for-one in BoM variation. (Dwyer Report ¶38.) The failure to use actual cost in the

16  proposed models renders the analysis fatally defective. (Burtis ¶165.)

17        Analysis of actual data shows that Dr. Dwyer's assumption that BoM data can be used as a

18  reliable proxy for actual costs is not valid. (Burtis ¶165.)

19

20                                      **Redacted**

21

22

23                                     (Burtis ¶165.)

24

25                                      **Redacted**

26

---

27  [77]    Ex L 66:9–16 (Though in Dr. Dwyer's Report, the supplier is an original equipment manufacturer, at his deposition, he testified the supplier was the seller to the end-user).

28  [78]    HP 001 231954-001 used on 347905-001.xls. is an example.

Winston & Strawn LLP
101 California Street
San Francisco, CA 94111-5894

**Redacted** (Burtis ¶165.)  The SRAM cost varies substantially across the different suppliers and over time.  (Burtis ¶165.)  But over this same period, the estimated SRAM cost in the BoM is constant, providing no information about actual SRAM cost from particular suppliers, and it does not change when actual SRAM costs do.  (Burtis ¶165.)

**Redacted**

(Burtis ¶165.)

Assuming for argument's sake that the BoM data for the reduced form models accurately reflects costs (which, as described below, it does not), the reduced form model as proposed by Plaintiffs' experts is fatally flawed because it cannot identify instances of no pass-through.  (Burtis ¶166.)  First, the model as proposed by Dr. Dwyer will not take into account data or evidence that show that an overcharge was blocked or absorbed in the distribution chain before it reached the original equipment manufacturer and thus not passed through to it.  (Burtis ¶166.)

**Redacted**

(Burtis ¶166.)

**Redacted**

Another defect of Dr. Dwyer's proposed model is that it is structured to depend on an aggregation of customers and products.[79]  If a model aggregates class members who have paid prices that are not related to a change in cost together with proposed class members who have paid prices that are related to a change in cost, it can show a false-positive pass-through.  (Burtis ¶167.)

This phenomenon was proven at Dr. Dwyer's deposition, where he was presented with a

---

[79]   Ex B, Harris Dep. 42–43.  Dr. Harris admits that the coefficient of a regression has an "average quality to it," and "the whole premise of regression modeling is to take a sample of data from a bigger population of data and be able to make a statement about the broader population."

-28-

Winston & Strawn LLP
101 California Street
San Francisco, CA 94111-5894

1  hypothetical data pool.  The set of data showed, for half of the period (Period A), that prices were

2  not related to costs and that, for the other half of the period (Period B), there was a relationship

3  between price and cost.[80]  Dr. Dwyer admitted that a reduced form regression of price and cost is not

4  capable of "capturing the lack of pass through in Period A at all."[81]  The hypothetical example is

5  supported with evidence.

**Redacted**

(Burtis ¶180.)

11  There is substantial evidence of individual customers purchasing particular products where

12  there is no pass-through, yet Dr. Dwyer's reduced form model could show pass-through because of

13  aggregation.  (Burtis 167–68, 175–77.)

**Redacted**

(*Id.*)  If Plaintiffs'

17  expert had estimated the reduced form model for this single product and for this individual customer,

18  the model should find no pass-through.  (*Id.*)  But if these transactions are aggregated across all

19  routers, and if there were some customers and products where there was a relationship between the

20  BoM and price, Dr. Dwyer's model could, again, mistakenly find that there was pass-through.  (*Id.*)

**Redacted**

(*Id.*)

### (2)   The Structural Model Is Inappropriate in This Case.

24  Dr. Dwyer's proposed structural model relies on an article in which the model was employed

25  to estimate cost pass-through for various types of cheese.[82]  The underlying assumptions of the

---

80  Ex L, Dwyer Dep. 171–174; Ex. 8.
81  Ex L, Dwyer Dep. 174:17–25.
82  Ex O, Donghun Kim and Ronald W. Cotterill, *Cost Pass through in Differentiated Product Markets: The Case of U.S. Processed Cheese*, 56 J. Indus. Econ. 32–48 (2008) ("Cheese Article"); Ex L Dwyer Dep. 117–118, 162–165.

-29-

model in the Cheese Article relied on by Dr. Dwyer are highly restrictive, such that the model is entirely inappropriate here. (Burtis ¶169.) The structural model is based on theoretical assumptions that firms set prices based on costs and that when costs change, prices change.[83] Thus, the necessary implication of this assumption is that pass-through of costs will always occur. (Burtis ¶170.) That is, the model does not test for pass-through; it **assumes** pass-through. (*Id.*)

As with the reduced form model, the structural model is defective for testing for pass-through because it contains no actual cost data at all. (Burtis ¶171.)[84] Rather, in order to find a pass-through coefficient, Plaintiffs' experts use a formula to concoct "cost," which may or may not have any relationship to the actual cost of the product. (*Id.*) This is nothing short of economic slight of hand.

Also, the structural model ignores intermediate parts of the distribution chains, because it focuses only on prices at the retail level. (Burtis ¶172.) Once Plaintiffs' experts concoct the cost, they take the alleged overcharge from the top of the SRAM distribution chain and add it to the concocted cost at the bottom. (Burtis ¶172.) Essentially using economic mumbo-jumbo, they transport overcharge over the intermediaries, ignoring the possibility that intermediaries will absorb pass-through. (Burtis ¶172.) The pass-through amount is then found through a formula based on fictional changes in the costs. (Burtis ¶¶171–72.) Since Plaintiffs' expert assumes that firms will always raise prices when costs go up, he will always find a positive pass-through regardless of whether pass-through actually occurred. (Burtis ¶172.)

Plaintiffs' experts have no plan to identify end products that contain Defendants' SRAM, even though the assumptions of the structural model require such identification. Dr. Dwyer has no plan to separate products that contain Defendants' SRAM from products that contain only non-Defendant SRAM or no SRAM at all. For example, Dr. Dwyer is not concerned that many consumer routers do not contain SRAM, and plans to estimate a structural model for consumer routers generally. (Ex L, Dwyer Dep. 111:24–112:14.) Dr. Dwyer claims that including data for

---

[83] The model assumes that firms maximize profits. (Ex L, Dwyer Dep. 38; Ex OO, Cheese Article 38. As Dr. Harris testified, "the overlying framework that microeconomists employ when they assume firms maximize profits, and as a result, the price in those markets reflect marginal costs." Ex B Harris, Dep. 238:23–239:1. And, if price is equal to marginal costs, then each time marginal cost changes, price will change. (Burtis ¶170 n. 243.)

[84] Dr. Dwyer testified that cost is not necessary to estimate his structural model; he has proposed it for those situations in which cost data are not available. Ex L, Dwyer Dep. 32–33.

-30-

Winston & Strawn LLP
101 California Street
San Francisco, CA 94111-5894

consumer routers that do not contain SRAM may enable him to capture the effect of substitute products. To capture the effect of the substitute non-SRAM routers, however, Dr. Dwyer would still be required to separate those routers that do contain SRAM from those that do not. (Burtis ¶174.) If Dr. Dwyer does not separate the products, the result obtained will not take into account the fact that consumer routers that do not contain SRAM can constrain the price of routers that do contain SRAM. Yet he has no plans to separate them; thus, his model is not reliable. (*Id.*)

**(3)   Averaging Data Yields False-Positive Pass-Through.**

The structural model proposed is also defective since it aggregates data that can include transactions where no pass-through occurred with data for transactions where it might have. This aggregation can lead to a false-positive pass-through conclusion. Plaintiffs' experts' proposed models do not and cannot provide information about whether or not individual proposed class members were impacted, but will only provide average information regarding the amount of impact across multiple products and distribution chains. Thus, it is possible that, within the averages found by Plaintiffs' experts, there are individual class members who were not impacted. (Burtis ¶175.) Dr. Harris admits that the Plaintiffs' proposed models could find a statistically significant pass-through coefficient even when there are transactions in the data that have no pass-through.[85]

Dr. Harris admits that the models proposed will generate coefficients that have "an average quality," and that they test "the broader market." (Ex B, Harris Dep. 42:24–43:23, 178:22–179:20.) The models cannot be used to determine if any individual class member has been injured or the extent of that injury, but can only be used to draw conclusions about aggregates of proposed class members and the average amount of injury or impact. (Burtis ¶¶175–77.) According to Dr. Harris, "the whole premise of regression modeling is to take a sample of data from a bigger population of data and be able to make a statement about the broader population" (Ex B, Harris Dep. 43:19–22.) Plaintiffs' experts admit that the models are "aggregate models of demand," and "amalgamations" that do not "make predictions about individual behavior."[86] These admissions show that Plaintiffs' models cannot be used to determine if any individual proposed class member was impacted. The

---

[85] Ex B, Harris Dep. 56–57.
[86] Ex L, Dwyer Dep. 83:3–8, 54:21–55:2, Ex B, Harris Dep. 43:14–23.

-31-

Winston & Strawn LLP
101 California Street
San Francisco, CA 94111-5894

1   models, at best, can be used to find average impact across groups of individuals, who purchased

2   divergent products from divergent distribution chains, which were subject to divergent pricing

3   models and business practices.  The complexity of this case cries out against averaging.

4       Since average results, by definition, ignore differences among class members and can

5   disguise the fact that large segments of the class suffered no pass-through at all, the model assumes

6   what it is supposed to prove.  (Burtis ¶12, 178–80.)  As the ABA Section of Antitrust has explained

7   in discussing one kind of regression that Dr. Dwyer proposes to use:

8           The reduced-form pricing equation assumes that a conspiracy has the same

9           effect on every purchaser and focuses on an average effect, which may hide

10          variation across class members.  If one is attempting to test whether there is an

11          impact on all members of a proposed class, however, *that assumption is not*

12          *valid*, as it assumes the very proposition that is being tested.

