FRANCIS O. SCARPULLA (41059)
CRAIG C. CORBITT (83251)
CHRISTOPHER T. MICHELETTI (136446)
QIANWEI FU (242669)
JANE YI (257893)
ZELLE HOFMANN VOELBEL & MASON LLP
44 Montgomery Street, Suite 3400
San Francisco, CA 94104
Telephone: (415) 693-0700
Facsimile: (415) 693-0770
fscarpulla@zelle.com
ccorbitt@zelle.com

*Interim Lead and Liaison Counsel for Indirect Purchaser Class*

**UNITED STATES DISTRICT COURT**

**NORTHERN DISTRICT OF CALIFORNIA**

**OAKLAND DIVISION**

| | |
|---|---|
| IN RE STATIC RANDOM ACCESS MEMORY (SRAM) ANTITRUST LITIGATION | Case No. M:07-CV-01819-CW<br><br>MDL No. 1819<br><br>**INDIRECT-PURCHASER PLAINTIFFS' NOTICE OF MOTION AND MOTION TO EXCLUDE THE EXPERT OPINION OF MICHELLE M. BURTIS; MEMORANDUM OF POINTS AND AUTHORITIES**<br><br>**ORAL ARGUMENT REQUESTED**<br><br>Hearing Date: September 3, 2009<br>Time: 2:00 p.m.<br>Courtroom: 2, 4th Floor<br>Judge: Hon. Claudia Wilken |
| This Document Relates to:<br><br>ALL INDIRECT PURCHASER ACTIONS | |

## TABLE OF CONTENTS

NOTICE OF MOTION AND MOTION TO EXCLUDE ..... 1

STATEMENT OF ISSUES TO BE PRESENTED ..... 1

MEMORANDUM OF POINTS AND AUTHORITIES ..... 1

I. INTRODUCTION ..... 1

II. STANDARDS FOR EXCLUSION ..... 2

III. DR. BURTIS' RELIABILITY IS COMPROMISED BY BIAS IN HER TESTIMONIAL HISTORY ..... 3

IV. DR. BURTIS' ECONOMIC CONCLUSIONS ARE UNRELIABLE AND SHOULD BE EXCLUDED FROM THE RECORD ..... 5

- A. Dr. Burtis' Theory of Pass-Through is Unreliable As She Fails to Apply Standard Economic Methods ..... 5
- B. Dr. Burtis' Criticism of the Reduced-Form Analysis Is Unsupported by Academic or Scientific Analyses ..... 6
- C. Dr. Burtis' Criticism of the Structural Analysis of Pass-Through Is Unsupported by Academic or Scientific Analyses ..... 10
- D. Dr. Burtis' Analysis Does Not Assess Aggregate Impact Properly ..... 11
- E. Dr. Burtis' Conclusions about the Measures of the SRAM Overcharge Are Erroneous ..... 12

V. CONCLUSION ..... 13

# TABLE OF AUTHORITIES

**Federal Cases**

*Bellinder v. Microsoft Corp.*,
No. 00-C-0855, 2001 WL 1397995 (Kan. Dist. Ct. Sept. 7, 2001) .......... 5

*Daubert v. Merrell Dow Pharms., Inc.*
43 F.3d 1311 (9th Cir. 1995) .......... 10

*Daubert v. Merrell Dow Pharmaceuticals, Inc.*,
509 U.S. 579 (1993).......... 1, 2

*Gordon v. Microsoft Corp.*,
No. 00-59944, 2001 WL 366432 (Minn. Dist. Ct. Mar. 30, 2001), *review denied*, 645 N.W.2d 393 (Minn. 2002), *opinion on remand*, 2003 WL 23105552 (Minn. Dist., Ct. March 14, 2003) .......... 5

*Gordon v. Microsoft Corp.*,
No. MC 00-5994, 2003 WL 23105550 (Minn. Dist. Ct. Dec. 15, 2003).......... 11

*In re Cardizem CD Antitrust Litig.*,
200 F.R.D. 326 (E.D. Mich. 2001) .......... 12

*In re Catfish Antitrust Litig.*,
826 F.Supp. 1019 (N.D. Miss.1993).......... 13

*In re Flat Glass Antitrust Litig.*,
191 F.R.D. 472 (W.D.Pa.1999) .......... 7

*In re Graphics Processing Units Antitrust Litig.*,
253 F.R.D. 478 (N.D. Cal. 2008).......... 3

*In re Hydrogen Peroxide Antitrust Litig.*,
240 F.R.D. 163 (E.D.Pa.2007).......... 7

*In re Indus. Gas Antitrust Litig.*,
100 F.R.D. 280 (N.D. Ill. 1983).......... 7

*In re Industrial Silicon Antitrust Litig.*,
No. 95-2104, 1998 WL 1031507 (W. D. Pa. Oct. 13, 1998).......... 7

*In re Live Concert Antitrust Litig.*,
247 F.R.D. 98 (C.D. Cal. 2007).......... 7

*In re NASDAQ Market-Makers Antitrust Litig.*,
169 F.R.D. 493 (S.D.N.Y. 1996) .......... 7

