# EXHIBIT 1

UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF CALIFORNIA
OAKLAND DIVISION
--oOo--

| | |
|---|---|
| IN RE: STATIC RANDOM ACCESS MEMORY (SRAM) ANTITRUST LITIGATION | ) Master Docket File: M:07-CV-01819-CW |
| This Document Relates to: | ) |
| INDIRECT PURCHASER ACTIONS | ) MDL No. 1819 |

*** HIGHLY CONFIDENTIAL - PURSUANT TO PROTECTIVE ORDER***

DEPOSITION OF
MICHELLE M. BURTIS, Ph.D.

Friday, June 5, 2009

REPORTED BY: SHERRI STARR, CSR# 10245 (01-419881)

Page 42

Q. Okay. And does Exhibit 6 list all the cases in which you have provided an opinion as a testifying expert on whether a class should be certified?
MR. RYAN: Objection. Vague and ambiguous as to the term "testifying expert." It may have different meanings in different jurisdictions.
THE WITNESS: It does not, of course, list this case. And I also filed a report in a natural gas case recently where that report related to class certification.
MR. MICHELETTI: Q. When did you file that report?
A. May 15th, I think. It's now June, right?
Q. Already. What is the name of that case?
A. I think it's In Re: Western Natural Gas Litigation or something like that.
Q. What court is that pending in? Is it federal court or state court?
A. I think it's federal court in Las Vegas.
Q. And that is a class case?
A. Yes.
Q. And you were retained by defendants in that case?
A. Yes.
Q. With that addition, does Exhibit 6 and the

Page 43

natural gas case identify all of the cases in which you've provided an opinion on class certification?
MR. RYAN: Objection. Vague and ambiguous as to the term "opinion." It's a different question from the one asked earlier.
THE WITNESS: Do you mean provided a report?
MR. MICHELETTI: Q. Well, you provide opinions in reports, do you not?
MR. RYAN: Objection. Compound.
THE WITNESS: I'm just asking if that's what you mean.
MR. MICHELETTI: Q. Well, I said "opinion," but it doesn't really matter. Answer it in whichever way you feel comfortable.
A. This would include all the cases in which I've filed a report that relate to class certification.
Q. And in each of those reports, you have expressed opinions regarding class certification; is that correct?
A. In each of the reports related to class certification, yes.
Q. The natural gas case plus all the cases listed in your CV also identify all cases in which you have expressed an opinion on whether or not impact or injury to class members could be determined using common versus

Page 44

individualized proof; is that right?
MR. RYAN: Objection. Vague and ambiguous, compound.
THE WITNESS: Yeah, I'm sorry, are you asking me whether the reports listed on my CV that relate to class certification deal with impact?
MR. MICHELETTI: Q. I'm asking you that to the extent that any of them -- the extent you have expressed opinions on impact and whether it can be assessed using common formulaic proof, Exhibit 1 and the natural gas case are all the cases in which you have so expressed an opinion to the extent you did so?
MR. RYAN: Objection. Vague and ambiguous, mischaracterizes the witness's testimony. The witness mentioned this case as well.
THE WITNESS: And so my CV lists all the reports in which I have expressed an opinion related to whether or not impact on a class can be determined on a class-wide basis.
MR. MICHELETTI: Q. Okay. In addition -- and then there's also the natural gas case?
A. I'm sorry, and this case, yes.
Q. And this case.
And all my questions right now I'm setting aside the opinions you're giving in this case. I'm

Page 45

looking historically to what you've done prior to this case; do you understand that?
A. Yes, I do.
Q. In each instance where you have opined on the issue of class certification, it is true, isn't it, that you have opined that the class should not be certified?
A. That's correct.
Q. And in each instance you have opined that the class did not meet the requirements for class certification that you were asked to address?
MR. RYAN: Objection. Vague.
THE WITNESS: I don't understand that question.
MR. MICHELETTI: Q. In each instance where you have opined on class certification, you opined that the class did not meet the legal or economic requirements for class certification; isn't that right?
MR. RYAN: Objection. Vague, compound.
THE WITNESS: Yeah, I don't know that I've ever tried to do any kind of legal analysis.
MR. MICHELETTI: Q. Well, you understand that there are legal requirements for class certification, correct?
MR. RYAN: Objection. Calls for a legal conclusion.

