# EXHIBIT 2

UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF CALIFORNIA
OAKLAND DIVISION
--oOo--

IN RE: STATIC RANDOM ACCESS )
MEMORY (SRAM) ANTITRUST )
LITIGATION )
)Master Docket
)File:
)M:07-CV-01819-CW
)
This Document Relates to: )
)
INDIRECT PURCHASER ACTIONS )MDL No. 1819
____________________________________)

VIDEOTAPED DEPOSITION OF
MARK J. DWYER, Ph.D.

Thursday, April 2, 2009

REPORTED BY: SHERRI STARR, CSR# 10245 (01-417694)

Page 70

If my assumption is correct, what percentage of the overcharge will be left for the consumer after that absorption?
A. I'm not sure how each level can absorb 20 percent if there are more than five levels. So it seems internally inconsistent. But in that extreme hypothetical where there's a very long distribution chain and every level is for some reason unspecified gratuitously or generously deciding to take a hit on costs out of the goodness of their hearts, my guess sitting here today would be that there would be no overcharge to the -- in fact, maybe they would be paid to take the product at that point, I don't know.
Q. Really, it could actually be zero or below?
A. Well, in your hypothetical, all these distributors are shoveling money out and all taking a loss. It seems to me that you're accumulating a negative cost by the time -- you could be accumulating a negative cost by the time you get down to the consumer.
Q. Well, let's use a real simple example. Let's start with a dollar, okay?
MR. MICHELETTI: A dollar what?

Page 71

MR. RYAN: Q. A dollar overcharge. And then let's do 20 percent each level. What would that come out to?
A. I don't know. I could try using your calculator.
Q. Please do.
A. Are they each taking 20 percent of the dollar?
Q. They're absorbing 20 percent of the dollar overcharge each time.
A. Well, 20 percent of $1 is 20 cents.
Q. Right.
A. And there are eight levels.
Q. Uh-huh.
A. And eight times 20 cents is $1.60.
Q. So by the time it gets to the consumer, the entire overcharge would have been absorbed, correct?
A. In that hypothetical, everybody is buying a product and selling it for less than it cost them over and over and over again. Yeah, there's no overcharge.
Q. So the point of this example is to show that if you don't know what's going on in the middle, how can you know what's going on at the end?

Page 72

A. Well, in that hypothetical of consumers being paid, as I understand it, to purchase a product, that would show up in the data.
Q. Well, no, I didn't say that they're being paid to purchase the product. I said that they're absorbing 20 percent of the overcharge each time. So if the product were $1,000 but the overcharge was $1, that's the hypothetical, okay? So you want to think about that and answer the question again?
If you've got $1,000 product and you've got $1 overcharge, you've got eight intermediate levels and each one of the levels is absorbing 20 percent of the overcharge, will there be an overcharge pass-through to the end user?
A. I don't think there will be.
Q. And how does your methodology identify whether situations like that occur in the chain of commerce for SRAM?
A. My methodology would notice that there is a fall in price for the consumer when SRAM costs rise and so it would take that into account and assign a negative relationship between component costs. Because as component costs go up in comparing the conspiracy period to a nonconspiracy period, component costs are going up -- sorry, SRAM

Page 73

costs are going up, the --
Q. I'm confused.
A. I think I'm lost in the hypothetical.
Q. Okay. I'm really confused because I thought you told me that the structural model didn't have costs in it. So how would the structural model identify my hypothetical?
A. I thought we were talking about the reduced-form model. We had switched to the reduced-form model a few minutes back.
Q. Okay. So let's talk about the structural model.
How would the structural model identify a situation where the intermediaries have absorbed all of the overcharge?
A. The structural model is capturing what a profit-maximizing firm faces and their response to how -- their view -- how demand varies in the market. If, in your hypothetical, firms are not profit maximizing, then the model doesn't capture that behavior, it violates an assumption of the model.
Q. That's right, but also your model isn't even looking at the intermediate sellers and purchasers, correct, it's only looking at the end of

to a different market.
Q. Is there anything else that you're relying on for the structural model analysis as far as authorities?
A. I think I've just proposed it as an example in a referee journal of the kind of analysis I proposed in this declaration.
Q. Do you plan to do what is done in the article you've referenced at Footnote 12?
A. The analysis will be similar. There will be -- I expect that there will be some differences. There's a choice of something called instrumental variables in the structural model analysis. And the Kim and Cotterill work, they're dealing with a product that does not have much technological innovation, and so they develop a set of instruments to accommodate that fact. They use essentially geographic variation as a way of identifying -- of constructing instrumental variables.
I planned -- well, I have not excluded that possibility that those would be useful instruments in my analysis. I plan to first consider instrumental variables that have been used previously in other applications of the same structural modeling approach that have been used for



computers or for automobiles where there's more technological innovation, more product differentiation over time.
Q. Well, other than those qualifications, are you going to do essentially the same thing that's done in the article referenced in Footnote 12?
A. I plan to follow a similar course of analysis, I would say. It's a different market than the products I'm looking at so there will be differences in that regard. But I think that's a good and close analogy to what I'm proposing in the structural model analysis.
Q. Would you agree that the model described in the article referenced in Footnote 12 relies on the assumption that firms determine the price to charge by finding the price that maximizes profit?
A. Yes, I would.
Q. And that the price that they determined there is done mathematically; is that correct?
A. There's a mathematical expression that expresses that objective to choose prices to profit maximize.
Q. Are you utilizing the same formula that they use in the article or something different?
A. Could you be more specific. There are



