# EXHIBIT 12

Case 4:07-md-01819-CW Document 799-13 Filed 07/30/09 Page 2 of 9 PageID #: 18281

1971

# PROCEEDINGS

OF THE

SIXTY-FOURTH ANNUAL CONFERENCE ON

# TAXATION

HELD UNDER THE AUSPICES OF THE

# National Tax Association

At

KANSAS CITY, MISSOURI
September 26-30, 1971

AND

MINUTES OF THE SPECIAL MEETING OF THE NATIONAL TAX ASSOCIATION HELD MONDAY, SEPTEMBER 27, 1971 AND OF THE ANNUAL MEETING HELD WEDNESDAY, SEPTEMBER 29, 1971 AND OF ALL MEETINGS OF THE BOARD OF DIRECTORS DURING THE CALENDAR YEAR 1971

EDITED BY
STANLEY J. BOWERS
*Executive Director*

COLUMBUS, OHIO
1972

# THE EFFECTS OF CHANGES IN SALES TAX RATES ON RETAIL PRICES

NANCY DAYTON SIDHU

Northeastern Illinois University
Chicago, Illinois

Since Adam Smith wrote *The Wealth of Nations* in 1776, economists have derived many theories about sales tax incidence.[1] The burdens of sales taxation have rested upon landlords,[2] capitalist-entrepreneurs,[3] factor owners,[4] or consumers [5] in these theories. The empirical studies performed in the area of sales and excise tax shifting have not yielded consistent results either. Investigators of effects of the early U.S. state sales taxes interviewed retailers about their treatment of the new taxes.[6] Answers varied from complete tax shifting onto consumers to complete tax absorption by retailers.[7]

Popular opinion apparently believes that sales tax burdens are uniformly shifted onto consumers by retailers. Both retailers and customers point to the widespread practice of separate tax quotation and use of tax bracket schedules as evidence of such shifting.[8] However, this evidence is not necessarily conclusive because retailers could be reducing their before tax prices and then adding the proper amount of tax — per schedule — to arrivé at after tax prices.[9]

This study reports an attempt to utilize a different source of objective data on retail prices in order to observe price effects of sales taxes.

[1] Adam Smith, *An Inquiry into the Nature and Causes of the Wealth of Nations*, ed. Edwin Cannan (New York: Random House, Inc., 1937).

[2] *Ibid.*, p. 824.

[3] David Ricardo, *Principles of Political Economy and Taxation*, ed. Piero Sraffa (New York: Cambridge University Press, 1951), p. 205.

[4] Earl R. Rolph and George F. Break, *Public Finance* (New York: The Ronald Press Company, 1961), p. 294.

[5] John F. Due, *Sales Taxation* (Urbana: University of Illinois Press, 1957), p. 15.

[6] See J. W. Bell, Grady Guyton, and Ralph L. Sackett, "Mississippi's General Sales Tax: How It Works," *Bulletin of the University of Mississippi*, XXX: 3 (January, 1933), pp. 1-48; and Robert M. Haig and Carl Shoup, *The Sales Tax in the American States* (New York: Columbia University Press, 1934).

[7] See, for example, Bell, *et al.*, *op. cit.*, p. 14, and Haig and Shoup, *op. cit.*

[8] See John F. Due, *State Sales Tax Administration* (Chicago: Public Administration Service, 1963), pp. 137-142, on the use of separate quotation and bracket schedules.

[9] Haig and Shoup, *op. cit.*, pp. 358-359, also note this possibility.



The data in question are metropolitan commodity group Consumer Price Indexes for the period 1954 to 1966 inclusive.[10] Simple observation of retail prices before and after any tax rate change could not yield the required information because other factors were present that influenced prices besides sales taxes. Therefore, a mathematical model of retail behavior was developed and was confronted with the data.

## THE MODEL

The balanced budget approach to tax incidence was utilized to derive the model of retail reactions to sales taxes.[11] This approach assumes that government expenditures increase by an amount equal to the additional revenues generated by the new sales tax rate. If there were no compensating increase in public expenditure, any observed changes in prices and sales levels would be due to a combination of sales tax incidence and the effects of the government's deflationary policy. Utilization of the balanced budget approach ensures that total real demand for resources remains constant after a tax rate increase.

