Economics of cost pass through and damages in indirect purchaser antitrust cases
George Kosicki; Miles B Cahill
*Antitrust Bulletin;* Fall 2006; 51, 3; ABI/INFORM Global
pg. 599


THE ANTITRUST BULLETIN: *Vol. 51, No. 3/Fall 2006* : 599

# *Economics of cost pass through and damages in indirect purchaser antitrust cases*

BY GEORGE KOSICKI* AND MILES B. CAHILL**

## I. INTRODUCTION

In recent years, global price-fixing conspiracies in citric acid, lysine, vitamins, and other bulk raw materials have resulted in highly publicized criminal convictions and the payment of billions of dollars in damages to direct purchasers of these products.[1] In addition, defendants in these litigations have faced significant damages claims from indirect purchasers. For example, in the vitamins litigation, manufacturers, retailers, and consumers in 24 states who purchased vitamin-containing products

* Vice President, Analysis Group, Inc., Boston, MA.

** Associate Professor, Department of Economics, College of the Holy Cross, Worcester, MA.

AUTHORS' NOTE: *Some of the material for this article was developed through discussions with Robert S. Pindyck. Helpful comments were also received from Tammy Sisitsky, Pierre-Yves Cremieux, Charles H. Anderton, John R. Carter, and Robert Baumann. Sarah Lowe and Megan Peter provided research assistance.*

[1] *See* JOHN M. CONNOR, GLOBAL PRICE FIXING (2001) for an overview of this litigation. For a review of the status of claims by foreign purchasers, *see* Ronald W. Davis, *The Mystery Deepens: U.S. Antitrust Treatment of International Cartels*, 17 ANTITRUST 31 (2003).

© 2006 by Federal Legal Publications, Inc.

Reproduced with permission of the copyright owner. Further reproduction prohibited without permission.

from suppliers other than the defendants (or who purchased bulk vitamins from distributors) received $305 million in a settlement with the six major vitamin manufacturers.[2] Moreover, this settlement did not resolve all indirect purchaser claims because many members of the indirect purchaser class opted out of the settlement and pursued their own individual claims in state courts.

Assessing the magnitude of indirect purchaser damages is a complex task, but it is clear that such assessments often need to be made by many parties (e.g., by lawyers, expert witnesses, and the courts). In this article, we explore the economic relationships that affect such assessments and address misconceptions that occur in the antitrust economics literature pertaining to damages calculations for indirect purchaser lawsuits. To fully expose the potential complexities of an indirect purchaser damages analysis, we consider the case of a firm that indirectly purchases an input the price of which has been artificially increased (e.g., citric acid), and then uses that input to manufacture another product that is sold to retailers (e.g., soft drinks). While many indirect purchaser cases involve consumer-level class action claims (i.e., consumers claiming damages from purchasing an overpriced product through retailers), the situation we consider is more complex from an economic perspective because it allows for the possibility that an indirect purchaser may pass on some of its cost increase in the form of higher prices on downstream sales (i.e., sales of products closer to the final consumer level).[3]

Indirect purchaser lawsuits may only be pursued under state law, as they were found to be untenable under federal law in 1977 in the land-

---

[2] *See* Kevin J. O'Connor, *Is the* Illinois Brick *Wall Crumbling?* 15 ANTITRUST 34, 37 (2001). According to O'Connor, direct and indirect claims by state governments were settled for an additional $30 million. Defendants also agreed to establish an additional fund to pay plaintiffs' attorneys fees.

[3] Indirect purchaser class certification issues, primarily in the context of claims at the consumer level, are discussed in Chris S. Coutroulis & D. Matthew Allen, *The Pass-on Problem in Indirect Purchaser Class Litigation*, 44 ANTITRUST BULL. 179 (1999); John E. Lopatka & William H. Page, *Indirect Purchaser Suits and the Consumer Interest*, 48 ANTITRUST BULL. 531 (2003); and Samid Hussain, Daniel M. Garrett & Vandy H. Howell, *Economics of Class Certification in Indirect Purchaser Antitrust Cases*, 10 COMPETITION 18 (2001).

Reproduced with permission of the copyright owner. Further reproduction prohibited without permission.

# EXHIBIT 13

mark Supreme Court decision *Illinois Brick Co. v. Illinois*.[4] The basis for *Illinois Brick* was the 1968 decision in *Hanover Shoe, Inc. v. United Shoe Machinery Corp.*,[5] which ruled that a defendant could not normally use the defense that all or some of an overcharge was passed on downstream. From this logic, the Court concluded in *Illinois Brick* that because defendants are liable for full damages to the direct purchasers, it is unreasonable to assess damages that may occur downstream. In addition, the Court found that dividing damages among the various levels of indirect purchasers was exceedingly complex and that this complexity would make antitrust enforcement inefficient and less effective.[6] After *Illinois Brick*, however, several states passed "*Illinois Brick* repealer" statutes expressly giving indirect purchasers standing to sue under state law.[7] In 1989, in *California v. ARC America Corp.*,[8] the Supreme Court found that indirect purchasers may recover trebled damages under state laws that permit such recovery, even when trebled damages were assessed under federal law to direct purchasers. Currently, twenty-three states and the District of Columbia have *Illinois Brick* repealer laws, and courts in six other states allow indirect purchaser claims under state antitrust, consumer protection, or unfair trade laws.[9]

---

[4] 431 U.S. 720 (1977).

[5] 392 U.S. 481 (1968).

[6] *See* Ronald W. Cotterill, Leonard Egan & William Buckhold, *Beyond* Illinois Brick*: The Law and Economics of Cost Pass-Through in the ADM Price Fixing Case*, 18 REV. INDUS. ORG. 45 (2001) and WILLIAM H. PAGE, PROVING ANTITRUST DAMAGES (1996) for concise reviews of the *Illinois Brick* decision.

[7] *See* Ralph Folsom, *Indirect Purchasers: State Antitrust Remedies and Roadblocks*, 50 ANTITRUST BULL. 181 (2005) for a list of states that have adopted such statutes.

[8] 490 U.S. 93 (1989).

[9] *See* Folsom, *supra* note 7, at 183–84 and 187–88 for a list of the statutes and judicial opinions that authorize indirect purchaser claims. For additional background on state indirect purchaser laws and relevant cases, *see* O'Connor, *supra* note 2; Donald I. Baker, *Federalism and Futility: Hitting the Potholes on the* Illinois Brick *Road*, 17 ANTITRUST 14 (2002); and Joel M. Cohen & Trisha Lawson, *Navigating Multistate Indirect Purchaser Lawsuits*, 15 ANTITRUST 29 (2001). The Antitrust Modernization Commission has heard testimony from numerous parties regarding possible reform of indirect purchaser claims, http://www.amc.gov/commission_hearings.htm.

Reproduced with permission of the copyright owner. Further reproduction prohibited without permission.

The thirty jurisdictions (twenty-nine states plus the District of Columbia) that permit indirect purchaser lawsuits differ on the important question of whether a downstream pass through defense is admissible. Five of the statutes (District of Columbia, Hawaii, New Mexico, New York, and North Dakota) explicitly allow defendants to use evidence of downstream pass through as a defense.[10] An additional five state statutes (Idaho, Illinois, Oregon, Rhode Island, and Vermont) prohibit duplicative recovery of damages, while two statutes (Minnesota and South Dakota) indicate that courts "may" take steps to avoid duplicative recovery.[11] In other states, judicial review has been needed to clarify the status of downstream evidence. In Michigan, for example, a recent opinion held that indirect purchaser plaintiffs are not required to consider downstream pass through when estimating damages (i.e., plaintiffs do not have to prove the absence of pass through), but defendants may present evidence regarding downstream pass through as a defense.[12]

---

[10] *See* D.C. Code Ann. § 28-4509 (1981); Haw. Rev. Stat. §§ 480-3, 480-13, & 480-14 (1980); N.M. Stat. Ann. § 57-1-3 (amended in 1989); N.Y. Gen. Bus. L. § 340(6) (amended in 1998); N.D. Cent. Code § 51-08, 1-08 (amended in 1991). For example, according to the District of Columbia statute, "a defendant shall be entitled to prove as a partial or complete defense to a claim for damages that the illegal overcharge has been passed on to others who are themselves entitled to recover so as to avoid duplication of recovery of damages."

