# Exhibit 118
# Consisting of 118A-C

# Articles by ABA, D. Rubenfeld, and D. Gujarati

Exhibit 118A

# Econometrics

## Legal, Practical, and Technical Issues

SECTION OF ANTITRUST LAW

Section of Antitrust Law

Defending Liberty
Pursuing Justice

**Exhibit 118A**

This volume should be officially cited as:

ABA SECTION OF ANTITRUST LAW,
ECONOMETRICS (2005)

Cover design by ABA Publishing.

The materials contained herein represent the opinions of the authors and editors and should not be construed to be the action of either the American Bar Association or the Section of Antitrust Law unless adopted pursuant to the bylaws of the Association.

Nothing contained in this book is to be considered as the rendering of legal advice for specific cases, and readers are responsible for obtaining such advice from their own legal counsel. This book and any forms and agreements herein are intended for educational and informational purposes only.

© 2005 American Bar Association. All rights reserved.
Printed in the United States of America.

Library of Congress Control Number: 2005923166
ISBN: 1-59031-517-0

Discounts are available for books ordered in bulk. Special consideration is given to state bars, CLE programs, and other bar-related organizations. Inquire at ABA Publishing, American Bar Association, 321 N. Clark St., Chicago, Illinois 60610.

09 08 07 06 05 5 4 3 2 1

Exhibit 118A

CHAPTER VIII

# THE USE OF ECONOMETRICS IN CLASS CERTIFICATION

## A. Introduction

Econometric analysis can be useful to help satisfy certain of the requirements of Rule 23 of the Federal Rules of Civil Procedure, which governs class certification.[1] In particular, because econometric analysis allows one to control for hundreds of individual variables, it can be used to defeat the argument that individual issues predominate, which relates directly to Rule 23(b)(3). As a practical matter, a proper regression analysis may allow a court to certify a class that would otherwise appear not to meet the requirements of Rule 23(b)(3). For instance, in two similar cases involving the sale of cattle, a class was certified where

---

1. Rule 23 imposes a number of different requirements on a potential class. Rule 23(a) requires a class to demonstrate numerosity, commonality, typicality, and adequacy of representation. Rule 23(b) requres that the proposed class action meet at least one of the following criteria:

> (1) the prosecution of separate actions by or against individual members of the class would create a risk of:
>
> (A) inconsistent or varying adjudications with respect to individual members of the class which would establish incompatible standards of conduct for the party opposing the class or;
>
> (B) adjudication with respect to individual members of the class which would as a practical matter be dispositive of the interests of the other members not parties to the adjudications or substantially impair their ability to protect their interests; or
>
> (2) the party opposing the class has acted or refused to act on grounds generally applicable to the class, thereby making appropriate final injunctive relief or corresponding declaratory relief with respect to the class as a whole; or
>
> (3) the court finds that the questions of law or fact common to the members of the class predominate over any questions affecting only individual members, and that a class action is superior to other available methods for the fair and efficient adjudication of the controversy.

FED. R. CIV. P. 23(b).

Exhibit 118A



plaintiffs offered a workable statistical analysis, but certification was denied where the lack of a suitable mathematical formula suggested that generalized proof was not available.[2] However, econometric analysis is not a magic bullet that can be used to ensure class certification. If a plaintiff sets forth a regression analysis that suffers from theoretical or empirical flaws, a court may find that the requirements of Rule 23(b)(3) are not met.

This chapter begins with a discussion of the legal standard set forth by Rule 23(b)(3). It then discusses the econometric issues that frequently arise in the context of class certification, including the use of simple statistics and the application of regression analysis.

## B. Legal Issues

Federal Rule of Civil Procedure 23(b)(3) permits class certification "if the court finds that the questions of law or fact common to the members of the class predominate over any questions affecting only individual members, and that a class action is superior to other available methods for the fair and efficient adjudication of the controversy."[3] The predominance inquiry examines whether a proposed class is "sufficiently cohesive to warrant adjudication by representation."[4] Plaintiffs, who carry the burden of proof, satisfy the predominance requirement of Rule 23(b)(3) by presenting "generalized evidence" that "proves or disproves an element on a simultaneous, class-wide basis, since such proof obviates the need to examine each class member's individual position."[5]

2. *Compare* Pickett v. IBP, Inc., No. 96-A-1103-N, 2001 U.S. Dist. LEXIS 22453, at *30 (M.D. Ala. Dec. 21, 2001) (certifying class), *with In re* Beef Indus. Antitrust Litig., 1986-2 Trade Cas. (CCH) ¶ 67,277 (S.D. Tex. June 3, 1986) (denying class certification).
3. FED. R. CIV. P. 23(b)(3). In addition to satisfying at least one of the subsections of Rule 23(b), the plaintiff must also meet the four preliminary requirements of Rule 23(a): (1) the class is so numerous that joinder of all members is impracticable, (2) there are questions of law or fact common to the class, (3) the claims or defenses of the representative parties are typical of the claims or defenses of the class, and (4) the representative parties will fairly and adequately protect the interests of the class. FED. R. CIV. P. 23(a).
4. Amchem Prods. v. Windsor, 521 U.S. 591, 623 (1997).
5. *In re* Potash Antitrust Litig., 159 F.R.D. 682, 693 (D. Minn. 1995).

Exhibit 118A



"Common questions need only predominate; they need not be dispositive of the litigation."[6]

In class action treble damages litigation alleging price-fixing conspiracies in violation of Section 1 of the Sherman Act, econometric evidence can be used to establish, or rebut, Rule 23(b)(3)'s predominance requirement. Although the Supreme Court has stated that predominance is "readily met in certain cases alleging . . . violations of the antitrust laws,"[7] defendants sometimes have shown that one or more of the elements of an antitrust claim is not subject to common proof.

A private action for damages under Section 4 of the Clayton Act requires proof that (1) defendants violated the antitrust laws, and (2) the alleged violations caused injury to plaintiffs' "business or property," resulting in (3) quantifiable damages.[8] Because proof of a violation standing alone will not establish civil liability, plaintiffs must also show that the alleged violation caused them injury-in-fact. While the existence of a price-fixing conspiracy is ordinarily amenable to common proof,[9]

---

6. *Id.*
7. *Amchem Prods.*, 521 U.S. at 625 (dictum).
8. *See, e.g.*, *In re* Linerboard Antitrust Litig., 203 F.R.D. 197, 214 (E.D. Pa. 2001); *In re* Lorazepam & Clorazepate Antitrust Litig., 202 F.R.D. 12, 29 (D.D.C. 2001); *In re* Playmobil Antitrust Litig., 35 F. Supp. 2d 231, 245 (E.D.N.Y. 1998).
9. Frequently, allegations of conspiracy relate "solely to defendants' conduct, and as such, proof for these issues will not vary among class members." *Potash*, 159 F.R.D. at 694; *see* Lumco Indus. v. Jeld-Wen, Inc., 171 F.R.D. 168, 172 (E.D. Pa. 1997) (stating that the "focus of inquiry will be on . . . defendants' words and actions; it will not vary among individual class members"); *In re* NASDAQ Market-Makers Antitrust Litig., 169 F.R.D. 493, 519 (S.D.N.Y. 1996) (holding that the "relevant proof of [a single conspiracy] will not vary among class members, and clearly presents a common question fundamental to all class members"). However, courts have found that plaintiffs failed to offer a method of proving conspiracy with common evidence where, for example, the evidence of conspiracy was specific to particular geographic areas and the alleged conspiracy was national in scope, *e.g.*, Alabama v. Blue Bird Body Co., 573 F.2d 309 (5th Cir. 1978), or the evidence of conspiracy related to individual transactions and the purported class would have encompassed many such transactions, *e.g.*, Windham v. American Brands, Inc., 565 F.2d 59 (4th Cir. 1977).

Exhibit 118A



defendants often contest whether impact, or the fact of injury, can be demonstrated on a common basis using generalized evidence applicable to the entire class. For violations other than price fixing, such as tying or exclusionary conduct under Section 2, defendants may contest predominance on the issue of violation as well.

The Rules Enabling Act provides a limitation on possible methods of common proof because the class representative's proposed method may not eliminate one of the elements of the claim as to any plaintiff. The Act provides that "the Federal Rules of Civil Procedure shall not abridge, enlarge, or modify any substantive right and shall preserve the right of trial by jury as at common law and as declared by the Seventh Amendment to the Constitution."[10] Thus, defendants may oppose class certification by arguing that a particular method of common proof would have the effect of eliminating or modifying one or more of the elements of a claim as to some purported class members. For instance, courts have rejected on this ground the so-called "floating fund" method by which damages are assessed for the whole class in the aggregate without individual proof of injury.[11]

---

10. 28 U.S.C. § 2072.
11. *E.g.*, Eisen v. Carlisle & Jacquelin, 479 F.2d 1005, 1014, 1018 (2d Cir. 1973) (holding "the 'fluid recovery' concept and practice... illegal, inadmissible as a solution of the manageability problems of class actions and wholly improper" because, inter alia, "[a]mended Rule 23 was not intended to affect the substantive rights of the parties to any litigation."), *vacated on other grounds*, 417 U.S. 156 (1974); *In re* Hotel Tel. Charges, 500 F.2d 86, 90 (9th Cir. 1974) (same; citing *Eisen*). *But see* Weisfeld v. Sun Chem. Corp., 210 F.R.D. 136, 143 (D.N.J. 2002) (for impact to be shown on a class-wide basis, "the common proof [must] adequately demonstrate[ ] damage to each individual") (quoting Newton v. Merrill Lynch, Pierce, Fenner & Smith, Inc., 259 F.3d at 180 n.21 (3d Cir. 2001)), *aff'd*, 84 Fed. Appx. 257 (3d Cir. 2004). Several courts have held, however, that the mere possibility that a few class members may not have been injured in fact does not, standing alone, defeat certification. *In re* Auction Houses Antitrust Litig., 193 F.R.D. 162, 166 (S.D.N.Y. 2000); *In re* NASDAQ Market-Makers Antitrust Litig., 169 F.R.D. 493, 523 (S.D.N.Y. 1996) ("[E]ven if it could be shown that some individual class members were not injured, class certification, nevertheless, is appropriate where the antitrust violation has caused widespread injury to the class.").

Exhibit 118A



Orders granting or denying class certification often end litigation. Where certification is granted, defendants often settle because a finding of liability to the class can lead to overwhelming damages. Conversely, orders denying certification frequently terminate litigation that is too costly to pursue as an individual plaintiff. According to the Rules Advisory Committee Notes, Rule 23(f) addresses this death knell problem by providing a ten day period to seek discretionary review of certification decisions by the court of appeals, and, thus, "permission to appeal is most likely to be granted when the certification decision turns on a novel or unsettled question of law, or when, as a practical matter, the decision on certification is likely dispositive of the litigation."[12]

### *1. Demonstrating Common Proof of Impact and Injury*

At the certification stage, courts determine whether the plaintiffs will be able to use common evidence in their attempt to prove that the defendants' alleged antitrust violations affected each member of the class.[13] Two early antitrust decisions denied certification because the plaintiffs were not able to offer a method of proving impact by generalized evidence where the alleged conspiracy concerned bid rigging, or other price manipulation, over a series of auctions dispersed in time and place.

In one early decision, the Fifth Circuit vacated an order certifying a national class of school bus purchasers, because the record showed that school buses were heterogeneous products, which were practically custom made for particular purchasers who were supplied by distributors serving different geographic areas:

> [G]iven the diverse nature of the school bus market, we have difficulty envisioning how plaintiffs can prove in a *manageable manner* that the conspiracy was indeed implemented in a particular area, and that it did in fact cause damage. More specifically, we do not understand how the

---

12. FED. R. CIV. P. 23(f) Advisory Committee Note.
13. *See* Valley Drug Co. v. Geneva Pharms., Inc., 350 F.3d 1181 (11th Cir. 2003); *In re* Commercial Tissue Prods., 183 F.R.D. 589, 596 (N.D. Fla. 1998).

Exhibit 118A



plaintiffs can make this proof without examining the relevant school bus market where each individual plaintiff is located.[14]

Still, the Fifth Circuit did not hold as a matter of law that class treatment was impermissible, stating "it may be . . . that the plaintiffs can figure out some way to show impact as to each member of the plaintiffs' class without having to resort to lengthy individualized examination."[15]

Similarly, *Windham v. American Brands, Inc.*[16] rejected class consideration for claims of price manipulation at wholesale auctions of "flue cured tobacco[,] a non-standardized or non-fungible commodity," that were geographically and chronologically dispersed. The court explained that "where the issue of damages and impact does not lend itself to a mechanical calculation, but requires separate mini-trials of an overwhelmingly large number of individual claims," courts deny class treatment.[17] *Blue Bird* and *Windham* established the need for a "mechanical calculation" or a "way to show impact as to each member of the plaintiffs' class without having to resort to lengthy individualized examination."[18] In more recent cases, econometric methods have been used to meet, or rebut, this requirement.

The Third Circuit's decision in *Bogosian v. Gulf Oil Corp.*[19] provided another early benchmark for class certification of antitrust claims. The plaintiff service station dealers claimed that their leases with major oil companies contained an illegal tie-in requiring purchase of

14. Alabama v. Blue Bird Body Co., 573 F.2d 309, 328 (5th Cir. 1978) (citation omitted).
15. *Id.*
16. 565 F.2d 59, 63 (4th Cir. 1977) (en banc).
17. *Id.* at 68.
18. *Blue Bird*, 573 F.2d at 327-28; *accord* Walsh v. Ford Motor Co., 807 F.2d 1000, 1017 (D.C. Cir. 1986) (refusing to certify class in action with 20 materially different products); Abrams v. Interco, Inc., 719 F.2d 23, 29-30 (2d Cir. 1983) (refusing to certify class in action with "scores of . . . product lines"); *Blue Bird*, 573 F.2d at 312, 322-23 (refusing to certify class where there was no uniformity in the quality or price of the products, as the question of injury might have had to have been dealt with individually); Alaska v. Suburban Propane Gas Co., 1995-1 Trade Cas. (CCH) ¶ 71,042 (D. Alaska 1995) (refusing to certify class because options of different purchasers varied, causing price increases to vary).
19. 561 F.2d 434 (3d Cir. 1977).

Exhibit 118A



gasoline from the lessor. Although not a price-fixing case itself, *Bogosian*'s discussion of proof of impact has been cited by numerous courts considering price-fixing claims:

> If, in this case, a nationwide conspiracy is proven, the result of which was to increase prices to a class of plaintiffs beyond the prices which would obtain in a competitive regime, an individual plaintiff could prove fact of damage simply by proving that the free market prices would be lower than the prices paid and that he made some purchases at the higher price. If the price structure in the industry is such that nationwide the conspiratorially affected prices at the wholesale level fluctuated within a range which, though different in different regions, was higher in all regions than the range which would have existed in all regions under competitive conditions, it would be clear that all members of the class suffered some damage, notwithstanding that there would be variations among all dealers as to the extent of their damage. "The burden of proving the fact of damage under § 4 of the Clayton Act is satisfied by . . . proof of *some* damage flowing from the unlawful conspiracy. . . ." Under these circumstances, proof on a common basis would be appropriate. Even if the variation in price dynamics among regions or marketing areas were such that in certain areas the free market price would be no lower than the conspiratorially affected price, it might be possible to designate subclasses to conform with these variations.[20]

Some lower courts have read this passage to establish a presumption of impact in price-fixing cases, which satisfies the requirement of common or generalized proof.[21] Other courts, by contrast, have carefully considered the facts of each case alleging price fixing to determine

---

20. *Id.* at 455 (quoting Zenith Radio Corp. v. Hazeltine Research, Inc., 395 U.S. 100, 114 (1969)). As part of this determination, courts have recognized that the "fact of injury" (or impact) is different from the "quantum of injury" (or damages) and "often susceptible of common proof even if the amount of damages is uncertain or must be individualized." Paper Sys. v. Mitsubishi Corp., 193 F.R.D. 601, 615 (E.D. Wis. 2000).

21. *See In re* Bromine Antitrust Litig., 203 F.R.D. 403, 414 (S.D. Ind. 2001); *In re* NASDAQ Market-Makers Antitrust Litig., 169 F.R.D. 493, 526 (S.D.N.Y. 1996); *In re* Alcoholic Beverages Litig., 95 F.R.D. 321, 327 (E.D.N.Y. 1982).

Exhibit 118A



whether common proof of impact is possible.[22] The court in *In re Industrial Diamonds Antitrust Litigation*[23] observed, however, that "it often makes little difference which view the court espouses" because most defendants argue that the complicated nature of their pricing practices demands close examination of their cases. As a result, even if a *Bogosian* presumption does apply, courts frequently evaluate the specific circumstances of each case as the defendants opposing class certification attempt to rebut the presumption on the facts.

Recently, the Third Circuit approved the application of the *Bogosian* short cut to an alleged conspiracy to decrease output in the linerboard industry by reducing production levels:

> A strong argument can be made that the *Bogosian* concept of presumed impact was properly applied here. . . . A reduction in supply will cause prices to rise. A deliberate cut in supply, as alleged here, is a deliberate interference with market forces. Coincident with this interference with the normal market forces, linerboard prices in the eastern United States rose in six consecutive price increases . . . .[24]

The court concluded that, if the facts supported plaintiffs' theory, an individual plaintiff could prove injury in fact by showing that the free market price would have been lower than the price paid as "this would be a demonstration of the law of supply and demand at work."[25] Conversely, at least one court has suggested that the *Bogosian* presumption may not be applied where the alleged conspirators did not "control the relevant market" because in such cases "the forces of supply and demand and free

---

22. *See, e.g.*, *In re* Domestic Air Transp. Antitrust Litig., 137 F.R.D. 677, 689-92 (N.D. Ga. 1991).
23. 167 F.R.D. 374, 382 (S.D.N.Y. 1996),
24. *In re* Linerboard Antitrust Litig., 305 F.3d 145, 152 (3d Cir. 2002).
25. *Id.* at 153. While affirming the district court's reliance on *Bogosian*, the Third Circuit also cited approvingly to the trial court's "belt and suspenders" approach to the class certification question, *id.*, relying not only on the doctrine of presumed impact, but also on the plaintiffs' profferred expert witnesses, who "effectively utilized supporting data, including charts and exhibits, to authenticate their professional opinions that all class members would incur . . . damages," *id.* at 155.

