# Exhibit 125

# Part 2 of 2, Consisting of 125A (continued), 125B and 125C

# Articles by J. Nieberding and R. Cantor; and S. Hussain, D. Garrett, and V. Howell

Exhibit 125A



be consolidated.[133] When cases have been consolidated, courts can try the issue of liability and the total amount of the overcharge first, and leave passing-on and allocation questions to be tried only if liability and the fact of an overcharge are established. When litigated, allocation issues need not be particularly difficult. Allocation among different distribution levels is susceptible to both theoretical and empirical investigation; allocation among purchasers at any one level can be simplified by presuming that the sum allocable to that level is itself allocable among particular buyers in a manner proportional to their total purchases. Fair, sensible presumptions of this character which save time and resources while preserving substantial justice, are appropriate judicial responses to complexity.[134]

Note, too, that cases in which individual final purchasers are identifiable are likely to be those in which either a class or *parens patriae* action would be appropriate. *Illinois Brick* itself typifies one pattern. The State of Illinois and over seven hundred of its state and local agencies alleged that concrete-block manufacturers had cartelized to impose an overcharge aggregating $3 million on block sold to subcontractors doing work for contractors on public buildings. In such a situation, the passing-on issues are not particularly difficult, and it is likely that the claims of all final purchasers can be heard in a single suit. This may not always be possible, however. In some instances a single, final purchaser with a large individual claim might be motivated to sue alone or to opt out of any pending class action, but, if several individual actions were initiated, they could be consolidated for pretrial and eventually tried together.[135]

Litigation problems are different when the class of final purchasers is known but, because numbers are large and individual

---

[133] Actions on behalf of consumers can be brought as *parens patriae* actions under Title III of the Hart-Scott-Rodino Antitrust Improvements (Hart-Scott-Rodino) Act, 15 U.S.C. §§ 15C-15H (1976), or, in some circumstances, as class actions under rule 23 of the Federal Rules of Civil Procedure. *See* L. SULLIVAN, *supra* note 2, at § 249. Suits by individual or class claimants at the same or different levels can be consolidated for pretrial or trial when in the same district, FED. R. CIV. P. 42, transferred on motion from one district to another to facilitate consolidation, 28 U.S.C. § 1404 (1976), or transferred and consolidated for pretrial at the initiative of the Judicial Panel on Multidistrict Litigation, *id.* § 1407.

[134] Although legislation is hardly necessary to facilitate such case management by the courts in the interest of efficiency, the bill introduced by Representatives Rodino, Sieberling, and Hughes on February 8, 1979, to overrule *Illinois Brick* would specifically provide such power in a new section 4I of the Clayton Act. H.R. 2060, 96th Cong., 1st Sess. 1979). *See generally* REVIEW OF ANTITRUST, *supra* note 128.

[135] *See* note 133 *supra* & accompanying text.

Exhibit 125A



transactions small and nonrecurrent, it is difficult or costly to identify individual final purchasers. In these circumstances, individual actions by single purchasers will not occur. Under present law, the only means for bringing suits on behalf of these final purchasers are consumer class actions, the utility of which has been greatly reduced by restrictive judicial interpretation,[136] and *parens patriae* actions. Moreover, even when an action is brought to a successful conclusion on behalf of such purchasers, very few of them will claim the proceeds: some form of *cy pres* remedy is essential.

We do not challenge the soundness of *Eisen v. Carlisle & Jacquelin*,[137] which limits the situations in which consumer class actions are feasible. Whatever one might conclude about the utility, fairness, and feasibility of consumer class actions, there is no doubt that Congress, aware of (and perhaps sharing) judicial reluctance to countenance such actions, has made a deliberate choice to authorize and encourage *parens patriae* actions to vindicate consumer interests in these kinds of situations.[138] Neither can there be doubt that *Illinois Brick* frustrates that congressional choice. Given that overcharges can be traced with ease in a large portion of cases (a fact the Court has failed to perceive), and given the intent of Congress in enacting the Hart-Scott-Rodino Act, the argument is compelling that *parens patriae* suits are the appropriate way to protect the public when vast overcharges have been thinly spread among a large class of consumers.

Such suits provide all or most of the advantages of consumer class actions yet avoid all or most of the deficiencies which make the latter problematical. Like consumer class actions, they are an efficient means of aggregating large numbers of small overcharge claims and could be utilized not merely to require wrongdoers to disgorge, but also to develop *cy pres* remedies that substantially reimburse individuals actually injured. Unlike consumer class actions, however, *parens patriae* actions are fueled not by the incentive of large legal fees but by the incentive of state attorneys general to enhance the public welfare.[138a]

---

136 *See* L. SULLIVAN, *supra* note 2, at § 249(a).

137 417 U.S. 156 (1974).

138 The legislative history of Title III of the Hart-Scott-Rodino Act convinces us that Congress was trying to create a more effective remedy for injured consumers. *See, e.g.*, H.R. REP. No. 94-499, 94th Cong., 1st Sess. 3-8 (1975) (Antitrust Parens Patriae Act).

138a Landes and Posner, who stand aloof on the frictionless plane of price theory when arguing about the incentives of direct purchasers to seek windfalls, wander wide-eyed into the institutional underbrush in their eagerness to discredit the potential of *parens patriae* suits to deter violations. *See* Landes & Posner, *supra* note 61a, at 612-13. Whereas they portray corporate managers as rational profit-maximizers, without a shred of evidence they freely fantasize that state attorneys

**Exhibit 125A**



Yet, even if one concluded that no action of any kind could vindicate the interests of final purchasers when these purchasers can be identified only by class, the argument for legislation to overrule *Illinois Brick* would still be forceful. There would remain a large number of cases in which passing on occurred, in which the victims, the final purchasers, were readily identifiable as individuals, and in which the overcharge passed on to these purchasers would be both substantial in amount and easily traced. The conclusion that other, quite different cases might present litigation problems lends no support to a rule which deprives affected purchasers in such relatively easy cases of all possible redress for serious losses.

There is a related position—though it has more to do with judicial custom than capacity—sometimes pressed to bolster the claim that courts lack the ability to trace an overcharge: it is the rather mystical assertion, originally attributable to that realist, Justice Holmes, that courts terminate analyses after "the first step." [139] The truth is that, throughout the history of judicial inquiry, courts have both cut inquiry short and pressed it farther, depending upon which course was most responsive to prevailing perceptions of policy. If the common-law tradition has bearing, a useful distinction may be perceived between tort and contract concepts. With limited exceptions, courts tend to limit liability for breach of contract to parties that participated with the defendant in the transaction but to extend liability for tort as far as causalities can be efficiently traced. Cartelization, after all, is a blatant, deliberate tort with potential for financial harm as great as or greater than many other business torts. From the perspective of judicial tradition, the argument for tracing an overcharge through the distribution chain from, for example, a manufacturer to ultimate consumers, is quite as strong as that for holding the same manufacturer liable to the same consumers for a product defect. Indeed, if the law were to make distinctions between these cases, it might more logically treat the cartelist—or monopolist—who knowingly imposes a tortious overcharge more severely than it does the hapless manufacturer which is well-intentioned but wanting in care.

### B. *Duplicative Liability and Compensatory Justice*

The concept of "duplicative liability" requires definition. The majority opinion in *Illinois Brick* seems to fear that if down-chain

---

general will bring "headline-grabbing, scapegoat-seeking lawsuits against politically unpopular corporations." *Id.* 613.

[139] *See* Southern Pac. Co. v. Darnell-Taenzer Lumber Co., 245 U.S. 531, 533 (1918).

**Exhibit 125A**



plaintiffs are permitted to recover, violators might be forced to disgorge more than the statutory damages of three times the total amount of the overcharge.[140] Such a result might accurately be called "excessive liability," and we shall use this designation when we refer to it.

As a practical matter, to allow down-chain plaintiffs to sue would create no risk of excessive liability. An overcharge is first paid by a plurality of direct purchasers—that is, by all of the initial customers of the monopolized or cartelized industry. Each of these firms then sells to its own customers, multiplying the aggregate size of the buyer group, and so on at each succeeding distribution stage. An aggregate recovery equal even to the full amount of the overcharge trebled could result only if suits were successsfully brought on behalf of *all* direct purchasers or, if any one direct purchaser did not recover, by all subsequent purchasers in the chain beginning with any nonrecovering direct purchaser. Has any cartel or monopolist ever been forced to account so comprehensively for its overcharge? The question itself underscores the triviality of the risk. Yet excessive liability implies a recovery even larger than this—that is, larger than the maximum recovery that the statute authorizes. Not only would the full overcharge imposed on all direct purchasers have to be recovered and trebled, but also total recoveries in at least one chain would have to exceed three times the amount of the overcharge to the direct purchaser in that chain. An unbiased observer would hardly place this risk very high on any agenda of national policy concerns.

The risk of duplicative liability, then, if it is to be taken seriously at all, must be taken to imply a more limited risk—that in one or more chains beginning with a direct purchaser, there may be successful suits by purchasers at two or more vertical levels which are duplicative in that they are predicated, at least in part, upon inconsistent findings about the extent of passing on. We shall use the designation "duplicative liability," therefore, to refer to this occurrence.

Picture, for example, a cartelist, *M*, that imposes an overcharge of ten dollars on each of one hundred resellers, *R*, each of which resell to ten consumers, *C*. Now assume that one of the resellers sues and recovers three times ten dollars (on the theory that it paid the full overcharge) and that a down-chain consumer also sues and recovers three times one dollar (on the theory that the overcharge was fully passed on, one tenth to each of the ten consumers). This state

---

[140] 431 U.S. at 730-31.

**Exhibit 125A**



of facts would involve no *excessive* liability as we have defined that term. Excessive liability would occur if *all* resellers sued and recovered three times ten and, in addition, one or more down-chain consumers sued and recovered three times one. On the other hand, a recovery of three times ten by even one primary purchaser followed by a recovery of three times one by a consumer lower in that primary purchaser's chain would involve *duplicative* liability, as we have defined it, inasmuch as the first recovery presupposes no passing on and the second presupposes 100% passing on.

One might argue that duplicative, as distinguished from excessive, liability ought not concern us, that lack of symmetry is more an aesthetic than a policy deficiency. We reject that position, however. A satisfactory system of justice would avoid the windfall resulting from overlapping liabilities, even though the violator has not yet disgorged an amount approaching the total overcharge. We do not, however, find in this demand of compensatory justice any warrant for selecting primary purchasers as the presumptive victims of all overcharges—the ones to whom the cause of action should alone be assigned. (Indeed, because a high rate of passing on is the rule, not the exception, any group to be chosen presumptively ought to consist of the last identifiable purchasers in the chain, not the first.)

Our conclusion, rather, is that duplicative liability, though a concern, can be effectively avoided through adjudication. Because tracing an overcharge is far simpler than the Court has supposed, the risk of inconsistent findings is correspondingly smaller. The Court has spoken as though the risk of inconsistent decisions about passing on is peculiarly high because of factual complexity. In many instances, the opposite will be true: evidence will be very clear, and sequential trials, even if independently conducted, would likely lead to consistent results.

Some risk of inconsistency does, of course, remain, but it is no greater than that inevitably incurred when common questions are presented in any series of litigated cases. The risk can be handled by the customary methods for reducing inconsistent findings.

Such means are numerous. The four-year limitation statute will give protection in some cases.[141] If the first suit is at all delayed, it may soon become too late for competing claimants to sue. This protection will not always be available, however. Of greater significance, then, are the numerous devices which can bring potentially inconsistent passing-on claims into a single proceeding

---

[141] 15 U.S.C. § 15(b) (1976).

Exhibit 125A



which will foreclose inconsistent results. Transfer and consolidation for pretrial at the direction of the Judicial Panel on Multidistrict Litigation will often be available.[142] A consolidated trial involving all or a representative group of plaintiffs may be appropriate.[143] Courts and parties may also make use of interpleader.[144] Moreover, in appropriate cases, a court might require an overcharge award to be held in escrow pending the outcome of other suits in progress or about to be started.[145] Lastly, res judicata and collateral estoppel will in many circumstances bind a party with respect to liability, the total size of the overcharge, or the amount of the overcharge allocable at different levels.[146]

During the period between *Hanover Shoe* and *Illinois Brick*, courts successfully used some of these devices.[147] As far as we are aware, there is not a single credible claim that any defendant was ever held to duplicative liability. The risk, then, is not merely one that can be adequately handled case by case, it is one that judicial experience shows to be easily managed.

There is, furthermore, an equally important concern about compensatory justice which *Illinois Brick* ignores. Granting the overcharge cause of action solely to direct purchasers would achieve a

---

[142] 28 U.S.C. § 1407(a) (1976).

[143] *Id.* § 1407(h). Section 4 of S. 300, the pending bill to overrule *Illinois Brick*, would amend this section to permit the Judicial Panel on Multidistrict Litigation to consolidate any related civil actions arising under the Clayton Act, including suits by direct and indirect purchasers, for trial as well as pretrial. *See* 1979 SENATE REPORT, *supra* note 18, pt. 2.

[144] 28 U.S.C. § 1335 (1976); FED. R. CIV. P. 22(1). As the Court noted in *Illinois Brick*, although a defendant for its own reasons may neglect to interplead competing claimants, they may be joined (individually or as a class) as necessary, though not indispensable, parties. 431 U.S. at 738-40. *See* Comment, *Standing to Sue in Antitrust Cases: The Offensive Use of Passing On*, 123 U. PA. L. REV. 976, 997-98 (1975).

[145] There seems little doubt that a court, under its general authority to administer federal statutes in a manner doing substantial justice, could on motion after verdict order an appropriate remittitur, even in a jury case, if duplicative recovery rendered a verdict excessive. *See* Dimick v. Schiedt, 293 U.S. 474, 476-85 (1934), and cases cited therein. Although a decision to delay judgment or execution of verdict pending the outcome of a case not yet concluded is more extreme in form, it would be predicated upon essentially the same theory. Doubt about judicial power to use the escrow device could be resolved by appropriate provision in the legislation to overrule *Illinois Brick*. A recent report states that a bill containing such a provision is under consideration in the House Judiciary Committee. *See New House Proposals Emerge to Reverse* Illinois Brick, [1979] 926 ANTITRUST & TRADE REG. REP. (BNA) A-7 to -8.

[146] *Cf.* Parklane Hosiery Co. v. Shore, 99 S. Ct. 645 (1979) (allowing offensive use of collateral estoppel under certain circumstances).

[147] *See* cases cited in note 130 *supra*.

**Exhibit 125A**



just result if, but only if, direct purchasers were the ones actually bearing the burden of the overcharge. To the extent that direct purchasers pass the overcharge on to down-chain buyers, it is blatantly unfair to deny all redress to those down-chain purchasers. Supporters of *Illinois Brick* recognize this dilemma and try to avoid it by suggesting that much of the overcharge is ultimately borne by the direct purchaser,[148] but earlier parts of this Article show that this response cannot withstand examination. Theoretical economics and practical information about pricing practices suggest that even in the short run massive passing on is the rule and that in the long run it is well nigh inevitable.

When passing on is asserted affirmatively by a down-chain purchaser, the claimant ought to bear the burden either of proving the overcharge empirically or of proving the facts upon which a presumption of passing on can be based. When the plaintiff can prove that it is a final purchaser, the further process of proving the overcharge will be straightforward enough. In some instances, however, the distribution chain will become complex and obscure. Especially when the overcharge is on a product the price of which is classified as an indirect cost, the process of tracing may become extremely difficult and, at some point in the chain, uncertain or even speculative in outcome.

When difficulty reaches this stage, inquiry should stop: buyers at or below these points in any chain should be denied the right to try to show that passing on took place. Under the rubric of standing to sue, many courts prior to *Illinois Brick* handled the problem presented by obscure chains in essentially this way; standing to assert a claim based on passing on was allowed, as far down the chain as the impact was discernible,[149] and, at the point at which tracing became speculative, standing was denied.[150]

The ideal of compensatory justice, then, is simply not within the reach of the judicial machinery in the instances in which passing on may or may not have occurred, but in which final purchasers cannot be manageably identified either as individuals or as a class.

---

[148] *E.g.*, 1978 *Senate Hearings*, *supra* note 15, pt. 2, at 315 (statement of Dorsey D. Ellis, Jr.).

[149] *E.g.*, *In re* Western Liquid Asphalt Cases, 487 F.2d 191 (9th Cir. 1973), *cert. denied*, 415 U.S. 919 (1974). For an interesting discussion of existing doctrine and its applicability in passing-on contexts, see Berger & Bernstein, *supra* note 5.

[150] *E.g.*, Mangano v. American Radiator & Standard Sanitary Corp., 438 F.2d 1187 (3d Cir. 1971).

**Exhibit 125A**



When the defendant can prove that the direct purchaser did pass on, and when those ultimately injured cannot be identified, we must choose among allowing the cartel or monopoly to retain the overcharge, assigning the overcharge to the primary purchaser without inquiry into whether or not passing on occurred, or assigning it to the lowest identifiable purchaser on the chain, provided that the purchaser can prove that the overcharge was passed to its level.

Our method of inquiry, described in part IV(A), implicitly rejects choosing the first of these alternatives. We now make that rejection explicit. To allow the violator to show passing on defensively when there is no serious risk of duplicative liability would be to grant a windfall to the violator—an aggravated violation of the ideal of compensatory justice and a gratuitous sacrifice of the deterrent effect of the treble-damage remedy. To allow primary or subsequent—but still intermediate—purchasers to recover, even though further passing on is suspected might or might not sacrifice compensatory justice, but it would be a less serious imposition on compensatory justice than allowing the wrongdoer to keep his gain, and the deterrent effect of the treble-damage remedy would remain intact.

Our choice between the direct purchaser and intermediate down-chain purchasers to whom the overcharge can be traced is to grant the remedy to the latter. The choice is between a firm that both paid and passed on an overcharge, and a firm that paid and may or may not have passed it on. The principle of compensatory justice suggests at least a weak preference for the latter and, for reasons explained in the next section, we think that choice will in many circumstances have the greatest deterrent impact. Instead of following the Holmesian dictum, which advocates stopping at the first step, we think courts should be ready to trace the overcharge as far as they reasonably can. For these reasons, legislation to overrule *Illinois Brick* should make clear that when a primary (or mid-chain) purchaser sues for an overcharge, the defense that the plaintiff passed on should be available only in instances presenting a real risk of duplicative liability. If plaintiff establishes that possible plaintiffs farther down the chain are barred by the statute of limitations or have been served as necessary parties, yet have not appeared and asserted a claim or otherwise can be shown not to threaten duplicative liability, the reason for allowing the passing-on defense is eliminated. In such circumstances the goal of deterrence and the lack of any threat to compensatory justice should result in rejection of a passing-on defense.

**Exhibit 125A**



### C. *Passing On and the Deterrence of Violations*

The majority in *Illinois Brick* concluded that assigning the cause of action for an overcharge solely to the direct purchaser would provide greater deterrence than would granting relief to purchasers (even when down-chain) that actually suffered the loss.[151] The majority thus resolved what might be termed an issue of legislative fact—an issue upon which it had little, if any, reliable empirical information.[152]

Direct purchasers have often sued in the past and sometimes recovered large damages.[153] One must infer, moreover, that these purchasers are encouraged to sue by *Illinois Brick* and would, to an indeterminate extent, be discouraged from suing by a rule which requires them not only to prove the offense and the overcharge but also to defend against efforts by defendant or other claimants to show that not all of the overcharge stayed in their hands. Neither of these observations, however, warrants the conclusion that *Illinois Brick* aids deterrence.

