FRANCIS O. SCARPULLA (41059)
CRAIG C. CORBITT (83251)
CHRISTOPHER T. MICHELETTI (136446)
JANE YI (257893)
ZELLE HOFMANN VOELBEL & MASON LLP
44 Montgomery Street, Suite 3400
San Francisco, CA 94104
Telephone:    (415) 693-0700
Facsimile:    (415) 693-0770
fscarpulla@zelle.com
ccorbitt@zelle.com

*Interim Lead and Liaison Counsel for*
*Indirect Purchaser Class*

(Additional Counsel listed on signature page)

## UNITED STATES DISTRICT COURT

## NORTHERN DISTRICT OF CALIFORNIA

## OAKLAND DIVISION

| | |
|---|---|
| IN RE STATIC RANDOM ACCESS MEMORY (SRAM) ANTITRUST LITIGATION | Case No. M:07-CV-01819-CW |
| | MDL No. 1819 |
| This Document Relates to: ALL INDIRECT PURCHASER ACTIONS | **FOURTH CONSOLIDATED AMENDED CLASS ACTION COMPLAINT FOR VIOLATIONS OF FEDERAL AND STATE ANTITRUST LAWS, STATE CONSUMER PROTECTION LAWS AND STATE COMMON LAW OF UNJUST ENRICHMENT** |
| | **JURY TRIAL DEMANDED** |

## PREAMBLE

Pursuant to the Court's February 14, 2008 Order, the Third Consolidated Amended Complaint amended and included claims the Court dismissed but gave Indirect-Purchaser Plaintiffs leave to amend. Indirect-Purchaser Plaintiffs did not replead any claims dismissed without leave to amend. However, by failing to replead these claims, Indirect-Purchaser Plaintiffs do not waive their right to appeal this Court's dismissal with prejudice of those claims

Plaintiffs, by their attorneys, bring this civil action for damages and injunctive relief on behalf of themselves and all others similarly situated against the Defendants named herein, and

demanding a trial by jury, complain and allege as follows:

## JURISDICTION AND VENUE

1.      This complaint is filed under Section 16 of the Clayton Act, 15 U.S.C. §26, to obtain injunctive relief for violations of Section 1 of the Sherman Act, 15 U.S.C. §1, to recover damages or restitution under state antitrust and consumer protection laws, and to recover the costs of suit, including reasonable attorneys' fees, for the injuries that Plaintiffs and all others similarly situated sustained as a result of the Defendants' violations of those laws.

2.      The Court has jurisdiction over the federal claim under 28 U.S.C. §§1331 and 1337. The Court has jurisdiction over the state law claims under 28 U.S.C. §1367 because those claims are so related to the federal claim that they form part of the same case or controversy.  The Court also has jurisdiction over the state law claims under 28 U.S.C. §1332 because the amount in controversy for the Class exceeds $5,000,000, and there are members of the Class who are citizens of a different state than the Defendants.

3.      Venue is proper in this District under 15 U.S.C. §22 and 28 U.S.C. §1391 because Defendants reside, transact business, or are found within this District, and a substantial part of the events giving rise to the claims arose in this District.

4.      The activities of the Defendants and their co-conspirators, as described herein, were within the flow of, were intended to, and did have a substantial effect on the foreign and interstate commerce of the United States.  Defendants' conspiracy further substantially affected commerce in California, and accordingly, Defendants and their co-conspirators have purportedly availed themselves of California's laws.

## DEFINITIONS

5.      As used herein, the term "Static Random Access Memory" ("SRAM") includes all types of static random access memory sold during the Class Period.  SRAM is a type of memory that is faster and more reliable than dynamic random access memory ("DRAM").  The term "static" is derived from the fact that SRAM does not need to be refreshed like DRAM.  While DRAM supports access times of about 60 nanoseconds, SRAM can give access times of 10 nanoseconds.  In addition, its cycle time is much shorter than that of DRAM because it does not need to pause between

accesses.

6.     As used herein, the term "computer" refers to both desktop and mobile computers (primarily laptop computers), workstations and servers.

7.     As used herein, the term "Class Period" means the time period November 1, 1996 through at least December 31, 2006.

## THE PARTIES

**A.     The Plaintiffs.**

8.     Plaintiff Javier Oyola Alemany is a resident of Puerto Rico who indirectly purchased SRAM manufactured and/or sold by one or more of the Defendants or their co-conspirators during the Class Period, for end use and not for resale, and was injured as a result of Defendants' illegal conduct.

9.     Plaintiff James Allen is a resident of Massachusetts who indirectly purchased SRAM from one or more of the Defendants or their co-conspirators during the Class Period, for end use and not for resale, and was injured as a result of Defendants' illegal conduct.  Pursuant to Mass. Gen. L. 93A, §9, Plaintiff mailed a written demand for relief to Defendants at least 30 days prior to filing his initial complaint.  No Defendant responded with a reasonable tender of settlement.

10.     Plaintiff Justus Austin III is a resident of Michigan who indirectly purchased SRAM from one or more of the Defendants or their co-conspirators during the Class Period, for end use and not for resale, and was injured as a result of Defendants' illegal conduct.

11.     Plaintiff Renae Awakuni is a resident of Hawaii who indirectly purchased SRAM from one or more of the Defendants or their co-conspirators during the Class Period, for end use and not for resale and primarily for personal, household, or family purposes, and was injured as a result of Defendants' illegal conduct.  Pursuant to Hawaii Rev. Stat. §480-13.3, Plaintiff filed her initial Complaint under seal and served a copy on Hawaii's Attorney General within seven days. Following expiration of the statutory review period, the Hawaii Attorney General informed the United States District Court for the District of Hawaii that it would not proceed with the action or file its own action involving the same or similar claims as set forth in Plaintiff's initial Complaint.

12.     Plaintiff Michael Francis Ayers is a resident of Massachusetts who indirectly

purchased SRAM from one or more of the Defendants or their co-conspirators during the Class Period, for end use and not for resale, and was injured as a result of Defendants' illegal conduct.

13.     Plaintiff Kenneth Bagwell is a resident of Michigan who indirectly purchased SRAM from one or more of the Defendants or their co-conspirators during the Class Period, for end use and not for resale, and was injured as a result of Defendants' illegal conduct.

14.     Plaintiff Michael Baranic is a resident of California who indirectly purchased SRAM from one or more of the Defendants or their co-conspirators during the Class Period, for end use and not for resale, and was injured as a result of Defendants' illegal conduct.

15.     Plaintiff James W. Barnes is a resident of California who indirectly purchased SRAM from one or more of the Defendants or their co-conspirators during the Class Period, for end use and not for resale, and was injured as a result of Defendants' illegal conduct.

16.     Plaintiff Ronnie Barnes is a resident of Florida who indirectly purchased SRAM from one or more of the Defendants or their co-conspirators during the Class Period, for end use and not for resale, and was injured as a result of Defendants' illegal conduct.

17.     Plaintiff Robert C. Bedore, Jr. is a resident of Maine who indirectly purchased SRAM from one or more of the Defendants or their co-conspirators during the Class Period, for end use and not for resale and primarily for personal, family, or household purposes, and was injured as a result of Defendants' illegal conduct.

18.     Plaintiff Joshua A. Belke is a resident of Wisconsin who indirectly purchased SRAM from one or more of the Defendants or their co-conspirators during the Class Period, for end use and not for resale, and was injured as a result of Defendants' illegal conduct.

19.     Plaintiff Todd Berg is a California resident who indirectly purchased SRAM from one or more of the Defendants or their co-conspirators during the Class Period, for end use and not for resale, and was injured as a result of Defendants' illegal conduct.

20.     Plaintiff Ron Birdsong, individually, and on behalf of Birdsong Air Conditioning and Heating Services, is a resident of Tennessee who indirectly purchased SRAM from one or more of the Defendants or their co-conspirators during the Class Period, for end use and not for resale, and was injured as a result of Defendants' illegal conduct.

FOURTH CONSOLIDATED AMENDED CLASS ACTION COMPLAINT
Case No. M:07-CV-1819-CW

21.     Plaintiff Terry Bisel is a resident of California who indirectly purchased SRAM from one or more of the Defendants or their co-conspirators during the Class Period, for end use and not for resale, and was injured as a result of Defendants' illegal conduct.

22.     Plaintiff Rebecca Bly is a resident of the District of Columbia who indirectly purchased SRAM from one or more of the Defendants or their co-conspirators during the Class Period, for end use and not for resale and primarily for personal, family, or household use, and was injured as a result of Defendants' illegal conduct.

23.     Plaintiff Michael Brooks is a resident of California who indirectly purchased SRAM from one or more of the Defendants or their co-conspirators during the Class Period, for end use and not for resale, and was injured as a result of Defendants' illegal conduct.

24.     Plaintiff Carlos R. Carrillo is a resident of Puerto Rico who indirectly purchased SRAM from one or more of the Defendants or their co-conspirators during the Class Period, for end use and not for resale, and was injured as a result of Defendants' illegal conduct.

25.     Plaintiff Ward Cater is a resident of North Dakota who indirectly purchased SRAM from one or more of the Defendants or their co-conspirators during the Class Period, for the end use and not for resale, and was injured as a result of Defendants' illegal conduct.

26.     Plaintiff Scott L. Clarke is a resident of Maine who indirectly purchased SRAM from one or more of the Defendants or their co-conspirators during the Class Period, for end use and not for resale and primarily for personal, family, or household purposes, and was injured as a result of Defendants' illegal conduct.

27.     Plaintiff Culinary Workers Union Local 226 is a resident of Nevada that indirectly purchased SRAM from one or more Defendants or their co-conspirators during the Class Period, for end use and not for resale, and was injured as a result of Defendants' illegal conduct.

28.     Plaintiff Dona Culver is a resident of the District of Columbia who indirectly purchased SRAM from one or more Defendants or their co-conspirators during the Class Period, primarily for personal, family or household purposes, and was injured as a result of Defendants' illegal conduct.

29.     Plaintiff Christopher C. Crawford is a resident of South Dakota who indirectly

1    purchased SRAM from one or more of the Defendants or their co-conspirators during the Class

2    Period, for end use and not for resale, and was injured as a result of Defendants' illegal conduct.

3        30.    Plaintiff Romney Darkins is a resident of California who indirectly purchased SRAM

4    from one or more of the Defendants or their co-conspirators during the Class Period, for end use and

5    not for resale, and was injured as a result of Defendants' illegal conduct.

6        31.    Plaintiff Ryan Edwards is a resident of Florida who indirectly purchased SRAM from

7    one or more of the Defendants or their co-conspirators during the Class Period, for end use and not

8    for resale, and was injured as a result of Defendants' illegal conduct.

9        32.    Plaintiff Judd Eliasoph is a resident of California who indirectly purchased SRAM

10   from one or more of the Defendants or their co-conspirators during the Class Period, for end use and

11   not for resale, and was injured as a result of Defendants' illegal conduct.

12       33.    Plaintiff Fairmont Orthopedics & Sports Medicine, P.A. is a Minnesota company that

13   indirectly purchased SRAM from one or more of the Defendants or their co-conspirators during the

14   Class Period, for end use and not for resale, and was injured as a result of Defendants' illegal

15   conduct.

16       34.    Plaintiff Cristi Ferguson is a resident of Kansas who indirectly purchased SRAM

17   from one or more of the Defendants or their co-conspirators during the Class Period, for end use and

18   not for resale and primarily for personal, family, household, business or agricultural purposes, and

19   was injured as a result of Defendants' illegal conduct.

20       35.    Plaintiff Patricia Fitzsimmons is a resident of Minnesota who indirectly purchased

21   SRAM from one or more of the Defendants or their co-conspirators during the Class Period, for end

22   use and not for resale, and was injured as a result of Defendants' illegal conduct.

23       36.    Plaintiff Alicia Foley is a resident of Massachusetts who indirectly purchased SRAM

24   from one or more of the Defendants or their co-conspirators during the Class Period, for end use and

25   not for resale, and was injured as a result of Defendants' illegal conduct.  Pursuant to Mass. Gen. L.

26   93A, §9, Plaintiff mailed a written demand for relief to Defendants at least 30 days prior to filing her

27   initial complaint.  No Defendant responded with a reasonable tender of settlement.

28       37.    Plaintiff Craig Friedson is a resident of the District of Columbia who indirectly

purchased SRAM in Maryland from one or more of the Defendants or their co-conspirators during the Class Period, for end use and not for resale and primarily for personal, household, or family use, and was injured as a result of Defendants' illegal conduct.

38.     Plaintiff Scott Friedson is an resident of Arizona who indirectly purchased SRAM from one or more of the Defendants or their co-conspirators during the Class Period, for end use and not for resale, and was injured as a result of Defendants' illegal conduct.

39.     Plaintiff Frank Gertzen is a resident of Pennsylvania who indirectly purchased SRAM from one or more of the Defendants or their co-conspirators during the Class Period, primarily for personal, family or household purposes, and was injured as a result of Defendants' illegal conduct.

40.     Plaintiff Chris Giauque is a resident of Utah who indirectly purchased SRAM from one or more of the Defendants or their co-conspirators during the Class Period, for end use and not for resale, and was injured as a result of Defendants' illegal conduct.

41.     Plaintiff Jacob Greenwell is a resident of California who indirectly purchased SRAM from one or more of the Defendants or their co-conspirators during the Class Period, for end use and not for resale, and was injured as a result of Defendants' illegal conduct.

42.     Plaintiff Janet Hall is a resident of Alaska who indirectly purchased SRAM from one or more of the Defendants and their co-conspirators during the Class Period, for end use and not for resale, and was injured as a result of Defendants' illegal conduct.

43.     Plaintiffs Thomas and Donna Hark are residents of West Virginia who indirectly purchased SRAM from one or more of the Defendants or their co-conspirators during the Class Period, for end use and not for resale, and were injured as a result of Defendants' illegal conduct.

44.     Plaintiff Robert S. Harmon is a resident of Arkansas who indirectly purchased SRAM from one or more of the Defendants or their co-conspirators during the Class Period, for end use and not for resale, and was injured as a result of Defendants' illegal conduct.

45.     Plaintiff Joseph Hastings is a resident of Mississippi who indirectly purchased SRAM from one or more of the Defendants or their co-conspirators during the Class Period, for end use and not for resale, and was injured as a result of Defendants' illegal conduct.

46.     Plaintiff Heather Hawk is a resident of New Mexico who indirectly purchased SRAM

from one or more of the Defendants or their co-conspirators during the Class Period, for end use and not for resale, and was injured as a result of Defendants' illegal conduct.

47.     Plaintiff Kenneth W. Hebert is a resident of Idaho who indirectly purchased SRAM from one or more of the Defendants or their co-conspirators during the Class Period, for end use and not for resale, and was injured as a result of Defendants' illegal conduct.

48.     Plaintiff Paul Hickman is a resident of Montana who indirectly purchased SRAM from one or more of the Defendants or their co-conspirators during the Class Period, for end use and not for resale, and was injured as a result of Defendants' illegal conduct.

49.     Plaintiff Penny Hochstein is a South Dakota resident who indirectly purchased SRAM from one or more of the Defendants or their co-conspirators during the Class Period, for end use and not for resale, and was injured as a result of Defendants' illegal conduct.

50.     Plaintiff Curtis Hogue is a resident of North Carolina who indirectly purchased SRAM from one or more of the Defendants or their co-conspirators during the Class Period, for end use and not for resale, and was injured as a result of Defendants' illegal conduct.

51.     Plaintiff Rhonda L. Jacobs is a resident of West Virginia who indirectly purchased SRAM from one or more of the Defendants or their co-conspirators during the Class Period, for end use and not for resale, and was injured as a result of Defendants' illegal conduct.

52.     Plaintiff Karl Johnson is a resident of West Virginia who indirectly purchased SRAM from one or more of the Defendants or their co-conspirators during the Class Period, for end use and not for resale, and was injured as a result of Defendants' illegal conduct.

53.     Plaintiff Susan Juliffs is a resident of Iowa who indirectly purchased SRAM from one or more of the Defendants or their co-conspirators during the Class Period, for end use and not for resale, and was injured as a result of Defendants' illegal conduct.

54.     Plaintiff Karol Juskiewicz is a resident of California who indirectly purchased SRAM from one or more of the Defendants or their co-conspirators during the Class Period, for end use and not for resale, and was injured as a result of Defendants' illegal conduct.

55.     Plaintiff Nicolas Kane is a resident of Wisconsin who indirectly purchased SRAM from one or more of the Defendants or their co-conspirators during the Class Period, for end use and

1   not for resale, and was injured as a result of Defendants' illegal conduct.