13  *Econometrics*, 2005 ABA Sec. Antitrust 22  (emphasis added.)  For this independent reason,

14  Plaintiffs have failed to meet their burden to show that common impact can be proven with common

15  proof because averages sweep uninjured persons into the class.  (*GPU*, 253 F.R.D at 504 (the court

16  explained that, were the class to be certified, the "regressions would either be *overly reliant on*

17  *averages and would thus sweep in an unacceptable number of uninjured plaintiffs, or they would*

18  *be unmanageably individualized*.") (emphasis added)); *Am. Booksellers Ass'n v. Barnes & Noble,*

19  *Inc.*, 135 F. Supp. 2d 1031, 1038–40 (N.D. Cal. 2001) (rejecting economic model that "uses an

20  average price differential" as insufficient to demonstrate common impact); *A&M Supply Co. v.*

21  *Microsoft Corp.*, 654 N.W.2d 572, 602 (Mich. Ct. App. 2002) (same).)

22          **(b)      Plaintiffs' Experts' Methodologies Are Neither Realistic Nor Sufficiently**

23                   **Plausible Because They Do Not Account For Divergent Variables.**

24      Courts throughout the country[87] and within the Northern District of California repeatedly

25  refuse to certify indirect purchaser classes where plaintiffs cannot show pass-through.  For example,

---

[87]      *See e.g.*, *A&M Supply Co. v. Microsoft Corp.*, 654 N.W.2d 572 (Mich. Ct. App. 2002);
*Execu-Tech Bus. Sys., Inc. v. Appleton Papers, Inc.*, 743 So. 2d 19 (Fla. Dist. Ct. App. 1999);
*Keating v. Philip Morris, Inc.*, 417 N.W. 2d 132 (Minn Ct. App. 1987); *Melnick*, 2001 WL 1012261;
*Derzorz v. Appleton Papers*, No. 96-CV-3678, 1998 WL 1031504 14, at *7-8 (Wis. Cir. Ct., July 7,
1998); *Peridot*, 2000 WL 673933, at *4.

Winston & Strawn LLP
101 California Street
San Francisco, CA 94111-5894

1    in *Methionine I* and *Methionine II,* Judge Breyer denied and decertified indirect classes due to

2    difficulties similar to those in the present case regarding whether common proof could be used.[88]

3         In *Methionine I*, the proposed class included indirect purchasers of methionine.  (*Id.* at 162.)

4    Though plaintiffs' expert had earlier presented a colorable method of proving impact for direct

5    purchasers, Judge Breyer stated the indirect-purchaser inquiry "is from one to several steps removed

6    from the inquiry in the direct purchaser class action."  (*Id.* at 164.)  Plaintiffs' expert provided a

7    generic description for calculating pass-through, but did not identify evidence suggesting his formula

8    was appropriate for the methionine industry.  (*Id.* at 164–65.)  And the evidence showed that some

9    class members "may not have been injured . . . because the overcharge was not passed along" or

10   because the class member passed along the overcharge to its customers."  (*Id.* at 166.)  Thus,

11   Plaintiffs did not met their burden of showing "that there is a reasonable method for determining on

12   a class-wide basis whether and to what extent that overcharge was passed on to each of the . . .

13   indirect purchasers ***at all levels of the distribution chain***."  (*Id.* at 164.)  Because the question of

14   impact was "an individual question that would have to be resolved by mini-trials examining the

15   particular circumstances of each class member . . . common issues [did] not predominate and class

16   certification under 23(b)(3) [was] inappropriate."  (*Id.* at 165 (citations omitted).)  Here, determining

17   impact requires individual inquiries "***at all levels in the distribution chain***;" because many class

18   members could not have been injured "because [any] overcharge was not passed along."[89]

19        In *Methionine II*, Judge Breyer found that, even after narrowing the class to exclude resellers,

20   plaintiffs were unable to provide an acceptable methodology.[90]  That was because, like the SRAM

21   industry, the methionine industry is complex, consisting of "multiple sellers, a myriad of distribution

22   channels, and hundreds of different products."  (*Id.* at *5.)  Additionally, like the SRAM industry,

23   which supplies SRAM to manufacturers who incorporate it as one small part of the end products sold

24   to indirect purchasers, "[t]he complexity [in the methionine industry] is increased when one

25   considers the impact to end users, many of whom purchased products containing very little

Winston & Strawn LLP
101 California Street
San Francisco, CA 94111-5894

---

88    *Methionine I*, 204 F.R.D. 161; *Methionine II*, 2003 WL 22048232.
89    *See also Peridot*, 2000 WL 673933, at *4 ("[W]here evidence shows that defendant's alleged price-fixing was not always 'passed on' to all putative class members, however, proof of impact and damages to each class member becomes too individualized a task to make a class action feasible.").
90    *Methionine II*, 2003 WL 22048232, at *2, *5.

Winston & Strawn LLP
101 California Street
San Francisco, CA 94111-5894

methionine." (*Id.* at *5.) The court decertified the class upon defendants' showing that the expert *did not* "*take into account any of the myriad variables that could account for the price of the final product to the end user.*" (*Id.* at *4 (emphasis added).) Similarly here, Plaintiffs' experts do not account for myriad variables impacting price, including "multiple sellers, a myriad of distribution channels, hundreds of different products," the *de minimis* cost of SRAM in relation to the overall cost of SRAM-containing products, and pricing and sales practices that affect pass-through.

In *GPU*, Judge Alsup denied certification to indirect purchasers of graphics processing units due to plaintiffs' failure to satisfy predominance. (*GPU*, 253 F.R.D. at 500.) The court explained that econometric models, including regressions, should be allowed only as a means of common proof when deemed plausibly reliable.[91] Due to the large number of manufacturers, resellers, and products at issue, plaintiffs' expert was forced to use numerous variables in each of the reseller-specific regressions, (*Id.* at 504.) but still failed to account for several relevant variables, including product features, supply and demand factors, and product customization. (*Id* at 496.)

In *Infineon*, though Judge Hamilton previously found predominance as to direct purchasers, the court found that indirect purchaser plaintiffs were unable to provide a methodology to account for pass-through to "class members who belong to divergent customer groups, purchase DRAM pursuant to divergent purchasing mechanisms, and whose DRAM purchases are based on purchases of divergent downstream DRAM-containing products." (*Infineon*, 2008 WL 4155665, at *10–11.)

Here, Plaintiffs cannot account for similar divergent variables, discussed in turn below, that affect whether class members were impacted. Thus, Plaintiffs have failed to meet their burden of providing a realistic and sufficiently plausible methodology for proving class-wide impact.

### (i)      Divergent Distribution Chains Require Individualized Proof of Impact.

Plaintiffs bear the burden of demonstrating "a reasonable method for determining on a class-wide basis whether and to what extent [any] overcharge was passed on to each of the . . . indirect purchasers *at all levels of the distribution chain*." (*Methionine I*, 204 F.R.D. at 164 (emphasis added); *Methionine II*, at *5 (class certification denied where methodology did not account for

---

[91]      *Id.* at 491 (citing *Piggly Wiggly*, 100 F. App'x at 299–301.)

complexities of the methionine industry, which consists of "multiple sellers, a myriad of distribution channels, and hundreds of different products"); *GPU*, 253 F.R.D. at 89 (whether or not impact can be proven on a common basis involves a "particularized analysis of the specific industry and the chain of distribution"); *City of St. Paul v. FMC Corp.*, Civ. No. 3–89–0466, 1990 WL 259683, at *2 (D. Minn. Nov. 14, 1990) (indirect purchaser class certification denied where third parties added value at various points in the chain of distribution, necessitating a reseller-by-reseller inquiry).)

Between Defendants and putative class members are many different firms with different roles, who appear at different and sometimes multiple levels in the myriad distribution chains. The longer and more complex the distribution chains, the more difficult it becomes to trace pass-through.

**Redacted**

(*See* Burtis ¶57.) For a variety of reasons, tracing SRAM or any overcharge throughout the myriad distribution chains is difficult and cannot be done on a class-wide basis. (Burtis ¶36.) First, there are many different distribution chains, with varying intermediate levels. (*Id.*) The particular path from a Defendant to a putative class member depends on a multitude of factors, including: (1) direct purchaser type; (2) what the direct purchaser did with the SRAM, such as reselling it, using it as part of one of the various intermediate products, or using it as part of one of the various end products containing SRAM; (3) the type of the SRAM-containing product; (4) the manner of distribution to the end purchaser; (5) the method used by the end purchasers to acquire the products; and (6) whether the product is refurbished and/or resold. (Burtis ¶¶36, 59.)

Second, individual distribution chains involve numerous possible firms engaged in different manufacturing, selling, and distribution activities at different levels. (Burtis ¶37.) Firms in different chains incur different costs, are affected by different market conditions and supply and demand factors, and engage in differing pricing practices. (Burtis ¶¶34, 36.) Empirical analysis of the available data establishes that different firms at different points in distribution chains do not pass-through SRAM cost increases to customers. (*E.g.*, Burtis ¶¶24, 109, 112–12, 117, 119, 120–21, 126.) To determine and measure pass-through from one level to the next, it would be necessary to trace the SRAM and any alleged overcharge through each level of the various distribution chains,

Winston & Strawn LLP
101 California Street
San Francisco, CA 94111-5894

-35-

Winston & Strawn LLP
101 California Street
San Francisco, CA 94111-5894

1   taking into account factors that can affect whether pass-through is occurring.  (Burtis ¶34.)

2          Third, to trace an end product to an SRAM manufacturer, one must account for: (1) products

3   containing SRAM substitutes (Burtis ¶38); (2) products containing non-Defendant SRAM

4   (Burtis ¶38); and (3) products containing SRAM manufactured during a time period in which

5   Plaintiffs deem the alleged conspiracy to have been ineffective.  (Burtis ¶187.)  As discussed,

6   determining whether a product contains SRAM and if a particular SRAM was manufactured by a

7   Defendant is an individualized and fact-intensive task.

8          Plaintiffs do not identify or account for the myriad distribution chains through which SRAM

9   traveled, or the entities within those chains.  In fact, Dr. Harris admitted at his deposition that his

10  models do not take into account pricing to intermediaries: "What we're interested in is pass-through

11  to the class members, and the class members are not intermediate individuals.  Our models are

12  testing pass-through to class members, not pass-through from an OEM to distributor."  (Ex B, Harris

13  Dep. 100:24–101:4.)  Dr. Harris disregards the "number of intermediaries or distribution paths" as

14  "irrelevant" to proving impact (Ex B, Harris Dep: 13:14–14:2), notwithstanding the fact that

15  intermediaries within a distribution chain can absorb or block pass-through (and therefore impact).