*In Re SRAM Antitrust Litig.*,
2008 WL 4447592 (N.D. Cal. 2008) .......... 13

*Kennedy v. Collagen Corp.*,
161 F.3d 1226 (9th Cir. 1998) .......... 2

*Kohen v. Pacific Investment Mgt. Co., LLC*,
2009 WL 1919013 (7th Cir. July 7, 2009) ..... 12

*Kumho Tire Co. v. Carmichael*,
526 U.S. 137 (1999) ..... 2

*McPhail v. First Command Financial Planning, Inc.*,
247 F.R.D. 598 (S.D. Cal. 2007) ..... 3

*Petruzzi's IGA Supermarkets, Inc. v. Darling-Delaware Co., Inc.*,
998 F.2d 1224 (3d Cir.1993) ..... 7

*Presidio Golf Club of San Francisco, Inc. v. National Linen Supply Corp.*,
1976 WL 1359 (N.D. Cal. Dec. 30, 1976) ..... 12

*Somers v. Apple, Inc.*,
2009 WL 2137148 (N.D. Cal. 2009) ..... 3

*Weisfeld v. Sun Chemical Corp.*,
210 F.R.D. 136 (D.N.J.2002) ..... 7

**State Cases**

*Bruno v. Super Ct.*,
127 Cal.App.3d 120 (1981) ..... 12

*Comes v. Microsoft*,
696 N.W.2d 318 (Iowa 2005) ..... 5

*Howe v. Microsoft Corp.*,
656 N.W.2d 285 (North Dakota 2003) ..... 5

*In re Florida Microsoft Antitrust Litig.*,
No. 99-27340, 2002 WL 31423620 (Fla. Cir. Ct. Aug. 26, 2002) ..... 5

*In re South Dakota Microsoft Antitrust Litig.*,
657 N.W.2d 668 (South Dakota 2003) ..... 5

*Microsoft I-V Cases*,
2000-2 Trade Cases, (CCH) ¶73,013 (Cal. Sup. Ct. 2000) ..... 10, 13

*Rosack v. Volvo of America Corp.*,
131 Cal.App.3d 741 (Cal. App. Ct. May 18, 1982) ..... 12

*Sherwood v. Microsoft Corp.*,
No. 99C-3562, 2003 WL 21780975 (Tenn. Cir. Ct 2003) ..... 5, 12

**Federal Rules**

Fed.R.Evid. 702 ..... 2

**State Statutes**

Cal. Bus. & Prof. Code § 16760(d)........................................................................................ 12

**NOTICE OF MOTION AND MOTION TO EXCLUDE**

TO ALL PARTIES AND THEIR COUNSEL OF RECORD:

PLEASE TAKE NOTICE that on September 3, 2009, at 2:00 p.m., or as soon thereafter as the matter may be heard, in Courtroom 2, 4th Floor, 1301 Clay Street, Oakland, California, before the Honorable Claudia Wilken, the indirect purchaser plaintiffs will and hereby do move the Court, pursuant to Federal Rule of Evidence 702 and *Daubert v. Merrell Dow Pharmaceuticals, Inc*., 509 U.S. 579 (1993) and other precedent, for an Order excluding the expert opinion of Defendants' expert, Michelle M. Burtis, Ph.D.

This motion is based upon this Notice of Motion; the Memorandum of Points and Authorities; Indirect Purchaser Plaintiffs' Motion for Class Certification; the Declaration of Michael J. Harris, Ph.D. in Support of Indirect Purchaser Plaintiffs' Motion for Class Certification and exhibits thereto; the Declaration of Mark Dwyer, Ph.D. in Support of Indirect Purchaser Plaintiffs' Motion for Class Certification and exhibits thereto; the complete files in this consolidated action; argument of counsel; and other further matters as this Court may consider.

**STATEMENT OF ISSUES TO BE PRESENTED**

Whether the expert report of Michelle Burtis report and her related testimony should be excluded because they are unreliable as a matter of law under Federal Rule of Evidence 702 and *Daubert v. Merrell Dow Pharmaceuticals, Inc*. and the case law following that decision.

**MEMORANDUM OF POINTS AND AUTHORITIES**

## I. INTRODUCTION

Plaintiffs move to exclude the testimony of defense expert Dr. Michelle Burtis under Federal Rule of Evidence 702. Dr. Burtis' report is merely thinly disguised advocacy. She relies on no published academic source, or any standard economic methodology, for her conclusions. Her entire opinion is premised on her conclusions about purported wide variations in the forms of SRAM, channels of distribution, pricing and consumer products containing SRAM. She finds it impossible to imagine that SRAM overcharges to direct purchasers from SRAM manufacturers would

eventually be borne by indirect purchasers of SRAM, including consumers of products containing SRAM. Rather than demonstrating her conclusions through accepted economic methodology, she criticizes Plaintiffs' submissions with one argument she hopes will be devastating: the impact on indirect purchasers cannot be understood without individual analysis of each of the purchases, and its chain of distribution, for each of the millions of members of the indirect purchaser class.

Because her opinion does not reflect (and, in fact, denies) standard and accepted economic methodology, her testimony should be excluded.