Page 46

THE WITNESS: Well, I understand that we're all involved in a legal proceeding. I understand that.
MR. MICHELETTI: Q. And some of the requirements that you're addressing today are guided by the legal requirements for class certification; isn't that correct?
A. I guess it would help me if you gave me an example of what it is you're calling a legal requirement.
Q. A legal requirement that you have to show impact using common formulaic proof.
A. Certainly, that is something that I thought about as an economist.
Q. Okay. And each time you have expressed an opinion on that topic, you have opined that that requirement has not been met?
A. That's correct.
Q. Have you ever evaluated a class that you thought should be certified?
MR. RYAN: Objection to the extent it calls for confidential opinions that the witness is not permitted to discuss.
MR. MICHELETTI: Q. It's a "yes" or "no" question.
MR. RYAN: And it's overbroad.

Page 47

THE WITNESS: I'm sorry, will you repeat it.
MR. MICHELETTI: Could you read the question back, please.
(The record was read as follows:
"Question: Have you ever evaluated a class that you thought should be certified?")
THE WITNESS: I don't recall ever evaluating a class that I thought should be certified.
MR. MICHELETTI: We've been going for about an hour and 20. Is a break okay?
THE WITNESS: Sure.
(Recess was taken.)
MR. MICHELETTI: Q. Dr. Burtis, do you agree that at its foundation, this case is about whether class members had paid more for their products that contain SRAM as a result of the alleged SRAM overcharges imposed by the defendants?
MR. RYAN: Objection. Calls for a legal conclusion, vague, ambiguous.
THE WITNESS: Actually, can you read it back.
(The record was read as follows:
"Question: Dr. Burtis, do you agree that at its foundation, this case is about whether class members had paid more for their products that contain SRAM as a result of the alleged SRAM overcharges imposed by the defendants?")
THE WITNESS: So for me, that's not quite the issue. The issue is whether or not there is some class-wide method that could be used to determine whether or not proposed class members were impacted and to the extent they were, measure the amount.
MR. MICHELETTI: Q. Okay. So in terms of -- you would agree that that's the ultimate question in the case, but your role in the case is to assess whether or not class members paid more can be determined using accepted economic principles?
MR. RYAN: Objection. Mischaracterizes the testimony, vague, ambiguous, calls for a legal conclusion, compound.
THE WITNESS: So, you know, all I can do is tell you about what I am doing. And in terms of what some other overarching issue is in this case, I really don't have any basis to answer that question.
MR. MICHELETTI: Q. Okay. Outside of this

Page 48 (continuation above: lines 1–7 of Page 48 complete the read-back; line 8 onward as above)

Page 49

litigation, have you ever developed an econometric or statistical model that tested whether an overcharge for an upstream component is reflected in the prices paid by the final consumer of a product or service?
MR. RYAN: Objection. Vague, ambiguous, overbroad.
THE WITNESS: I cannot think of an example of doing that. I certainly have not done that for a class like this case.
MR. MICHELETTI: Q. What do you mean by that?
A. Well, I have not done it for a group of purchasers and products like the one that we see in this case.
Q. And when you say "like the one that we see in this case," what do you mean?
A. Oh, I mean that there are many diverse, different products. So I have not done that.
Q. Okay. But have you done it for a situation involving products that are not diverse, such as you claim this one is?
A. And the question is whether I've developed a model to -- I'm sorry, will you say it again.
Q. Have you ever developed an econometric or statistical model that tested whether an overcharge for an upstream component is reflected in the prices paid by

Page 50

the final consumer of the product?
MR. RYAN: Objection. Vague and ambiguous, compound.
THE WITNESS: As I sit here right now, I cannot think of an example of doing that kind of analysis.
MR. MICHELETTI: Q. You didn't do that in Graphics?
A. No.
Q. Was that a component case?
A. Yes, well, it was at least partially a component case.
Q. In your view, does pass-through of an overcharge ever occur?
MR. RYAN: Objection. Vague, ambiguous, overbroad, incomplete hypothetical.
THE WITNESS: It's pretty broad.
MR. MICHELETTI: Q. Can you answer the question?
A. Well, I can't answer that question. I don't know, can it ever occur? Is it possible that it occurs to one individual purchaser for a particular product? Sure, it's possible.
Q. It's possible. I mean, you would have to concede that pass-through of overcharges does occur in