several equations in their paper and I don't know, by saying "the same formula," I don't know that the set of demographic variables would likely be different for preference for cheese versus computer products. And the set of product features will be different. It won't be sodium and fat, it will be other more technological features of these products. So I'm not sure. There will certainly be differences, but the underlying methodology is very similar.
Q. Is the formula substantially the same as what's on your Exhibit 6?
A. My Exhibit 6?
MR. MICHELETTI: Which formula?
THE WITNESS: Written here (indicating).
MR. RYAN: Q. Let me ask it this way: Is the formula that you've written down in Exhibit 6, is there a formula in the article referenced in Footnote 12 that's substantially the same?
A. I don't believe so. The formula that I've written down in Exhibit 6 is looking at quantity as a firm choice variable. And I'm not proposing that I'm using that in my analysis; that was just for purposes of our conversation earlier.
The analysis, the profit maximization



problem that firms face or assume to solve in the Kim and Cotterill analysis is the same as I propose in the structural analysis in my declaration.
Q. What data have you requested that would allow you to estimate reduced-form models if you obtain the data?
A. I think the two major inputs that we have requested from third parties are final end-use prices and then component cost data which consists of two parts itself: One is overall component cost data and the other is the SRAM component cost.
Q. Have you received any of this data?
A. Yes, we have.
Q. Who have you received it from?
A. I don't know all of the names. I believe that we've -- we have -- we have received BOM information from ten entities.
Q. Would you say what BOM means for the record, please.
A. Sure. Bill of materials information, which is component cost information, from ten entities. They include 3Com, Nortel -- well, Motorola, Nokia, Extreme Networks, and I believe we have some BOM information from HP as well. And Solectron is a contract manufacturer that has

A. I don't believe so, not in the models that I have in my declaration.
Q. How do you determine what information is or isn't relevant with respect to these issues?
A. Well, with respect to the reduced-form analysis, component cost is a factor in the regression. So the degree of explanatory power that that effect has on price will tell me the degree to which those costs are passed through, how confident we can be in that finding.
In the structural model context, I'm following an academic literature that uses these same models, the same essential model of demand that estimates pass-through using that specification.
Q. And when you say "academic literature," you're referring to the cheese article that we discussed earlier?
A. I'm referring to several papers that use that same technology. The Kim and Cotterill paper is one, Aviv Nevo is another. Then there's the Berry, Levinsohn, and Pakes paper, and there are, I believe, many other papers. I've even cited other papers in my declaration that use largely the same demand estimation technology.
Q. Isn't it true that the only article that



you've identified that deals with pass-through is the cheese article we discussed earlier?
A. That's the Kim and Cotterill article, yes, is the only one that I've identified.
Q. The only one that you've identified that deals with pass-through, correct?
A. Correct.
Q. So when you said earlier, "In the structural model context, I'm following an academic literature that uses the same models, same essential model of demand that estimates pass-through using that specification," you had to be referring to the what I call the cheese article, correct?
A. No, I'm referring to the larger literature as well because the pass-through analysis is a consequence of the demand estimation. It could have been computed for any of the other articles as well.
Q. But none of the other articles did it, correct?
A. They weren't interested in that issue, but it was a consequence of the model that they estimated.
Q. Do you disagree with the cheese article?
A. In what regard?
Q. In any regard. Do you think it's wrong in



any regard?
MR. MICHELETTI: Counsel, do you have it so he can review it?
MR. RYAN: Sure, I'll find it.
(Whereupon Exhibit 7 was marked for identification.)
MR. RYAN: What we're going to do is we're going to take a short break. And what I'd like you to do, Dr. Dwyer, is I'd like you to review the article, which has been marked as Exhibit 7, and tell me if you disagree with any of the assumptions or conclusions in the article.
MR. MICHELETTI: Counsel, I want to stay on the record. I don't think we need to go off the record.
MR. RYAN: You want to use up a lot of videotape while he's reading through the article?
MR. MICHELETTI: Why don't we let him look through it and see if he can answer the question. If he feels he needs more time, we can take a break.
MR. RYAN: I just didn't want to rush the witness.
THE WITNESS: Just in terms of the specification, in general, I agree with the methodology of this article. There are other issues



if I were modeling cheese that I might have considered that are not discussed here.
For instance, the set of product attributes is limited to issues of fat and sodium. And for this market which is processed cheese, I would think that packaging and maybe size of product, you know, might play a role in preferences more so than variations in fat and sodium.
In terms of demographic variables, I might have chosen something other than -- at least wanted the researchers to examine other factors besides age, income, child -- whether there's a child under 17, and a nonwhite indicator. I would think that education and other demographic variables might have been relevant and weren't included.
As I think I mentioned earlier in the record, from my applications, I believe a different set of instrumental variables would be the first that I would choose, as opposed to the instrumental variables that are used in this analysis. Other than that, I don't disagree with their work and, as I say, methodologically. I believe my proposals are very consistent with what they've done.
MR. RYAN: Q. Thank you. Now, as I understand it, you and Dr. Harris have adopted the