Six other assumptions were necessary for the construction of a formal model of sales tax incidence. Assumptions about phenomena external to the firm were:

(1) Retail markets are oligopolistic markets characterized by product differentiation and interdependent decision-making.[12]

(2) Resource prices are inflexible downwards. Thus, by assumption, firms cannot shift tax burdens backwards by paying lower prices for productive factors.

(3) The monetary authority is assumed to permit a monetary expansion large enough to allow prices to rise after the new tax rate becomes effective. If it did not do so, unemployment might result when taxes were increased.

(4) Pressures exist to quote the sales tax separately from retail price and to fully shift the tax according to tax bracket schedules, from state sales tax laws or local retail associations.

Assumptions about firm behavior are:

(5) Retailers utilize markup pricing methods wherein prices are calculated on the basis of wholesale costs plus fixed percentage markups.[13]

[10] U.S. Bureau of Labor Statistics, *The Consumer Price Index: U.S. City Average and Selected Areas*, issued monthly.

[11] Richard A. Musgrave, *The Theory of Public Finance* (New York: McGraw-Hill Book Company, 1959), pp. 214-215, develops the concept of balanced budget incidence.

[12] John F. Due, "Is the Perfectly Competitive Model Useful for Analysis of Price Reactions to Tax Changes?" *National Tax Journal*, XXI: 2 (June, 1968), especially p. 225.

[13] The literature describing this process is large. As an example, see Paul D. Converse, Harvey W. Huegy, and Robert V. Mitchell, *Elements of*

(6) Retail firms in general do not strive to maximize profits. Rather, they attempt to gain a *satisfactory* minimum level of profits or rate of return.[14]

Utilizing these assumptions, retailers try to adjust retail prices to shift any wholesale price increases onto their customers. Likewise, when faced with an increased sales tax rate, these retailers try to increase selling prices by adding the (increased) tax due to the retail prices established by cost plus markup. If the retail market under consideration is characterized by the absence of strong price competition, firms will be encouraged to pursue these policies because their competitors are doing the same thing. If all firms do in fact raise prices by the amount of tax due (succumbing to the pressures of assumption 4), prompt and complete forward tax shifting will occur.

However, some retail markets are characterized by chronic or spasmodic price warfare.[15] In such markets, assumptions 5 and 6 are probably being violated: retailers are sacrificing current profits by deliberately utilizing low markups. Such retailers must be considered to be absorbing at least a portion of the sales tax burden *even if* they always quote the tax separately and add it to the retail price at the end of each sale. It makes little sense to say that a retailer in this situation is absorbing some costs but fully shifting all sales taxes. Had there been no sales tax increase, he might well have charged the same selling price (inclusive of tax at the old rate) and gained the amount of tax increase in extra profit margin for himself. Mere segregation of the sales costs of selling at retail is not sufficient to prove that the entire tax burden is being shifted from retailers to their customers.

It is the purpose of this study to discover to what extent forward tax shifting does occur. Such an investigation requires knowledge of retail behavior in the absence and in the presence of sales taxes. This knowledge in turn requires that the relation between retail price and cost be established first.

For the ith retail commodity, markup pricing procedures require that price in the $t^{th}$ period be determined according to:

$$p_{it}' = m_i w_{it} \qquad \text{for all } i, t \tag{1}$$

where $i = 1, \ldots, n$

*Marketing* (seventh edition; Englewood Cliffs: Prentice-Hall, Inc., 1965), pp. 170-174, 569-572.

[14] Several writers have noticed this phenomenon. See, for example, W. Warren Haynes, *Pricing Decisions in Small Business* (Lexington: University of Kentucky Press, 1962), pp. 54-55; and A. D. H. Kaplan, Joel B. Dirlam, and Robert F. Lanzillotti, *Pricing in Big Business: A Case Approach* (Washington, D.C.: The Brookings Institution, 1958), pp. 181-184, 188-198, 206-207.