[11] *See* Idaho Code § 48-108(2) (amended in 2000); 740 Ill. Comp. Stat. Ann. § 10/7(2) (amended in 1981); Or. Rev. Stat. §§ 646.775 & 646.780 (amended in 2001); R.I. Gen. Laws § 6-36-12(g) (amended in 1979); Vt. Stat. Ann. Title 9, § 2465(b); Minn. Stat. Ann. § 325D.57 (amended in 1984); S.D. Codified Laws Ann. §§ 37-1-14.3 & 37-1-33 (amended in 1980). For example, the Idaho statute states: "The court shall exclude from the amount of monetary relief awarded to a plaintiff under this section any amount which duplicates amounts allocable to any other actual or potential plaintiff." In contrast, the South Dakota statute, in the context of preserving a person's right to sue when injured directly or indirectly, states: "In any subsequent action arising from the same conduct, the court may take any necessary steps to avoid duplicative recovery against the defendant." S.D. Codified Laws Ann. § 37-1-33 (1980).

[12] *See* Judge Hogan's Memorandum Opinion Regarding Michigan Law in the Vitamins Litigation (Memorandum Opinion Re: Kellogg Company's Motion *in Limine* to Preclude the Evidence that It Passed on Any Indirect Purchaser Overcharges, Kellogg Co. v. F. Hoffman-La Roche Ltd. (D. D. C.

Reproduced with permission of the copyright owner. Further reproduction prohibited without permission.

## II. OVERVIEW OF AN INDIRECT PURCHASER COST PASS THROUGH AND DAMAGES ANALYSIS

From an economic perspective, calculating damages to an indirect purchaser of a product that is destined for further manufacturing involves the comparison of actual and "but-for" profits. The calculation of profits that would occur but for the purchase of an input at an artificially inflated price is, in turn, naturally broken down into a determination of but-for costs and revenues. But-for costs are the total costs that the plaintiff would incur if the artificial price increase were subtracted from the actual price paid. The determination of but-for costs should take into account changes in the prices of other inputs that are triggered by the overcharge, any substitutions away from the overcharged input, as well as any effect on costs of a change in the production level.[13] But-for revenues should take into account changes in the price at which the firm sells its product and any change in quantity that is triggered by the lower marginal (i.e., incremental) costs of the but-for world.

The extent to which a given overcharge by the defendants affects the profits of the indirect purchaser plaintiff, however, fundamentally depends on the pricing behavior of the indirect suppliers (e.g., the direct purchasers).[14] In the extreme case in which an indirect supplier

---

Mar. 14, 2003) (Misc. No. 99-197 (THF), MDL No. 1285), *available at* http://www.dcd.uscourts.gov/vit786.pdf. A similar decision was made in Iowa in 2004. *See* Judge Schectman's Order to Compel with Limitations, Farmers Cooperative Elevator Co. v. Akzo Nobel, Inc., No. LACV 035453 (Carroll Cty. Dist. Ct. Mar. 12, 2004).

[13] For example, the Hawaii statute expressly allows a defendant in a class action lawsuit to utilize a "pass back" defense: "[D]efendant shall be entitled to prove as a partial or complete defense to a claim for compensatory damages that the illegal overcharge has been passed on or passed back to others who are themselves entitled to recover so as to avoid duplication of recovery of compensatory damages." Haw. Rev. Stat. § 480-13(c) (1980). From an economic perspective, pass back occurs when the overcharge changes market conditions for another input such that the plaintiff actually pays a supplier a *lower* price for the input than would be the case in the but-for world.

[14] The indirect suppliers are the direct purchasers when only one step in the production and distribution process separates the defendants and the plaintiff. For ease of exposition, this is the case we consider here.

Reproduced with permission of the copyright owner. Further reproduction prohibited without permission.

does not raise its prices in the face of higher input costs, the original overcharge never hits the indirect purchaser plaintiff, and there is no difference between but-for and actual costs. Consequently, the first step in an indirect purchaser analysis is to assess the impact of the overcharge on the prices charged by the plaintiff's suppliers.[15] We refer to this impact on the suppliers' prices as the upstream pass through. The second step involves determining the degree to which the plaintiff's marginal cost of production was inflated because of the purchase of the higher-priced input. In the third step, the impact of the marginal cost change on the plaintiff's selling price is determined; this is the downstream pass through that in large part informs the calculation of but-for revenue. In the fourth step, the effect of the change in the selling price on the quantity sold by the plaintiff is determined, taking into account that other firms in the industry (if any) may be changing their prices. Finally, the plaintiff's change in profits is computed, taking into account the marginal cost, price, and quantity changes in the previous steps.

Figure 1 summarizes the basic steps in the damages analysis. Note that there are two pass through determinations in this analysis. All else equal, the higher the upstream pass through, the greater the damage to the indirect purchaser plaintiff; similarly, in most circumstances, the higher the downstream pass through, the lower the damage.[16] From an economic perspective, however, because upstream and downstream markets are linked (e.g., economic factors that contribute to higher pass through downstream sometimes contribute to higher pass through upstream), determining whether a particular piece of evidence raises or lower damages is not always straightforward.

---

[15] Although the word "overcharge" naturally refers to the extent to which the price has been artificially increased relative to the noncollusive "but-for" price, in practice the difference between the actual and but-for price is frequently expressed as a percentage of the actual price. If computed in this way the "overcharge" percentage in fact refers to the percentage reduction in the actual price needed to determine the but-for price. For example, if the actual price is $11 and the but-for price is $10, the actual price is 10 percent higher than the but-for price; alternatively, one could say that the but-for price is 9.1 percent less than the actual price.

[16] An exception to this proposition is discussed below in section IV.

Reproduced with permission of the copyright owner. Further reproduction prohibited without permission.

*Figure 1*
Overview of Steps in Indirect Purchaser Analysis

DIRECT PURCHASER ANALYSIS

How much lower would the price of the original product be but for the conspiracy?

⬇

INDIRECT PURCHASER ANALYSIS

1. How much of the overcharge was passed on to the indirect purchaser by the upstream supplier?
2. To what extent did the change in input price affect the plaintiff's cost?
3. How much of the cost change was passed on downstream?
4. How much did the change in the selling price affect downstream unit sales (taking into account price changes of other competitors)?
5. How much did the plaintiff's profits change?

In the sections that follow, we explore a number of economic relationships that come into play when proceeding through the steps summarized in figure 1. In section III we discuss relationships that are related to the issue of cost pass through. We begin by considering the extent to which the basic theory of tax incidence in competitive markets applies to the indirect purchaser problem and show that the conventional analysis of the effects of a per unit sales tax understates the degree of cost pass through. In so doing, we also show that discussions of pass through easily can become confused by a failure to consider whether the relationship between costs and prices is expressed as a rate of change or as the relationship between two percentage changes (an elasticity). After discussing these background issues, we turn to the more complex topic of cost pass through by firms with some degree of market power. While it has been well established in the economics literature that pass through under these conditions depends on the functional form of the firm's demand curve, we present a more straightforward way to integrate this factor into the analysis. In the final part of section III, we discuss linkages between upstream

Reproduced with permission of the copyright owner. Further reproduction prohibited without permission.

and downstream demand that have implications for the overall consistency of the pass through analyses. In section IV we show that the damages incurred by an indirect purchaser depend on more than just the upstream and downstream cost pass through analyses presented in section III. In the context of perfectly competitive markets, we discuss the implications for damages of the long-run entry and exit of competitors. In the context of oligopolistic markets (i.e., markets with few firms, each possessing some market power) we discuss the role of output changes in the determination of damages and show that cross-price elasticities play an important role in the relationship between pass through and damages. Section V presents concluding remarks.

## III. ECONOMICS OF COST PASS THROUGH

### A. *Pass through in competitive markets*

Most discussions of pass through start with insights from tax incidence theory.[17] Tax incidence seeks to determine which portion of, say, an excise tax imposed on all producers (sellers), is ultimately paid by the producers in the form of a lower after-tax price, and which portion is paid by consumers in the form of a higher price. The most basic studies of tax incidence assume perfectly competitive markets, linear supply and demand curves, and the imposition of a constant per unit tax on all of the producers, which in turn creates a parallel upward shift in the supply curve by the amount of the per unit tax. In such an example, the fraction of the change in cost that is passed on to the buyers in the form of higher prices is determined by the relative elasticities of supply ($E_S$) and demand ($E_D$).[18] Specifically, the change in the price to consumers (D$P$) relative to the change in marginal cost (D$MC$) stemming from the imposition of the per unit tax is given by the equation:[19]

$$\frac{\Delta P}{\Delta MC} = \frac{E_S}{E_S - E_D} \qquad (1)$$

---

[17] *See, e.g.*, Robert G. Harris & Lawrence A. Sullivan, *Passing on the Monopoly Overcharge: A Comprehensive Analysis*, 128 U. PA. L. REV. 269 (1979).