Exhibit 118A



competition effected [*sic*] the prices purchasers paid as much as did the conspiracy."[26]

While the *Bogosian* presumption better fits situations where there is a single market-wide price, the fact that prices may be individually negotiated does not necessarily defeat class treatment. For example, *Industrial Diamonds* permitted price-fixing claims for products with a manufacturer's list price even though the majority of sales were made at negotiated discounts below list price.[27] Conversely, the court denied class treatment for claims based on the sale of "thousands of distinct products for which [there were] no set list prices," many of which were developed "specifically for a particular customer," because "plaintiffs have not demonstrated that impact could be established through common proof."[28]

In tying cases the focus of class certification disputes is frequently whether the existence of the tie or coercion can be demonstrated on the

---

26. *In re* Elec. Weld Steel Tubing Antitrust Litig., No. 79-4628, 1980 U.S. Dist. LEXIS 9604, at *16 (E.D. Pa. Nov. 6, 1980). *But see In re* Mercedes-Benz Antitrust Litig., 213 F.R.D. 180, 187-88 (D.N.J. 2003) (rejecting dealers' argument that because Mercedes-Benz lacked market power in market defined as luxury automobiles, the impact of the alleged dealers' conspiracy to fix resale prices could not be demonstrated by common proof); *In re* Plastic Cutlery Antitrust Litig., 1998-1 Trade Cas. (CCH) ¶ 72,107 (E.D. Pa. 1998) (rejecting argument predicated on lack of market power in some geographic areas).
27. 167 F.R.D. at 384.
28. *Id.* Likewise, in some cases where the alleged conspiracy involves both wholesalers and manufacturers, retail customers have not been able to form a class because of concerns about disparate impact. *E.g.*, Mekani v. Miller Brewing Co., 93 F.R.D. 506 (E.D. Mich. 1982) (court rejected class of retailers who purchased beer through 180 different distributors on grounds that the case would "degenerate into 180 separate trials and common questions would be overwhelmed by issues peculiar to individual parties"); *In re* Beer Distribution Antitrust Litig., 188 F.R.D. 557 (N.D. Cal. 1999) (deferring issue of class certification until after a decision on a motion for summary judgment as to whether the per se rule or rule of reason applied); *see also In re* Fine Paper Antitrust Litig., 82 F.R.D. 143, 156 (E.D. Pa. 1979), *aff'd*, 685 F.2d 810 (3d Cir. 1982); *In re* Coordinated Pretrial Proceedings in Petroleum Prods. Antitrust Litig., 691 F.2d 1335 (9th Cir. 1982). Similar problems have been encountered by indirect purchaser plaintiffs suing for damages under state antitrust laws that, unlike federal law, permit recovery by indirect purchasers.

Exhibit 118A



basis of class-wide evidence, thus allowing class-wide questions to predominate over questions affecting only individual members as required by Rule 23(b)(3). A pair of Third Circuit decisions illustrates the general trend. In *Ungar v. Dunkin' Donuts of America, Inc.*,[29] the plaintiffs were franchisees who claimed that the franchisor had tied the use of its trademark to the franchisees' purchase of equipment, signs, and supplies, and the lease or sublease of real estate from the franchisor.[30] The court of appeals reversed a class certification order that had been entered by the district court, concluding that "[w]here, as here, plaintiff franchisees place no reliance on express contractual tie-ins, each, individually, must prove that his purchases were coerced as an element of establishing a prima facie case of illegal tying. . . . Accordingly, the certification should not have been granted."[31]

A year later, however, a different panel of the same court held in *Bogosian* that *Ungar*'s reference to an "express contractual tie-in" was to be understood as providing only an example of, rather than a limitation on, legitimate common proof. Despite the fact that the plaintiffs had not alleged the existence of an explict contractual tie, the court held that:

> If the plaintiffs are able to show that the lease agreements in use by all defendants have similar clauses which have the practical economic effect of precluding sale of other than the lessor's gasoline, they will have shown that the purchase of gasoline was tied in to the lease of the service station.[32]

Since the court held that the determination of the "practical economic effect" of the lease terms constituted a question of fact amenable to expert testimony and common to the class, it reversed the district court's denial of class certification.[33] The Third Circuit's distinction between claims centering on the defendant's allegedly

---

29. 531 F.2d 1211 (3d Cir. 1976).
30. *Id.* at 1215.
31. *Id.* at 1226. *But see* Little Caesar Enters. v. Smith, 895 F. Supp. 884 (E.D. Mich. 1995) ("There is no dispute that where a tying arrangement is apparent from the face of a contract, or from reasonable inferences based upon the contract and related documents, a national class would be appropriate.").
32. 561 F.2d at 452.
33. *Id.*

Exhibit 118A



uniform policies or contracts, in which conditioning can generally be shown by class-wide evidence, and those involving more individualized proof of salesmanship has been followed in other circuits as well.[34]

Other class certification decisions in tying cases have focused on whether the tie affected members of the proposed class similarly, or even benefited some while harming others. While several courts have addressed this issue as part of Rule 23(a)'s requirements of typicality and adequate representation, it may also affect 23(b)'s preponderance inquiry. The issue divided a panel of the Second Circuit in *In re Visa Check/Mastermoney Antitrust Litigation*,[35] a case challenging the "honor all cards rule" Visa and MasterCard imposed on retailers. The defendants' expert argued that "credit card interchange fees would increase as debit interchange fees decreased if credit cards were no longer tied in a 'package' to debit cards."[36] The defendants asserted that, as a result, the rule affected retailers differently depending on their proportion of credit to debt card transactions. The panel majority was sufficiently persuaded by the plaintiffs' expert's empirical evidence showing that unbundled credit card fees would not necessarily increase to affirm the certification order. A dissent argued that it was error for the district court not to determine the appropriate measure of damages at the class certification stage and that, if an overcharge method based on the package price were used, conflicts emerged between members of the

---

34. *E.g.*, Little Caesar Enters. v. Smith, 1997-1 Trade Cas. (CCH) ¶ 71,817 (E.D. Mich. Sept. 30, 1996) ("Yet, in evaluating whether common questions of law or fact predominate, the critical question under Rule 23(b)(3) is not whether the proofs are external to the contract terms, nor whether they are complex instead of simple proofs. Rather, the critical question for Rule 23(b)(3) is whether the method of proving coercion involves facts—even if complex and external to the contract—that are predominately common to the class and not individual."), *adopted*, 172 F.R.D. 236, 238 (E.D. Mich. 1997); Fifth Moorings Condominium, Inc. v. Shere, 81 F.R.D. 712, 717-18 (S.D. Fla. 1979); Martino v. McDonald's Sys., 81 F.R.D. 81, 87-89 (N.D. Ill. 1979); *cf.* George Lussier Enters. v. Subaru of New England, Inc., 2001-2 Trade Cas. (CCH) ¶ 73,437 (D.N.H. Aug. 31, 2001) (certifying class for tying claim where plaintiffs proposed to prove conditioning in part through expert testimony regarding regression analysis).

35. 280 F.3d 124 (2d Cir. 2001).

36. *Id.* at 134.

Case 4:07-md-01819-CW Document 806-7 Filed 08/06/09 Page 15 of 72 PageID #: 18619

Exhibit 118A



proposed class based on variations in the proportion of debit to credit card sales.

Using analysis similar to the *Visa Check* dissent, the district court in *Bradburn Parent/Teacher Store, Inc. v. 3M*[37] refused to certify a class of wholesale purchasers of transparent tape in part because the named plaintiff was a small retailer whose interests would conflict with the large big box retailers, who purchased most of 3M's Scotch brand tape. The court was persuaded by 3M's expert's testimony that the small retailers, who lack the scale to sell their own house-brand tape, would pursue an overcharge theory of damages based on an anticompetitive increase in the wholesale price of Scotch tape. By comparison, the big box retailers would benefit from a lost profits theory of damages based on lost sales of their own house brands. The court viewed this difference as creating "a serious and imminent potential conflict of interest between [the plaintiff] and other members of the proposed class."[38]

A dichotomy has similarly developed in monopolization cases. Where the plaintiffs claim damages from an overcharge (typically as consumers), courts have applied the equivalent of the *Bogosian* presumption and found that class-wide issues as to the existence of a monopolistic scheme or conspiracy in a single market predominate over individual issues such as damages.[39] This rule has been followed even when not all of the class members were allegedly the victims of the defendant's anticompetitive practices, since the class's proof of "an alleged overcharge result[ing] from the preclusion of competition" would mean that any purchaser from the defendant during the monopolistic

37. Civ. No. 02-7676, 2004 U.S. Dist. LEXIS 2247 (E.D. Pa. March 1, 2004). A later motion to certify a narrower class was granted. Bradburn Parent/Teacher Store, Inc. v. 3M, Civ. No. 02-7676, 2004 U.S. Dist. LEXIS 16193 (E.D. Pa. Aug. 17, 2004).

38. *Id.* at *29; *cf.* Telecomm Tech. Servs. v. Siemens Rolm Communs., 172 F.R.D. 532 (N.D. Ga. 1997) (in challenge to alleged tie of service to replacement parts, court found the likely effect of breaking the tie would be to raise the price of replacement parts which would have benefited some members of the proposed class while harming others).

39. *E.g.*, *In re* Lorazepam & Clorazepate Antitrust Litig., 202 F.R.D. 12, 29 (D.D.C. 2001) (relying in part on proffered econometric evidence to certify class of direct purchasers alleging price fixing, monopolization, and conspiracy to monopolize claims).

period would have been injured.[40] By contrast, where the gravamen of the monopolization claim is that the plaintiffs were foreclosed from competing in the relevant market, and thus suffered lost profits, courts have denied certification, reasoning that issues of each plaintiff's losses from anticompetitive foreclosure, as opposed to legitimate competitive or other pressures, predominate over any class-wide questions.[41]

## 2. *Proving Damages*

Plaintiffs may also show that they will use common proof to compute damages. Plaintiffs are not required to present a precise formula for calculating damages at the certification stage, for courts only examine whether the proposed methods are so "insubstantial as to amount to no method at all."[42] Even where no method of proving the amount of damages by common proof has been shown, courts may certify a class for the purpose of determining liability and impact only.

In general, once antitrust liability (including the fact of injury) has been established, the burden of proving the amount of damages is "much less severe."[43] Plaintiffs need only introduce evidence sufficient to allow a jury to render "a just and reasonable estimate of damage based on the relevant evidence."[44]

---

40. Stephenson v. Bell Atl. Corp., 177 F.R.D. 279, 287 (D.N.J. 1997) (discussing plaintiffs' claim that consumer confusion resulting from misrepresentations made to some but not all prospective purchasers erected a barrier to entry leading to monopolistic overcharges, damages from which could be calculated using econometric evidence).

41. *E.g.*, Chestnut Fleet Rentals, Inc. v. Hertz Corp., 72 F.R.D. 541 (E.D. Pa. 1976) (denying certification where market was "heterogeneous and fragmented" and gravamen of the complaint was "illegal competitive foreclosure").

42. Rozema v. Marshfield Clinic, 174 F.R.D. 425, 442 (W.D. Wis. 1997); *In re* Potash Antitrust Litig., 159 F.R.D. 682, 697 (D. Minn. 1995).

43. *In re* Terazosin Hydrochloride Antitrust Litig., 203 F.R.D. 551, 559 (S.D. Fla. 2001), *vacated and remanded on other grounds sub nom.* Valley Drug Co., v. Geneva Pharms., Inc., 350 F.3d 1181 (11th Cir. 2003); *see also In re* NASDAQ Market-Makers Antitrust Litig., 169 F.R.D. 493, 527 (S.D.N.Y. 1996).

44. *In re* Terazosin Hydrochloride Antitrust. Litig., 203 F.R.D. at 559; *see* Bigelow v. RKO Radio Pictures, Inc., 327 U.S. 264 (1946) (leading case);

Exhibit 118A



In some cases, damages can be calculated with a general formula similar to that used to show impact. For example, in *Terazosin Hydrochloride*,[45] plaintiffs' experts devised a formula for calculating plaintiffs' damages that incorporated pricing, demand, and sales statistics. The court noted that all variables in the formula concerned evidence common to the class, and while a jury might have to consider some individualized evidence when rendering individual damages calculations, such consideration would not preclude certification.[46] Likewise, in *In re Linerboard*[47] the district court noted that the formulas plaintiffs presented to demonstrate impact could also be used to calculate damages and that any individual issues concerning damages would not defeat class certification.

Individual questions of the amount of damages, as opposed to the fact of impact, generally are not fatal to class certification.[48] In fact, courts find that common issues predominate based on common proof of violation and injury-in-fact even if individualized assessment of damages is required.[49]

---

Story Parchment Co. v. Paterson Parchment Paper Co., 282 U.S. 555 (1931); *In re* Polypropylene Carpet Antitrust Litig., 178 F.R.D. 603, 618 (N.D. Ga. 1997). For detailed descriptions of econometric models underlying plaintiffs' damages methodologies presented for purposes of class certification, see Jonathan B. Baker & Daniel L. Rubinfeld, *Empirical Methods in Antitrust Litigation: Review and Critique*, 1 AM. L. & ECON. REV. 386 (1999).

45. 203 F.R.D. at 559.

46. *Id.*

47. 203 F.R.D. 197, 220 (E.D. Pa.), *aff'd*, 305 F.3d 145 (3d Cir. 2002).

48. *E.g.*, Paper Sys. v. Mitsubishi Corp., 193 F.R.D. 601, 615 (E.D. Wis. 2000); *In re* Playmobil Antitrust Litig., 35 F. Supp. 2d 231, 246 (E.D.N.Y. 1998); Rozema v. Marshfield Clinic, 174 F.R.D. 425, 443 (W.D. Wis. 1997).

49. *Paper Sys.*, 193 F.R.D. at 615; *see In re* Potash Antitrust Litig., 159 F.R.D. 682, 697 (D. Minn. 1995) (holding that "individualized analysis [of damages] is not by itself sufficient to preclude certification when liability can be determined on a class-wide basis"); Ruiz v. Stewart Assocs., 171 F.R.D. 238, 243 (N.D. Ill. 1997) (concluding that variation in damages among proposed class members "does not overcome the predominance of common questions established here").

Case 4:07-md-01819-CW Document 806-7 Filed 08/06/09 Page 18 of 72 PageID #: 18622

Exhibit 118A



Courts may bifurcate the proceeding under Rule 42(b) and conduct a class trial to establish liability, and thereafter create subclasses or conduct individual proceedings to determine the amount of damages. For example, the *Vitamins* court concluded:

> The issue of damages with respect to each class member may introduce many individual issues; however, this is not enough to defeat certification. . . . [P]erhaps defendants' arguments point to the possibility that, as this litigation proceeds, the putative vitamins classes should be further divided into subclasses pursuant to Rule 23(c) as many of the issues related to actual damages are in fact individualistic.[50]

Where the individual assessment of damages would be unmanageable or overwhelm the resources of the court, class treatment may not meet Rule 23's efficiency and superiority requirements. For instance, *Wilcox Development Company v. First Interstate Bank of Oregon*[51] denied class certification because the plaintiffs had not shown a suitable mathematical formula for computing damages, and, without such a formula, the trial of the individual claims of 8,500 class members

---

50. *In re* Vitamins Antitrust Litig., 209 F.R.D. 251, 264 (D.D.C. 2002); *see In re* Buspirone Patent Litig., 210 F.R.D. 43, 55 (S.D.N.Y. 2002) ("[T]o the extent overcharges overstate or understate the appropriate measure of damages for different classmembers, this issue can be addressed by creating subclasses if necessary."); *In re* Lorazepam & Clorazepate Antitrust Litig., 202 F.R.D. 12, 30 (D.D.C. 2001) (finding "several reasonable approaches to calculating damages," including aggregation for the class at trial and subsequent allocation to individual members in a later administrative claims procedure); Alexander v. Q.T.S. Corp., No. 98 C 3234, 1999 U.S. Dist. LEXIS 11842, at *41-42 (N.D. Ill. July 30, 1999), *adopted in part,* 1999 U.S. Dist. LEXIS 16169 (N.D. Ill. Sept. 30, 1999) (certifying a class despite court's skepticism that plaintiffs' expert would be able to specify a common formula for damages because bifurcated proceedings were an option if damages required individual proof).
51. 97 F.R.D. 440, 447 & n.4 (D. Or. 1983), *aff'd in part on other grounds and rev'd in part on other grounds*, 815 F.2d 522 (9th Cir. 1987).

Exhibit 118A



would take almost three years of solid court time, assuming thirty minutes per claim.[52]

Courts may also reject bifurcation on constitutional grounds where questions of impact and amount of damages overlap substantially. As the Seventh Circuit explained when directing the decertification of a class in a non-antitrust action:

> [T]he judge may not divide issues between separate trials in such a way that the same issue is reexamined by different juries. . . . The right to a jury trial in federal civil cases, conferred by the Seventh Amendment, is a right to have juriable issues determined by the first jury impaneled to hear them . . . , and not reexamined by another finder of fact.[53]

Thus, the court in *Blue Bird Body* explained:

> In an antitrust action brought under the Clayton Act, it is most important to be aware of the Seventh Amendment limitations on a Rule 42(b) bifurcation. This awareness is important because liability under §4 necessarily includes proof of injury to business and property. Therefore, bifurcation to separate juries of liability and damages in a §4 case inevitably introduces the possibility that in the liability phase the first jury might find that there was such injury, while the second jury might on the same evidence of injury in the damage phase, find none. . . . [T]he use of bifurcation must be grounded upon a clear understanding between the court and counsel of the issue or issues involved in each phase and what proof will be required to pass from one phase to the next.[54]

---

52. *See* Windham v. American Brands, Inc., 565 F.2d 59, 67 (4th Cir. 1977) (benchmark would not work because it would create a "deluge of mini-trials"); *In re* Hotel Tel. Charges, 500 F.2d 86, 89 (9th Cir. 1974) ("In a class of forty million, assuming only ten percent of these unknown class members came forward with claims, and assuming the proof of each claim required only ten minutes, approximately one hundred years would yet be required to adjudicate the claims."); *In re* Transit Co. Tire Antitrust Litig., 67 F.R.D. 59, 77, 79 (W.D. Mo. 1975) ("[T]he time and complexity [of proving individual damages] would reach proportions so as to make the class action totally unmanageable.").
53. *In re* Rhone-Poulenc Rorer Inc., 51 F.3d 1293, 1303 (7th Cir. 1995).
54. Alabama v. Blue Bird Body Co., 573 F.2d 309, 318-19 (5th Cir. 1978) (internal quotation omitted). *Compare In re* Indus. Gas Antitrust Litig.,

Exhibit 118A



## C. Legal Standards for Use of Statistical Analysis in Class Certification

### 1. *Overview*

Class certification disputes increasingly involve statistical or econometric analyses. In particular, economic experts have tested the propositions that there is evidence of common impact and that a common formula may be used to estimate damages. Plaintiffs' experts typically contend that statistical tests and other available evidence can be used to demonstrate common impact and that relatively simple formulas can be used to assess damages. They argue that regression analysis may be used to isolate the effects of an alleged conspiracy in situations where product heterogeneity, or other factors, might appear to make common proof impossible.