Information about the number of direct purchasers that have sued in the past tells us nothing about their importance or significance as private attorneys general unless we also know (or make assumptions about) the total number of overcharges to be found in the economy and, thus, about the percentage of all violators that are sued by direct purchasers. Like the Court, we are without data on this matter, and without data, claims either way about the effectiveness of primary purchasers as antitrust enforcers pass wide

---

[151] Thus, the majority read *Hanover Shoe* as "resting on the judgment that the antitrust laws will be more effectively enforced by concentrating the full recovery for the overcharge in the direct purchasers" and, in part for this reason, declined to permit down-chain purchasers to prove passing-on. 431 U.S. at 735.

[152] It is unfortunate that there is so little accessible data regarding the relationship between government and private antitrust actions. Such information would be valuable not only for the present needs—evaluating the deterrent effects of alternative policies—but would be of enormous value in the allocation of resources within antitrust enforcement agencies. In a proposal for a research project which would collect and analyze such data, M. Block, H. Demmert, & F. Nold *supra* note 56, at 35, present preliminary evidence showing that private actions are surprisingly infrequent when the government has already won a case against conspirators. Of the 49 price-fixing cases won (by verdict or *nolo contendere* plea) by the government in the period 1971 to 1976, private actions against the conspirators have been brought in only 18 cases. In its most immediate bearing on the deterrent effects of *Illinois Brick*, this evidence suggests that even when presented with the facts of a successful government action, which can be introduced in trial by private plaintiff, direct purchasers—who would almost certainly learn of the violation through their trade publications—often lack incentive to sue.

[153] Cases are collected in Handler, *Changing Trends in Antitrust Doctrines: An Unprecedented Supreme Court Term—1977*, 77 Colum. L. Rev. 979, 1000-01 (1977).

Exhibit 125A



of the mark.[154] Moreover, were it assumed that an inference can be drawn from the existence of past direct-purchaser suits, the plausible inference would be that these purchasers are little deterred by the risk of competing claimants farther down the chain. In suits started before *Illinois Brick,* direct purchasers faced that risk but sued anyway.

By contrast, the contention that legislative overruling of *Illinois Brick* would inevitably deter direct-purchaser suits to some extent is supported by the conventional marginal analysis of theoretical economics.[155] It is the *net* effect of *Illinois Brick* that is important, however, and there is reason to believe that legislative reversal would have a relatively small deterrent effect on suits by direct purchasers and a much larger and more significant effect in encouraging suits on behalf of down-chain purchasers.

The deterrent effect of overruling *Illinois Brick* on suits by direct purchasers would not be a smooth, continuous function, so that each marginal addition to the difficulty of the litigation would deter some marginal number of potential direct-purchaser plaintiffs. Common sense and experience both suggest that a party that is likely to litigate in the hope of recovering, say, a million-dollar overcharge, is likely to do so within a fairly wide range of predictions or expectations about the risk and difficulties of the lawsuit.

One concern of any potential plaintiff will be the anticipated cost of the suit. At the beginning of any complex case, this is ex-

---

[154] Landes and Posner claim to present evidence supporting their argument that direct purchasers are the most vigorous enforcers. The only data they offer, Landes & Posner, *supra* note 61a, at 629 (Table 1), show that the ratio of private antitrust actions to private civil actions and the ratio of private antitrust actions to government antitrust actions have both increased during the period 1960-1978. Statistical machinations notwithstanding, Landes and Posner fail to substantiate their claim because their data do not discriminate between actions brought by direct purchasers and those brought by indirect purchasers, or even between overcharge actions and actions by competitors, franchisees, or others making antitrust claims wholly unrelated to the passing-on problem.

Impression-supporting information, such as that collected by Professor Handler, *supra* note 153, cuts both ways. Indirect purchasers were plaintiffs in almost two-thirds of all private treble-damage actions brought since 1960, and were the only plaintiffs in about 25% of all cases. *Antitrust Enforcement Act of 1979: Hearings on S.300 Before the Senate Comm. on the Judiciary,* 96th Cong., 1st Sess. 12 (1979); 1979 SENATE REPORT, *supra* note 19, at 16. Moreover, there are some significant overcharge cases in which primary purchasers were discernibly less aggressive enforcers than downstream buyers. *E.g.,* West Va. v. Chas. Pfizer & Co., 440 F.2d 1079 (2d Cir.), *cert. denied,* 404 U.S. 871 (1971). Given that the recent *parens patriae* legislation opens up significant new potential for enforcement by states on behalf of consumers, there seems little doubt that the vigor and frequency of enforcement by (and on behalf of) downstream buyers will increase.

[155] *But see* 1978 *House Hearings, supra* note 15, at 192-95 (statement of Richard A. Posner).

Exhibit 125A



tremely difficult to estimate beyond saying that the costs will be high. It is unlikely that the presence or absence of a passing-on defense will be a key factor in a decision to sue. The gestalt concern is whether the estimated potential recovery is large enough to pursue through complex litigation. Anyone who considers himself a potential plaintiff at all is likely to remain one within a fairly wide variation of estimates about the likely size of the recovery. A direct purchaser that has suffered substantial losses is not likely to give up at the outset upon learning that recovery will be limited to three times those injuries and will not include injuries suffered by others. Whether the probability of success makes the effort and expense worthwhile involves numerous complex questions concerning liability and damage calculation. It does not seem likely that the addition of a passing-on issue will often prove critical in the calculations of a potential plaintiff with real and substantial losses.

Conceivably, some potential plaintiffs will give up solely because of the passing-on defense, but these may not be particularly important ones. They are likely to be those that know that they have in fact passed on all of the overcharge and that, if they sued, would be doing so as bounty hunters seeking a windfall. Wholesalers or retailers in some of the antibiotic cases are, perhaps, pertinent examples.[156] Few such purchasers sued before *Illinois Brick* and experience suggests that those who do sue are likely to be "tag along" plaintiffs seeking a windfall settlement. It is possible that the *Illinois Brick* result will encourage more such direct purchasers to sue, but that expectation does not necessarily make *Illinois Brick* more attractive. Potential plaintiffs without real injury are seldom likely to be the only (or even the most likely) plaintiffs unless the operative rule of law precludes suit by parties actually injured.

Remember that the deterrent effect of *Illinois Brick* on suits by down-chain purchasers is absolute: given *Illinois Brick,* none of them will sue. Legislation which overrules that case would therefore likely encourage more overcharge enforcement cases than it would discourage. There are situations in which granting the cause of action solely to direct purchasers effectively forecloses any private suit. Often, direct purchasers pass on all or substantially all of the overcharge. This will be especially so in the cases which are socially more harmful—those in which the monopoly or cartel is well entrenched and direct and other purchasers have made long-term adjustments. If the ongoing relationship between the direct

---

[156] *See, e.g.,* West Va. v. Chas. Pfizer & Co., 440 F.2d 1079, (2d Cir.), *cert. denied,* 404 U.S. 871 (1971).

Exhibit 125A



purchaser and the potential defendant has any value to the direct purchaser (and often it will have), the direct purchaser will to that extent be deterred from suing. (Indeed, even in cases in which the direct purchaser absorbs a significant part of the overcharge, it may often be deterred by the risk of being cut off entirely.) It is true that some direct purchasers that suffered little or no real loss —for example, wholesalers in the antibiotic cases[157]—have brought suit in the past, but this does not diminish the force of our concern. The instances in which direct purchasers do sue tend to be those in which the cartelized product is peripheral rather than central to the direct purchasers' business needs, and in which the direct purchaser deals with several sellers at the cartelized level. Then, the direct purchaser is likely to have convenient alternative ways to continue to meet its need for supplies: it can withstand disruption of its relationship with the violator.[158] Many direct purchasers, however, are in long-term, ongoing supply relationships with a single firm (or a few) and are extremely dependent upon supplier continuity and goodwill. An automobile or television dealer serves as an example. Such a direct purchaser is highly unlikely to sue its supplier unless the relationship has been independently disrupted.[158a] In numerous instances, then, if down-chain purchasers have no cause of action, no suit is likely to be brought.

Direct purchasers do have one advantage as potential enforcers: they are closer to the violation and thus may be in a better position to be aware of it.[159] Yet, there are limits to the significance

---

157 *Id.*

158 Even in these situations direct purchasers may well be deterred. For example, if *A*, a distributor or wholesaler, brings an antitrust complaint in an effort to stop an antitrust violation by *B*, a manufacturer of one product in which *A* deals, *A* may find that *C*, *D*, and *E*, suppliers of other products in which *A* deals, begin to look for alternative distribution outlets.

158a Landes and Posner claim that "the idea that purchasers are bashful about suing their suppliers is today unrealistic, almost quaint," Landes & Posner, *supra* note 61a, at 614, but citing evidence that direct purchasers bring suits does not substantiate that claim. Because the total number of violations is unknown, there may be many cases in which direct purchasers do not bring actions against violators. Managers do not typically regard disruptions in supply as costless—they recognize that long-term supply relationships and business reputation have significant economic value not to be frittered away on antitrust actions unless the potential damage award is substantial. Moreover, the Landes-Posner analysis assumes that potential plaintiffs will treat every dollar of profit identically, whether earned by selling their products, recovering demonstrable losses (that is, monopoly overcharges not passed on), or windfall gains (that is, recovery of monopoly overcharges which had been passed on). We refuse to accept this characterization of managerial mentality in American society.

159 1978 *House Hearings, supra* note 15, at 193 (statement of Richard A. Posner).

**Exhibit 125A**



of propinquity. If the overcharge item represents a relatively small part of the direct purchaser's total cost, that purchaser's sensitivity may well be quite low and if it represents a very large part of cost, a dependency relationship is likely to dampen enthusiasm for a suit. Moreover, if the cartel or monopoly has been operating very long, direct purchasers will have made long-run adjustments (involving reduced capital investment) and will be earning normal returns (on the smaller capital that remains). Also, if *Illinois Brick* is overruled, a direct purchaser suffering from a violation but deterred from bringing suit, has alternative recourse: it can notify the Department of Justice or a state attorney general, or it can gossip to down-chain purchasers which, not being under dependency constraints, may sue. *Illinois Brick* forecloses the latter response.[160]

In any event, judicial experience during the years before *Illinois Brick* suggests that down-chain purchasers do identify violations and that, before being stifled by that case, were becoming increasingly vigilant as private attorneys general.[161] In many important cases, these buyers played a significant role.[162] Furthermore, cutting off down-chain purchasers frustrates a significant movement in antitrust enforcement which has been growing for some time and which Congress, in the Hart-Scott-Rodino Act,[163] sought to foster and encourage—suits on behalf of the states and their subdivisions as down-the-line purchasers and, in *parens patriae* actions, on behalf of state residents as ultimate consumers. The increasing skill and sophistication of state attorneys general in antitrust is one of the

---

160 If the fact that information may be accessible to direct purchasers makes necessary a bounty to direct purchasers, there are more selective ways to grant one than by offering three times the overcharge, as does the *Illinois Brick* rule. Congress could legislate to provide an appropriate bounty for the provision to the Department of Justice of information leading to successful criminal or civil proceedings against the violator. This approach would encourage any party with information to report it and would not deprive any injured party of incentive to sue. *Cf.* I.R.C. § 7623; Treas. Reg. § 301.7623 (1959) (providing for payments to those who inform about Internal Revenue Code violations).

161 *See* note 154 *supra.*

162 Illinois v. Ampress Brick Co., 536 F.2d 1163 (7th Cir. 1976); *In re* Western Liquid Asphalt Cases, 487 F.2d 191 (9th Cir. 1973), *cert. denied,* 415 U.S. 919 (1974); Armco Steel Corp. v. North Dakota, 376 F.2d 206, 210-11 (8th Cir. 1967); South Carolina Council of Milk Producers, Inc. v. Newton, 360 F.2d 414 (4th Cir.), *cert. denied,* 385 U.S. 934 (1966); *In re* Plywood Antitrust Litig., 76 F.R.D. 570 (E.D. La. 1976); *In re* Master Key Antitrust Litig., [1973-2] Trade Cas. ¶ 74,680 (D. Conn. 1973), *appeal dismissed,* 528 F.2d 5 (2d Cir. 1975). We are expressing here an impressionistic view. The incomplete data are no more *logically* compelling on our side of the argument than they are on Professor Handler's. *See* notes 153 & 154 *supra.*

163 15 U.S.C. §§ 15C-15H (1976).

**Exhibit 125A**



most hopeful signs for the free-enterprise system.[164] *Illinois Brick* does more than reduce state enforcement of the federal law: it also discourages states from refining and vigorously enforcing their own antitrust laws and thus destroys the hope that, as they become more aware of the advantages of free-market competition, they will consider the potential advantages of deregulation at the state level.

To summarize, if the law is serious about deterring monopoly pricing, then it is surely counterproductive to designate as the only possible private attorney general the purchaser likely to have the least incentive to sue and the greatest incentive to accept the status quo. Yet, *Illinois Brick* does precisely that.

## CONCLUSION

Our analysis uncovers the misapprehensions that underlie the *Illinois Brick* decision and brings into focus several of the deficiencies in the policy established by that decision. There is simply no credible argument that courts cannot handle passing-on issues. Clearly, they can. When they fail to do so, they sacrifice the desideratum of compensatory justice. Nor is there any credible basis for concluding that antitrust enforcement is invigorated by the rule of *Illinois Brick*: more likely its effect is quite the opposite. Congress, therefore, should pass legislation overruling *Illinois Brick* in the interest of deterring cartelization and monopolization and compensating the actual victims of these offenses.

---

[164] *See, e.g.*, 1978 *House Hearings*, *supra* note 15, at 36-43 (statement of Bruce E. Babbitt).

Exhibit 125A



## APPENDIX

| 1 | 2 | 3 | 4 | 5 | 6 | 7 | 8 | 9 | 10 | 11 | 12 | 13 |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Blue Book No. | Product | Territorial Scope | No. of Firms: Conspir-ators | No. of Firms: Total Market | Conspirators' % of Sales | Direct Purchasers | Are Direct Purchasers Final Purchasers? | Ease of Identifying Class/Individual | Directness of Costs | $e_S$ | $e_D$ | Probability of High Passing On |
| 1743 | Wrought Steel Wheels | National | 5 | 5 | 100 | Railroads/Transit Authorities | No/ Yes | Medium/ Low | Low | | | Low |
| 1744 | Rolled Steel Pipe Flanges & Rings | National | 6 | 6 | 100 | Industrial Users | No | Low | | | | Indeter-minate |
| 1748 | Bed Springs | National | 10 | 20 | | Box Spring & Inner-spring Mattress Mfrs. | No | High/ Low | Medium | High | Medium | Medium |
| 1749 | Metal Library Shelving | National | 7 | 9 | 78 | Schools, Colleges, Gov't Agencies | Yes | | | | | |
| 1751 | Steel Castings | National | 10 | | 80 | Construction, Mining, Industrial Users | No | Low | | | | Indeter-minate |
| 1754 | Self-Locking Nuts | National | 4 | 6 | 97 | Aerospace Industry/ Government | No/ Yes | High/ Medium | Medium | High | Low | Medium |
| 1756 | Liquefied Petroleum Gas Delivery | Regional | 5 | 5 | 100 | Businesses/ Households | No/ Yes | Low | | | | Indeter-minate |
| 1763 | Refuse Collection | Local | 86 | 102 | | Businesses/ Households | No/ Yes | Low | | | | Indeter-minate |
| 1773 | Linoleum Installation | Local | 12 | | | Contractors for Com-mercial & Gov't Projects | No | High/ High | High | High | Low | High |
| 1778 | Women's Swimsuits | National | 9 | | | Retail Stores | No | High/ Low | High | High | Medium | High |
| 1779 | Fabricated Structural Steel | Regional | 6 | | 99 | Contractors for Large Construction Projects | No | High/ High | High | High | Medium | High |

Exhibit 125A



| 1 | 2 | 3 | 4 | 5 | 6 | 7 | 8 | 9 | 10 | 11 | 12 | 13 |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | | | No. of Firms | | | | | | | | | |
| Blue Book No. | Product | Territorial Scope | Conspirators | Total Market | Conspirators' % of Sales | Direct Purchasers | Are Direct Purchasers Final Purchasers? | Ease of Identifying Class/Individual | Directness of Costs | $e_g$ | $e_D$ | Probability of High Passing On |
| 1796 | Carbon Steel Sheets | National | 10 | | | Auto, Appliance, Container & Construction Industries | No | Low | | | | Indeterminate |
| 1800 | Commercial Baking Flour | Regional | 9 | | 65 | Commercial Bakers | No | High/ Low | High | Medium | Low | Medium |
| 1801 | Fertilizer | Regional | 4 | | | Commercial Farmers | No | Medium/ Low | Medium | Low | Low | Low |
| 1802 | Stainless Steel Welding Electrodes | National | 7 | 8 | 87 | Transportation, Chemical Industries/Military | No/ Yes | Medium/ Low | Low | | | Low |
| 1818 | Steel Products (Wholesale) | Regional | 5 | | 72 | Industrial Steel Users | No | Medium/ Low | High | Medium | Medium | Medium |
| 1842 | Acoustical Ceiling Materials | Local | 10 | | 90 | Contractors subcontract with Ceiling Installers | No | High/ High | High | High | Medium | High |
| 1845 | Hydraulic Hose | National | 6 | | 90 | Hose Assembly Mfrs. | No | Medium/ Low | Medium | High | Medium | Medium |
| 1847 | Nonpremium Beer | Local | 10 | 10 | 100 | Military Installations | No | High/ Low | High | High | Low | High |
| 1849 | Gasoline | Regional | 12 | | | Affiliated & Independent Retail Dealers | No | High/ Low | High | High | Low | High |
| 1860 | Liquid Asphalt | Regional | 20 | | 95 | State of Missouri | Yes | | | | | |
| 1880 | Milk | Local | 11* | | 13 | Grocery Stores/ Institutions | No/ Yes | High/ Low | High | High | Low | High |