2      56.     Plaintiff Michael Katz is a resident of California who indirectly purchased SRAM

3   from one or more of the Defendants or their co-conspirators during the Class Period, for end use and

4   not for resale, and was injured as a result of Defendants' illegal conduct.

5      57.     Plaintiff Allen Robert Kelley is a resident of Nevada who indirectly purchased SRAM

6   from one or more of the Defendants or their co-conspirators during the Class Period, for end use and

7   not for resale, and was injured as a result of Defendants' illegal conduct.

8      58.     Plaintiff Kevin Kicia is a resident of Rhode Island who indirectly purchased SRAM

9   from one or more of the Defendants or their co-conspirators during the Class Period, primarily for

10  personal, family or household purposes and was injured as a result of Defendants' illegal conduct.

11     59.     Plaintiff Sean Koch is a resident of California who indirectly purchased SRAM from

12  one or more of the Defendants or their co-conspirators during the Class Period, for end use and not

13  for resale, and was injured as a result of Defendants' illegal conduct.

14     60.     Plaintiff Henry Kornegay is a resident of Montana who indirectly purchased SRAM

15  from one or more of the Defendants or their co-conspirators during the Class Period, for end use and

16  not for resale, and was injured as a result of Defendants' illegal conduct.

17     61.     Plaintiff Ronald A. Kramer is a resident of Maine who indirectly purchased SRAM

18  from one or more of the Defendants or their co-conspirators during the Class Period, for end use and

19  not for resale and primarily for personal, family, or household purposes, and was injured as a result

20  of Defendants' illegal conduct.

21     62.     Plaintiff Mark Lambert is a resident of West Virginia who indirectly purchased

22  SRAM from one or more of the Defendants or their co-conspirators during the

23  Class Period, for end use and not for resale, and was injured as a result of Defendants' illegal

24  conduct.

25     63.     Plaintiff Paul Lauttamus is a resident of West Virginia who indirectly purchased

26  SRAM from one or more of the Defendants or their co-conspirators during the Class Period, for end

27  use and not for resale, and was injured as a result of Defendants' illegal conduct.

28     64.     Plaintiff Alfred Livingston is a resident of Mississippi who indirectly purchased

SRAM from one or more of the Defendants or their co-conspirators during the Class Period, for end use and not for resale, and was injured as a result of Defendants' illegal conduct.

65.     Plaintiff David Loomis is a resident of West Virginia who indirectly purchased SRAM from one or more of the Defendants or their co-conspirators during the Class Period, for end use and not for resale, and was injured as a result of Defendants' illegal conduct.

66.     Plaintiff Stephanie Luekel is a resident of Massachusetts who indirectly purchased SRAM from one or more of the Defendants or their co-conspirators during the Class Period, for end use and not for resale, and was injured as a result of Defendants' illegal conduct.  Pursuant to Mass. Gen. L. 93A, §9, Plaintiff mailed a written demand for relief to Defendants at least 30 days prior to filing her initial complaint.  No Defendant responded with a reasonable tender of settlement.

67.     Plaintiff Laura Magnuson is a resident of New York who indirectly purchased SRAM from one or more of the Defendants or their co-conspirators during the Class Period, for end use and not for resale, and was injured as a result of Defendants' illegal conduct.

68.     Plaintiff Lawrence Markey is a resident of California who indirectly purchased SRAM from one or more of the Defendants or their co-conspirators during the Class Period, for end use and not for resale, and was injured as a result of Defendants' illegal conduct.

69.     Plaintiff Terrence Martin is a resident of Michigan who indirectly purchased SRAM from one or more of the Defendants or their co-conspirators during the Class Period, for end use and not for resale, and was injured as a result of Defendants' illegal conduct.

70.     Plaintiff Kym Masters, a California resident, indirectly purchased SRAM from one or more of the Defendants or their co-conspirators during the Class Period, for end use and not for resale, and was injured as a result of Defendants' illegal conduct.

71.     Plaintiff Mark Miles is a resident of Arkansas who indirectly purchased SRAM from one or more of the Defendants or their co-conspirators during the Class Period, for end use and not for resale, and was injured as a result of Defendants' illegal conduct.

72.     Plaintiff Roman Muñoz is a resident of California who indirectly purchased SRAM from one or more of the Defendants or their co-conspirators during the Class Period, for end use and not for resale, and was injured as a result of Defendants' illegal conduct.

FOURTH CONSOLIDATED AMENDED CLASS ACTION COMPLAINT
Case No. M:07-CV-1819-CW

73.     Plaintiff Allen Nassiff is a resident of Vermont who indirectly purchased SRAM from one or more of the Defendants or their co-conspirators during the Class Period, for end use and not for resale, and was injured as a result of Defendants' illegal conduct.

74.     Plaintiff Jo Nash is a California resident who indirectly purchased SRAM from one or more of the Defendants or their co-conspirators during the Class Period, for end use and not for resale, and was injured as a result of Defendants' illegal conduct.

75.     Troung Nguyen is a Washington resident who indirectly purchased SRAM from one or more of the Defendants or their co-conspirators during the Class Period, for end use and not for resale, and was injured as a result of Defendants' illegal conduct.

76.     Plaintiff Blaine Olson is a Montana resident who indirectly purchased SRAM from one or more of the Defendants or their co-conspirators during the Class Period, for end use and not for resale, and was injured as a result of Defendants' illegal conduct.

77.     Plaintiff Cade Oyadomori is a resident of Hawaii who indirectly purchased SRAM from one or more of the Defendants or their co-conspirators during the Class Period, for end use and not for resale and primarily for personal, family, or household purposes, and was injured as a result of Defendants' illegal conduct.  Pursuant to Hawaii Rev. Stat. §480-13.3, Plaintiff filed his initial Complaint under seal and served a copy on Hawaii's Attorney General within seven days. Following expiration of the statutory review period, the Hawaii Attorney General informed the United States District Court for the District of Hawaii that it would not proceed with the action or file its own action involving the same or similar claims as set forth in Plaintiff's initial Complaint.

78.     Plaintiff Jai Paguirigan is a resident of Wisconsin who indirectly purchased SRAM from one or more of the Defendants or their co-conspirators during the Class Period, for end use and not for resale, and was injured as a result of Defendants' illegal conduct.

79.     Plaintiff Penobscot Eye Care is Maine company that indirectly purchased SRAM from one or more of the Defendants or their co-conspirators during the Class Period, for end use and not for resale, and was injured as a result of Defendants' illegal conduct.

80.     Plaintiff David Perez is a resident of California who indirectly purchased SRAM from one or more of the Defendants or their co-conspirators during the Class Period, for end use and not

for resale, and was injured as a result of Defendants' illegal conduct.

81.     Plaintiff John Pharr d/b/a JP Micro is a resident of Florida who indirectly purchased SRAM from one or more of the Defendants or their co-conspirators during the Class Period, for end use and not for resale, and was injured as a result of Defendants' illegal conduct.

82.     Plaintiff Suzanna Purdy is a resident of Nevada who indirectly purchased SRAM from one or more of the Defendants or their co-conspirators during the Class Period, for end use and not for resale, and was injured as a result of Defendants' illegal conduct.

83.     Plaintiff Mark Pierce is a New Hampshire resident who indirectly purchased SRAM from one or more of the Defendants or their co-conspirators during the Class Period, for end use and not for resale, and was injured as a result of Defendants' illegal conduct.

84.     Plaintiff Daniel Price is a resident of California who indirectly purchased SRAM from one or more of the Defendants or their co-conspirators during the Class Period, for end use and not for resale, and was injured as a result of Defendants' illegal conduct.

85.     Plaintiff Greg Proiette is a resident of California who indirectly purchased SRAM from one or more of the Defendants or their co-conspirators during the Class Period, for end use and not for resale, and was injured as a result of Defendants' illegal conduct.

86.     Plaintiff Reclaim Center, Inc. is a Minnesota corporation that indirectly purchased SRAM from one or more of the Defendants or their co-conspirators during the Class Period, for end use and not for resale, and was injured as a result of Defendants' illegal conduct.

87.     Plaintiff David Reedy is a resident of California who indirectly purchased SRAM from one or more of the Defendants or their co-conspirators during the Class Period, for end use and not for resale, and was injured as a result of Defendants' illegal conduct.

88.     Plaintiff Richard Romero is a resident of New Mexico who indirectly purchased SRAM from one or more of the Defendants or their co-conspirators during the Class Period, for end use and not for resale, and was injured as a result of Defendants' illegal conduct.

89.     Plaintiff Candace Rowlette is a resident of Florida who indirectly purchased SRAM from one or more of the Defendants or their co-conspirators during the Class Period, for end use and not for resale, and was injured as a result of Defendants' illegal conduct.

90. Plaintiff Frederick Rozo is a resident of California who indirectly purchased SRAM from one or more of the Defendants or their co-conspirators during the Class Period, for end use and not for resale, and was injured as a result of Defendants' illegal conduct.

91. Plaintiffs Stacy Salzman and Mitchell Salzman are residents of Florida who indirectly purchased SRAM from one or more of the Defendants or their co-conspirators during the Class Period, for end use and not for resale, and were injured as a result of Defendants' illegal conduct.

92. Plaintiffs Timothy Show and Nuja Show are residents of Arizona who indirectly purchased SRAM from one or more of the Defendants or their co-conspirators during the Class Period, for end use and not for resale, and were injured as a result of Defendants' illegal conduct.

93. Plaintiff Jason Smith is a resident of Pennsylvania who indirectly purchased SRAM from one or more of the Defendants or their co-conspirators during the Class Period, primarily for personal, family or household purposes, and was injured as a result of Defendants' illegal conduct.

94. Plaintiff Joe Solo is a resident of California who indirectly purchased SRAM from one or more of the Defendants or their co-conspirators during the Class Period, for end use and not for resale, and was injured as a result of Defendants' illegal conduct.

95. Plaintiff Craig Sparks is a resident of Iowa who indirectly purchased SRAM from one or more of the Defendants or their co-conspirators during the Class Period, for end use and not for resale, and was injured as a result of Defendants' illegal conduct.

96. Plaintiff Stargate Films is a California corporation that indirectly purchased SRAM from one or more of the Defendants or their co-conspirators during the Class Period, for end use and not for resale, and was injured as a result of Defendants' illegal conduct.

97. Plaintiff Christopher J. Stawski is a resident of Wisconsin who indirectly purchased SRAM from one or more of the Defendants or their co-conspirators during the Class Period, for end use and not for resale, and was injured as a result of Defendants' illegal conduct.

98. Plaintiff Lara Sterenberg is a resident of Arizona who indirectly purchased SRAM from one or more of the Defendants or their co-conspirators during the Class Period, for end use and not for resale, and was injured as a result of Defendants' illegal conduct.

99. Plaintiff Aaron Stobbe is a Utah resident who indirectly purchased SRAM from one

or more of the Defendants or their co-conspirators during the Class Period, for end use and not for resale, and was injured as a result of Defendants' illegal conduct.

100.    Plaintiff David Takeda is a California resident who indirectly purchased SRAM from one or more of the Defendants or their co-conspirators during the Class Period, for end use and not for resale, and was injured as a result of Defendants' illegal conduct.

101.    Plaintiff Don Thompson is a resident of California who indirectly purchased SRAM from one or more of the Defendants or their co-conspirators during the Class Period, for end use and not for resale, and was injured as a result of Defendants' illegal conduct.

102.    Plaintiffs E. Carol Vinson and Robert Vinson are residents of Arizona who indirectly purchased SRAM from one or more of the Defendants or their co-conspirators during the Class Period, for end use and not for resale, and were injured as a result of Defendants' illegal conduct.

103.    Plaintiff Robert Schulyer Watson is a resident of Vermont who indirectly purchased SRAM from one or more of the Defendants or their co-conspirators during the Class Period, for end use and not for resale, and was injured as a result of Defendants' illegal conduct.

104.    Plaintiff UFCW 8 – Golden State is a resident of California that indirectly purchased SRAM from one or more of the Defendants or their co-conspirators during the Class Period, for end use and not for resale, and was injured as a result of Defendants' illegal conduct.

105.    Plaintiff United Food & Commercial Workers Local 99 is a resident of Arizona that indirectly purchased SRAM from one or more of the Defendants or their co-conspirators during the Class Period, for end use and not for resale, and was injured as a result of Defendants' illegal conduct.

106.    Plaintiff United Food & Commercial Workers Local 711 is a resident of Nevada that indirectly purchased SRAM from one or more of the Defendants or their co-conspirators during the Class Period, for end use and not for resale, and was injured as a result of Defendants' illegal conduct.

107.    Plaintiff Daniel Yohalem is a resident of New Mexico who indirectly purchased SRAM from one or more of the Defendants or their co-conspirators during the Class Period, for end use and not for resale, and was injured as a result of Defendants' illegal conduct.

108.   Plaintiff Rachael Zaas is a resident of Michigan who indirectly purchased SRAM from one or more of the Defendants or their co-conspirators during the Class Period, for end use and not for resale, and was injured as a result of Defendants' illegal conduct.

109.   Plaintiff Bekah Zietz is a resident of Washington who indirectly purchased SRAM from one or more of the Defendants or their co-conspirators during the Class Period, for end use and not for resale, and was injured as a result of Defendants' illegal conduct.

**B.**   **The Defendants.**

110.   Defendant Samsung Electronics Company, Ltd. is a business entity organized under the laws of South Korea, with its principal place of business at Samsung Main Building 250-Taepyungro-2 ka, Chung-gu, Seoul, Korea.  During the time period covered by this Complaint, Defendant Samsung Electronics Company, Ltd. manufactured, sold and distributed SRAM to customers throughout the United States.

111.   Defendant Samsung Electronics America, Inc. is a wholly owned and controlled subsidiary of Defendant Samsung Electronic Company, Ltd. with its principal place of business at 105 Challenger Road, Ridgefield Park, New Jersey.  During the time period covered by this Complaint, Defendant Samsung Electronics America, Inc. sold SRAM to customers throughout the United States.

112.   Defendant Samsung Semiconductor, Inc. is a wholly owned and controlled subsidiary of defendant Samsung Electronics Company, Ltd. with its principal place of business at 3655 North First Street, San Jose, California.  During the time period covered by this Complaint, Defendant Samsung Semiconductor, Inc. sold and distributed SRAM to customers throughout the United States.  Samsung Electronics Company, Ltd. and Samsung Semiconductor, Inc. are referred to collectively herein as "Samsung."

113.   Defendant Hynix Semiconductor, Inc. is a business entity organized under the laws of South Korea, with its principal place of business at SAN 163-1, Ami-Ri Bubal-Up, Ichon-City, Korea.  During the time period covered by this Complaint, Defendant Hynix Semiconductor, Inc. manufactured, sold and distributed SRAM to customers throughout the United States.

114.   Defendant Hynix Semiconductor America, Inc. is a wholly owned and controlled

subsidiary of defendant Hynix Semiconductor, Inc. with its principal place of business at 3101 North First Street, San Jose, California.  During the time period covered by this Complaint, Defendant Hynix Semiconductor America, Inc. sold and distributed SRAM to customers throughout the United States.  Hynix Semiconductor, Inc. and Hynix Semiconductor America, Inc. are referred to collectively herein as "Hynix."

115.    Defendant Micron Technology, Inc. is a Delaware Corporation with its principal place of business at 8000 South Federal Way, Boise, Idaho.  During the time period covered by this Complaint, Defendant Micron Technology, Inc. manufactured, sold and distributed SRAM throughout the United States.

116.    Defendant Micron Semiconductor Products, Inc. is a wholly owned and controlled subsidiary of defendant Micron Technology, Inc. with its principal place of business at 8000 South Federal Way, Boise, Idaho.  During the time period covered by this Complaint, Defendant Micron Semiconductor Products, Inc. sold and distributed SRAM to customers throughout the United States.  Micron Technology, Inc. and Micron Semiconductor Products, Inc. are referred to collectively herein as "Micron."

117.    Defendant NEC Electronics Corporation is a business entity organized under the laws of Japan, with its principal place of business at 1753 Shimonumabe, Nakahara-Ku, Kawasaki, Kanagawa, Japan.  During the time period covered by this Complaint, Defendant NEC Electronics Corporation sold SRAM to customers throughout the United States.

118.    Defendant NEC Electronics America, Inc. is a wholly owned and controlled subsidiary of NEC Electronics Corporation, with its principal place of business at 2880 Scott Boulevard, Santa Clara, California and its manufacturing plant in Roseville, California.  During the time period covered by this Complaint, Defendant NEC Electronics America, Inc. sold and distributed SRAM to customers throughout the United States.  NEC Electronics Corporation and NEC Electronics America, Inc. are referred to collectively herein as "NEC."