16  Dr. Harris's Report does not address competition within intermediary markets and he admitted this

17  failure at his deposition.  (Ex B, Harris Dep. 197:19–198:9.)  Thus, Plaintiffs' experts essentially

18  ignore the vast and divergent spiderweb between the Defendants and the end users.

19         Class certification should be denied because, as Plaintiffs' expert admits, his models focus

20  solely on the first and last steps in the distribution chain and completely ignore the complexities

21  involved with the "multiple sellers, [the] myriad of distribution channels, and hundreds of different

22  products."[92]  Therefore, Plaintiffs have not met their burden of showing "that there is a reasonable

23  method for determining on a class-wide basis whether and to what extent [any] overcharge was

24  passed on to each of the . . . indirect purchasers at all levels of the distribution chain."[93]  Plaintiffs try

25  to get around their burden by relying on *Microsoft* cases, which are inapposite, because (1) there was

26  only one manufacturer; (2) few intermediaries; and (3) end users had a contract with Microsoft.

---

27

28  [92]  *Methionine II*, 2003 WL 22048232 at *5.
    [93]  *Methionine I*, 204 F.R.D. at 164.

-36-

Winston & Strawn LLP
101 California Street
San Francisco, CA 94111-5894

(ii)     **Divergent Pricing and Sales Practices Require Individualized Proof of Impact.**

Any methodology used to measure pass-through must take into account the individualized pricing strategies of each firm involved in the distribution chains.  (*A&M Supply*, 654 N.W.2d at 601–03 (class certification denied where plaintiffs' expert's method did not account for evidence that retailers charged a variety of prices for computers with the same components and charged the same prices for computers with different components).)[94]  Costs and prices of SRAM and SRAM-containing products vary for a variety of reasons due to a variety of sales and pricing practices. Even the economic literature relied upon by Dr. Harris Dr. Harris recognizes that entities price products for a variety of strategic purposes, including increasing market share, and building or protecting brand value or brand loyalty.  (*See* Ex MM, H&S Paper 302 (acknowledging non-cost reasons for setting prices).)  Plaintiffs' experts' methodologies are neither realistic nor sufficiently plausible because they do not and cannot account for divergent pricing and sales practices including: (1) fixed-term pricing models or set-price contracts; (2) the *de minimis* cost of SRAM in relation to the overall cost of SRAM-containing products; (3) SRAM cost increases outweighed by transactional costs associated with raising prices; (4) bundled pricing; (5) loss leaders; and (6) secondary-market pricing.  Each of these factors is discussed in turn below.

(1)     **Fixed-Term Pricing Models and Set-Price Contracts Require Individualized Proof of Impact.**

The data and evidence produced by third parties establishes that pricing structures existed during the class period that absorbed or blocked pass-through from traveling down the distribution chain.  (Burtis ¶¶109, 112–12, 117, 119, 120–21, 124–126.

**Redacted**

---

[94]     *See also Keating v. Philip Morris, Inc.*, 417 N.W.2d 132, 137 (Minn. Ct. App. 1987) (citations omitted) (agreeing with trial court that due to use of non-uniform discounts, determining the fact of damage "will require thousands of factual examinations done on a retailer by retailer basis, and a transaction by transaction basis"); *Peridot*, 2000 WL 673933, at *4 ("[T]he problem of determining damages on a class-wide basis is magnified in an indirect purchaser case often making the determination of the affect [*sic*] of a price-fixing conspiracy too complex for a class action.  This is especially true when the distributors use non-uniform discounts and pricing.") (citations omitted).

-37-

**Redacted**

And Dr. Harris admitted that if a direct SRAM purchaser enters into a contract with a customer to produce a certain amount of SRAM-containing product at a fixed price, there will be no overcharge passed through:

> Q.   Can you identify any other scenarios where pass-through might be zero?
>
> A.   You could hypothesize a situation *where a direct purchaser has a long-term, fixed-price contract with a customer and therefore has to absorb any cost increases* over the term of that long-term contract.

(Ex B, Harris Dep. 40:6–12 (emphasis added).)  Despite the fact that he recognizes that such contracts can block pass-through, Dr. Harris admits that he has not tried to learn if such contracts exist in the multi-layered distribution chains for SRAM-containing products.  (Ex B, Harris Dep. 41:10–19.)  Dr. Harris stated that he "thinks" — with no investigation — that it would be unlikely for an intermediary, such as a smart phone manufacturer, to enter into set-price agreements, but if such contracts did exist, there would be "zero" pass-through.  (Ex B, Harris Dep. 53:18–54:20.)

Contrary to Dr. Harris's "thinking," there is indisputable real-world evidence that original equipment manufacturers enter into set-price contracts that prevent pass-through.

**Redacted**

---

[95]   Compare n. 9 (Dr. Harris's definition of smart phones) with Kyocera phone features (Ex D Lieberman ¶2).

-38-

Winston & Strawn LLP
101 California Street
San Francisco, CA 94111-5894

Winston & Strawn LLP
101 California Street
San Francisco, CA 94111-5894

**Redacted**

The inability to change prices to respond to SRAM cost increases meant

that there was no pass-through.   **Redacted**

Plaintiffs' experts' methodologies do not and cannot account for such

instances of pass-through blocking.

        **(2)**        **The Proportionally *De Minimis* Cost of SRAM Requires Individualized Proof of Impact.**

Plaintiffs bear the burden of providing a methodology that accounts for the complexities associated with the *de minimis* cost of any alleged overcharge in relation to the overall cost of the SRAM-containing products, but Plaintiffs have not and cannot provide a methodology accounting for this variable.  (*OSB*, 2007 WL 2253425, at *7 (pass-through is difficult to show when the component cost is a small proportion of the overall product cost); *GPU*, 253 F.R.D. at 499 (methodology must account for fact that a graphics chip is one component of graphics card); *Methionine II,* 2003 WL 22048232, at *5 ("The complexity . . . is increased when one considers the impact to end users, many of whom purchased products containing very little methionine.").)

-39-

If a putative class member is able to show that his/her product does, in fact, contain SRAM, the SRAM my be a small fraction of the total component price. (Burtis ¶¶67–68, 163; **[Redacted]**

**Redacted** And any overcharge would be an even smaller percentage of the total cost of the end product. (Burtis ¶67.) Thus, any potential overcharge compared to the total cost of the product will be *de minimis* and likely not passed through to the next level of commerce.

**Redacted**

Given that other component costs may be changing at the same time as the SRAM cost, isolating the effect of any alleged overcharge would require controlling for cost changes of the other components and would give rise to numerous individualized inquiries. (Burtis ¶163.)

### (3) Transactional Costs That May Outweigh SRAM Cost Increases Require Individualized Proof of Impact.

The evidence shows that firms will not increase prices in reaction to cost increases if to do so would be more costly than absorbing the increase. Dr. Harris admits that if the cost associated with increased prices of products is greater than the overcharge then "the rational response to that would be not to change your price because it's not financially in your best interest." (Ex B, Harris Dep. 82:15–17. *See also* 89:23–90:7, 158:14–25.) And he admitted that end purchasers of such products will "suffer no impact from the overcharge." (Ex B, Harris Dep. 83:14–18. *See also* 89:13–90:7, 158:14–159:2, 171:23–172:10 (agreeing that when transactional costs outweigh the amount of the overcharge, the vendor will "absorb[] the cost increase.").) Here, the indisputable evidence shows that any overcharge of an SRAM component would have represented an insignificant amount of the total cost of a product. And in many cases firms did not increase prices in reaction to SRAM cost increases because to do so would have cost more than simply absorbing the increased cost. **[Redacted]** As one original equipment manufacturer attested, "The SRAM component costs were so small relative to the . . . sale price . . . that, even if [the vendor] had the ability to alter its pricing or output based on increases in the cost of SRAM, it would not have done so **Redacted**

-40-

Winston & Strawn LLP
101 California Street
San Francisco, CA 94111-5894

**Redacted**

**(4)   Bundled Pricing Requires Individualized Proof of Impact.**

Many products within the proposed class definition were sold as parts of bundled deals with other goods and/or services.[96]  (Burtis ¶83–85; Ex 15.)  When putative class members bought products as parts of bundles, the prices paid depended on products or markets other than the alleged SRAM-containing products.[97]  For example, Dr. Harris admitted that when smart phones are bundled with services, pass-through may be contained in the service contract, in the phone price, or in both.  (Ex B, Harris Dep. 228:21–230:14.)  Dr. Harris admitted that if such firms sold such smart phones to their employees at cost while the firm covered the cost of the service contracts, there would be no pass-through.  (Ex B, Harris Dep. 233:8–234:1.)

**Redacted**

Put simply, in many instances, bundling either absorbs or blocks pass-through, or completely obscures the traceability of SRAM component costs in the bundled price.  Despite the complex and individualized issues related to bundling, Dr. Harris admitted he has done nothing "to determine whether [bundled pricing that can block pass-through] goes on in the real world."  (Burtis ¶87 (quoting Ex B, Harris Dep. 234:11–14).)  Plaintiffs' experts' methodologies are neither realistic nor sufficiently plausible because they do not and cannot account for bundled pricing.  (*See GPU*, 253 F.R.D. at 499 (methodology must account for fact that "graphics cards were sold to some indirect

---

[96]   Several proposed class representatives purchased bundled products.  Ex E, Kicia Dep. 57:20–58:7; Ex F, Brooks Dep. 39:3–20, 49:12–18; Ex G, Sterenberg Dep. 55:11–56:10, 60:7-15; Ex H, Culver Dep. 33:3–7, 76:7–11; Ex I, Munoz Dep. 29:1-21; Ex J, Edwards Dep. 24:2–25:7; 30:5–15; 32:3-19; Ex Q, Allen Dep. 70:13–71:3; Ex DD, Penobscot Eye Care Dep. 28:14–29:2.