## II. STANDARDS FOR EXCLUSION

Federal Rule of Evidence 702 requires the trial court to examine the sufficiency of data or studies underlying an expert's opinion. The trial court acts as a gatekeeper to the admission of expert scientific testimony, and must "ensure that any and all scientific testimony or evidence admitted is not only relevant but reliable." *Daubert v. Merrell Dow Pharmaceuticals, Inc.*, 509 U.S. 579, 579-80, 589 (1993). This two-step assessment considers whether (1) the reasoning or methodology underlying the testimony is scientifically valid (the reliability prong); and (2) whether the reasoning or methodology properly can be applied to the facts in issue (the relevancy prong). *Id.* at 592-93; *Kennedy v. Collagen Corp.*, 161 F.3d 1226, 1228 (9th Cir. 1998).

Reliable testimony must be grounded in the methods and procedures of science and signify something beyond "subjective belief or unsupported speculation." *Daubert*, 509 U.S. at 590. Factors relevant to the reliability prong include: (1) whether the theory can be and has been tested; (2) whether it has been subjected to peer review; (3) the known or potential rate of error; and (4) whether the theory or methodology employed is generally accepted in the relevant scientific community. *Daubert*, 509 U.S. at 593-94. As later confirmed in *Kumho Tire Co. v. Carmichael*, 526 U.S. 137, 141-42 (1999), "*Daubert's* list of specific factors neither necessarily nor exclusively applies to all experts or in every case. Rather the law grants a district court the same broad latitude when it decides how to determine reliability as it enjoys in respect to its ultimate reliability determination."

At the class certification stage, courts employ the Daubert analysis to determine the admissibility of expert testimony. *McPhail v. First Command Financial Planning, Inc*., 247 F.R.D. 598, 604-05 (S.D. Cal. 2007) (quoting *Dukes v. Wal-Mart, Inc.*, 474 F.3d 1214, 1227 (9th Cir. 2007)). Although this standard is "more lenient," the Court "'must ensure that the basis of the expert opinion is not so flawed that it would be inadmissible as a matter of law.'" McPhail, 247 F.R.D. at 604-05 (quoting *In re Visa Check/MasterMoney Antitrust Litig*., 280 F.3d 124, 135 (2d Cir. 2001)). Where an "expert report" amounts to "written advocacy ... akin to a supplemental brief," a motion to strike is appropriate because this evidence is not useful in evaluating whether class certification requirements have been met. *McPhail*, 247 F.R.D. at 604-05 (quoting *Fisher v. Ciba Specialty Chems. Corp*., 238 F.R.D. 273, 281 (S.D. Ala. 2006)).

## III. <u>DR. BURTIS' RELIABILITY IS COMPROMISED BY BIAS IN HER TESTIMONIAL HISTORY</u>

Dr. Burtis has entrenched and unwavering views against permitting class certification in antitrust cases.[1] In every antitrust case in which she has opined on class certification, she has testified that impact cannot be shown using common formulaic proof and that the class should not be certified. *See* Declaration of Jane Yi In Support of Motion To Exclude The Expert Opinion of Michelle M. Burtis, Ph.D. ("Yi Declaration") Ex. 1 (Deposition of Michelle Burtis ("Burtis Dep."), pp. 42-46).[2] Indeed, Dr. Burtis has never in her career evaluated a class she thought should be certified (*id.* p. 47). Nor has she ever "developed an econometric or statistical model that tested whether an overcharge for an upstream component" was reflected in the prices paid by the final consumer of the products. (*id.*, pp. 49-52).

Dr. Burtis's opinions here reflect her steadfast philosophical opposition to class certification in general. However, her methods and opinions are unreliable under the standards established by

---

[1] Although she has testified previously against certification of indirect purchaser classes in several cases: *See e.g., In re Graphics Processing Units Antitrust Litig*., 253 F.R.D. 478 (N.D. Cal. 2008); *Somers v. Apple, Inc.*, 2009 WL 2137148 (N.D. Cal. 2009) and *Smokeless Tobacco Cases I-IV*, JCCP Nos. 4250, 4258, 4259 and 4262 (San Francisco Superior Court). As far as plaintiffs are aware, her testimony was not been previously challenged under the *Daubert* standard.

[2] All further cites to "Ex." alone are cites to the Yi Declaration.

Rule 702 and *Daubert* and should be excluded. They are without academic support; she does not cite a single academic publication on which she relies for her conclusions—apart from the authoritative sources *supporting* the methods of Drs. Harris and Dwyer. In responding to Drs. Harris and Dwyer, she only criticizes the academic sources they cite or mischaracterizes their content. *See* Reply Declaration of Michael J. Harris, Ph.D. ("Harris Reply Decl.") ¶¶44, 101-07, 116-17 (Dkt. No. 795). Her analysis is not based on accepted economic principles. Instead, Dr. Burtis takes the untenable position that complex antitrust litigation can only be accomplished through analysis of individual data for each member of the proposed indirect purchaser class. Burtis Decl. ¶¶ 13-15 (Dkt. No. 725). She rejects reasonable scientific inquiry in favor of her position that individual calculations of impact and damage are acceptable methods for assessing class wide impact and proof of damages. *See* Harris Reply Decl. ¶¶3-7 (Dkt. No. 795).