Page 51

some context, does it not?
MR. RYAN: Objection. Vague, overbroad, incomplete hypothetical.
THE WITNESS: I can only, I think, repeat what I said. It's certainly possible for that to happen. But what I'm thinking of may be different than your question. Your question doesn't have anything to do with whether or not there's a class, for example.
MR. MICHELETTI: Q. Correct.
A. So if you're asking me whether an overcharge can be passed through from one company to another, just looking at two transactions, I would say yes, that's possible.
Q. Can you -- are you aware of any historical antitrust cases where you believe or understand that pass-through of overcharges at the price-fixing level or monopolistic-overcharge level have been passed through to end users?
MR. RYAN: Objection. Vague, overbroad, compound, lack of foundation.
THE WITNESS: You know, I don't have one in mind.
MR. MICHELETTI: Q. You can't think of any?
A. Not sitting here. I mean, I haven't thought about that.

Page 52

Q. Well, as we go through the day, if you can think of any, please let me know. Will you do that?
A. So you want to know antitrust cases and -- what is it? What is the -- an overcharge has been found by a court to have been passed through? Are you asking me for court decisions?
Q. No, where you believe it occurred.
A. Where I believe it occurred?
Q. Yes.
A. Based on my own analysis?
Q. Based upon any information.
MR. SCARBOROUGH: It lacks foundation, calls for speculation.
MR. RYAN: Join.
MR. MICHELETTI: Q. Will you let me know if you can think of any?
A. Sure.
Q. Okay. In your opinion, your economic opinion, what specific conditions need to be present for pass-through of an overcharge at the manufacturer level to be passed through to an end user?
MR. RYAN: Objection. Vague, overbroad, incomplete hypothetical.
THE WITNESS: Well, definitionally, what a condition is that the overcharge at the manufacturing

Page 53

level is an increase in cost to the next level of distribution and that next level of distribution then increases its price to the customer. That's what pass-through is, that the consumer or the end user is paying a price that is higher than they otherwise would have paid.
MR. MICHELETTI: Q. What if it's not an increase in cost but a price-fixing conspiracy that prevents the price from dropping, what conditions need to be present for pass-through to occur in that context?
MR. RYAN: Objection. Vague and ambiguous, calls for a legal conclusion, incomplete hypothetical.
THE WITNESS: Again, just definitionally, I think my previous answer fits your question. The issue is what the price would have been to the end user with and without the overcharge.
MR. MICHELETTI: Q. Well, in the situation where prices are maintained as opposed to increased, artificially, anticompetitively maintained at a certain level, there's no increase that is passed on to the distributor in that context, right?
MR. RYAN: Objection. Vague and ambiguous, compound, calls for a legal conclusion, incomplete hypothetical.
THE WITNESS: Again, I think that you just

Page 98

THE WITNESS: It's a very difficult question because, again, you seem to be assuming away everything below SRAM, and I don't know how to do that. I don't know how to answer that question.
If you have differentiated SRAM, it's probably because you have differentiated uses of it, which means you have differentiated end-use products, and that means you probably have a differentiated distribution structure in the middle. And so for all those -- you know, it's very hard to segment those three things and to talk about them one by one.
MR. MICHELETTI: Q. All right. So what you're saying, then, is that with regard to the differentiated nature of SRAM, to the extent it serves as an impediment to pass-through in a general sense, it is connected to and because of these complex and varied distribution paths and the breadth of the end-use products?
MR. RYAN: Objection. Same objections as before and mischaracterizes the testimony.
Can we have the question read back.
(The record was read as follows:
"Question: All right. So what you're saying, then, is that