[15] Gas wars are prominent cases in point.



$p_{it}'$ = retail price in absence of tax,
$w_{it}$ = invoice cost per unit,
$m_i$ = 1 plus markup percentage.

Markup percentages can vary between stores for the same commodity and between commodities in the same store, but they are assumed to remain constant over the time period under consideration.

Retail costs can be roughly divided into two groups for our purposes. The first group is wholesale or invoice costs for each of the n commodities stocked by the retailer. The second group is composed of fixed costs and all other costs which must be paid for out of gross margins. The cost function of a retail firm in the $t^{th}$ period thus takes the form:

$$C_t = OC_t + \sum_{i=1}^{n} w_{it} q_{it} \tag{2}$$

where $C_t$ = total costs
$OC_t$ = fixed and other non-wholesale costs
$q_{it}$ = sales of the ith good in period t.[16]

Retail profits in absence of tax can then be calculated according to:

$$\pi_t' = R_t' - C_t \tag{3}$$
$$= \sum_{i=1}^{n} (m_i - 1) w_{it} q_{it} - OC_t$$

where $R_t'$ = revenues in period t, equal to $\sum_{i=1}^{n} p_{it}' q_{it}$

This formulation emphasizes the role which markups [the $(m_i - 1)$s] play in covering non-wholesale costs in order for the retailer to operate at a profit. By assumption, the retailer will not change his policies to improve his store's profit performance as long as profits remain at satisfactory levels.

Suppose a sales tax of rate s is imposed upon the sale of the ith article, to be computed as a percentage of the retail price and added to it; *i.e.*,

$$p_{it}^{g} = (1 + s) p_{it}^{n} \tag{4}$$

where $p_{it}^{g}$ = gross selling price inclusive of tax,
$p_{it}^{n}$ = net price on which the tax is computed.

[16] We assume all goods purchased at wholesale are subsequently sold at retail, thus eliminating inventory problems from the analysis.

The tax liability per unit sold is therefore $sp_{it}^n$.

The net price received by the retailer can be related to the price in absence of tax as shown in equation 5:

$$p_{it}^n = p_{it}' - s(1 - a_i)p_{it}^n \tag{5}$$
$$= p_{it}'[1 + s(1 - a_i)]^{-1}$$
$$= \frac{m_i w_{it}}{1 + s(1 - a_i)},$$

where $0 \leq a_i \leq 1$.

$a_i$ represents the proportion of legal tax liability shifted forward by the retailer onto his customers through increased prices. a equals zero if the tax is completely absorbed by the retailer (0% of the tax burden shifted), and it equals one if the tax burden is shifted entirely onto the store's customers.

Since backward tax shifting is ruled out by the assumptions, the retailer can shift tax burdens only forward onto his clientele through higher prices. a, as a measure of the extent of such price increases, is therefore an empirical indicator of the degree of tax shifting which occurs.

Substituting "net" for "in absence of tax," after tax profits are computed as:

$$\pi_t^n = R_t^n - C_t$$
$$= \sum_{i=1}^{n} \frac{m_i - 1 - s(1 - a_i)}{1 + s(1 - a_i)} w_{it} q_{it}. \tag{6}$$

If the sales tax is 100% shifted (all $a_i$s equal one), equation 6 reduces to equation 3. The $q_{it}$s do not change because we utilize the balanced budget approach.

This model suggests that full and prompt shifting of sales tax burdens will occur if retail markets are peaceful. If markets are not peaceful, some shrinkage of markup is likely to occur, and sales tax burdens will be partially or fully absorbed. However, by assumption, retailers will be reluctant to start such price wars unless profits fall well below satisfactory levels because such wars are so destructive of current profits. Therefore, markets are more likely to be peaceful than not, and hence sales tax burdens are more likely to be fully shifted forward than not.