[18] Under most circumstances the elasticity of demand ($E_D$) is a negative number.

[19] *See* ROBERT S. PINDYCK & DANIEL L. RUBINFELD, MICROECONOMICS 328 (6th ed. 2005).

Reproduced with permission of the copyright owner. Further reproduction prohibited without permission.

The fraction of the cost change passed on to buyers is greater the less sensitive buyers are to price changes (the less negative is the value of $E_D$) and the more sensitive suppliers are to price changes (the higher the value of $E_S$). The fraction of the cost changed passed on, often termed the *pass through rate* (PTR), is 100 percent when the supply curve (i.e., the sum of the individual firm marginal cost curves) is perfectly elastic or the demand curve is perfectly inelastic. In all other cases, the pass through rate will be between 0 percent and 100 percent.[20]

While equation (1) is a useful and well-known reference point in discussions of pass through, the assumption of a parallel shift in supply limits its application in the context of an indirect purchaser analysis. Under the most commonly assumed technologies (i.e., production functions) an increase in the price of an input will in fact increase the firm's marginal cost in a way that is *proportional* to the level of marginal cost (i.e., the change is a *percentage* of the marginal cost) rather than by a constant *absolute* amount. This point is established formally in appendix A for constant elasticity of substitution (CES) production functions.[21] In graphical terms, if the supply curve is upward sloping, the input price change will rotate the supply curve (i.e., the vertical shift is greater for higher values of marginal cost), whereas the shift is parallel in the case of the constant per unit tax.[22] Appendix A also illustrates that a simple way to determine the percentage change in the marginal cost that accompanies an input price change is to relate the percentage change in the marginal cost to the *percentage* change in the price of the input. Specifically, appendix A shows that for all CES technologies:

$$\% \text{ change in MC} = (\text{cost share of input}) \times (\% \text{ change in price of input}) \qquad (2)$$

---

[20] Note that this formula does not take into account long-run adjustments in supply caused by the entry or exit of firms that follows when the typical firm no longer operates at a point of zero economic profits. We discuss this entry/exit response in section IV below.

[21] Other well-known production functions (e.g., Cobb-Douglas and Leontief fixed proportions) are special cases of the CES function.

[22] For the CES production function, an input price change creates a parallel shift only in the case where marginal cost is constant (horizontal). This occurs when the technology is characterized by constant returns to scale.

Reproduced with permission of the copyright owner. Further reproduction prohibited without permission.

An alternative way to state this point is that for a CES technology, the elasticity of marginal cost with respect to the price of the input is the cost share of that input.[23]

In Harris and Sullivan's widely cited review of cost pass through in an indirect purchaser context, proportional shifts in supply were not considered, only parallel shifts.[24] Figure 2 shows that a failure to account for the proportional nature of the supply shift understates pass through, provided that supply is upward sloping. For example, as shown in figure 2, suppose that because of an overcharge on an indirectly-purchased input, the plaintiff charges a price of $60 (at the intersection of demand and actual supply). Suppose we also know that removing the overcharge would reduce the marginal cost of the plaintiff by fifty percent relative to the actual level. This means that at the actual quantity sold, marginal cost has been changed by $30 (50% x $60) relative to what it would be in the but-for world, and it would be easy to proceed to analyze the $30 cost change as if it created a constant $30 shift in supply at all output levels. Figure 2 shows that an analysis based on a parallel shift in supply of $30 would result in a predicted pass through of $15 (price falls from $60 in the actual world to $45 in the but-for world). In fact, however, the supply curve has shifted by a factor of fifty percent over its entire range, and this leads to an actual pass through of $20 (price falls from $60 in the actual world to $40 in the but-for world).[25]

---

[23] The relationship in equation (2) holds for all CES functions for infinitesimal changes in the input price. As the elasticity of substitution approaches zero (i.e., fixed proportions) the relationship is exactly true, even for larger discrete changes in the input price. For nonzero values of the elasticity of substitution, this method for computing the percentage change in marginal cost will overstate the actual percentage when the input price is increasing; it will understate the percentage change in marginal cost when the input price is falling.

[24] *See* Harris & Sullivan, *supra* note 17.

[25] The analysis depicted in figure 2 is essentially the same as the analysis of the incidence of an ad valorem tax placed on a producer. While treating a supply shift as parallel when in fact it is proportional will *understate* pass through, the parallel shift will *overstate* the actual change in total variable cost associated with the input price change (the area between the actual and but-for supply curves for all quantities up to the actual level).

Reproduced with permission of the copyright owner. Further reproduction prohibited without permission.

*Figure 2*
Comparing the Pass Through of Proportional and Absolute Cost Changes




## B. *The relationship between pass through measures*

While figure 2 focused on the *absolute* change in price associated with a *percentage* change in marginal cost, a preferable measure of pass through is the elasticity of price with respect to marginal cost (i.e., the ratio of the percentage change in price to the percentage change in marginal cost). We refer to this elasticity as the pass through elasticity (PTE). This elasticity measure is preferable because it is insensitive to the units used to measure the price.[26]

[26] The PTE is also the standard way to measure pass through in the exchange rate literature. For example, complete pass through is defined as a situation in which a one percent appreciation in the exchange rate results in a one percent increase in the price in the importing country. *See* Pinelopi Koujianou Goldberg & Michael Knetter, *Goods and Exchange Rates: What Have We Learned?* 35 J. ECON. LIT. 1243 (1997); and Giovanni P. Olivei, *Exchange Rates and the Prices of Manufacturing Products Imported into the United States*, NEW ENG. ECON. REV., First Quarter 2002, at 3 (2002).

Reproduced with permission of the copyright owner. Further reproduction prohibited without permission.

The PTE is different from the pass through rate measure that was discussed earlier in the context of a constant change in marginal cost. The two measures are related by the equation

$$\text{PTE} = \text{PTR}\left(\frac{\text{MC}}{P}\right) \qquad (3)$$

where MC/$P$ is the ratio of marginal cost to price. In any situation in which the firm is operating such that price exceeds marginal cost (i.e., in any departure from perfect competition), then the PTE is less than the PTR.

While the two pass through measures are closely related—and it is easy to transform one into the other—it is also easy to confuse them and draw incorrect conclusions regarding the degree of pass through. For example, in Cabral's industrial organization text, the author derives the pass through rate (under conditions in which marginal cost and price will clearly not be equal), but interprets the result as a pass through elasticity. Specifically, Cabral discusses an example in which the pass through rate is determined to be 2/3, but he concludes: "Therefore, if marginal cost ($c$) increases by 40%, $p$ [price] will increase by (2/3)40% = 26.6%."[27] Note that this mistake overstates pass through. The correct percentage change in price depends on the PTE, which equals the PTR multiplied by the firm's ratio of marginal cost to price. For example, if marginal cost is one-half of the price, the PTE is one-third (2/3 x 1/2) and the hypothetical 40 percent cost increase will lead to only a 13.3 percent increase in price (40 percent x 1/3).

Similarly, Connor also confuses the PTR and PTE, but he understates the degree of pass through by failing to take into account that the PTE, by definition, is always less than or equal to the PTR. In discussing the measurement of pass through by cola makers of a citric acid cost increase, he states:

> If for the purposes of illustration, cola makers require citric acid in the formula that accounts for 1 percent of manufacturing costs, when the citric acid cartel raised its prices by 80 percent the cola companies raised cola prices by 2 percent. In this example the pass-through rate is 250 percent (the increase in price divided by the increase in costs of 0.8 percent).[28]

---

27 *See* LUIS CABRAL, INTRODUCTION TO INDUSTRIAL ORGANIZATION 117 (2001).

28 *See* CONNOR, *supra* note 1, at 467.

Reproduced with permission of the copyright owner. Further reproduction prohibited without permission.

While Connor is correct in recognizing that, using equation (2), an 80 percent increase in the price of citric acid will (at least approximately) raise incremental (i.e., marginal) manufacturing costs 0.8 percent if citric acid accounts for 1 percent of costs, he is incorrect in characterizing the PTR as 250 percent.[29] If marginal cost increases by 0.8 percent and price increases by 2 percent, the PTE is 2.5, and the PTR is given by 2.5 x ($P$/MC). So, for example, if the ratio of price to marginal cost were two to one, the pass through rate in this case would be 500 percent. Both the Cabral and Connor examples demonstrate that failure to recognize the way in which pass through is measured will lead to inaccurate conclusions about the extent of pass through, particularly if there is a significant margin between price and cost.