Conversely, defendants' experts typically contend that some members of the proposed class may not have been affected by the alleged anticompetitive behavior, that there is a conflict within the purported class because some members may have benefited from the same conduct that allegedly harmed others, or that individualized evidence must be presented to establish impact and estimate damages for class members.

### 2. *Econometric Analysis of Common Impact*

Antitrust plaintiffs seeking class certification often present econometric formulas and other statistical analyses to show common impact, particularly in cases concerning complex industries or complicated price structures. In *In re Bromine Antitrust Litigation*,[55] plaintiffs offered expert testimony to make a threshold showing that despite individual price negotiations, diverse supply and demand conditions, and product variations, a common formula could be used to establish class-wide impact. *In re Industrial Diamonds Antitrust*

---

100 F.R.D. 280, 304 (N.D. Ill. 1983) (rejecting bifurcation as a solution to individual proof of damages due to Seventh Amendment concerns) *with In re* Ampicillin Antitrust Litig., 88 F.R.D. 174, 179 (D.D.C. 1980) (denying Seventh Amendment objection to bifurcation) *and In re* Master Key Antitrust Litig., 70 F.R.D. 23 (D. Conn.) (same), *appeal dismissed*, 528 F.2d 5 (2d Cir. 1975).

55. 203 F.R.D. 403, 414-15 (S.D. Ind. 2001).

Exhibit 118A



*Litigation*[56] found that expert testimony supported the view that individually negotiated prices were based in part on list prices, and expert analysis "indicated that [the allegedly conspiratorial] 1992 list price increases had, in general, an upward effect on the transaction prices paid by purchasers of those products."[57]

But in other cases, expert statistical studies have fallen short of demonstrating a method of showing common impact. For example, in a case involving allegations of market division by use of non-compete clauses in employment contracts, the plaintiffs' expert presented a regression analysis purporting to show that overall compensation levels would have been higher in a market without non-compete agreements. The court denied class certification after observing that individual impact to all members had not been demonstrated. The court was not "convinced that Plaintiff's expert ha[d] even claimed, much less shown, that he w[ould] be able to prove impact on a class-wide basis."[58]

---

56. 167 F.R.D. 374, 383 (S.D.N.Y. 1996).

57. *Id.* at 383-84; *see also In re* Magnetic Audiotape Antitrust Litig., No. 99 Civ 1580, 2001 U.S. Dist. LEXIS 7303, at *18-19 (S.D.N.Y. Jun. 6, 2001) (certifying class where plaintiffs' expert offered a statistical study that controlled for type of product and customer size); Paper Sys. v. Mitsubishi Corp., 193 F.R.D. 601, 614-15 (E.D. Wis. 2000) (finding that, despite variations in product and pricing, plaintiffs satisfied burden of showing that they could prove common impact and damages through various econometric analyses); *In re* Disposable Contact Lens Antitrust Litig., 170 F.R.D. 524, 531-32 (M.D. Fla. 1999) (certifying class, despite fragmented industry, where plaintiffs presented expert testimony demonstrating "at least a colorable method of proving impact at trial") (internal quotation and citation omitted); *In re* Flat Glass Antitrust Litig., 191 F.R.D. 472, 486 (W.D. Pa. 1999) (describing a regression equation as a viable method of common proof of impact).

58. Weisfeld v. Sun Chem. Corp., 210 F.R.D. 136, 144 (D.N.J. 2002), *aff'd*, 84 Fed. Appx. 257 (3d Cir. 2004). In state law price-fixing actions by indirect purchasers, plaintiffs have sometimes run into difficulty demonstrating impact on a class-wide basis due to the need to show that the alleged overcharge was passed along by the middleman to the ultimate customer. For example, in a case involving indirect purchasers of infant formula, a state court found that individualized issues regarding impact and damages from a conspiracy predominated over common issues of law or fact. McCarter v. Abbott Labs., No. CV-91-050, at 6 (Ala. Cir. Ct. April 14, 1993), *quoted in In re* Brand Name Prescription

Exhibit 118A



a. Standard Applied to Evaluate Validity of Method

While plaintiffs have not always been required to specify a particular model for showing impact at the certification stage, they usually are required to identify a valid method for the particular factual situation at issue. For example, in *Linerboard*, the Third Circuit found that the plaintiffs' experts had proffered two "generally accepted" methods of showing common impact at trial, namely multiple regression analysis and "the bench mark or yardstick approach."[59] Although the plaintiffs were not required to pick one method over the other at the class certification stage, the experts' testimony satisfied the court that common methods of proof were available.[60]

The Second Circuit's decision in *In re Visa Check/Mastermoney Antitrust Litigation*[61] discussed the standard generally applicable to expert analysis at the class certification stage:

> Although a trial court must conduct a "rigorous analysis" to ensure that the prerequisites of Rule 23 have been satisfied before certifying a class, a motion for class certification is not an occasion for examination of the merits of the case. A district court must ensure that the basis of the expert opinion is not so flawed that it would be inadmissible as a matter of law. . . . However, a district court may not weigh conflicting expert evidence or engage in "statistical dueling" of experts. The question for the district court at the class certification stage is whether plaintiffs' expert evidence is sufficient to demonstrate common

---

Drugs Antitrust Litig., No. 94-C-897, 1994 U.S. Dist. LEXIS 16658 (N.D. Ill. Nov. 15, 1994), at *18-19. The difficulties of demonstrating such pass through are beyond the scope of this chapter.

59. 305 F.2d 145, 154 (3d Cir. 2002).

60. *Id.* at 155; *see In re* Lorazepam & Clorazepate Antitrust Litig., 202 F.R.D. 12, 29 (D.D.C. 2001); *see also In re* Domestic Air Transp. Antitrust Litig., 137 F.R.D. 677, 689-90 (N.D. Ga. 1991) (concluding that economic formulas presented by plaintiffs' expert, which entailed "some form of averaging," constituted common evidence sufficient to show class-wide impact at trial). *But see In re* Agric. Chems. Antitrust Litig., 1995-2 Trade Cas. (CCH) ¶ 71,197 (N.D. Fla. 1995) (reviewing the facts supporting plaintiffs' expert's conclusions and finding that the expert had no basis for concluding that the suggested or reported price was an overcharge and that plaintiffs suffered injury).

61. 280 F.3d 124 (2d Cir. 2001).

Exhibit 118A



questions of fact warranting certification of the proposed class, not whether the evidence will ultimately be persuasive.[62]

The court of appeals affirmed, noting that the district court had "in an almost fifty page opinion, thoroughly considered each of defendants' criticisms of [the plaintiffs' expert's] theory and [the expert's] response to each of those criticisms."[63] In each case, the district court concluded, the expert had "sufficiently addressed the criticism."[64]

Several courts have suggested that expert opinion may be considered at the class certification stage without first deciding whether it would be admissible as merits evidence under the standard announced in *Daubert v. Merrell Dow Pharmaceuticals, Inc.*[65] For example, a district court stated that a plaintiff's expert opinion "need not . . . satisfy the requirements of *Daubert* to be admissible with respect to class certification."[66] However, it did examine whether the method would "comport with the basic principles of econometric theory," "have any probative value," and "primarily use evidence that is common to all

62. *Id.* at 134-35 (citations and internal quotations omitted).
63. *Id* at 135.
64. *Id.* The dissent, however, faulted the majority for not resolving a dispute over the correct measure of damages in a tying case. The defendants contended that the correct measure was a "package price" that included both the tied and tying product. The plaintiffs initially contended that it was appropriate to measure just the change of the price of the tied product, but later posited that injury-in-fact could be demonstrated as to each plaintiff even if the package price measure was used. The question of how to measure damages was potentially of critical significance, because economic theory referenced by the dissent predicted that, if a tie is broken, the price of the tying product may increase. Thus, those customers who used more of the tying product (credit cards) than the tied product (debit cards) could have actually benefited from the tie. The dissent felt compelled to decide these questions, because the answers it would have given would have made class treatment inappropriate due to a conflict between the members of the purported class. The panel majority, however, apparently found the plaintiffs' experts' explanation of why credit card users were also harmed sufficiently plausible to support certification of the class.
65. 509 U.S. 579, 592-93 (1993).
66. Nichols v. SmithKline Beecham Corp., 2003-1 Trade Cas. (CCH) ¶ 73,974, at 95,882-83 (E.D. Pa. 2003).

Exhibit 118A



members of the proposed class."[67] Other courts have suggested that a "lower" or "modified" *Daubert* standard may be appropriate to the preliminary stage of the litigation given the different question before the court in the certification, as opposed to merits, phase of the litigation.[68]

b. Battle of the Experts.

In class certification, a court must decide whether the claims are amenable to common proof, not whether the plaintiff will ultimately succeed in proving the claims.[69] However, the line between deciding the appropriateness of the method and the strength of the merits can be difficult to draw. In many of these cases, the plaintiffs submit the report of their expert, which uses common statistical evidence and purports to show class-wide impact, and the defendants submit their own expert report, purportedly showing just the opposite. To the extent they view the conflict as one concerning the strength of the merits, courts have generally deferred any evaluation on the merits for trial.

In *Potash*, for example, the plaintiffs submitted their economist's evaluation of the potash market, which examined pricing, price lists, and actual transaction data, to demonstrate common impact. The defendants presented the report of their own economist, which did not show

---

67. *Id.* at 95,883 (citing *In re* Polypropylene Carpet Antitrust Litig., 996 F. Supp. 18, 26 (N.D. Ga. 1997)).

68. *See* Thomas & Thomas Rodmakers, Inc., v. Newport Adhesives & Composites, Inc., 209 F.R.D. 159, 162-63 (C.D. Cal. 2002) ("a lower *Daubert* standard should be employed at this early stage of the proceedings"); *In re* Monosodium Glutamate Antitrust Litig., 205 F.R.D. 229, 234-35 (D. Minn. 2001) ("*Daubert* requires a more searching inquiry than is appropriate at this preliminary stage"); Midwestern Mach. v. Northwest Airlines, 211 F.R.D. 562, 565-66 (D. Minn. 2001) ("*Daubert* is helpful" for excluding a flawed methodology, but it would be inappropriate "for a court to look beyond the methodology and critique the prospective results"); *cf. Visa Check*, 280 F.3d at 132.

69. *See In re* Polypropylene Carpet Antitrust Litig., 178 F.R.D. 603, 618 (N.D. Ga 1997) (providing that "the [c]ourt examines evidence as to *how* the class proponents intend to prevail at trial, not whether the *facts* adduced by the class proponents are susceptible to challenges by class opponents") (emphasis added).

**Exhibit 118A**



common impact.[70] The court noted the conflict but stated that the certification stage was not the proper forum for resolving the "battle of the experts"; rather, it was sufficient at that point that the plaintiffs' experts had provided evidence "common to the class and susceptible to class-wide proof" that defendants had caused injury.[71]

In a nonantitrust case, the Seventh Circuit has expressed the view that courts must make factual determinations when deciding class certification motions to the extent that such determinations are required to decide whether the conditions of Rule 23 are met.[72] Applying the *Szabo* standard, an antitrust court may need to subject econometric

---

70. *In re* Potash Antitrust Litig., 159 F.R.D. 682, 696-97 (D. Minn. 1995).

71. *Id.*; *see In re* Bromine Antitrust Litig., 203 F.R.D. 403, 414 (S.D. Ind. 2001); *In re* Terazosin Hydrochloride Antitrust Litig., 203 F.R.D. 556, 558 (S.D. Fla. 2001), *vacated and remanded on other grounds sub nom.* Valley Drug Co. v. Geneva Pharm., 350 F.3d 1181 (11th Cir. 2003); *In re* Commercial Tissue Prods., 183 F.R.D. 589, 596 (N.D. Fla. 1998); *In re* Playmobil Antitrust Litig., 35 F. Supp. 2d 231, 247 (E.D.N.Y. 1998); Paper Sys. v. Mitsubishi Corp., 193 F.R.D. 601, 614 (E.D. Wis. 2000); *In re* Disposable Contact Lens Antitrust Litig., 170 F.R.D. 524, 531-32 (M.D. Fla. 1999); *In re* Catfish Antitrust Litig., 826 F. Supp. 1019, 1042 (N.D. Miss. 1993). Other courts may have gone further by deferring a decision on the viability of the proposed method for the particular circumstances before the court. *See In re* NASDAQ Market-Makers Antitrust Litig., 169 F.R.D. 493, 522 (S.D.N.Y. 1996) (holding that the court need not decide at the class certification stage which economic theories are "best suited to the particularities of this case"); *In re* Industrial Diamonds Antitrust Litig., 167 F.R.D. 374, 384 (S.D.N.Y. 1996) (stating that the court "need not consider [expert's affidavit] in detail, as it is for the jury to evaluate this conflicting evidence and to determine what weight to give the expert's conclusions").

72. *See* Szabo v. Bridgeport Machs., Inc., 249 F.3d 672, 676 (7th Cir. 2001) (Easterbrook, J.) (comparing the inquiry to the type of fact finding courts undertake to decide dismissal motions under Rule 12 (b)(1) or (b)(2) and holding that "if some of the considerations under Rule 23(b)(3) overlap the merits . . . then the judge must make a preliminary inquiry into the merits"); *see also* Gen. Tel. Co. of the Southwest v. Falcon, 457 U.S. 147, 160 (1982) ("[S]ometimes it may be necessary for the court to probe behind the pleadings before coming to rest on the certification question.").

Case 4:07-md-01819-CW Document 806-7 Filed 08/06/09 Page 26 of 72 PageID #: 18630

Exhibit 118A



studies showing common impact to a critical analysis before certifying a class.

### 3. *Econometric Analysis of Damages*

While "the federal courts have consistently and firmly adhered to the principle that once liability has been demonstrated, complexity or uncertainty as to the amount of damages will not preclude recovery,"[73] a class proceeding must still meet Rule 23's requirement of manageability. Particularly where there are many plaintiffs with unique claims, class certification disputes may turn on whether damages calculations can be made manageable by a common formula using a few pieces of information, without requiring a detailed inquiry into the individual circumstances of each class member. In some seemingly complex cases, econometrics can make proof of damages more formulaic so as to avoid "a deluge of mini-trials" that would otherwise make the litigation unmanageable or undermine the efficiency that is the basis for class treatment under Rule 23.

For example, one court certified a class of over thirty thousand cattle producers who sold cattle on a cash basis. With respect to damages, the court found that "plaintiffs' experts provide a convenient, formulaic basis for computing the damages of individual class members. Individual questions of damages do not predominate in this case and the determination of damages relies upon econometric models and calculations that are common to all class members."[74] Likewise, *Lumco Industries v. Jeld-Wen, Inc.*[75] approved a class where plaintiffs proposed using a regression analysis to prove damages by calculating the overcharge produced by the conspiracy and multiplying the result by the volume of each class member's purchases.[76] As the court recognized in *In re Polypropylene Carpet Antitrust Litigation*,[77] "at the same time the

---

73. *In re* Folding Carton Antitrust Litig., 75 F.R.D. 727, 735 (N.D. Ill. 1977) (citing, inter alia, Bigelow v. RKO Radio Pictures, 327 U.S. 251, 264 (1946)).
74. Pickett v. IBP, No. 96-A-1103-N, 2001 U.S. Dist. LEXIS 22453, at *31 (N.D. Ala. Dec. 21, 2001).
75. 171 F.R.D. 168 (E.D. Pa. 1997).
76. *Id.* at 174.
77. 996 F. Supp. 18 (N.D. Ga. 1997).

Exhibit 118A



regression analysis examines whether antitrust impact exists, it also measures the magnitude of this impact."[78] Thus, it certified a class where the plaintiffs intended to estimate the amount of any overcharge by regression analysis and multiply the result by the number of purchases by class members.[79] One court initially denied class certification where it appeared that individual calculation of damages would make class litigation unmanageable, but later certified a class after receiving additional expert affidavits suggesting that the plaintiffs were prepared to support a general formula for damages.[80]

## D. Data Analysis in Class Certification Disputes[81]

This section identifies and discusses specific analytical approaches used by economists when providing opinions for the court's assessment of class certification. While this section focuses on information that relates to the demonstration of common impact, such evidence typically is also relevant to the determination of whether damage estimates will be highly individualized.

The information considered by economists when assessing whether a class should be certified includes detailed institutional information about the structure of the market and market transactions. A detailed understanding of the marketplace can be quite important both in its own right and for providing a context for the interpretation of statistical information. As a result, before turning to statistical tests that may be

---

78. *Id.* at 29.
79. *Id.*
80. *See In re* Industrial Gas Antitrust Litig., 100 F.R.D. 280, 295 (N.D. Ill. 1983); *see also* Paper Sys. v. Mitsubishi Corp., 193 F.R.D. 601, 615 (E.D. Wis. 2000) (regression analysis controlled for a variety of factors including the grade of paper and the size of individual plaintiff's purchases); *In re* Domestic Air Transp. Antitrust Litig., 137 F.R.D. 677, 692-93 (N.D. Ga. 1991) (expert proposed several common methods for proving damages); *In re* Auction Houses Antitrust Litig., 193 F.R.D. 162, 166 (S.D.N.Y. 2000) (rate schedules that would have been employed in the absence of the conspiracy could be estimated with econometric methods).
81. The analytical approaches described in this section have been employed in actual cases. However, due to confidentiality restrictions, the cases and actual data are not provided.

Exhibit 118A



performed in class certification disputes, this section discusses the interpretation of frequently used types of nonstatistical evidence. The last two subsections address simple statistical tests and econometric models used to determine if there has been common impact.

### 1. *Nonstatistical Evidence*

Often important evidence relevant to class certification disputes is contained in documents and factual testimony. For example, direct documentary evidence that firms met, agreed to raise prices, and in fact implemented the agreed upon prices provides substantial evidence of common impact. Similarly, convictions or guilty pleas obtained by an enforcement agency, such as the Department of Justice, are also frequently considered. However, this nonstatistical evidence is often incomplete. While it may provide direct evidence that there was a price-fixing agreement, it may not provide all of the needed details on the nature of the agreement, such as how effective and far-reaching it was. As a result, while relevant, this information may not be sufficient to demonstrate impact on all members of a proposed class. Other factors, such as evidence of what prices were affected by the conspiracy, need to be considered to see whether common issues predominate over individual issues.[82] Nevertheless, the price-fixing allegation itself is a common starting point for identifying a potential class in a price-fixing case. Moreover, it is important to take such information into account when specifying an econometric model.