*4 firms acquitted

Exhibit 125A



| 1 | 2 | 3 | 4 | 5 | 6 | 7 | 8 | 9 | 10 | 11 | 12 | 13 |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | | | No. of Firms | | | | | | | | | |
| Blue Book No. | Product | Territorial Scope | Conspir-ators | Total Market | Conspirators' % of Sales | Direct Purchasers | Are Direct Purchasers Final Purchasers? | Ease of Identifying Class/Individual | Directness of Costs | $e_S$ | $e_D$ | Probability of High Passing On |
| 1883 | Book Matches (Resale) | National | 10 | 10 | 100 | Retail Stores | No | High/ Low | High | High | Low | High |
| 1885 | Concrete Pipe | Regional | 4 | 4 | 100 | Highway & Sewer Construction Contractors | No | High/ High | High | High | Low | High |
| 1887 | Cement Installations | Local | 125 | | | Housing Contractors | No | High/ High | High | High | Low | High |
| 1888 | Concrete Pressure Pipe | Regional | 2 | 2 | 100 | Highway & Sewer Construction Contractors | No | High/ High | High | High | Low | High |
| 1890 | Drill Jig Bushings | National | 9 | 13 | 82 | Machinists, especially Aircraft Mfrs. | No | Low | | | | Indeter-minate |
| 1907 | Linen Supplies | Local | 31 | | 90 | Hotels and Restaurants | No | High/ Low | Low | | | Low |
| 1909 | School Construction | Local | | | | School Districts | Yes | | | | | |
| 1921 | Plumbing Fixtures (vitreous china) | National | 7 | 15+ | 98 | Building Contractors | No | High/ Medium | High | High | Low | High |
| 1925 | Dairy Products | Regional | | 45 | | Grocery Stores, Home Delivery Carriers | No | High/ Low | High | High | Low | High |
| 1928 | Fuel Oil | Local | 26 | | | Apartment Owners/ Households | No/ Yes | High/ High | High | Medium | Medium | Medium |
| 1930 | Class Rings | Regional | 3 | 5 | 90 | Students | Yes | | | | | |
| 1951 | Gasoline* | Local | 200 | | | Motor Vehicle Operators | Yes | | | | | |

*4 separate conspiracies prosecuted

Case 4:07-md-01819-CW Document 806-16 Filed 08/06/09 Page 19 of 80
PageID #: 18991

Exhibit 125A



| 1 | 2 | 3 | 4 | 5 | 6 | 7 | 8 | 9 | 10 | 11 | 12 | 13 |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | | | No. of Firms | | | | | | | | | |
| Blue Book No. | Product | Territorial Scope | Conspir-ators | Total Market | Conspirators' % of Sales | Direct Purchasers | Are Direct Purchasers Final Purchasers? | Ease of Identifying Class/Individual | Directness of Costs | $e_s$ | $e_D$ | Probability of High Passing On |
| 1954 | Tickets | Regional | 9 | 10+ | <91 | Amusement Parks, Transportation Companies | No | High/ Low | Low | | | Low |
| 1957 | Plumbing Contracting | Regional | 14 | | 90 | Building Contractors | No | High/ High | High | High | Medium | High |
| 1962 | Tickets | Regional | 3 | | 95 | Amusement Parks, Transportation Companies | No | High/ Low | Low | | | Low |
| 1963 | Bread (Wholesale) | Regional | 50 | | | Grocery Stores/ Schools, Hospitals | No/ Yes | High/ Low | High | High | Low | High |
| 1965 | Plumbing Brass Fittings | National | 6 | | 30 | Building, Plumbing Contractors | No | High/ Medium | High | Medium | Medium | Medium |
| 1970 | Wholesale Baked Goods | Regional | 7 | 8+ | | Grocery Stores/ Schools and Hospitals | No/ Yes | High/ Low | High | High | Medium | High |
| 1994 | Auto Repair | Local | 16 | | | Motor Vehicle Owners | Yes | | | | | |
| 1997 | Wholesale Bread | Local | 6 | 12+ | | Grocery Stores/ Schools and Hospitals | No/ Yes | High/ Low | High | High | Low | High |
| 2001 | Linen Supply | Local | 6 | 6 | 100 | Hotels & Restaurants | No | High/ Low | Low | | | Low |
| 2009 | Athletic Equipment | Local | 6 | 6 | 100 | School Districts | Yes | | | | | |
| 2025 | Linen Supplies (Industrial) | Regional | 3 | | | Gasoline, Automobile Dealers | No | Medium/ Low | Low | | | Low |
| 2030 | Linen Supplies | Local | 4 | | | Commercial Establishments | No | Low | | | | Indeter-minate |

Exhibit 125A



| 1 | 2 | 3 | 4 | 5 | 6 | 7 | 8 | 9 | 10 | 11 | 12 | 13 |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | | | No. of Firms | | | | | | | | | |
| Blue Book No. | Product | Territorial Scope | Conspir-ators | Total Market | Conspirators' % of Sales | Direct Purchasers | Are Direct Purchasers Final Purchasers? | Ease of Identifying Class/Individual | Directness of Costs | $e_S$ | $e_D$ | Probability of High Passing On |
| 2032 | Maple Floors | Local | 4 | | | Building Contractors | No | High/ Medium | High | High | Medium | High |
| 2034 | Dairy Products | Regional | 3 | 13 | 95 | Grocery Stores/ Institutions | No/ Yes | High/ Low | High | High | Low | High |
| 2035 | Ready-Mix Concrete | Regional | 8 | 17 | | Contractors | No | High/ High | High | High | Medium | High |
| 2036 | Industrial Chemicals | Local | 5 | | | Industrial Users | No | Low | | | | Indeter-minate |
| 2090 | Vending Machines | Local | 6 | 6 | 100 | Restaurants, Hotels | No | Low | | | | Indeter-minate |
| 2104 | Snack Foods | Regional | 4 | | 95 | Grocery Stores, Schools | No | Low | High | High | Medium | High |
| 2124 | Ready-Mix Concrete | Local | 10 | | | Contractors | No | High/ High | High | High | Medium | High |
| 2136 | Ready-Mix Concrete | Local | 9 | 9 | 100 | Contractors | No | High/ High | High | High | Medium | High |
| 2145 | Rendering | Local | 13 | 16 | | Stores, Restaurants, Packing Plants | No | High/ Low | Low | | | Low |
| 2156 | Autobody Repair | Local | | | | Insurance Companies/ Motor Vehicle Owners | No/ Yes | High/ Medium | Medium | Medium | Medium | Medium |
| 2177 | Rendering | Local | 3 | 3 | 100 | Retail Meat Markets | No | High/ Low | Low | | | Low |
| 2182 | Wholesale Bread | Local | 3 | 6 | | Grocery Stores | No | High/ Low | High | High | Low | High |
| 2189 | Dairy Products | Local | 4 | 7 | | Grocery Stores/ Institutions | No/ Yes | High/ Low | High | High | Low | High |

Exhibit 125A



| 1 | 2 | 3 | 4 | 5 | 6 | 7 | 8 | 9 | 10 | 11 | 12 | 13 |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | | | No. of Firms | | | | | | | | | |
| Blue Book No. | Product | Territorial Scope | Conspir-ators | Total Market | Conspirators' % of Sales | Direct Purchasers | Are Direct Purchasers Final Purchasers? | Ease of Identifying Class/Individual | Directness of Costs | $e_S$ | $e_D$ | Probability of High Passing On |
| 2192 | Retail Shoes | Local | 3 | | | Households | Yes | | | | | |
| 2211 | Overhead Garage Doors | Regional | 6 | 8 | | Contractors/ Households | No/ Yes | High/ High | High | High | Medium | High |
| 2243 | Plumbing Supplies and Services | Local | 8 | | | Contractors | No | High/ Medium | High | High | Medium | High |
| 2246 | Automobile Glass Replacement Parts | Local | 8 | 11 | | Insurance Companies/ Motor Vehicle Owners | No/ Yes | High/ Medium | Medium | Medium | Medium | Medium |
| 2277 | Wholesale Bakery Products | Local | 4 | 5 | 96 | Grocery Stores, Restaurants | No | High/ Low | High | High | Medium | High |
| 2278 | Wholesale Meat | Local | 6 | 6 | 100 | Hotels, Restaurants/ Schools | No/ Yes | High/ Low | High | Medium | Medium | Medium |

Exhibit 125B

James F. Nieberding and Robin A. Cantor. 2007. Price Dispersion and Class Certification in Antitrust Cases: An Economic Analysis. *Journal of Legal Economics* 14(2): pp. 61 – 84.

# Price Dispersion and Class Certification in Antitrust Cases: An Economic Analysis

**James F. Nieberding, LECG and**
**Robin A. Cantor, Navigant Consulting**
*For additional information see Author Contact page*

**Abstract** *Differences in prices paid by putative class members (i.e., price dispersion) often become a focal point for class certification in antitrust matters. This paper discusses how an economic analysis of the existence, extent, and nature of price dispersion faced by plaintiffs seeking class certification may be informative even in matters thought to be particularly appropriate for class treatment (e.g., horizontal price-fixing). The existence of price variability among the products at issue can be addressed within the class framework if such price differences are systematic and able to be controlled for in any but-for pricing analysis.*

## Introduction

A class action lawsuit provides a means whereby large numbers of plaintiffs may have their complaint involving common questions of fact adjudicated in a consolidated proceeding. However, before a class can be certified, certain *legal* conditions must be met.[1] Additionally, in antitrust cases, economic evidence often is at the heart of whether or not these conditions are satisfied. The authors' focus in this paper is to explore the *economic* evidence

[1]In federal court, these are governed by Rule 23 of the Federal Rules of Civil Procedure. In general, for a class to be certified, the four prerequisites to Rule 23(a)(1)-(4) must be met (i.e., numerosity, commonality, typicality, and adequacy) as well as several additional requirements of Rule 23(b) (e.g., predominance and superiority). Most States have similar rules.



Electronic copy available at: http://ssrn.com/abstract=1028586

Exhibit 125B

criteria, in particular pricing variability, and its relevance in helping to inform the class certification decision in an antitrust context.[2]

Generally, the central issue for an economist at the class certification stage is whether or not there is a common formula, model, or other methodology that plaintiffs could use to establish that each class member suffered impact and damages from the alleged anti-competitive act. Indeed, the class certification decision frequently depends on the quality of the expert analyses. As noted by Cook and Rugg (2006),

> [A]ntitrust class certification decisions usually turn on which side has presented evidence that directly supports its class certification arguments rather than merely citing legal principles and case authority. … Often the determination of whether [the plaintiff's expert] can truly deliver on a methodology to demonstrate antitrust impact through class-wide proof is the determining factor in a court's predominance decision.[3]

While price variability is but one economic factor relevant to the class certification decision, differences in prices paid by putative class members (i.e., price dispersion) often becomes a focal point for the economic analysis of class issues in antitrust matters. Typically, such price dispersion cases involve horizontal issues (e.g., price-fixing, bid-rigging) where class members argue that but-for the alleged anti-competitive conduct, plaintiffs would have paid lower prices. Such cases frequently are viewed by the courts as being particularly appropriate for class treatment because they presumably impact all direct purchasers in the affected market.[4]

As discussed in Nieberding and Cantor (2004), plaintiffs in these cases often base their arguments on case law stemming from

---

[2] This paper focuses on class actions that seek damages pursuant to Rule 23(b)(3) which holds that in order to successfully argue for class treatment, plaintiffs must establish that common issues are subject to generalized proof and predominate over individualized issues.

[3] Cook and Rugg (2006), at 4 and 8.

[4] See, e.g., *In re* Plastic Cutlery Antitrust Litigation, Civil Action Master File No. 96-CV-728 (E.D. Pa 1998), pp. 3-4. ("Class actions are widely-recognized as being particularly appropriate for the litigation of antitrust cases alleging a price-fixing conspiracy because price-fixing schemes presumably impact all purchasers in the affected market, so that common questions on the issue of liability predominate.")



Electronic copy available at: http://ssrn.com/abstract=1028586

*Bogosian v. Gulf Oil Corp.* (1977).[5] This case established the so-called "*Bogosian* shortcut" which favors a presumption of common impact on class members whenever economic reasoning provides a sensible link between the alleged unlawful conduct and common injury to individual class members. However, even in these matters, economic analysis is still required to ascertain whether average class-wide impact is a reasonable representation of that suffered by all members of the proposed class, or whether an individualized, plaintiff-specific assessment of impact and damages is more appropriate.[6] Such a sentiment was endorsed by the U.S. Court of Appeals for the Third Circuit in *In re Linerboard Antitrust Litigation*,[7] where the role of economic reasoning **and** sound economic analysis to support the appropriateness of class certification was highlighted.

In *Linerboard*, a matter in which the authors were involved,[8] a key issue was whether an alleged conspiracy among linerboard producers would likely have had a common impact on direct purchasers who used this product to make corrugated sheet and boxes. Another issue was whether average prices in this industry were meaningful for pricing analysis as opposed to being too idiosyncratic and, hence, inappropriate for class treatment. The Third Circuit noted that the plaintiffs' experts reliably demonstrated that certain product characteristics and economic conditions were present which led to a systematic pricing structure, providing them a basis for concluding that there existed a reliable formulaic approach to estimate damages for class members.

> A strong argument can be made that the Bogosian concept of presumed impact was properly applied here. … In addition to relying on the Bogosian short cut, it [the district court] credited the testimony of plaintiffs' experts, opinions that were supported by charts, studies and articles from

---

[5]*Bogosian v. Gulf Oil Corp*., 561 F.2d 434 (3d Cir. 1977).

[6]Impact or injury can be common in that all class members are negatively affected by the alleged conduct (e.g., pay a higher price). While damages can be plaintiff-specific in a class action, they must be based on a common formulaic approach. See, e.g., *In re* VisaCheck/MasterMoney Antitrust Litigation, 280 F.3d 124 (2d Cir. 2001), at 139.

[7]*In re* Linerboard Antitrust Litigation, (MDL No. 1261), filed September 5, 2002 (Third Circuit).

[8]Dr. Cantor served as the expert economist on class certification for the corrugated sheet plaintiffs. Dr. Nieberding assisted with the preparation of the expert report.

**Exhibit 125B**

> leading trade publications. These experts suggested that advanced econometric models could be effectively prepared to establish class-wide impact.[9]

The class action trade press, in commenting on the Supreme Court's refusal to review the Third Circuit's decision in *Linerboard*, noted

> In addition to the "*Bogosian* shortcut" of presumed impact, the panel noted, the plaintiffs' case for showing class-wide injury was bolstered by two expert witnesses who backed up their professional opinions with supporting data.[10]

The authors believe that the Third Circuit's decision in *Linerboard* affirms the role of proper economic analysis to either support or refute the appropriateness of class treatment in cases that invoke the *Bogosian* shortcut of presumed impact. Arguments that invoked *Bogosian* without such supporting analyses were unconvincing to the court as seen in *Weisfeld* (upholding a district court's decision denying Weisfeld's motion for class certification).[11]

> Contrary to the support presented by the plaintiffs' experts in In re Linerboard, the District Court found telling that Weisfeld's expert provided only "naked conclusions" that common proof would demonstrate injury to class members. … We found it significant, however, that those experts [in *Linerboard*] engaged in "extensive empirical investigation" and economic analysis. Further, the experts [in *Linerboard*] "effectively utilized supporting data, including charts and exhibits, to authenticate their professional opinions." The In re Linerboard plaintiffs, therefore, did not rely "solely on presumed impact and damages" and adequately demonstrated "that they could establish [antitrust] injury on a class-wide basis." (Citations omitted)

---

[9] *In re* Linerboard Antitrust Litigation, (MDL No. 1261) filed September 5, 2002 (Third Circuit), at 13-14.

[10] "Supreme Court Rejects Plea for Review of Class Certification Ruling," *Class Action Litigation Reporter*, Volume 10, Issue 5, June 2003, at 10.

[11] *Weisfeld v. Sun Chem. Corp.*, 210 F.R.D. 136, 143-44 (D.N.J. 2002), *aff'd* (3d Cir. 2004).

The standard articulated in *Linerboard* has appeared in recent decisions. For example, in *American Seed v. Monsanto*, the court denied class certification because the plaintiff's economist's opinion lacked the type of analyses accepted by the Third Circuit.[12]

> The court finds that this suit lacks the factual support that existed in other cases upholding class certification based on the *Bogosian* short-cut presumption of impact … [the plaintiff's expert economist] "has not supported his theory of presumed impact with any supporting documentation" … [and his] "submissions are not 'supported by charts, studies, and articles from leading trade publications' as in *In re Linerboard*, 305 F.3d at 153."[13]

And, as argued by Cook and Rugg (2006),

> [C]lass certification should not be automatic in price fixing litigation. It must be based upon common evidence of a violation and antitrust impact, and upon developed expert testimony adapted to the particular industry. Most of all, both parties must submit actual evidence rather than mere legal arguments.[14]

Notably, with respect to the topic central to this paper, the court pointed out that the plaintiff's economist in *American Seed v. Monsanto* "did not study the pricing and/or pricing variability for any of the varieties of GM corn seeds."[15]

One other issue to consider is the relevance of *Daubert* and its progeny – which govern the admissibility of expert testimony –

---

[12]*American Seed Co., Inc. v. Monsanto Co.,* D. Del., Civ. No. 05-535-SLR, (November 13, 2006).

[13]"Monsanto Defeats Class Certification in Corn Seed Monopolization Suit," *Antitrust and Trade Regulation Report*, BNA, Inc., Volume 91, No. 2282 (December 8, 2006), at 604.

[14]Cook and Rugg (2006), at 13.

[15]"Monsanto Defeats Class Certification in Corn Seed Monopolization Suit," at 604.

at the class certification stage.[16] While a detailed discussion of the topic is not the focus of this paper, the authors do note that such challenges have been initiated against expert testimony submitted in class proceeding.[17] As noted by The U.S. Court of Appeals (2nd Circuit),

> We note that a motion to strike expert evidence pursuant to *Daubert v. Merrell Dow Pharmaceuticals, Inc.*, 509 U.S. 579 (1993), involves a inquiry distinct from that for evaluating expert evidence in support of a motion for class certification. … although the parties' substantive arguments in both instances may be similar, as is true in this case. A *Daubert* motion is typically not made until later stages in litigation, such as in association with a motion for summary judgment, motion *in limine*, or at trial, and a district court should not postpone consideration of a motion for class certification for the sake of waiting until a *Daubert* examination is appropriate.[18]

While courts may be reluctant to apply *Daubert* before admitting expert testimony during class certification, some commentators have argued that an increased use of *Daubert* is warranted at this stage of litigation (Burch 2004).

## Price Dispersion and Class Certification

At the class-certification stage, the expert is asked to assess whether the alleged conduct, impact, and damage for each proposed class member can be made through common or formulaic means that are based on well-accepted empirical methods, and can be applied for the purposes of computing damages for the plaintiffs on a class-wide basis. If there are issues relating to each class member that must be analyzed individually, or if each class member's

---

[16]Three Supreme Court decisions beginning with *Daubert* have imposed strict standards on acceptable expert testimony (*Daubert v. Merell Dow Pharms., Inc.*, 509 U.S. 579 (1993); *Gen. Elec. Co. v. Joiner*, 522 U.S. 136 (1997); and *Kumho Tire Co. v. Carmichael*, 526 U.S. 137 (1997)).

[17]See, *e.g.*, *In re Visa Check/MasterMoney Antitrust Litig.*, 192 F.R.D. 68 (E.D.N.Y. 2000).

[18]*Wal-Mart Stores, Inc. v. Visa U.S.A., Inc. (In re Visa Check/MasterMoney Antitrust Litig.)*, 280 F.3d 124 (2d Cir. 2001), at 7.

transactions must be examined separately to determine impact or damages, then a common formulaic methodology will not reasonably or reliably establish class-wide impact or damages.