119.    Defendant Cypress Semiconductor, Inc. ("Cypress") is a business entity organized under the laws of California, with its principal place of business at 3939 North First Street, San Jose, California.  During the time period covered by this Complaint, Defendant Cypress Semiconductor,

Inc. sold and distributed SRAM to customers throughout the United States.

120.     Defendant Mitsubishi Electric Corporation is a business entity organized under the laws of Japan, with its principal place of business at Tokyo Building 2-7-3, Marunouchi, Chiyoda-ku, Tokyo 100-8310, Japan.  During the time period covered by this Complaint, Defendant Mitsubishi Electric Corporation, Inc. manufactured, sold and distributed SRAM to customers throughout the United States.

121.     Defendant Mitsubishi Electric & Electronics USA, Inc. is a wholly owned and controlled subsidiary of defendant Mitsubishi Electric Corporation.  Defendant Mitsubishi Electric & Electronics USA, Inc. is a business entity organized under the laws of Delaware, with its principal place of business at 500 Corporate Woods Parkway, Vernon Hills, IL 60061.  During the time period covered by this Complaint, Defendant Mitsubishi Electric & Electronics USA, Inc. manufactured, sold and distributed SRAM to customers throughout the United States.  Mitsubishi Electric Corporation and Mitsubishi Electric & Electronics USA, Inc. are referred to collectively herein as "Mitsubishi."

122.     Defendant Renesas Technology Corporation is a business entity organized under the laws of Japan with its principal place of business at Nippon Bldg., 2-6-2, Ote-machi, Chiyoda-ku, Tokyo 100-0004, Japan.  Renesas Technology Corporation was established in April 2003 as a joint venture between Defendants Hitachi, Ltd. and Mitsubishi Electric Corp.  During the time period covered by this Complaint, Defendant Renesas Technology Corporation sold SRAM to customers throughout the United States.

123.     Defendant Renesas Technology America, Inc. is a wholly owned and controlled subsidiary of Renesas Technology Corporation with its principal place of business at 450 Holger Way, San Jose, California, 95134-1368.  During the time period covered by this Complaint, Defendant Renesas Technology America, Inc. sold and distributed SRAM to customers throughout the United States.  Renesas Technology America, Inc. and Renesas Technology Corporation are referred to collectively herein as "Renesas."

124.     Defendant Toshiba Corporation is a business entity organized under the laws of Japan, with its principal place of business at 1-1, Shibaura 1-chome, Minato-ku, Tokyo 105-8001,

Japan. During the time period covered by this Complaint, Defendant Toshiba Corporation manufactured, sold and distributed SRAM to customers throughout the United States.

125. Defendant Toshiba America, Inc. is a wholly owned and controlled subsidiary of Toshiba Corporation with its principal place of business at 1251 Avenue of the Americas, Suite 4110 New York, NY 10020. During the time period covered by this Complaint, Defendant Toshiba America, Inc. manufactured, sold and distributed SRAM to customers throughout the United States.

126. Defendant Toshiba America Electronic Components, Inc. is a wholly owned and controlled subsidiary of Toshiba Corporation with its principal place of business located at 19900 MacArthur Boulevard, Suite 400, Irvine, CA 92612. During the time covered by this Complaint, Defendant Toshiba America Electronic Components, Inc. sold and distributed SRAM to customers throughout the United States. Toshiba Corporation, Toshiba America Corporation, and Toshiba America Electronic Components, Inc. are referred to collectively herein as "Toshiba."

127. Defendant Etron Technology, Inc. is a business entity organized under the laws of Taiwan, with its principal place of business at No. 6, Technology Road 5, Hsinchu Science Park, Hsinchu, Taiwan. During the time period covered by this Complaint, Defendant Etron Technology, Inc. sold and distributed SRAM to customers throughout the United States.

128. Defendant Etron Technology America, Inc. is a wholly owned and controlled subsidiary of Etron Technology, Inc. with its principal place of business at 3375 Scott Blvd., Suite 128, Santa Clara, California. During the time period covered by this Complaint, Defendant Etron Technology America, Inc. sold SRAM to customers throughout the United States. Etron Technology, Inc. and Etron Technology America, Inc. are referred to collectively herein as "Etron."

129. Each of the Defendants named herein acted as the agent or joint venturer of or for the other Defendants with respect to the acts, violations and common course of conduct alleged herein. Each Defendant which is a subsidiary of a foreign parent acts as the sole United States agent for SRAM made by its parent company.

C.  **Co-Conspirators.**

130. Premier Technical Sales, Inc., Stratus Technical Sales, LLC, and Jack Shattuck participated as co-conspirators with the Defendants in the violations of law alleged in this Complaint

1    and have engaged in conduct and made statements in furtherance thereof.

2        131.    Various other firms, corporations, partnerships and/or individuals, domestic and/or

3    foreign, who are presently unknown to Plaintiffs, participated as co-conspirators with the Defendants

4    in the violations of law alleged in this Complaint and have engaged in conduct and made statements

5    in furtherance thereof.

6        132.    The acts charged in this Complaint have been done by some or all of Defendants and

7    their co-conspirators, or were authorized, ordered or done by their respective officers, agents,

8    employees or representatives while actively engaged in the management of each Defendant's

9    business or affairs.

10       133.    Defendants are also liable for acts done in furtherance of the alleged conspiracy by

11   companies they acquired through merger or acquisition.

12                    **EFFECTS ON INTERSTATE AND INTRASTATE COMMERCE**

13       134.    Defendants conduct business throughout the United States, including in the State of

14   California, and they have purposefully availed themselves of the laws of the United States.

15   Defendants' products are sold in the flow of interstate commerce and Defendants' activities had a

16   direct, substantial and reasonably foreseeable effect on such commerce.

17       135.    Defendants' conspiracy further substantially affected commerce in each of the states

18   identified herein.  Defendants have purposefully availed themselves of the laws of each of the states

19   identified herein in connection with their activities relating to the pricing of SRAM.  Defendants

20   produced, promoted, sold, marketed, and/or distributed SRAM in each of the states identified herein,

21   thereby purposefully profiting from access to indirect purchasers in each such state.  As a result of

22   the activities described herein, Defendants:

        a.    Caused tortious damage to the residents of the states identified herein;

        b.    Caused tortious damage in each of the states identified herein by acts or
omissions committed outside each such state by regularly doing or soliciting
business in each such state;

        c.    Engaged in persistent courses of conduct within each such state and/or derived
substantial revenue from the marketing of SRAM in each such state (and

-19-

services relating to such marketing); and

d. Committed acts or omissions that they knew or should have known would cause damage (and did, in fact, cause such damage) in each such state while regularly doing or soliciting business in each such state, engaging in other persistent courses of conduct in each such state and/or deriving substantial revenue from the marketing of SRAM (and services relating to such marketing) in each such state.

136. The conspiracy described herein affected adversely every person in each of the states identified in this Complaint who indirectly bought SRAM for end use and not for resale. Defendants' conspiracy has lasted for many years and resulted in monetary damages to purchasers in each state identified herein.

137. Prices of SRAM in each state can be manipulated by conspirators within that state, outside of it, or both. Without enforcing the antitrust and/or consumer protection laws of each of the states identified herein, companies that break the law will go unpunished. Defendants knew that commerce in each of the states identified herein would have to be adversely affected in order to implement their conspiracy.

## CLASS ACTION ALLEGATIONS

138. Plaintiffs bring this suit as a class action pursuant to Rules 23(b)(2) and 23(b)(3) of the Federal Rules of Civil Procedure, on behalf of themselves and a Plaintiff Class ("the Class") composed of and defined as follows:

> All persons and entities residing in the United States who, from November 1, 1996 through at least December 31, 2006, purchased SRAM in the United States indirectly from the Defendants for their own use and not for resale. Specifically excluded from this Class are the Defendants; the officers, directors or employees of any Defendant; any entity in which any Defendant has a controlling interest; and any affiliate, legal representative, heir or assign of any Defendant. Also excluded are any federal, state or local governmental entities, any judicial officer presiding over this action and the members of his/her immediate family and judicial staff, and any juror assigned to this action.

139. Plaintiffs also bring this action on their own behalf and as a class action pursuant to Rules 23 of the Federal Rules of Civil Procedure and/or respective state statute(s), on behalf of all members of the following classes (collectively, the "Indirect-Purchaser State Classes") with respect

-20-

1  to claims under the antitrust and/or consumer protection statutes of each of those jurisdictions and

2  under common law principles of unjust enrichment recognized in each of those jurisdictions:

3       a.    **ARIZONA**: All persons and entities in Arizona who indirectly purchased

4      SRAM and/or products containing SRAM, for end use and not for resale, that

5      was manufactured and/or sold by one or more of the Defendants during the

6      Class Period. Specifically excluded from this Class are the Defendants, the

7      officers, directors or employees of any Defendant; any entity in which any

8      Defendant has a controlling interest; and any affiliate, legal representative,

9      heir or assign of any Defendant. Also excluded are any federal, state or local

10      governmental entities, any judicial officer presiding over this action and the

11      members of his/her immediate family and judicial staff, and any juror

12      assigned to this action (the "Arizona Indirect Purchaser Class").

13       b.    **ARKANSAS**: All persons and entities in Arkansas who indirectly purchased

14      SRAM and/or products containing SRAM, for end use and not for resale, that

15      was manufactured and/or sold by one or more of the Defendants during the

16      Class Period. Specifically excluded from this Class are the Defendants, the

17      officers, directors or employees of any Defendant; any entity in which any

18      Defendant has a controlling interest; and any affiliate, legal representative,

19      heir or assign of any Defendant. Also excluded are any federal, state or local

20      governmental entities, any judicial officer presiding over this action and the

21      members of his/her immediate family and judicial staff, and any juror

22      assigned to this action (the "Arkansas Indirect Purchaser Class").

23       c.    **CALIFORNIA**: All persons and entities in California who indirectly

24      purchased SRAM and/or products containing SRAM, for end use and not for

25      resale, that was manufactured and/or sold by one or more of the Defendants

26      during the Class Period. Specifically excluded from this Class are the

27      Defendants, the officers, directors or employees of any Defendant; any entity

28      in which any Defendant has a controlling interest; and any affiliate, legal

representative, heir or assign of any Defendant. Also excluded are any federal, state or local governmental entities, any judicial officer presiding over this action and the members of his/her immediate family and judicial staff, and any juror assigned to this action (the "California Indirect Purchaser Class").

d.    **FLORIDA**: All persons and entities in Florida who indirectly purchased SRAM and/or products containing SRAM, for end use and not for resale, that was manufactured and/or sold by one or more of the Defendants during the Class Period. Specifically excluded from this Class are the Defendants, the officers, directors or employees of any Defendant; any entity in which any Defendant has a controlling interest; and any affiliate, legal representative, heir or assign of any Defendant. Also excluded are any federal, state or local governmental entities, any judicial officer presiding over this action and the members of his/her immediate family and judicial staff, and any juror assigned to this action (the "Florida Indirect Purchaser Class").

e.    **HAWAII**: All persons and entities in Hawaii who indirectly purchased SRAM and/or products containing SRAM, for personal, family or household use, that was manufactured and/or sold by one or more of the Defendants during the Class Period. Specifically excluded from this Class are the Defendants, the officers, directors or employees of any Defendant; any entity in which any Defendant has a controlling interest; and any affiliate, legal representative, heir or assign of any Defendant. Also excluded are any federal, state or local governmental entities, any judicial officer presiding over this action and the members of his/her immediate family and judicial staff, and any juror assigned to this action (the "Hawaii Indirect Purchaser Class").

f.    **IOWA**: All persons and entities in Iowa who indirectly purchased SRAM and/or products containing SRAM, for end use and not for resale, that was manufactured and/or sold by one or more of the Defendants during the Class Period. Specifically excluded from this Class are the Defendants, the officers,

directors or employees of any Defendant; any entity in which any Defendant has a controlling interest; and any affiliate, legal representative, heir or assign of any Defendant. Also excluded are any federal, state or local governmental entities, any judicial officer presiding over this action and the members of his/her immediate family and judicial staff, and any juror assigned to this action (the "Iowa Indirect Purchaser Class").

g.   **KANSAS**: All persons and entities in Kansas who indirectly purchased SRAM and/or products containing SRAM, for personal, family or household use, that was manufactured and/or sold by one or more of the Defendants during the Class Period.  Specifically excluded from this Class are the Defendants, the officers, directors or employees of any Defendant; any entity in which any Defendant has a controlling interest; and any affiliate, legal representative, heir or assign of any Defendant. Also excluded are any federal, state or local governmental entities, any judicial officer presiding over this action and the members of his/her immediate family and judicial staff, and any juror assigned to this action (the "Kansas Indirect Purchaser Class").

h.   **MAINE**: All persons and entities in Maine who indirectly purchased SRAM and/or products containing SRAM, for personal family or household use, that was manufactured and/or sold by one or more of the Defendants during the Class Period.  Specifically excluded from this Class are the Defendants, the officers, directors or employees of any Defendant; any entity in which any Defendant has a controlling interest; and any affiliate, legal representative, heir or assign of any Defendant. Also excluded are any federal, state or local governmental entities, any judicial officer presiding over this action and the members of his/her immediate family and judicial staff, and any juror assigned to this action (the "Maine Indirect Purchaser Class").

i.   **MASSACHUSETTS**: All persons and entities in Massachusetts who indirectly purchased SRAM and/or products containing SRAM, for end use

-23-

1    and not for resale, that was manufactured and/or sold by one or more of the

2    Defendants during the Class Period.  Specifically excluded from this Class are

3    the Defendants, the officers, directors or employees of any Defendant; any

4    entity in which any Defendant has a controlling interest; and any affiliate,

5    legal representative, heir or assign of any Defendant. Also excluded are any

6    federal, state or local governmental entities, any judicial officer presiding over

7    this action and the members of his/her immediate family and judicial staff,

8    and any juror assigned to this action (the "Massachusetts Indirect Purchaser

9    Class").

10    j.    **MICHIGAN**: All persons and entities in Michigan who indirectly purchased

11    SRAM and/or products containing SRAM, for end use and not for resale, that

12    was manufactured and/or sold by one or more of the Defendants during the

13    Class Period.  Specifically excluded from this Class are the Defendants, the

14    officers, directors or employees of any Defendant; any entity in which any

15    Defendant has a controlling interest; and any affiliate, legal representative,

16    heir or assign of any Defendant. Also excluded are any federal, state or local

17    governmental entities, any judicial officer presiding over this action and the

18    members of his/her immediate family and judicial staff, and any juror

19    assigned to this action (the "Michigan Indirect Purchaser Class").

20    k.    **MINNESOTA**: All persons and entities in Minnesota who indirectly

21    purchased SRAM and/or products containing SRAM, for end use and not for

22    resale, that was manufactured and/or sold by one or more of the Defendants

23    during the Class Period.  Specifically excluded from this Class are the

24    Defendants, the officers, directors or employees of any Defendant; any entity

25    in which any Defendant has a controlling interest; and any affiliate, legal

26    representative, heir or assign of any Defendant. Also excluded are any federal,

27    state or local governmental entities, any judicial officer presiding over this

28    action and the members of his/her immediate family and judicial staff, and

1    any juror assigned to this action (the "Minnesota Indirect Purchaser Class").

2    l.    **MISSISSIPPI**: All persons and entities in Mississippi who indirectly

3    purchased SRAM and/or products containing SRAM, for end use and not for

4    resale, that was manufactured and/or sold by one or more of the Defendants

5    during the Class Period.  Specifically excluded from this Class are the

6    Defendants, the officers, directors or employees of any Defendant; any entity

7    in which any Defendant has a controlling interest; and any affiliate, legal

8    representative, heir or assign of any Defendant. Also excluded are any federal,

9    state or local governmental entities, any judicial officer presiding over this

10    action and the members of his/her immediate family and judicial staff, and

11    any juror assigned to this action (the "Mississippi Indirect Purchaser Class").

12    m.    **MONTANA**: All persons and entities in Montana who indirectly purchased

13    SRAM and/or products containing SRAM, for end use and not for resale, that

14    was manufactured and/or sold by one or more of the Defendants during the

15    Class Period.  Specifically excluded from this Class are the Defendants, the

16    officers, directors or employees of any Defendant; any entity in which any

17    Defendant has a controlling interest; and any affiliate, legal representative,

18    heir or assign of any Defendant. Also excluded are any federal, state or local

19    governmental entities, any judicial officer presiding over this action and the

20    members of his/her immediate family and judicial staff, and any juror

21    assigned to this action (the "Montana Indirect Purchaser Class").