[97]   Burtis ¶58, 59, 62; Ex C, Watts Decl. ¶12 (many carriers "sell mobile phones, including smart phones, or personal data assistants, below their total cost in exchange for long term, volume contracts with end customers").  *See e.g., In re Wireless Tel. Servs. Antitrust Litig.*, 385 F. Supp. 2d 403, 410 (S.D.N.Y. 2005) ("It is undisputed that . . . wireless service providers [sell] their respective service and handsets as a package, and that in doing so, the carriers have subsidized the cost of handsets to make initial entry into the wireless services market 'more palatable.'").

Winston & Strawn LLP
101 California Street
San Francisco, CA 94111-5894

1   purchasers on a stand-alone basis but to others bundled in a computer").  *See* <span>Redacted</span>)

Winston & Strawn LLP
101 California Street
San Francisco, CA 94111-5894

2   **(5)   Loss Leaders Require Individualized Proof of Impact.**

3       During the Class Period, many retailers sold SRAM-containing products below cost as "loss

4   leaders," for sales and marketing reasons, such as luring customers to their stores (*i.e.*, "Black-

5   Friday").  Because loss leaders are priced based on strategic purposes, and without reference to cost,

6   there will often be no pass-through of any alleged overcharge.  (*Durden*, 1996 WL 34391966, at *3

7   (retailers did "not pass on price increases" when using products as loss leaders to attract customers).)

8   Dr. Harris agrees that there may be no overcharge passed through when a price is set below cost

9   based on what would bring people into a store, but he offers no means of identifying and excluding

10  putative class members who have suffered no impact in such situations.  (Ex B, Harris Dep. 208:2–

11  209:11, 208:23–209:11 (agreeing that loss-leader pricing may not result in an overcharge pass-

12  through when the loss-leader price is set at a level to generate customer traffic); Ex MM, H&S Paper

13  302–303 ("multiproduct firms may deliberately price below marginal cost on some products as a

14  strategy to increase sales of other products").)  Even though Dr. Harris admitted that a loss-leader

15  situation can impact the amount of pass-through and sometimes precludes pass-through, he makes no

16  effort in his methodology to account for this variable.

17  **(6)   Resale Markets Require Individualized Proof of Impact.**

18      Plaintiffs' proposed class definitions appear to include purchasers of equipment sold in the

19  significant and highly developed markets for used electronics equipment.  (Burtis ¶70.) [98]  Used,

20  refurbished, and leased products create problems for determining whether any overcharge was

21  passed through.  (Burtis ¶74)  Used product prices are affected by the age and condition of the

22  equipment, whether or not it has been refurbished, and the reputation of the reseller.  (Burtis ¶73.)

23  Dr. Harris explained that one would "need to have some understanding about the attributes of [a

24  used] product, the wear and tear, and the depreciations" to determine whether an overcharge passed

25  through to a secondary purchaser.  Dr. Harris also explained that some secondary firms, such as

26

27  ---
[98]   As discussed, secondary market sales of used and refurbished goods make it administratively
28  infeasible to objectively determine the identities of class members and create issues with duplicative
    damage recoveries.  Plaintiffs' methodologies do not account for these problems.

-42-

1   eBay, employ auction sales, in which buyers largely determine the price.[99]  (Ex B, Harris Dep.

2   216:14–217:1.)  In fact, Dr. Harris testified that there is no way to determine whether a Blackberry

3   sold on eBay contained a pass-through of any overcharge.  (Ex B, Harris Dep. 220:13–20.)

4   Drs. Harris and Dwyer's methodologies, however, have not taken into account secondary-

5   market sales.  (Ex B, Harris Dep. 211:25–212:12; Ex L, Dwyer Dep. 158:9–19.)  Dr. Harris testified

6   that, despite their apparent inclusion in the class based on a plain reading of the proposed class

7   definition, he does not consider purchasers of used products to be part of the class.  (Ex B, Harris

8   250:3–251:5.)  The existence of used product markets, whether such products are part of the class or

9   not, affects if and who was the recipient of any pass-through overcharge.  For example, Dr. Harris

10  testified that he has "no idea how [he would] determine" whether putative class members, who he

11  treats as having suffered a pass-through, actually resold their products and passed through any

12  purported overcharge to the secondary purchaser.  (Ex B, Harris Dep. 220:13–20.)  In such

13  situations, there are individualized issues associated with whether the initial purchaser or the

14  secondary purchaser is more directly harmed.  (Ex B, Harris 250:3–251:5.)  Because Plaintiffs'

15  experts' methodologies do not and cannot account for used and refurbished products and the factors

16  affecting prices of those products, it is not a realistic or sufficiently plausible means of proving

17  impact on a class-wide basis with common proof.

18              **(iii)    Divergent Products Require Individualized Proof of Impact.**

19  Plaintiffs seek to recover based on purchases of numerous and highly differentiated products,

20  which are sold at widely different prices through many different and complicated distribution chains,

21  involving different firms.  (Burtis ¶79.)  The product categories and the products within them are not

22  interchangeable and are affected by different supply and demand factors.  (Burtis ¶¶77, 81; Ex L,

23  Dwyer Dep. 50–51.)  Thus, each product must be considered separately to determine whether

24  customers were impacted by any alleged pass-through of any component overcharge.

25  Even though Plaintiffs' expert, Dr. Harris, admits that he thinks that there are at least 14

26  separate relevant product markets, he has done no actual product-market analysis as part of his

Winston & Strawn LLP
101 California Street
San Francisco, CA 94111-5894

---

[99]    Secondary market sales in forums such as eBay are not limited to used and refurbished products.  New products are also sold in such forums.

Winston & Strawn LLP
101 California Street
San Francisco, CA 94111-5894

methodology for determining whether and how pass-through occurs.  (Ex B, Harris Dep. 134:4–13

("it's my opinion that they're separate markets, if we're talking about substitution between and

across products"); 135:4–19 (listing 14 different relevant product markets that may exist in this

case); 119:6–7 ("***I haven't done a market analysis for the various products*** . . . .") (emphasis

added); 136:24–137:2 ("I haven't done a formal analysis of the various products. ***It's clear that***

***they're not substitutable across the broad product categories***.") (emphasis added).)  Indeed,

Dr. Dwyer admits that what they are essentially proposing is a one-size-fits-all model that can be

used interchangeably for products as divergent as routers and chocolate bars.  (Ex L, Dwyer Dep.

57:15:24.)[100]  Moreover, Drs. Harris and Dwyer have not done any empirical analysis to test whether

their methodologies can be applied in the real world or applied to the product markets at issue:

> Q.   Have you done any empirical analysis at all in forming any of your
>
> opinions?
>
> A.   Those opinions contained in the declaration, ***no***.
>
> Q.   What about the opinions that you have sitting here today, have you done
>
> any empirical analysis in forming those opinions?
>
> A.   As I said before, our work is ongoing, we're developing models.  ***We at***
>
> ***one point will have results, and I'll have opinions about those results***.

(Ex B, Harris Dep. 137:5–14 (emphasis added).)  Thus, Plaintiffs have failed to meet their burden of

providing a realistic and sufficiently plausible methodology for determining or quantifying impact

for purchasers of these divergent products on a class-wide basis.  (*Infineon*, 2008 WL 4155665, at

*10 (class certification denied where court "fundamental[ly]" concerned with experts' "failure to

offer specific methodologies that purport to adequately demonstrate impact for all class members

across customer, ***product***, and procurement type") (emphasis added).)[101]

---

[100]      Since Plaintiffs purport to have purchased SRAM as a component of other products, they are participants in separate markets for products that contain SRAM.  As such, Plaintiffs have not alleged and have not suffered antitrust injury, since they do not have grounds from which to argue they are participants in the allegedly restrained market.  (*In re Dynamic Random Access Memory (DRAM) Antitrust Litig.*, 516 F. Supp. 2d 1072, 1089-91 (N.D. Cal. 2007). *See also Bhan, C.R.N.A. v. NME Hosps., Inc.*, 772 F.2d 1467, 1470-71 (9th Cir. 1985).)
[101]      *Methionine II*, 2003 WL 22048232, at *5 (class certification denied where methodology did not account for industry consisting of "multiple sellers, a myriad of distribution channels, and hundreds of different products."); *GPU*, 253 F.R.D. at 496 (class certification denied where

-44-

**(iv)     Divergent Class Members With Varying Degrees of Negotiating Power Require Individualized Proof of Impact.**

The proposed class definitions encompass putative class members who vary dramatically in size and scope, from, for example: (1) a individual consumer who purchased a computer or smart phone; to (2) a small business that purchased an inexpensive server or router; to (3) a firm that purchased thousands of computers and smart phones, and hundreds of routers and switches; to (4) a massive enterprise that purchased billions of dollars worth of products potentially containing SRAM.

Plaintiffs' experts do nothing to account for the divergent class members and their attributes, many of which impact whether pass-through occurred.  For example, putative class members of divergent sizes exert varying degrees of negotiating power when purchasing their products through various procurement methods, resulting in substantially different prices (and thus, different levels of pass-through) for the same products.  (Burtis ¶65; *GPU*, 253 F.R.D. at 489–90 (wholesale customers who purchased products on individually negotiated terms "came to the negotiating table in a fundamentally different position than the representative plaintiffs"); *Infineon*, 2008 WL 4155665, at *11 (customer size is a factor that increases the likelihood that proof of pass-through can only be shown with resort to individualized proof); *Piggly Wiggly Clarksville, Inc. v. Interstate Brands Corp.*, 100 F. App'x. 296, 300 (5th Cir. 2004) (questioning whether negotiating ability "can be included in a general formula . . . unless a numerical value can be assigned to it" ).) [102]

The significance of the variance in negotiating power can be illustrated by contrasting an individual who purchases a smart phone and cellular service and data plan at Best Buy, with a law firm that negotiates directly with a cellular carrier to purchase 500 smart phones, well below cost, in exchange for 500 service and data plans.  (Burtis ¶84.)  As Dr. Harris admits, there may be zero or reduced pass-through to the firm, (Ex B, Harris Dep. 233–234), while the individual may have

methodology failed to account for several relevant variables, including "GPU performance, product features, supply and demand factors, the customization of the product, and product deadlines associated with the sale").