In support of their motion for class certification, Plaintiffs here have presented generalized evidence on antitrust impact including qualitative economic opinions, analyses concerning the structure of the market, the homogeneity and interchangeability of the product, and the competitive nature of the distribution channels for the end-user products at issue. *See e.g.*, Declaration of Michael J. Harris, Ph.D. ("Harris Decl.") ¶¶23, 27, 39-52, 54-55, 64, 67 (Dkt. No. 780). Plaintiffs have shown that predominantly generalized evidence will be used to prove injury. Plaintiffs also have presented plausible methodologies that may be used to perform quantitative expert statistical analysis to demonstrate class-wide injury. *See e.g.*, Declaration of Mark Dwyer, Ph.D. ("Dwyer Decl.") ¶¶6-10, 36-61 (Dkt. No. 645).

Dr. Burtis challenges Plaintiffs' showing on the grounds that its experts' qualitative economic opinions regarding the structure and competitive nature of the market are unsupported or wrong; the models identified by Drs. Harris and Dwyer are inappropriate; and that variations in distribution chains, pricing, sales, products and class members preclude use of the proposed methodologies here. Because her arguments are not supported by accepted scientific methodologies or references to standard economic literature, her conclusions are unreliable and should be excluded from the record.

## IV. DR. BURTIS' ECONOMIC CONCLUSIONS ARE UNRELIABLE AND SHOULD BE EXCLUDED FROM THE RECORD

Dr. Michelle Burtis' testimony is the foundation of Defendants' challenges to Plaintiffs' ability to show impact using predominantly generalized proof. But as detailed in Plaintiffs' experts' reply declarations, Dr. Burtis's analyses are designed only to defeat class certification, are not credible and should be rejected as unreliable. *See* Harris Reply Decl. ¶¶9-11, 36-47 (Dkt. No. 795); Dwyer Reply Decl.¶¶ 2-12 (Dkt. No. 760).

The clash of the experts here is stark. Dr. Burtis takes the position that no economic model can be constructed to analyze pass through of the SRAM overcharge to indirect purchasers of products containing SRAM because there are individual variations in pricing, products, distribution channels, and types of purchasers. In contrast, Plaintiffs' experts propose generalized models, based on sound and established economic principles, to assess the impact of an SRAM overcharge as injury to class members (Dr. Harris) and to propose a model to estimate aggregate damage to class members (Dr. Dwyer). Dr. Burtis rejects any generalized model because she contends that every single individual class member must have his or her claim separately evaluated and tried to a jury in order to prove impact and the amount of damages suffered. Burtis Decl. ¶¶13-15, 18 (Dkt. No. 725).

### A. Dr. Burtis' Theory of Pass-Through is Unreliable As She Fails to Apply Standard Economic Methods

Plaintiffs' expert, Dr. Harris, relies on economic theory in rendering his opinions on impact to the class.[3] Dr. Burtis opposes his conclusions but cites no contrary academic sources refuting the

[3] *See, e.g., Microsoft I-V, J.C.C.P*. No. 4106, 2000 WL 35568182, 2002 Trade Cas. (CCH) ¶ 73,013 at 88,562 (Cal. Super. Aug. 29, 2000); *In re Florida Microsoft Antitrust Litig*., No. 99-27340, 2002 WL 31423620, at *8 (Fla. Cir. Ct. Aug. 26, 2002); *Comes v. Microsoft*, 696 N.W.2d 318, 324 (Iowa 2005); *Bellinder v. Microsoft Corp*., No. 00-C-0855, 2001 WL 1397995, at *6 (Kan. Dist. Ct. Sept. 7, 2001); Gordon v. Microsoft Corp., No. 00-59944, 2001 WL 366432, at *9 (Minn. Dist. Ct. Mar. 30, 2001), *review denied*, 645 N.W.2d 393 (Minn. 2002), *opinion on remand*, 2003 WL 23105552 (Minn. Dist., Ct. March 14, 2003) ("*Gordon I*"); "Decision and Order on Motion for Class Certification," pp. 3-4 (Oct. 2, 2002) in *In re New Mexico Indirect Purchasers Microsoft Corp. Antitrust Litig*., No. D-0101-CV-200007-1697, (N.M. Dist. Ct. Sept. 30, 2002), Request for Judicial Notice (Dkt. 645-11) ("RJN") Ex. 17; *Howe v. Microsoft Corp*., 656 N.W.2d 285, 290 (North Dakota 2003); *In re South Dakota Microsoft Antitrust Litig*., 657 N.W.2d 668, 676 (South Dakota 2003); "Memorandum and Order" in *Sherwood v. Microsoft Corp*., No. 99C-3562, 2003 WL 21780975 (Tenn. Cir. Ct), RJN Ex. 19.

opinions of Plaintiffs' expert. Dr. Burtis wrongly asserts that Dr. Harris's analysis is contradicted by the Harris & Sullivan article upon which he relies. Burtis Decl. ¶¶133-135 (Dkt. No. 725). As detailed in Dr. Harris's reply declaration, these arguments are premised on Dr. Burtis's misquotes, selective use of language taken out of context, and outright omission of pertinent information taken from the article. Harris Reply Decl. ¶¶101-07, 116-18 (Dkt. No. 795). As such her opinion is not credible.