Page 99

with regard to the differentiated nature of SRAM, to the extent it serves as an impediment to pass-through in a general sense, it is connected to and because of these complex and varied distribution paths and the breadth of the end-use products?")
THE WITNESS: So I think I would probably repeat my answer. I can't think of a reason. I don't understand how you can have these very differentiated SRAM without having the rest of it, so it's hard for me to answer your question, you know, just isolating the effect of differentiated SRAM.
MR. MICHELETTI: Q. Any answer you give on that topic is going to be related to the other two categories is what you're saying?
MR. RYAN: Objection. Mischaracterizes the testimony.
THE WITNESS: I don't know how to answer the question the way that it's posed. I think that you want me to somehow assume away the rest of the distribution in the end-use products, but I don't know how to do that because remember we're talking about pass-through here

Page 100

and it goes all the way from SRAM to the end-use products. And the premise of the question is differentiated SRAM, why are there differentiated SRAM if they're not differentiated end-use products?
MR. MICHELETTI: Q. Okay. One of the views that you express in your declaration is that Dr. Harris has failed to adequately analyze whether or not the product markets that are at issue here are highly competitive or competitive in a sense; is that right?
MR. RYAN: What page are you referring to?
THE WITNESS: I criticized Dr. Harris for drawing a conclusion without having a basis for the conclusion.
MR. MICHELETTI: Q. Okay. Do you -- and in fact, Dr. Harris opines that there is widespread and intense competition across the product markets that are at issue in this case, does he not?
A. I don't remember exactly the words that he used, but I think that he is drawing the conclusion of some sort of competition. He admits that he is not defining any product markets so I think it's a fairly nebulous conclusion.
Q. Do you dispute that the market for PDAs and Smartphones is a highly competitive market?
MR. RYAN: Objection. Vague and ambiguous,

Page 101

"highly competitive."
THE WITNESS: That's right. And I think those words should, if you're going to use them, be defined. Especially the way that Dr. Harris uses them and his attempt to draw conclusions based on them, and I don't think that he has really defined them.
MR. MICHELETTI: Q. Well, I'm asking you. What's your opinion?
A. I would ask you to define them.
Q. Define what, "highly competitive"?
A. "Highly competitive," how are you using it?
Q. The way you use it in the English language. Can you answer the question?
MR. RYAN: Objection. Vague and ambiguous, argumentative.
If you have a dictionary you'd like to read her, go ahead, please.
THE WITNESS: The way that you use it in the English language is -- or at least can be different from the way an economist would use those terms.
MR. MICHELETTI: Q. Okay. Well, do you have a definition of "highly competitive" as an economist?
MR. RYAN: Objection. Vague and ambiguous.
THE WITNESS: There can be many different definitions. I think that's my point here.

MR. MICHELETTI: Q. Do you have one?
A. There are several.
Q. What is your definition of "highly competitive"?
A. I don't have a single one.
Q. Okay. How many do you have?
A. I don't know. I could sit here and think about that.
Q. What's the first one that pops into your head?
A. There is certainly a definition of competition in economics that relates to a very particular economic model where there are certain assumptions underlying that model, and as a result of those assumptions, there are results that come from the model, or implications of the model. That's a definition I think economists use fairly frequently.
There are other ways that economists model competition, and so we could think about those models and implications of the models and the assumptions underlying them.
Q. Let me ask you again.
Do you have an opinion as to whether or not the market for PDAs and Smartphones is a competitive market? How's that?
MR. RYAN: Objection. Vague and ambiguous.



THE WITNESS: I would answer the same way.
MR. MICHELETTI: Q. You would not be able to provide me with an opinion?
A. Well, I think --
MR. RYAN: Objection. Vague and ambiguous, it mischaracterizes the testimony.
THE WITNESS: And I need to understand how that word is being used in that question.
MR. MICHELETTI: Q. Well, it's not perfect competition, which I think is probably what you were describing a moment ago. Okay, it's not that, it's something less than that, and it's a competitive market.
A. Well, just saying that, really there's no economic meaning to that. I think what you're trying to communicate is that there are suppliers of Smartphones that attempt to make sales to consumers and perhaps they attempt to make sales to the same consumers. And that's about as far as that definition goes, or as that term goes the way that you've used it.
Q. Well, let me ask it a different way since you can't seem to answer it the way I've asked it.
MR. RYAN: Objection. Argumentative.
MR. MICHELETTI: Q. How would you characterize the competition in the Smartphone and PDA market?