## Testing the Model

Testing this model of retail behavior involved testing its conclusion



of full forward shifting of sales tax burdens. As noted above, the testing procedure could not be a simple check of retail prices just before and just after sales tax rates change because other variables may have been operating to change prices in addition to sales tax rate changes. A proper testing procedure, therefore, had to take these other variables into account. In our model, the most important other variables are wholesale prices. If their effects on retail prices could be allowed for, then the effects of sales taxes could be ascertained because these are assumed to be the only two factors operating on retail prices.

Aggregating over all local retailers of a given commodity group gives: [17]

$$CPI_t = \frac{BWPI_t}{1 + s(1 - a)}, \tag{7}$$

where $CPI_t$ = retail price index in period t,
$WPI_t$ = wholesale price index in period t,
B = multiplicative constant (involving a weighted sum of markups of retailers in the retail index store sample).

The investigation of tax shifting resolved itself to the problem of estimating a, the tax shifting parameter. This was not an easy task because equation 7 is nonlinear in the parameters a and B. The estimator finally adopted was a two-stage procedure: [18] first, least squares estimates of lnB were calculated for each of many values of a; then that value of a was selected as the estimate of the average proportion of sales tax shifted which gave the smallest standard error of lnB.

Estimates of a were calculated for commodities sold in seven Standard Metropolitan Statistical Areas: Baltimore, Chicago, Detroit, Los Angeles, San Francisco, Seattle, and the District of Columbia. These areas were selected for study because (1) the Bureau of Labor Statistics publishes monthly or quarterly Consumer Price Indexes for them, and (2) sales tax rates changed at least once during the period of observation (May, 1954 through December, 1966) for each of them.

The five commodity groups used in the analysis were: food (in two cases, food away from home), women's and girls' apparel, men's and boys' apparel, footwear, and other (mostly alcoholic beverages and tobacco products). These particular groups were selected because at least seventy per cent of products included in each group were taxable under the state sales tax laws in question. Retail prices of these commodities were measured by the quarterly metropolitan commodity

[17] The aggregation procedure can be found in Nancy Dayton Sidhu, "The Effects of Changes in Sales Tax Rates on Retail Prices," unpublished doctoral dissertation, University of Illinois at Urbana-Champaign, 1971, pp. 75-77.

[18] The estimator is derived in *ibid.*, pp. 79-80.

TABLE 1. — Time Series Estimates of a by Commodity Group and Standard Metropolitan Statistical Area

| SMSA | Commodity Group: Food | Men's and Boys' Apparel | Women's and Girls' Apparel | Footwear | Other |
|---|---|---|---|---|---|
| Baltimore | — | 1.25 | 4.66 | 5.42 | 1.30 |
| Chicago | 3.12 | −0.50[b] | −0.50[b] | −0.12 | −0.50[b] |
| Detroit | 1.08 | −0.50[b] | 4.81 | −0.33 | 3.09 |
| Los Angeles | 6.00[a, b] | 1.30 | 2.67 | −0.41 | 3.31 |
| San Francisco | 6.00[a, b] | 0.61 | 2.62 | 4.10 | 3.55 |
| Seattle | 6.00[b] | 3.45 | 3.22 | 3.14 | 0.88 |
| Washington, D.C. | 3.47 | −0.50[b] | 3.68 | 3.30 | — |

[a] Food away from home; *e.g.*, restaurant meals.
[b] The IBM program utilized did not estimate values of a greater than +6.00 nor less than −0.50.

group Consumer Price Indexes. Wholesale prices were measured by the national Wholesale Price Indexes for those same commodity groups.[19]

The results of utilizing this data in the least squares estimator mentioned above are presented in Table 1. Thirty-three estimates of a were obtained, one for each of the five commodity group Consumer Price Indexes in each of the seven different metropolitan areas.[20] Of the thirty-three estimates, eight were negative. Retailers of these commodities in these metropolitan areas appear to have been absorbing burdens greater than their legal tax liabilities.

Twenty-five estimates of a were positive, indicating that retailers were able to shift at least part of sales tax burdens onto their customers in the majority of cases. Table 1 actually indicates an even stronger finding: retailers were often able to shift *more than* the amount of their tax liabilities onto consumers; in twenty-three of the twenty-five cases, the estimated values of a were greater than +1.00.