### C. *Pass through by firms with market power*

While the economics of cost pass through are often explored in the context of a perfectly competitive market, some antitrust authors maintain that a pass through analysis (or incidence analysis) requires restrictive competitive assumptions. For example, Hussain, Garrett and Howell assert that "it is important to realize that incidence theory assumes perfect competition, a condition that might not be met by all markets."[30] Similarly, Coutroulis and Allen state that

> [i]ncidence analysis is postulated upon the assumption of a perfectly competitive industry. . . . In the real world, of course, the classic assumptions underlying the economist's notion of a competitive market will often not be present, militating against the validity of using an incidence analysis approach for proving either common impact or common damages.[31]

As we discussed in section III.A above, it is true that the most basic discussions of tax incidence *assume* perfect competition, but this assumption is by no means a necessary condition for an incidence analysis.[32] Pass through analyses for firms with market power may be

---

[29] Also note that the 0.8 percent increase in marginal cost will be exactly true only if the technology is characterized by an elasticity of substitution of zero.

[30] *See* Hussain, Garrett & Howell, *supra* note 3, at 23.

[31] *See* Coutroulis & Allen, *supra* note 3, at 199–200.

[32] Hussain, Garrett & Howell, *supra* note 3, at 21, 23–26 emphasize that most tax incidence discussions *assume* perfect competition for purposes of

Reproduced with permission of the copyright owner. Further reproduction prohibited without permission.

more complex than under perfectly competitive conditions, but many important pass through relationships have already been derived in the economics literature for markets characterized as monopolies or oligopolies.[33]

In the single seller case, for example, the pass through rate is always exactly 50 percent if the monopolist faces a linear demand and a constant marginal cost.[34] In contrast, in a perfectly competitive market with constant marginal cost (a perfectly elastic supply curve), the pass through rate for an industry-wide increase in marginal cost is 100 percent. Alternatively, when a monopolist faces a constant elastic-

---

simplification, but elsewhere in the paper they assert that the validity of an incidence analysis depends on the extent to which the conditions of perfect competition are met. That is, the authors seem to suggest that it is not possible to conduct an incidence analysis in markets where firms have market power.

[33] *See* Robert L. Bishop, *The Effects of Specific and Ad Valorem Taxes*, 82 Q. J. ECON. 198 (1968); Jeremy I. Bulow & Paul Pfleiderer, *A Note on the Effect of Cost Changes on Prices*, 91 J. POL. ECON. 182 (1983); Jesus Seade, *Profitable Cost Increases and the Shifting of Taxation: Equilibrium Responses of Markets in Oligopoly* (U. Warwick Discussion Paper No. 260, 1985); Simon P. Anderson, Andre de Palma & Brent Kreider, *Tax Incidence in Differentiated Product Oligopoly*, 81 J. PUB. ECON. 173 (2001); Don Fullerton & Gilbert E. Metcalf, *Tax Incidence*, *in* 4 HANDBOOK OF PUBLIC ECONOMICS 1787 (Alan J. Auerbach & Martin Feldstein eds., 2002); and John M. Barron, Kelly Hunt Blanchard & John R. Umbeck, *An Economic Analysis of a Change in an Excise Tax*, 35 J. ECON. EDUC. 184 (2004). With the exception of the Bishop and Barron, Blanchard & Umbeck papers, the literature typically maintains an assumption of constant marginal cost when discussing pass through by firms with market power. We maintain that assumption in the discussion that follows. Upward sloping marginal cost will yield a lower pass through elasticity for any constant percentage change in the marginal cost.

[34] *See* HAL R. VARIAN, INTERMEDIATE MICROECONOMICS: A MODERN APPROACH 423–25 (6th ed. 2002). A linear demand has the form $Q = a - bP$ where $a$ and $b$ are constants. The notion that a monopolist may pass through less of a cost increase than a company in a competitive industry is sometimes considered to be counterintuitive, but the result is consistent with the fact that each firm in a perfectly competitive market must at least break even in the long-run. In contrast, a monopolist can still survive if it does not completely pass through cost changes, provided it is earning positive economic profits prior to the cost change.

Reproduced with permission of the copyright owner. Further reproduction prohibited without permission.

ity demand curve, the pass through rate will be greater than 100 percent.[35] With constant elasticity demand and a constant marginal cost, a monopolist's optimal price is

$$P = \left( \frac{E_D}{1 + E_D} \right) \text{MC} \tag{4}$$

where $E_D$ is the numerical value of the price elasticity of market demand.[36] This pricing rule implies a pass through rate given by the equation,

$$\text{PTR} = \frac{E_D}{1 + E_D} \tag{5}$$

This equation shows that the pass through rate increases as the price elasticity decreases (in absolute value). For example, a monopolist facing a constant own-price elasticity of –3 will have a pass through rate of 1.5, while a monopolist facing a constant own-price elasticity of –2 will have a pass through rate of 2.0.

Note, however, that regardless of the pass through rate, the *elasticity* of price with respect to marginal cost (the PTE) for the monopolist is always one in the constant elasticity case.[37] This follows from the definition of the PTE:

$$\text{PTE} = \text{PTR}\left( \frac{\text{MC}}{P} \right) = \left( \frac{E_D}{1 + E_D} \right)\left( \frac{\text{MC}}{P} \right) \tag{6}$$

Substituting equation (4) for $P$ in equation (6), yields PTE = 1.

---

[35] *See id.* A constant elasticity demand has the form $Q = aP^{-b}$ where $-b$ is the own-price elasticity of demand. The constant elasticity form is often written using the natural logarithm function: $\log Q = \log a - b \log P$.

[36] In the single seller (monopoly) case, the elasticity facing the individual firm is the same as the market elasticity. The elasticity of demand is a negative number as long as there is an inverse relationship between price and quantity.

[37] Note that price is a constant proportional markup over marginal cost. When price and cost are related via a constant proportional markup, a one percent change in cost always leads to a one percent change in price, and so the elasticity of price with respect to marginal cost is one.

Reproduced with permission of the copyright owner. Further reproduction prohibited without permission.

Taken together, the linear and constant elasticity cases just discussed illustrate the importance of the functional form (i.e., the curvature) of the demand curve in determining pass through by firms with market power. That is, it is not only the level of the elasticity that is important, but also how the elasticity changes. A convenient way to explore the role of the functional form of the demand curve is to express the demand curve using the Box-Cox transformation of the basic linear model:

$$\frac{q^{\lambda}-1}{\lambda}=a-b\left(\frac{p^{\lambda}-1}{\lambda}\right) \qquad (7)$$

where the parameter $\lambda$ controls the degree of curvature of the demand curve ($a$ and $b$ are demand function parameters that control the position and slope of the demand curve).[38] As $\lambda$ decreases from one and approaches zero, the demand curve changes from linear to constant elasticity demand. Figure 3 illustrates how the curvature of the demand function changes as $\lambda$ varies.[39]

The connection between pass through and the functional form of the demand curve has been explored by other economists, but not in the convenient framework of the Box-Cox functional form.[40] For example, Bulow and Pfleiderer express the pass through of the monopolist as a function of the price elasticity of the monopolist's own-price elasticity of demand.[41] Anderson, de Palma, and Kreider

---

[38] *See* ROBERT S. PINDYCK & DANIEL L. RUBINFELD, ECONOMIC MODELS AND ECONOMIC FORECASTS 277 (4th ed. 1998) for a discussion of the Box-Cox transformation.

[39] Note that in figure 3 as *l* varies, the *a* and *b* parameters must be adjusted so that the demand curves all have a point in common (i.e., $Q = 15$, $P = 3$ in figure 3).

[40] *See* Bulow & Pfleiderer, *supra* note 33; Seade, *supra* note 33; Ronald W. Cotterill, *Estimation of Cost Pass Through to Michigan Consumers in the ADM Price Fixing Case* (U. Conn., Food Mktg. Policy Ctr., Research Report No. 39, 1998), Cotterill, Egan & Buckhold, *supra* note 6; Anderson, de Palma & Kreider, *supra* note 33; and Fullerton & Metcalf, *supra* note 33. The relationship between pass through and curvature has also been explored in the exchange rate pass through literature. *See, e.g.*, Goldberg & Knetter, *supra* note 26.

[41] *See* Bulow & Pfleiderer, *supra* note 33. Cotterill, *supra* note 40, expresses the pass through of the monopolist as a function of the rate of change (i.e., the derivative) of the own-price elasticity. His expression can be simplified to the expression used in Bulow & Pfleiderer.

Reproduced with permission of the copyright owner. Further reproduction prohibited without permission.