Evidence contained in documents and statements by fact witnesses that relate to the determination of whether defendants exercised market power can also be important in class certification disputes. Market power is necessary to sustain prices above the competitive levels. If the defendants have no market power, perhaps because there are significant competitors who are not participating in the alleged anticompetitive behavior, it is unlikely the defendants could successfully charge higher prices to all class members on a sustained basis. Similarly, if there is no evidence that the members of the conspiracy exercised market power (e.g., they did not follow through on commitments to raise prices or

---

82. *In re* Domestic Air Transp. Antitrust Litig., 137 F.R.D. 677 (N.D. Ga. 1991).

Case 4:07-md-01819-CW Document 806-7 Filed 08/06/09 Page 29 of 72 PageID #: 18633

Exhibit 118A



continued to produce all that they could produce),[83] then even if they have a conspiratorial agreement, there may not have been an adverse impact on some, or all, class members.

In conspiracy cases, evidence from documents and testimony will be very important for delineating the extent of the conspiracy and thus the extent of a properly defined class. A conspiracy may have little or no effect on some customers for many different reasons. For example, some purchasers may be in areas that have fewer suppliers, and because there are fewer suppliers, price may already be at the monopoly level as a result of tacit collusion. Explicit collusion would not raise price to such customers. Alternatively, some buyers may suffer less impact from a conspiracy because they have more options than other buyers do. Perhaps they have a greater ability to switch to substitute products or to bring the product in from areas unaffected by collusion. The impact on customers can also vary if some of the suppliers cheat on their conspiratorial agreement.

The impact of monopolistic activities can also vary across customers (and thus class members) when different customers have different negotiating strengths.[84] Customers with substantial negotiating strength are less likely to pay higher prices due to monopolistic behavior than others. A variety of factors affects a customer's ability to negotiate. For example, when a customer is particularly well positioned to substitute other products for defendants' products, a dominant firm or collusive group may choose not to raise the price it charges that particular member

83. Economists often explore whether firms were producing at full capacity as a way of assessing whether they withheld product from the market as part of a conspiracy or other monopolistic behavior. These analyses should recognize that a firm's name plate capacity may not reflect its practical capacity.

84. Economists also recognize that the price a customer pays may be a function of the information that the customer has about the market performance, including the prices being paid by others. Similarly, economists recognize that the prices customers pay may depend on the amounts they purchase because of transactional savings and because customers who buy large amounts may have credible threats that smaller customers do not have (e.g., entry may be a more realistic option). As a result, some economists have argued that one needs to control for differences in scale and customer information when analyzing prices and impact.

of the proposed plaintiff class.[85] Other factors that can affect the ability of a firm to negotiate include the customer's inventory position, its ability to enter into the production of the product, and its sensitivity to the price of the particular product.

With respect to price-fixing conspiracies or unilateral efforts to raise price, the impact of the anticompetitive behavior may be limited if not all members of the industry participate. While such incomplete participation does not guarantee that there was no effect, since non-participants may be unable to serve all purchasers or may unilaterally follow the lead of others, it is important nonstatistical information that should be considered in the analysis.

Even within a firm that is attempting to raise prices monopolistically, the control over pricing decisions may not be sufficient to increase all prices. For example, when a firm is participating in a collusive price-fixing agreement, knowledge of the firm's participation and of the nature of the agreement is often a closely held secret because of the penalties associated with being caught. As a result, individuals involved in selling and pricing the product may not know about the agreement and may pursue competitive pricing policies. This implies that when trying to determine the boundaries of a conspiracy, it is important to consider the product and geographic areas of responsibility for the sales personnel within each company and to understand who was participating in the conspiracy and how different prices were set. The pricing data frequently must be disaggregated to understand the reach of the price-fixing agreement.[86]

As the preceding discussion indicates, while nonstatistical information is often helpful, it is rarely determinative. Even when a proposed class is limited to purchasers of a fungible product in a well-

---

85. In *Alaska Propane*, the court decided that some members of the class were well-positioned to substitute other types of energy for propane and thus did not necessarily experience a price increase (since the supplier price discriminated across customers). Alaska v. Suburban Propane Gas Co., 1995-1 Trade Cas. (CCH) ¶ 71,042 (D. Alaska 1995).

86. The analysis of price data to determine the extent of a conspiracy's effects must be done with care. Price data that are too aggregated may mask pricing patterns that reveal the true reach of the conspiracy. For example, customer-specific prices may reveal that the conspiracy was not uniformly affecting all class members.

Exhibit 118A



defined geographic market, some class members may not be affected.[87] As a result, it is critical that the plaintiffs control for the fact that members of the proposed class buy different products or services in different geographic markets. This analysis may be limited to simple statistics, but it may also involve sophisticated econometric analysis that controls for multiple variables that affect price.

### 2. *Simple Data Analysis*

As part of their analysis of the impact of alleged anticompetitive behavior, economists often undertake fairly straightforward price studies. In many class certification disputes, the statistical analyses presented do not include multivariate regressions, either because the needed data are not available or because the experts do not believe they are needed. This section reviews common data analyses and non-regression studies used in class certification disputes.

#### a. Prices Paid at a Point in Time

If members of a proposed class buy a relatively homogeneous product, one would expect that they would be paying similar prices if they were all affected by the alleged anticompetitive practice, all else being equal. As a result, a common starting point for price analyses is a comparison of the prices paid by class members. Table 1 provides an example of such a price comparison.

The January 1999 prices in Table 1[88] show that different customers are being charged different prices. The high price of $0.45 is more than 60% above the low price of $0.28. These sizeable differences in price suggest that different customers may be subject to very different pricing strategies.

87. For example, in circumstances where price discrimination is possible, some customers may not pay the competitive price because they would turn to substitutes if the price rose above competitive levels.

88. Because of confidentiality concerns, examples in this section use hypothetical data; the data are similar to those in tables presented in actual cases.

Exhibit 118A



**Table 1**
**Prices Paid for Product Z by Various Buyers in the Proposed Class, January 1999 and January 2001**

| | January 1999 | January 2001 |
|---|---|---|
| Buyer 1 | $0.30 | $0.32 |
| Buyer 2 | $0.40 | $0.42 |
| Buyer 3 | $0.28 | $0.45 |
| Buyer 4 | $0.30 | $0.43 |
| Buyer 5 | $0.45 | $0.35 |

The observed price differences can be interpreted in several different ways, depending on the anticompetitive theory being advanced and the structural characteristics of the market. For example, in cases where a collusive group is alleged to be price discriminating by charging monopolistic prices to members of the plaintiff class and competitive prices to any customer outside the class who bought similar products, economists have argued that one can use these price differences to demonstrate impact and to estimate damages. Similarly, economists have sometimes argued that prices in another geographic market are competitive and can be used to evaluate the structure of the prices charged in the area where the anticompetitive behavior is alleged to have occurred. However, in at least some of these cases, other economists have attempted to use differences in the prices paid by members of the proposed class to establish that there is no common impact. In particular, these economists have explored the distribution of prices to see whether there are members of the proposed class who pay lower prices than those paid by at least some of the allegedly favored customers (who are hypothesized to be paying a competitive price).[89] In these disputes,

89. These empirical analyses can allow economists to report the frequency with which the lowest price was paid by an allegedly disfavored class member, the percentage of the time that disfavored customers paid a price that was below the median (or mean) price paid by the favored customers, and the percentage of the time that the prices paid by the allegedly disfavored class members were below the price paid by at least one of the favored customers.

Case 4:07-md-01819-CW Document 806-7 Filed 08/06/09 Page 33 of 72 PageID #: 18637

Exhibit 118A



economists have looked at both mean and median prices.[90]

Economists testifying for plaintiffs in some cases have advanced the possibility that observed prices for the proposed class members are part of a distribution that has been shifted by the alleged anticompetitive behavior. Under this theory, a variety of customer and market characteristics cause both competitive and noncompetitive prices to vary across customers within both the favored and disfavored customer groups. This variation creates the possibility that some disfavored customers (who are part of the proposed class) may pay lower prices than some favored customers who are believed to be paying competitive prices.

When two competing theories are both consistent with observed price patterns, additional information is necessary to test the theories. For example, if one is testing the hypothesis that the low prices paid by some members of the proposed class are attributable to other factors that cause prices to vary across class members, one could attempt to identify these factors and then collect data on them to test the proposition. For example, if one is concerned that prices vary with respect to the amount purchased, one might stratify the samples of favored customers and class members by volume of purchases, comparing the prices of equal-size customers in the two groups.

Any analysis of price differences should consider whether these differences simply reflect differences in products, services, and transactional characteristics. For example, even if the product is a relatively homogeneous one like milk, packaging costs may differ across customers (e.g., glass bottle versus paper package). The dairy might provide the service of stocking shelves to one customer but not to another. Delivery costs may differ because some customers are located at a greater distance than others or because some customers are located on less densely populated delivery routes and thus require larger incremental delivery costs. Or, the terms of the contracts that set the

---

90. Economists use three different measures of central tendency: mean, median, and mode. The mean is the average for the data set. The median is the value that has an equal number of observations on either side. The mode is the most frequent value. It is common to use either the difference in means or medians. The choice depends on the circumstances, with the median being preferred if one is concerned that the mean may be significantly affected by outlying values in the data set.

Exhibit 118A



prices for different customers may differ because they were negotiated at different points in time or because they require the buyer and seller to incur different risks (e.g., some may be spot transactions and others may be long-term agreements in which the buyer and seller will face risks associated with changes in demand and supply conditions). For example, one customer may have a price that was set by contract three years ago while another's price may reflect a spot market purchase. In addition, one must consider institutional characteristics of the buyer that may affect the average prices reported. For example, a given customer may pay several different prices for the same product, depending on what part of its organization is using the product. In this case, an average price for the customer may be misleading, and there is the risk that customers may have been misclassified if there has been an effort to classify them by type. The severity of this problem will obviously depend on the particular facts.

The pricing differences observed in simple tables, such as Table 1, may also be due to differences in pricing strategy. If there is direct information on firm pricing strategies (such as documents or testimony) or other information on market structure that suggests firms might charge different prices to different customers, economists will analyze the observed prices to see if they are consistent with the patterns suggested by these other information sources. For example, if structural characteristics of the market or direct pricing strategy information suggest that some buyers are better situated to avoid the impact of a monopolistic price increase than others, pricing data could be studied to determine whether these data are consistent with this view. In Table 1, an economist might be interested in knowing whether Buyer 3 is a customer who, according to documents or structural characteristics in January 1999, has viable alternatives to the monopolist's product, since this may explain why Buyer 3 is paying a substantially lower price.

b. Price Patterns over Time

Economists do not limit their analyses of price data to the prices charged at a particular point in time. They also consider how prices change over time because there is often a large amount of valuable information in price changes. These "time series" analyses not only examine how prices change for an individual customer but also compare the price patterns of different customers.

Exhibit 118A



Focusing on the prices of a particular customer, such as Buyer 1 in Figure 1, an economist would look at the price data to see if there is a significant increase in price at the time when the alleged anticompetitive behavior began. For example, if there were an allegation of price fixing, an economist would attempt to determine whether prices were significantly higher during the alleged conspiratorial period. As a first cut, an economist would typically explore whether there is a sizeable price increase following the institution of the alleged price-fixing agreement, as there is for Buyer 1 between February and September 1999. Economists would then review the prices paid by other customers to determine if their experience appears to parallel that of the Buyer 1. If customers are to be in the same class, the prices they pay should be similarly affected by the impact of a conspiracy.[91] As shown in Figure 1, it may be that some customers (e.g., Buyers 1 and 2) experience a price increase, while others (such as Buyer 3 in Figure 1) do not. If the prices are not moving in the same direction, in roughly the same magnitude, the impact of the conspiracy may not be uniform. Indeed, it is possible that some customers are not affected at all, providing a basis for the argument that they do not belong in the same class. Again, as is shown in Figure 1, it appears that Buyer 3 may not have been affected, or at least not affected in the same way, as Buyers 1 and 2.[92]

The fact that different buyers have disparate experiences may become particularly clear if one uses the price data underlying Figure 1 to calculate price changes from period to period for each customer. Specifically, Buyer 3 does not experience significant increases in price during the February-September 1999 period; in contrast, Buyers 1 and 2 did experience an increase in price during this period. Generally, when the prices for some customers are going up while the prices of other customers are not, there is reason to doubt that the different customers (class members) are experiencing a common impact. However, if observed differences are due to measurable and systematic factors that

---

91. Regressions that focus on general trends for different customers may be misleading. While they may show a general upward trend (suggesting that different customers experienced similar price increases), a careful review of the actual pricing data may reveal variations in the pricing behavior that are significant and masked by regression lines.

92. Note that this does not necessarily preclude class treatment, if damages can be established using a common formulaic approach..

Exhibit 118A



can be controlled for in a regression, a common impact may be shown and class treatment may still be appropriate.

**Figure 1**
**Actual Prices Paid for Product X by Selected Buyers, 1998-2000**




Comparison of relative prices over time also provides insights into whether a particular customer is well-positioned to protect itself against a price increase. For example, while the January 1999 data in Table 1 are consistent with Buyer 3 having options that allow it to protect itself from anticompetitive price increases, consideration of the January 2001 data contradicts this conclusion. As is shown in Table 1, Buyer 3 pays a substantially higher price in January 2001 and experiences a much larger price increase between 1999 and 2001 than the other buyers. One would not expect to see this type of price increase over time if Buyer 3 were a power buyer with a lot of options. Understanding the observed pattern requires additional analysis. For example, a review of contractual terms might reveal that Buyer 3 has a low price in January 1999 because of a long-term contract locking in a low historical price and that it has to pay higher (perhaps collusive) prices after the expiration of this contract at some point between January 1999 and January 2001.[93]

93. Economists often consider whether other factors that have changed over time, such as costs, could have caused the observed price pattern.

Exhibit 118A



c. Margin Analyses

In some cases, economists have analyzed the price-cost margins that the defendants earned on sales to different customers to establish common impact.[94] The underlying economic theory is that the initiation of anticompetitive behavior will be associated with an increase in the price that the firm charges relative to the costs it incurs in supplying the product.

Typically, some measure of incremental costs is used in this analysis, since price is equal to marginal cost in textbook competition models.[95] While aggregate financial data are sometimes used, it often is important to look at price-cost margins at a product-specific level to eliminate the possibility that observed changes in the margin are due to changes in the mix of products sold rather than anticompetitive behavior.

As with price data, an economist would look at margin data to see if the margin increased at the onset of the alleged anticompetitive behavior for all members of the proposed class. For example, if the plaintiffs allege that a merger that occurred at the end of 1999 led to a postmerger price increase during the first quarter of 2000, an economist might consider whether the margin data suggest that all buyers in a proposed class paid higher prices that returned higher profits to the alleged monopolist. As shown in Table 2, the data appear to be consistent with such a theory for Buyers 1–3.[96] However, Buyer 4 has a pattern that appears inconsistent with class-wide impact.

---

94. This type of approach is sometimes referred to as a "yardstick" model. In these models economists create a pro forma income statement for the defendants based on relevant cost factors and reasonable profit margins (based on a benchmark industry or firm) and compare these profits to the defendants' actual profits. The difference in profits is sometimes used to calculate a percentage overcharge, which is used to show impact and estimate damages.

95. Price-cost margins are often defined as (Price - Marginal Cost)/Price. Marginal costs are sometimes estimated by using variable costs. However, variable costs are not always a good proxy for marginal costs. Moreover, in oligopolies, prices may be above marginal costs even without conspiratorial or other behavior that violates antitrust laws, which can also make this approach problematic.

96. The data suggest that the alleged monopolist was not able to sustain the higher margin, perhaps because of entry in the fourth quarter of 2000.

Exhibit 118A



**Table 2**
**Comparison of Price-Cost Margins**

| | 99Q1 | 99Q2 | 99Q3 | 99Q4 | 00Q1 | 00Q2 | 00Q3 | 00Q4 |
|---|---|---|---|---|---|---|---|---|
| Buyer 1 | 30% | 33% | 32% | 32% | 50% | 52% | 54% | 30% |
| Buyer 2 | 25% | 25% | 27% | 32% | 55% | 53% | 52% | 33% |
| Buyer 3 | 32% | 31% | 34% | 35% | 49% | 54% | 52% | 31% |
| Buyer 4 | 30% | 33% | 32% | 32% | 35% | 34% | 33% | 34% |

Even with respect to Buyers 1–3, the data do not necessarily demonstrate that there is class-wide impact. As is true with price data, one must consider whether other factors underlie the observed pattern. Margins can rise in the short-run because of changes in underlying supply and demand characteristics that have nothing to do with the merger's alleged creation of market power.[97] Changes in accounting procedures that accompanied the merger could also cause margins to change. Perhaps most importantly, especially in the case of a merger, the post-merger margins may have increased not because of price increases, but because of merger-related efficiencies that lowered marginal costs.[98] If it is not possible to control for these other factors, then it may not be possible to demonstrate class-wide impact.

d. Benchmark Comparisons

In some cases, economists have compared the prices (or price margins) paid by potential class members during the period of alleged anticompetitive behavior to the prices paid for a benchmark product

97. For example, an unexpected surge in demand that cannot be met by existing production capacity may be associated with a price spike that is unrelated to the exercise of market power.

98. In a competitive market, prices are determined by the costs of the marginal source of supply. A firm that achieves efficiencies through a merger may earn some infra-marginal rents because it is more efficient than the marginal source of supply. These inframarginal rents may be reflected in the firm's price-cost margins. Specifically, the price-cost margins may be higher after a merger because costs are substantially lower and the same premerger price, or perhaps an even lower price, is charged.

Exhibit 118A



during the same time period.[99] They may also compare the changes in the prices paid by potential class members at the beginning and end of the alleged anticompetitive behavior to the change in the benchmark product. In selecting the benchmark, economists attempt to identify a competitive product that faces comparable supply and demand conditions, because the comparison should control for factors other than anticompetitive behavior that could have caused the product's price to vary over time. Unfortunately it is often difficult to identify a product that experiences sufficiently similar supply and demand relationships as the product that is the focus of the antitrust complaint. When there are substantial differences in the economic forces that determine the benchmark product's price, the use of the benchmark may introduce biases that undermine the value of the comparison.

Figure 2 provides an illustrative comparison. If one believed that egg production was competitive and involved similar supply and demand factors as milk production (perhaps because both are agricultural products), one might compare the price of milk over time to the price of eggs to see if there was a difference in the pattern during the period when anticompetitive activity is believed to have occurred. In Figure 2, the price of eggs appears to be always about 40 percent of the price of milk, except in the last quarter of 1999 when the price of milk has a bigger increase. The stability of the relationship in prices between milk and eggs before the end of 1999 gives some support for the assumption that eggs might provide a sensible benchmark. Moreover, the data in Figure 2 are generally consistent with an allegation that some form of anticompetitive behavior was initiated at the end of 1999.