Defendants frequently argue that individual, idiosyncratic pricing strategies result in price variability that render a generalized assessment of impact and damages unreliable if not impossible. Other types of "variability" may include differences in methods of distribution, product differentiation, varied promotions offered by defendants to different customers or at different times, and varied participation in such promotions by class members. Plaintiffs, on the other hand, generally argue that such price variability will not preclude class certification because price differences are due to observable, measurable factors and, therefore, are systematic and able to be controlled for in any but-for pricing analysis. As a result, the pricing structure often becomes a major point of contention at the class certification stage. For example, how changes in list prices impact transaction prices paid by class members, in particular the existence and extent of price dispersion, can be hotly contested.

Impact on direct purchasers in an antitrust case can be shown by common proof of a price conspiracy (usually left to the lawyers), and but-for prices can be established for the conspiracy period at some non-conspiracy benchmark (usually left to the economists). The economist's task can be accomplished by using proper statistical methods or other quantitative techniques that properly control for variation among plaintiffs should they exist.[19] However, an analysis of price dispersion at the class certification stage should not be confused with "damages issues" such as the estimation of but-for prices.[20] The former type of price analysis is the subject of this paper. Nieberding (2006) provides a detailed treatment of the latter type of price analysis.

---

[19]See*,* e.g., Page (1999), at 11-12:

> Price-fixing cases often involve complexities associated with regional variation in competitive conditions, heterogeneities of products and prices, variations in buying power of purchasers, and so forth. These factors necessarily raise individual issues of damages and impact, and may bar certification if the plaintiff's proposed theory fails to account for them. But courts have accepted statistical techniques to isolate the impact of the overcharge as sufficient for certification. [footnotes omitted]

[20]See, e.g., *In re* Polypropylene Carpet Antitrust Litigation, 178 FRD 603, 618 (ND Ga, 1997) ("[A]t the class certification stage, Plaintiffs must show that antitrust impact can be proven with common evidence on a classwide basis; Plaintiffs need not show antitrust impact in fact occurred on a classwide basis.").

**Exhibit 125B**

A discussion of price dispersion and its implications concerning class treatment can be found in instances where courts have certified a class, denied class certification, certified only a sub-class of the original class, or have deemed credible yet conflicting expert testimony on class issues to be more appropriate for consideration by the trier-of-fact than the court. For example, in instances where courts have certified a class, they had this to say concerning price variability:

> Neither a variety of prices nor negotiated prices is an impediment to class certification if it appears that plaintiffs may be able to prove at trial that, as here, the price range was affected generally.[21]

> Great Lakes argues that the varying prices and the diverse supply and demand factors affecting five different bromine compounds and their derivatives and blends preclude generalized proof of impact on a class of plaintiffs. … This argument fails, however … A wide range of products and prices does not make it impossible to use common proof to demonstrate impact.[22]

> Additionally, differences such as pricing methods, prices paid by purchasers, end users, price changes in product lines and variation in methods of purchase are not enough to show a predominance of individual questions.[23]

In other instances, courts have found that price variation was too idiosyncratic and that class treatment would be less reliable than a more individualized investigation.

> The typicality requirement can be met in an antitrust case even though there are many products sold at varied prices and conditions. … [however] The Court finds that proof of injury is an individual

---

[21] *In re* NASDAQ Market-Makers Antitrust Litigation, 169 F.R.D. 523 (S.D.N.Y. 1996).

[22] *In re* Bromine Antitrust Litigation, 203 F.R.D. 26-27 (S.D. Ind. 2001).

[23] Judge's decision supporting Class Certification and denying Summary Judgment in *Erie Forge v. Cyprus Minerals Co.* (W.D. Pa.) 19 (July 27, 1995).

> matter that varies by customer, by transaction, and by products purchased. … Prices for the various sizes and flavors of product varied from day to day, from customer to customer, with essentially comparable customers on occasion paying different prices on the same day for the same product.[24]
>
> In these different markets, defendants price nuts in different ways. … Grouping purchasers in all of these sub-markets together ignores the crucial difference in how defendants set prices for different purchasers. Given the diversity of markets, it can hardly be said that common issues predominate.[25]
>
> List prices differed [from] variety to variety, and sometimes differed from region to region for a single variety. … farmers buying GM seeds often received varying discounts from the list prices, so each farmer would have to prove separately that he paid an actual transaction price that was supra-competitive; … The wide variation in list prices among hybrids and the pricing of some GM hybrids with zero or negligible list price premiums, as compared with corresponding non-GM hybrids, would require the purchasers of some hybrids to prove injury through evidence that would vary according to individualized market conditions… .[26]

Yet, in other instances, courts have used the issue of price dispersion to assist in re-defining a class that is then allowed to proceed with litigation:

> [W]e are persuaded that despite the wide range of products and prices involved, common proof of impact is possible on behalf of purchasers who bought list-price products. Common proof is not possible, however, on behalf of purchasers who

---

[24]*Butt v. Allegheny Pepsi-Cola Bottling Co.*, 116 F.R.D. 488, 491, 493 (ED Va 1987).

[25]*Burkhalter Travel Agency v. MacFarms Int'l., Inc.*, 141 F.R.D. 154 (N.D. Cal. 1991).

[26]*McIntosh v. Monsanto Co. (E.D. Mo.)*, Case No 03-3993 (March 7, 2005), at 12-14.

**Exhibit 125B**

> bought non-list price products. … The testimony of plaintiffs' expert economist provides some support for the proposition that individual negotiations for discounts, credits and rebates were based, at least in part, on applicable list prices.[27]

And, in some instances where courts have been confronted with conflicting evidence based upon expert testimony, classes have been certified with such evidence left to the trier-of-fact:

> Defendants argue that the variety of prices paid and volumes purchased by the proposed class will predominate over any class-wide proof of a relationship between defendant's alleged price-fixing conspiracy and the prices paid by plaintiffs. … However, [plaintiffs' expert] finds the defendants' prices behaved similarly over time … [while defendants' expert] persuasively shows that based on individualized transaction data, pricing to audiotape buyers was on an individualized basis, and that this approach to pricing can be seen to apply across products, different volume purchasers, and time periods.[28]

Here, the court said that "numerous courts in antitrust actions have found that this 'battle of the experts' is properly evaluated by the jury, not the Court" which "the Court cannot consider in deciding a class certification motion."[29]

In situations involving vertical relationships where the class consists of indirect purchasers (in those States that allow antitrust standing for such plaintiffs), a study of the effect on consumer prices of, say, a vertical restraint usually requires a more complex assessment *vis-à-vis* conduct involving horizontal issues. Such matters may involve a detailed study of prices throughout the entire distribution chain, perhaps with numerous intervening levels, that precedes an end-user and potential class member of the product in question. Therefore, the "commonality" and/or "predominance" analysis is substantially confounded when class members are

---

[27] *In re* Industrial Diamonds Antitrust Litigation, 167 F.R.D. 383 (S.D.N.Y. 1996).

[28] *In re* Magnetic Audiotape Antitrust Litigation, 2001 U.S. Dist. LEXIS 7303, 14, 19 (S.D.N.Y. June 6, 2001).

[29] *Id.* at 15, 21.

indirect purchasers, in large part because there are numerous intervening market transactions that determine what impact, if any, reaches a particular indirect purchaser. Hussain, Garrett, and Howell (2001) find that courts may be more apt to rule against class certification (or call for a more narrow class definition) in such cases.

One factor that makes for the difficulty in indirect purchaser cases is the issue of "pass-through" or "pass-on." In general, this difficulty addresses the extent (if any) that direct purchasers from defendants pass on overcharges to their direct customers who, in turn, sell to another set of customers, and so on, down the distribution chain until the indirect purchasers at issue are reached. Issues of pass-through must be analyzed at each level of distribution. A further complicating factor may be that at each level of this chain, there may be a different market structure with different implications for pass-through.

The issue of pass-on and its implications for class certification in indirect purchaser lawsuits can be found in instances when classes have, and have not, been certified. For example, as noted by the State of Michigan's Court of Appeals (in reversing a class-certification decision by a trial court),

> [W]hen proving pass-on, plaintiffs typically must present evidence in the form of economic theory and analysis … [which] are most useful, and therefore come closest to satisfying the actual damages and common proof requirements for pass-on, when there are a minimum of variables involved. … One defense expert's study confirmed this premise from *Wood*, suggesting that the pass-on rates not only varied widely for Microsoft's products, but were sensitive to the price points used to market them. Even if the relevant market is perfectly competitive and results in one hundred percent pass-on of the overcharge, which another defense expert disputes, the plaintiffs' expert's affidavits fail to assure us that the methodologies he has proposed can account or adjust for this breadth of remaining variation for the class.[30]

[30] *A & M Supply v. Microsoft Corp*., 252 Mich. Ct. of Appeals, opinion filed August 27, 2002, at 27, 29, and 34.

However, when confronted with the same issues about the appropriateness of class certification including pass-on considerations, the South Dakota Supreme Court (among several other States) sustained the class certification of indirect purchasers suing Microsoft Corp.[31]

## An Empirical Test

As an example of one technique used to investigate price variability in the context of class certification, consider an indirect purchaser case where manufacturers who distribute their product through wholesalers are being sued (in State court) for anti-competitive actions which allegedly led to higher prices.[32]

Assume the class of indirect purchasers consists of those consumers who purchased from the wholesalers, and that the critical issue is whether or not the pass-through of manufacturers' price increases to plaintiffs is uniform. One technique to test this hypothesis involves analysis of the transactions databases of the wholesalers with indirect purchasers using a standard method of analysis, a fixed-effects panel data model. This specification allows one to test directly for the presence of different pass-through rates for individual plaintiffs. Results indicating that there are statistically significant individualized influences on measured pass-through rates would be consistent with there being differences in the degree of pass-through to different indirect purchasers. Hence, any attempt to make the pass-through effect common to all plaintiffs will lead to less reliable results, with some plaintiffs receiving substantial windfall gains or losses. Moreover, class certification would likely fail in such a case because each wholesaler's transactions database would need to be analyzed in order to determine the varied pass-throughs to class members. Such an exercise likely would stretch the bounds of manageability.

A panel data set is one in which observations are collected on identified units (or "cross sections" or "panels") over a period of time. To understand how a fixed-effects model accounts for the influence of individual factors, consider the simple regression model:

[31] *In re* South Dakota Microsoft Antitrust Litigation, S.D., 2003 SD 19, opinion filed February 12, 2003.

[32] For confidentiality reasons, use of the actual data or identifying the matter involved is not possible. However, the authors believe the example used is sufficient for the purposes of this article.

$$Y_{it} = \alpha_i + \beta_i X_{it} + \mu_{it} \, . \qquad (1)$$

Here, the dependent variable Y (price increase to indirect purchaser) and the independent variable X (manufacturer's price increase) are observed for numerous indirect purchasers (denoted by the subscript "i") for a given wholesaler over several periods of time (denoted by the subscript "t"). The fixed-effects model allows individual effects to explain variation in the dependent variable through the regression intercept term ($\alpha_i$) and the pass-through effect ($\beta_i$). That is, the intercept term and the pass-through rates are plaintiff-specific; they remain constant over time for a given purchaser but are allowed to vary across purchasers. In contrast, if the intercepts and pass-through rates are the same across plaintiffs, then equation (1) can be written

$$Y_{it} = \alpha + \beta X_{it} + \mu_{it} \qquad (2)$$

where the intercept term ($\alpha$) and the pass-through effect ($\beta$) are assumed to be common to all plaintiffs and to not vary across plaintiffs. If equation (2) is a sufficient specification for the regression model, individual characteristics do not contribute significant explanation to variation in the dependent variable. Consequently, all individual effects can be captured through a common intercept term and a common pass-through rate.

The statistical test regarding the importance of individual factors in explaining variations in the dependent variable is an F-test of whether equation (1) or (2) is a sufficient model to explain the data. If F-test results indicate that there are statistically significant individualized influences on measured pass-through rates (i.e., the more appropriate model is equation (1)), then this is consistent with there being differences in the degree of pass-through to different indirect purchasers. Accordingly, this (together with other information) would support rejecting the class if plaintiffs argued for common pass through.

## The Implication of Price Dispersion for Class Certification

The law-of-one price is a tenet of theoretical economics which states that in competitive markets comprised of many buyers and sellers, identical goods and services ought to sell in a given market at identical prices at a given point in time under conditions

of product homogeneity, zero transaction costs, zero search costs, no informational asymmetries, and no market imperfections. Indeed, in the economists' paradigm of perfect competition which embodies these assumptions, all sellers and buyers are price-takers at a single, prevailing market equilibrium price. For economists, the analysis of class certification as it pertains to price dispersion may be viewed as an empirical test of whether or not the law-of-one price holds in a particular context for a given set of plaintiffs, after properly accounting for observable factors that systematically influence pricing. Clearly, if this law-of-one price holds, then this would be statistical evidence in support of class certification. However, when the law-of-one price does not hold a class still might be certified. That is, a certifiable class might exist in the presence of price dispersion if price differences are due to systematic factors that are able to be controlled for in any but-for pricing analysis.

If price dispersion still exists after controlling for all reasonable influences that may explain observed price differences, then the law-of-one price is violated. Despite its intuitive appeal, the existence of price dispersion (which belies the law-of-one price) has been well-documented in the economics literature even for items thought to largely conform to the law-of-one price (Liu and Serfes 2005; Anderson and Palma 2003). Indeed, in a seminal paper, Stigler (1961) noted the prevalence of price dispersion in a variety of industries with seemingly homogeneous goods, a finding confirmed in more recent research (Pratt, Wise, and Zeckhauser 1979; Abbott 1994), while Lach (2002) finds that "price dispersion prevails even after controlling for observed and unobserved product heterogeneity" in his study of four homogeneous products. Even with the internet where it is thought that search costs are low compared to conventional markets, studies of internet pricing find persistent price dispersion and scant support for the phenomenon that prices on the Internet are conforming to the law-of-one price (Baye, Morgan, and Scholten 2004; Bayliss and Perloff 2002; Pan, Ratchford, and Shankar 2002).

The existence of improperly defined markets, regional/local market power, non-trivial transaction/search costs, informational asymmetries, capacity constraints, and equilibrium randomization of prices by firms, all have been cited as reasons for empirically observed price dispersion. Theoretical models of price dispersion often focus on search costs of buyers and/or capacity constraints and demand uncertainty facing firms, and how this can lead to price dispersion occurring in equilibrium (Arnold 2000; Dana 1999;

Salop and Stiglitz 1977).

Some of these factors, for example market power, might be the very reason class certification is being sought. However, this article will consider the case of how positive and significant search can result in equilibrium price dispersion.

In the absence of such search costs, buyers would have full information about prices (or could become fully informed costlessly) and likely would seek out the lowest price, guaranteeing that this would be the only one price to prevail in equilibrium. However, with positive search costs, those buyers who engage in searching in order to determine the true distribution of available prices become "informed" *vis-à-vis* those buyers who remain "uninformed." This informational asymmetry may cause markets not to obey the law-of-one price.

Indeed, it has been shown that firms with market power can exploit such market imperfections and find it profitable to engage in strategies of "equilibrium price dispersion" with respect to buyers. That is, firms recognize that consumer search costs present an opportunity to extract "rents" so that in equilibria there exists a distribution of prices resulting in persistent price dispersion in which sellers charge different prices for the same good/service.

The following simple "search cost" model, while generating price dispersion in equilibrium, illustrates that non-trivial search costs and rent extraction need not defeat class certification.[33]

Assume a continuum of consumers of two types: those who search for the lowest price for a given product and those who do not. All consumers are indexed by the search cost "s" on the interval [L, H] where those with relatively high search costs (perhaps due to high opportunity costs of their time) are close to H (for high) and those with low search costs lie closer to L (for low). Suppose there are two stores selling a single product and that both stores face the same cost of acquiring and marketing this product. A Discount store ("D") charging price $P_d$, and an Upscale store ("U") charging price $P_u$ are the two stores. For simplicity, assume all costs to be zero and that

$$P_u > P_d \qquad (3)$$

(this will be shown to exist in equilibrium). The average price faced by a shopper who does not search but, with equal probability,

[33]More complicated search cost models can be found in the industrial organization literature (e.g., Shy 1995: 421-426).

shops at either D or U is

$$\hat{P} = (P_d + P_u)/2. \qquad (4)$$

Consumers, unless they conduct a search while knowing this average price, do not know which store is type D or U.

If a consumer searches for the lowest price, he will find D and pay price

$$P_d + \alpha \cdot s \qquad (5)$$

where $\alpha$ represents the effort or preference for searching which likely varies by consumer. If a consumer does not search and shops randomly, he will pay price $\hat{P}$. Therefore, a consumer will search for the lowest price if the consumer perceives

$$\hat{P} > (P_d + \alpha \cdot s) \qquad (6)$$

and not search if the consumer does not perceive

$$\hat{P} < (P_d + \alpha \cdot s). \qquad (7)$$

A consumer will be indifferent between searching and not searching if

$$\frac{P_d + P_u}{2} = (P_d + \alpha \cdot s) \qquad (8)$$

or, solving for the optimal search cost, $\hat{s}$, using equation (8) yields,

$$\hat{s} = \frac{P_u - P_d}{2\alpha}. \qquad (9)$$

Assume that

$$H > \hat{s} > L > 0. \qquad (10)$$

Given this setup, the expected demand facing the discount store D will be

$$ED_d = \hat{s} - L + \left(\frac{H - \hat{s}}{2}\right). \quad (11)$$

Here, $(\hat{s} - L)$ represents those consumers who find it in their best interest to search and buy at D; $\left(\frac{H - \hat{s}}{2}\right)$ represents those consumers who do not search but shop randomly and end up at store D. Using equation (9), equation (11) can be written as

$$ED_d = \frac{H}{2} - L + \frac{P_u - P_d}{4\alpha}. \quad (12)$$

Therefore, recalling that all costs were assumed to be zero, store D's expected profit ($E\pi_d$) is $P_d \cdot ED_d$, or (using equation (12))

$$E\pi_d = P_d \cdot \left(\frac{H}{2} - L + \frac{P_u - P_d}{4\alpha}\right) \quad (13)$$

In deciding its optimal price, $P_d^*$, D takes the price of its competitor ($P_u$) as given, and selects its price to maximize expected profits as given in equation (13).[34] From D's first-order condition,[35] it can be shown,

$$P_D^* = \alpha(H - 2L) + \frac{P_u}{2} \quad (14)$$

which represents D's "best response function" to the price charged by U, $P_u$.

[34]In the jargon of industrial organization economics, D and U are competing according to a static Bertrand non-cooperative model of oligopoly in which price (as opposed to output) is the strategic variable.

[35]In optimization problems, a first-order condition is the first derivative of the objective function (here, D's expected profit function) with respect to the choice variable (here, D's price). First-order conditions equal to zero are necessary (but not sufficient) for the optimal value of the choice variable to be a relative maximum or minimum. Specifically, D's first-order condition is $\frac{\partial(E\pi_d)}{\partial P_d} = \left(\frac{H}{2} - L + \frac{P_u - P_d}{4\alpha}\right) - \frac{P_d}{4\alpha} = 0$ which, when solved for $P_d^*$, yields equation (14).