22    n.    **NEBRASKA**: All persons and entities in Nebraska who indirectly purchased

23    SRAM and/or products containing SRAM, for end use and not for resale, that

24    was manufactured and/or sold by one or more of the Defendants during the

25    Class Period.  Specifically excluded from this Class are the Defendants, the

26    officers, directors or employees of any Defendant; any entity in which any

27    Defendant has a controlling interest; and any affiliate, legal representative,

28    heir or assign of any Defendant. Also excluded are any federal, state or local

governmental entities, any judicial officer presiding over this action and the members of his/her immediate family and judicial staff, and any juror assigned to this action (the "Nebraska Indirect Purchaser Class").

o.   **NEVADA**: All persons and entities in Nevada who indirectly purchased SRAM and/or products containing SRAM, for end use and not for resale, that was manufactured and/or sold by one or more of the Defendants during the Class Period.  Specifically excluded from this Class are the Defendants, the officers, directors or employees of any Defendant; any entity in which any Defendant has a controlling interest; and any affiliate, legal representative, heir or assign of any Defendant. Also excluded are any federal, state or local governmental entities, any judicial officer presiding over this action and the members of his/her immediate family and judicial staff, and any juror assigned to this action (the "Nevada Indirect Purchaser Class").

p.   **NEW HAMPSHIRE**: All persons and entities in New Hampshire who indirectly purchased SRAM and/or products containing SRAM, for end use and not for resale, that was manufactured and/or sold by one or more of the Defendants during the Class Period.  Specifically excluded from this Class are the Defendants, the officers, directors or employees of any Defendant; any entity in which any Defendant has a controlling interest; and any affiliate, legal representative, heir or assign of any Defendant. Also excluded are any federal, state or local governmental entities, any judicial officer presiding over this action and the members of his/her immediate family and judicial staff, and any juror assigned to this action (the "New Hampshire Indirect Purchaser Class").,

q.   **NEW MEXICO**: All persons and entities in New Mexico who indirectly purchased SRAM and/or products containing SRAM, for end use and not for resale, that was manufactured and/or sold by one or more of the Defendants during the Class Period.  Specifically excluded from this Class are the

FOURTH CONSOLIDATED AMENDED CLASS ACTION COMPLAINT
Case No. M:07-CV-1819-CW

Defendants, the officers, directors or employees of any Defendant; any entity in which any Defendant has a controlling interest; and any affiliate, legal representative, heir or assign of any Defendant. Also excluded are any federal, state or local governmental entities, any judicial officer presiding over this action and the members of his/her immediate family and judicial staff, and any juror assigned to this action (the "New Mexico Indirect Purchaser Class").

r.    **NEW YORK**: All persons and entities in New York who indirectly purchased SRAM and/or products containing SRAM, for end use and not for resale, that was manufactured and/or sold by one or more of the Defendants during the Class Period.  Specifically excluded from this Class are the Defendants, the officers, directors or employees of any Defendant; any entity in which any Defendant has a controlling interest; and any affiliate, legal representative, heir or assign of any Defendant. Also excluded are any federal, state or local governmental entities, any judicial officer presiding over this action and the members of his/her immediate family and judicial staff, and any juror assigned to this action (the "New York Indirect Purchaser Class").

s.    **NORTH CAROLINA**: All persons and entities in North Carolina who indirectly purchased SRAM and/or products containing SRAM, for end use and not for resale, that was manufactured and/or sold by one or more of the Defendants during the Class Period.  Specifically excluded from this Class are the Defendants, the officers, directors or employees of any Defendant; any entity in which any Defendant has a controlling interest; and any affiliate, legal representative, heir or assign of any Defendant. Also excluded are any federal, state or local governmental entities, any judicial officer presiding over this action and the members of his/her immediate family and judicial staff, and any juror assigned to this action (the "North Carolina Indirect Purchaser Class").

t.    **PENNSYLVANIA**: All persons and entities in Pennsylvania who indirectly

FOURTH CONSOLIDATED AMENDED CLASS ACTION COMPLAINT
Case No. M:07-CV-1819-CW

purchased SRAM and/or products containing SRAM, for personal, family or household use, that was manufactured and/or sold by one or more of the Defendants during the Class Period.  Specifically excluded from this Class are the Defendants, the officers, directors or employees of any Defendant; any entity in which any Defendant has a controlling interest; and any affiliate, legal representative, heir or assign of any Defendant.  Also excluded are any federal, state or local governmental entities, any judicial officer presiding over this action and the members of his/her immediate family and judicial staff, and any juror assigned to this action (the "Pennsylvania Indirect Purchaser Class").,

u.   **RHODE ISLAND**: All persons and entities in Rhode Island who indirectly purchased SRAM and/or products containing SRAM, for personal, family or household use, that was manufactured and/or sold by one or more of the Defendants during the Class Period.  Specifically excluded from this Class are the Defendants, the officers, directors or employees of any Defendant; any entity in which any Defendant has a controlling interest; and any affiliate, legal representative, heir or assign of any Defendant. Also excluded are any federal, state or local governmental entities, any judicial officer presiding over this action and the members of his/her immediate family and judicial staff, and any juror assigned to this action (the "Rhode Island Indirect Purchaser Class").,

v.   **SOUTH DAKOTA**: All persons and entities in South Dakota who indirectly purchased SRAM and/or products containing SRAM, for end use and not for resale, that was manufactured and/or sold by one or more of the Defendants during the Class Period.  Specifically excluded from this Class are the Defendants, the officers, directors or employees of any Defendant; any entity in which any Defendant has a controlling interest; and any affiliate, legal representative, heir or assign of any Defendant. Also excluded are any federal,

1    state or local governmental entities, any judicial officer presiding over this

2    action and the members of his/her immediate family and judicial staff, and

3    any juror assigned to this action (the "South Dakota Indirect Purchaser

4    Class").

5    w.    **TENNESSEE**: All persons and entities in Tennessee who indirectly

6          purchased SRAM and/or products containing SRAM, for end use and not for

7          resale, that was manufactured and/or sold by one or more of the Defendants

8          during the Class Period.  Specifically excluded from this Class are the

9          Defendants, the officers, directors or employees of any Defendant; any entity

10         in which any Defendant has a controlling interest; and any affiliate, legal

11         representative, heir or assign of any Defendant. Also excluded are any federal,

12         state or local governmental entities, any judicial officer presiding over this

13         action and the members of his/her immediate family and judicial staff, and

14         any juror assigned to this action (the "Tennessee Indirect Purchaser Class").,

15   x.    **UTAH**: All persons and entities in Utah who indirectly purchased SRAM

16         and/or products containing SRAM, for end use and not for resale, that was

17         manufactured and/or sold by one or more of the Defendants during the Class

18         Period.  Specifically excluded from this Class are the Defendants, the officers,

19         directors or employees of any Defendant; any entity in which any Defendant

20         has a controlling interest; and any affiliate, legal representative, heir or assign

21         of any Defendant. Also excluded are any federal, state or local governmental

22         entities, any judicial officer presiding over this action and the members of

23         his/her immediate family and judicial staff, and any juror assigned to this

24         action (the "New Hampshire Indirect Purchaser Class").,

25   y.    **WEST VIRGINIA**: All persons and entities in West Virginia who indirectly

26         purchased SRAM and/or products containing SRAM, for end use and not for

27         resale, that was manufactured and/or sold by one or more of the Defendants

28         during the Class Period.  Specifically excluded from this Class are the

-29-

1    Defendants, the officers, directors or employees of any Defendant; any entity

2    in which any Defendant has a controlling interest; and any affiliate, legal

3    representative, heir or assign of any Defendant. Also excluded are any federal,

4    state or local governmental entities, any judicial officer presiding over this

5    action and the members of his/her immediate family and judicial staff, and

6    any juror assigned to this action (the "West Virginia Indirect Purchaser

7    Class").,

8    z.    **WISCONSIN**: All persons and entities in Wisconsin who indirectly

9    purchased SRAM and/or products containing SRAM, for end use and not for

10    resale, that was manufactured and/or sold by one or more of the Defendants

11    during the Class Period.  Specifically excluded from this Class are the

12    Defendants, the officers, directors or employees of any Defendant; any entity

13    in which any Defendant has a controlling interest; and any affiliate, legal

14    representative, heir or assign of any Defendant. Also excluded are any federal,

15    state or local governmental entities, any judicial officer presiding over this

16    action and the members of his/her immediate family and judicial staff, and

17    any juror assigned to this action (the "Wisconsin Indirect Purchaser Class").

18    and

19    aa.    **DISTRICT OF COLUMBIA**: All persons and entities in the District of

20    Columbia who indirectly purchased SRAM and/or products containing

21    SRAM, for personal, family or household use, that was manufactured and/or

22    sold by one or more of the Defendants during the Class Period.  Specifically

23    excluded from this Class are the Defendants, the officers, directors or

24    employees of any Defendant; any entity in which any Defendant has a

25    controlling interest; and any affiliate, legal representative, heir or assign of

26    any Defendant. Also excluded are any federal, state or local governmental

27    entities, any judicial officer presiding over this action and the members of

28    his/her immediate family and judicial staff, and any juror assigned to this

FOURTH CONSOLIDATED AMENDED CLASS ACTION COMPLAINT
Case No. M:07-CV-1819-CW

1        action (the "District of Columbia Indirect Purchaser Class").

2        140.     This action has been brought and may be properly maintained as a class action

3    pursuant to Rule 23 of the Federal Rules of Civil Procedure for the following reasons:

4             a.       The Class is ascertainable and there is a well-defined community of interest

5                      among the members of the Class;

6             b.       Based upon the nature of the trade and commerce involved and the number of

7                      indirect purchasers of SRAM, Plaintiffs believe that the members of the Class

8                      number in the thousands, and therefore is sufficiently numerous that joinder of

9                      all Class members is not practicable;

10            c.       Plaintiffs' claims are typical of the claims of the members of the Class

11                     because Plaintiffs indirectly purchased SRAM from one or more of the

12                     Defendants or their co-conspirators, and therefore Plaintiffs' claims arise from

13                     the same common course of conduct giving rise to the claims of the members

14                     of the Class and the relief sought is common to the Class;

15            d.       The following common questions of law or fact, among others, exist as to the

16                     members of the Class:

17                     i.       whether Defendants formed and operated a combination or conspiracy

18                              to fix, raise, maintain or stabilize the prices of, or allocate the market

19                              for, SRAM;

20                     ii.      whether the combination or conspiracy caused SRAM prices to be

21                              higher than they would have been in the absence of Defendants'

22                              conduct;

23                     iii.     the operative time period of Defendants' combination or conspiracy;

24                     iv.      whether Defendants' conduct caused injury to the business or property

25                              of Plaintiffs and the members of the Class;

26                     v.       the appropriate measure of the amount of damages suffered by the

27                              Class;

28                     vi.      whether Defendants' conduct violates Section 1 of the Sherman Act;

-31-

1    vii.    whether Defendants' conduct violates Sections 16720 and 17200 of

2    the California Business and Professions Code;

3    viii.   whether Defendants' conduct violates the antitrust, unfair competition,

4    and consumer protection laws of the other states as alleged below; and

5    ix.    the appropriate nature of class-wide equitable relief.

6    e.    These and other questions of law or fact which are common to the members of

7    the Class predominate over any questions affecting only individual members

8    of the Class;

9    f.    After determination of the predominate common issues identified above, if

10    necessary or appropriate, the Class can be divided into logical and manageable

11    subclasses;

12    g.    Plaintiffs will fairly and adequately protect the interests of the Class in that

13    Plaintiffs have no interests that are antagonistic to other members of the Class

14    and have retained counsel competent and experienced in the prosecution of

15    class actions and antitrust litigation to represent themselves and the Class;

16    h.    A class action is superior to other available methods for the fair and efficient

17    adjudication of this litigation since individual joinder of all damaged Class

18    Members is impractical; the damages suffered by individual Class Members

19    are relatively small, thus, absent the availability of class action procedures, it

20    would not be feasible for Class Members to redress the wrongs done to them;

21    i.    Defendants have acted, and refused to act, on grounds generally applicable to

22    the Class, thereby making appropriate final injunctive relief with respect to the

23    Class as a whole; and

24    j.    In the absence of a class action, Defendants would be unjustly enriched

25    because they would be able to retain the benefits and fruits of their wrongful

26    conduct.

27    141.    The Claims in this case are also properly certifiable under the laws of the State of

28    California, and of the other individual states identified below in the Fourth and Fifth Claims for

-32-

1   Relief.

2   ## NATURE OF THE MARKET

3   142.   Throughout the period of time covered by this Complaint, Defendants and their co-

4   conspirators engaged in the business of manufacturing, marketing and selling SRAM throughout the

5   United States.  The sale of SRAM constituted a multi-billion dollar business on an annual basis.  For

6   example, worldwide SRAM sales were estimated at approximately $3.3 billion in 2003, and at

7   approximately $4.1 billion in 2004, 50% of which were in the United States.

8   143.   In 1998, the top six manufacturers accounted for approximately 63% of SRAM sales,

9   and the top nine manufacturers accounted for approximately 79% of such sales.  In both 2003 and

10   2004, the top six manufacturers accounted for approximately 75% of SRAM sales; the top eight

11   manufacturers accounted for approximately 82% of SRAM sales.  In 2004, the top nine

12   manufacturers sold approximately 84% of all SRAM.  The Defendants are the largest manufacturers

13   and sellers of SRAM in the United States.

14   144.   The shares of the leading SRAM manufacturers in 2003 were as follows:  Samsung:

15   32.5%; Renesas  15.0%; Cypress  11.6%; Toshiba  7.9%; NEC  7.2%; Hynix   3.7%.

16   145.   The SRAM industry has been subject to consolidation during the Class Period.  For

17   example, on December 26, 2002, Hitachi, Ltd. and Mitsubishi Electric Corporation announced an

18   agreement to combine their semiconductor operations into a new company, Renesas Technology

19   Corp., by April 1, 2003.  In the Spring of 2003, Micron announced that it was exiting the SRAM

20   market and agreed to sell its synchronous SRAM product inventory to Cypress.

21   146.   Defendants operate manufacturing factories called fabrication plants or "fabs."  These

22   fabrication plants make "wafers" that are cut into individual chips, called "dies."  Once the dies have

23   electronics printed on them, the chip is complete.

24   147.   SRAM has no free-standing use; it must be inserted into a device, such as a computer,

25   to serve any function.  Because SRAM has no independent utility, the value of, and thus demand for,

26   SRAM is derived through its storage capabilities for products that need volatile memory.

27   148.   SRAM is a commodity, with commodity margins.  The SRAM market is

28   characterized by price inelasticity.  In fact, Defendants refer to "commodity SRAM" to mean a

-33-

FOURTH CONSOLIDATED AMENDED CLASS ACTION COMPLAINT
Case No. M:07-CV-1819-CW

1   common memory type of SRAM.

2   149.   When SRAM is purchased by consumers as part of an electronic device, it is a

3   distinct, physically-discrete, hardware element of the end-use product and is traceable throughout the

4   chain of distribution to the end user.  SRAM does not undergo any alterations as it moves through

5   the chain of distribution.  SRAM is identifiable by a part number, and bears a unique serial number

6   that would permit tracing.  Manufacturers such as Cypress, Hynix, Micron, NEC, Renesas, Samsung,

7   and Toshiba manufacture SRAM that is clearly identifiable by a specific, discrete part or model

8   number, and that bears a unique serial number that is directly traceable to the specific manufacturing

9   defendant.  Photos of samples of SRAM from Samsung, NEC and Micron are depicted below.





FOURTH CONSOLIDATED AMENDED CLASS ACTION COMPLAINT
Case No. M:07-CV-1819-CW

150.     The SRAM manufacturing market is dominated by a handful of leading manufacturers – the Defendants in this case.  The market for the manufacture and sale of SRAM is subject to high manufacturing and technological barriers to entry.  Efficient fabrication plants are large and costly.

151.     Defendants' direct-purchaser customers include the world's largest computer manufacturers, such as Hewlett Packard, IBM, Apple, Dell and Sun Microsystems; microprocessor manufacturers, such as Intel; computer equipment manufacturers such as Cisco; and cellular phone manufacturers such as Motorola and Ericsson.