[102]     *See also Robinson v. Tex. Auto. Dealers Ass'n*, 387 F.3d 416, 424 (5th Cir. 2004) (holding that different negotiation styles precluded a showing of impact through common proof); *Exhaust Unlimited, Inc. v. Cintas Corp.*, 223 F.R.D. 506, 513 (S.D. Ill. 2004) (denying certification where prices were "established in decentralized negotiations" such that "individualized inquires would be especially necessary").

Winston & Strawn LLP
101 California Street
San Francisco, CA 94111-5894

DEFENDANTS' OPPOSITION TO INDIRECT PURCHASER
PLAINTIFFS' MOTION FOR CLASS CERTIFICATION (M:07-cv-1819 CW)

received pass-through, depending on the facts.  Proposed representative Robert Harmon offered

another illustration, admitting that, as a computer business owner, he is in a better position to

negotiate router purchases as a business, rather than as an individual.  (Ex II, Harmon Dep. 45:3–14.)

Dr. Harris concedes that his models cannot account for pass-through preclusion due to negotiating

power because the transactional data cannot detect it and such an inquiry would be individualized:

> Q.  ***So are you able to tell from the data . . . how much negotiating power***
> ***they have?***  Are you able to extrapolate that from the data?
>
> A.  ***No, you wouldn't find that from the data. You're imposing individual***
> ***inquiry on the model***.
>
> Q.  When you say "individual inquiry," ***do you mean identifying a specific***
> ***customer's negotiating power or long-term relationship with a particular***
> ***seller is going to involve individualized issues; is that what you mean?***
>
> A.  ***Well, yes***, if you want to ascertain that information -- and I'm not saying
> that it's relevant, but ***if you want to ascertain that***, I suppose ***you would have***
> ***to get on the phone and find out what that relationship is.  But no, that***
> ***wouldn't be found in transactional level of detail.***

(Ex B, Harris Dep. 278:18–279:10 (emphases added).)  Plaintiffs' methodologies are neither realistic

nor sufficiently plausible because they do not account for varying customer size and varying degrees

of negotiating power, which Dr. Harris admits requires an individualized analysis.

**(v)      Ineffective Subperiods of Alleged Conspiracy Require**
**Individualized Proof of Impact.**

Proof of class-wide injury is further complicated by Plaintiffs' view that there were

subperiods during which the alleged conspiracy was ineffective.  Dr. Dwyer stated that he will

utilize Dr. Noll's findings in the DRAM case to delineate subperiods "within the Class Period in

which the [alleged conspiracy] . . . would have been unlikely to be effective."  (Ex L, Dwyer 6, 19.

*See* Ex QQ, Noll Report 5.)  These "ineffective" periods leave much of the class indisputably

unaffected by any alleged conspiracy, and thus unable to rely upon common proof of injury.  (*See*

*Butt v. Allegheny Pepsi-Cola Bottling Co.*, 116 F.R.D. 486, 490–91 (E.D. Va. 1987) (customers not

Winston & Strawn LLP
101 California Street
San Francisco, CA 94111-5894

-46-

affected by conspiracy "probably did not sustain injury from the alleged conspiracy, and thus lack standing to sue").) When some putative class members are affected by an alleged conspiracy and others are not, "[p]roof of injury must begin with a customer-by-customer assessment of which purchases were [affected by the alleged conspiracy]." (*Id.*)

The customer-by-customer assessment would be particularly complex here, because it is difficult to learn if the SRAM contained in a particular product was manufactured during an ineffective period. (Burtis ¶187.) And, due to varying lag times between the time SRAM was initially sold and the time the SRAM-containing products were purchased, one cannot distinguish between purchases of "overpriced" and "market priced" SRAM. (Burtis ¶187, n. 249.) Plaintiffs have not provided a methodology to account for this issue.

**(c)   Common Impact Cannot Be Presumed In This Case.**

Plaintiffs seek to avoid their inability to propose a method to establish impact by common proof by invoking a "presumption of injury" theory. Plaintiffs' attempt to rely on such a presumption is misplaced, however, because the present case is not of the type where a presumption can be applied. The cases cited by Plaintiffs do not apply because they involve situations where, unlike here, (1) the allegedly price-fixed product was ***not*** modified substantially or incorporated as a component of a larger product;[103] (2) the plaintiffs were actually direct purchasers;[104] (3) there was actual evidence tracing pass-through to class members.[105]

Plaintiffs rely heavily on the California Court of Appeal's decisions in *B.W.I.* and *In re Cipro Cases I & II* ("*Cipro*"),[106] but those holdings are inapposite. In *B.W.I.*, the court presumed impact because "the product in question is ultimately sold to the consumer, and is largely unchanged in form from the price-fixing manufacturer to the indirect purchaser....The effects of the price-fixing were not obscured by substantially altering or adding to the item received from the manufacturer."[107]

---

[103]   *B.W.I. Custom Kitchen v. Owens-Ill., Inc.*, 235 Cal. Rptr. 228, 235 (Cal. Ct. App. 1987).
[104]   *Rosack v. Volvo of Am. Corp.*, 182 Cal. Rptr. 800 (Cal. Ct. App. 1982) (involved no pass-through; vertical price fixing case where the class bought directly from alleged co-conspirators); *In re Catfish Antitrust Litig.*, 826 F. Supp. 1019, 1040-41 (N.D. Miss. 1993) (class members were catfish distributors who bought directly from catfish processors).
[105]   *B.W.I.*, 235 Cal. Rptr. at 235 n.8.
[106]   *Cipro*, 17 Cal. Rptr. 3d 1 (Cal. Ct. App. 2004).
[107]   *B.W.I.*, Cal. Rptr. at 235.

-47-

Winston & Strawn LLP
101 California Street
San Francisco, CA 94111-5894

In *Cipro*, the court held that any presumption applies only if the product reaches end users unchanged from its original sale.[108]  But here, many putative class members purchased products where SRAM was merely a small component.  (Burtis ¶67.)  Also, in *B.W.I.*, the evidence presented was consistent and corroborated that intermediate sellers had passed through any overcharge.[109]  Here, the intermediate-seller evidence proves many of them did not pass through any overcharge to putative class members.  Common impact simply cannot be presumed in this case.

### 2.   Plaintiffs Do Not Show Predominance of Common Issues Under State Laws.

Due Process limits the application of one state's laws to other states' residents, and prohibits use of a single state's laws in a multi-state class merely to avoid individual issues.[110]  Choice of law determinations therefore must be made for each proposed class member.  Within each of the proposed 27 state sub-classes, a choice of law inquiry must be made to determine whether the forum state's law applies.  As Appendix A demonstrates, these states apply various choice of law tests.[111]

Plaintiffs bring claims under various state consumer protection and/or unjust enrichment laws, but as Appendices A through D illustrate, there are wide variations between each state's laws.  Moreover, some states, such as Florida, may apply one choice of law test for a consumer action claim and another test for an unjust enrichment claim.  (Appx. A.)

Under just one of these choice of law regimes, the traditional approach, where the place a contract was made governs which forum's law applies, an individual inquiry must be made into where each proposed class member purchased an SRAM-containing end product.  Four proposed state classes: Florida, Kansas, New Mexico, and Rhode Island, cover states who follow this approach, and their class members must make individualized proof of where they purchased their products to determine which state's law applies.  Some Plaintiffs' proposed representatives, such as Florida's proposed representative, Ryan Edwards, who testified that he purchased his Blackberry in

---

[108]   *Cipro*, 17 Cal. Rptr. 3d at 10.
[109]   *B.W.I.*, 235 Cal. Rptr. at 235 n.8 ("Plaintiff substantiates this proposition by stating that 'each distributor whose deposition has been taken testified that price increases to the defendants/manufacturers were completely passed on to plaintiff and the members of the class.'").
[110]   *Phillips Petroleum Co. v. Shutts*, 472 U.S. 797 (1985).
[111]   These choice of law tests include: (1) the traditional tests; (2) significant contacts; (3) Restatement (Second) for pecuniary damages analyses for torts and contracts; (4) governmental interest analysis; (5) *lex fori*; (6) better law; and (7) combined modern.  Appx. A.

Winston & Strawn LLP
101 California Street
San Francisco, CA 94111-5894

1    Michigan, illustrate how this is an individualized question.  (Ex J, Edwards Dep. 22:13–22.)

2         States that apply the Restatement (Second) approach have an even more complicated

3    individual inquiry, since this test looks at several factors, in addition to where a contract was made.

4    (Appx. A.)  In Ryan Edwards' example, the Court would need to look at the place the contract was

5    negotiated, its place of performance, the location of its subject matter, and the domicile, residence,

6    nationality, place of incorporation, and place of business of the parties, in addition to the place of

7    contracting, to determine whose consumer protection laws apply.  Thus, these complicated choice of

8    law inquiries, which must be made for each of the 27 states involved in this action, reveal that

9    Plaintiffs cannot show that common issues predominate.

10   **E.      A Myriad of Subclasses Would Be Required, Rendering The Case Unmanageable.**

11        The Supreme Court has found that "the adequacy inquiry under Rule 23(c)(4)(b), serves to

12   uncover conflicts of interest between named parties and the class they seek to represent."[112]

13   Disparate interests within a class require division into individually represented, homogenous

14   subclasses to eliminate conflicting interests of representatives and their counsel.[113]  Additionally, the

15   Supreme Court has recognized that where one group of claimants has "***more valuable claims***" than

16   another group, subclasses represented by different counsel are mandated to avoid conflicts between

17   groups of class members.[114]  Each separate and homogenous subclass requires "separate

18   representation to eliminate conflicting interests of counsel."[115]

19        Plaintiffs bear the burden of presenting a class definition and a suitable and realistic plan for

20   a manageable trial, including appropriate subclasses.[116]  Here, Plaintiffs have failed in their burden to

21   put forth a manageable plan that addresses the numerous intra-class conflicts requiring subclasses.