Further, while she claims that Dr. Harris failed to adequately analyze the competitiveness of the markets for SRAM-containing products, she does not dispute that his analysis is relevant to assessing pass-through. But, although Dr. Burtis claims that Dr. Harris failed to adequately analyze competition in those markets, she concedes that she has done no analysis of, and has no opinion on, the extent of such competition. Ex. 1 (Burtis Dep., pp. 101-05). Dr. Burtis' position has no validity in challenging Dr. Harris's opinions because her testimony does not contain any citation to standard economic literature.

Her challenges to Dr. Harris' conclusions do not negate his analysis that these market issues are common to all class members. For example, Dr. Harris opines that in assessing pass through, the common market factors that would need to be analyzed include categories of resellers in the distribution chain, the degree of competition among intermediaries in the distribution channels, and pricing practices such as timing, mark up policies and impact of costs. See Harris Decl. ¶¶23, 27, 39-52, 54-55 and 64 (Dkt. No. 780). Dr. Burtis does not dispute that these factors are relevant; rather, she disputes Dr. Harris's evaluation of them and his conclusions. *See* Harris Reply Decl. ¶¶16-17, 109-119 (Dkt. No. 795).

**B. Dr. Burtis' Criticism of the Reduced-Form Analysis Is Unsupported by Academic or Scientific Analyses**

Econometric models are routinely used in antitrust cases to determine pass-through of an overcharge.[4] The "reduced-form" regression and other econometric analyses that have been

[4] Courts regularly certify antitrust classes where plaintiffs' economists propose statistical models to show that an overcharge affected all consumers on a market-wide basis. *See, e.g., In re NASDAQ*

described by Drs. Harris and Dwyer are more than sufficient to meet the threshold requirement of a "plausible methodology" of determining impact through predominantly generalized proof.[5]

Dr. Burtis' claims that the models identified by Drs. Harris and Dwyer are "fatally defective" are without merit. Dr. Burtis' primary challenge to Dr. Dwyer's methods—namely, that they "fail to take into account actual SRAM cost data" and that they "ignore entire distribution chains" are clearly wrong. The third party data collected by Plaintiffs includes SRAM component costs (*see e.g.*, Harris Decl. ¶71 (Dkt. No. 780)), and Dr. Dwyer's declaration expressly states that the "data provided by the OEMs specify *SRAM cost components themselves, and allow for a further statistical test, precisely, whether the SRAM cost pass-through differs from the overall BoM (i.e., component cost) pass-through rate.*" Dwyer Decl. ¶38 (Dkt. No. 645) (emphasis added). Dr. Dwyer also testified in his deposition of his intent to use SRAM component cost in his reduced form analysis.[6] Despite these unequivocal and repeated statements, Dr. Burtis testified in her deposition that she did not understand that Dr. Dwyer intended to use SRAM cost in his analysis. Ex. 1 (Burtis Dep., pp. 210-11).

Given her miscomprehension of, or apparent failure to read, Dr. Dwyer's declaration and deposition, it is clear that Dr. Burtis' arguments are based upon false assumptions as to how Dr. Dwyer will use the data being collected. Her opinions on this point should be excluded on that basis

---

*Market-Makers Antitrust Litig.*, 169 F.R.D. 493, 521-22 (S.D.N.Y. 1996); *In re Indus. Gas Antitrust Litig.*, 100 F.R.D. 280, 306 (N.D. Ill. 1983); *Relafen*, 221 F.R.D. at 275.

[5] *In re Industrial Silicon Antitrust Litig.*, No. 95-2104, 1998 WL 1031507, at *1 (W. D. Pa. Oct. 13, 1998) (a price-fixing case where court held that "multiple regression analysis was a mainstream tool in economic study and an accepted method of determining damages in antitrust litigation"). Accord, *In re Live Concert Antitrust Litig.*, 247 F.R.D. 98, 146 (C.D. Cal. 2007) ("Regression analysis is a well-recognized tool in determining antitrust damages."); *Petruzzi's IGA Supermarkets, Inc. v. Darling-Delaware Co., Inc.*, 998 F.2d 1224, 1237-39 (3d Cir.1993) (admitting multiple regression analysis for use in calculating antitrust damages); *In re Hydrogen Peroxide Antitrust Litig.*, 240 F.R.D. 163, 175 (E.D.Pa.2007) ("when used properly multiple regression analysis is one of the mainstream tools in economic study and it is an accepted method of determining damages in antitrust litigation," citing *In re Flat Glass Antitrust Litig.*, 191 F.R.D. 472, 486 (W.D.Pa.1999)); *Weisfeld v. Sun Chemical Corp.*, 210 F.R.D. 136, 143 (D.N.J.2002) (observing that courts have "recognized the validity" of the regression analysis method for demonstrating class-wide impact).