MR. RYAN: Objection. Vague and ambiguous, overbroad.
MR. SCARBOROUGH: Move to strike the preface.
THE WITNESS: I have not done an analysis of the Smartphone market, if there is such a market, and so I can't sit here and characterize the competition in that market.
MR. MICHELETTI: Q. Would your answer be the same for the market for servers?
MR. RYAN: Objection. Assumes that there is a particular market and it's been defined, vague and ambiguous.
THE WITNESS: Can you read the prior question.
MR. MICHELETTI: Q. Let me start over.
How would you characterize competition in the server market?
MR. RYAN: Objection. Vague and ambiguous.
THE WITNESS: Again, I think I would say that I don't know that that is a market. And I have not done -- don't have in my report an analysis of a server market that would allow me to answer that question.
MR. MICHELETTI: Q. How would you characterize competition in the router and switches markets?
MR. RYAN: Same objections.



THE WITNESS: I have not -- A, I don't know that -- I'm not even sure if your question is presuming there's one or two of those markets. In any event, there's no evidence that -- whether that is one or two markets or some other number of markets. And I haven't done an analysis of those firms that make those products in order to answer that question.
MR. MICHELETTI: Q. And would your answers be the same with regard to voice-over-Internet protocol systems, modems and firewalls, and mainframes?
MR. RYAN: Same objections. Compound.
MR. MICHELETTI: Q. I.e., you haven't done an analysis to determine whether or not those are, in fact, markets, and, B, you have done no analysis of that competitive environment in those purported markets; is that correct?
THE WITNESS: I have done no analysis to determine whether or not those are or are not markets. And sorry, what was the second part that question?
MR. MICHELETTI: Q. And you have done no analysis of the competitive state of each of those markets?
A. That's correct, there's no analysis like that in my report.
THE REPORTER: Mr. Micheletti, can we go off

Page 186

overbroad.
THE WITNESS: Are you asking your question about litigation?
MR. MICHELETTI: Q. No, generally.
A. There are academic articles that have nothing to do with class certification or whether the model is applicable to classes of purchasers or whether or not the model can be used to determine impact. But there are models -- or I'm sorry, there are articles that set out reduced-form models.
Q. There are academic articles that set out reduced-form regression models that can be used to determine pass-through?
A. Not in this case and not for the purposes here. I'm trying to be clear that you're asking me a question about, I think, economic articles or economists using reduced-form models for pass-through. There are such instances, but they are not used for the purposes like Dr. Dwyer is attempting to use them here.
Q. Well, I'm trying to separate it from this particular case. I'm just talking generally about reduced-form regression analysis and whether or not it's a generally accepted method of measuring pass-through that is used by economists.
MR. RYAN: Objection. Vague, ambiguous,

Page 187

overbroad, incomprehensible, irrelevant.
THE WITNESS: And I'm not sure the answer to that question. The articles that I'm thinking of, they are relating to reduced form models. I don't know that they're relating to determining or measuring pass-through.
MR. MICHELETTI: Q. So you would at least agree that the use of reduced-form models by economists is well-accepted?
MR. RYAN: Objection. Vague, overbroad.
THE WITNESS: You know, it is done. It is also criticized. So I wouldn't characterize it as well-accepted, as though everybody thinks it's a great thing.
MR. MICHELETTI: Q. Well, do you think it's a great thing?
A. Well, it depends on what it is you're using it for.
Q. There are circumstances in your view under which you use a reduced-form model to measure some economic issue is acceptable; you would agree with that?
A. There are certain circumstances that you could use a reduced-form model.
Q. Can you identify what you have in mind.
A. You know, I can't think of one right now.

Page 188

Q. So you don't challenge the reduced-form regression method generally, only whether it can be reliably used in this particular case; is that correct?
MR. RYAN: Objection. Vague, compound, mischaracterizes the testimony.
Please read the question back.
(The record was read as follows:
"Question: So you don't challenge the reduced-form regression method generally, only whether it can be reliably used in this particular case; is that correct?")
THE WITNESS: There are a number of problems with the reduced-form models. Again, reduced-form is an extremely generic general term. So we're using it as though it has some meaning here, which it really doesn't. I certainly have some problems with its use in this case, or as it's being described to be used in this case.
MR. MICHELETTI: Q. Well, you just said there are a number of problems with the reduced-form model. What are those problems?
MR. RYAN: Objection. Mischaracterizes the