These results showed an unexpected amount of diversity and also that a substantial amount of over-shifting took place. What factors can account for these findings?

Stripped to its essentials, equation 7 expresses a relation between the local Consumer Price Index and the national Wholesale Price Index for a given commodity group. The other variable in the equation, the

[19] The Wholesale Price Index was admittedly an imperfect substitute for invoice costs to local retailers, but it was the only inexpensive, readily available type of data which could be used in this position.
[20] Sales of food in Baltimore and other in Washington were tax-exempt.



state sales tax rate, actually changed very little over the observation period. Further, the model adds these small percentages to one, making the rate changes which did occur even less significant: in the estimation process, $(1+s)$ acted much like a constant.

As one possibility, suppose retailers in the BLS retail store sample changed their markups between 1954 and 1966. The model expressed in equation 7 does not allow for this possibility: it forces margins to be constant. However, if margins actually did increase during the period, B would be an increasing function of time instead of a constant. The only way the estimator could have coped with this change would be to make $\frac{1+s}{1+s(1-a)}$ larger than it actually should have been. This could be accomplished by overstating the true value of a.

An attempt was made to see if this interpretation of the apparent high degree of overshifting of sales tax burdens is reasonable. While no direct measure of the size of gross margins in the years 1954 through 1966 exists, an indirect method of checking for margin increases can be used: calculate percentage increases for the local CPI and compare the price increase for each city and each commodity with its associated estimated a value. Such a comparison was made. The results were set up in two sets of rankings: the SMSA with the highest percentage price increase in food was given a ranking of 1 under that commodity, and the SMSA with the highest estimated a value was likewise given a ranking of 1. The resulting pairs of rankings appear in Table 2.

As an aid in using Table 2, define a statistic C:

$$C = \sum_{i=1}^{I} d_i, \qquad (8)$$

where $d_i$ = the difference between the CPI ranking and the a estimate ranking for the ith SMSA

If C = 0, there is perfect correspondence between the two sets of rankings. If I = 7, then C = 24 indicates total disagreement between the two sets of rankings. For Table 2, C was calculated for each commodity group:

| | | | |
|---|---|---|---|
| Food: | C = 2 | Men's and boys' apparel: | C = 6 |
| Footwear: | C = 6 | Women's and girls' apparel: | C = 16 |
| Other: | C = 8 | | |

With the exception of women's and girls' apparel, the correspondence between the two sets of rankings for each commodity group was quite close. Such a correspondence implies that retailers selling commodities in these four groups were able to shift sales tax burdens onto

TABLE 2. — Rankings of CPI Group Price Increases and a Estimates

| SMSA | Food | | Male Apparel | | Female Apparel | | Footwear | | Other | |
|---|---|---|---|---|---|---|---|---|---|---|
| | p* | a** | p* | a** | p* | a** | p* | a** | p* | a** |
| Baltimore | – | – | 2 | 3 | 4 | 2 | 1 | 1 | 4 | 4 |
| Chicago | 2 | 3 | 6 | 6 | 7 | 7 | 6 | 5 | 6 | 6 |
| Detroit | 4 | 4 | 7 | 7 | 5 | 1 | 4 | 6 | 3 | 3 |
| Los Angeles | – | – | 4 | 2 | 2 | 5 | 7 | 7 | 5 | 2 |
| San Francisco | – | – | 5 | 4 | 1 | 6 | 2 | 2 | 2 | 1 |
| Seattle | 1 | 1 | 1 | 1 | 6 | 4 | 3 | 4 | 1 | 5 |
| Washington, D.C. | 3 | 2 | 3 | 5 | 3 | 3 | 5 | 3 | – | – |

* Price increase ranking.
** Estimated a value ranking.

their customers only in those cases where they were able to shift other cost increases onto them as well, through larger markups and higher prices.

Why should markups have been increased? Undoubtedly, retailers experienced many cost increases between 1954 and 1966. Not only did invoice costs rise (as shown by the increasing Wholesale Price Index), but many costs paid for out of retail markups also rose. To the extent that these costs increased faster than retail prices, profit margins were narrowing, and incentives existed for retailers to raise markups by increasing prices.