Case 4:07-md-01819-CW Document 799-14 Filed 07/30/09 Page 18 of 33 PageID #: 18306



*Figure 3*
Demand Curves Generated by the Box-Cox Functional Form




express the pass through of a price-setting firm in a differentiated products market as a function of the elasticity of the slope of the demand curve facing the individual firm. Fullerton and Metcalf derive a pass through expression for quantity setting firms selling homogeneous products. Their expression depends on the elasticity (with respect to quantity) of the slope of the inverse demand curve facing the firm.[42] Table 1 shows the values of these curvature measures for the cases of linear and constant elasticity demand. Note that in table 1, the own-price elasticity of demand facing the typical firm is denoted by *e*.

[42] *See* Fullerton & Metcalf, *supra* note 33. This measure of curvature is also used in Sheldon Kimmel, *Effects of Cost Changes on Oligopolists' Profits*, 40 J. IND. ECON. 441, 443 (1992) and Seade, *supra* note 33.

Reproduced with permission of the copyright owner. Further reproduction prohibited without permission.

Case 4:07-md-01819-CW Document 799-14 Filed 07/30/09 Page 19 of 33
PageID #: 18307



*Table 1*

Comparison of Curvature Measures Used in Pass Through Analyses

| *Measure of Curvature* | *Value When Demand is Linear* | *Value When Demand is Constant Elasticity* |
|---|---|---|
| Box-Cox functional form parameter (*l*) | 1 | 0 |
| Price elasticity of own-price elasticity | $1 - e$ | 0 |
| Elasticity of slope of demand curve | 0 | $e - 1$ |
| Elasticity of slope of inverse demand | 0 | $(1/e) - 1$ |

Table 1 shows that it is easier to characterize the linear and constant elasticity demand cases using the Box-Cox functional form. In the Box-Cox model, linear and constant elasticity demand are always represented by the same values ($\lambda = 1$ and $\lambda = 0$, respectively). With the alternative measures of curvature, the value associated with one of the cases is not a constant and will vary with the value of the own-price elasticity of demand. This makes it harder to evaluate pass through expressions containing these alternative measures of curvature.

Using the Box-Cox functional form, pass through can ultimately be expressed as a function of the functional form parameter ($\lambda$) for a wide variety of market models. Figure 4, for example, shows how the PTE varies with $\lambda$ for a differentiated products industry with three identical firms ($N = 3$). In this model each firm chooses the price that maximizes its profits, taking its rivals' prices as given. For comparison purposes, the PTE for the monopoly case ($N = 1$) is also shown. Appendix B provides the details of this price setting model and derives the expression for the PTE schedule depicted in figure 4.[43]

[43] In constructing figure 4, demand function parameters were chosen so as to achieve the following benchmarks: $P = 3$, total $Q = 15$, individual firm own-price elasticity = –2, cross-price elasticity = 0.5, ratio of $P$ to MC = 2.

Reproduced with permission of the copyright owner. Further reproduction prohibited without permission.

*Figure 4*
The Effect of Functional Form on Pass Through for Firms with Market Power




In figure 4, note that for any number of firms, the PTE converges to one as demand approaches constant elasticity (*l* approaches zero). Note also that the PTE falls fairly rapidly as the functional form moves away from constant elasticity demand (*l* increases towards one). As the number of firms (*N*) increases, the PTE schedule rotates out, indicating a higher PTE for any functional form parameter greater than zero.

## D. *The connection between upstream and downstream pass through*

The economic factors influencing cost pass through that have been discussed so far apply to both the upstream and downstream pass through analyses. At the same time, however, it is important to keep in mind that the two analyses are not completely independent because the demand for any upstream input is fundamentally linked to the demand for the downstream product. Specifically, it has been

Reproduced with permission of the copyright owner. Further reproduction prohibited without permission.

Case 4:07-md-01819-CW Document 799-14 Filed 07/30/09 Page 21 of 33
PageID #: 18309



established in the economics literature that the demand for the upstream input will be more elastic (a) the greater the elasticity of demand for the final product; (b) the greater the elasticity of substitution with other inputs; (c) the greater the elasticity of supply of substitute inputs; and (d) the larger the cost share of the input.[44]

When the supply curves for all substitute inputs are perfectly elastic, and downstream producers have CES technology with constant returns to scale, the upstream market elasticity of an input (e.g., input 1) can be related to factors (a), (b), and (d) above through the formula:[45]

$$E_1 = s_1(\text{PTE})(E_D) - (1 - s_1)s \qquad (8)$$

where $E_1$ is the upstream market elasticity for input 1, $s_1$ is the cost share of input 1, PTE is the elasticity of the downstream price with respect to marginal cost, $E_D$ is the market elasticity of demand for the downstream product, and $\sigma$ is the elasticity of substitution between input 1 and other inputs. Note that if the PTE = 1, the upstream market elasticity can be expressed as a weighted average of the downstream elasticity of demand and the elasticity of substitution, where the weight is the cost share of the input. So, for example, if $E_D = -2$ and $\sigma = 1$, the derived demand elasticity for an input with a cost share of 25 percent is –1.25 [i.e., 0.25(1)(–2) –0.75(1) = –1.25]. In cases where the PTE = 1 and the input is used as part of a fixed proportions production process ($\sigma = 0$), the derived demand elasticity is just the elasticity of the downstream product multiplied by the cost share of the input. Overall, equation (8) suggests that inputs that constitute a small share of costs will tend to have relatively low own-price elasticities. All else equal, under competitive market conditions, this tends to

[44] These principles are often referred to as the Hicks-Marshall laws of derived demand. *See* RONALD G. EHRENBERG & ROBERT S. SMITH, MODERN LABOR ECONOMICS 100 (8th ed. 2003) for a conceptual overview in the context of the demand for labor. A mathematical treatment is provided in WALTER NICHOLSON, MICROECONOMIC THEORY: BASIC PRINCIPLES AND EXTENSIONS (7th ed. 1998), Chapter 21 and the Extensions to Chapter 21. For the fourth Hicks-Marshall law to hold, the elasticity of demand must exceed the elasticity of substitution.

[45] *See* NICHOLSON, *supra* note 44, at 649–50, 663.

Reproduced with permission of the copyright owner. Further reproduction prohibited without permission.

increase the upstream pass through, provided the supply of the indirect input is not perfectly elastic. If the upstream market is not perfectly competitive, a higher demand elasticity will tend to increase the pass through rate, but not necessarily the pass through elasticity.[46]

Even if upstream pass through is determined to be complete, however, it is important to keep in mind that this does not imply that the overcharge percentage on the indirect product will be the same as the overcharge percentage on the original product. This follows from equation (2), which relates the percentage change in marginal cost to the percentage change in the input price. Even if the elasticity of the indirect supplier's price with respect to marginal cost is one, the percentage change in the supplier's marginal cost will only be a portion of the overcharge percentage on the indirect product, and so the percentage change in the supplier's price will be only a portion of the overcharge percentage. For low values of the elasticity of substitution ($\sigma$), the cost share of the input will in most cases provide an appropriate factor by which the overcharge percentage on the original product can be adjusted.

## IV. THE RELATIONSHIP BETWEEN DOWNSTREAM PASS THROUGH AND DAMAGES

### A. *Damages in perfectly competitive markets*

A fundamental result of the perfectly competitive framework is that in the long run, profits are driven to the breakeven level as firms freely enter and leave the industry (and expand and contract), until the price charged for the product is equal to the minimum average (i.e., per unit) cost of production.[47] As a result, in the long run any industry-wide cost increase stemming from artificially inflated input prices will be fully passed through the supply chain and there are no damages to survivor firms, as all firms in the industry return to a

---

[46] Recall that when a firm has market power, the functional form of the demand curve also plays a role in determining pass through. If the firm faces a constant elasticity demand, the PTE is one regardless of the PTR.

[47] The firm will also be operating so that price equals marginal cost because marginal cost equals average cost at the output level where average cost reaches its minimum.

Reproduced with permission of the copyright owner. Further reproduction prohibited without permission.

profit that reflects the opportunity cost of all inputs. As a result of these long-run adjustments, any damages that occur in a perfectly competitive environment are fundamentally a short-run phenomenon driven primarily by the pass through relationships discussed earlier.[48] From an economic perspective, damages associated with changes in the firm's optimal quantity are likely to be extremely small because the economic profit margins earned on any increased unit sales that would occur in the but-for world are likely to be very small.