---

99. One could also use the same product in a different geographic area as a benchmark if the price fixing allegation does not cover all of the areas in which the defendant sells.

Exhibit 118A



**Figure 2**
**Milk and Egg Prices: First Quarter 1998 to Last Quarter 1999**




These data are far from determinative. First, without additional analysis, it is not clear that the prices of eggs and of milk should be tightly related. It could simply be historical coincidence for the relatively brief 1998-99 period that is shown in Figure 2. Economists would be much more comfortable about eggs being a good benchmark for milk if there were some fundamental structural relationship between the products. Second, the increase in the price of milk that is observed in late 1999 could be due to factors unrelated to the alleged anticompetitive behavior (e.g., there might have been an outbreak of mad cow disease that led to the slaughtering of a large numbers of cows). Third, even if there were a widespread increase in the price of milk due to anticompetitive reasons, this type of analysis does not show that all class members were impacted if different class members paid different prices.

e. Analysis of Trading Characteristics

When assessing whether class members are subject to common impact, it is often helpful to have an understanding of the fundamental trading patterns in the industry and to relate these trading patterns to the alleged antitrust violation. In particular, it is often helpful to explore whether the same group of sellers or potential sellers is supplying all of the potential class members or whether there are some sellers that supply some potential class members, but not all. It is also helpful to consider

Case 4:07-md-01819-CW Document 806-7 Filed 08/06/09 Page 41 of 72 PageID #: 18645

Exhibit 118A



whether all industry members are thought to have participated in the alleged anticompetitive behavior, since this may mean that at least some class members had access to firms that were not necessarily offering anticompetitive prices.[100] For example, if sellers *A*, *B*, and *C* conspire to raise prices to one group of buyers, but *A*, *B*, and *D* are the sellers or potential sellers for another group of buyers, the conspiratorial price may not be charged to the second group.

**Table 3**
**Summary of Sellers and Potential Sellers to Selected Buyers**

| | Seller *A* | Seller *B* | Seller *C* | Seller *D* | Seller *E* |
|---|---|---|---|---|---|
| Buyer 1 | | X | X | | |
| Buyer 2 | X | X | | | |
| Buyer 3 | | | X | X | |
| Buyer 4 | X | | X | | |
| Buyer 5 | | X | | X | |
| Buyer 6 | | | | X | X |
| Buyer 7 | | X | X | | |
| Buyer 8 | X | X | X | | |
| Buyer 9 | X | X | X | X | |
| Buyer 10 | | | X | X | X |

Constructing a matrix of supply relationships such as is shown in Table 3 is a helpful first step in the structural analysis. Assuming that sellers *A*, *B*, and *C* are the conspirators and that sellers *D* and *E* are not, Buyers 3, 5, 6, 9, and 10 may have been positioned to protect themselves from the alleged conspiracy. However, before reaching this conclusion, it is necessary to consider other data, such as the pricing to the different

100. Even if some firms did not directly participate in the alleged anticompetitive activity, their prices may have been influenced by that behavior. For example, if a subset of firms in an industry collude, it may be that the firms that did not participate in the collusive agreement still charged prices above the competitive level because they did not face aggressive pricing by the colluders and thus were able to sell their output at higher prices.

Exhibit 118A



buyers over time. Even if a seller has not served a particular customer, it is possible that its presence in the relevant market may affect the price paid by that customer since the customer can threaten to switch to that seller if the existing supplier does not lower its price.

f. Class Certification When Products and Prices Vary Across Class Members

Class members do not have to buy the same, homogeneous product at a uniform price to be found to be in the same class. Classes have been certified that include members that purchased different products or paid substantially different prices for the products or services they purchased. However, this generally requires statistical evidence showing that there is a stable structural relationship between the prices paid by the different class members.

Recent litigation involving the U.S. airline industry is illustrative.[101] A plaintiff class was certified in that case despite the fact that class members paid widely varying prices (e.g., airline ticket prices differed by carrier, type of service, cancellation rights, time of booking, route, and other factors). The plaintiffs apparently were able to show that the prices had a relatively well-defined structure. The plaintiffs' expert convinced the court that there is little or no difference between the prices of different carriers, assuming the route and all other service characteristics are the same. Moreover, he advanced evidence suggesting that, although carriers on a route may offer a wide variety of fares, different types of fares generally bear a constant relationship to each other. For example, in this case the unrestricted first class fare on a route was almost always 150 percent above the coach fare. The plaintiffs' expert also argued that fares on different routes would bear a reasonably constant relationship to each other because of supply-side substitutability. Although customers generally would not substitute between different routes, airlines could easily move capacity from route to route. For example, while a passenger who wanted to go to Los Angeles typically could not easily switch his or her destination to Seattle, an airline could easily move its aircraft and crews from serving Los Angeles to serving Seattle.

---

101. *In re* Domestic Air Transp. Antitrust Litig., 137 F.R.D. 677 (N.D. Ga. 1991).

Exhibit 118A



Notwithstanding the decision to certify, however, there were serious problems with the class as defined. In a subsequent decision approving settlement of the case, the court noted the "difficulty in proving antitrust injury and damages to the class," and that "some of the benchmarks [plaintiffs' expert] expected [in arguing for certification] to use to assess damages were problematic."[102] The court acknowledged the possibility of decertification in light of these issues.

The airline example suggests that when a potential class includes members who purchased different products at somewhat different prices, plaintiffs typically argue that there is common impact by asserting that the alleged illegal activities influenced every price. Moreover, courts often cite this fact when certifying classes in such cases.[103] In contrast, courts have denied class certification in cases where this is not true. For example, in a case alleging postmerger monopolization of propane gas, the court denied class certification after finding that the alleged price premium paid by each member of the proposed class was affected "by the price, identity, and availability of substitute products . . . which in turn is a function of [the purchaser's] location, use for propane, volume of propane or propane substitute required, and individual negotiating skill."[104]

g. Selection of the Relevant Price for Analysis

In many industries, sellers have list prices. In some situations, list prices may reflect the prices paid by all customers, but that is relatively rare. It is more common for customers to be quoted a price that is unrelated to list price or that is actually discounted off of the list price. When this is the case, economists focus on the transaction price, not the

102. *In re* Domestic Air Transp. Antitrust Litig., 148 F.R.D. 297, 317 (N.D. Ga. 1993).

103. The argument that the alleged conspiracy would affect all prices in the same way was described as crucial when the court granted class certification in *In re* Industrial Gas Antitrust Litig., 100 F.R.D. 280 (N.D. Ill. 1983).

104. Alaska v. Suburban Propane, 1995-1 Trade Cas. (CCH) ¶ 71,042 (D. Alaska Jan. 12, 1995).

Exhibit 118A



list price, since the transaction price is the price at which the good was purchased and sold.[105]

While the focus of most of the quantitative analysis will be on transaction prices, it can be helpful to develop an understanding of the role of list prices in the industry. For example, even when firms do not charge list prices, it may be the case that while different customers pay different prices, all of their prices are based on list prices (e.g., there is a stable discount off of list price for each customer). When this is the case, it is more likely that an upward shift in list prices, perhaps due to a collusive agreement, will affect each member of the class. However, as is more commonly the case, when list prices play little role in determining transaction prices, it is more likely that different customers will experience different price patterns.

Figure 3 illustrates how actual prices may diverge from list prices. In Figure 3, list prices suggest there was a significant price increase, but transaction prices do not change. In cases where transaction and list prices diverge, the economic analysis should be based on transaction prices, not list prices.

**Figure 3**
**List Price vs. Actual Price for Product 1**




105. Actual transaction prices are not always known. Often the only price data available are from invoices. These may not reflect final transaction prices if there are off-invoice rebates or discounts. It may be necessary to interview company personnel to determine the relationship, if any, between transaction prices and list prices.

Exhibit 118A



Sometimes the prices used by economists are averages of a number of different prices charged to different customers or for somewhat different products.[106] Using such averages can lead to serious analytical problems. For example, averages can hide substantial variation across individual cases, which may be key to determining whether there is common impact. In addition, average prices may combine the prices of different package sizes of the same product or of somewhat different products. When this happens, the average price paid by a customer can change when the mix of products that the customer buys changes—even if the price of no single product changed.

When there is a serious chance that changes in average prices over time may be due to changes in product mix or may hide variations across individual class members, it is important to look at disaggregated price data. Yet simplifying data because they are perceived to be too complex can impair the validity of the analysis. For example, when there are large numbers of products, perhaps because there are numerous styles or models, it is sometimes not practical to look at all prices in detail. Economists often use the largest volume product to make price comparisons when this is the case. However, when different customers buy different products (e.g., buy different models), focusing only on the largest volume product may cause the analysis to miss important differences between class members. As a result, it can also be important to consider the prices of a variety of different products across time, rather than focusing exclusively on one particular product.

### 3. *Regression Analysis*

As the discussion of simple statistical tests indicates, it is often necessary to control for a variety of factors that can affect price to assess whether all members of a proposed class are affected. While much may be accomplished through detailed market analysis and the consideration of individual cases, formal statistical techniques that accommodate the simultaneous influences of numerous economic variables may be

106. Prices are sometimes derived from financial statements that report total revenues and units sold by dividing total revenues by quantity, since total revenue equals price times quantity. While this is often a sensible procedure, one must consider whether differences between units may affect the interpretation of this average price.

Case 4:07-md-01819-CW Document 806-7 Filed 08/06/09 Page 46 of 72 PageID #: 18650

Exhibit 118A



required. Multiple regression analysis is commonly used in these situations.

Multivariate regressions can allow economists to study price changes by controlling for a variety of variables and relationships thought to affect price. Statistical studies of price equations can, in some cases, be used to evaluate impact and to develop a formulaic approach for calculating damages across class members.[107] However, one must proceed with care.

When regression analysis is used improperly, it can provide misleading information. By their very nature, regressions summarize data. In the process of summarizing, they can overlook crucial detail. For example, it is always possible to perform a regression with the price as the dependent variable and with a variety of independent variables. The regression can be estimated, and a line can be fitted to the data. This does not mean, however, that impact can be shown with common proof, or that damages can be calculated in a formulaic manner. More careful analysis of the data is necessary to make sure that when the regression captures trends, it is not missing important information specific to individual customers that runs counter to those trends.

The regression would typically use price, or a form of price, as the dependent variable.[108] Independent variables may include dummy variables representing product characteristics and the dates of the alleged conspiracy time period. Other variables sometimes warranting inclusion are the quantity purchased and year. Additional variables may be needed to represent other supply and demand conditions when these help to determine price.

A typical model is the "reduced-form" pricing equation.[109] In such an equation, the price paid by a given purchaser at a given time is a function of a vector of variables that affect the demand and supply of the

---

107. The damages for an individual customer can be calculated using this formula if the values of each independent value are known for each customer. These values can be inserted into the equation that was estimated by the regression to calculate the damages.

108. For example, a ratio of price to the cost of an important input may be used in some situations.

109. *See* Jonathan B. Baker & Daniel L. Rubinfeld, *Empirical Methods in Antitrust Litigation: Review and Critique*, 1 AM. L. & ECON. REV. 386 (1999).

Exhibit 118A



product, such as product features, input prices, or weather.[110] The equation also includes a dummy variable with a value of one during the period of the conspiracy and zero at other times, and is assumed to be the same for all class members. The estimated coefficient on this dummy variable is generally taken to be the estimate of injury. If it is positive and significant, that result may support the plaintiffs' view that the conspiracy increased prices.

The reduced-form pricing equation assumes that a conspiracy has the same effect on every purchaser and focuses on an average effect, which may hide variation across class members.[111] If one is attempting to test whether there is an impact on all members of a proposed class, however, that assumption is not valid, as it assumes the very proposition that is being tested. As a result, somewhat more complex models that do not make such an assumption must be used to test for class-wide impact.[112]

One approach is to divide the proposed class into categories and use a model that allows the value of the dummy variable to be different for different categories. This would be appropriate if members of the proposed class can be grouped using some observable structural characteristic that is believed to affect the price they will pay. For example, customers in one area may have seen smaller price increases than customers elsewhere because there was a small firm in the area that did not participate in the conspiracy.

Assuming that one can support this type of structure, the first reduced-form regression model could be changed to include a dummy variable that has a value of one during the time period of the conspiracy only if a customer is in the area that is believed to have had a smaller price effect. The model would produce one estimate of the effects of the

110. This vector does not include the quantity sold, as that not only influences price but also is influenced by price. Including volume in the equation requires the use of a more complicated model than the reduced form shown in the text.

111. This point is similar to the point made in the discussion of the use of average prices above. When one is using a statistic that is an average, one must consider the possibility that the average is hiding variation across class members.

112. Assuming that there is class-wide impact, this type of model might be used to estimate damages for each class member on a formulaic basis, assuming that the needed member-specific data are available.

conspiracy for customers not in the affected area and another for customers in the affected area. The hypothesis that customers in the affected area had a smaller price increase can be tested by the value of the dummy variable for customers in the affected area. If that coefficient is negative and significantly different from zero, then the results will support the view that those customers suffered a smaller price increase.[113]

It is possible to modify the preceding regression model to allow the effects of the conspiracy to vary among more than two groups of purchasers. In fact, given enough data, it is possible to let the variable that represents the conspiracy's effects assume a different value for every customer. In this way, every member of the class can present a formulaic estimate of its impact and damages that is grounded in a regression model that is common to all. However, while theoretically possible, several practical and theoretical issues should be recognized.

First, as one subdivides the class into more and more groups, the need for data increases significantly. Estimating a model that allows each purchaser to experience a different price increase requires an enormous amount of data and will not often be feasible. The data demands become even more daunting if one wishes to take into account the possible interaction between customer effects and other supply and demand variables that appear in the reduced-form model.

Second, caution must be exercised in interpreting the results of the preceding model. Even if the regression results show that prices rose for all classes of customer, one might not be able to conclude that these price increases were due to a common anticompetitive activity if there were several confounding structural changes. For example, if prices rose due to explicit collusion in one market and tacit collusion in another, one is likely to need additional information to distinguish between the causes of the price increase in the two markets. Even with the inclusion of some variables associated with structural changes that would support increased tacit collusion, it still might be difficult to interpret the results. For example, because of problems with multicollinearity, results would be

113. It can also be relevant to consider variance around the mean price in each subarea. While the average price might be higher for a subarea, this could be due to averaging. As a result, unless there is reason to believe that every buyer in the group paid the average price or close to it, it would be appropriate to check for variations in prices within the subarea.

Exhibit 118A



hard to interpret if there were a high degree of correlation between the tacit collusion variable and the onset of the collusive agreement.

Plaintiffs using regressions for class certification purposes will generally try to control for various customer attributes. But these attributes are not always accurately captured in regressions because of data limitations or problems with the specification of the regression. For example, if individual customers qualify for volume discounts at some times but not others, the regression would need to take this into account. Similarly, if delivery charges are added to prices at some times and not others or the types of products offered and purchased change over time, it would be improper to use time-series data or models that do not reflect these variations over time. When there is substantial variation in fundamental aspects of the price data of this type, individual inquiries are necessary to understand the factors that shaped the prices that specific customers paid.

In sum, econometric analysis can provide valuable insights into whether there is a class-wide impact and may often allow the construction of a formula for estimating damages for different class members. Still, econometric analysis is not a panacea. One must proceed with care to avoid pitfalls caused by data limitations and biases that creep in through inappropriate structural assumptions. In particular, it is crucial to consider whether the econometric model and results reflect the fundamental structural characteristics of the market.[114]

---

114. For example, if the two different geographic markets contain different sets of sellers (and potential sellers), that fact suggests that it may be difficult to have a single conspiratorial agreement that works effectively in the two markets. Careful investigation of the behavior of the sellers is crucial with regard to this issue.

Daniel L. Rubinfeld, *Quantitative Methods in Antitrust*, *in* 1 ISSUES IN COMPETITION LAW AND POLICY 723 (ABA Section of Antitrust Law 2008)

*Chapter 30*

# QUANTITATIVE METHODS IN ANTITRUST

Daniel L. Rubinfeld*

This chapter surveys empirical methods that are used to evaluate antitrust issues relating to merger analysis, liability, impact, and damages. The chapter first describes a number of applications for traditional statistical methods that rely on reduced form estimation using cross-section or time-series data. It then examines the application of methods that uncover the structure of demand, including (1) the estimation of demand elasticities using market transactions data; (2) the use of transactions or bidding data, perhaps merged with information on buyer characteristics, to learn about the structure of preferences and to make inferences about the extent of buyer substitution between alternatives; and (3) the use of survey techniques. The chapter then raises a number of important conceptual issues that are relevant with respect to questions of liability, impact, and damages.

## 1. Introduction

Quantitative methods have been described and debated in detail elsewhere by a host of commentators.[1] This chapter provides a brief, critical overview of methodologies that have been used and the range of questions that they address.

Econometrics involves the application of statistics to the quantitative, or empirical measurement of relationships that flow from economic analysis. Multiple regression and other econometric methods have been used frequently in cases brought by the competition authorities and in private litigation. The issues raised include liability, damages, and class certification. Empirical methods can help courts to identify what happened and why. Frequently, this can be accomplished by using a multiple regression analysis that distinguishes among a number of competing factors that Are correlated with (i.e., related to) a fact pattern. The technique allows one to isolate a key relationship or critical influence from other competing explanations. In using multiple regression, it is important to distinguish correlation from causality. Evidence that two variables are correlated does not in itself support the conclusion that the two are causally linked. A central role for econometrics and other quantitative methods is to provide the underlying theoretical support for key propositions involving such issues as relevant

---

* University of California, Berkeley. The author is especially grateful to the coauthors of several prior papers, especially Jonathan Baker, whose ideas had much to do with the views expressed here.