Exhibit 125B

The analysis with respect to U is similar to that for D. Namely, U's expected profit ($E\pi_u$) is $P_u \cdot ED_u$, where U's expected demand represents those who randomly shop (as opposed to search) and end up at U. Using equation (9), U's expected profit is

$$ED_u = \frac{H - \hat{s}}{2} \tag{15}$$

$$E\pi_u = P_u \cdot \left( \frac{H}{2} - \frac{P_u - P_d}{4\alpha} \right). \tag{16}$$

In deciding its optimal price, $P_u^*$, U takes the price of its competitor ($P_d$) as given, and selects its price to maximize expected profits as given in equation (16). From U's first-order condition,[36] it can be shown that

$$P_u^* = \alpha H + \frac{P_d}{2} \tag{17}$$

which represents U's "best response function" to the price charged by D ($P_d$). Equilibrium prices are found by simultaneously solving equations (14) and (17) for $P_d^*$ and $P_u^*$. Doing so yields

$$P_d^* = \frac{2}{3}\alpha(3H - 4L) \tag{18}$$

and

$$P_u^* = \frac{2}{3}\alpha(3H - 2L). \tag{19}$$

---

[36]S's first-order condition is $\frac{\partial(E\pi_u)}{\partial P_u} = \left(\frac{H}{2} - \frac{P_u - P_d}{4\alpha}\right) - \frac{P_u}{4\alpha} = 0$ which, when solved for $P_u$, yields equation (17).

Equations 18 and 19 show that in equilibrium there is price dispersion, namely, $P_u^* > P_d^*$.[37] That is, the discount store will charge a lower equilibrium price ($P_d^*$) for the same product than the upscale store ($P_u^*$).

The existence of price dispersion by itself, however, need not weaken the appropriateness of class certification if price differences are due to observable, measurable factors and are systematic and able to be controlled for in any pricing analysis. In the above situation, to the extent that one can properly control for "store type" in a statistical analysis of pricing, such price variability or dispersion does not represent the kind of idiosyncratic pricing strategies that make generalized assessment of impact and damages unreliable in a class setting.

## Conclusion

Whether or not impact can be proven on a common basis depends upon the facts and circumstances of each case. The authors conclude that price variation is not a sufficient condition to defeat common-impact arguments necessary for class certification. It is argued that an economic study of the existence, extent, and nature of price variability frequently is applicable in the class certification decision in antitrust matters where economic evidence may be critical in finding whether or not one size fits all.

The existence of price dispersion can be addressed within the class framework if there are systematic price adjustments for these differences. Situations such as differences in prices among long-term contracts (e.g., each contract varies according to non-price factors such as credit terms), among geographic areas (e.g., the commodity at issue is traded on a national basis but regional price differences exist), among purchases by large and small buyers (e.g., the existence of volume discounts), or among contract and spot sales (even though all prices are based upon a national price index), need not hinder the appropriateness of class

---

[37] To see this, note that from equations 18 and 19, $P_s^* - P_d^* = \frac{4}{3}(\alpha L) > 0$. Also, note that an increase in the cost or effort associated with searching ($\alpha$) serves to increase the spread between the two equilibrium prices, while a decrease in $\alpha$ causes both prices to become more competitive in that they converge toward cost (zero in this case).

Exhibit 125B

treatment if such differences are systematic and reasonably can be controlled for in any but-for analysis.

In other instances, however, price variation among class members may be due to idiosyncratic influences making a generalized assessment of impact and damages unreliable and less appropriate than plaintiff-specific analysis. For example, if pass-through behavior varies substantially and idiosyncratically with respect to how it affects the prices paid by putative class members, then calculations of impact and damages will be less reliable if treated as a class than if done individually.

Exhibit 125B

## References

### Articles

Abbott, T. 1994. Observed price dispersion: Product heterogeneity, regional markets, or local market power? *Journal of Economics and Business* 46: 21-37.

Anderson, S. and A. Palma. 2003. Price dispersion. *Virginia Economics Online Papers* 361, University of Virginia, Department of Economics.

Arnold, M.A. 2000. Costly search, capacity constraints and Bertrand equilibrium price dispersion. *International Economic Review* 41: 117-131.

Baye, M., J. Morgan, and P. Scholten. 2004. Price dispersion in the small and in the large: Evidence from an internet price comparison site. *Journal of Industrial Economics* 52(4): 463-496.

Bayliss, K. and J. M. Perloff. 2002. Price dispersion on the internet: good firms and bad firms. *Review of Industrial Economics* 21: 305-324.

BNA, Inc. 2006. Monsanto defeats class certification in corn seed monopolization suit. *Antitrust and Trade Regulation Report* 91 (2282): 604.

Burch. E. C. 2004. Between 'merit inquiry' and 'rigorous analysis': Using Daubert to navigate the gray areas of federal class action certification. *Florida State University Law Review* 31: 1041.

Cook, C. and C. Rugg. 2006. Class certification should not be automatic in price fixing actions. *ABA Committee on Class Actions and Derivative Suits* 16(2): 4-13.

Dana, J. 1999. Equilibrium price dispersion under demand uncertainty: The roles of costly capacity and market structure. *RAND Journal of Economics* 30: 632–660.

Hussain, S., D. Garrett, and V. Howell. 2001. Economics of class certification in indirect purchaser antitrust cases. *The Journal of the Antitrust and Unfair Competition Law Section of the State Bar of California* 10(1): 18-52.

**Exhibit 125B**

Lach, S. 2002. Existence and persistence of price dispersion: An empirical analysis. *Review of Economics and Statistics* 84: 433-442.

Liu, Q. and K. Serfes. 2005. The effect of market structure on price dispersion: An analysis of the U.S. airline industry. University of Oklahoma, Department of Economics Working Paper.

Nieberding, J. and R. Cantor. 2004. Price dispersion, the 'Bogosian short cut,' and class certification in antitrust cases. *Economics Committee Newsletter* distributed at the American Bar Association (ABA) Antitrust Section Spring Meetings, March 31, 2004. (Reprinted in *Texas Business Litigation Quarterly*, Spring 2005, 23-25).

Nieberding, J. F. 2006. Estimating overcharges in antitrust cases using a reduced-form approach: Methods and issues. *Journal of Applied Economics* IX (2): 361-380.

Page, W. H. 1999. Limits of state indirect purchaser suits. *Antitrust Law Journal* 67: 11-12.

Pan, X., B. Ratchford, and V. Shankar. 2002. Can price dispersion in online markets be explained by differences in e-tailer service quality? *The Journal of the Academy of Marketing Science* 30: 429-441.

Pratt, J. W., D. A. Wise, and R. Zeckhauser. 1979. Price differences in almost competitive markets. *Quarterly Journal of Economics* 93(2): 189-211.

Salop, S. and J. Stiglitz. 1977. Bargains and ripoffs: A model of monopolistically competitive price dispersion. *Review of Economic Studies* 44: 493-510.

Shy, O. 1995. *Industrial organization: Theory and applications*. Cambridge, MA: The MIT Press.

Stigler, G. 1961. The economics of information. *Journal of Political Economy* 69: 213-225.

Supreme court rejects plea for review of class certification ruling. 2003. *Class Action Litigation Reporter* 10(5): 10.

**Statutes and Rules**

Federal Rules of Civil Procedure, Rule 23(a)(1)-(4).

Federal Rules of Civil Procedure, Rule 23(b)(3).

**Cases**

*A & M Supply v. Microsoft Corp.,* 252 Mich. Ct. of Appeals, opinion filed August 27, 2002, at 27, 29, and 34.

*American Seed Co., Inc. v. Monsanto Co.,* D. Del., Civ. No. 05-535-SLR, (November 13, 2006).

*Bogosian v. Gulf Oil Corp.,* 561 F.2d 434 (3d Cir. 1977).

*Bromine Antitrust Litigation,* 203 F.R.D. 26-27 (S.D. Ind. 2001).

*Burkhalter Travel Agency v. MacFarms Int'l., Inc.*, 141 F.R.D. 154 (N.D. Cal. 1991).

*Butt v. Allegheny Pepsi-Cola Bottling Co.,* 116 F.R.D. 488, 491, 493 (ED Va 1987).

*Daubert v. Merell Dow Pharms., Inc.,* 509 U.S. 579 (1993).

*Erie Forge v. Cyprus Minerals Co.* (W.D. Pa.) 19 (July 27, 1995).

*Gen. Elec. Co. v. Joiner,* 522 U.S. 136 (1997).

Industrial Diamonds Antitrust Litigation, 167 F.R.D. 383 (S.D.N.Y. 1996).

*Kumho Tire Co. v. Carmichael*, 526 U.S. 137 (1997).

Linderboard Antitrust Litigation, (MDL No. 1261), filed September 5, 2002 (Third Circuit).

Magnetic Audiotape Antitrust Litigation, 2001 (U.S. Dist. LEXIS 7303, 14, 19 (S.D.N.Y. June 6, 2001).

**Exhibit 125B**

*McIntosh v. Monsanto Co.* (E.D. Mo.), Case No 03-3993 (March 7, 2005), at 12-14.

NASDAQ Market-Makers Antitrust Litigation, 169 F.R.D. 523 (S.D.N.Y. 1996).

Polypropylene Carpet Antitrust Litigation, 178 FRD 603, 618 (ND Ga, 1997).

South Dakota Microsoft Antitrust Litigation, S.D., 2003 SD 19, opinion filed February 12, 2003.

VisaCheck/MasterMoney Antitrust Litigation, 280 F.3d 124 (2d Cir. 2001), at 139.

Visa Check/MasterMoney Antitrust Litig., 192 F.R.D. 68 (E.D.N.Y. 2000).

*Wal-Mart Stores, Inc. v. Visa U.S.A., Inc.*, 280 F.3d 124 (2d Cir. 2001), at 7.

*Westfeld v. Sun Chem. Corp.,* 210 F.R.D. 136, 143-44 (D.N.J. 2002), *aff'd* (3d Cir. 2004).

Exhibit 125C

# ECONOMICS OF CLASS CERTIFICATION IN INDIRECT PURCHASER ANTITRUST CASES

SAMID HUSSAIN, PH.D.
DANIEL M. GARRETT, PH.D.
VANDY M. HOWELL, PH.D.*

## Introduction

The objective of this paper is to analyze the economics surrounding indirect purchaser antitrust cases. Two key issues considered by the courts are common impact and whether damages are subject to common proof. In such cases, antitrust impact (or fact of injury) and damages often hinge on the actions of wholesalers, distributors, retailers at the intermediate level, and final purchasers at the end-user level. This paper focuses on the following questions:

How do retailers behave? What are the implications of this behavior on the extent to which the alleged overcharge is passed on to consumers?

How do consumers behave and how does their behavior bear on damages?

What are the implications of retailer and consumer behavior for class conflict?

In indirect purchaser antitrust cases, it is often assumed that wholesalers, distributors, and retailers conform to an extreme case of perfect competition (where supply is assumed to be perfectly elastic).[1]

* Samid Hussain is an Associate, Daniel M. Garrett is a Manager, and Vandy M. Howell is a Manager at Cornerstone Research, Menlo Park, CA. Opinions expressed in this paper are solely those of the authors and do not necessarily represent the views of Cornerstone Research.

1 A perfectly elastic industry supply means that any expansion of output does not result in the increase of unit costs.

This assumption means that the intermediaries would fully pass on an alleged overcharge to final purchasers. The first question addressed in this paper is whether real world behavior departs from this assumption of full pass-on. Our review of the empirical evidence shows that the retail sector rarely conforms to this (extreme) perfect competition paradigm. Consequently, pass-on is best assessed empirically. Regarding the second question, how consumer behavior bears on the calculation of damages, we find that consumer differences in purchasing behavior can affect damages. In such cases, an accurate calculation of damages should account for individual-level behavior. Finally, in answer to the third question, whether variation in behavior at the distribution and end-user levels creates class conflict, we find that, in certain circumstances, such a variation may place the financial interests of some of the proposed class members at odds with other class members.

The paper is organized into five sections. Section II provides a brief overview of the landmark court decisions regarding indirect class certification. Section III focuses on the behavior of distributors and retailers to determine if simple descriptions of perfect competition are consistent with empirical evidence. Section IV shifts the discussion to consumer behavior to draw attention to potential diversity in consumer behavior and ways it can complicate damage issues on a classwide basis. Section V characterizes situations where the financial interests of some of the proposed class members may conflict with other class members. Section 5 discusses conclusions.

## The Legal Environment Surrounding Indirect Purchaser Antitrust Cases

Three landmark Supreme Court decisions, *Hanover Shoe, Inc. v. United Shoe Machinery Corp.*, *Illinois Brick Co. v. Illinois*, and *California v. ARC America Corp.* were instrumental in defining and limiting the certification of indirect classes.[2] The *Hanover Shoe* decision in 1968 prohibited the use of the pass-on argument by the *defense*

2 *Hanover Shoe, Inc. v. United Shoe Machinery Corp.*, 392 U.S. 481 (1968); *Illinois Brick Co. v. Illinois,* 431 U.S. 720 (1977); *California v. ARC America Corp.,* 490 U.S. 93 (1989). Some of the other key cases that set the stage for *Illinois Brick* are:

*Continued on Page 20*

against direct purchasers.[3] In a similar vein, the *Illinois Brick* decision in 1977 prevented indirect purchasing plaintiffs from bringing cases.[4]

---

*Continued from Page 19*

*Chattanooga Foundry& Pipe Works v. City of Atlanta,* 203 U.S. 390 (1906): The Supreme Court held that the city could sue for direct purchaser damages due to a water pipe cartel. In this case, no one brought up the argument that the city could pass on the overcharge to its water customers. Some view this case as a precursor to *Illinois Brick* and *Hanover Shoe.*

*Atlantic City Elec. Co. v. General Electric Co.,* 337 F.2d 844 (1964): Defendants protested that plaintiffs would receive a windfall from litigation because they were able to pass on any overcharge to the consumers. The court ruled that the defendants received a windfall from fixing prices and there was no injustice in transferring that windfall to plaintiffs.

*Hawaii v. Standard Oil,* 405 U.S. 251 (1972): The Supreme Court ruled that the State of Hawaii could not pursue a *parens patriae* claim against four oil refiners who conspired to restrain trade. The court was concerned about duplicative recovery. In 1976, Congress enacted the *Hart-Scott-Rodino Antitrust Improvements Act*, which was added to the Clayton Act. This allowed any state attorney general to sue in a federal district court as *parens patriae* on behalf of natural persons residing in such State to secure monetary relief

3 In *Hanover Shoe,* plaintiff was a direct purchaser, alleging injury by antitrust violation. Defendants argued that they should be allowed to show that the plaintiff passed on the costs of the violation to its customers. The facts of Hanover Shoe presented a particularly complicated problem with respect to the pass-on issue. The product involved, shoe manufacturing machinery, was not itself resold by plaintiff. In effect, the court was being asked to determine whether plaintiff s pricing decision for shoes reflected the illegal overcharge for the machinery which was used in their manufacture. *See B.W.I. Custom Kitchen v. Owens-Illinois*, 235 Cal. Rptr. 228 (1987).

4 In *Illinois Brick*, the plaintiffs were indirect purchasers, alleging passing on of all or part of the overcharge by the direct purchasers. The court summarized the task that lay before it as follows: Having decided [in *Hanover Shoe*] that in general a pass-on theory may not be used defensively by an antitrust violator against a direct purchaser plaintiff, we must now decide whether that theory may be used offensively by an indirect purchaser plaintiff against an alleged violator.

For nearly a decade following the *Illinois Brick* ruling, efforts to overturn the *Illinois Brick* decision took place on several fronts. Congress instigated one unsuccessful front. It considered several bills that would have overturned *Illinois Brick* but was unable to pass any of them. A more successful effort was launched by the individual states. A number of states either repealed the *Illinois Brick* rule for private actions or used their pre-*Illinois Brick* antitrust and consumer protection statutes to authorize indirect purchaser suits. In 1989, the Supreme Court decision in *California v. ARC America Corp.*[5] legitimized indirect purchaser suits in state courts.[6] Consequently, the statutory schemes vary from state to state, and when combined with federal antitrust law, they make for what amounts to a broad spectrum of antitrust law that varies by jurisdiction. [7]

**Behavior of Distributors and Retailers and Implication for Pass-On**

The assumption of an overcharge paid by direct purchasers is insufficient on its own to guarantee that entities further down the distribution chain pay the overcharge. Fundamentally, it is important to know the extent to which direct purchasers pass on any overcharge to their immediate customers, the extent to which these customers pass on any overcharge they might pay, and so on down the distribution chain until the final customers are reached. An economist asked to determine how an overcharge was passed on through the distribution chain might turn to incidence analysis. Incidence analysis is an economic theory of how an initial overcharge affects prices at the next stage of distribution. Incidence analysis is so named because it draws on the economic literature on tax incidence, which seeks to answer who pays particular taxes. In general, economists simplify incidence analysis by assuming wholesalers and retailers set prices under a realm of perfect competition.

5 490 U.S. 93 (1989).

6 Numerous indirect purchaser lawsuits across different states followed this favorable ruling for local repeals of *Illinois Brick*. Table 1 in appendix A reports the outcomes of the key indirect class certification cases across states. This table is adapted from and has been updated with more recent cases (*See* William H. Page, *The Limits of State Indirect Purchaser Suits: Class Certification in the Shadow of Illinois Brick*, ANTITRUST L.J., (1999). It shows how indirect purchasers have fared differently in different states.

7 See Blair & Harrison, *Reexamining the Role of Illinois Brick in Modern Antitrust Standing Analysis*, GEO. WASH. L. REV., (December 1999).

Exhibit 125C

Perfect competition imposes a very restrictive set of conditions/assumptions. For example:

It assumes that there are a large number of small buyers and sellers that maximize profits. These buyers and sellers do not have market power on the buying or selling side.

There is no strategic interplay between and across the buyers and sellers. All buyers and sellers, including the ultimate consumers, have full information about prices, products, and availability.

All intermediaries sell an identical product. Consumers are therefore expected to be indifferent between products sold by the sellers.

## Incidence Theory

Incidence theory implies that an overcharge will be fully passed on to the ultimate consumers under two extreme cases.[8] In the first case, the industry supply at the intermediate level is assumed to be perfectly elastic, meaning that any expansion of output does not result in an increase in unit costs.[9] The second case is encountered when the demand of ultimate consumers is perfectly inelastic, meaning that the consumers continue to buy a fixed quantity of the product irrespective of price changes. However, in reality neither of these two assumptions accurately describes most real-world markets. At the very least, empirical analysis would be required.

More generally, incidence analysis requires estimating supply and demand elasticities and then using those estimates to determine

---

8 Note that there are two other extreme cases that predict that direct purchasers do not pass on the overcharge. These two cases are theoretical possibilities and are unlikely to be encountered in a cartel context.

9 Supply refers to the industry supply at the intermediate level while demand refers to the demand of ultimate consumers or indirect purchasers. Elasticity is defined as the sensitivity of quantity demanded (or supplied) to price changes. It can be thought of as the percentage change in the quantity demanded (or supplied) due to a one percent increase in the price of that good.