152.     During the Class Period, the markets for the manufacture of the end-use products in which SRAM is incorporated were subject to vigorous price competition.  The SRAM and end-use markets are therefore inextricably linked, and cannot be considered separately.  Participants in the SRAM industry were well aware of this intimate relationship, and utilized end-use industry forecasts to predict sales of their own products.

153.     The end-use industries were all subject to vigorous price competition during the Class Period.  The SRAM direct purchasers had very thin net margins.  They were therefore at the mercy of their component costs, so that increases in component costs, such as the price of SRAM, lead to quick, corresponding price increases in the end-use products.

154.     SRAM is a significant cost component of end-use electronic products using memory chips.  Because of the thin margins for those electronic products, the original equipment manufacturers ("OEM") could not absorb any part of the increased cost of SRAM.

155.     The cost of memory chips, including SRAM, to direct-purchaser OEMs is an

important component in the selling price of that OEM's electronic products. If the cost that an OEM pays for SRAM increases, that directly affects the prices of the products sold by the OEM.

156.    As the market for computers, system servers, and other electronic devices was highly competitive during the Class Period, whenever an OEM paid more for memory chips, including SRAM, that OEM passed on 100% of that increased cost to its customers, who, in turn, passed on at least 100% of the increased SRAM costs to the end-user consumers, such as the Indirect-Purchaser Plaintiffs and the Class Members.

157.    Beginning in 1998 and continuing through much of 2001, SRAM prices rose, due to the effects of the industry-wide collusion alleged herein and which is being investigated by the DOJ. During 2000 alone, the average selling price of SRAM in the United States increased by 35%—from $3.93 in 1999 to approximately $5.31 in 2000. SRAM prices experienced an increase in 2002, and again in 2003 and subsequent years, which was the result of the Defendants' and their co-conspirators' price-fixing conspiracy.

158.    California is the largest market in the United States for SRAM and is the world-wide center of the computer industry and other industries that depend upon the SRAM markets. Statements concerning the prices and market conditions for SRAM were disseminated by Defendants from and into California on a regular and continuous basis.

## DEFENDANTS' ILLEGAL CONDUCT

159.    In October of 2006, the DOJ subpoenaed several companies in connection with an investigation of cartel activity in the SRAM industry, which included: Samsung, Cypress, Hynix, Micron, Mitsubishi, NEC, Renesas, and Toshiba. Several of the companies being investigated—Hynix, Micron and Samsung—pled guilty to price-fixing in the DRAM industry and paid substantial fines to the DOJ for those unlawful activities ($300 million for Samsung and $185 million for Hynix). Micron, another major SRAM manufacturer, was the amnesty applicant in the DRAM price-fixing investigation and paid a substantial fine.

160.    The DOJ's SRAM investigation is a criminal one. This fact is significant because, according to Chapter III, Section C.5 of the DOJ's Antitrust Division Manual, "[c]urrent Division policy is to proceed by criminal investigation and prosecution in cases involving horizontal, per se

1    unlawful agreements such as price-fixing, bid rigging and horizontal customer and territorial

2    allocations."

3         161.    Several of the individuals employed by Defendants who pled guilty to criminal

4    felonies in the DRAM criminal case investigation also had pricing responsibility for SRAM.  For

5    Defendant Samsung, these include:  (1) Tom Quinn, Vice-President of Marketing for Memory

6    Products; (2) Y. H. Park, Vice-President of Sales who had responsibility for U.S. memory pricing;

7    and (3) I. U. Kim, Vice-President of Marketing.  Those from Defendant Hynix who pled guilty to

8    felony price-fixing violations in DRAM and who also had responsibility for SRAM pricing included

9    its Senior Vice President and General Manager of Worldwide Sales and Marketing, D.S. Kim; its

10   Director of Global Strategic Accounts, C.K. Chung; and its Senior Manager and Vice President for

11   Product Marketing and Vice President for Operations, C.Y. Choi.

12        162.    Beginning at a date unknown to the Plaintiffs, but at least as early as November 1,

13   1996, and continuing thereafter to at least October 15, 2006, Defendants and their co-conspirators

14   engaged in a contract, combination, or conspiracy, the effect of which was to raise the prices at

15   which they sold SRAM to artificially-inflated and supra-competitive levels.

16        163.    Defendants, through their officers, directors and employees, effectuated the aforesaid

17   contract, combination, or conspiracy between themselves and their co-conspirators by, among other

18   things:

19              a.    participating in meetings and conversations, including through various trade

20                    associations consortiums, and working groups, to discuss the prices of SRAM

21                    in the United States;

22              b.    agreeing, during those meetings and conversations, to charge prices at

23                    specified levels and otherwise to increase and maintain prices of SRAM sold

24                    in the United States;

25              c.    issuing price announcements and quotations in accordance with the

26                    agreements reached; and

27              d.    selling SRAM in the United States at non-competitive prices.

28        164.    In furtherance of this conspiracy to fix prices, the SRAM manufacturers engaged in a

1   systematic and continuous exchange of confidential pricing, quantity and other business information.

2   Defendants and their co-conspirators communicated extensively with one another to discuss and

3   exchange information about SRAM, including the market and prices for SRAM in general, as well

4   as related to specific OEMs.

5        165.    Throughout the class period, representatives of the defendants communicated

6   personally or over the telephone or in writing in the United States to discuss SRAM business,

7   including SRAM pricing.  Such communications occurred in or about:  March 1997; May 1998;

8   December 1998; August 1999; October 1999; November 1999; December 1999; March 2000; April

9   2000; July 2000; August 2000; October 2000; November 2000; March 2001; April 2001; May 2001;

10  June 2001; July 2001; October 2001; November 2001; January 2002; February 2002; March 2002;

11  April 2002; June 2002; July 2002; November 2002; February 2003; April 2003; May 2003; June

12  2003; July 2003; December 2003; during 2004 (the exact months being unknown to Plaintiffs) and

13  September 2005.

14       166.    More specifically, representatives of one or more Defendants communicated on the

15  following dates about the subjects stated:

16            a.    Ken Yap of Samsung had direct contact with Cypress.  In a May 1998 email

17                    to his colleague, he asked, "I wonder if you have a wish list as we discussed in

18                    the previous meeting.  I'll have lunch with my buddy at Cypress on

19                    Thursday."  Il Ung Kim responds, "I am open to talk about anything related to

20                    SRAM business.  One curious topic could be mini-BGA cost, capacity and

21                    ramp-up plan."

22            b.    In September 1999, CK Chung sent an e-mail to Gary Swanson and others at

23                    Hynix regarding October pricing for Strategic Accounts and stated that he had

24                    "chatted with Samsung guys this morning"  and learned about Samsung's

25                    memory prices to certain OEMs.  Regarding the price increases contemplated

26                    by the e-mail, he says, "Hopefully [sic] this price increases have our strategic

27                    customers reduce their purchases, we can move more products in the spot,

28                    spot market price down reducing the gap with contract price, etc, etc.  Let's

-38-

1   hope the best."

2   c.   John Bugee of Samsung had direct contact with Cypress as well.  He sent an

3   e-mail to his colleagues in October 1999 which contained LPSRAM pricing to

4   Intel he received from Cypress.  He spoke to Cypress again and in March 13,

5   2000 reported on information, including pricing, he learned when he "spoke to

6   Cypress today regarding their LPSRAM program with Intel."  He spoke to

7   Cypress again on April 28, 2000 and reported that he "encouraged Cypress to

8   significantly increase (not decrease) their price" to Intel.  Bugee also shared

9   pricing information he received concerning Micron, NEC, and Toshiba.  Mr.

10   Bugee again spoke to Cypress on October 2, 1999 regarding pricing to Intel,

11   and reported back to Samsung that Cypress' "[c]urrent pricing is in the $6.00

12   range."  On October 21, 1999, Mr. Bugee again spoke to Cypress, and

13   reported to Samsung that "Cypress has quoted Y2K pricing of:  2M:

14   Presently very low $3.00 range, and sub-$2.00 in Q400.  4M:  $6.00."  Mr.

15   Bugee further reported that "Cypress acknowledged that the market is

16   tightening, and that customers are requesting upsides.  This might cause them

17   to re-adjust their forward pricing upwards, as well as continue to minimize

18   capacity commitments to Intel."  Bugee also spoke directly to Cypress in

19   August 2000 about prices to Intel and others.  His direct communications

20   continued into 2001.  In March 2001, HD Park asked Bugee and Steve

21   Wienger to let him know how much the competition sold in January and

22   February since they had "whole competition information."

23   d.   In November 1999, a new Samsung employee traveled to the United States

24   and met with representatives of Micron and Cypress.  J.H. Ko, wrote that he,

25   "met to discuss the Sync SRAM market."

26   e.   Bugee spoke directly to his contacts at Etron in December 1999 regarding

27   LPSRAM pricing.  He spoke to his contacts again in July 2000, when he

28   e-mailed, "I spoke to Etron this morning.  I am pleased to report the following

-39-

FOURTH CONSOLIDATED AMENDED CLASS ACTION COMPLAINT
Case No. M:07-CV-1819-CW

1   …" and provided intelligence about Etron's LPSRAM products and pricing to

2   Intel.  Bugee spoke again to his contact at Etron in October of that year.

3   Bugee spoke to his Etron contact in November 2000, regarding among other

4   things, prices to Intel.  Based on the information he received directly from

5   Etron about pricing to Intel, he suggests that the Etron "price" that Intel will

6   try to use to get Samsung to move its price is meaningless and that Samsung

7   should stay firm at its higher price. Bugee's communications continued to

8   2001.  In addition,  Woung Moo Lee, Senior Manager, Worldwide SRAM

9   Marketing,  also had direct communications with Etron regarding pricing.

10   f.   In July 2000, Bagbee of Samsung sent around competitive information.  Upon

11   receiving it, his colleague, H.D. Park, Manager SRAM Marketing,  replied,

12   "can we share this kind of competitive info, with price info, once per month at

13   least!!!"

14   g.   Mike Black of Micron Marketing had good friends at all of  Micron's so-

15   called competitors.  For example, in May 2001, Micron was looking for

16   information on Samsung and Cypress' datasheets for various SRAM.  Mike

17   Black was asked to get some information by Tom Pawlowski, another Micron

18   employee.  Another of Black's co-workers reported that Black was "pinging

19   his contacts for information" but it was not being received quickly enough for

20   Pawlowski, who directed Black to "please get the Cypress and Samsung info

21   directly from our contacts there?  Looks like this is a real hot potato now."

22   On October 26, 2001, Micron's Black reported to Micron and David Carr of

23   Silicon Access regarding discussions with Samsung, and wrote that "[m]y

24   conversations with them would put their road map similar to ours.  Pricing for

25   18M parts out in 2004 around $20 for a 400MHz and in 2005 would move to

26   $15 range…" [ellipsis in original].

27   h.   On June 15, 2001, Hee Sang Yoon, a Hynix employee in charge of SRAM

28   Strategic Marketing, sent an e-mail to SRAM Manufacturers, including

among others, Micron, suggesting that they meet for an "SRAM Manufacturer Meeting" on a regular basis.  Hynix states that "suppliers can control the market situation if they have accurate information on customer and market demand in general."  According to Hynix, it "would be a golden opportunity for us (SRAM vendors) since we could discuss how we could manage the ever changing market situation by exchanging our views on Today's SRAM Market."  The proposed meeting agenda included: SRAM Market Analysis by Application, Sales Performance and Forecast, Production Volume by Density, world wide supply forecasts by manufacturer and product roadmaps.

i.  Tom Pawlowski of Micron sent a Hynix e-mail to Jerry Johnson and Mike Black with the following note:  "Hmmm.  Interesting", Black's response to the request to have an official meeting to discuss SRAM prices was "Wow".

j.  Tom Pawlowski must have replied to Yoon at Hynix, who sent Pawlowski an e-mail on June 25, 2001, "I think we can make good time to get suppliers' status which you wanted it.  In my mind, someone who is in charge of marketing, they need two information one is demand forecast and the other one is supplier forecast…"  He suggests that Hynix can get "a lot of demand information"  and proposes a private SRAM meeting between the two companies.  The next day, June 26, Pawlowski responds to Hee Sang suggesting that he contact Mike Black.  On June 27, 2001, Micron's Black confirmed to Hynix' Yoon that "I would like to have an opportunity to meet with you and discuss this SRAM market."  That same day, Yoon wrote back and suggested that they meet in Korea.

k.  In October 2001, J. M. Sung of Hynix met with a Cypress employee, Mario Martinez in California about "SRAM product development & Market."

l.  Similarly, Mike Black sent an email in January 2002 to Jerry Johnson of Micron containing information that he had received on Samsung's worldwide synchronous SRAM sales and promised to send the Cypress data and GSI

-41-

Technology, Inc. ("GSI") information "when they get back from Japan …"
Jerry Johnson asked Black to put the information into a chart and Black
replied, "I will, but I want to wait until my Samsung buddy gets back, he has
the numbers for everybody!"

m.   On January 17, 2002, Mike Black (Micron Marketing) provided detailed
information regarding Samsung's "worldwide sync SRAM sales" to Jerry
Nalywajko (Micron Tactical Marketing Mgr.) and other Micron employees.

n.   Jack Truong of Samsung wrote to Mark D'Arcangelo, Product Marketing
Manager for SRAM at Hitachi, in February 2002 providing Samsung's SRAM
revenue numbers for low power, async fast and sync, and asking for Hitachi's
revenue numbers.  In response,  D'Arcangelo asked why Samsung's async
number was down from previous month and the sync number doubled and
Truong provided an explanation involving who the buyer was and other
information.  D'Arcangelo responded with Hitachi's numbers, and again
asked Truong about the Samsung numbers.  Truong provided additional
explanations.  They also asked one another about exchanging the competitors'
latest roadmaps, which, they both did.  On June 18, 2002, Hitachi's
D'Arcangelo emailed Hitachi's "SRAM numbers" to Truong as follows:
"Low Power: $435k Async: $628k Sync: $17k * Sun problem."  On
September 6, 2002, Hitachi's Toshihiko Seki wrote to Samsung's Truong
regarding Low Power SRAM, and asked "Are you able to share with me some
of the low power SRAM revenue number?" and "Can you share some data?"
and shared that "we do roughly 7M$/mo in worldwide right now and wafer
business is about 2M$ . . . "

o.   David Bagby, Samsung's Director of SRAM Sales, had lunch with "the NEC
America guys" in March 2002 regarding, among other things, the SRAM
prices to Intel.  Bagby provided "key" information from the lunch to his
colleague Woung Moo Lee (Senior Manager, Worldwide SRAM and MCP

Marketing, Semiconductor Sales Division, Samsung Electronics Company, Ltd.), who thanked him for the "valuable" information.  After his conversation with the "NEC guys," Bagby was able to tell Lee that with respect to 2M low power SRAM, "I think we have a chance to raise this price come April 1.  My feeling [is] a small increase will trigger the thought that maybe things will get tight and they better be careful."  NEC also reported to Bagby in that conversation that NEC had excess 4M low power SRAM that Intel did not want, and the parties discussed the TAM.  Bagby concluded "Keep price at $1.80."  On April 17, 2002, Samsung's Bagby wrote to Takahiro Kambe of Hitachi and stated "I would like to give you WW [world-wide] data on SRAM from all competitors would you like that."

p.   In April 2002, Micron's Jerry Nalywajko sent an e-mail around Micron with SRAM competitor ASP ("average selling price") and other data as well as data on the low power SRAM market.  He told his colleagues that while the data seemed reliable, "Mike Black will double ck on this with his sources."

q.   In July 2002, Black reached out to Mike Pearson at Samsung to see whether Samsung would answer a number of questions about its SRAM manufacturing processes and told Pearson that  "this may seem too sensitive, but we would be willing to exchange this level of information."  At first, Samsung "politely decline[d] … [the] offer to share data" but two days later had a "change of heart" and let Black know that he would have his competitor's sensitive data in a few days.

r.   In a November 21, 2002 e-mail to Jan Dupreez (Micron), Mike Black (Micron) provided comparative SSRAM specifications for Micron's top two competitors, Samsung and Cypress.

s.   In February 2003, Truong (Samsung) sent an e-mail to Goto at NEC thanking him for their conversation and attaching PSRAM roadmaps.  Goto responded in kind with NEC's latest roadmaps.  Both asked the other to keep the

information confidential.   On May 1, 2003, Samsung's Truong asked NEC's Goto "Would you like to exchange sync SRAM & Low power SRAM presentation between NEC and Samsung," and NEC's Goto responded that same day that "I have absolutely no problem to exchange an [updated] roadmap . . ."

t.     Samsung's Jack Truong met with Rob Sloan of Cypress on June 11, 2003 regarding SRAM.  After that meeting, Sloan sent an e-mail to Truong attaching Cypress's current SRAM presentation and requesting that Truong forward Samsung's to him.

u.     In September 2005, Y. S. Lee of Samsung wrote to Hiroyuki Goto of NEC and Clint Min of Renesas following up on their conversation during a "cigarette break" at a trade association meeting earlier in the day, and seeking a private dinner to discuss QDR II (SRAM).  The dinner was set up for September 23, 2005.  Before the dinner, Goto of NEC e-mailed his colleague at NEC to see what specific information was needed from Renesas, "I am having informal dinner with John and Clint tonight.  Is there anything you want me to hear from them?"  S. J. Han of NEC asked Goto to get some information about Samsung and Renesas SRAM QDR II+ and S3 and "run rates."