---

22

23   [112]    *Amchem Prods., Inc.*, 521 U.S. at 625.
     [113]    *Ortiz*, 527 U.S. at 856 ("[I]t is obvious after *Amchem* that a class divided between holders of
24   present and future claims . . . requires division into homogeneous subclasses under Rule 23(c)(4)(B),
     with separate representation to eliminate conflicting interests of counsel.") (citing *Amchem Prods.,*
25   *Inc. v. Windsor*, 521 U.S. 591, 627 (1997)).
     [114]    *Id.* at 857 (emphasis added).
26   [115]    *Id.* at 819.
     [116]    *Zinser*, 253 F.3d at 1190 ("The Plaintiffs, however, bear the burden of establishing
27   appropriate subclasses and demonstrating that each subclass meets the Rule 23 requirements.")
     (quoting *In re Telectronics Pacing Systems, Inc.*, 168 F.R.D. 203, 221 (S.D. Ohio 1996)). *See also In*
28   *re Paxil Litig.*, 212 F.R.D. 539, 546 (C.D. Cal. 2003) (denying class certification because of
     plaintiffs' failure to put forth manageable trial plan).

Winston & Strawn LLP
101 California Street
San Francisco, CA 94111-5894

Winston & Strawn LLP
101 California Street
San Francisco, CA 94111-5894

1  Plaintiffs' broad class definitions for each state encompass a vast array of indirect purchaser

2  categories, whose claims have varying strengths and weaknesses, based on, for example: (1) the date

3  of product purchases; (2) the product type or differences within each product type; (3) the

4  complexity of the distribution chains involved; (4) whether intermediaries may have absorbed

5  SRAM price increases; (5) different pricing and sales practices of different distributors and resellers;

6  and (6) the negotiating power of the end user and types of indirect purchasers.  Each of these indirect

7  purchaser categories can give rise to conflicting interests.

### 1.    Date of Product Purchases

9      Courts have long recognized that the strength of claims may vary within a proposed class

10  based on time periods within a proposed class period.[117]  The proposed decade-long class period in

11  the present case is fertile terrain for large variations in the strength of class members' claims.

12      First, the proposed class period extends back to nearly 13 years ago, and only a tiny fraction

13  of the purchases can be documented at this point.  Several proposed class representatives do not have

14  documented proof of their purchases.[118]  Older claims will have more difficult proof issues than

15  newer claims; thus, they will be at odds with the newer claims.

16      Second, during the proposed class period, the SRAM market evolved, as more products

17  contained embedded, instead of standalone, SRAM, and more complex, specialized SRAM

18  components came onto the market.  (Exs C, D.)  These changes make it more difficult for class

19  members to prove that they purchased products containing standalone SRAM. The purchase date

20  also creates variations in the strength of claims as named Defendants' market share mostly trended

21  upwards from 53% in 1996 to 75% in 2005, making the earlier purchases more difficult to prove,

22  particularly when manufacturers sourced larger amounts of SRAM from non-Defendants.  (Ex QQ,

---

23  [117]    *Ortiz*, 527 U.S. at 857 ("Pre-1959 claimants accordingly had more valuable claims than post-
1959 claimants," because 1959 marked the expiration of the insurance policy providing settlement
24  funds.).  *See also In re Paxil Litig.*, 212 F.R.D. at 548 (finding plaintiffs had failed to put forward a
manageable trial plan in drug products liability suit "because the putative plaintiffs all took Paxil at
25  different times, some of those patients may have ingested Paxil and withdrawn from it before the
advertisements at issue were aired or may have never seen the advertisements.").
26  [118]    Ex F, Brooks Dep. 36:17–37:1, 42:1–42:4, 44:18–44:20, 51:18–52:12; Ex FF, Gatti Dep.
28:13–28:20, 46:10–48:6; Ex II, Harmon Dep. 26:9–26:20; Ex U, Markey Dep. 23:18–23:24; Ex I,
27  Munoz Dep. 30:23–31:3, 52:22–53:7, 65:15–66:20; Ex JJ, O'Donnell Dep. 16:18–17:20, 24:13–
25:5; Ex X, Solo Dep. 26:18–29:21, 30:14–30:22, 30:14–31:21, 49:8–49:22, 57:21–58:19, 70:16–
28  71:15.

Winston & Strawn LLP
101 California Street
San Francisco, CA 94111-5894

1   Noll Report ¶37, Table 1.)

2          Finally, assuming a conspiracy existed, Dr. Noll acknowledged that there were periods when

3   the alleged conspiracy was not effective in the DRAM market and the same factors that caused this

4   to occur in the DRAM market could have caused any conspiracy in the SRAM market to be

5   ineffective during those periods.  (Ex RR, Noll Dep. 116:10–117:13.)  Therefore, indirect purchasers

6   who purchased products during a period when the alleged conspiracy was ineffective will have

7   weaker claims than those who purchased at other times, giving rise to intra-class conflicts.

8          **2.        Product Types or Variations within a Product Type**

9          In the antitrust price-fixing context, the existence of diverse product markets and sub-markets

10   within a class definition may make a class unmanageable.[119]  In *Burkhalter*, plaintiffs sought to

11   certify a direct purchaser class for the price fixing of macadamia nuts, but defendants argued that the

12   market was "too complicated to handle in a single class action," and that different classes would be

13   required for mainland and Hawaiian purchasers, for retail nut sales and bulk nut sales, and for

14   specific macadamia nut products, because "total nut sales are so diverse that generalizations cannot

15   be made."[120]  The court agreed with the defendants that "grouping purchasers in all of these sub-

16   markets together ignores the crucial differences in how defendants set their prices for different

17   purchasers."[121]  Similarly here, the separate end-user product markets that Dr. Harris listed in his

18   deposition,[122] will require, at a minimum, one class representative per market for each state.

19          **3.        The Complexity of the Distribution Chains Involved**

20          The existence of diverse product distribution chains creates conflicts within the proposed

21   class definition.  Class members who purchased products with very few levels of separation from

22   Defendants will have much stronger claims than those who purchased products with many levels of

23   separation in the distribution chain.  As the article relied on by Dr. Harris for his opinions states:

24                  When it appears that the first (or any subsequent) purchaser uses the product

25                  as an input for other products which are passed on at a price, but that the

26   
27   [119]  *Burkhalter Travel Agency v. MacFarms Int'l, Inc.*, 141 F.R.D. 144, 154-56 (N.D. Cal. 1991).
         [120]  *Id.* at 153.

28   [121]  *Id.* at 154.
         [122]  Ex B, Harris Dep. 134:4–13, 135:4–19.

-51-

Winston & Strawn LLP
101 California Street
San Francisco, CA 94111-5894

> production-distribution chain is so multilineal, fractured, or convoluted as to
> make tracing through to the next step unfeasible [sic], the inquiry, quite
> simply, must end . . . there will no doubt be a minority of cases in which it
> will not be possible to make a reasonable identification of the final purchasers,
> usually because the cost increase is passed on through a large number of
> different products to different kinds of users."

(Ex MM, H&S Paper 327.)  Purchasers of a product with a convoluted distribution chain, where the type and/or price of SRAM is untraceable may be more inclined to settle, whereas class members who are only a couple of degrees removed from a SRAM Defendant manufacturer has a stronger interest in holding out for a higher settlement or in litigating the case, thereby posing conflicts.

**4.    Different Pricing and Sales Practices of Different Distributors and Resellers**

Various sales and pricing models make some class member's claims weaker or stronger than others.  Bundling is just one sales method that may weaken a claim, since it is harder to discern SRAM component pricing within a bundle.  For instance, a Blackberry purchaser who signed on for a two-year carrier contract in exchange for a Blackberry sold below cost will have more incentive to settle than a Blackberry purchaser who paid the full price for the phone without signing a carrier contract, because the latter purchaser may have an easier time segregating out the overcharge.

**5.    Varying Degrees of Negotiating Power of End Users**

The court in *Burkhalter* recognized "significant differences between . . . large and small purchasers, and between bulk and retail purchasers" among the many "cross-cutting factual circumstances that would make the class incoherent."[123]  Part of this incoherence was attributable to how "[i]n these different markets, defendants price nuts in different ways and purchasers have varying degrees of leverage over defendants."[124]  In *GPU*, the court also found the same distinction, where the representative plaintiffs had no negotiating power at all but some large putative class members  "likely had more bargaining power than defendants themselves."[125]  Similarly here, there are individual, consumers, small-, mid-, and large-size firms that are putative class members.  The

---

[123]    *Burkhalter*, 141 F.R.D. at 154.
[124]    *Id.*
[125]    *GPU*, 253 F.R.D. at 489.

1   negotiating power of an indirect purchaser who buys millions of products creates a different set of

2   issues and defenses than a smaller purchaser. Thus, there are inherent conflicts of interests that

3   could only be addressed by multiple subclasses.

4        **6.**     **Multiple Levels of Subclasses Would Be Required Within Each State.**

5        For each of the 27 proposed state subclasses, Plaintiffs have grouped all SRAM product

6   types over the entire proposed class period. At a minimum, each proposed state subclass must be

7   further divided into subclasses based on each factor described above, including product market,

8   purchase date, whether a product was new or used, pricing or sales model, and indirect purchaser

9   type. These factors must be considered and multiplied out against each of the others, ultimately

10   creating hundreds of subclasses. For example, if the 14 product types listed by Dr. Harris were

11   multiplied out by 3 types of indirect purchasers (consumer purchasers, small enterprise purchasers,

12   and large enterprise purchasers), and then multiplied out by the 27 states, that would result in 1,134

13   different subclasses, before even considering the other factors.

14        Additionally, based on conflicts-of-law rules described above, many states will apply the law

15   of another state for products purchased in another state. (Appx. A.) Each state's consumer

16   protection laws may vary in: (1) whether they require Plaintiffs to prove reliance; (2) what level of

17   *scienter* is required; (3) what damages a plaintiff must prove, with additional damages allowed in

18   certain circumstances; (4) statutes of limitations; (5) varying defenses available, including different

19   safe harbor provisions; and (6) varying notice requirements. (App. A, Variations in State Consumer

20   Protection Laws.) Likewise, state unjust enrichment laws vary depending on: (1) the type of

21   relationship between parties required; (2) if *scienter* is required; (3) whether plaintiffs must show

22   that they have exhausted all remedies against parties with whom they are in privity or whether there

23   is no other available remedy; and (4) statutes of limitations. Given the large variations between the

24   different types of claims in each of the states, the court would be faced with applying the laws of

25   many states within each state's proposed class.