[6] *See* Ex. 2 (Dwyer Dep., p. 73, 121, 162) (explaining how use of SRAM component cost data would account for possible absorption of overcharges in the intermediate distribution levels; obtaining SRAM component cost data; and that "component cost is a factor in the regression," respectively).

alone. Most importantly, Dr. Burtis admitted at her deposition that she did not herself "make any effort to generate any reduced form regression analyses" based on products and data in this case to test her opinion that the analyses Dr. Dwyer performed demonstrated false positives on pass-through. Ex. 1 (Burtis Dep., p. 235). Her failure to do so is telling and is evidence of the unreliability of her conclusions. Had she attempted to prove the critical point she makes by demonstrating scientifically the failure of Dr. Dwyer's formula, her opinion might carry weight. As it stands, she has criticized Dr. Dwyer's conclusions without substantiating her arguments in accepted methodologies.

Ultimately, the unreliability of Dr. Burtis' testimony is her issue with the use of regression models in class cases in general. Dr. Burtis has never developed an econometric or statistical model that tested whether a price increase for an upstream component is reflected in the prices paid by the final consumer of the product. Ex.1 (Burtis Dep., pp 49-50). In fact, Dr. Burtis could not identify any circumstances under which a reduced-form analysis could reliably be used to measure not only pass-through, but any economic issue. *Id*. at 186-88). In sum, there is no reduced-form model that would ever satisfy Dr. Burtis because she believes that the use of econometrics to assess impact and damages on a class-wide basis in antitrust cases is unreliable. *See e.g*., Ex. 1 (Burtis Dep., pp 186-87, 189) (Dr. Burtis questioning whether reduce-form regression analysis is generally accepted by economists and unable to identify any circumstances under which it could reliably estimate anything)). She thus ignores the innumerable academic studies that found pass through despite the absence of analysis at the individual transactional level.[7]

Instead, Dr. Burtis is of the view that determination of pass-through requires an individuated forensic accounting exercise to trace each overcharge on a chip-by-chip and firm-by-firm basis through the chain of distribution to the end-user.[8] This view, however, is contrary to well-settled

---

[7] *See* n.9, *infra*.

[8] *See* Burtis Decl. ¶18 (Plaintiffs must show that "it is possible to link the overcharge on a particular SRAM to the price of an end-use product purchased by a proposed class member"), ¶35 ("it is necessary to trace the SRAM and the overcharge on the SRAM though various distribution chains from Defendants to proposed class members . . ."); ¶175 (criticizing Plaintiffs' experts for "not proposing a model for each individual proposed class member").

economic principles and academic sources that recognize that econometrics are useful and reliable for assessing impact and damages to class members. *See* Harris Reply Decl. ¶¶47, 51, 54-55 (Dkt. No. 795). Regression analyses are routinely and widely used by academics and economists to calculate pass through rates in a variety of industries.[9]

Drs. Harris and Dwyer cite multiple academic sources supporting their pass-through related analyses. *See* Harris Decl. ¶¶60, 63, 64 ns. 61-63, 65 (citing academic authorities analyzing methodologies pertaining to "tax incidence rates" and pass-through rates) (Dkt. No. 780); Dwyer Decl. ¶¶38, ns. 7-8, ¶45 n.10 (citing academic authorities reviewing the "Lagrange" multiplier test to be used to in analyzing SRAM component cost, regression methods focusing on capturing the effects of product attributes on price and other pass-through related analyses.) (Dkt. No. 645). *See also* Harris Reply Decl. ¶¶47, 51, 54-55 (Dkt. No. 795).

And Burtis' view has been firmly rejected by other courts. Defense arguments that impact on an indirect purchaser cannot be considered collectively because of the multiple factual variations affecting the end-user's purchase of the product containing the price-fixed commodity were considered and rejected during certification of a consumer class in the California *Microsoft* litigation. In that action Microsoft was accused of using its monopoly power to set unfair pricing for operating systems and software sold to consumers. Like Dr. Burtis here, Microsoft's expert argued at

[9] *See, e.g.*, Ex. 3 (L.J. Bachmeier, and J.M. Griffin, 2003, New Evidence on Asymmetric Gasoline Price Responses, Review of Economics and Statistics, Vol. 85(3)); Ex. 4 (R.W. Bacon, 1991, Rockets and Feathers: the Asymmetric Speed of Adjustment of UK Retail Gasoline Prices to Cost Changes, Energy Economics, Vol. 13); Ex. 5 (L. Beetendorf, S.A.Van Der Geest, and M. Varkevisser, 2003, Price Asymmetries in the Dutch Gasoline Market, Energy Economics, Vol. 25); Ex. 6 (Timothy Besley and Harvey Rosen, June 1999, Sales Taxes and Prices: An Empirical Analysis, National Tax Journal, Vol. 52, pp. 157-78); Ex. 7 (John F. Due, December 1954, The Effect of the 1954 Reduction in Federal Excise Taxes on the List Prices of Electrical Appliances, National Tax Journal, Vol. 39, pp. 539-40); Ex. 8 (Jeffrey E. Harris, 1987, The 1983 Increase in the Federal Cigarette Excise Tax, in Tax Policy and the Economy, Vol. 1, Lawrence H. Summers, ed., MIT Press: Cambridge, pp. 87-1l2); Ex. 9 (G. Kirchgassner, and K. Kubler, 1992, Symmetric or Asymmetric Price Adjustments, Energy Economics, Vol. 14); Ex. 10 (Oswald Brownlee and George Perry, 1967, The Effects of the 1965 Federal Excise Tax Reduction on Prices, National Tax Journal, Vol. 20(3), pp. 235-49); Ex. 11 (Jim Poterba, 1996, Retail Price Reactions to Changes in State and Local Sales Taxes, National Tax Journal, Vol. 49(2), pp. 165-76); Ex. 12 (Nancy D. Sidhu, The Effects of Changes in Sales Tax Rates on Retail Prices, in Proceedings of the Sixty-Fourth Annual Conference on Taxation, National Tax Association-Tax Institute of America: Columbus, pp. 720-33).