Page 189

testimony, omits portions of the answer.
THE WITNESS: So what I was referring to was that there are a number of problems with its use in this case. And certainly there are a number of problems with using it generally for purposes of determining whether or not individuals have been impacted.
MR. MICHELETTI: Q. Then maybe I misheard you. I thought you said there were a number of problems with the reduced-form method generally, setting aside this case, and that it's not reliable in this case as well. And so is that correct or not correct?
MR. RYAN: Objection. Vague, ambiguous, compound. The witness said that the reduced-form --
MR. MICHELETTI: Counsel, state your objection, one or two words, and then we can move on. Don't tell the witness what to say.
MR. RYAN: Stop trying to manipulate the witness by recharacterizing her answers.
THE WITNESS: So the reduced -- what that means, "reduced-form" is something really, really general in economics.
MR. MICHELETTI: Q. Okay.
A. It basically means you take one variable, one endogenous variable, and you string out a bunch of other variables and you regress your endogenous variable and

Q. Does that not indicate that he intends to use the SRAM cost component that is in the BoM in his regression?
A. I don't think that's what he's saying. That's not how I'm reading this. But again, given that Dr. Dwyer has not specified any of these models, it's unclear. But I do not read it that way.
What he's saying here, he is going to do a further statistical test. To me, what that means is that's something outside of the regression that he's describing. It's unclear exactly what that is.
Q. In any event, you understand that the reference to SRAM cost components there is a reference to SRAM cost components as reflected in the BoMs?
MR. RYAN: Objection. Mischaracterizes the testimony, vague and ambiguous.
THE WITNESS: And Dr. Dwyer really is not providing us enough information to know what he's talking about here.
MR. MICHELETTI: Q. So you disagree that Dr. Dwyer states in paragraph 38 that he intends to use the BoM cost in his regression analysis?
MR. RYAN: Objection. Mischaracterizes the testimony, takes the report out of context.
THE WITNESS: I think he's saying that he is



going to use the BoM cost in his regression, yes.
MR. MICHELETTI: Q. I'm sorry, let me restate.
You disagree that Dr. Dwyer is indicating in his report that he intends to use the SRAM cost component in the BoM in his regression analysis?
MR. RYAN: Objection. Mischaracterizes the testimony, assumes facts not in evidence.
THE WITNESS: It's very unclear what it is he means by those sentences. My reading, my best reading of this, reading the tea leaves here, is that he's going to put the BoM in as an explanatory variable and then he's going to do something else, which he doesn't really describe, only -- he describes it only as a further statistical test and he's going to somehow use some SRAM cost in that further statistical test. But he doesn't tell us what that test is and he doesn't tell us where the SRAM cost would come from.
MR. MICHELETTI: Q. Isn't it clear from the context of his declaration that he's going to be deriving it from the BoM?
A. Well, he may be. I don't know. I don't know. I know because I've looked at some data. You could get it from one of two sources. So had I written this, you know, if I wanted to be really specific, I would have



set out which one.
Q. Do you have an opinion as to whether -- and strike that.
What are the two sources?
A. There's an exhibit in my report, I can't remember which one, that shows the SRAM cost as recorded in the BoM and actual SRAM costs from purchases, and those two things are different.
Q. Okay. Do you have an opinion as to which is more appropriate to use in a regression analysis in this case?
MR. RYAN: Objection. Mischaracterizes the testimony, assumes facts not in evidence, outside the scope of her opinion.
Would you read the question back, please.
(The record was read as follows:
"Question: Do you have an opinion as to which is more appropriate to use in a regression analysis in this case?")
THE WITNESS: It may depend on the company. The data that I was looking at for, I believe it was 3Com, 3Com is buying SRAM from a lot of different



sources. The prices of that SRAM that 3Com pays are very different and they're different from the BoM. If you want to measure the relationship between defendants' SRAM and 3Com's prices then you should use those prices.
MR. MICHELETTI: Q. The purchase price, not the price reflected in the BoM?
A. Again, I think it would depend on the company. It would also -- we don't have a lot of information about what's really going on in that BoM and why there are differences between the two sets of data.
Q. Have you ever heard of a BoM before this case?
A. Yes.
Q. In what context?
A. Bill of materials. I don't know. It's a fairly common term.
Q. Have you been exposed to it in any academic context in economics?
A. No, I don't think so.
Q. Just more generally in analyzing businesses in your profession?
A. Yes.
Q. Have you done any -- do you have any understanding as to how they're prepared?
MR. RYAN: Objection. Vague, overbroad.
THE WITNESS: Yeah, I'm not sure what you mean