As an example, BLS figures show that the national average weekly wage of workers in retail trade increased 46.8% from May, 1954 through December, 1966, the period covered by this study.[21] This wage increase was larger than most of the retail commodity group price increases in the same period. If other costs also rose this rapidly, the incentive to increase markups in order to maintain profit levels certainly existed. This being the case, those retailers who *could* widen gross margins likely *would* have done so. Those retailers who were unable to do so would have had to absorb a portion of such wage increases out of profits. In these cases, any sales tax increase would *also* have been absorbed, in whole or in part. Thus, the factors preventing some retailers from shifting cost increases forward would also have prevented them from shifting sales tax increases onto their customers.

What are some of these factors? They can be divided theoretically

[21] U.S. Bureau of Labor Statistics, *Employment and Earnings for the United States, 1909-1968*, Bulletin No. 1312-6 (Washington, D.C.: Government Printing Office, August, 1968), pp. 764-765.



into two groups: factors affecting the amount and intensity of competition between retailers and factors affecting the nature of demand curves facing the firms. One indicator of the strength of retail competition in any area could be the number of stores relative to population in that area. Figures showing area population per store were derived, using 1967 Census of Business data, for each different commodity group in each city.[22] Rankings of the results were compared with rankings of a estimates for the different cities within each commodity group. A smaller population per store would be expected to correspond with a smaller estimate of a and so on. The comparison is omitted in this paper, but the C values can be given:

| | |
|---|---|
| for Food: | C = 0 |
| for Men's apparel: | C = 12 |
| for Women's apparel: | C = 16 |
| for Footwear: | C = 20 |

This type of relationship appears to have existed for food but not for any of the other commodities. The only explanation ventured for this phenomenon is that the market structure of food retailing is fairly uniform in most cities, with many chain supermarkets and some smaller independent stores. Thus, the more food stores per population, the stronger is price competition likely to be between them and the harder it is for any one store to increase markups to maintain profits in the face of increased costs.

On the other hand, retail market structures for the other commodities are likely to vary considerably from city to city. Price competition is not necessarily more severe in cities with relatively more shoe stores; local competition may emphasize non-price factors instead, such as style, location, or breadth of selection. If so, the relationships between population per store and estimated a values are likely to be much weaker in those commodities and in those cities in which style and other non-price factors are important in attracting customers; *e.g.*, women's and girls' apparel.

Retailers also feel downward price pressure if they are located near a state border, and a lower tax rate is in force on the other side. Such a border situation could result in narrowing retail profit margins if price competition proves to be severe.

Certain cities in this study are closer than others to borders with lower tax rates on the other side. An attempt was made to measure the strength of the border effect by relating each SMSA's distance to a lower tax border to the average estimated a value of that SMSA. The results of this comparison are shown in Table 3, columns 1 and 2. Table 3 shows that the metropolitan areas closest to lower tax borders

[22] U.S. Bureau of the Census, *1967 Census of Business: Retail, Wholesale Services, Retail Trade Area Statistics*, Vols. BC67-RA6, BC67-RA10, BC67-RA15, BC67-RA22 (Revised), BC67-RA24, BC67-RA49.

TABLE 3. — Border Effects, Income Growth, and Average a Values

| SMSA | Border Rank* | Average a Value** | Income Growth Rank*** |
|---|---|---|---|
| Baltimore | 4 | 3 | 5 |
| Chicago | 7 | 7 | 7 |
| Detroit | 5 | 6 | 6 |
| Los Angeles | 2 | 4 | 1 |
| San Francisco | 1 | 1 | 4 |
| Seattle | 3 | 2 | 2 |
| Washington, D.C. | 6 | 5 | 3 |

* The city farthest from a lower tax border received the first ranking.
** The highest average a value received first ranking.
*** The highest growth rate received first ranking.

also have the lowest average estimated a value rankings. The C value for this comparison is only 6, indicating that a border effect probably exists.