### B. *Damages for a pure monopolist*

In contrast to the perfectly competitive case, there is not necessarily a long-run limit on damages for firms with market power. Limitations on entry that may exist in such markets lead to the possibility that significant damages may exist even in the long run. Moreover, because price will exceed marginal cost for firms with market power, changes in quantity that accompany price changes may have a significant effect on damages. Even with complete downstream pass through, profits may be adversely affected if the quantity demanded falls by a significant amount. As an extreme example, consider the case, discussed earlier, of a pure monopolist facing a constant elasticity demand and constant marginal cost. In percentage terms, such a firm would be characterized by complete pass through (PTE = 1) and the pass through rate would actually exceed 100 percent.

Table 2 below illustrates the downstream pass through and damages that occur when a monopolist faces a demand curve with a constant elasticity of −2 and the but-for level of marginal cost is one percent below the actual marginal cost (1.485 vs. 1.50).[49] With respect

[48] Because the overcharge reaching indirect purchasers may be intermittent, short-run effects may predominate even when price fixing agreements are found to have existed for many years. *See* William M. Landes & Richard A. Posner, *The Economics of Passing On: A Reply to Harris and Sullivan*, 128 U. PA. L. REV. 1274, 1277 (1980). For a recent review of the evidence on the duration of price fixing agreements, *see* Margaret C. Levenstein & Valerie Y. Suslow, *What Determines Cartel Success?* 44 J. ECON. LIT. 43 (2006).

[49] Quantity in the actual world was set to 15 by adjusting the *a* parameter in the constant elasticity demand function with the *b* parameter set at 2. *See* note 35 *supra*.

Reproduced with permission of the copyright owner. Further reproduction prohibited without permission.

to pass through, the profit maximizing price (see equation (4)) falls from 3.00 to 2.97. Given that the absolute change in marginal cost was 0.15, this indicates a pass through rate of 2.0.[50] With respect to damages, profits increase by 0.227 (or 1.01 percent) as marginal cost is reduced in the but-for scenario. Note, however, that the change in profits is essentially the same as in the case of no pass through. If price and quantity did not respond to the change in cost, damages would be the amount of the cost reduction (0.15) multiplied by actual output (15), which equals a profit increase of 0.225.

The reason the change in profits for this monopolist is essentially the same with and without downstream pass through is the relatively large increase in output that accompanies the plaintiff's lower but-for price in the scenario where pass through is considered. Even though price and marginal cost are lower in the but-for world, the increase in output that accompanies the price pass through means that *total* costs and revenues both *increase*, and they increase by the same percentage. To the extent that revenues are greater than costs for the monopolist, however, this equal percentage change in costs and revenues means that profits increase in the but-for world. In addition, as table 2 indicates, the profit increase is essentially the same as in the zero pass through case. For larger changes in marginal cost, the damages to the monopolist are actually *higher* in the high pass through scenario compared to the no pass through scenario.[51]

As the preceding example demonstrates, determining damages for a pure monopolist requires careful analysis.[52] While pass

---

[50] Note that the pass through rate can also be computed using equation (5).

[51] This is also technically true in table 2 because 0.227 (1.01 percent) > 0.225 (1.0 percent), but the difference is slight because the original change in marginal cost is very small.

[52] *See* Kimmel, *supra* note 42, for a general treatment of the relationship between cost and profit changes for an *n* firm quantity setting (i.e., Cournot) industry. Other papers that explore the relationship between cost changes and profits for firms with market power include Michael L. Katz & Harvey S. Rosen, *Tax Analysis in an Oligopoly Model*, 13 PUB. FIN. Q. 3 (1985); Nicholas Stern, *The Effects of Taxation, Price Control and Government Contracts in Oligopoly and Monopolistic Competition*, 32 J. PUB. ECON. 133 (1987); Fernando Bernstein & Awi Federgruen, *Comparative Statics, Strategic Complements and*

Reproduced with permission of the copyright owner. Further reproduction prohibited without permission.

Case 4:07-md-01819-CW Document 799-14 Filed 07/30/09 Page 25 of 33
PageID #: 18313



through depends on the functional form of the demand curve, damages may depend as much on the change in quantity as on the extent of pass through. In fact, under certain conditions, the extent of pass through may have little or no impact on damages, as the example shows.

*Table 2*

Damages for a Monopolist Facing Constant Elasticity Demand

| | *Actual* | *But-for* | *Change* | *% Change* |
|---|---|---|---|---|
| Marginal cost (MC) | 1.500 | 1.485 | −0.015 | −1.00% |
| Own-price elasticity | −2.000 | −2.000 | | |
| Price (*P*) | 3.000 | 2.970 | -0.030 | −1.00% |
| Quantity (*Q*) | 15.000 | 15.305 | 0.305 | 2.03% |
| Ratio of MC to *P* | 0.500 | 0.500 | | |
| Pass through rate (PTR) | 2.000 | 2.000 | | |
| Pass Through elasticity (PTE) | 1.000 | 1.000 | | |
| *With pass through* | | | | |
| Revenue | 45.000 | 45.455 | 0.455 | 1.01% |
| Costs | 22.500 | 22.727 | 0.227 | 1.01% |
| Profit | 22.500 | 22.727 | 0.227 | 1.01% |
| *With no pass through* | | | | |
| Revenue | 45.000 | 45.000 | 0.000 | 0.00% |
| Costs | 22.500 | 22.275 | −0.225 | −1.00% |
| Profit | 22.500 | 22.725 | 0.225 | 1.00% |

*Substitutes in Oligopolies*, 40 J. MATH. ECON. 713 (2004); and X. Henry Wang & Jingang Zhao, *Welfare Effects from Small Cost Reductions in Differentiated Oligopoly* (U. of Saskatchewan, Working Paper, February 2006), *available at* http://duke.usask.ca/~jiz400/wp/bertrand.cournot.pdf. These papers differ from the oligopoly analysis that follows in that they assume firms choose quantity (*see* Katz & Rosen, Stern, and Kimmel, *supra*) or assume that the demand curve facing the firm is linear (*see* Bernstein & Federgruen and Wang & Zhao, *supra*).

Reproduced with permission of the copyright owner. Further reproduction prohibited without permission.

### C. *Damages for a firm in a differentiated products oligopoly*

In markets where there are differentiated products and more than one competitor, higher downstream pass through will reduce damages, but the extent to which this occurs depends on (a) the extent to which other firms in the market also face higher costs; and (b) the cross-price elasticities between the plaintiff and its competitors. When all firms in an industry experience a cost increase and start to increase prices, the reduction in quantity suffered by any particular firm will be less than if it had to raise price in an environment where all other competitor prices are constant.[53] In this situation, the own-price elasticity of the *market* demand will be a better indicator of the degree to which the *firm's* quantity will change than the firm's own-price elasticity.[54] In the *N*-firm differentiated products model described in appendix B, for example, the market elasticity perfectly captures the cross-price effects because market demand is given by the expression

---

[53] This also makes the indirect purchaser problem discussed here different from the issue of the pass through of merger cost savings. In the latter context, the cost change is not experienced by all firms in the industry. For an analysis of cost pass through in the context of horizontal mergers, *see* Paul L. Yde & Michael G. Vita, *Merger Efficiencies: Reconsidering the 'Passing-On' Requirement*, 64 ANTITRUST L.J. 735 (1996); Luke Froeb, Steven Tschantz & Gregory Werden, *Pass Through Rates and the Price Effects of Mergers*, 23 INT'L J. INDUS. ORG. 703 (2005); and Orley Ashenfelter, David Ashmore, Jonathan B. Baker & Signe-Mary McKernan, *Identifying the Firm-Specific Cost Pass-Through Rate* (FTC, Bureau of Economics, Working Paper No. 217. 1998), *available at* http://www.ftc.gov/be/workpapers/wp217.pdf.

[54] In implementing the damages framework in this context, it is also important to keep in mind that the appropriate demand curve to be estimated is at the wholesale, rather than retail, level. In general, the wholesale demand can be thought of as being derived from the retail demand in the same way that the demand for the upstream input is derived from the demand for the downstream product (*see* equation (8)). For example, assuming a fixed one-to-one relationship between wholesale and retail sales ($s = 0$) and complete pass through at the retail level (PTE = 1), the wholesale elasticity will be lower than the retail elasticity if there are significant costs associated with retailing (so that the wholesale product represents only a fraction of the costs at the wholesale level). However, if the retail price is set to be a constant proportional markup over the wholesale price, then the wholesale and retail price elasticities will be the same.

Reproduced with permission of the copyright owner. Further reproduction prohibited without permission.

$$E_D = e_{ii} + (N - 1)e_{ij} \quad (9)$$

where $e_{ii}$ is the own-price elasticity of firm $i$, and $e_{ij}$ is the cross-price elasticity between the quantity of $i$ and the price of $j$.