1. *See, e.g.*, Franklin Fisher, *Multiple Regression in Legal Proceedings*, 80 COLUM. L. REV. 702 (1980); Daniel L. Rubinfeld & Peter O. Steiner, *Quantitative Methods in Antitrust Litigation*, 46 L. & CONTEMP. PROBS. 69 (1983); Daniel L. Rubinfeld, *Econometrics in the Courtroom*, 85 COLUM. L. REV. 1048 (1985) [hereinafter *Courtroom*]; Jonathan B. Baker, *Contemporary Empirical Merger Analysis*, 5 GEO. MASON L. REV. 347 (1997); Jerry A. Hausman & Gregory K. Leonard, *Economic Analysis of Differentiated Products Mergers Using Real World Data*, 5 GEO. MASON L. REV. 321 (1997); Jonathan B. Baker & Daniel L. Rubinfeld, *Empirical Methods in Antitrust Litigation: Review and Critique*, 1 AM. L. & ECON. REV. 386 (1999); ABA SECTION OF ANTITRUST LAW, ECONOMETRICS (John Harkrider & Daniel L. Rubinfeld eds., 2005).

product market in the analysis of mergers and monopolization, the likely price effects of mergers, the anticompetitive effects of a range of anticompetitive practices involving restraints of trade, and, of course, the damages that flow from wrongful activity.[2]

Because the range of applications of these empirical techniques is so broad, this review must necessarily be limited. The chapter begins by focusing on methodology, explaining why it is important in antitrust analysis to distinguish between reduced-form methods and methods that identify the structure of demand. Three approaches are considered: (1) estimating demand elasticities from data on market transactions, (2) using transactions or bidding data to learn about the structure of preferences and to make inferences about the extent of buyer substitution between alternatives, and (3) using survey techniques to evaluate demand structure.

Next, in the applications section, the chapter discusses some of the important methodological issues that arise when one is considering, first liability, and then antitrust injury and damages. The chapter first describes a number of applications for traditional statistical methods that rely on reduced form estimation using cross-section or time-series data. It then examines the various methods that can be used to uncover the structure of demand. The chapter then raises a number of important conceptual issues that are relevant with respect to questions of liability,[3] and then antitrust injury[4] and damages.[5]

## 2. Methodology

### *2.1. Reduced-form methods*

The most common statistical method employed in antitrust litigation involves the estimation of "reduced-form" price equations. A typical reduced-form model might explain the variation in the price of a product as a function of a series of variables relating to cost, demand, and market structure. In some cases, the model would include additional "dummy variables" (i.e., variables that take on the values zero or one) that

---

2. *See, e.g.*, Alabama v. Blue Bird Body Co., 573 F.2d 309 (5th Cir. 1978); *In re* Domestic Air Transp. Antitrust Litig., 137 F.R.D. 677, 683 (N.D. Ga. 1991). Another important application of quantitative methods comes in the class certification arena. Class certification requires plaintiff to show, among other things, that there are common legal and factual issues among the members of the class. Typically, this involves a showing by plaintiff that damages can, in principle, be evaluated through a common method, and that the named plaintiff adequately represents the members of the class. *See, e.g.*, *In re* Polypropylene Carpet Antitrust Litig., 996 F. Supp. 18, 29 (N.D. Ga. 1997); *In re* Terazosin Hydrochloride Antitrust Litig., 280 F.2d 124 (11th Cir. 2001); Bradburn Parent/Teacher Store v. 3M, No. 02-7676, 2004 WL 1842987 (E.D. Pa. 2004).
3. *See, e.g.*, United States v. Eastman Kodak Co., 853 F. Supp. 1454 (W.D.N.Y. 1994). It is difficult to see how quantitative evidence alone could provide conclusory evidence about conspiracy. However, such evidence could support a view that alleged conspiratorial behavior was (or was not) consistent with the unilateral self-interest of the firms alleged to have conspired. *See, e.g.*, Ohio *ex rel.* Montgomery v. Louis Trauth Dairy, 925 F. Supp. 1247 (S.D. Ohio 1996).
4. *See, e.g.*, *Polypropylene Carpet*, 996 F. Supp. at 22-29.
5. *See, e.g.*, Colorado v. Goodell Bros., No. 84-A-803, 1986 WL 5073 (D. Colo. 1987). In addition to class certification, this chapter also does not address questions relating to the admissibility of expert testimony.

represent geographic or time differences in prices that account for variables omitted from the model (the set of such variables are the "fixed effects"). The model is called "reduced form" because the price equation is derived from other more basic economic relationships relating to demand and supply. As a result, the parameters (the variable coefficients in a multiple regression model) of a reduced-form equation are typically themselves functions of a number of the structural parameters (the parameters of the underlying economic relationships).

Reduced-form relationships are frequently easier to estimate than the structural relationships from which they are derived. It can be difficult to identify demand, for example, both conceptually (due to an inability to distinguish the demand from supply forces) and empirically (due to a lack of data). There are many occasions in which reduced-form estimates can help to answer relevant questions. However, there are risks associated with the use of reduced-form models. While the parameters from structural equations are linked to the underlying economics, reduced-form parameters are often not. As a result, one runs the risk of generating misleading results when the nature of competition changes over time.

*The reduced-form model.* A typical reduced-form multiple regression equation might take the following form:

$$P_{it} = \alpha + \beta w_{it} + \gamma y_{it} + \delta s_{it} + \varepsilon_{it} \quad (1)$$

In this notation, $P_{it}$ represents the price of a product at time $t$ paid by customer $i$ (or, in many specifications, in region $i$), $w$ is a set of variables that affect per-unit costs (e.g., input prices), $y$ is a group of variables affecting demand (e.g., the prices of substitute products), and $s$ is a set of variables related to market structure (e.g., seller concentration).

In Equation (1), the observations are drawn from a panel that reflects both cross-section and time-series variation. The linear form can account for models that are explicitly linear or that can be linearized after a transformation of the variables (e.g., the log-linear model). The error term can be seen to reflect random shifts in demand, marginal cost, or conduct by market participants. Typically, the error is assumed to be independent of, and therefore uncorrelated with, all of the right-hand variables. For example, an increase in the firms' costs of production not reflected in the included cost variables may cause price to increase, but it is assumed that the resulting price increase will not in turn affect market structure.[6]

The model in Equation (1) is termed reduced-form because it describes the equilibrium price that results from the interaction of demand and supply (or cost) forces in an industry, with the output variable having been removed by substitution. The cost and demand-shift variables included in these regressions are typically viewed as exogenous, since they are presumed to be determined independently of the dependent variable and therefore unaffected by it.[7] Variables related to market demand appear in

6. This presumes that the model does not contain a lagged dependent variable and a serially correlated error.

7. For a discussion of the possible endogeneity of the market concentration variable, see William Evans, Luke Froeb & Gregory J. Werden, *Endogeneity in the Concentration-Price Relationship: Causes, Consequences, and Cures*, 61 J. INDUS. ECON. 431 (1993).

Exhibit 118B



the reduced-form price equation for two reasons. First, shifts in demand may alter marginal cost by changing the scale of firm operations. Second, oligopolists have an incentive to increase their markup of price over marginal cost when demand becomes more inelastic. Consequently, variables related to market structure may appear in the reduced-form price equation because they reflect the extent to which the firms are able to exercise market power.

Reduced-form models are attractive in part because their modeling and data requirements are manageable. They can help to answer questions such as whether prices were higher during the period of alleged conspiracy, even when there is not sufficient information to isolate the structure of demand and supply separately. They make only limited computational demands and can often be estimated (for single-equation linear models) using the ordinary least squares methodology.[8]

When possible and appropriate, economic theory can be used to assist in the specification of the underlying structural relationships. Typically, theory will inform the question of what variables to include in a regression model, but it is rare that theory will help one to decide the particular functional form to prefer for a model. As a result, the manageability of reduced-form models may come with a cost. First, the omission of relevant variables can bias the results. If, for example, costs were high during those periods of alleged wrongful behavior because of the influence of variables not included in the regression model, or if demand grew more inelastic during that period in ways not captured by the included demand-side variables, then a dummy variable reflecting the likely effect of wrongful behavior might have a large positive coefficient for reasons unrelated to the existence of the alleged conspiracy. Second, the results might not be robust to the choice of functional form. For example, a dummy variable indicating the likely effect of a price-fixing conspiracy might have a large positive coefficient, but the coefficient might be reduced when a log-linear model is estimated.[9] As a general rule, any inference that anticompetitive behavior led to supracompetitive prices can be made with greater confidence if the measure of the difference between average prices in the conspiratorial period and the benchmark period remains large irrespective of the functional form chosen.

There are occasions in which regression models can be useful if one wishes to simulate the likely effects of potentially anticompetitive behavior. While merger simulation is perhaps the best known application in antitrust, simulation methods have been used in a variety of other contexts.[10] As a general rule, however, simulations that use reduced-form rather than structural price equations may not be reliable if the underlying structural parameters would be different in the but-for world. This could be a problem, for example, if one were using simulation to predict the price that buyers

---

8. *See, e.g.*, ROBERT S. PINDYCK & DANIEL L. RUBINFELD, ECONOMETRIC MODELS AND ECONOMIC FORECASTS (4th ed. 1998).

9. The term "large" is used to suggest practical economic significance, that is, a magnitude that matters economically. In contrast, statistical significance characterizes the precision with which a parameter or parameters are measured.

10. For a review of merger simulation methods, see ABA SECTION OF ANTITRUST LAW, *supra* note 1. Some alternative uses of simulation are discussed in Rubinfeld, *Courtroom*, *supra* note 1.

would have obtained had firms not conspired. Buyers that are aware (at least probabilistically) about a possible violation may view any expected damage recovery as a price reduction. A simulation that does not account for this possibility may overstate the magnitude of the overcharge to buyers, though this possibility depends heavily on buyers having had knowledge of the violation and its likely prosecution.

*Pass through*. Reduced-form methods can be used to identify the rate at which a firm has historically passed through firm-specific cost changes to prices.[11] Pass-through issues are often central in private indirect purchaser cases, where it is important to evaluate the extent to which any direct purchaser overcharges are passed on to indirect purchasers.[12]

Whatever the application, the pass-through rate is an important element in an assessment of the net effect of the transaction on prices paid by buyers. For example, if direct customers were overcharged by 10 percent on their purchases, and it is determined that the pass-through rate is 30 percent, then indirect purchasers will have damages of 3 percent, rather than 10 percent. Pass-through rates depend crucially on the nature of competition, the market shares of the firms that are affected by the wrongful activity, and on the shapes of the relevant demand and cost curves.[13]

Inferences about the firm-specific pass-through rate can be made by estimating a reduced-form price equation that relates a firm's price ($p$) to its own costs ($c$) and its rival's costs ($cr$) and a series of fixed effects variables ($F$), as in the following equation (from which firm and time subscripts have been omitted):

$$p = \alpha + \beta_1 c + \beta_2 cr + \lambda F + \varepsilon \qquad (2)$$

In this model, the competitor's cost variable can be thought of as a proxy for industry-wide costs. With industry-wide costs included, the cost variable picks up only the effect of firm-specific cost variation on prices.[14]

It is important to understand with respect to mergers that the firm-specific pass-through rate may not be the appropriate rate to apply to the efficiencies that would be achieved, given that the merger might change the extent to which the firms competed. In *Staples*, this did not turn out to be a problem, since the inclusion of variables related

11. Perhaps the best example came out of the Federal Trade Commission's *Staples* litigation. FTC v. Staples, Inc., 970 F. Supp. 1066 (D.D.C. 1997); *see also* ABA SECTION OF ANTITRUST LAW, *supra* note 1. *See generally* Orley Ashenfelter et al., Identifying the Firm-Specific Cost Pass-Through Rate (Federal Trade Comm'n, Working Paper No. 217, January 1998).

12. *See, e.g.*, Ronald Cotterill et al., *Beyond Illinois Brick: The Law and Economics of Cost Pass-Through in the ADM Price Fixing Case,* 18 REV. INDUS. ORG. 45 (2001); Robert Taylor, *Indirect Damages from Price Fixing: The Alabama Lysine Case*, 18 REV. INDUS. ORG. 33 (2001).

13. If the market is otherwise competitive, the pass-through fraction is given by $Es/(Es - Ed)$, where $Es$ is the elasticity of supply and $Ed$ the elasticity of demand. *See* ROBERT S. PINDYCK & DANIEL L. RUBINFELD, MICROECONOMICS 328 (6th ed. 2005). The authors point out that it is quite possible that pass-through rates will be lower in industries in which firms have substantial market power than in more competitive industries.

14. In *Staples* the court agreed with the Federal Trade Commission's expert economist that Staples had historically passed through only 15% of firm-specific cost reductions to consumers. *See Staples*, 970 F. Supp. at 1090.

to market structure in the regression model did not substantively change the regression results.[15]

*Summary*. Reduced-form models have the potential to provide evidence on a wide range of problems. They offer relatively straightforward approaches that can be explained with relative ease to triers of fact. Nevertheless, reduced-form methods raise a diverse array of issues, including, but not limited to, the possibility of omitted variables, errors in data measurement, and the potential endogeneity of one or more explanatory variables.

Reduced-form models are least desirable when the key question for litigation depends on structural parameters, which can be difficult to recover from reduced forms. Accordingly, the next subsection discusses the use of structural models, particularly those aimed at identifying the structure of demand.

### *2.2. Structural models*

Whether there is sufficient demand substitution to prevent the exercise of market power depends on the extent to which consumers will be diverted to other products in the face of a price increase (as measured by the price elasticity of demand for the product). Thus, identifying the structure of the demand for products is central to the analysis of market definition. The price elasticity of demand measures this directly. However, it is sometimes useful to identify the particular set of products to which lost sales are likely to be diverted; these diversion calculations depend crucially on the various cross-price elasticities of demand. Cross-price elasticities are often central to the identification of localized competition in evaluating the unilateral competitive effects of mergers.

The extent and nature of demand substitution can be determined in a number of ways. This section focuses on three methods: the empirical estimation of demand elasticities, the use of transactions or bidding data to learn about the structure of preferences, and the use of survey techniques.

*Demand elasticity estimation*. Typically, demand elasticities are estimated using inverse demand functions, with price being a function of output and other variables (geographic area and time subscripts have been omitted):

$$p = \alpha + \beta q + \delta qs + \gamma y + \varepsilon \qquad (3)$$

In Equation (3), the price of a product is thought to depend on a vector of quantities sold ($q$), the quantity of sales of substitute products ($qs$), and a group of demand variables ($y$). Equation (3) presumes that observations are drawn from multiple markets (such as geographic areas) and at various periods of time (typically weeks, months, quarters, or years). The own- and cross-elasticities of inverse demand are obtained from the estimates of the $\beta$'s and $\delta$'s.

In some antitrust applications, it is useful to estimate residual demand functions (rather than the more traditional Marshallian (structural) demand functions). The residual demand function omits the quantity variables for products other than the one of

15. Ashenfelter et al., *supra* note 11.

Exhibit 118B



interest and adds a vector of cost-shift variables thought to affect the price and output of the omitted products.[16]

Whether one should prefer structural or residual demand elasticities depends on the question asked and the available data. The elasticities of the structural demand function provide information about buyer preferences; they show which products are close substitutes and which are not. More specifically, they summarize the way buyers would respond to price or output changes, assuming that rival firms do not change their decisions. Either approach can provide information relevant to identifying single firm market power or to determining whether a merger between sellers of differentiated products would permit the merged firm to exercise market power unilaterally.

Reduced-form models are particularly useful when one believes the underlying economic structure of a market is unlikely to be affected by a merger or to have been unaffected by alleged anticompetitive acts. Thus, in *In re Polypropylene Carpet Antitrust Litigation*, the plaintiff's economic expert, Martin Asher, proposed a damage model in which price was a function of cost factors, demand variables, market structure variables, and a set of dummies that accounted for fixed effects (price differences associated with different means of distribution).[17] The case for a reduced form was based on the view that all of the explanatory variables were reasonably viewed as exogenous (i.e., determined independently of the dependent variable and therefore unaffected by it).

Structural models are often useful when one is estimating a demand system that is to be used to simulate the likely effects of a merger, especially one in which the merger itself may affect the nature of competition in the relevant market. For example, the econometrics underlying the analysis of the likely effects of the merger of two cereal companies, Post and Nabisco, was debated at trial using structural models of demand.[18]

When using statistical methods to uncover information about relevant demand elasticities, it is important to run through a checklist of possible issues. Some of the more important issues are discussed below.

*Identification*. Price and output are "endogenous" variables, i.e., they are jointly determined by the intersection of demand and supply. As a consequence of the presence of an endogenous variable on the right-hand side of a demand equation, ordinary least squares estimation of Equation (3) is likely to yield biased estimates of own- and cross-elasticities of demand. The identification issue relates to whether or not variations in price and output are due primarily to shifts in supply; without further information that allows one to distinguish demand from supply, demand will not be identified.

To identify demand, one should look for "natural experiments," i.e., occasions in the past in which exogenous cost shocks have affected the industry under study. Variables that reflect cost changes, such as the prices of key production inputs, provide the most

16. *See* Jonathan B. Baker & Timothy F. Bresnahan, *Estimating the Residual Demand Curve Facing a Single Firm*, 6 INT'L J. INDUS. ORG. 283 (1988).

17. *Polypropylene Carpet*, 996 F. Supp. at 29. For a more detailed discussion, see Baker & Rubinfeld, *supra* note 1.

18. *See* Daniel L. Rubinfeld, *Market Definition with Differentiated Products: The Post-Nabisco Cereal Merger*, 68 ANTITRUST L.J. 163 (2000); *see also* Aviv Nevo, *Mergers with Differentiated Products: The Case of the Ready-to-Eat Cereal Industry*, 31 RAND J. ECON. 395 (2000).

natural instruments for isolating demand functions. It is sometimes the case that one can obtain information about cost-shifting for all of the products at issue. Then identification and estimation of demand are likely to be straightforward. Often, however, there is insufficient cost-shifting information. In this case, identification is possible only if one makes additional assumptions about the nature of the demand.[19] When a demand function cannot be identified econometrically, the questions that can be answered empirically may be limited to those for which reduced-form methods provide an answer.

One common identification strategy when the number of cost-shift variables is small is to restrict the parameters of the demand system, for example by constraining all products in a group to enter the demand system with a common parameter or by imposing symmetry on the cross-elasticities. If the number of free parameters is limited, then even a handful of cost-shift variables may be sufficient to achieve identification.