**Exhibit 125C**

pass-on under conditions of perfect competition.[10] Pass-on can vary from 0 to 100 percent, depending upon the elasticities. However, it is important to realize that incidence theory assumes perfect competition, a condition that might not be met by all markets.

**Simple Stories of Perfect Competition Associated with Incidence Analysis Are Problematic**

One major problem with the incidence approach, in addition to the assumption of perfect competition, is that the extent of pass-on is ambiguous without reliable estimates of demand and supply elasticities. In *Illinois Brick*, the court called attention to this limitation.[11] Landes & Posner (1979) reiterate the empirical challenges surrounding the determination of pass-on due to its reliance upon reliable estimates of elasticities of supply and demand.[12]

A more fundamental problem with incidence theory is its assumption that the intermediate level of distribution is perfectly competitive. Courts at both the federal and state levels are cognizant of the inadequacy of simplistic economic models in depicting the realities of the actual market.[13] Furthermore, indirect certification cases, such as *Execu-Tech Business Systems, Inc. v. Appleton Papers Inc.*, *McCarter v. Abbott Labs.*, and *Wood v. Abbott Labs.*, call attention to the importance of test-

10 Specifically, the rate of pass-on assuming competitive intermediaries is defined as follows: Rate of Pass-On = (elasticity of supply)/(elasticity of supply + elasticity of demand).

11 The court held that, even if these assumptions [of perfect competition] are accepted, there remains a serious problem of measuring the relevant elasticities the percentage change in the quantities of the passer s product demanded and supplied in response to a one percent change in price. *Illinois Brick v. Illinois* (431 U.S. 720, 1977).

12 *See* Landes & Posner, *Adjudication as a Private Good*, J. LEGAL STUDIES, (March 1979).

13 In *Illinois Brick*, the Supreme Court explained that, in the real economic world rather than an economist s hypothetical model, the latter s drastic simplifications generally must be abandoned. Overcharged direct purchasers often sell in imperfectly competitive markets. They often compete with other sellers that have not been

*Continued on Page 24*

ing whether, in reality, markets conform to the perfectly competitive paradigm. Therefore, an important question to answer is: are intermediaries, such as retailers, perfectly competitive?

The empirical literature on retailing, summarized in Table 1, shows that retail margins and prices vary across time, brands, geographical locations, and stores. These findings suggest a significant departure from perfect competition in the retail sector.

A survey of empirical research shows that a variety of factors contribute to this variation. These factors, explained in Appendix B, include:

¥ Differences in pricing strategies

¥ Variation in promotion programs

¥ Variation in menu costs

¥ Magnitude of cost shocks and speed of adjustment

¥ Degree of advertisement

¥ Differences in types of services offered

¥ Economies of scale

¥ Private label penetration

¥ Informational and locational asymmetries

---

*Continued from Page 23*

subject to the overcharge; and their pricing policies often cannot be explained solely by the convenient assumption of profit maximization. In *Execu-Tech Business Systems, Inc. v. Appleton Papers Inc.* (No. 96-9636 CACE 05, 1997 (Fla. App. 4 Dist.)), the court noted that, [t]he unacceptability of the assumptions and the near-impossibility of measuring the relative elasticities renders incidence analysis little more than a guessing game in practice  In at least two other cases (*e.g.*, *Wood v. Abbott Labs.*, 1997 WL 824019, and *Durden v. Abbott Labs.*, No. CV 93-663, 1996), the restrictive assumptions of perfect competition were found to be inconsistent with empirical evidence that showed significant deviation from the competitive paradigm. *See* Coutroulis & Allen, *The Pass-on Problem in Indirect Purchaser Class Litigation*, THE ANTITRUST BULL., (Spring 1999).

**Exhibit 125C**

**Table 1: Empirical Literature on Margins and/or Prices**

| Index | Year | Source | Data | Product | Type of Variation | Key Findings |
|---|---|---|---|---|---|---|
| 17 | 1986, 1998 | Census of Retail Trade (CRT)[17] | CRT, 1986, 1998 | Average Retail Gross Margins for a Given Store Type | Cross Sectional & Time Series Variation | Retail margins differed across different types of stores.<br>Store Type<br>Retail Margin 1986<br>Retail Margin 1998<br>Grocery stores<br>23.4%<br>25.9%<br>Drug stores<br>30.1%<br>28.4%<br>Gasoline stations<br>20.7%<br>21.8%<br>Liquor stores<br>25.5%<br>28.0% |
| 18 | 1980-1984 | Borenstein, 1991[18] | NPD, Inc., 1980-84 | Unleaded and Leaded Gasoline | Cross Sectional & Time Series Variation | Significant cross-sectional and time-series variation of retail margin differences between unleaded and leaded gasoline. |
| 19 | 1986-1992 | Borenstein & Shepard, 1996[19] | Lundberg Survey of 43 cities over 72 months, 1986-92 | Gasoline | Cross Sectional & Time Series Variation | Retail-terminal margins varied substantially.<br>• Minimum Retail Margin: -8.00 cents/gallon<br>• Maximum Retail Margin: 34.90 cents/gallon<br>• Standard deviation: 5.43 (19% of mean margin) |
| 20 | 1984-1985 | Slade, 1998[20] | Information Resources, 1984-85 | Saltine Crackers | Cross Sectional & Time Series Variation | Prices were highly volatile whereas the costs were less volatile. |
| 21 | 1993 | Steiner, 1993[21] | Chain Store Age Supermarkets, various years | Cigarettes | Cross Sectional Variation | Retail gross margins differed across types of retailers. |
| 22 | 1994 | Adams, III, 1997[22] | Author's survey of 20 convenience stores offering gasoline and in-store items in Auburn/Opelika, Alabama | Variety of Items* | Cross Sectional Variation | Dispersion in prices existed across similar stores for the same items. |
| 23 | 1987-1988 | Warner & Barsky, 1995[23] | Survey conducted by Warner in Ann Arbor, Michigan | Variety of Products** | Cross Sectional & Time Series Variation | Prices varied across different types of retail stores for a given good. |
| 24 | 1991-1992 | Levy, et al., 1997[24] | Electronic Shelf Label (ESL) Systems | Shelf prices in five large Supermarket chains | Cross Sectional & Time Series Variation | The percentage of products for which prices changed is on average per week very similar across the chains. |
| 25 | N/A | Ambrose, 1979[25] | Pricing Survey conducted by Ambrose in Omaha, Nebraska and surrounding areas from 34 stores | 54 items*** | Cross Sectional Variation | • Inner city prices were closer than both suburban and rural grocery prices.<br>Variation in prices in rural areas is significantly higher than the variation in prices in urban suburban or rural prices. |

* Brand Name Cigarettes, Beer (Budweiser and Miller), Coca-Cola, Chocolate Bars (Snickers and Hershey), Potato Chips (Frito Lay), etc.
** Action Figure (GI Joe), Bathroom Towels (Fieldcrest), Bicycle (Huffy Vortex), Photographic Camera (Minolta Freedom 200), Power Drill (Black & Decker), Food Processor (Big Oskar), Men's Sweater (Crewneck), Television (Sony KV1363).
*** Cereal and bakery products, meat, poultry, fish, dairy products, fruits, vegetables, and other home foods.

---

17 "Annual Benchmark Report for Retail Trade," U.S. Census Bureau, 1990-1999, U.S. Department of Commerce.
18 Severin Borenstein, *Selling Costs and Switching Costs: Explaining Retail Gasoline Margins*, RAND J. ECON., (Autumn 1991).
19 Borenstein & Shepard, *Sticky Prices, Inventories, and Market Power in Wholesale Gasoline Markets*, National Bureau of Economic Research (working paper #5468), (February 1996).
20 Margaret E. Slade, *Optimal Pricing with Costly Adjustment: Evidence from Retail-Grocery Prices*, REV. ECON. STUDIES, (1998).
21 Robert L. Steiner, *The Inverse Association Between the Margins of Manufacturers and Retailers*, REV. INDUS. ORG., (1993).
22 Frank A. Adams III, *Search Costs and Price Dispersion in a Localized, Homogeneous Product Market: Some Empirical Evidence*, REV. INDUS. ORG. (1997).
23 Warner & Barsky, *The Timing and Magnitude of Retail Store Markdowns: Evidence from Weekends and Holidays*, Q. J. ECON., (1995).
24 Daniel Levy, *The Magnitude of Menu Costs: Direct Evidence from Large U.S. Supermarket Chains*, Q. J. ECON., (August 1997).
25 David M. Ambrose, *Retail Grocery Pricing: Inner City, Suburban and Rural Comparisons*, J. BUS., (January 1979).

**Exhibit 125C**

A more realistic characterization of the retail markets downstream from the manufacturer, which is consistent with the empirical evidence, is that of monopolistic competition with varying degrees of oligopoly and monopsony, depending on the product class.[14,15] In these markets, the retailers are price-makers rather than price-takers. [16] When retailers interact in a world of imperfect competition, the extent of pass-on cannot be determined by incidence theory alone. In such a world, pass-on is best assessed empirically.

**Select Features of the Empirical Approach and Court Rulings on Empirical Analyses**

An empirical approach need not assume that the wholesale level and retail level are perfectly competitive. Rather wholesalers and

---

14 See Steiner, 1993; Betancourt & Malanoski, An Estimate Model of Supermarket Behavior: Price, Distribution Services and Some Effects of Competition, EMPIRICA1, (1999).

15 In some markets, retailing is viewed as an oligopoly because strategic interaction exists between a few competitors that enjoy substantial market shares. Such market shares are often exploited to dictate relationships with manufacturers in order to earn varying degrees of profits. *See* Shepard, A., *Price Discrimination and Retail Configuration*, J. POL. ECON., (1991); Cotterill & Haller, *Barrier and Queue Effects: A Study of Leading US Supermarket Chain Entry Patterns*, 40 J. INDUS. ECON., (1992); Bruce W. Marion, *Changing Power Relationships in US Food Industry: Brokerage Arrangements for Private Label Products*, AGRIBUSINESS, (April 1998); Park & Weliwita, *Competitive Behavior in the Food Retailing Industry*, CAN. J. AGRIC. ECON., (March 1999). Leveraged buyouts, increasing concentration in food retailing due to mergers and acquisitions, and financial restructuring are some of the reasons for the shift away from competitive behavior. *See* Judith A. Chevalier, *Capital Structure and Product Market Competition: Empirical Evidence from Supermarket Industry*, AM. ECON. REV., (1995); Park & Weliwita, *supra*. A detailed discussion of changes in channel structure can be found in Messinger & Narasimhan, *Has Power Shifted in the Grocery Channel?*, MARKETING SCI., (1995). In some other markets, retailing is better approximated by monopolistic compe-

*Continued on page 27*

retailers can be studied and market dynamics are incorporated in the determination of pass-on.[26] Some of the key features of the empirical approach, as well as some court rulings that support an empirical assessment of pass-on, are:

*Estimating Pass-On at the Store Level*

A key feature of the empirical approach is to determine whether manufacturer price increases during an alleged cartel period were in fact passed on by wholesalers and retailers in the form of higher retail prices. This involves determining whether retail prices rise predictably after manufacturer prices increase. It is also important to determine whether retailers responses to price increases *change* during the alleged cartel period. A lack of consistent relationship between manufacturer list prices and retail prices suggests that impact can be established and damages calculated only on an individualized basis. On the other hand, a consistent relationship between list prices and retail prices may suggest that overcharges to direct customers would have a classwide effect determinable through common proof.

---

*Continued from page 26*

tition where firms are somewhat differentiated and entry is relatively easy. *See* Dobson & Waterson, *Retailer Power: Recent Developments and Policy Implications*, ECON. POL Y, (1999).

16 *See* Daniel Levy, *Price Adjustments at Multiproduct Retailers*, MANAGERIAL & DECISION ECON., (forthcoming, 1998).

NOTE: Footnotes 17 - 25 appear on page 25 with Table 1.

26 This approach recognizes that the distribution path from the first purchaser to the ultimate consumer can be quite varied and complex. In the simplest example of an indirect purchaser distribution chain, manufacturers sell directly to retailers. In a more complex example, manufacturers sell to intermediaries (such as a wholesaler or a distributor) who then sell the product to retailers. The important point is that there need not be a single intermediary between manufacturers and retailers. Often, an industry s distribution channels include a mixture of zero, one, two, or more intermediaries between manufacturers and retailers. In *Derzon v. Appleton* (No. 96-CV-3678, 1998), the Circuit Court of Wisconsin held that, the many levels of distribution separating these

*Continued on page 28*

**Exhibit 125C**

*Testing Variation in Prices or Lack Thereof*

Another important feature of the empirical approach is to test whether there is a significant variation in retail prices, as this is indicative of departure from the competitive market assumptions. Observed variation in retail prices, given uniform manufacturer prices, under reasonable conditions shows that retailers have different markups and/or their wholesalers have different markups. These retailers are making different pricing decisions and therefore different pass-on decisions.[27] This suggests that any overcharge is not likely to be uniformly passed on to consumers. In other words, the determination of common impact and quantification of damages is complicated by the presence of the wide variation in the prices that proposed class members paid during the alleged class period. Conversely, lack of variation in retail prices, given uniform manufacturer prices, suggests that an overcharge is likely to be uniformly passed on to consumers.

---

*Continued from page 26*

consumers from the defendants makes it completely unmanageable in the absence of clear methodology for proof of damages by common evidence. [T]he jury will still have to consider the extent to which any price increase was passed on at each stage of distribution. Page, 1999 (*Id.* note 6), notes that most of the decided cases in the past have involved one intermediate actor. For example, courts in the infant formula cases construed toy stores and supermarkets as a single intermediary. Similarly, the Florida Circuit Court in the thermal fax paper case construed all paper converters as a single intermediary (*Execu-Tech v. Appleton Papers*, No. 96-9636 CACE 05, 1997). In the prescription drug cases, however, the courts differed in their interpretation of the number of intermediate sellers. In Maine and Minnesota, where the class was denied certification, the courts recognized two intermediate levels between the defendants and the indirect purchasers (*Karofsky v. Abbott Labs.*, No. CV-95-1009, 1997; *Kerr v. Abbott Labs.*, No. 96-002837, 1997). In the District of Columbia, where the class was certified, the court held that wholesalers were part of the conspiracy and that there was a single intermediate seller (*Goda v. Abbott Labs.*, No. 1445-96 1997).

27 Some of these alternative pricing strategies are described in Appendix B.

Exhibit 125C

Several courts have considered empirical evidence on retail prices in deciding whether damages are individualized for each member of the class. For example, in *Execu-Tech v. Appleton Papers*, the court held that the defendant s empirical findings showing variation in retail prices were vitally important.[28] In *Wood v. Abbott Labs.*, the defendant s expert was also able to demonstrate tremendous variation in pricing and discounting by manufacturers.[29] In *Kerr v. Abbott Labs.*, the court held that, [t]he dissimilarities inherent in purchases of various brand-name drugs, from various retailers, under varying terms, precludes a uniform method for calculating damages. [30] In *Durden v. Abbott Labs.*, the court held that, [w]hether infant formula price increases are passed on to consumers would have to be evaluated on at least a retailer by retailer basis. Since different consumers bought from different retailers, the evaluation would need to be made one consumer at a time. Injury and damages are therefore not common issues. [31] In

28 In this case, the defendant s expert used survey data to show significant variation in thermal fax prices across store locations, types of stores, and within types of stores. The expert also used regression analysis to reveal that most of the variation in retail prices could not be explained by the observables. The court denied certification on the ground that only individual level analysis of the transactions could explain the bulk of the variation in prices paid by the indirect purchasers (*Execu-Tech v. Appleton Papers*, No. 96-9636 CACE 05, 1997).

29 The court noted, examining 7 drugs over 2 different time periods, showed that, when manufacturers increased their list prices, 24.4% of the retailers did not increase their prices to consumers (*Wood v. Abbott Labs*, 1997 WL 824019).

30 *Kerr v. Abbott Labs.*, 1997-1 Trade Cas. (CCH) *f* 776, 1997 WL 314419, Minnesota District Court.

31 *Durden v. Abbott Labs.*, No. CV 93-663, Alabama Circuit Court, Calhoun County, January 16, 1996. Furthermore, the court emphasized the importance of empirical investigations: Dr. McLeod [defendant s expert] reviewed extensive empirical evidence. McLeod testified that, during the relevant period, some stores passed on 100% of manufacturer price increases, some stores passed on part of these increases, and a significant number of stores did not pass on any part of the price increase at all. Moreover, the court criticized the Plaintiff s expert for

*Continued on page 30*

*McCarter v. Abbott Labs.*, the courts also interpreted the variation in retail prices to mean that retail sales were decidedly individualized.[32] In *Fischenich v. Abbott Labs.*, the court noted that, the indirect purchasers paid different retail prices for the formula and that the plaintiffs had no idea of the prices paid, quantity purchased, and the dates of purchase.[33] This inability to reconstruct purchases in *Fischenich v. Abbott Labs.* was pointed out by the court in *Gordon v. Microsoft*. In that case, in certifying the class, the court held that, consumers are much more likely to remember, and perhaps even to have a record of, when they purchased a computer than when they purchased baby food [a]lthough class members may recall fewer details about purchasing a shrink-wrapped product than a PC, there will still be far fewer purchases to reconstruct than the weekly or even daily purchases of infant formula.[34]

These cases illustrate that an empirical examination of variation in retail prices, or lack thereof, as well as the ability to reconstruct the retail prices actually paid by the consumers, are important in establishing whether damages are individualized for each member of the class.

*Examining Variation in Promotion Programs and Participation*

An examination of variation in promotion programs (offered by manufacturers, wholesalers, and retailers) and variation in participation in these programs (by entities down the

---

*Continued from page 29*

not testing theory with data: Unlike Dr. McLeod, Dr. Beyer s theory is not supported by any empirical data. Dr. Beyer admitted that his theory is not only not tested but not testable. (p. 7) Dr. Beyer s theory of 100% passthrough of the price of baby formula and the damages, if any, being confined only to that class of individuals purchasing baby formula amounts to evidentiary voodoo.

32 *McCarter v. Abbott Labs.*, No. CV 91-050, Alabama Circuit Court, Shelby County, April 9, 1993.

33 *Fischenich v. Abbott Labs.*, No. MC-94-6868, Minnesota District Court, Hennepin County, May 26, 1995.

34 *Gordon, et al. v. Microsoft Corporation*, No. 00-5994, Minnesota District Court, Hennepin County, February 5, 2001.

distribution chain) can be critical as it may lead to variation in prices at the wholesale and retail levels and thus varying degrees of pass-on. This is because only a subset of wholesalers and retailers may qualify for these programs and, of those that qualify, some may choose not to participate. Furthermore, the degree of participation may also vary across the participants. This variation in participation results in purchasers effectively paying different prices. Conversely, if most wholesalers and retailers qualify for promotion programs and the participation rates are similar, then such promotion programs are less likely to contribute towards variation in wholesale and retail prices.