167.     In addition to the communications among the Defendants listed above, Defendants distributed various press releases and public statements designed to mislead the public about the reasons for SRAM price increases of SRAM.  For example on October 11, 1999, Electronic Buyers News reported:

a.     "[D]uring a conference call last week to financial analysts to report its quarterly earnings, Don Baldwin, vice president of Micron Technology, Boise, Idaho, said the company 'is on allocation across the board on all its memory products-128-Mbit and 64-Mbit DRAMs, flash, and SRAMs. We're forced to turn away a large amount of business, and most of the other DRAM

-44-

1        manufacturers are doing the same.'"

2        168.    On January 13, 2000, Purchasing Magazine, quoted Avo Kanadjian, vice president of

3    memory marketing for Samsung Electronics, as follows:    "Samsung's capacity utilization is at an

4    all-time high, . . . All of my product lines are fighting for capacity allocation. Flash would kill for

5    additional capacity. SRAM we can't supply enough of because of cell phones."

6        169.    The Defendants' earnings conference calls, transcripts of which are available online

7    in written and audio form, also revealed many misleading public statements about the pricing of

8    SRAM.  For example:

9                a.    On July 18, 2002 Cypress Semiconductor Corp. Q2 2002 Earnings Call:

10                    "Follow Up: Samsung is shifting production from older DRAM to SRAM,

11                    thoughts? . . .

12                    Answer: . . .  Right now, relationships, products are what's required to hang in

13                    there until capacity, supply and demand are equal, it's a non-event. It won't

14                    change pricing, the customer is driving pricing."  Cypres participants on the

15                    call were T.J. Rodgers (President and CEO), Emmanuel Hernandez (VP,

16                    Finance & Administration, and CFO), and Ralph Schmitt (EVP, Sales and

17                    Marketing.)

18                b.    During the July 15, 2004 Cypress Semiconductor Corp. Q2 2004 Earnings

19                    Call: Ralph Schmitt (Cypress EVP, Sales and Marketing) stated: "Our SRAM

20                    pricing in Q3 will be up, primarily due to the fact that we've negotiated that

21                    pricing with major contracts at our customers back in the May and June

22                    timeframe. . .T. J. Rodgers (Cypress President and CEO) stated: "On pricing,

23                    our average selling price last quarter was $1.38, up from $1.36 the quarter

24                    before that, $1.33 the quarter before, $1.28 a quarter before that and that was

25                    the bottom of the recession. So we've been actively raising prices. Right now

26                    we are not actively raising prices, but many of the price raises we've done

27                    have yet to really show up in revenue, so we still expect favorable news on

28                    ASPs going forward, although we're not, as I said, currently raising prices

-45-

more."

c.    On a January 26, 2006 <u>Cypress Semiconductor Corp. Q4 2005 Earnings Call</u>: T.J. Rodgers (President, CEO and Director) noted: "What's happened is the way we run our fabs, the value added products always get everything they need and then we fill up the rest of our fabs to their capability to make with SRAMs and right now we're 33% short, or 25% short on an $80mm demand and it's only the third week of the quarter. So we're booked up, we're in the process of pushing out some deliveries to the least profitable segments of the SRAM business. So we're going through the standard up turn maneuver of focusing on the best of our SRAM business to try to raise margins. So your question about double ordering is something we don't consider right now, what the mode we're in right now is we're calling our strategic accounts, we're telling them about the issues with SRAMs and we're asking them to tell us exactly what they need to stay alive and we are scheduling less than what they have ordered and we're making sure that their lines stay up and we don't contribute to a lines down situation. With regard to new business, we are raising our prices so that demand and supply will come into equilibrium. Double ordering always happens. I always say I don't think we have it because we have visibility. We really don't and I am sure we have it right now, but for right now what we ship is more of a negotiation with our customers than what the backlog is."

d.     Additionally, during a July 20, 2006 <u>Cypress Semiconductor Corp. Q2 2006 Earnings Call</u>:  T.J. Rodgers (Cypress President and CEO) stated: "Pricing did go up for SRAM last quarter. We have an active price raising program going on. . . . If you look at some of the more popular products, our 16 megabit SRAM, which is a high profit margin generator for us, went up to 931 from 915. So we drove that set (inaudible) faster (multiple speakers). Okay, let me give you a different number. That's a kind of aggregate number, which is not

1      as good. Our fast SRAMs -- those are high-speed 10 nanoseconds

2      asynchronous RAMs -- the 16-meg is up to $15.25 for an ASP. In

3      micropower, we raised the ASP in our 16-meg there, we raised the ASP in the

4      4-meg, which has been a commodity product to $1.40 from $1.04. So across

5      the board, when we are allocating, one of the things we say is -- how many

6      would you like and how much are you willing to pay? So we have been asked

7      to sell SRAMs below our cost to stay alive in the past and we're not hesitating

8      now to take whatever profit the market will bear when we have SRAMs that

9      are needed and there aren't enough of in the world."

10      e.    On a January 25, 2007 <u>Q4 2006 Cypress Semiconductor Earnings Conference

11      Call – Final,</u> Chris Seams, (EVP, Marketing, Sales and Manufacturing,

12      Cypress Semiconductor) stated: " . . . Let me cover a few of the usual indices

13      for the fourth quarter. Revenue splits by geography were not changed

14      significantly, Asia remained number one at 38% of sales, followed by North

15      America at 31%, Europe at 23%, and Japan at 9% of sales. No single

16      customer was greater than 10% of sales. Units for the quarter were 158

17      million, down slightly, mostly from the PC Clock divestiture and shipping

18      more high density synchronous static RAMs. ASP was a high point for the

19      quarter. We enjoyed a continued strong pricing environment. ASP was $1.22,

20      up significantly from the third quarter ASP of $1.13. This is due to the SRAM

21      market consolidation and a larger percent of our revenue coming from

22      proprietary parts where customers price on value."

23      170.    In reality, price increases in the SRAM market were the result of careful collaboration

24 and manipulation by the SRAM manufacturers in order to raise market prices.

25      171.    In addition to the communications listed above, Defendants attended various trade

26 associations meetings in the state of California, at which meetings they discussed SRAM pricing

27 with the purpose and effect of raising, fixing and stabilizing SRAM prices.  Defendants'

28 participation in the trade associations, industry consortiums, and working groups was recognized as

a way to communicate with so-called competitors.  Such meetings occurred at the following trade

associations:

       a.     The JEDEC Solid State Technology Association ("JEDEC") (formerly the

            Joint Electron Device Engineering Council) is the semiconductor engineering

            standardization body of the Electronic Industries Alliance, a trade association

            representing segments of the electronic industry.  All Defendants are members

            of this group and have representatives on various of its committees and

            subcommittees, which meet regularly.  The JEDEC touts the benefits of

            membership in the organization as including the ability to "take advantage of

            networking opportunities" and "make valuable contacts throughout the

            industry."  The activities of the JEDEC provided the Defendants with

            opportunities to conspire on the pricing of SRAM.  The defendants

            participated in JEDEC committee and board meetings in California on the

            following dates:  11/5/01; 11/6/01; 11/7/01; and 11/8/01.;

       b.     The QDR (Quad Data Rate) Consortium ("QDRC") was formed in February

            of 1999 to jointly develop QDR SRAM, a type of high speed SRAM.  Initial

            members included, on information and belief, Defendants Cypress, Micron,

            NEC and IDT.  In March 2001, Samsung joined the consortium and in

            September 2001, Hitachi joined as well.  The nature of the market and the

            relationships of the Defendants create the likelihood that there were other

            Defendants, not yet known to Plaintiffs, who were members of the

            consortium. The QDRC held regular meetings both in person and

            telephonically, at which members, and perhaps others, attended.  The

            activities of the QDRC provided the Defendants with opportunities to conspire

            on the pricing of SRAM.  The defendants participated in QDRC meetings in

            California on the following dates: 4/21/01; 6/5/01; 7/19/01; 9/27/01; 11/8/01;

            5/14/02; 4/3/03;  6/10/03; 10/28/03; 11/20/03; 12/16/03; 10/15/04; 12/13/04;

            1/28/05; 2/24/05; 3/24/05; 4/28/05; 5/20/05; 6/29/05; 8/2/05; 9/05; 11/15/05;

1    1/19/06;

2    c.    The SigmaRAM Consortium was founded in July of 1999 to jointly develop

3          high-speed asynchronous SRAM for networking and telecommunications

4          applications.  By 2003, its members included Sony, Mitsubishi and Toshiba

5          amd Alliance Semiconductor, GSI, and ISSI.  The activities of the

6          SigmaRAM Consortium provided the Defendants with opportunities to

7          conspire on the pricing of SRAM;

8    d.    The Common Specifications for Mobile RAM (COSMORAM) Group,

9          consisting of Fujitsu, NEC and Toshiba, was formed in 2002 to jointly

10         examine common specifications for mobile RAM.  The activities of the

11         COSMORAM Group provided the Defendants with opportunities to conspire

12         on the pricing of SRAM:

13   e.    The CellularRAM Working Group ("CWG") was initially formed by

14         Defendants Cypress, Micron and one of the guilty parties in the DOJ's DRAM

15         investigation, Infineon Technologies, Inc., to jointly work on development of

16         CellularRAM technology.  Defendant Hynix joined in 2005.  The activities of

17         the CWG provided the Defendants with opportunities to conspire on the

18         pricing of SRAM;

19   f.    The Die Products Consortium ("DPC")  is an organization dealing with, *inter*

20         *alia*, development of strategies to enlarge the market for memory die products.

21         Samsung, Hynix, Infineon and IBM were members at times between 2002 and

22         2004.  Micron employees discussed joining the DPC in April 2003 to among

23         other reasons "track" Samsung.  The memory suppliers met at Hynix in

24         California on June 25, 2003 to develop standards for packing die, and agreed

25         to meet again on August 12, 2003 in San Jose, California. The activities of the

26         DPC provided the Defendants with opportunities to conspire on the pricing of

27         SRAM;

28   g.    The Multi Chip Package (MCP) Consortium was formed to handle issues

-49-

FOURTH CONSOLIDATED AMENDED CLASS ACTION COMPLAINT
Case No. M:07-CV-1819-CW

regarding die products and MCP issues.  The group held a meeting in California on June 25, 2003, apparently in conjunction with the DPC meeting, and again in August 4, 2004 in California.  The members included Micron, Samsung, Hynix, Infineon, Intel, AMD, Sharp, and Qualcom, and Elpida and Toshiba were invited to join.  The activities of the MPC Consortium provided the Defendants with opportunities to conspire on the pricing of SRAM;

h.   The Council on Computing Power (CoCP) is an industry group dedicated to maximizing computer performance by increasing awareness of RAM by joint marketing.  It was created in 1999 by Hyundai, NEC, Samsung, Infineon, and Micron.  TAEC was added in 2000 and the defendants participated in CoCP meetings in California on the following dates: 3/3/00; 3/7/00; 6/12/00; 6/13/00.  The activities of the CoCP provided the Defendants with opportunities to conspire on the pricing of SRAM;

i.   The World Semiconductor Trade Statistcs Industry Association was formed to provide timely, accurate and authentic semiconductor market date on industry product shipments in a product line format.  Cypress, Micron, NEC, Renesas, Seiko Epson, Sony and Toshiba are members; and

j.   The MultiMediaCard Association (MMCA) is an industry group headquartered in Cupertino, California and promotes standards for a variety of memory products.  In April 2003, Defendants Samsung, Micron, Renesas, among others, attended meetings together.  The activities of the MMCA provided the Defendants with opportunities to conspire on the pricing of SRAM.

172.   The conduct of the "business" of these organizations gave Defendants and their co-conspirators the cover needed to contact one another with impunity and to communicate competitive information, including SRAM pricing.  For example, after a QDRC meeting in 2001, as the Defendants began to exchange competitive information, including pricing information, they designated the documents "QDR" as opposed to specific company names, in order to hide the

-50-

identity of the company providing that information so that their price-fixing activities would not disclose the participants. These "consortium" meetings often led to separate and more private meetings at which SRAM prices and markets were discussed. This is exemplified by an e-mail sent by NEC to Micron seeking "the opportunity to shoot the breeze with you guys outside of the [February 8, 2002] consortium meeting."

173. In a January 11, 2001 e-mail regarding the provision of pricing information on QDRC presentation materials, Jerry Johnson (Micron) states "now that we've beaten Sigma the pricing is going up."

174. In addition to these trade associations, Defendants also participated in many working groups and attended conferences, in California, all of which provided Defendants with opportunities to conspire on the pricing of SRAM. For example:

175. On November 14, 1997, Rahman of Hynix met with a Samsung employee in California to discuss SRAM business.

176. On May 28, 1998, Ken Yap of Samsung had lunch in California with a Cypress employee.

177. In December 6, 1999, Jay Ko from Samsung in Korea met with Cypress and IDT in San Jose, California.

178. On June 12-13, 2000, a number of Defendants participated in an "exchange" meeting in San Jose, California.

179. In March 2001, J. M. Sung of Hynix met with Infineon and ISSI (Jung Chang) in California about SRAM Business and Hynix met with ISSI again in April about SRAM business.

180. On May 14 and 15, 2001, representatives of Micron attended a Network Processor Forum ("NPF") in Ottawa, Canada, that was also attended by representatives of Cypress and IDT. Among the issues under consideration was whether the QDR Consortium SRAM specifications or those of Sigma RAM should be adopted as the industry standard. A follow-up meeting of the NPF was scheduled for June 26 and 27, 2001 in Cypress' San Jose offices.

181. In October 2001, J. M. Sung of Hynix met separately with both Cypress (Mario Martinez) and ISSI, in California, about "SRAM product development & Market."

182.    On July 24, 2002, Mike Pearson (Samsung) e-mailed the other members of the QDRC suggesting a meeting at Samsung on August 21, 2002—"prior to our QDR face-to-face"—with members of Sigma RAM to discuss the "standardization of timings."  Pearson indicates that this suggestion was prompted by discussions with members of the Sigma RAM group at the "NPF Look Aside Task Group."

183.    On January 28-29, 2003, a number of defendants had a platform conference in San Jose, California.

184.    On July 28, 2003, Samsung and Cypress employees met in San Jose, California regarding SRAM market and technology.

185.    In February, 2005, NEC and Cypress met in California to exchange sample memory devices

186.    On May 19, 2005, QDRC members met with Marvel in California to discuss SRAM issues.

187.    Defendants subscribed to the NECX, an online market exchange for electronic components and computer systems, and the American Integrated Chip Exchange ("AICE"), a real-time commodity chip exchange, based in California, that published lists of spot prices, including for SRAM.  In July 2000, NECX purchased the AICE and its RAMDEX website.  Thereafter, in 2001, NECX was acquired by Converge, a California exchange founded by a group of manufacturers including HP, Agilent Technologies, Compaq, Gateway, Hitachi, NEC and Samsung.  The stated goal of Converge was to reduce members' material costs.  In addition, the Defendants participated in surveys from, for example, Gartner/Dataquest's Monthly Pricing and Procurement Project.  These exchanges provided Defendants with additional outlets for shared pricing to use in their SRAM conspiracy.

188.    The predominant locus of Defendants' actions in the United States which formed a contract, combination, trust or conspiracy was the State of California.  Therefore, all members of the Class, whether or not California residents, are entitled to recover under California law, as well as the laws of their own states.

///

**ACTIVE CONCEALMENT**

189.    Throughout and beyond the conspiracy, Defendants and their co-conspirators affirmatively and actively concealed their unlawful conduct from Plaintiffs.  Defendants and their co-conspirators conducted their conspiracy in secret and kept it mostly within the confines of their higher-level executives.  Defendants and their co-conspirators publicly provided pre-textual and false justifications regarding their price increases.  Defendants and their co-conspirators conducted their conspiracy in secret, concealed the true nature of their unlawful conduct and acts in furtherance thereof, and actively concealed their activities through various other means and methods to avoid detection.  Plaintiffs did not discover, and could not have discovered through the exercise of reasonable diligence, that Defendants and their co-conspirators were violating the antitrust laws as alleged herein until shortly before this class action litigation was commenced.