26        In effect, this becomes a situation where each proposed state class becomes a "miniature"

27   nationwide subclass that must apply the laws of different states. This will produce a cascade of

28   additional differences between each proposed state class, as the Ninth Circuit expressed, "[w]here

Winston & Strawn LLP
101 California Street
San Francisco, CA 94111-5894

-53-

Winston & Strawn LLP
101 California Street
San Francisco, CA 94111-5894

the applicable law derives from the law of the 50 states . . . differences in state law will compound the disparities among class members from the different states."[126]

### 7.     A Subclass Menagerie Would Be Unmanageable.

Here, not only have Plaintiffs not met their burden to come forward with a plan to address the numerous subclasses required, but Plaintiffs could not meet this burden, even if they had tried.  This is because their proposed definition requires so many subclasses, each with separate class representatives as to make the class action unmanageable.  Here, the subclass menagerie that would be required is simply unmanageable and would overwhelm the jury with different legal instructions and disparate issues that would be impossible to sort out even if trial lasted a year.[127]  In the present matter, Plaintiffs have failed to provide a trial plan.  And given the hundreds upon hundreds of subclasses their class definition requires, Plaintiffs cannot provide a workable trial plan.  Thus, class certification must be denied, as this class is simply unmanageable.

### F.     Damages Cannot Be Proven On a Class-Wide Basis Using Common Proof.

Plaintiffs have failed to meet their Rule (23)(b) requirements because they have not provided a reliable class-wide approach to measure damages.  To obtain class certification, Plaintiffs' expert must do more than provide a general explanation of the available methods that he or she will use to calculate damages.[128]  Plaintiffs offer Drs. Dwyer and Harris's opinions as proof that they have identified methods that would use common proof to establish class damages.  Dr. Dwyer states:

> Combining the results of the before-after analysis of direct purchaser
>
> overcharges, with the results of the pass-through study described above, will

---

[126]     *Zinser*, 253 F.3d at 1189 (internal quotation marks omitted).

[127]     *In re Paxil Litig.*, 212 F.R.D. at 546 ("[D]espite plaintiff's burden to provide an extensive analysis of state law variations, they have not explained how their multiple causes of action could be presented to a jury for resolution in a way that fairly represents the law of the fifty states while not overwhelming jurors with hundreds of interrogatories and a verdict form as large as an almanac"). (quoting *Ford Motor Co. Ignition Switch Prods. Liab. Litig.*, 174 F.R.D. 322, 350 (D.N.J. 1997).

[128]     *Piggly Wiggly Clarksville, Inc. v. Interstate Brands Corp.*, 100 F. App'x. 296, 300 (5th Cir. 2004) (denying certification where plaintiffs did not prove that "a reliable formula for damages can be devised which will yield statistically significant results, that the data that would have to be plugged into such a formula can be assembled, that the relevant variables like negotiating skill can be quantified, and that all of this can be used to reliably measure antitrust damages for each of the many thousands of members of the proposed class"); *Allied Orthopedic Appliances, Inc. v. Tyco Healthcare Group L.P.*, 247 F.R.D. 156, 177 (C.D. Cal. 2007) (plaintiffs' expert must "conduct [a] meaningful economic analysis" of proposed benchmarks to show that "a workable damage formula" exists before a court can grant certification).

-54-

Winston & Strawn LLP
101 California Street
San Francisco, CA 94111-5894

1    allow direct computation of the per-unit overcharges to indirect SRAM

2    purchasers.  Combining these results with quantities of end-use products sold

3    during periods affected by the conspiracy will yield aggregate overcharge

4    damages to indirect SRAM purchasers.  (Dwyer Report ¶64.)

5  Substantial flaws prevent Plaintiffs from meeting even the more relaxed requirements under the

6  predominance inquiry for damages, since the proposed method for determining damages is "so

7  insubstantial as to amount to no method at all."[129]

8    For the reasons discussed above, Dr. Dwyer's proposed method is not a reliable way to

9  determine class-wide damages.  For example, under Dr. Dwyer's proposed method, he does not use

10  actual cost, he ignores various levels of distribution chains, and he aggregates across divergent class

11  members, which can result in class members who were not impacted being deemed to have been

12  damaged.  Further, Dr. Dwyer cannot match Defendants' SRAM with end products, because he has

13  no way to tell which products contain Defendants' SRAM.

14  **G.    Plaintiffs Have Failed to Satisfy The Rule 23(a) Prerequisites to Class Certification.**

15    **1.    Several Named Plaintiffs' Claims and Defenses Are Not Typical.**

16    The typicality requirement of Fed. R. Civ. P. 23 (a)(3) is met only if "the claims or defenses

17  of the representative parties are typical of the claims or defenses of the class."  As set forth below

18  and in Appendix E, the claims and defenses of several proposed class representatives are not typical.

19    *Alleged Injuries Sustained in Different Product Markets.*  Each of the proposed class

20  representatives must have suffered the same injury as putative class members.[130]  Here, each of the

21  proposed class representatives did not purchase the same end products as the vast majority of the

22  putative class members they seek to represent and this requirement is therefore not met.  There are

23  no states for which Plaintiffs have proposed a class representative for every product and many

24  proposed class representatives purchased only one type of product.[131]  Any alleged injury therefore

25

26  [129]    *Infineon*, 2008 WL 4155665, at *6 n. 9 (quotation marks and citations omitted).
    [130]    *Falcon*, 457 U.S. at 156 (a class representative must be part of the class and possess the same

27  interest and suffer the same injury as the class members) (citations omitted).
    [131]    For example, for 18 of the 27 states in which Plaintiffs seek to certify a class, they propose a

28  representative who purchased only **one** type of product allegedly containing SRAM.  *See* Appx. A to
    Plaintiffs' Memorandum in Support of Class Certification.

Winston & Strawn LLP
101 California Street
San Francisco, CA 94111-5894

1  would have been sustained in a different product market[132] than putative class members who

2  purchased other products.[133]  Thus, the typicality requirement cannot be met for any state.[134]

3       *Products Do Not Contain SRAM.*  Several of the proposed class representatives purchased

4  products that the indisputable evidence shows did not contain SRAM.

5  **Redacted**

6       [135]  The claims of these proposed class representatives are not typical of absent class

7  members who purportedly purchased products containing SRAM.

8       *Disparities in Negotiating Power.*  Plaintiffs propose as class representatives only individual

9  consumers, small businesses, and union locals.  The claims of these proposed class representatives

10  are not typical of the claims of large enterprises that had strong bargaining power and purchased

11  products allegedly containing SRAM on individually negotiated terms.[136]  Such a disparity in

12  negotiating power precludes a finding of typicality for each state in this case.[137]

13       *Atypical State Law Issues.*  Several proposed class representatives present divergent choice of

14  law issues.  (Appx. A.)  Based on the choice of law rules of the states they seek to represent, these

15  representatives' claims may fall under the laws of other states, rendering them atypical of the claims

16  of absent class members.

---

17  [132]     Disparate alleged injuries also preclude a finding of typicality for those proposed class
18  representatives who purchased a product allegedly containing SRAM in a package bundled with
other products or services.  The overcharge could impact the customer in one market, but not in the
19  other. Plaintiffs' expert, Dr. Harris, admitted that the injury could be sustained in the service market,
rather than the product market, for bundled deals. Ex B, Harris Dep. 228:21–230:14.
20  [133]     Plaintiffs' expert, Dr. Harris, acknowledged that there are different product markets for the
end products in this case. Ex B, Harris Dep. 116:22–117:22, 118:13–119:16.
21  [134]     *Am/Comm Systems, Inc. v. Am. Tel. and Tel. Co.*, 101 F.R.D. 317, 321 (E.D. Pa. 1984)
("[R]epresentatives' claims are not typical of the proposed members' claims since proof of the
22  representatives' claims would not necessarily prove all the members' claims.").
[135]

23  **Redacted**
24

25  [136]     For example, named Plaintiff Christopher Smith, who purchased a router from a Best Buy
26  retail store in Oregon for $79.99, does not have the same negotiating power as Google, who, during
the proposed class period, bought approximately 450,000 servers, including servers in its massive
computing center in Oregon. Ex YY, Smith Dep. 49:20–50:15; Ex O.
27  [137]     *GPU*, 253 F.R.D. at 489-90 (holding that this very kind of disparity in negotiating power
defeats typicality requirement). This disparity in negotiating power also precludes a finding of
28  common impact, as is discussed above.

*Did Not "Purchase" For "End Use."*  At least two proposed class representatives cannot be deemed "purchasers" of products containing SRAM because they themselves did not purchase the products at issue.  (Appx. E.)  Because these proposed class representatives do not even meet the proposed class definitions, they cannot be deemed typical class representatives.

**2.     Several Named Plaintiffs Will Not Adequately Represent the Proposed Class.**

Each representative must "fairly and adequately protect the interests of the class," (Fed. R. Civ. P. 23(a)(4)), but, for the reasons stated here and in Appendix F, several do not.

*Conflicting Interests – Close Association.*  Proposed representatives are not adequate when, as here, they have "disabling conflicts" or "antagonistic interests" to absent class members.[138]  Conflicts arise, for example, when a plaintiff has a financial, business, or personal relationship with his attorney.[139]  Business and personal relationships create a conflict of interest because courts fear that a class representative who has a close association with his counsel will approve a settlement on terms less favorable to the interests of absent class members.[140]  Such conflicts are particularly concerning where, like here, the class representative's possible recovery is far outweighed by the attorneys' fees that his business associate or friend would earn. (*Id.*)  Several proposed class representatives are not adequate because they have business or personal relationships with the attorneys who represent them in this case, giving rise to conflicting interests.  (Appx. F.)

*Conflicting Interests – Resellers.*  A proposed class representative who resold the products for which he is claiming damages is not an adequate class representative because his interests are antagonistic to end user members of the putative class he seeks to represent.[141]  At least one proposed class representative fits this description and is therefore not adequate.  (Appx. F.)