class certification that diversity in products, pricing and marketing practices required individual analysis of price impact and damage and made class certification impossible. Rejecting this argument, and certifying an indirect purchaser class, the Court said: "Such a broad statement proves too much. If true, it would invalidate the entire study of microeconomics." *Microsoft I-V Case*s, 2000-2 Trade Cases, 88,561 (Cal. Sup. Ct. 2000).

### C. Dr. Burtis' Criticism of the Structural Analysis of Pass-Through Is Unsupported by Academic or Scientific Analyses

Dr. Burtis' challenge to Dr. Dwyer's intended use of a structural model to determine impact and damages to the class claims that it "assumes pass-through." Burtis Decl. ¶¶170 (Dkt. No. 725). The structural regression model, however, was developed by economists in an academic, non-litigation setting, and uses a model of demand that has been employed extensively in economics. *See* Dwyer Decl. ¶¶50, 53 ns.16-17, ¶¶59-61, ns. 21-22 (citing academic sources supporting the structural model and "discrete choice" model, methods of eliminating sample bias, and other scientific methods associated with use of the structural model) (Dkt. No. 645); *see also* Dwyer Reply Decl. ¶37 (Dkt. No. 760). As such, it may properly be utilized here.[10] Dr. Burtis's personal view, not generally accepted, is that it is not a reliable method of estimating class wide impact. Burtis Decl. ¶¶ 169 – 183 (Dkt. No. 725).

Dr. Burtis' further claim that the structural model "assumes pass-through" is also wrong. The structural model derives pass-through from measures of the degree of "own price elasticity" for end-use products, the structure of competition among product suppliers, and the degree to which cost shocks are common across end-use products. The academic work cited by Dr. Dwyer in his initial

---

[10] *See Daubert v. Merrell Dow Pharms., Inc*. 43 F.3d 1311, 1317 (9th Cir. 1995) ("[o]ne very significant fact to be considered is whether the experts are proposing to testify about matters growing naturally and directly out of research…conducted independent of the litigation"). Further, the reliability of expert testimony is demonstrated where "the proffered conclusions have been subjected to normal scientific scrutiny through peer review and publication." *Id*. at 1318. Here, the structural model Dr. Dwyer used to estimate impact is not founded on speculation and subjective presumption, but on the tenants of an objective and reputable publication which further establishes its reliability.

declaration reports significantly varying pass-through rates depending upon the configuration of these factors. Dwyer Reply Decl. ¶38 (Dkt. No. 760).

> Numerous academic studies have established that competition within intermediate markets results in pass through.[11] Indeed, Dr. Burtis has conceded in other cases that it is not always necessary to examine the intermediaries in the chain of distribution, and that one may properly focus on retail sales to consumers. *In the Smokeless Tobacco Cases I-IV*, where the court certified a class of indirect purchasers of smokeless tobacco (*see* RJN, Ex. 11 (Dkt. No. 645-21)), Dr. Burtis testified as follows: [T]he available information that I had had to do with retail prices. And when I looked at those retail prices, what I saw was that . . . the prices to the wholesalers, when they changed . . ., those changes were not always being reflected in the retail prices.
>
> "Whether or not that's because the wholesalers weren't passing on a price increase to the retailers or whether the retailers weren't passing it on, even though they had had a cost increase, I don't know.
>
> "I thought what was relevant here was the price that the proposed class members are being charged. And I noted that . . . changes in UST's list price were not always being mirrored at that level." *See* Declaration of Christopher T. Micheletti In Support Of Motion For Class Certification Ex. 96 (Burtis Smokeless Dep., p. 62) (Dkt. No. 756-11).

Dr. Burtis further opined in that case, in contradiction to her insistence here that intermediate levels must be scrutinized, that it was unnecessary to examine competition in the wholesale or retail markets given the end-user consumer retail sales data she possessed. *Id*. at 61, 63.