Page 234

product characteristics as some of his variables; is that right?
A. That's what he's describing.
Q. Okay. Are you -- can you identify any other variables that Dr. Dwyer intends to use based upon your review of his deposition and his declaration?
MR. RYAN: Objection. Vague, ambiguous. Which regression? Which model? What are you talking about?
THE WITNESS: Well, he spends a lot of time talking about the product characteristics. It is unclear. It's just unclear what he's going to do. From his deposition I think he's trying hard, he said, to collect information on the product characteristics. And it sounded as though that is what was preventing him or that was the data that he did not have at the time. But I don't know what else he's going to do.
MR. MICHELETTI: Q. As you sit here today, you cannot identify any other explanatory variables that Dr. Dwyer intends to use in his regression analysis -- I'm sorry, in his reduced-form regression analysis?
A. It's unclear what he's going to do. I think until we see or if we ever see a regression, a reduced-form regression -- I can't speculate on what he might do and so I don't know. I don't know the answer.

Page 235

Q. Have you made any effort to generate any reduced-form regression analyses in this case of any of the products or data that you have?
A. No.
Q. Why not?
A. Well, I don't think that that would be a useful thing to do.
Q. Did you consider developing any reduced-form models to show how they might demonstrate false positives on pass-through, which is one of the points that you were making?
A. Well, I think that this Exhibit 8 to Dr. Dwyer's deposition shows that.
Q. Well, I mean based upon actual data in the case.
MR. RYAN: Objection. Vague and ambiguous.
THE WITNESS: I have not done that.
MR. MICHELETTI: Q. Did you consider doing it?
A. I don't recall ever considering doing it. I think the point is made right here in Exhibit 8.
Q. Did you consider developing any structural models to show how they might demonstrate false positives on pass-through?
A. No.

Page 236

Q. Why not?
MR. RYAN: Objection. Vague, ambiguous, overbroad. The term "structural model" is vague and ambiguous.
THE WITNESS: I'm not sure why. I never thought about trying to operationalize the model that Dr. Dwyer is describing. I don't think it would be a useful thing to do.
MR. MICHELETTI: Q. You don't think that would be the best way to show that it just can't work?
MR. RYAN: Objection. Vague, ambiguous, outside the scope of her opinion, argumentative.
THE WITNESS: My opinion is actually that it's not appropriate so that it can't be used to determine whether or not indirect purchasers were impacted. So it never occurred to me to do that.
MR. MICHELETTI: Q. Turn to page 90 of your declaration, please. At the bottom of that page, you write "If plaintiffs' expert had estimated the reduced form model for this single product and for this individual customer, the model would find no pass-through. However, if these transactions had been aggregated into an analysis of all routers, or all enterprise routers, and if there were customers and products where there was a relationship between the BoM

Page 237

and price, Dr. Dwyer's model could, again, mistakenly find that there was pass-through, when there was none in this instance."
Is there any particular reason why you didn't try to demonstrate that through a regression?
MR. RYAN: Objection. The question is taking the text out of context. I request that the witness be allowed to read the context.
THE WITNESS: The --
MR. RYAN: Please take your time.
THE WITNESS: Okay. The sentence that you read is referring to Exhibits 40 and 41A. And if you look at Exhibit 41A, you actually cannot estimate the model when there's no variation in price. You can see what would happen -- well, you can see the result which is no pass-through because price doesn't change, but if price doesn't change at all, then there's no variation in price. That means you just can't estimate the model.
MR. MICHELETTI: Q. And why is that?
A. It's just statistics, you can't. In order for -- what that regression coefficient is doing is it's picking up changes in the two variables. And if there's no change in one of those variables, then there's nothing for it to pick up, just won't get an answer.
Q. It would spit out any coefficient estimate?