Income influences retail profits from the side of demand. If the incomes of his customers increase rapidly over time, then a retailer is better able to shift cost increases onto them through higher prices. Estimates of the rate of income growth in the various SMSA's are available.[23] Rankings of these growth rates were compared with the average estimated a values for each SMSA in an effort to ascertain their effects, if any, on margins. The results are shown in columns 2 and 3 of Table 3. C equals 10 for these two columns. The correspondence between the a rankings and the income growth rankings shows up especially well for the three SMSA's of Chicago, Detroit, and Seattle, less well for the other four cities. The low estimated a values of Chicago and Detroit appear to be at least partly due to the relatively slow growth in customers' incomes.

What has this exploration into gross profit margins shown? First, the ability to shift sales tax burdens is seen to be related to the ability to shift any cost increase onto consumers. This relationship is simple and direct in the case of food, where the products sold by each retailer are similar in the eyes of consumers. In this case, the ability to shift cost increases depends mainly on the severity of competition (as shown in Table 2).

On the other hand, the ability to shift cost increases, including sales tax increases, onto consumers is not a simple, straightforward question of store population in other lines of retailing where elements of style

[23] U.S. Department of Commerce, Office of Business Economics, *Survey of Current Business*, IL: 5 (Part I, May, 1969), pp. 19-33.



or product differentiation become important. For any commodity that can be successfully differentiated, the degree of price competition between sellers of that commodity depends less on the number of stores in the metropolitan area than on the number of each different type of store. The retailer who can successfully attract a clientele loyal to his differentiated products is *more able*, other things equal, to shift the burden of cost increases, *including sales tax rate increases*, onto that clientele. These considerations appear to help explain the poor behavior (from a theoretical standpoint) of estimated a values in such commodity groups as female apparel and footwear.

## CONCLUSIONS

This study has supported the hypothesis that consumers bear the burdens of sales taxes in the majority of cases. Retailers are usually able to increase gross margins enough to keep abreast of rising costs. These same retailers appear to be successfully shifting the burdens of sales taxes onto their customers, as well as other cost increases. This general result is in accordance with the theory of tax incidence in an imperfectly competitive market as set out above, and also with the layman's conventional knowledge of the subject, gained through casual observation.

However, in several instances, perhaps more than expected, retail profit margins did not keep up with rising costs. The retailers involved are apparently absorbing part or all of sales tax burdens.[24] A comparison of the cases in which tax absorption occurs with those characterized by forward tax shifting shows that the ability to shift sales taxes depends directly on the number of market competitors in food retailing, but that no similar relationship can be established in the apparel and footwear commodity groups. Nor is this ability directly related to income growth of the metropolitan area for these commodities. By elimination, a retailer's ability to shift taxes and other costs forward appears to be related to his distance from a lower tax border and to his ability to differentiate his product lines from those of his competitors.

This finding, that product differentiation is probably an important factor determining the ability of a retailer to shift sales taxes, accords with results of a study by McAllister of border influences on tax incidence.[25] His investigations showed that consumers (said they) would be likely to cross a border to a non-tax area to shop for several different kinds of commodities but not for those goods for which style was important to the purchaser, such as women's apparel.

[24] It has been suggested to me that retailers were shifting sales tax burdens backwards in these cases. It is not possible to verify this hypothesis with the data at hand.

[25] Harry E. McAllister, "The Border Tax Problem in Washington," *National Tax Journal*, XIV: 4 (December, 1961), pp. 362-374.