*Table 3*

The Relationship between Pass Through and Damages for a Plaintiff in an Oligopoly

| | | *Linear* | | *Constant Elasticity* | | | |
|---|---|---|---|---|---|---|---|
| | | $\lambda = 0$ | | $\lambda = 0.25$ | | $\lambda = 0.001$ | |
| | | *Actual* | *But-for* | *Actual* | *But-for* | *Actual* | *But-for* |
| [A] | Number of firms ($N$) | 3 | 3 | 3 | 3 | 3 | 3 |
| [B] | Demand parameter ($a$) | 7.3 | 7.3 | 3.4 | 3.4 | 2.7 | 2.7 |
| [C] | Demand parameter ($b$) | 3.3 | 3.3 | 2.3 | 2.3 | 2.0 | 2.0 |
| [D] | Demand parameter ($d$) | 0.8 | 0.8 | 0.6 | 0.6 | 0.5 | 0.5 |
| [E] | Marginal cost (MC) | 1.50 | 1.35 | 1.50 | 1.35 | 1.50 | 1.35 |
| [F] | Firm price ($P$) | 3.00 | 2.90 | 3.00 | 2.79 | 3.00 | 2.70 |
| [G] | Firm quality ($q_i$) | 5.00 | 5.20 | 5.00 | 5.30 | 5.00 | 5.60 |
| [H] | Market quantity | 15.00 | 15.50 | 15.00 | 16.00 | 15.00 | 16.70 |
| [I] | Firm own-price elasticity | –2.00 | –1.87 | –2.00 | –1.93 | –2.00 | –2.00 |
| [J] | Firm cross-price elasticity | 0.50 | 0.47 | 0.50 | 0.48 | 0.50 | 0.50 |
| [K] | Market elasticity | –1.00 | –0.94 | –1.00 | –0.97 | –1.00 | –1.00 |
| [L] | Ratio of MC to $P$ | 0.50 | 0.47 | 0.50 | 0.48 | 0.50 | 0.50 |
| [M] | Pass through rate (PTR) | 0.67 | | 1.33 | | 2.00 | |
| [N] | Pass through elasticity (PTE) | 0.33 | | 0.67 | | 1.00 | |
| [O] | Profit | 7.48 | 7.99 | 7.46 | 7.71 | 7.50 | 7.51 |
| [P] | Change in profit | | 0.509 | | 0.252 | | 0.001 |
| [Q] | Percentage change in profit | | 6.80% | | 3.39% | | 0.01% |

NOTES:

[A] through [E] are assumed values.
[F] = Solution to Equation (B7).
[G] = Equation (B1).
[H] = [A] x [G]
[I] = Equation (B4).
[J] = Equation (B5).
[K] = [I] + ([A] – 1) x [J].
[L] = [E]/[F].
[M] = Equation (B8).
[N] = Equation (B9).
[O] = ([F] – [E]) x [G].
[P] = But-for [O] – Actual [O].
[Q] = ([P]/Actual [O] x 100).

Reproduced with permission of the copyright owner. Further reproduction prohibited without permission.

Table 3 shows a numerical simulation of damages resulting from a ten percent change in marginal cost for the three-firm differentiated products oligopoly model detailed in appendix B.[55] The degree of pass through is allowed to vary by changing the functional form parameter $\lambda$ of the Box-Cox demand curve from 1.0 (linear demand) to 0.5 and then to nearly zero (constant elasticity demand). The results show that higher pass through leads to a reduction in damages in this context. This result, however, depends critically on the existence of the positive cross-price elasticity, which in turn results in a gap between the individual firm elasticity (–2) and the market elasticity (–1). In general, the stronger the cross-price effects, the lower the damages for any given own-price elasticity.[56] Consequently, for plaintiffs with market power, it is important to take into account cost increases experienced by rival firms, as well as cross-price effects on the plaintiff's output that occur as other competitors change their prices in response to cost increases.

## V. CONCLUSION

Assessing damages incurred by indirect purchasers when there is an upstream overcharge is a complex task. Indeed, this complexity is one of the fundamental reasons the Supreme Court cited in the *Illinois Brick* decision for prohibiting indirect purchaser lawsuits in federal courts. Because such lawsuits continue to be pursued at the state level, however, damages assessments must be made by the parties involved. In this article, we trace out a number of economic relationships that are applicable to these determinations, with particular attention given to the situation in which the law allows for the possibility of a downstream pass through defense. In reviewing these relationships, two general lessons emerge.

---

[55] In constructing table 3, demand function parameters were chosen so as to achieve the following actual world benchmarks: $P = 3$, total $Q = 15$, individual firm own-price elasticity = –2, cross-price elasticity = 0.5, ratio of price to marginal cost = 2.

[56] If the quantity reduction is particularly small in a high pass through case, it is even possible for profits to increase when a cost increase uniformly hits all firms (i.e., but-for profits will be lower than actual profits). *See* Anderson, de Palma & Kreider, *supra* note 33.

Reproduced with permission of the copyright owner. Further reproduction prohibited without permission.

Case 4:07-md-01819-CW Document 799-14 Filed 07/30/09 Page 29 of 33
PageID #: 18317



The first lesson of this analysis is that some of the methods suggested by the antitrust literature for analyzing pass through are inappropriate in the context of assessing indirect damages. For example, while the commonly used framework of tax incidence theory is a useful starting point for analyses of cost pass through, the results related to the incidence of a constant per unit tax may not apply to the increase in marginal cost actually experienced by indirect purchasers. Because in many cases the associated cost increases are likely to be proportional to marginal cost, traditional (per unit) tax incidence theory will underestimate pass through when supply is upward sloping. In addition, contrary to statements in the antitrust literature, a pass through or incidence analysis does not require a perfectly competitive market. Significant progress has been made in the economics literature in understanding the determinants of pass through when firms have some degree of market power. For example, a pass through analysis will be informed by estimates of the degree of curvature of the firm's demand relationship (i.e., the functional form of demand), not just point estimates of the own-price elasticity. A useful framework for assessing the effect of the curvature of demand on pass through is the Box-Cox transformation of the linear demand system. The Box-Cox functional form conveys in a simple and unambiguous way the degree of curvature that is being considered.

The second lesson is that some important elements of economic analysis are easily overlooked when estimating damages incurred by an indirect purchaser. For example, because upstream and downstream demand conditions are linked by economic principles of derived demand, assessments of upstream pass through may be influenced by evidence regarding downstream pass through. Perhaps most importantly, when firms have market power, damages assessments require more than just an assessment of pass through. Changes in unit sales can also have a significant impact on damages. Moreover, changes in unit sales should be assessed keeping in mind that other firms may also be changing prices, with particular attention given to the cross effects of other competitors' prices on the plaintiff's unit sales.

Reproduced with permission of the copyright owner. Further reproduction prohibited without permission.

**APPENDIX A**

*The effect of an input price change on marginal cost*

Consider the constant elasticity of substitution (CES) production function, where there are two inputs ($x_1$ and $x_2$), with fixed prices $w_1$ and $w_2$. The output of the firm is given by $q$. The CES function is specified with parameters $a$, $b$, $e$ and $s$, where $s$ is the elasticity of substitution and $e$ is a returns to scale factor.

$$q = \left(\alpha x_1^{\sigma-1/\sigma} + \beta x_2^{\sigma-1/\sigma}\right)^{\frac{\sigma}{\sigma-1}\varepsilon} \tag{A1}$$

For the CES function, it is well established that the profit-maximizing cost function when both inputs are variable is:[1]

$$C(w_1, w_2, q) = q^{1/\varepsilon}\left[\alpha^{\sigma} w_1^{1-\sigma} + \beta^{\sigma} w_2^{1-\sigma}\right]^{\frac{1}{1-\sigma}} \tag{A2}$$

The marginal cost (MC) of output is:

$$\text{MC} = \frac{\partial C}{\partial q} = \frac{1}{\varepsilon} q^{(1-\varepsilon)/\varepsilon}\left[\alpha^{\sigma} w_1^{1-\sigma} + \beta^{\sigma} w_2^{1-\sigma}\right]^{1/(1-\sigma)} \tag{A3}$$

which simplifies to:

$$\text{MC} = \frac{q^{1/\varepsilon}}{\varepsilon q}\left[\alpha^{\sigma} w_1^{1-\sigma} + \beta^{\sigma} w_2^{1-\sigma}\right]^{1/(1-\sigma)} = \frac{C}{\varepsilon q} \tag{A4}$$

To illustrate the response of marginal cost to a change in the price of input $x_1$, we first determine the cost share of input 1, $(w_1 x_1)/C$, for the CES cost function. By Shephard's lemma, $\partial C/\partial w_1$ is the optimal demand function for input 1, $x_1^*$:

$$\frac{\partial C}{\partial w_1} = \frac{q^{1/\varepsilon}\left[\alpha^{\sigma} w_1^{1-\sigma} + \beta^{\sigma} w_2^{1-\sigma}\right]^{1/(1-\sigma)} \alpha^{\sigma} w_1^{-\sigma}}{\left[\alpha^{\sigma} w_1^{1-\sigma} + \beta^{\sigma} w_2^{1-\sigma}\right]} = x_1^* \tag{A5}$$

which can be expressed in terms of the cost function:[2]

$$\frac{\partial C}{\partial w_1} = x_1^* = \frac{\left[\alpha^{\sigma} w_1^{-\sigma}\right]}{\left[\alpha^{\sigma} w_1^{1-\sigma} + \beta^{\sigma} w_2^{1-\sigma}\right]} C \tag{A6}$$

---

1 *See* EUGENE SILBERBERG, THE STRUCTURE OF ECONOMICS 293 (1990).