The strategy of restricting the parameters of the demand system is almost always adopted when estimating demand functions for individual goods in differentiated products markets with a substantial number of products. The analysis is difficult because any increase in prices of the products of the firms that merge can induce increases in rivals' prices, and because the analysis of these effects can be sensitive to assumptions about the form of demand functions (e.g., Is the function form linear or nonlinear?), demand symmetries (e.g., Are cross-price elasticities symmetric?), the nature of the interaction among firms (e.g., Is competition Bertrand, Cournot, Stackleberg, other?) and the possible presence of economies of scale and scope. Moreover, in consumer cases, the analysis may also be sensitive to the assumptions that are made (or not made) about the timing of purchasers. For example, failure to account for inventorying of consumer goods could affect one's estimates of demand parameters.[20]

A further complication arises because firms selling branded consumer products may not compete solely on price. Marketing variables such as advertising and promotion can affect buyer substitution patterns. If these variables are important in buyer decision making, any available relevant data should be incorporated into the analysis of demand.[21]

With numerous products to be taken into account, any empirical analysis must make some assumptions that simplify the nature of the demand for the products that are being studied. While the particulars differ, it is typical to assume that some cross-price elasticities are zero and that there is symmetry in the nonzero cross-price elasticities. One way to achieve these restrictions is to characterize demand decisions as following a multilevel decision-making process and to aggregate individual brands into sensible

---

19. *See* Timothy Bresnahan, *Empirical Methods for Industries with Market Power*, *in* 2 HANDBOOK OF INDUSTRIAL ORGANIZATION 1011, table 1 (Richard Schmalensee & Robert Willig eds., 1989) (listing eight possible identification strategies in this setting).
20. *See* Baker, *supra* note 1, at 352-55.
21. For a discussion of the importance of accounting for marketing issues, see Daniel Hosken et al., *Issues in Scanner Data*, *in* ECONOMETRICS: LEGAL, PRACTICAL, & TECHNICAL ISSUES at app. IV (John Harkrider ed., 2005).

Exhibit 118B



aggregates, assuming that the demands for products in one nest or segment of a larger demand structure are separable from the demands of products in other nests.[22]

To illustrate the nesting concept, one might think of the decision to obtain a drug prescription as occurring in the third stage of a three-stage decision-making process. The first stage might allocate consumer health expenditures into prescription drugs, physician costs, and other health-related expenses. The second stage might then determine the demand for various drug categories, such as anti-infectives or anti-inflammatories, while the third stage would explain allocations among particular drugs within a category. The multistage model would greatly reduce the choice among many, many individual drugs into a choice among a relatively small number of nests, and then, with the aggregation of drugs into nests, would drastically reduce the number of elasticities that must be estimated.

The benefits of reducing the number of parameters are substantial—it facilitates identification when instruments are few, simplifies computations, and deals with limited data. However, the results can be quite sensitive to the restrictions that are made. In particular, the decision to include a product or group of products in one nest rather than another can substantially affect the conclusion that one reaches concerning the definition of the relevant antitrust market.[23]

Hausman and Leonard have proposed a different solution to the identification problem, one that employs the nationwide component of individual city prices as an instrumental variable for identifying demand.[24] The authors assume that whatever the underlying structural model, the reduced-form price equation for an individual product sold in city $i$ in period $t$ is

$$P_{it} = \alpha_{it} + \beta c_t + \varepsilon_{it} \qquad (4)$$

where $c_t$ is the marginal cost in period $t$, which is assumed to be substantially the same across geographic areas. While demand and cost shocks might affect the error term, Equation (4) assumes that there are no nationwide demand-shift variables. In this case, the nationwide component of price will reflect the effect of changes in cost, but not the influence of demand. As a result, this price component can serve as a suitable instrument to identify demand.

This instrumental variables approach is relatively easy to use if one has access to scanner data. However, one must believe that shocks to the nationwide component of prices in the industry during the time period under study result mainly from variations in cost, not demand. In some cases, identification may flow directly from the fact that prices affect demand with a lag; with sufficient lags, there will be little chance that prices and quantities will feed back on each other sufficiently to make price endogenous. Here, as in many other ways, the nonstatistical evidence available in the antitrust

22. *See, e.g.*, Jerry A. Hausman, Gregory K. Leonard & J. Douglas Zona, *Competitive Analysis with Differentiated Products*, 34 ANNALES D'ECONOMIE ET DE STATISTIQUE 159 (1994); *see also* Nevo, *supra* note 18.

23. *See* Daniel L. Rubinfeld, *supra* note 18.

24. *See* Hausman & Leonard, *supra* note 1.

litigation context can complement the statistical evidence and make expert testimony more compelling.

*Functional forms*. An additional methodological question involves the choice of functional form. The functional form describes the shape of the regression "line."[25] While a wide variety of functional forms are possible, the most common forms are linear (a straight line in a two variable regression model) and linear in the logarithms or log-linear (curvilinear in a two variable regression model). The linear regression model is sufficiently flexible to account for both linear and log-linear specifications. Both are manageable and allow for the calculation of own- and cross-price elasticities, but each constrains the way in which demand elasticities change as price changes. To investigate statistically the extent to which demand elasticities change with price, more flexible demand systems may be desirable.[26]

There is a cost to having greater flexibility in functional forms. To achieve flexibility in an economical manner, it may be necessary to impose other constraints, such as those built into a multistage demand system. Frequently the tension between the desire for functional form flexibility and the need to restrict parameters can best be addressed by incorporating restrictions that facilitate estimation, while testing the sensitivity of the results to alternative plausible assumptions.

*The reliability of simulations*. In dealing with unilateral effects, for example, it is important to evaluate the magnitude of the incentive of the merging parties to raise price after the merger. The elasticities of demand themselves may provide indicators of the strength of these incentives, or they may be combined with information or assumptions about cost and oligopoly behavior to simulate the effect of the merger on price.[27] Under some circumstances, the simulated price increases may be more informative indicators of the strength of merged firm's incentive to raise price than what one can tell from demand and cross-elasticities themselves. Simulations also provide a valuable method of assessing the sensitivity of predictions to uncertainty in parameter estimates and to alternative assumptions about the underlying demand and supply functions and market structure.

Simulation has its own risks. To use the simulation approach, one must make assumptions about how costs, demand, and the nature of oligopoly behavior are likely to change postacquisition.[28] These difficulties may mean that in some cases complex simulations will contribute little more than can be learned about the anticompetitive incentive of the merging firms to raise price from the demand elasticities alone.

---

25. If there is more than one explanatory variable, the regression will be characterized by a plane.

26. One popular flexible system (which may itself not be flexible enough) is the AIDS (almost ideal demand system). *See generally* Angus Deaton & J. Muellbauer, *An Almost Ideal Demand System*, 70 AM. ECON. REV. 312 (1980).

27. *See, e.g.*, Hausman & Leonard, *supra* note 18; Nevo, *supra* note 18; Gregory J. Werden, *Simulating the Effects of Differentiated Products Mergers: A Practical Alternative to Structural Merger Policy*, 5 GEO. MASON L. REV. 363 (1997).

28. *See generally* Baker, *supra* note 1, at 356-60. With price-cost margin data and an assumption of Bertrand pricing, one can estimate own- and cross-elasticities of demand. Alternatively, if demand elasticities are estimated one can estimate marginal costs.

### *2.3. Other methods for identifying the structure of demand*

In some instances, direct estimation of demand elasticities will not be possible. There are, however, alternative statistical methodologies that can be useful if one wishes to learn about consumer preferences: (1) the use of auction models to make inferences from bidding records, (2) inferring preferences from an analysis of the attributes of goods and services actually purchased by consumers, and (3) eliciting preferences from survey responses to hypothetical questions involving product attributes.

*Auction models*. In some cases, choices are made through a bidding process, whether through formal auctions or informal bidding. Econometric tools have been developed to analyze auctions generally, and in particular, to distinguish bid rigging from competitive bidding in formal auctions. One interesting application involves an attempt to identify phantom bidding by cartel members (noncompetitive bids submitted by firms feigning competition). The approach involves estimating a regression model that explains the bidding behavior of firms that are assumed not to be involved in the bid rigging, using the resulting estimated bid functions to predict the "competitive" bidding of those firms alleged to be involved in bid rigging, and comparing the predicted bids to the actual bids. Deviations that are otherwise consistent with a bid-rigging theory can be taken as support for the presence of a bid-rigging conspiracy.[29] The method requires accurate measurement of the variables that are expected to predict differences in behavior across sellers in the absence of bid rigging, such the differences in the costs of serving various buyers.[30]

Auction modeling can also be useful in a merger setting, when one wishes to evaluate likely unilateral effects. One approach is to estimate parameters that describe the auction process in a differentiated oligopoly. These parameters can then be used to predict the hypothetical effects of a merger, as, for example, in the analysis of Oracle's acquisition of PeopleSoft.[31]

Auction models may also be useful in informal bidding situations when there are not sufficient market data to estimate demand functions directly, but it is possible to find out a good deal about the winning and losing bids.[32] The information about the bids that are made—especially winning bids—can be used to infer preferences. For example, one

---

29. This approach requires that the value of the contract or procurement to bidders be based on observable bidder characteristics or be identical across the firms. For applications to the bidding process for highway paving jobs on Long Island in the early 1980s and to the procurement process for Ohio school milk auctions throughout the 1980s, see Robert H. Porter & J. Douglas Zona, Ohio School Milk Markets: An Analysis of Bidding (Apr. 1997) (unpublished article, on file with author); Robert H. Porter & J. Douglas Zona, *Detection of Bid Rigging in Procurement Auctions*, 101 J. POL. ECON. 518 (1993).

30. A somewhat different approach is taken in Luke M. Froeb, Robert A. Koyak & Gregory J. Werden, *What is the Effect of Bid-Rigging on Prices?*, 42 ECON. LETTERS 419 (1993). Rather than assume stability between the conspiracy and nonconspiracy periods, the authors alternatively backcast but-for prices from the nonconspiracy period into the conspiracy period and forecast but-for conspiratorial prices from the conspiracy period into the nonconspiratorial period.

31. The testimony of the government's expert, Preston McAfee, was given relatively little weight in the court's decision against the government because it was arguably predicated on the wrong market definition. United States v. Oracle Corp., 331 F. Supp. 2d 1098 (N.D. Cal. 2004).

32. *See, e.g.*, Rubinfeld & Steiner, *supra* note 1.

can regress the winning bid in an informal bidding competition against factors that would affect the individual sellers' bids (e.g., estimates of individual seller costs, volume of product to be sold, delivery conditions). The resulting regression (whose functional firm might ideally be suggested from information about the structure of the underlying market) could then be used to evaluate whether the merging firms are or are not close substitutes (e.g., similar bidding patterns could reflect similar costs). This information can, in turn, be used to predict the price effects of a proposed merger.

Another option is to analyze the choice of firms that were invited to bid by a seller involved in procurement bidding. Given that procuring bidding is relatively costly, one would expect that only those bidders that offer relatively close alternatives will be invited to bid. One would then presume that the more frequently that pairs of firms bid, other things equal, the more similar the products. An analysis of the closeness of products could be achieved by evaluating whether the probability that one firm will bid in a particular auction conditional on a second firm's bidding is significantly different from the unconditional probability. A higher conditional probability would support the view that the two products are relatively close substitutes. Alternatively, one could use multiple regression analysis to evaluate bids, holding constant factors that are believed to reflect the degree of substitutability of the products.

Consider, for example, the Department of Justice's 1998 investigation of two proposed accounting firm mergers: Coopers & Lybrand and Price Waterhouse, and Ernst & Young and KPMG Peat Marwick.[33] Auditing firms are typically chosen through an informal bidding process. In the market for auditing services, accounting firms routinely develop industry specializations through industry-specific investments in software, personnel, and marketing. This raises the possibility that the merger of two firms with expertise in the same or similar markets could lead to higher auditing fees.

The Department of Justice analysis of the two accounting mergers relied in part on a historical data set on the audit fees and audit bids for each of the then big six accounting companies.

The analytical approach involves estimating a price equation that explains audit fees as a function of audit costs, client characteristics (e.g., sales volume, assets, costs, industry), and a measure of the prior years' market shares of the firm in the client's industry. The regression parameters could serve as the basis for a test of whether auditors have valuable expertise in auditing clients in particular industries and a simulation of the likely price effects of merger.

Auction techniques have their own limitations. As a general rule, their predictions can be quite sensitive to the assumption made about differences in costs, if any, among competing bidders, and to the assumption made about the nature of competition in the market (the form of auction, one shot or repeated play, etc.). Furthermore, it can be difficult to provide statistical measures that characterize the reliability of the resulting predictions.

*Market shares*. Another approach to understanding the nature of demand involves uncovering the valuation buyers place on individual product characteristics from the

---

33. *See* Mary W. Sullivan, The Effect of the Big Eight Accounting Firm Mergers on the Market for Audit Services (U.S. Dep't of Justice Economic Analysis Group, Working Paper No. EAG 00-2, 2000).

distribution of buyers' first choices (i.e., market shares).[34] Each buyer is assumed to select the product that gives him the most value, taking into account product characteristics, including price. The distribution of buyer preferences is then described by relating market shares to observable product characteristics, given an assumption about the distribution of unobservable buyer tastes. Typically, the number of characteristics is smaller than the number of products, so that the number of parameters to be estimated is substantially less than the number of own- and cross-elasticities of demand.

In this framework, the parameters of the demand functions are selected to make the distribution of buyers' first choices fit market shares as closely as possible. The distribution of choices, in turn, restricts the way in which products substitute for each other. Using this approach, instruments for price are required in order to generate consistent parameter estimates;[35] this is analogous to the problem of identifying demand when product quality varies. Natural instruments are input prices or variables related to the degree of rivalry among the firms. With consistent estimates of the parameters of the distribution of preferences, it is possible to derive implied demand cross-elasticities between, for example, the products of merging firms.

This approach builds in the reasonable assumption that when individuals substitute away from a good whose price has increased they will substitute towards goods with similar characteristics. To work effectively, however, the demand function must be flexible in form, sufficiently flexible to capture the manner in which preferences depend on product characteristics. As usual, there is a trade-off. Estimating additional parameters permits greater flexibility, but the computational difficulties can be severe, and the results can be sensitive to the specific methodology used to estimate the model. As with other methodologies, it is important to evaluate the robustness of the empirical results.

*Conjoint survey methods*. While survey methods have been widely utilized in litigation involving issues such as false advertising and copyright and patent infringement, their use in antitrust remains rare.[36] A properly designed survey (including the statistical design of the research and the crafting of the survey instrument) can avoid a number of problems that are inherent in market-based data. Thus, the judicious design of the survey questions and the selection of those to be surveyed can ensure that explanatory variables are exogenous, rather than endogenous.

Surveys are sometimes treated with skepticism when they rely on answers to hypothetical questions in order to predict but-for behavior. While one must be careful in

---

34. For further discussion and references to an extensive bibliography, see Steven T. Berry, *Estimating Discrete-Choice Models of Product Differentiation*, 25 RAND J. ECON. 242 (1994).

35. The academic literature implementing this methodology employs a generalized method of moments (GMM) estimation technique, a natural choice for fitting sample moments to a distribution. Least squares regression can be thought of as a special case of the GMM technique, just as it can be thought of as a special case of the more familiar maximum likelihood estimation approach. *See* PINDYCK & RUBINFELD, *supra* note 8, ch. 10.

36. See Shari Seidman Diamond, *Reference Guide on Survey Research*, *in* REFERENCE MANUAL ON SCIENTIFIC EVIDENCE 229 (2d ed. 2000), for an overview of the use of survey methods and its many applications.

interpreting survey answers when respondents are not faced with choices that involve real economic constraints, an appropriate survey approach can be used to predict the price effects of a merger or to evaluate the extent of harm caused by a firm's exclusionary practices. "Conjoint analysis" is a potentially useful tool. It has proven valuable as a marketing tool for deciding whether to match a competitor's price increase, for pricing new brands, and for setting new prices among the bundle of existing brands.[37]

To use the conjoint approach to evaluate the demand for a group of products, one might show a group of respondents descriptions of actual and hypothetical characteristics of each of the products at issue (including price). Respondents would be asked to allocate a fixed number of points among each set of product options. The responses would be taken as measures of the likelihood that individuals will make actual consumption choices, conditional on the prices and product characteristics that they face. With a judicious choice of product descriptions, consumer preferences can be evaluated using a discrete choice demand model. A successful conjoint analysis chooses an experimental design with a subset of all possibilities that is sufficient to estimate underlying consumer demand functions with reasonable accuracy.[38]

Conjoint analysis can provide empirical answers to questions for which alternative approaches would fail because of a lack of data. Moreover, because it is based on an experimental design, it is subject to statistical testing. There are, of course, a number of risks. First, because the answers to hypothetical questions may not accurately reflect the choices that individuals would make under actual market conditions. Second, because the empirical methodology usually relies on the aggregation of responses, some information about individual preferences may not be utilized. Third, because individual responses do not flow from a utility-maximizing constrained optimization problem, the predicted but-for prices may not have a high degree of accuracy. Finally, if one wishes to account for interactions among product characteristics, one must use a complex experimental design. This may substantially add to the cost of the study.

The government has relied on conjoint studies on a number of occasions. In reaching a consent decree with a number of ski resort operators in 1997, conjoint analysis played an important role.[39] More recently, conjoint methods were used in an exclusionary practices case: *United States v. Dentsply*.[40] In *Dentsply*, the government alleged that the defendant, which manufacturers artificial teeth for use in dentures and other restorative appliances, had engaged in a series of restrictive dealing relationships that allowed it maintain its monopoly power in the sale of prefabricated artificial teeth to dealers and laboratories. Because the conjoint methods were excluded as evidence by the district

---

37. *See, e.g.*, Paul E. Green & Jeffrey Savitz, *Applying Conjoint Analysis to Product Assortment and Pricing in Retailing Research*, 2 PRICING STRATEGY & PRAC. 4 (1994).

38. For a specific application, see Vijay Mahajan, Paul E. Green & Stephen M. Goldberg, *A Conjoint Model for Measuring Self- and Cross-Price/Demand Relationships*, 19 J. MARKETING RES. 334 (1982).

39. Competitive Impact Statement, United States v. Vail Resorts, 62 Fed. Reg. 5037, 1997 WL 36727 (D. Colo. 1997) (No. 97-B-10), *available at* http://www.usdoj.gov/atr/cases/f1000/1014.htm.

40. United States v. Dentsply Int'l, 277 F. Supp. 2d 387 (D. Del.), *rev'd*, 399 F.3d 181 (D. Del. 2003); *see also* Competitive Impact Statement, *supra* note 39.

Exhibit 118B



court, all of the issues surrounding their ability to provide accurate estimates of the extent of exclusion were not fully debated.

### *2.4. Summary*

A variety of methods that allow one to identify the structure of demand have proven to be extremely valuable in antitrust analysis. Once one has identified the shape of demand functions, it is possible to evaluate questions relating to market and monopoly power and to estimate the price effects of a merger or of alleged anticompetitive behavior. As a general rule, the methods that have been discussed are not as straightforward as reduced-form methods, and they typically require more data. But in many cases they can generate answers to questions that reduced-form methods cannot address. Even when both reduced-form and structural methods would be informative, the latter can often exploit qualitative information about market structure to improve the precision of parameter estimates and treat problems arising from the potential endogeneity of price and/or output variables.