The courts recognized these arguments in *McCarter v. Abbott Labs.* and *Execu-Tech v. Appleton Papers*.[35] In the former, the Alabama Circuit Court called attention to the occasional volume discounts offered by the defendants to certain retailers. In the latter case, William H. Page notes that the court found that prices at the manufacturing level were negotiated for each transaction. Some sales involved price-protection clauses, which prevent any general price increase from being imposed on a particular buyer, and others involved discounts, bonuses, or rebates. Moreover, some price increases were not applied to certain intermediate purchasers. All of these factors contributed to the conclusion that the individual issues would outweigh the class issues in the proof of impact on indirect purchases. [36]

*Identifying Product Heterogeneity or Lack Thereof*

Another feature of the empirical approach relates to identifying product heterogeneity, or lack thereof, because impact and damages may vary across heterogeneous products. Since product heterogeneity in terms of types, brands, and grades implies that markups and pass-on are likely to vary, it is relatively easy to demonstrate that the impact and the amount of damages are likely

---

35 *McCarter v. Abbott Labs.*, No. CV 91-050, Alabama Circuit Court, Shelby County, April 9, 1993. *Execu-Tech Business Sys., Inc. v. Appleton Papers, Inc.*, No. 96-9636 CACE 05, Florida Circuit Court, Broward County, December 15, 1997.

36 *Id.* note 6.

**Exhibit 125C**

to differ across class members.[37] In *Execu-Tech v. Appleton Papers*, the court rejected plaintiffs proposed expert testimony because it rested on unrealistic assumptions that were contradicted by empirical realities.[38] One of those assumptions was that the product was homogeneous. This assumption did not hold because manufacturers sell different types and grades of thermal fax papers that are not perfectly substitutable. In *Kerr v. Abbott Labs.*, the court identified the existence of various brand-name drugs as one of the factors that would make a class action unmanageable.[39]

Any alteration in the product across the distribution levels also complicates the pass-on analysis. If the product is transformed or altered in a significant way between manufacturer and consumer, then it may be very difficult to determine the extent to which final retail prices incorporate any of the manufacturer overcharge to the ultimate consumer. This is because the final retail price also incorporates the value added by intermediaries between manufacturer and consumer. Although a Minnesota court accepted this type of argument in *City of St. Paul v. FMC Corp.*,[40] the California Superior Court in *Microsoft* was not fully persuaded by a similar argument. Specifically, in *City of St. Paul v. FMC Corp.*, the court held that the chlorine product was sold in cylinders of different sizes and the smaller cylinders were repackaged. Direct purchasers and other intermediaries added value in terms of

---

37 According to Coutroulis & Allen, [i]f product differentiation exists, the initial premise of incidence analysis is not satisfied because there is no well-defined single market. Separate supply and demand elasticities would need to be estimated for each relevant product market. If the degree of product differentiation, as shown by the actual evidence, is substantial, this will militate against using common proof to estimate pass-on and will instead require an individualized analysis. *See* Coutroulis & Allen, *The Pass-on Problem in Indirect Purchaser Class Litigation*, THE ANTITRUST BULL., (Spring 1999).

38 *Execu-Tech v. Appleton Papers*, No. 96-9636 CACE 05, Florida Circuit Court, Broward County, December 15, 1997.

39 *Kerr v. Abbot Labs.*, 1997-1 Trade Cas. (CCH) *f* 71,776, 1997 WL 314419, Minnesota District Court, February 19, 1997.

40 *City of St. Paul v. FMC Corp.*, 1990-2 Trade Cas. (CCH) *f* 69,283, 1990 WL 259683, District of Minnesota, November 4, 1990.

**Exhibit 125C**

inspection, testing, delivery, and maintenance services. In certifying *Microsoft* in California, however, the court was not persuaded by defendant s argument that a class action would be unmanageable because Microsoft software is a small component of the ultimate product, a personal computer ( PC ) that consists of hundreds of other components and is sold by intermediaries as part of a package with other products and services.[41]

The *Microsoft* case calls attention to an extreme case of product alteration where the alleged product is used as an input to produce another product. Page, 1999, cites cases where this type of product alteration was decisive in the denial of class certification.[42] In Michigan, this factor played a major role in the denial of certification in *Wilcox v. Archer-Daniels-Midland*, of a class of purchasers of products (such as soft drinks and cereal) in which allegedly price-fixed high fructose corn syrup or citric acid was an ingredient. In Alabama, the court questioned the validity of plaintiffs expert testimony that all Alabama hog farmers had purchased feed containing price-fixed synthetic lysine since not all feed contained synthetic lysine.[43]

---

41 The defendants argued that, Microsoft software is often incorporated as a very small component no more than about three percent of the total cost according to one plaintiffs experts of a larger product, i.e., a personal computer ( PC ) made by an original equipment manufacturer ( OEM ) such as IBM, Compaq or Dell. Indeed, PCs are built with hundreds of hardware and software components in addition to the Microsoft software, and are very often sold as part of a package with a huge variety of other products such as printers, monitors and storage devices. Intermediaries often sell PCs containing Microsoft software together with installation, maintenance, training and technical support services. The court held that, [a]t this point, the court is not persuaded that a comprehensible analysis of these issues cannot be made within the context of properly managed trial proceedings. *Coordination Proceeding Special Title [Rule 1550(b)], Microsoft Cases*, Judicial Council Coordination Proceeding No.: 4106, Superior Court of California, County of San Francisco, August 4, 2000.

42 *Id.* note 6.

43 *Wilcox, et al. v. Archer-Daniels-Midland Co., et al.*, DN. 96-82473-CP, Michigan Circuit Court, Ingham County, September 29, 1997.

**Exhibit 125C**

Alternatively, when the product is not altered across the distribution chain, courts may view this favorably with regards to certifying a class. For example, in California, the court in *B.W.I. Custom Kitchen v. Owens-Illinois* held that:

> [W]here the product in question is ultimately sold to the consumer, and is largely unchanged in form from the price-fixing manufacturer to the indirect purchaser, assessing whether the manufacturer s overcharges were passed on is less difficult. Plaintiff and class members herein bought the price-fixed item itself, empty glass containers, from a middleman. The effects of the price-fixing were not obscured by substantially altering or adding to the item received from the manufacturer. Therefore, a class should be able to show on a generalized basis that its members absorbed at least some portion of the alleged overcharges.[44]

**Consumer Behavior and Implications for Damages**

Variation in consumer purchasing behavior may further complicate the calculation of damages by common formula. Differences in consumer behavior can affect damages in two distinct ways. First, consumers may differ in their day-to-day purchasing habits, for example, use of coupons, frequency of visits to the store, type of stores frequented, valuation of goods, degree of store/brand loyalty, etc. Second, consumers with otherwise identical purchasing habits may respond differently to a price increase. For instance, consumers may pursue coupons more aggressively, switch to other stores, substitute away to another product/brand, delay purchases over time, etc., in case of an overcharge. Therefore, an accurate damage calculation should account for individual-level information, such as the amount of purchase, the time of purchase, and the purchase price.[45]

---

44 B.W.I. Custom Kitchen v. Owens-Illinois, 235 Cal. Rptr. 228 (1987).

45 Moreover, this calculation would also have to account for the fact that some consumers may have modified their behavior because of a conspiracy. To accurately quantify damages in the presence of mitigation efforts, one needs to model consumers behavior *absent* an alleged conspiracy. The need for such an individualized study precludes calculation of damages by common proof.

Empirical research on three aspects of consumer behavior— coupon usage, store loyalty, and brand loyalty — are explored below. This exploration details how manufacturer price increases might affect specific consumers.

**Empirical Evidence on Coupon Usage**

Several studies show that coupon usage rates vary by product, household income, age of female head, composition of household, education of household head, etc.[46] This implies that individual class members pay different effective prices based on their coupon usage. Therefore, any changes in the types of coupon offering during the alleged cartel period is likely to result in different damages for different class members. Furthermore, consumers may also pursue coupons more aggressively during the class period in order to mitigate the effects of an overcharge. Consequently, any determination of damages would require detailed information about coupon usage at the individual level over time.

Alternatively, all else being equal, when coupon offerings and coupon usage rates do not change during the alleged cartel period, it may be easier to calculate damages by common formula.

**Empirical Evidence on Store Loyalty**

Calculation of class member damages requires, among other thing, a careful examination of the class members store loyalty during the conspiracy period. If the proposed class members shop at many

46 *See* Ward, R.W. and J.E. Davis, *A Pooled Cross-Section Time Series Model of Coupon Promotions*, 60 AM. J. AGRIC. ECON. 393-401, (1978); William O. Bearden, Donald R. Lichtenstein, and Jesse E. Teel, *Brand Type, Coupon, and Price Format Effects on Consumer Evaluation of Newspaper Appeals*, 60 J. RETAILING, (Summer 1984), 11-34. (1980); Gallo et al., *Couponings Growth in Food Marketing*, 17 AGRIC. ECON. REP. (1982); Chakravarthi Narasimhan, *A Price Discrimination Theory of Coupons*, MARKETING SCI., (Spring 1984); William J. Levedahl, *Coupon Redeemers: Are They Better Shoppers?*, THE J. CONSUMERS AFF., (Winter 1988).

stores (on a random basis), then calculation of damages using a common formula may be appealing. For such class members, an average overcharge estimate might be a good approximation. However, store-loyal class members are monetarily impacted differently than class members who shop at many stores. Determining which customers shop at many stores may therefore be necessary to assess damages accurately.

Further, class members that switch stores in search of the lowest price may have yet another different damage pattern. For example, a class member who shifts purchases to a lower-price (but less convenient) store may be damaged less than a store-loyal customer.

Therefore, before calculating damages using a common formula, an important question to answer is whether customers are generally loyal to stores. Table 1 in Appendix C reports empirical findings on store loyalty. These findings suggest that store loyalty is related to the following factors:

¥ Type of product purchased

¥ Customer s subjective perception of service quality and merchandise quality

¥ Age of customer

¥ Income of customer

¥ Price expectation for the basket of goods

¥ Convenience of store

¥ Previous experience in the store

¥ Advertisement/store deals

¥ Availability of store loyalty programs such as frequent shopper cards

¥ Household s awareness of coupons and access to coupons

The directions of correlations between these factors and store loyalty are explained in Table 1. This review of the empirical literature demonstrates that store loyalty can vary across consumers and that several factors explain this variation. Consequently, a careful account of store loyalty during the conspiracy period is required to assess damages accurately.

### Empirical Evidence on Brand Loyalty

Variation in brand loyalty is another important factor in determining damages. Individuals who are less loyal to brands may offset price increases by switching to other brands. For example, some individuals who are less loyal to a particular brand may switch to a cheaper brand in the face of a price increase. Such customers are monetarily impacted differently than class members who are loyal to their brand and decide not to switch.

Again, before ascribing damages using a common formula, we need to answer the question of whether customers are generally loyal to brands. Table 2 in Appendix C reports the empirical findings on store loyalty. This survey shows that customers vary in terms of their adherence to brands across several dimensions. Some of these dimensions are:

Product type: essential versus non-essential products

Household characteristics: age of the household head, presence of children in the household, prior experience with the product, future business conditions, and household s payment relative to the median price

Customer preferences: choice of the brands versus quantity to be consumed, frequency of shopping

Consumer s impression of brands based on past consumption.

### Potential Class Conflict Issues

Both the typicality requirement and the adequacy requirement bear directly on class conflict issues. If the goal of class certification is to extract aggregate compensation from the alleged conspirators, then the precise distribution of the aggregate compensation is irrelevant. On the other hand, if fair and adequate allocation of the compensation across class members is a significant concern, conflicts may exist. In this case, failure to account for heterogeneity among class members (in terms of the extent of damages) is likely to result in an unfair and inadequate distribution of compensation.

*Transparent Cases of Class Conflict*

One example of class conflict is when the proposed class consists of both retailers and end-users. In such a case, the conflict is clear-cut because full pass-on implies no damages to the retailer but complete damages to the end user. To demonstrate their damages, retailers will want to contend that they did not pass on much or any of the overcharge. End-users, on the other hand, will want to argue the opposite, i.e., that retailers passed on most or all of the overcharge.

*Heterogeneity and Class Conflict*

Earlier, we discussed that variation in retail prices (assuming that manufacturer prices are equal across direct purchasers) implies variation in pass-on, which in turn implies variation in damages. A uniform formula or methodology on a classwide basis that does not account for the fact that purchasers bought different quantities and paid different prices is likely to overcompensate some purchasers and undercompensate others. In some cases, such a uniform formula or methodology may indicate that some class members are unharmed and therefore fail to compensate them at all. In this case, conflict arises because consumers who are likely to be overcompensated may subscribe to a uniform formula or methodology while consumers who are likely to be undercompensated may object to such an approach. Furthermore, if the quantity consumed and prices paid vary with factors such as race, gender, income, and age, there may also be a conflict with regard to whether these differences should be aggregated or separated out in a damages model.

**Conclusions**

Our review of the empirical evidence shows that, in many instances, intermediaries behavior does not conform to the perfect competition paradigm. In these situations, pass-on is best assessed empirically. Also, consumers can differ across several dimensions in terms of their purchasing behavior. In such cases, an accurate calculation of damages may require analysis of individual level information. In addition, class conflict can arise when damage models use a uniform formula or methodology. Consumers likely to be overcompensated by a uniform formula or methodology may endorse it while consumers likely to be undercompensated by such a model may object.

# Appendix A

## Table 1: Distribution of Indirect Class Certification Outcomes Since 1981*

| | Panel A | | | | | | | | | | Panel B | | | | | | | Panel C | | | | Panel D | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | Illinois Brick Repealer States | | | | | | | | | | States Using Pre-Illinois Brick Statutes to Authorize Indirect Purchaser Suits | | | | | | | Illinois Brick Repealer States with Limited Provisions | | | | Not Determinate | | | | | | |
| | Degree of Acceptance of Generalized Proof by State Court (High Acceptance ——————————>Low Acceptance) | | | | | | | | | | Degree of Acceptance of Generalized Proof by State Court (High Acceptance ——————>Low Acceptance) | | | | | | | | | | | | | | | | | | |
| Product Name | CA | WI | NM | KS | SD | DC | ME | NC | MI | MN | TN | FL | AZ | TX | CO | AL | WA | IL | MD | RI | HI | GA | MS | MO | KY | IA | NH | CT |
| Prescription Drugs | Yes<br>Yes | Yes | | | | Yes | No | | No | No | | | | | | No | | | | | | | | | | | | |
| Infant Formula | | Yes | | Yes | Yes | | | | No | No | | | | | | | | | | | | | | | | | | |
| Microsoft | Yes | | Yes | | | | | | | Yes | | | | | | | | | No | No | | | | No | No | No | No | No |
| Cardizem | | | | | | | | | Yes | | | | | No | No | | | | | | | | | | | | | |
| Glass Containers | Yes | | | | | | | | | | | | | | | | | | | | | | | | | | | |
| Contact Lenses | No | | | | | | | | | | | | | | | No | | | | | | | | | | | | |
| Caustic Soda & Chlorine | | | | | | | | | | No | | | | | | | | | | | | | No | | | | | |
| Thermal Fax Paper | | No | | | | | | | | | | No | | | | | | | | | | | | | | | | |
| Sugar | | | | | | | | | | | | | | | | | | | | | | | No | | | | | |
| Compact Discs | | | | | | | | | | | Yes | | | | | | | | | | | | | | | | | |
| Cigarettes-I | | | | | | | | | | No | | | | | | | | | | | | | | | | | | |
| Cigarettes-II | | | | | | | | | | | | | No | | | | | | | | | | | | | | | |
| Synthetic Lysine | | | | | | | | | | | | | | | | No | | | | | | | | | | | | |
| HF Corn Syrup & Citric Acid | | | | | | | | | No | | | | | | | | | | | | | | | | | | | |
| Polypropylene Carpet | | | | | | | | | | | | | | | | | | | | | | Yes | | | | | | |
| Commercial Tissue | | | | | | | | | | No | | | | | | | | | | | | | | | | | | |
| CARB Gas | Yes | | | | | | | | | | | | | | | | | | | | | | | | | | | |
| No. of Certified Cases | 5 | 2 | 1 | 1 | 1 | 1 | 1 | | 1 | 1 | 1 | 0 | 0 | 0 | 0 | 0 | | | 0 | 0 | | 1 | 0 | 0 | 0 | 0 | 0 | 0 |
| No. of Certifications Denied | 1 | 1 | 0 | 0 | 0 | 0 | 0 | | 3 | 6 | 0 | 1 | 1 | 1 | 1 | 4 | | | 1 | 1 | | 0 | 1 | 1 | 1 | 1 | 1 | 1 |

* This table is adapted from Page (1999) and has been updated with more recent cases.




Exhibit 125C

Exhibit 125C

# Appendix B
# Determinants of Variation in Retail Prices/Margins

## Differences in Pricing Strategies

### Everyday-Low-Price Strategy Versus High-Low-Price Strategy

Levy et al., 1997, show that differences in the number of weekly price changes across supermarket chains in the U.S. are due in part to different pricing strategies.[1] Some chains follow an everyday-low-price strategy, maintaining low prices for an extended duration of time and offering few promotional discounts. Alternatively, some chains follow a high/low price strategy, charging higher prices and offering frequent discounts through sales and promotions. The pricing strategy is thus responsible for price differences.

### Loss Leaders

Some stores discount highly advertised brands as loss leaders or traffic builders in order to generate sales of other products in the store.[2] In other words, a markdown on a key product increases the number of buyers who come into the store and thus increases the potential number of buyers for other products. Here, lower prices of one commodity is strategically linked to higher prices of other products (Epstein, 1998).[3] Since consumers cannot know all prices, consumers use the well-known advertised brands as benchmarks to assess prices across stores. In that sense, the more-advertised brands are often sold at or below competitive levels thereby reducing the margin for some retailers. A necessary condition for traffic building via loss leader is that retailers sell a sufficient variety of products. A specialty store with a few products is less likely to use the loss leader strategy (Albion & Farris, 1987).[4] Consequently, differences in loss leader can result in variation in retail prices and margins across stores.

---

1 Daniel Levy, et al., *The Magnitude of Menu Costs: Direct Evidence from Large U.S. Supermarket Chains*, Q. J. ECON., (August 1997).

2 J.D. Hess & E. Gerstner, *Loss Leader Pricing and Rain Check Policy*, 6 MARKETING SCI., No. 4., (Fall 1987).

3 G.S. Epstein, *Retail Pricing and Clearance Sales: The Multiple Product Case*, J. ECON. BUS., (1998).

4 Mark S. Albion, et al., *Manufacturer Advertising and Retail Gross Margins*, ADVANCES IN MARKETING & PUB. POL Y, (Paul N. Bloom ed. 1987).

**Price Discrimination**

At times, retailers price discriminate against groups of customers who value a product differently. Every now and then, retailers also discriminate against groups that are less likely to switch to other stores. For example, Borenstein, 1991, found that gas stations discriminate against customers who are less likely to switch stations. Hence, to the extent that the distribution of such customers is not random across retailers, prices vary.[5]

**Quantity Discounting and Surcharging**

Murillo, 1998, showed that price dispersion may also result from the way stores set unit prices for larger packages of a certain product.[6] This practice is called quantity discounting and quantity surcharging. He found systematic differences between upscale and downscale stores. Specifically, he found that upscale chain stores use quantity surcharges less frequently than the downscale chain stores and that these practices persist through time.