190.    As a result of the active concealment of the conspiracy by Defendants and their co-conspirators, any and all applicable statutes of limitations otherwise applicable to the allegations herein have been tolled.

**PLAINTIFFS' INJURIES**

191.    Plaintiffs and the Class members as defined below have been damaged as a direct, foreseeable, and proximate result of Defendants' misconduct.  Plaintiffs and the Class members participate in the market for the sale of SRAM.  To the extent Plaintiffs and Class members purchase SRAM as part of a computer or other equipment purchase, Defendants' unlawful conspiracy and unfair, deceptive and unconscionable practices have caused the prices at which OEMs sell such SRAM to increase to supra-competitive levels.

192.    Defendants have extinguished the market forces of competition to their mutual benefit.  Consumers, including Plaintiffs and Class members, are injured by paying supra-competitive prices for SRAM.

193.    Because Defendants control the market for SRAM, there are virtually no choices for consumers who require such a memory product other than buying one from entities that pay supra-competitive prices to Defendants because of Defendants' unlawful agreement alleged herein.

194.    The market for SRAM and the markets for Computers and mobile phones are

intertwined because the SRAM market exists to serve the Computer and mobile phone markets. SRAM and Computer and mobile phone markets are united in that one cannot exist without the other.

195.    The conspiratorial conduct of the Defendants and their co-conspirators, the purpose of which is to raise the price of SRAM, would, on information and belief, directly increase the price of the Computers and mobile telecommunications devices.  The economic and legal literature has recognized that unlawful overcharges on a component normally resulted in higher prices for products that contained that price-fixed component.   As two noted antitrust scholars – Professors Robert G. Harris (Professor Emeritus and former Chair of the Business and Public Policy Group at the Haas School of Business at the University of California at Berkeley) and Lawrence A. Sullivan (Professor of Law Emeritus at Southwestern Law School and author of the Handbook of the Law of Antitrust) – have observed, "in a multiple-level chain of distribution, passing on monopoly overcharges is not the exception: it is the rule."

196.    Where as here, there are few products whose price is dependent on only one factor or variable, economists have developed techniques to isolate and understand the relationship between one "explanatory" variable and a "dependent" variable in those cases when the dependent variable is explained by a multitude of variables—when all such variables may be changing simultaneously. That analysis—called regression analysis—is commonly used in the real world and in litigation to determine the impact of a price increase on one cost in a product (or service) that is an assemblage of costs.  Thus, it will be possible to isolate and identify the impact of increases in the price of SRAM on computer and mobile telecommunication equipment prices even though these products contain a numbers of other components whose prices may be changing over time.

197.    During the Class Period, Plaintiffs and the Class Members paid supra-competitive prices for SRAM.  These inflated prices were passed on to them by manufacturers, distributors, and retailers.  Those overcharges have unjustly enriched Defendants.

///

///

///

## VIOLATIONS ALLEGED

### First Claim for Relief

#### (Violation of Section 1 of the Sherman Act)

198.    Plaintiffs incorporate and reallege, as though fully set forth herein, each and every allegation set forth in the preceding paragraphs of this Complaint.

199.    Beginning at a time presently unknown to Plaintiffs, but at least as early as November 1, 1996 and continuing through at least December 31, 2006, the exact dates being unknown to Plaintiffs, Defendants and their co-conspirators entered into a continuing agreement, understanding, and conspiracy in restraint of trade to artificially raise, fix, maintain, and/or stabilize prices for SRAM in the United States, in violation of Section 1 of the Sherman Act, 15 U.S.C. §1.

200.    In formulating and carrying out the alleged agreement, understanding, and conspiracy, the Defendants and their co-conspirators did those things that they combined and conspired to do, including but not limited to the acts, practices, and course of conduct set forth above, and the following, among others:

        a.      To fix, raise, maintain and stabilize the price of SRAM;

        b.      To allocate markets for SRAM among themselves;

        c.      To submit rigged bids for the award and performance of certain SRAM contracts; and

        d.      To allocate among themselves the production of SRAM.

201.    The combination and conspiracy alleged herein has had the following effects, among others:

        a.      Price competition in the sale of SRAM has been restrained, suppressed, and/or eliminated in the United States;

        b.      Prices for SRAM sold by Defendants and their co-conspirators have been fixed, raised, maintained and stabilized at artificially high, non-competitive levels throughout the United States; and

        c.      Those who purchased SRAM directly or indirectly from Defendants and their co-conspirators have been deprived of the benefits of free and open

1    competition.

2        202.    Plaintiffs have been injured and will continue to be injured in their business and

3 property by paying more for SRAM purchased indirectly from the Defendants and their co-

4 conspirators than they would have paid and will pay in the absence of the combination and

5 conspiracy, including paying more for personal computers and other products in which SRAM is a

6 component as a result of higher prices paid for SRAM by the manufacturers of those products.

7        203.    Plaintiffs and the class are entitled to an injunction against Defendants, preventing

8 and restraining the violations alleged herein.

9                      **<u>Second Claim for Relief</u>**

10             **(Violation of the California Cartwright Act)**

11        204.    Plaintiffs incorporate and reallege, as though fully set forth herein, each and every

12 allegation set forth in the preceding paragraphs of this Complaint.

13        205.    Defendants' contract, combination, trust or conspiracy was centered in, carried out,

14 effectuated and perfected mainly within the State of California, and Defendant's conduct within

15 California injured all members of the Class throughout the United States.  Therefore, this claim for

16 relief under California law is brought on behalf of all members of the Class, whether or not they are

17 California residents.

18        206.    Beginning at a time presently unknown to Plaintiffs, but at least as early as November

19 1, 1996, and continuing thereafter at least up to and including at least December 31, 2006,

20 Defendants and their co-conspirators entered into and engaged in a continuing unlawful trust in

21 restraint of the trade and commerce described above in violation of Section 16720, California

22 Business and Professional Code.  Defendants, and each of them, have acted in violation of Section

23 16720 to fix, raise, stabilize and maintain prices of, and allocate markets for, SRAM at supra-

24 competitive levels.

25        207.    The aforesaid violations of Section 16720, California Business and Professions Code,

26 consisted, without limitation, of a continuing unlawful trust and concert of action among the

27 Defendants and their co-conspirators, the substantial terms of which were to fix, raise, maintain and

28 stabilize the prices of, and to allocate markets for, SRAM.

208.     For the purpose of forming and effectuating the unlawful trust, the Defendants and their co-conspirators have done those things which they combined and conspired to do, including but in no way limited to the acts, practices and course of conduct set forth above and the following:

    a.     to fix, raise, maintain and stabilize the price of SRAM;

    b.     to allocate markets for SRAM amongst themselves;

    c.     to submit rigged bids for the award and performance of certain SRAM contracts; and

    d.     to allocate among themselves the production of SRAM.

209.     The combination and conspiracy alleged herein has had, inter alia, the following effects:

    a.     price competition in the sale of SRAM has been restrained, suppressed and/or eliminated in the State of California and throughout the United States;

    b.     prices for SRAM sold by Defendants and their co-conspirators have been fixed, raised, maintained and stabilized at artificially high, non-competitive levels in the State of California and throughout the United States; and

    c.     those who purchased SRAM from Defendants and their co-conspirators have been deprived of the benefit of free and open competition.

210.     Plaintiffs and the other members of the Class paid supra-competitive, artificially inflated prices for SRAM.

211.     As a direct and proximate result of Defendants' unlawful conduct, Plaintiffs and the members of the Class have been injured in their business and property in that they paid more for SRAM than they otherwise would have paid in the absence of Defendants' unlawful conduct.  As a result of Defendants' violation of Section 16720 of the California Business and Professions Code, Plaintiffs seek treble damages and the costs of suit, including reasonable attorneys' fees, pursuant to Section 16750(a) of the California Business and Professions Code.

**Third Claim for Relief**

**(Violation of the California Unfair Competition Law)**

212.     Plaintiffs incorporate and reallege, as though fully set forth herein, each and every

allegation set forth in the preceding paragraphs of this Complaint.

213.     Defendants' business acts and practices were centered in, carried out, effectuated and perfected mainly within the State of California, and Defendant's conduct within California injured all members of the Class throughout the United States.  Therefore, this claim for relief under California law is brought on behalf of all members of the Class, whether or not they are California residents.

214.     Beginning on a date unknown to Plaintiffs, but at least as early as November 1, 1996, and continuing thereafter at least up through and including December 31, 2006, Defendants committed and continue to commit acts of unfair competition, as defined by Sections 17200, *et seq.* of the California Business and Professions Code, by engaging in the acts and practices specified above.

215.     This Claim is instituted pursuant to Sections 17203 and 17204 of the California Business and Professions Code, to obtain restitution from these Defendants for acts, as alleged herein, that violated Section 17200 of the California Business and Professions Code, commonly known as the Unfair Competition Law.

216.     The Defendants' conduct as alleged herein violated Section 17200.  The acts, omissions, misrepresentations, practices and non-disclosures of Defendants, as alleged herein, constituted a common continuous and continuing course of conduct of unfair competition by means of unfair, unlawful and/or fraudulent business acts or practices within the meaning of California Business and Professions Code, Section 17200, *et seq.*, including, but not limited to, the following:

a.     The violations of Section 1 of the Sherman Act, as set forth above;

b.     The violations of Section 16720, *et seq.*, of the California Business and Professions Code, set above;

c.     Defendants' acts, omissions, misrepresentations, practices and non-disclosures, as described above, whether or not in violation of Section 16720, *et seq.* of the California Business and Professions Code, and whether or not concerted or independent acts, are otherwise unfair, unconscionable, unlawful or fraudulent;

d. Defendants' act and practices are unfair to consumers of SRAM in the State of California and throughout the United States, within the meaning of Section 17200, California Business and Professions Code; and

e. Defendants' acts and practices are fraudulent or deceptive within the meaning of Section 17200 of the California Business and Professions Code.

217. Plaintiffs and each of the Class members are entitled to full restitution and/or disgorgement of all revenues, earnings, profits, compensation and benefits which may have been obtained by Defendants as a result of such business acts or practices.

218. The illegal conduct alleged herein is continuing and there is no indication that Defendants will not continue such activity into the future.

219. The unlawful and unfair business practices of Defendants, and each of them, as described above, have caused and continue to cause Plaintiffs and the members of the Class to pay supra-competitive and artificially-inflated prices for SRAM. Plaintiffs and the members of the class suffered injury in fact and lost money or property as a result of such unfair competition.

220. The conduct of Defendants as alleged in this Complaint violates Section 17200 of the California Business and Professions Code.

221. As alleged in this Complaint, Defendants and their co-conspirators have been unjustly enriched as a result of their wrongful conduct and by Defendants' unfair competition. Plaintiff and the members of the Class are accordingly entitled to equitable relief including restitution and/or disgorgement of all revenues, earnings, profits, compensation and benefits which may have been obtained by Defendants as a result of such business practices, pursuant to the California Business and Professions Code, Sections 17203 and 17204.

**Fourth Claim for Relief**

**(Violation of State Antitrust and Unfair Competition Laws)**

222. Plaintiffs incorporate and reallege, as though fully set forth herein, each and every allegation set forth in the preceding paragraphs of this Complaint.

223. By reason of the foregoing, Defendants have entered into agreements in restraint of trade in violation of Arizona Revised Stat. §§44-1401 *et seq.*

224.     By reason of the foregoing, Defendants have entered into agreements in restraint of trade in violation of California Bus. & Prof. Code §§16700 *et seq.* and Cal. Bus. & Prof. Code §§17200 *et seq.*

225.     By reason of the foregoing, Defendants have entered into agreements in restraint of trade in violation of District of Columbia Code Ann. §§28-4503 *et seq.*

226.     By reason of the foregoing, Defendants have entered into agreements in restraint of trade in violation of Hawaii Code, H.R.S. §§ 480-1, *et seq.*

227.     By reason of the foregoing, Defendants have entered into agreements in restraint of trade in violation of Iowa Code §§553.1 *et seq.*

228.     By reason of the foregoing, Defendants have entered into agreements in restraint of trade in violation of Kansas Stat. Ann. §§50-101 *et seq.*

229.     By reason of the foregoing, Defendants have entered into agreements in restraint of trade in violation of Maine Rev. Stat. Ann. 10, §§1101 *et seq.*

230.     By reason of the foregoing, Defendants have entered into agreements in restraint of trade in violation of Michigan Comp. Laws. Ann. §§445.773 *et seq.*

231.     By reason of the foregoing, Defendants have entered into agreements in restraint of trade in violation of Minnesota Stat. §§325D.52 *et seq.*

232.     By reason of the foregoing, Defendants have entered into agreements in restraint of trade in violation of Mississippi Code Ann. §75-21-1 *et seq.*

233.     By reason of the foregoing, Defendants have entered into agreements in restraint of trade in violation of Nebraska Rev. Stat. §§59-801 *et seq.*

234.     By reason of the foregoing, Defendants have entered into agreements in restraint of trade in violation of Nevada Rev. Stat. Ann. §§598A *et seq.*

235.     By reason of the foregoing, Defendants have entered into agreements in restraint of trade in violation of New Mexico Stat. Ann. §§57-1-1 *et seq.*

236.     By reason of the foregoing, Defendants have entered into agreements in restraint of trade in violation of North Carolina Gen. Stat. §75-1 *et seq.*

237.     By reason of the foregoing, Defendants have entered into agreements in restraint of

1   trade in violation of North Dakota Cent. Code §§51-08.1-01 *et seq.*

2       238.    By reason of the foregoing, Defendants have entered into agreements in restraint of

3   trade in violation of the Puerto Rico Code 10 LPRA §251, *et seq.* and 31 LPRA §5141.

4       239.    By reason of the foregoing, Defendants have entered into agreements in restraint of

5   trade in violation of South Dakota Codified Laws Ann. §§37-1 *et seq.*

6       240.    By reason of the foregoing, Defendants have entered into agreements in restraint of

7   trade in violation of Tennessee Code Ann. §§47-25-101 *et seq.*

8       241.    By reason of the foregoing, Defendants have entered into agreements in restraint of

9   trade in violation of Vermont Stat. Ann. 9 §§2453 *et seq*

10      242.    By reason of the foregoing, Defendants have entered into agreements in restraint of

11  trade in violation of Utah Stat. §§ 76-10-919 *et seq.*

12      243.    By reason of the foregoing, Defendants have entered into agreements in restraint of

13  trade in violation of West Virginia §§47-18-1 *et seq.*

14      244.    By reason of the foregoing, Defendants have entered into agreements in restraint of

15  trade in violation of Wisconsin Stat. §§133.01 *et seq.*

16      245.    By reason of the foregoing, defendants have entered into agreements in restraint of

17  trade in violation of Wyoming Stat. §40-12-105.

18      246.    Class Members in each of the states listed above paid supra-competitive, artificially

19  inflated prices for SRAM. As a direct and proximate result of Defendants' unlawful conduct, such

20  members of the Class have been injured in their business and property in that they paid more for

21  SRAM than they otherwise would have paid in the absence of Defendants' unlawful conduct.

22      247.    As a result of Defendants' violations of the statutes set forth, Class members seek

23  damages and costs of suit, including reasonable attorneys' fees.

24                          **Fifth Claim for Relief**

25          **(Violation of State Consumer Protection and Unfair Competition Laws)**

26      248.    Plaintiffs incorporate and reallege, as though fully set forth herein, each and every

27  allegation set forth in the preceding paragraphs of this Complaint.

28      249.    Defendants engaged in unfair competition or unfair, unconscionable, deceptive or

-61-

1  fraudulent acts or practices in violation of the state consumer protection and unfair competition

2  statutes listed below.