*Failure to Retain Products and Documents.*  The Supreme Court has characterized the responsibility that a putative class representative has to the members of the class as "one of a

---

[138]  *See e.g.*, *Lerwill v. Inflight Motion Pictures, Inc.*, 582 F.2d 507, 512 (9th Cir. 1978) ("representatives must not have antagonistic or conflicting interests with the unnamed members").
[139]  *London v. Wal-Mart Stores, Inc.*, 340 F.3d 1246, 1255 (11th Cir. 2003) (reversing grant of class certification since plaintiff worked … as his attorney's stockbroker and because plaintiffs counsel had a "long-standing personal friendship"); *Pattillo v. Schlesinger*, 625 F.2d 262, 265, n.2 (9th Cir. 1980); *Jaroslawicz v. Safety Kleen Corp.*, 151 F.R.D. 324, 329–30 (N.D. Ill. 1993).
[140]  *London*, 340 F.3d at 1254.
[141]  *Methionine I*, 204 F.R.D. at 167 (recognizing inherent antagonism between resellers and ultimate consumers in price fixing cases, refusing to certify class with both).

Winston & Strawn LLP
101 California Street
San Francisco, CA 94111-5894

Winston & Strawn LLP
101 California Street
San Francisco, CA 94111-5894

fiduciary character" that is "dependent on his diligence, wisdom and integrity."[142]  The Court explained that a class representative must meet "standards of responsibility, liability and accountability" to protect the class he seeks to represent.  (*Id.* at 550.)  Several of the proposed class representatives have not met such standards, and are therefore not adequate, because they have destroyed or failed to retain documents and evidence undoubtedly relevant to this litigation, including the very products for which they are claiming damages.  (*See* Appx. F.)

*Failure to Review Complaint.*  Several of the proposed class representatives did not review or approve the complaints filed in this action.  (*See* Appx. F.)  This lack of involvement in the case renders these proposed class representatives not adequate.[143]

### 3.   Class Certification Should Be Denied in Several States With No Adequate and Typical Proposed Class Representative.

The sole proposed class representatives from the following states are not adequate and/or typical:  Arizona, Arkansas, District of Columbia, Kansas, Maine, North Carolina, South Dakota, Utah, and Rhode Island.[144]  Thus, class certification should be denied in these states for failure to meet the prerequisites to class certification under Rule 23(a).  Also, class certification must be denied in Michigan, where Plaintiffs have withdrawn each of the proposed class representatives.[145]  Plaintiffs cannot certify as class in North Dakota or Puerto Rico because they do not propose a class definition for those territories.  (Motion 2–9.)  In Utah, the state's Illinois Brick repealer statute, the Utah Antitrust Act ("UAA"), passed on May 1, 2006, is not retroactive.[146]  Plaintiffs seek to certify a

---

[142]   *Cohen v. Beneficial Industrial Loan Corp.*, 337 U.S. 541, 549 (1949).

[143]   *See Burkhalter Travel Agency v. MacFarms Int'l, Inc.*, 141 F.R.D. 144, 153-54 (N.D. Cal. 1991) ("In considering the involvement and knowledge of a prospective class representative [to determine whether the prospective class representative meets the adequacy requirement], 'the Court must feel *certain* that the class representative will discharge his fiduciary obligations by fairly and adequately protecting the interests of the class.'") (quoting *Koenig v. Benson*, 117 F.R.D. 330, 333– 34 (E.D.N.Y. 1987)); *Rolex Employees Ret. Trust v. Mentor Graphics Corp.*, 136 F.R.D. 658, 666 (D. Or. 1991) (inadequate representative "contributed nothing to the drafting of the complaint").

[144]   *See* Appxs. E, F.

[145]   Plaintiffs have agreed to withdraw each of the proposed class representatives for Michigan: Kenneth Bagwell and Terrence Martin (Ex ZZ).  Plaintiffs have also agreed to withdraw David Perez (California) (Ex NN 30:18-40:14) and UFCW Local 711 (Nevada) (Ex AAA).

[146]   *See California v. Infineon Techs. AG*, No. C 06-4333 PJH, 2008 WL 1766775, *5 (N.D. Cal. 2008) (dismissing claims brought under UAA because indirect purchaser standing did not exist before May 1, 2006 and concluding that "indirect purchaser status is lacking under the UAA, since the conduct alleged in the third amended complaint pre-dates the 2006 amendment to the UAA").

Utah state class from November 1, 1996 to December 31, 2006, but the UAA will only allow indirect purchasers to bring an action for just an 8-month period, May 1, 2006 through December 1, 2006. Even if Plaintiffs' proposed Utah class were narrowed to this shorter period, Plaintiffs would be without a Utah representative, since the proposed representative testified that he bought his product in April 2004, long before the UAA took effect.[147]

## H.   Plaintiffs' Motion for Certification of a Nationwide Injunctive Class Should Be Denied Because There Is No Threat of Future Harm.

Plaintiffs move to certify a nationwide injunctive class under Rule 23(b)(2). The motion should be denied because: (1) the Court lacks Article III standing to enter an injunction because there is no threat of future harm or violations because the class period expired over two years ago; and (2) this action seeks monetary relief as its primary form of relief.

First, in order for the Court to have Article III jurisdiction to enter an injunction against the Defendants, Plaintiffs must be "realistically threatened by a repetition of the violation,"[148] there must be a definitive likelihood of future harm,[149] and it must be likely that the injury will be redressed by a favorable decision.[150] Plaintiffs seek to certify a nationwide injunctive class of those "who, from November 1, 1996 through December 31, 2006, purchased SRAM in the United States indirectly from the Defendants for their own use and not for resale." There is no threat of future harm here and a favorable decision will not redress any injury Plaintiffs claim during a proposed class period that ended over two years ago. Therefore, the Court lacks Article III jurisdiction to enter an injunction against the Defendants and Plaintiffs' motion should be denied.

Second, a Rule 23(b)(2) class is inappropriate when plaintiffs primarily seek monetary relief.[151] Plaintiffs' primary objective here is monetary damages, as they define the proposed class as those who purchased during a proposed class period that ended over two years ago, and do not

---

[147]   Ex BB, Giaque Dep. 19:22–24.
[148]   *Gest v. Bradbury*, 443 F.3d 1177, 1181 (9th Cir. 2006) (citation omitted).
[149]   *O'Shea v. Littleton*, 414 U.S. 488, 496–97 (1974).
[150]   *Friends of the Earth, Inc. v. Laidlaw Envtl. Serv. (TOC), Inc.*, 528 U.S. 167, 180–81 (2000); *In re Multidistrict Vehicle Air Pollution*, 538 F.2d 231, 236-37 (9th Cir. 1976) (stating where "there are no ongoing violations[,] . . . [an injunction] fails to serve any function of the antitrust laws").
[151]   *Molski v. Gleich*, 318 F.3d 937, 950 (9th Cir. 2003); *In re Paxil Litig.*, 218 F.R.D. 242, 247 (C.D. Cal. 2003).

Winston & Strawn LLP
101 California Street
San Francisco, CA 94111-5894

1    allege that the conspiracy is ongoing. An injunction to bar conduct that has ceased is highly unlikely

2    to be the "predominant" goal of the lawsuit.[152]

3                                    **IV.    CONCLUSION**

4              Can the Court reasonably find that pass-through in this case can be shown with common

5    proof on a class-wide basis in spite of the fact that the indisputable evidence shows that millions of

6    putative class members suffered no pass-through and Plaintiffs have no way to exclude such

7    members from the class? Can the Court reasonably find that the amount of pass-through can be

8    determined on a class-wide basis using common proof even though the indisputable evidence shows

9    that Plaintiffs' experts' models will show significant class-wide pass-through even when millions of

10   members of the class suffered no pass-through?

11             If the answer to either of these questions is "No," this Court should deny certification in this

12   case with prejudice, and not place its imprimatur upon the methods conjured up by Plaintiffs'

13   experts.

14

15   Dated:  April 30, 2009                                   Respectfully submitted,

16                                                            WINSTON & STRAWN LLP

17

18                                          By    _____/s/ Patrick M. Ryan_____
                                                          PATRICK M. RYAN
19                                                       Attorneys for Defendants
                                                    NEC ELECTRONICS CORPORATION
20                                                 AND NEC ELECTRONICS AMERICA, INC.

21             I, Patrick M. Ryan, hereby attest, pursuant to N.D. Cal. General Order No. 45, that the

22   concurrence to the filing of this document has been obtained from each signatory hereto.

23                                                      _____/s/ Patrick M. Ryan_____
24                                                             Patrick M. Ryan

25

26

27

28   ---
     [152]    *See In re Paxil Litig.*, 218 F.R.D. at 247-48 ("[T]he fact that some (perhaps most) of the
     allegedly offending conduct has ceased . . . speaks to the 'essential goal' of this litigation.").

Winston & Strawn LLP
101 California Street
San Francisco, CA 94111-5894

*Additional Defendants and Counsel:*

**LATHAM & WATKINS LLP**

By /s/ *Belinda Lee*
    Belinda Lee
    Attorneys for Defendants
    Toshiba Corporation and Toshiba
    America Electronic Components, Inc.


**MAYER BROWN LLP**

By /s/ *Robert E. Bloch*
    Robert E. Bloch (*pro hac vice*)
    Attorneys for Defendant
    Cypress Semiconductor, Inc.


**McDERMOTT WILL & EMERY LLP**

By  /s/ *Craig P. Seebald*
    Craig P. Seebald (*pro hac vice*)
    Vincent van Panhuys (*pro hac vice*)
    Attorneys for Defendants Renesas
    Technology Corp., Renesas Technology
    America, Inc., Mitsubishi Electric
    Corporation, and Mitsubishi Electric &
    Electronics USA, Inc.

**WHITE & CASE LLP**

By /s/ *Matthew S. Leddicotte*
    Matthew S. Leddicotte (*pro hac vice*)
    Attorneys for Defendant Etron Technology
    America, Inc.


**O'MELVENY & MYERS LLP**

By /s/ *Michael F. Tubach*
    Michael F. Tubach
    Attorneys for Defendants
    Hynix Semiconductor Inc., and
    Hynix Semiconductor America Inc.


**SHEPPARD, MULLIN, RICHTER & HAMPTON LLP**

By  /s/ *James L. McGinnis*
    James L. McGinnis
    Attorneys for Defendants
    Samsung Electronics America, Inc.,
    Samsung Electronics Company, Ltd., and
    Samsung Semiconductor, Inc

Winston & Strawn LLP
101 California Street
San Francisco, CA 94111-5894