### D. Dr. Burtis' Analysis Does Not Assess Aggregate Impact Properly

Dr. Burtis criticizes Plaintiffs' proposed methods of assessing impact is that they use average data that can yield false-positive pass-through. Burtis Decl. ¶¶175-183 (Dkt. No. 725). This criticism of regression analyses has been repeatedly rejected. The court in *Gordon v. Microsoft Corp*., No. MC 00-5994, 2003 WL 23105550, at *3 (Minn. Dist. Ct. Dec. 15, 2003) ("*Gordon II*") explained this point:

> "The damages question for trial is presumably not about whether a specific Microsoft price increase found its way through the distribution chain and resulted in an increase in the price paid by a specific class member. Rather, the question is how a series of Microsoft price increases, and/or a series of Microsoft failures to reduce prices, impacted the price each consumer paid. The question of what would have happened but for Microsofts monopoly overcharge is a hypothetical, and a hypothetical question generally cannot be answered by historical data about

---

[11] *See, e.g.*, Ex. 13 (Kosicki, George and Miles B. Cahill, 2006, Economics of Cost Pass Through and Damages in Indirect-Purchaser Antitrust Cases, Antitrust Bulletin Vo. 51(3), pp. 599-630).

> what actually happened, but must often be answered by general principles about what generally tends to happen. Thus, average pass through rates appear reasonable and even necessary to prove damages here."

As the court in *Gordon II* noted, this view is consistent with federal authorities applying Rule 23. *See, e.g., In re Cardizem CD Antitrust Litig.*, 200 F.R.D. 326, 345 (E.D. Mich. 2001); NASDAQ, 169 F.R.D. at 523; *Presidio Golf Club of San Francisco, Inc. v. National Linen Supply Corp.*, No. C 71-431 SW, 1976 WL 1359 at *5 (N.D. Cal. Dec. 30, 1976). It is also supported by other state Microsoft cases. *See, e.g., Microsoft I-V Cases*, 2000-2 Trade Cas. (CCH), *South Dakota Microsoft*, 657 N.W.2d at 674; *Sherwood*, 2003 WL 21780975, at *18.

Dr. Burtis complains that, within the averages found by Dr. Dwyer, it is possible that there are individual class members who were not impacted, and that the models cannot be used to determine damages of individual class members. Even assuming there may be an individual class member who was not impacted, "[t]he fact that certain members of the class may not have been injured at all does not defeat class certification." *Rosack v. Volvo of America Corp.*, 131 Cal.App.3d 741, 754 (Cal. App. Ct. May 18, 1982). Accord, *Kohen v. Pacific Investment Mgt. Co., LLC*, 2009 WL 1919013 (7th Cir. July 7, 2009). There is no need to determine the damages of an individual class member because, under the antitrust laws at issue, damages may be calculated on an aggregate basis. *See e.g.*, Cal. Bus. & Prof. Code § 16760(d) (aggregate calculation of damages under Cartwright Act expressly permitted); *Bruno v. Super Ct.*, 127 Cal.App.3d 120, 129 n.4 (1981) ("In many cases, such an aggregate calculation will be far more accurate than summing all individual claims.").

**E. Dr. Burtis' Conclusions about the Measures of the SRAM Overcharge Are Erroneous**

Dr. Burtis criticizes Plaintiffs' experts' proposed methodologies for determining damages on a class wide basis as incomplete and dependent upon incorrect assumptions. Burtis Decl. ¶¶ 184-188 (Dkt. No. 725). With respect to the calculation of damages, plaintiffs' experts explained several mainstream methodologies that could be used to compute damages on a common basis. *See* Harris Decl. ¶¶69-83 (Dkt. No. 780); Dwyer Decl. ¶¶16-64 (Dkt. No. 645); *see also Microsoft I-V Cases*,

2000 WL 35568182, 2000-2 Trade Cas. (CCH) ¶ 73,013 at 88,558 (quoting *In re Catfish Antitrust Litig.*, 826 F.Supp. 1019, 1042 (N.D. Miss.1993)). This Court has already found that the similar methods of calculating aggregate damages proposed by the direct purchaser plaintiffs' expert were sufficient. *See In Re SRAM Antitrust Litig.*, 2008 WL 4447592 at **5-6 (N.D.Cal. Sept. 29, 2008). Dr. Burtis' doubts about Plaintiffs' experts' models are not substantiated at this time and should be excluded from the record.

## V. CONCLUSION

Plaintiffs have demonstrated that Dr. Burtis' testimony is not based on generally accepted economic principles, and is so unreliable in so many respects as to be inadmissible under Rule 702. It should be excluded.

Dated: July 30, 2009

Respectfully submitted,

*/s/ Craig C. Corbitt*
Craig C. Corbitt

FRANCIS O. SCARPULLA (41059)
CRAIG C. CORBITT (83251)
CHRISTOPHER T. MICHELETTI (136446)
QIANWEI FU (242669)
JANE YI (257893)
ZELLE HOFMANN VOELBEL & MASON LLP
44 Montgomery Street, Suite 3400
San Francisco, CA 94104
Telephone: (415) 693-0700
Facsimile: (415) 693-0770
fscarpulla@zelle.com
ccorbitt@zelle.com

*Interim Lead and Liaison Counsel for Indirect-Purchaser Class*

#3218317v1