### IMPLICATIONS

What difference does it make whether or not U.S. consumers pay sales taxes? The answer to this question involves two separate criteria for taxation. The first is that of revenue. Sales taxes provide the states with large, stable revenues obtained with only moderate administrative costs.[26]

The second criterion for a good tax is equity. A general definition of an equitable tax is one which treats in a similar fashion those taxpayers in similar circumstances and vice versa.[27] On this score, a typical state sales tax, which taxes sales of most consumption commodities but few consumption services,[28] is not an equitable tax *if* all retailers shift tax burdens forward onto their customers. Such a tax discriminates against large families, and it also is regressive with respect to income.[29] Some of this inequity can be eliminated if food sales are exempted from tax. Such a food-exempt tax is almost proportional with respect to income.[30] However, an exemption satisfying the equity criterion reduces revenues and thus conflicts with the revenue criterion![31]

This study has shown that, in most cases, such a conflict does indeed exist because consumers do bear the major portion of sales tax burdens. However, the large number of cases exhibiting apparent tax absorption points out that consumers may not be bearing the entire tax burden. Morgan has noted that business firms pay a sizeable share of sales taxes in most states.[32] If some retail firms are forced to absorb sales taxes in addition to this business portion of the total tax burden, then consumers bear even less of the total burden than has heretofore been believed.

Adam Smith listed four "maxims with regard to taxes in general": equality (equity), certainty (liability is predetermined by a consistent set of rules), convenience of payment, and economy in collection.[33] While most state sales taxes get high marks on the last two criteria, this study serves to emphasize their low scores on the first two.

[26] John F. Due, *Sales Taxation*, p. 312.

[27] On the concept of equity in taxation, see Carl S. Shoup, *Public Finance* (Chicago: Aldine Publishing Co., 1969), pp. 23-27, 45-47; as well as Musgrave, *op. cit.*, chapter 8.

[28] For a description of the different state sales taxes, see U.S. Advisory Commission on Intergovernmental Relations, *State and Local Finances: Significant Features, 1966 to 1969* (Washington: GPO, 1968), pp. 57-73.

[29] David G. Davies, "An Empirical Test of Sales Tax Regressivity," *Journal of Political Economy*, LXVII: 1 (February, 1959), pp. 59-71.

[30] James W. McGrew, "Effects of a Food Exemption on the Incidence of a Retail Sales Tax," *National Tax Journal*, II: 4 (December, 1949), pp. 362-367.

[31] John F. Due, *State Sales Tax Administration*, p. 188.

[32] Daniel C. Morgan, *Retail Sales Tax: An Appraisal of New Issues* (Madison: University of Wisconsin Press, 1964), pp. 26-27.

[33] Adam Smith, *op. cit.*, pp. 777-779.



CHAIRMAN LYNN: Thank you, Nancy. Our first discussant this morning is Elizabeth Likert David of the Universities of Wisconsin and Michigan. Dr. David:

## DISCUSSANT

ELIZABETH L. DAVID
University of Wisconsin
Madison, Wisconsin

I am extremely pleased to be able to comment on these excellent papers. The span of their interests is large, and I shall limit my comments to the Boskin paper, not because the others are less interesting or significant, but simply to raise more questions about the repercussions of income maintenance policies on labor supply.

I would like to comment first on the estimates and procedures used to derive the model of labor supply, second, on the comparisons of the income maintenance policies (N.I.T., wage subsidies and demogrants) that have been made, and finally, on the measure of success of the distribution program.

Looking at the source of Boskin's estimates, it is important to realize that his argument is built upon the cross-section hypothesis that interpersonal differences at a given point in time reflect the response function of a particular person as he is affected by changes in his circumstances over time. Preliminary findings from the New Jersey negative income tax experiment provide a glimpse into truly longitudinal response and suggest a considerably smaller reduction in labor supply than Boskin estimates. The New Jersey results suggest that the labor supply response will be on the order of a 10% to 15% reduction in hours worked by the family. This occurs because there is a larger reduction in the hours the wife works while the change in those of the husband seems to be explainable primarily because he stays out of the labor force somewhat longer, apparently more carefully searching the labor market. This inference is made because the wage he earns in the post-payment period is higher than it was before he was included in the experiment. (See Watts, 1971.)

Granting that Boskin did not have the resources of the negative income tax experiment proposal at hand, Boskin's is only one of a variety of estimates of labor supply that have been produced in recent years all using the Current Population Survey or SEO as data. Other estimates have been made by Hall, by Kalachek and Raines, by Garfinkle and by Christensen (1971). I will concentrate my comments on the Christensen study because it is most nearly similar to Boskin's work,