2 *See* RONALD W. SHEPHARD, COST AND PRODUCTION FUNCTIONS 10 (1953).

Reproduced with permission of the copyright owner. Further reproduction prohibited without permission.

Case 4:07-md-01819-CW Document 799-14 Filed 07/30/09 Page 31 of 33
PageID #: 18319



Therefore, the cost share ($s_1$) for input $x_1$ is:

$$s_1 = \frac{w_1}{C}x_1 = \left(\frac{w_1}{C}\right)\left(\frac{\left[\alpha^\sigma w_1^{-\sigma}\right]}{\left[\alpha^\sigma w_1^{1-\sigma} + \beta^\sigma w_2^{1-\sigma}\right]}\right)C = \frac{\left[\alpha^\sigma w_1^{1-\sigma}\right]}{\left[\alpha^\sigma w_1^{1-\sigma} + \beta^\sigma w_2^{1-\sigma}\right]} \quad \text{(A7)}$$

When the price of input 1 ($w_1$) increases infinitesimally, the rate of change in marginal cost relative to the change in $w_1$ is:

$$\frac{\partial \mathrm{MC}}{\partial w_1} = \frac{1}{\varepsilon q}\frac{\partial C}{\partial w_1} = \frac{\left[\alpha^\sigma w_1^{-\sigma}\right]}{\left[\alpha^\sigma w_1^{1-\sigma} + \beta^\sigma w_2^{1-\sigma}\right]}\frac{C}{\varepsilon q} \quad \text{(A8)}$$

which can be rewritten as

$$\frac{\partial \mathrm{MC}}{\partial w_1} = \frac{\left[\alpha^\sigma w_1^{-\sigma}\right]}{\left[\alpha^\sigma w_1^{1-\sigma} + \beta^\sigma w_2^{1-\sigma}\right]}\mathrm{MC} \quad \text{(A9)}$$

Note that for small changes in $w_1$, the change in MC is a function of the initial level of MC, and in fact is proportional to the initial level of MC. Note also that for any given change in $w_1$, the percentage change in MC is constant:

$$\frac{\partial \mathrm{MC}}{\mathrm{MC}} = \frac{\left[\alpha^\sigma w_1^{-\sigma}\right]}{\left[\alpha^\sigma w_1^{1-\sigma} + \beta^\sigma w_2^{1-\sigma}\right]}\partial w_1 \quad \text{(A10)}$$

Alternatively, we can relate the percentage change in MC to the percentage change in $w_1$ by multiplying the right-hand side of equation (A10) by ($w_1/w_1$):

$$\frac{\partial \mathrm{MC}}{\mathrm{MC}} = \frac{w_1\left[\alpha^\sigma w_1^{-\sigma}\right]}{\left[\alpha^\sigma w_1^{1-\sigma} + \beta^\sigma w_2^{1-\sigma}\right]}\left(\frac{\partial w_1}{w_1}\right) = \frac{\left[\alpha^\sigma w_1^{1-\sigma}\right]}{\left[\alpha^\sigma w_1^{1-\sigma} + \beta^\sigma w_2^{1-\sigma}\right]}\left(\frac{\partial w_1}{w_1}\right) \quad \text{(A11)}$$

which simplifies to

$$\frac{\partial \mathrm{MC}}{\mathrm{MC}} = \left(\frac{w_1 x_1}{c}\right)\left(\frac{\partial w_1}{w_1}\right) = s_1\left(\frac{\partial w_1}{w_1}\right) \quad \text{(A12)}$$

Equation (A12) shows that that the percentage change in marginal cost is equal to the cost share of the input multiplied by the percentage change in the input price.

Reproduced with permission of the copyright owner. Further reproduction prohibited without permission.

## APPENDIX B

*Pass through analysis for an N-firm industry with differentiated products*

Using the Box-Cox functional form, suppose that the demand for firm 1 is given by

$$\frac{q_1^\lambda - 1}{\lambda} = a - b\left(\frac{p_1^\lambda - 1}{\lambda}\right) + d\left(\frac{p_2^\lambda - 1}{\lambda}\right) + \cdots + d\left(\frac{p_N^\lambda - 1}{\lambda}\right) \tag{B1}$$

where $a$, $b$ and $d$ are demand function parameters ($d$ controls the degree of product differentiation), $N$ is the number of firms, and $\lambda$ is the Box-Cox functional form parameter. Suppose that the demand curves for the other $N$–1 firms are specified in the same way.

As $\lambda$ declines from one and approaches zero, the demand curve of the typical firm changes from linear to constant elasticity.

$$\lambda = 1 \Rightarrow q_1 - 1 = a - b(p_1 - 1) + d(p_2 - 1) + \cdots + d(p_N - 1) \tag{B2}$$

$$\lambda \to 0 \Rightarrow \ln q_1 = a - b \ln p_1 + d \ln p_2 + \cdots + d \ln p_N \tag{B3}$$

In this context, the own-price elasticity for firm 1 is:

$$e_{11} = -b\left(\frac{p_1}{q_1}\right)^\lambda \tag{B4}$$

and the cross-price elasticity of firm 1 demand with respect to the price of firm 2 is

$$e_{12} = d\left(\frac{p_2}{q_1}\right)^\lambda \tag{B5}$$

Assuming constant marginal cost (MC), the profit for firm 1 is:

$$\pi_1 = (p_1 - \text{MC})\left[a\lambda - b(p_1^\lambda - 1) + d(p_2^\lambda - 1) + \cdots + d(p_N^\lambda - 1) + 1\right]^{\frac{1}{\lambda}} \tag{B6}$$

To determine the profit maximizing price, we differentiate with respect to $p_1$, holding the prices of all rival firms constant.[1] We then

[1] This type of profit maximization problem is referred to as Bertrand price competition. The resulting equilibrium is a Nash equilibrium in

Reproduced with permission of the copyright owner. Further reproduction prohibited without permission.

utilize the fact that in equilibrium $p_1 = p_2 = \ldots = p_N = P$ to obtain the following equilibrium condition:

$$2bP^{\lambda} - \mathrm{MC}bP^{\lambda-1} - dP^{\lambda}(N-1) = a\lambda + 1 + b - d(N-1) \qquad \text{(B7)}$$

This equilibrium condition is solved numerically for the optimal value of $P$.

The pass through rate is found using the implicit function theorem:

$$PTR = \frac{dP}{d\mathrm{MC}} = -\frac{F_{\mathrm{MC}}}{F_P} = \frac{1}{2\lambda - \frac{\lambda d(N-1)}{b} - \frac{\mathrm{MC}}{P}(\lambda - 1)} \qquad \text{(B8)}$$

Consequently, the pass through elasticity expression is:

$$PTE = \frac{dP}{d\mathrm{MC}}\frac{\mathrm{MC}}{P} = \frac{1}{2\lambda - \frac{\lambda d(N-1)}{b} - \frac{c}{P}(\lambda - 1)}\frac{\mathrm{MC}}{P} \qquad \text{(B9}$$

prices. *See* Raymond Deneckere & Carl Davidson, *Incentives to Form Coalitions with Bertrand Competition*, 16 Rand J. Econ. 473 (1985), and Martin Shubik, Market Structure and Behavior (1980), Chapter 7, for similar models using linear demand.

Reproduced with permission of the copyright owner. Further reproduction prohibited without permission.