## 3. Applications

### *3.1. Liability issues*

In determining whether or not a violation has occurred, hypothesis testing can be a statistical tool. Hypothesis testing involves specific statistical tests which allow one to draw inferences about which of two or more competing explanations of an agreed set of events is the most credible. A typical hypothesis test will begin with a null hypothesis of no violation, with the alternative being that there was a violation. The tools of classical statistics and econometrics are well adapted to the use of such testing procedures.[41] However, there are particular issues that are likely to arise in the context of antitrust litigation that merit special attention.[42]

*The alternative hypothesis*. Assume for purposes of discussion that the issue in question is whether or not a manufacturer's distribution arrangement is anticompetitive. To some extent, perhaps indeed a great extent, the answer to the question of whether there is liability will depend not only on the law but also on range of qualitative evidence that flows from depositions, documents, and other traditional types of evidence. However, liability issues can also be informed by quantitative studies.

A valid study begins with an appropriate model—a characterization of the economic forces at issue. A typical model would include a dependent variable, such as the wholesale price of the product in question. The model will also include an explanatory variable that allows for the correct evaluation of alternative hypotheses. For example, the variable of interest might be a dummy variable that takes on the value 1 when the new distribution system was in place and 0 otherwise.

---

41. *See* David Kaye & David Freedman, *Reference Guide on Statistics*, *in* REFERENCE MANUAL ON SCIENTIFIC EVIDENCE 83 (2d ed. 2000); Daniel L. Rubinfeld, *Reference Guide on Multiple Regression*, *in* REFERENCE MANUAL ON SCIENTIFIC EVIDENCE 179 (2d ed. 2000).

42. These issues are spelled out in detail in Rubinfeld, *Courtroom*, *supra* note 1.

Exhibit 118B



Suppose that the following model has been specified:

$$P_{it} = \alpha + \beta D_{it} + \gamma X_{it} + \varepsilon_{it} \quad (5)$$

where $P$ is the price of a product, $D$ is the dummy variable that indicates the period of alleged violation, and $X$ represents a group of additional explanatory variables that might support alternative substantive hypotheses that can be accounted for by the regression analysis (the subscript $t$ represents a time dimension and the subscript $i$ represents customers). One might then put forward the null hypothesis that $\beta = 0$, namely, that the period of alleged violation had no effect on price. A positive and statistically significant coefficient on the $D$ variable would support a finding of liability.

If this hypothesis testing approach is to be used, it is important to include in the model variables that are thought to influence the dependent variable. To see this, note that if there are no $X$ variables in the model, then the only alternative to a finding that there is no difference in the product price between the actual and but-for periods is a finding of liability. The inclusion of additional explanatory variables amounts to allowing the model to incorporate alternative hypotheses other than liability.

Not all possible variables that might influence the dependent variable need be included for the analysis to be successful; some cannot be measured and others may make little difference. However, failure to include an important major explanatory variable that accounts for factors that differ between the period of alleged wrongdoing and other time periods can cause the measured effect of the dummy variable of interest to be biased, which in turn could lead to an invalid conclusion on liability. In general, omitted variables that are correlated with the dependent variable reduce the probative value of the regression analysis.

Omitting variables that are not correlated with the variable of interest is, in general, less of a concern, since the coefficient that measures the effect of the variable of interest on the dependent variable is estimated without bias. Even if bias is thought to be a risk, it may nevertheless be possible to account for bias qualitatively if one has knowledge about the relationship between the omitted variable and the explanatory variable.

*Practical versus statistical significance*. "Practical significance" means that the magnitude of the effect being studied is not de minimis—it is sufficiently important substantively for the court to be concerned. It is inappropriate as a general rule for liability questions to be decided solely on the basis of whether or not a particular result is or is not statistically significant. One reason is that the degree of statistical significance associated with a parameter is in part a function of the size of the sample being studied. Other things being equal, the statistical significance of a regression coefficient increases as the sample size increases. One would not want a conclusion of legal liability to rest entirely on a significance test which is sensitive to the size of the sample being studied.

Often, results that are practically significant are also statistically significant. However, it is possible with a large data set to find statistically significant coefficients that are practically insignificant. Similarly, it is also possible to obtain results that are practically significant but statistically insignificant. Suppose, for example, that a regression analysis suggests that prices are 7 percent higher in the period in which the alleged anticompetitive activity took place. If the data are such that only three of four

years of data are available outside the period of alleged wrongful behavior, the 7 percent difference could be practically significant yet statistically insignificant.

### *3.2. Damage issues*

Statistical and econometric methods can be very helpful in deciding whether a violation has led to antitrust impact, and, if so, the extent of damages (if any) that have arisen. With respect to damages, there are a number of important choices to be made in putting forward a study. Three of the most important are (1) whether the expert should rely on a structural or reduced-form model, (2) how the damage calculation should be performed, and (3) how one should test the reliability of the damage estimate.

*Structural or reduced-form model?* Consider a hypothetical collusive price-fixing case. The impact-damages question can be answered by comparing actual prices during the period in which wrongful conduct has occurred (which could extend beyond the period of actual wrongdoing) to the but-for prices that would arise in a world in which there had been no illegal conduct.

For such a case, the application of multiple regression would seem natural. Many things would be expected to have an effect on price in the but-for world, some through the demand side and some relating to supply. While such forces would affect price in any market, whether competitive or cartelized, they will not necessarily do so in the same way and to the same extent. To compare the actual world to the collusive world, it is helpful to use an appropriate structural model. The structural model will explain the nature of the interaction of firms in the but-for world and will specify the underlying structure of demand. It will then be (conceptually) straightforward to derive the likely effect of a price-fixing arrangement that was brought into place by a reduction in cartel output.

If there are sufficient data to allow one to estimate a structural model for the period in which there was no violation, a useful approach to damages is to estimate the structural model and to use that model to forecast what prices and quantities would be in the but-for world.[43] Damages might then be measured by the resulting lost profits on sales that were made as well as lost profits on sales that would have been made had there been no price fixing.

If such an approach is to be utilized, it is important to ask whether the other explanatory variables that are included in the regression model are known to be independent of the price-fixing activities and vice versa. If independence is not an appropriate assumption, a multiple regression analysis might reasonably account for price changes, but it would not be informative about the causal impact of the price-fixing arrangement. To see why, note that a cartel cannot only raise price and restrict output, it can also cause shifts in demand and supply that lead to price increases and take advantage of shifts in demand or supply that occur outside of the activities of the cartel. Such "indirect" effects of a cartel make statistical determination of prices but for the cartel difficult. They are especially likely to occur if demand and/or supply are heavily

---

43. See Joseph E. Harrington, Jr., *Post-Cartel Pricing During Litigation*, 52 J. INDUS. ECON. 517 (2004), for an interesting application.

affected by expectations since the cartel can deliberately influence those expectations by its actions.[44]

In many circumstances, there is insufficient information to accurately characterize the underlying structure of demand or the complexity of firm interactions. The use of reduced-form models can offer a suitable, indeed often reliable, alternative. The discussion that follows focuses, for simplicity, on issues involving reduced-form models.

Suppose that one has estimated the reduced-form model in Equation (5). The coefficient on the dummy variable, $D$, can be taken as a measure of the difference between the average price during the cartel's existence and the average price during the but-for competitive period. The dummy variable approach is appealing because it can be applied even where there is a relative paucity of data in the nonconspiratorial period. There is, however, an important limiting assumption implicit in the dummy variable approach. That assumption is that the overall behavior of the regression model can be modeled in precisely the same way during both the conspiratorial and nonconspiratorial periods. This may be a reasonable assumption in some cases, but it should not be made without substantial thought. If prices are determined in rather complex ways, the use of a single dummy variable that will reflect mean differences between the benchmark and but-for periods may be too simplistic. In particular, if one or more of the explanatory variables in the model is correlated with the dummy variable, then the dummy variable and forecasting approaches are likely to generate different damage estimates.[45]

A more general approach, which avoids the problem just described, is the "forecasting approach." In this approach, the expert estimates a regression model for the nonconspiratorial or "benchmark" period only. That model is then used to predict or forecast but-for prices during the conspiratorial period.[46] Suppose, for example, that the model at issue involves a study of prices of time, with $t = 1,...n$ the nonconspiratorial period, and $t = n+1, ...N$ the conspiratorial period. One could then use data for the first $n$ time periods to estimate a model of the form:

$$P_t = \alpha + \gamma X_t + \varepsilon_t \qquad (6)$$

and use as forecasted prices $P_f = a + cX_t$ for the time periods $n+1$ to $N$, where $a$ and $c$ are the estimated parameters of the model in Equation (6).

The forecasting approach avoids the assumption that the underlying model is identical in both the conspiratorial and nonconspiratorial periods. It is important to realize, as a consequence, that a model that fits the data well in the benchmark period may not forecast well into the period of alleged conspiracy. When using the forecasting approach, therefore, one should make an effort to report not only a measure of the

---

44. For a case in which this did present a serious problem (the uranium cartel), see Rubinfeld & Steiner, *supra* note 1, at 128.

45. These issues are discussed in further detail in Fisher, *supra* note 1; Rubinfeld & Steiner, *supra* note 1; Rubinfeld, *Courtroom*, *supra* note 1; see also Richard Higgins & Paul Johnson, *The Mean Effect of Structural Change on the Dependent Variable is Accurately Measured by the Intercept Change Alone*, 80 ECON. LETTERS 255 (2003), for a more detailed evaluation of the differences between the two approaches.

46. The nonconspiratorial period could include time after as well as before the alleged conspiracy.

goodness of fit of the regression model as estimated in the benchmark period but also some measure of forecast reliability. Often, standard errors that offer information about forecast accuracy can be calculated or simulated.[47]

*Are the damage estimates robust?* It is essential to evaluate the reliability of any estimate of antitrust impact and/or damages. Specifically, one should ask whether the results are unusually sensitive to slight modifications of the assumptions that underlie the model and of the data itself. It is especially important to check to see if the data are themselves reliable, and if reliable, whether any regression results are highly sensitive to one or a few data points. If the assumptions of the model are valid and the data are reliable, a damage study can be highly probative, even if the results are highly sensitive. However, when the assumptions of the model are not valid, standard tests can overstate or understate the significance of the results.

An interesting case in point is offered by the controversy that arose in *Conwood Co. v. U.S. Tobacco Co.*[48] In *Conwood*, the plaintiff's expert asserted that U.S. Tobacco's illegal marketing practices had caused substantial injury. The expert put forward a "foothold" theory of damages, which presumed that in the but-for world Conwood's market share would have grown most substantially in states in which Conwood initially had a small foothold market share.

The expert's damage model used cross-section data for 50 dates and the District of Columbia (for the years 1984, 1990, and 1997). The regression, which used data on the initial market share (*MS*) and the change in market share (*ΔMS*), took the following simple form:

$$\Delta MS = \alpha + \beta * MS \quad (7)$$

The expert found a positive and significant coefficient of 0.22 on the market share variable for the 1990 to 1997 period but not for the earlier period—the coefficient was –0.13. He concluded that a change occurred after 1990, which he attributed to the illegal practices.

It is crucial to show that the results of such a damage study do not substantively change given reasonable alternative specification choices. In *Conwood*, the results were not robust. Indeed, the exclusion of a single data point for the District of Columbia (the area with the smallest sales) completely changes the results. The coefficient during the previolation period increased to 0.26, whereas the postviolation coefficient became 0.24. When one data point for the smallest area of study is dropped, there is no significant difference between the coefficient on initial market share and consequently no support for the foothold theory.

---

47. See Rubinfeld, *supra* note 41, for a basic introduction and John Geweke, Daniel Houser & Michael Keane, *Simulation Based Inference for Dynamic Multinomial Choice Models*, *in* COMPANION TO THEORETICAL ECONOMETRICS 466 (Baitagi ed., 2000), for an approach to the simulation of forecast errors.

48. 290 F.3d 768 (6th Cir. 2002). The issues are described in greater detail in ABA SECTION OF ANTITRUST LAW, *supra* note 1, at 179-224, and in Motion for Leave to File Brief and Brief of Washington Legal Foundation, Stephen E. Fienber et al. as Amici Curiae in Support of Petitioners, Conwood, 290 F.3d 768 (No. 02-603), *available at* http://www.law.berkeley.edu/faculty/rubinfeldd/Profile/publications/rubinfeld_Daubert-Amicus%20Brief.pdf.

Interestingly, the jury awarded $350 million in damages, which was then trebled. However, the identification of the District of Columbia data point as an *outlier* at trial could have undermined the plaintiff's damage case.

## 4. Conclusion

Empirical methods offer powerful tools for understanding what has happened in the past and for simulating the likely effects of alternative scenarios. They can, in consequence, provide valuable information to courts in many areas, including class certification, the assessment of antitrust liability, the evaluation of anticompetitive harms suffered by consumers and producers, and the estimation of antitrust damages.

Because empirical analyses often appear complex to the lay person, there may be a tendency on the part of the courts or others to separate the evaluation of the evidence resulting from these methodologies from other factual evidence. Such a separation is inadvisable. The empirical analysis of data should be combined with an analysis of nonstatistical information. As more nonstatistical information is brought to bear, the systematic empirical evidence can often answer the key questions at issue in litigation more precisely. Conversely, the effort to come to grips with systematic empirical evidence often pays dividends by helping direct the search for nonstatistical evidence in documents or testimony.

It is important to use documents and deposition or oral testimony to confirm the specification of the model being utilized in an empirical study. To do so requires an appropriate mix of historical data, hypotheticals, and assumptions about behavior based on qualitative techniques. While there are important differences between the use of quantitative methods in antitrust and in the academic world, empirical antitrust analysis should draw heavily on the empirical literature in industrial organization economics. The questions raised by antitrust cases, and the data sets uniquely available under such circumstances, can provide a powerful stimulus to the development of new empirical methods, to the benefit of both the academic and the antitrust worlds.

Exhibit 118C

# BASIC ECONOMETRICS

Second Edition

**Damodar N. Gujarati**

*Bernard M. Baruch College*
*City University of New York*

**McGraw-Hill Book Company**

New York St. Louis San Francisco Auckland Bogotá Hamburg
London Madrid Mexico Milan Montreal New Delhi
Panama Paris São Paulo Singapore Sydney Tokyo Toronto

Exhibit 118C

This book was set in Times Roman.
The editor was Scott D. Stratford;
the cover was designed by Scott Chelius;
the production supervisor was Friederich W. Schulte.
Project supervision was done by Editing, Design & Production, Inc.
R. R. Donnelley & Sons Company was printer and binder.

**BASIC ECONOMETRICS**

Copyright © 1988 by McGraw-Hill, Inc. All rights reserved.
Printed in the United States of America. Except as permitted under the United States Copyright Act of 1976, no part of this publication may be reproduced or distributed in any form or by any means, or stored in a data base or retrieval system, without the prior written permission of the publisher.

1234567890 DOCDOC 89210987

ISBN 0-07-025188-6

**Library of Congress Cataloging-in-Publication Data**

Gujarati, Damodar.
Basic econometrics.

Includes index.
Bibliography: p.
1. Econometrics. I. Title.
HB139.G84 1988 330'.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
ISBN 0-07-025188-6

ations or errors of incomplete rvations. In the social sciences have no way of knowing the ollecting agency.

the correct model, one is likely s:

ow why anyone would commit ppens that we know what the se the necessary data are not s it has been argued by some ald be included as an explana- difficult to obtain. Therefore, Another reason is that one may he or she may not know the ear in the model: More often precise functional form of the ear in the variables or linear in some other form. Finally, and really a misspecification error the first place. We will take up

TION

are the consequences? To keep ion in the context of the three- of specification errors, namely, ous or unnecessary variable. Of variable case, but with tedious s a necessity once we go beyond

error, the incorrect specification of the



## Omitting a Relevant Variable

Suppose that the true model is:

$$Y_i = \beta_1 + \beta_2 X_{2i} + \beta_3 X_{3i} + u_i \tag{13.3.1}$$

but for some reason we fit the following model:

$$Y_i = \alpha_1 + \alpha_2 X_{2i} + v_i \tag{13.3.2}$$

The consequences of omitting $X_3$ are as follows:

1. If the left-out variable $X_3$ is correlated with the included variable $X_2$, that is, $r_{23}$ is nonzero, $\hat{\alpha}_1$ and $\hat{\alpha}_2$ are *biased as well as inconsistent*. That is, $E(\hat{\alpha}_1)$ is not equal to $\beta_1$ and $E(\hat{\alpha}_2)$ is not equal to $\beta_2$, and the bias does not disappear no matter how large the sample.
2. Even if $X_2$ and $X_3$ are uncorrelated ($r_{23} = 0$), $\hat{\alpha}_1$ is still biased, although $\hat{\alpha}_2$ is now unbiased.
3. The disturbance variance $\sigma^2$ is incorrectly estimated.
4. The conventionally measured variance of $\hat{\alpha}_2$ ($=\sigma^2/\sum x_{2i}^2$) is a biased estimator of the variance of the true estimator $\hat{\beta}_2$.
5. In consequence, the usual confidence interval and hypotheses testing procedures are likely to give misleading conclusions about the statistical significance of the estimated parameters.

Although formal proofs of each of these statements will take us far afield,[8] we have already provided some insight into the nature of the problem involved in App. 7A, Sec. 7A.5. It was shown there that (use $\hat{\alpha}_2$ in place of $b_{12}$):

$$E(\hat{\alpha}_2) = \beta_2 + \beta_3 b_{32} \tag{13.3.3}$$

where $b_{32}$ is the slope in the regression of the excluded variable $X_3$ on the included variable $X_2$ ($b_{32} = \sum x_{3i} x_{2i} / \sum x_{2i}^2$). As this expression shows, $\hat{\alpha}_2$ is biased, the bias depending on $\beta_3 b_{32}$. If, for instance, $\beta_3$ is positive (i.e., $X_3$ has positive effect on $Y$) and $b_{32}$ is positive (i.e., $X_2$ and $X_3$ are positively correlated), $\hat{\alpha}_2$, on average, will overestimate the true $\beta_2$ (i.e., a positive bias), that is, it will exaggerate the importance of $X_2$. But this result should not be surprising, for $X_2$ represents not only its direct effect on $Y$ but also its indirect effect (via $X_3$) on $Y$. In short, $X_2$ gets credit for the influence that is legitimately $X_3$'s, the latter being prevented to show its effect explicitly because it is not "allowed" to enter the

[8] For an algebraic treatment, see Jan Kmenta, *Elements of Econometrics*, The Macmillan Company, New York, 1971, pp. 391–399. Those familiar with matrix algebra may want to consult J. Johnston, *Econometric Methods*, 3d ed., McGraw-Hill Book Company, New York, 1984, pp. 259–264.