**Focal Pricing**

In some cases, stores follow a focal pricing strategy. For example, prices are made to end with a 9. This strategy gives a more favorable price perception to customers in order to stimulate greater demand (Anderson, 2000).[7] In other cases, price-setting strategy reflects mere convenience. For example, prices can be set so that they end in 5 or 0 after taxes are tacked on so that store clerks do not have to deal with pennies.

**Variation in Manufacturer/Wholesaler Promotion Programs**

Manufacturers often promote their products by offering a wide range of incentive programs to both wholesalers and retailers. For

---

5 Severin Borenstein, *Selling Costs and Switching Costs: Explaining Retail Gasoline Margins*, RAND J. ECON., (Autumn 1991).

6 Jose A. Murillo Garza, *Pricing and Power: Puzzles from the Retail Food Market*, Working Paper, Unpublished Dissertation, (1998).

7 Eric Anderson, *The Role of Pricing Endings: Why Stores May Sell More at $49 than $44*, Working Paper, Graduate Sch. of Bus., U. of Chicago, (May 2000).

example, manufacturers may at times offer discounts to wholesalers for prompt payment. Similarly, manufacturers may also reduce prices if wholesalers assist in selling certain brands. Wholesalers that do not participate in these programs are likely to set higher prices. Manufacturers also offer direct incentives to certain retailers. For example, retailers may receive price discounts when they assist manufacturers in terms of signage, shelf space, etc.[8] Again, retailers differ in the degree of participation in these programs and consequently induce variation in prices paid by the ultimate customers.[9] To summarize, the relative cost advantage varies across participants and depends upon the degree of participation in these programs. This variation in costs may trickle down through the distribution chain resulting in a variation in retail prices.

**Variation in Menu Costs**

Another determinant of variation in retail prices is variation in menu costs. Menu costs refer to the cost of changing nominal prices. Levy et al., 1997, show that supermarket chains in the U.S. face different costs of changing nominal prices. Some of these costs consist of (i) the labor cost of changing shelf prices, (ii) the costs of printing and delivering new price tags, and (iii) the cost of in-store supervision of the price change process. In another study, Levy et al., (1998) outline the complex process that underlies price changes at five large supermarket chains and one drugstore chain in the U.S.[10] This process consist of (i) collecting information on competitors, (ii) managerial decision-making regarding a change in price at corporate headquarters, (iii) price change preparation, (iv) actual physical price change, (v) price change verifica-

---

8 The buyer power at the intermediate level is also an important predictor of extracting these discounts. Differences in buyer power may translate into different negotiated prices.

9 It is important to note that wholesalers also offer promotional programs that can also contribute to variation in retail prices.

10 The chains studied operated an average of 400 stores each. In addition, the chains represented all large U.S. supermarket chains from the Northeast to the West Coast and were similar in the variety, selection, and quantity of products they carried. Daniel Levy, et al., *The Magnitude of Menu Costs: Direct Evidence from Large U.S. Supermarket Chains*, Q. J. ECON., (August 1997)

Exhibit 125C

tion, (vi) in-store and corporate resolution of the price mistakes, and (vii) scan guarantee refund. Cecchetti, 1986, confirms that menu costs vary by the size and frequency of price changes.[11]

**Magnitude of Cost Shocks and Speed of Adjustment**

The ways that retailers adjust to changes in costs is another determinant of variation in prices. Carlton, 1989, argues that some firms may be reluctant to raise their prices in response to unanticipated temporary cost increases so that their customers do not mistake such price increases as permanent and react in the long run by substituting away from the store.[12] Bergen, et al., 1998, show that refrigerated and frozen orange juice prices at a large midwestern supermarket chain were more rigid in response to temporary and small cost shocks than to permanent and large cost shocks.[13] Furthermore, research shows that the ability of prices to adjust to cost shocks also differ across products (Cecchetti[14], 1986; Kashyap[15], 1995; Blinder, 1994).[16] Therefore, it follows that any variation in the duration and magnitude of cost shocks across stores and products will result in a variation in prices.

---

11 Daniel Levy, et al., *Price Adjustment at Multiproduct Retailers*, MANAGERIAL & DECISION ECON., (1998).

12 Stephen G. Cecchetti, *The Frequency of Price Adjustment: A Study of the Newsstand Price of Magazines*, J. ECONOMETRICS, (April 1986).

13 Dennis W. Carlton, *The Theory and the Facts of How Markets Clear: Is Industrial Organization Valuable for Understanding Macroeconomics?*, HANDBOOK OF INDUS. ORG., (1989).

14 Mark Bergen, et al., *Heterogeneity in Price Rigidity: Evidence from Primary Micro-Level Data*, Working Paper, JEL Codes: E12, E31, L16, (1998).

15 Stephen G. Cecchetti, *The Frequency of Price Adjustment: A Study of the Newsstand Prices of Magazines*, J. ECON., (April 1986).

16 Anik K. Kashyap, *Sticky Prices: New Evidence from Retail Catalogues*, Q. J. ECON., (February 1995).

Moreover, Murillo, 1998, presents evidence of differences in retailers response to wholesale changes in prices depending on the size of the chain store.[17] Specifically, he finds evidence of downward price rigidity in large supermarket chains and upward rigidity in small chains. Ultimately, heterogeneity in price flexibility across different products and stores reflects the variation in institutional characteristics across different markets such as extent of competition, industry concentration, and market power (Dutta et al., 1997).[18]

**Degree of Advertisement**

A substantial amount of empirical evidence shows a negative correlation between advertising intensity and retail gross margin (Steiner, 1993).[19] Therefore, any variation in advertising intensity across products in the same store is likely to result in variation in retail gross margins across products for a given store.

**Types of Services**

Betancourt and Malanoski, 1999, identify differences in additional services offered by retail stores as important determinants of retail behavior. Some of these services consist of short waits at check-out counters, cleanliness, availability of a produce department, unit pricing, convenient location, etc.[20] Any variation in these services is likely to result in variation in retail margins. In an earlier study, Betancourt and Gautschi, 1993, show that retail distribution services such as accessibility of location, assortment of goods, assurance of product delivery, information, and ambiance are critical determinants of retail margins.[21]

---

17 Alan S. Blinder, *On Sticky Prices: Academic Theories Meet the Real World*, MONETARY POLICY, (1994)

18 *Id.* note 6

19 Shantanu Dutta, et al., *Price Flexibility in Channels of Distribution: Evidence from Scanner Data*, Working Paper, (1997).

20 Robert L. Steiner, *The Inverse Association Between the Margins of Manufacturers and Retailers*, REV. INDUS. ORG., (1993).

21 Betancourt & Malanoski, *An Estimate Model of Supermarket Behavior: Price, Distribution Services and Some Effects of Competition*, EMPIRICA, (1999).

Exhibit 125C

## Economies of Scale

An examination of operating costs in the retail sector suggests that there are economies of scale such that the percentage operating costs are lower for larger stores (Nooteboom, 1982).[22] Hence, variation in retail gross margins also stems from the variation in store size.

## Private Label Penetration

Retailers strategically introduce private labels in order to gain profits directly and obtain better terms of trade from a national manufacturer.[23] Lemon and Winer, 1993,[24] and Sethuraman, 1995, empirically show that private label promotions can be quite effective in taking share from the national brand sales.[25] Furthermore, Narasimhan & Wilcox, 1998, show that private label penetration is not always positively correlated with retail gross margins. Rather, the correlation depends upon (i) the perceived risks that the customers associate with purchasing a product and (ii) the ability of retailers to steal market share from the manufacturer.[26]

---

22 Betancourt & Gautschi, *Two Essential Characteristics of Retail Markets and their Economic Consequences*, J. ECON. BEHAV. & ORG., (August 1993).

23 B. Nooteboom, *A New Theory of Retailing Costs*, EUR. ECON. REV., 1982.

24 Narasimhan & Wilcox, *Private Labels and the Channel Relationship: A Cross-Category Analysis*, J. BUS., (1998).

25 Lemon & Winer, *A Forward-Looking Model of the Customer Keep/Dispose Decision*, (work in progress) J. MARKETING (under second review), (1993).

26 R. Sethuraman, *National Brand and Store Brand Price Competition: Who Hurts Whom?*, Cambridge, Mass.: Marketing Science Institute, Technical Working Paper.

**Exhibit 125C**

**Informational and Locational Asymmetries**

Price dispersion for homogenous products can occur due to differences in information and location costs for consumers (Stigler, 1961;[27] Adams, 1997).[28] Differences in information result from the cost of acquiring information, as customers are not fully aware of all the prices at different stores. With location costs, consumers may be aware of prices across stores but the convenience of location dominates other considerations. In this case, the opportunity cost of time and the cost of transportation are sufficiently high to prevent consumers from taking full advantage of distant stores. In a quasi-experimental study, Devine and Marion, 1979, examined price dispersion for major Ottawa supermarkets before and after publishing of comparative prices in daily newspapers.[29] They found that significant dispersion in prices existed for a standardized basket of food products before the dissemination of comparative price information. Furthermore, they found that the dissemination of information altered the dispersion of prices between stores and lowered the average price level in the market.

---

27 Narasimhan & Wilcox, *Private Labels and the Channel Relationship: A Cross-Category Analysis*, J. BUS., (1998).

28 G.J. Stigler, *The Economics of Information*, J. POLITICAL ECON., (June 1961).

29 Frank A. Adams III, *Search Costs and Price Dispersion in a Localized, Homogeneous Product Market: Some Empirical Evidence*, 12 R. INDUS. ORG. 801-08, (1997).

30 Devine & Marion, *The Influence of Consumer Price Information on Retail Pricing and Consumer Behavior*, AM. J. AGRIC. ECON., (August 1997).

Exhibit 125C

# Appendix C

## Table 2: Literature Review on Brand Loyalty

| Index | Year | Source | Data/Product | Key Finding |
|---|---|---|---|---|
| 1 | 1998 | Gonul, et al.[1] | Longitudinal data on household purchases of ketchup and diapers | • Authors show that, "when the purchase interval gets longer, consumers are more likely to switch. Hence, frequent purchasers are more likely to be brand loyal."<br>• Product type is important. If the product is "essential" and bought regularly, then brand loyalty is more likely. However, if the product is not essential, then switching is likely to occur in the presence of substitutes.<br>• Authors also show that store displays, coupons, and prices influence brand-switching. For instance, in the case of ketchup, price is a more significant predictor of brand switching compared to store displays, whereas, in the case of diapers, coupons are a significant predictor. |
| 2 | 1996 | Jackson & Perloff[2] | Personal computer purchases by large corporate customers | • Relative prices do not matter.<br>• Brand loyalty is stable over time.<br>• Corporate consumers do not view IBM-compatible computers as perfect substitutes.<br>• Exit and re-entry of a brand has different effects in the short run and long run. |

[1] Gonul, et al., *Joint Estimates of Purchase Timing and Brand Switch Tendency: Results from a Scanner Panel Data Set of Frequently Purchased Products*, Carnegie Mellon U. & U. of Alberta (1998).
[2] Jackson & Perloff, *Personal Computer Brand Loyalty*, Cal. Agric. Experiment Station-Giannini Found. of Agric. Econ., (April 1996).

Exhibit 125C

## Appendix C

### Table 2: Literature Review on Brand Loyalty

| Index | Year | Source | Data/Product | Key Finding |
|---|---|---|---|---|
| 3 | 1995 | Gilboa & Pazgal[3] | Scanner data on purchases of crackers, yogurts, and ketchup | • Brand switching can be explained by consumer's impression of brand based on past consumption.<br>• The authors also show that, "choosing the same brand out of internia" is more likely than choosing brands based on a dynamic re-valuation of decisions based on "cumulative memory." |
| 4 | 1995 | Allenby & Lenk[4] | Household brand choices for ketchup and detergents | • Authors found systematic differences between frequent and infrequent buyers of products in terms of their sensitivity to price, displays, and advertising |
| 5 | 1991 | Krishnamurthi & Raj[5] | BURKE data on a frequently purchased (unidentified) product class and IRI scanner data on caffeinated ground coffee | • Brand loyal customers are less price-sensitive (relative to less loyal customers) with regard to the choice of brands.<br>• Brand loyal customers are relatively more price-sensitive with regard to decisions that concern the quantity to be consumed. |
| 6 | 1973 | Newman & Werbel[6] | Major household appliances | • Authors found the age of the household head, presence of children in the household, prior experience with the product, future business conditions, and household's payment relative to the median price to be important predictors of brand loyalty. |

[3] Gilboa & Pazgal *History Dependent Brand Switching: Theory and Evidence*, Working Paper No. 1146, Dept. of Econ., Northwestern U., (November 1995).
[4] Allenby & Lenk, *Reassessing Brand Loyalty, Price Sensitivity, and Merchandising Effects on Consumer Brand Choice*, 13 J. BUS. & ECON. STAT., (July 1995).
[5] Krishnamurthi & Raj, *An Empirical Analysis of the Relationship Between Brand Loyalty and Consumer Price Elasticity*, MARKETING SCI., (Spring 1991).
[6] Newman & Werbel, *Multivariate Analysis of Brand Loyalty for Major Household Appliances*, J. MARKETING RES., (November 1973).

Exhibit 125C

# Appendix C

## Table 1: Literature Review on Store Loyalty

| Index | Year | Source | Data/Product | Key Findings |
|---|---|---|---|---|
| 1 | 2000 | Reynolds & Arnold[1] | Survey from "call customer" lists from two large regional departmental stores regarding upscale clothing and accessories | • Store loyalty in upscale retail stores is significantly tied to the customer's relationship with the salesperson.<br>• Satisfaction with the store is an important determinant of store loyalty. |
| 2 | 1998 | East, et al[2]. | Two mail surveys of supermarket customers | • Store retention and first-store loyalty are both positively correlated with brand loyalty and attitude toward the store.<br>• Store retention is positively correlated with customer's age.<br>• First-store loyalty is negatively correlated with customer's age.<br>• While first-store loyalty increases with income for customers under-45 and lowers for customers 65 years and older, store retention remains high in the middle-income group for all three age groups. |
| 3 | 1998 | Bell & Lattin[3] | Scanner panel data in 12 product categories, 1991-1993 | • A key predictor of store choice is the price expectation for the basket of goods, after controlling for household distance to the store, previous experience in the store, and advertised specials.<br>• Large basket shoppers are relatively price elastic in their store choice decisions but relatively price inelastic in their category purchase incidence decisions. |

[1] Reynolds & Arnold. *Customer Loyalty to the Salesperson and the Store: Examining Relationships Customers in an Upscale Retail Context*. J. PERSONAL SELLING & SALES MGMT. (Spring 2000).
[2] East, Harris et al., *Customer Defection from Supermarkets*. ADVANCES IN CONSUMER RES. (1998).
[3] Bell & Lattin. *Shopping Behavior and Consumer Preference for Store Price Format: Why 'Large Baskets' Shoppers Prefer EDLP*. MARKETING SCI. (1998).

Exhibit 125C

## Appendix C

### Table 1: Literature Review on Store Loyalty

| Index | Year | Source | Data/Product | Key Findings |
|---|---|---|---|---|
| 4 | 1998 | Sirohi, et al.[4] | Customer data for a multi-store grocery retailer | • Store loyalty as measured by "intent to continue shopping, intent to increase purchases and intent to recommend the store" depend upon service quality and merchandise quality perception.<br>• Customer's perception of store value is an especially important factor in the determination of store loyalty if there exists a high degree of competitor attractiveness. Absent that, the perceived value is not important. |
| 5 | 1998 | Tomei[5] | AC Nielsen: Second Annual Frequent Shopper Survey | • "Fully 55% of U.S. households actively participate in at least one grocery store loyalty program."<br>• "Chicago leads the way with the highest percentage of frequent shopper card holders at 94%, followed by Charlotte (87%), Los Angeles (84%), Buffalo/Rochester and New York (70% each)."<br>• Convenient location and store deals are important reasons for joining the loyalty program. |
| 6 | 1995 | Garton[6] | Customer Survey. | • Convenience of location and the level of staff knowledge regarding products and their use are important determinants of store loyalty. |

[4] Niren Sirohi, et al., *A Model of Consumer Perceptions and Store Loyalty Intentions for a Supermarket Retailer*, J. RETAILING, (1998).
[5] Robert Tomei, *The loyalty equation: new ACNielsen survey measures direct link between store traffic and frequent shopper programs*, FOOD & BEVERAGE MARKETING Vol. 17 No. 7 (July 1 1998)

Exhibit 125C

# Appendix C

## Table 1: Literature Review on Store Loyalty

| Index | Year | Source | Data/Product | Key Findings |
|---|---|---|---|---|
| 7 | 1987 | Bawa & Shoemaker[7] | National Consumer Panel (NPD Research) on 7 product categories | • Households that are not likely to use coupons are relatively more store-loyal than the coupon-prone households. |
| 8 | 1987 | Langrehr & Rinne[8] | Comparative analysis of U.S. and U.K. customers of grocery chain | • Grocery chain loyalty in the U.S. is higher than in the U.K.<br>• The choice of a particular store appears to be affected by customers' need to save time. |
| 9 | 1985 | Lumpkin[9] | Survey of elderly consumers regarding the apparel sector | • Among the elderly consumers, active and highly involved shoppers tend to be more store-loyal than brand- or label-loyal. |
| 10 | 1984 | Marketing News[10] | Survey of 328 patrons of 7 supermarkets in Philadelphia | • Bonus coupon programs do not build store loyalty.<br>• Promotions such as introduction of double and triple coupons encourage greater store-switching.<br>• An increase in the awareness of coupon programs is associated with a decrease in store loyalty. |
| 11 | 1978 | Foxall[11] | A review of earlier studies | • Shoppers that are loyal to certain brands are also loyal to a particular store.* |

[7] Bawa & Shoemaker, *The Coupon-Prone Consumer: Some Findings Based on Purchase Behavior Across Product Classes*, J. MARKETING. (October 1987).
[8] Langrehr & Rinne, *Patterns of Store Choice: A Replication*, FOOD MARKETING. (1987).
[9] James Lumpkin, *Shopping Orientation Segmentation of the Elderly Consumer*, J. ACAD. MARKETING SCI. (Winter/Spring 1985).
[10] J. George & John B. Lord, *Bonus Couponing Strikes Out as Supermarket Traffic-Builder*, 18 MARKETING NEWS. (1984)
[11] Gordon Foxall, *Marketing Response to Consumer Loyalty*, Q. REV. MARKETING. (March 1978).

Exhibit 125C

# Appendix C

## Table 1: Literature Review on Store Loyalty

| Index | Year | Source | Data/Product | Key Findings |
|---|---|---|---|---|
| 12 | 1977-78 | Goldman[12] | Study of customers' shopping patterns and store loyalty | • Store loyalty patterns vary across product categories.<br>• The loyal customers engage in "less prepurchase search among stores, know less about the stores selling the products, and makes less use of the set of stores known to them." |

Note: *This tendency appears to hold because not all stores carry all of the brands. N/A refers to not available.

[12] Arieh Goldman, *The Shopping Style Explanation for Store Loyalty*, J. RETAILING, (Winter 1977-1978).