3      250.    Defendants have engaged in unfair competition or unconscionable, unfair or

4  deceptive acts or practices in violation of Arkansas Code §4-88-101 *et seq.*

5      251.    Defendants have engaged in unfair competition or unfair or deceptive acts or

6  practices in violation of California Bus. & Prof. Code §17200 *et seq.*

7      252.    Defendants have engaged in unfair competition or unconscionable, unfair or

8  deceptive acts or practices in violation of District of Columbia Code §28-3901 *et seq.*

9      253.    Defendants have engaged in unfair competition or unconscionable, unfair or

10  deceptive acts or practices in violation of Florida Stat. §501.201 *et seq.*

11      254.    Defendants have engaged in unfair competition or unfair or deceptive acts or

12  practices in violation of Kansas Stat. §50-623 *et seq.*

13      255.    Defendants have engaged in unfair competition or unfair or deceptive acts or

14  practices that were indirectly purchased primarily for personal, family, or household purposes in

15  violation of 5 Maine Rev. Stat. §207 *et seq.*

16      256.    Defendants have engaged in unfair competition or unfair or deceptive acts or

17  practices in violation of Massachusetts General Laws, Chapter 93A, §1 *et seq.*

18      257.    Defendants have engaged in unfair  competition or unfair or deceptive acts or

19  practices in violation of Montana Code § 30-14-201 *et seq.*

20      258.    Defendants have engaged in unfair competition or unfair or deceptive acts or

21  practices in violation of Nebraska Rev. Stat. §59-1601 *et seq.*

22      259.    Defendants have engaged in unfair competition or unconscionable, unfair or

23  deceptive acts or practices in violation of New Mexico Stat. §57-12-1 *et seq.*

24      260.    Defendants have engaged in unfair competition or unfair or deceptive acts or

25  practices in violation of New York Gen. Bus. Law §349 *et seq.*  Specifically:

26          a.    Defendants engaged in commerce in New York;

27          b.    Defendants and their co-conspirators secretly agreed to raise prices by direct

28              agreement on bids to customers located in New York and through artificial

1    supply restraints on the entire SRAM market;

2    c.    New York consumers were targets of the conspiracy;

3    d.    The secret agreements were not known to New York consumers;

4    e.    Defendants made public statements about the price of SRAM and products

5          containing SRAM that Defendants knew would be seen by New York

6          consumers; such statements either omitted material information that rendered

7          the statements that they made materially misleading or affirmatively

8          misrepresented the real cause of price increases for SRAM and products

9          containing SRAM; and Defendants alone possessed material information that

10         was relevant to consumers, but failed to provide the information;

11   f.    Because of Defendants' unlawful trade practices in the State of New York,

12         there was a broad impact on New York consumer class members who

13         indirectly purchased SRAM; and consumer class members have been injured

14         because they have paid more for SRAM than they would have paid in the

15         absence of Defendants' unlawful trade acts and practices

16   g.    Because of Defendants' unlawful trade practices in the State of New York,

17         New York consumer class members who indirectly purchased SRAM were

18         misled to believe that they were paying a fair price for SRAM or the price

19         increases for SRAM were for valid business reasons; and similarly situated

20         consumers were potentially affected by Defendants' conduct;

21   h.    Defendants knew that their unlawful trade practices with respect to pricing

22         SRAM would have an impact on New York consumers and not just the

23         Defendants' direct customers;

24   i.    Defendants knew that their unlawful trade practices with respect to pricing

25         SRAM would have a broad impact, causing consumer class members who

26         indirectly purchased SRAM to be injured by paying more for SRAM than they

27         would have paid in the absence of Defendants' unlawful trade acts and

28         practices;

1          j.      Defendants' consumer-oriented violations adversely affected the public

2                 interest in the State of New York..

3      261.      Defendants have engaged in unfair competition or unconscionable, unfair or

4 deceptive acts or practices in violation of North Carolina Gen. Stat. §75-1 *et seq.*

5      262.      Defendants have engaged in unfair competition or unfair or deceptive acts or

6 practices in violation of the Pennsylvania Unfair Trade Practices and Consumer Protection Law, 73

7 P.S. Section 201-1 *et seq.*    Specifically:

8          a.      Defendants engaged in commerce in Pennsylvania;

9          b.      As alleged herein, Defendants engaged in acts or practices that were unfair or

10                 deceptive to natural persons creating a likelihood of confusion or

11                 misunderstanding on Plaintiffs' part;

12          c.      As alleged herein, Defendants used methods, acts or practices which mislead

13                 or deceive members of the public in a material respect about the true reasons

14                 for the price of SRAM;

15          d.      Pennsylvania consumers  purchased products primarily for personal, family or

16                 household purposes that contained SRAM manufactured by one or more of

17                 the Defendants;

18          e.      The price of SRAM incorporated into those products was artificially inflated

19                 due to the illegal price-fixing practices of the Defendants described above;

20          f.      The purchase price of the products bought by the Pennsylvania consumers

21                 which contained price inflated SRAM was thus, itself, artificially inflated;

22          g.      Pennsylvania consumers reasonably believed they were purchasing SRAM-

23                 containing products at a fair and competitive price, and reasonably relied on

24                 their respective purchasing prices being established honestly by the free

25                 market, but were deceived by the inclusion of illegally priced SRAM, which

26                 was artificially inflated the price of the products they bought;

27          h.      Pennsylvania consumers were injured by Defendants' actions.

28      263.      Defendants have engaged in unfair competition or unfair or deceptive acts or

practices that were indirectly purchased primarily for personal, family, or household purposes in violation of Rhode Island Gen. Laws. §6-13.1-1 *et seq.* Specifically:

    a.    Defendants engaged in commerce in Rhode Island;

    b.    Defendants and their co-conspirators unscrupulously and secretly agreed to raise SRAM prices by direct agreement on prices Defendants charged Defendants' customers located in Rhode Island and through artificial supply restraints on the entire SRAM market;

    c.    The secret agreements were not known to Rhode Island natural persons who indirectly purchased SRAM primarily for personal, family or household purposes;

    d.    Defendants made public statements that Defendants knew would be seen by Rhode Island natural persons who indirectly purchased SRAM primarily for personal, family or household purposes; such statements created a likelihood of confusion or misunderstanding with respect to the real reasons that the prices of SRAM and products containing SRAM were rising; and such statements either omitted material information that rendered the statements that they made materially misleading and confusing, or affirmatively deceived such consumers about the real cause of price increases for SRAM and products containing SRAM;

    e.    Because of Defendants' unlawful and unscrupulous trade practices in Rhode Island, natural persons in Rhode Island who indirectly purchased SRAM primarily for personal, family or household purposes were misled or deceived to believe that they were paying a fair price for SRAM or the price increases for SRAM were for valid business reasons;

    f.    Natural persons who indirectly purchased SRAM primarily for personal, family or household purposes have been injured because they have paid more for SRAM than they would have paid in the absence of Defendants' unlawful and unscrupulous trade acts and practices;

g.    Defendants knew that their unscrupulous and unlawful trade practices with respect to pricing SRAM would have an impact on Rhode Island natural persons who indirectly purchased SRAM primarily for personal, family or household purposes and not just the Defendants' direct customers;

h.    Defendants knew that their violations with respect to pricing SRAM would have a broad impact, causing natural persons who indirectly purchased SRAM primarily for personal, family or household purposes to be injured by paying more for SRAM than they would have paid in the absence of Defendants' unlawful trade acts and practices;

i.    Defendants' violations adversely affected public policy in Rhode Island..

264.   Defendants have engaged in unfair competition or unfair or deceptive acts or practices in violation of 9 Vermont §2451 *et seq.*

265.   Class Members in the states listed above paid supra-competitive, artificially inflated prices for SRAM.  As a direct and proximate result of Defendants' unlawful conduct, Plaintiffs and the members of the Class have been injured in their business and property in that they paid more for SRAM than they otherwise would have paid in the absence of Defendants' unlawful conduct.

266.   As a result of Defendants' violations of the laws listed above, the members of the Class in the states listed above are entitled to equitable relief including restitution and/or disgorgement of all revenues, earnings, profits, compensation and benefits which may have been obtained by Defendants as a result of such business practices, including compensable damages under New York law, and damages wherever else allowed by law.

**Sixth Claim for Relief**

**(Unjust Enrichment and Disgorgement of Profits)**

267.   Plaintiffs incorporate and reallege, as though fully set forth herein, each and every allegation set forth in the preceding paragraphs of this Complaint.

268.   Defendants have been unjustly enriched through overpayments by Plaintiffs and Class members and the resulting profits enjoyed by Defendants as a direct result of such overpayments. Plaintiffs' detriment and Defendants' enrichment were related to and flowed from the conduct

1   challenged in this Complaint.

2        269.    Under common law principles of unjust enrichment, Defendants should not be

3   permitted to retain the benefits conferred via overpayments by Plaintiffs and Class members.

4        270.    Plaintiffs and members of the following Indirect-Purchaser State Classes seek

5   disgorgement of all profits resulting from such overpayments and establishment of a constructive

6   trust from which Plaintiffs and Class members may seek restitution:

7           a.    Arizona Indirect-Purchaser Class;

8           b.    Arkansas Indirect-Purchaser Class;

9           c.    California Indirect-Purchaser Class;

10          d.    District of Columbia Indirect-Purchaser Class;

11          e.    Florida Indirect-Purchaser Class;

12          f.    Hawaii Indirect-Purchaser Class;

13          g.    Iowa Indirect-Purchaser Class;

14          h.    Kansas Indirect-Purchaser Class;

15          i.    Maine Indirect-Purchaser Class;

16          j.    Massachusetts Indirect-Purchaser Class;

17          k.    Michigan Indirect-Purchaser Class;

18          l.    Minnesota Indirect-Purchaser Class;

19          m.    Mississippi Indirect-Purchaser Class;

20          n.    Montana Indirect-Purchaser Class:

21          o.    Nebraska Indirect-Purchaser Class:

22          p.    Nevada Indirect-Purchaser Class;

23          q.    New Hampshire Indirect-Purchaser Class;

24          r.    New Mexico Indirect-Purchaser Class;

25          s.    New York Indirect-Purchaser Class;

26          t.    North Carolina Indirect-Purchaser Class;

27          u.    Pennsylvania Indirect-Purchaser Class;

28          v.    Rhode Island Indirect-Purchaser Class;

FOURTH CONSOLIDATED AMENDED CLASS ACTION COMPLAINT
Case No. M:07-CV-1819-CW

1      w.      South Dakota Indirect-Purchaser Class;

2      x.      Tennessee Indirect-Purchaser Class;

3      y.      Vermont Indirect-Purchaser Class;

4      z.      Washington Indirect-Purchaser Class:

5      aa.     West Virginia Indirect-Purchaser Class; and

6      bb.     Wisconsin Indirect-Purchaser Class.

7                          **PRAYER FOR RELIEF**

8      WHEREFORE, Plaintiffs pray:

9      A.      That the Court determine that the claims alleged herein under the Sherman

10   Act, state antitrust laws, and  state consumer protection and/or unfair competition laws may be

11   maintained as a Class action under Rule 23(a), (b)(2), and (b)(3) of the Federal Rules of Civil

12   Procedure;

13     B.      That the unlawful agreement, conduct, contract, conspiracy or combination

14   alleged herein be adjudged and decreed to be:

15     1.      A restraint of trade or commerce in violation of Section 1 of the Sherman Act,

16             as alleged in the First Claim for Relief;

17     2.      An unlawful combination, trust, agreement, understanding, and/or concert of

18             action in violation of the state antitrust laws identified in the Second and

19             Fourth Claims for Relief herein;

20     3.      Violations of the state consumer protection and unfair competition laws

21             identified in the Third and Fifth Claims for Relief herein; and

22     4.      Acts of unjust enrichment as set forth in the Sixth Claim for Relief herein.

23     C.      That Plaintiffs and the Class members recover damages, as provided by

24   federal and state antitrust laws, and that a judgment be entered in favor of Plaintiffs and the relevant

25   Class members against the Defendants, jointly and severally, in an amount to be trebled in

26   accordance with such laws (except as to New York Gen. Bus. Law §349 *et seq.*  for which Plaintiffs

27   do not seek discretionary trebling).

28     D.      That Plaintiffs and the relevant Class members obtain any penalties, punitive

or exemplary damages, and/or full consideration, where the laws of the respective states identified herein so permit;

E.      That Plaintiffs and the relevant Class members recover damages and/or all other available monetary and equitable remedies under the state unfair competition laws identified above;

F.      That Defendants, their affiliates, successors, transferees, assignees, and the officers, directors, partners, agents, and employees thereof, and all other persons acting or claiming to act on their behalf, be permanently enjoined and restrained from in any manner continuing, maintaining, or renewing the conduct, contract, conspiracy or combination alleged herein, or from entering into any other conspiracy alleged herein, or from entering into any other contract, conspiracy or combination having a similar purpose or effect, and from adopting or following any practice, plan, program, or device having a similar purpose or effect;

G.      That Plaintiffs and members of the Class be awarded restitution, including disgorgement of profits obtained by Defendants as a result of their acts of unfair competition and acts of unjust enrichment;

H.      That Plaintiffs and members of the Class be awarded pre- and post-judgment interest, and that that interest be awarded at the highest legal rate from and after the date of service of the initial complaint in this action;

I.      That Plaintiffs and members of the Class recover their costs of this suit, including reasonable attorneys' fees as provided by law; and

J.      That Plaintiffs and members of the Class have such other, further, and different relief as the case may require and the Court may deem just and proper under the circumstances.

Dated:  November 19, 2009                    Respectfully submitted,

                                              _____/s/ Christopher T. Micheletti_____
                                              Christopher T. Micheletti

                                              FRANCIS O. SCARPULLA (41059)
                                              CRAIG C. CORBITT (83251)
                                              CHRISTOPHER T. MICHELETTI (136446)
                                              JANE YI (257893)

-69-

FOURTH CONSOLIDATED AMENDED CLASS ACTION COMPLAINT
Case No. M:07-CV-1819-CW

ZELLE HOFMANN VOELBEL & MASON LLP
44 Montgomery Street, Suite 3400
San Francisco, CA  94104
Telephone:     (415)639-0700
Facsimile:      (415) 693-0770
fscarpulla@zelle.com
ccorbitt@zelle.com

*Interim Lead and Liaison Counsel for Indirect-Purchaser Class*

Steering Committee For Indirect-Purchaser Plaintiffs:

Wyatt B. Durrette, Jr.
Christine A. Williams
**DURRETTEBRADSHAW PLC**
Main Street Centre, 20ᵗʰ Floor
600 East Main Street
Richmond, VA  23219
Telephone:     (804) 775-6900
Facsimile:      (804) 775-6911

Michele C. Jackson (SB No. 90807)
Joseph R. Saveri (SB No. 130064)
**LIEFF CABRASER HEIMANN
& BERNSTEIN, LLP**
Embarcadero Center West
275 Battery Street, Suite 3000
San Francisco, CA 94111
Telephone:     (415) 956-1000
Facsimile:      (415) 956-1008

Natalie Finkelman Bennett
**SHEPHERD FINKELMAN MILLER & SHAH, LLC**
35 East State Street
Media, PA 19063
Telephone:     (610) 891-9880
Facsimile:      (610) 891-9883

## <u>JURY TRIAL DEMAND</u>

Pursuant to Rule 38(b) of the Federal Rules of Civil Procedure, Plaintiffs demand a trial by jury for all issues so triable.

Dated:  November 19, 2009        _____/s/ Christopher T. Micheletti_____

FRANCIS O. SCARPULLA (41059)
CRAIG C. CORBITT (83251)
CHRISTOPHER T. MICHELETTI (136446)
JANE YI (257893)
ZELLE HOFMANN VOELBEL & MASON LLP

-70-

44 Montgomery Street, Suite 3400
San Francisco, CA 94104
Telephone:     (415)639-0700
Facsimile:     (415) 693-0770
fscarpulla@zelle.com
ccorbitt@zelle.com

*Interim Lead and Liaison Counsel for Indirect Purchaser Class*

Steering Committee For Indirect-Purchaser Plaintiffs:

Wyatt B. Durrette, Jr.
Christine A. Williams
**DURRETTEBRADSHAW PLC**
Main Street Centre, 20th Floor
600 East Main Street
Richmond, VA 23219
Telephone:     (804) 775-6900
Facsimile:     (804) 775-6911

Michele C. Jackson (SB No. 90807)
Joseph R. Saveri (SB No. 130064)
**LIEFF CABRASER HEIMANN**
**& BERNSTEIN, LLP**
Embarcadero Center West
275 Battery Street, Suite 3000
San Francisco, CA 94111
Telephone:     (415) 956-1000
Facsimile:     (415) 956-1008

Natalie Finkelman Bennett
**SHEPHERD FINKELMAN MILLER & SHAH, LLC**
35 East State Street
Media, PA 19063
Telephone:     (610) 891-9880
Facsimile:     (610) 891-9883

3219155v2

FOURTH CONSOLIDATED AMENDED CLASS ACTION COMPLAINT
Case No. M:07-CV-1819-CW