1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

IN THE UNITED STATES DISTRICT COURT

FOR THE NORTHERN DISTRICT OF CALIFORNIA

IN RE STATIC RANDOM ACCESS MEMORY
(SRAM) ANTITRUST LITIGATION                    No. 07-md-01819 CW

                                               ORDER DENYING
                                               CYPRESS' MOTION
                                               FOR SUMMARY
                                               JUDGMENT OR
                                               PARTIAL SUMMARY
                                               JUDGMENT

_____/

        Cypress Semiconductor Corporation (Cypress) moves for summary

judgment or, in the alternative, for partial summary judgment on

all claims brought by the Direct Purchaser (DP) and Indirect

Purchaser (IP) Plaintiffs in this class action.  The DP and IP

Plaintiff classes allege that Cypress and other manufacturers

engaged in a price-fixing conspiracy.  DP Plaintiffs have brought

suit for antitrust violations under the Sherman Act, while IP

Plaintiffs have sued under various antitrust and consumer

protection statutes and the common law of twenty-seven United States jurisdictions.

The Court heard oral argument on this motion on October 14, 2010.  Having reviewed all of the parties' submissions, and considered their oral arguments, the Court denies Cypress' motion for summary judgment or, in the alternative, partial summary judgment.

BACKGROUND

Direct and Indirect Purchasers allege that Defendant manufacturers engaged in a price-fixing conspiracy related to a product called Static Random Access Memory (SRAM).  The facts of this case were described in detail in the Court's prior orders.  This order includes additional facts relevant to this motion.

From 1998 through 2004, Woung Moo (W.M.) Lee, Senior Manager and Group Leader of the SRAM Marketing Group for Samsung Electronics Co., Ltd. (SEC) from February, 1999 through 2002, and other Samsung[1] personnel held regular meetings with their competitors, including Toshiba, NEC, Mitsubishi, Etron and Hynix.  See Declaration of William H. London (London Dec.), Ex. 1 (Samsung's Fourth Supplemental Responses to DP Plaintiffs' Interrogatories at 8-10).  In these meetings, Samsung and its competitors exchanged information about SRAM production volume, marketing information, pricing, and major customers, such as

---

[1] SEC and Samsung Semiconductor, Inc. (SSI) are collectively referred to as "Samsung."

2

United States District Court
For the Northern District of California

Intel.  Id.  The meetings were convened at various locations throughout Asia, including in Japan, Korea and Taiwan.  Id. at 9-10.  Information was often exchanged and notes taken using white boards, or similar means.  Id.  Hence, the meetings have come to be known in this case as the "White Board" meetings.

W.M. Lee had direct communications with certain competitors regarding SRAM, including employees from NEC, Mitsubishi, Etron and Hynix.  Id.  He generally viewed competitors' production volume information as more important than information about their prices because production volume helped him determine oversupply or shortage in the market, in turn dictating the need to lower or raise prices.  Id. at 9.  For example, in one communication, W.M. Lee referred to a product oversupply for Intel, and advised that, to avoid this oversupply situation, SEC would reduce production and divert to a different product.  London Dec., Ex. 68.

During at least a portion of this time period, Joo Bong Ra worked for Samsung Semiconductor, Inc. (SSI), and reported to W.M. Lee regarding SRAM.  Id. at 8.  In August, 2000, Ra left SSI, and began working for Cypress.  London Dec., Ex. 15 (Ra Dep. 20:20).

Cypress did not attend the White Board meetings.  Outside of these meetings, however, Samsung and Cypress exchanged information regarding production, pricing and revenue for SRAM.  See e.g., London Dec., Ex. 17.  For example, Gary Scotch, a Cypress senior Strategic Account Manager, id., Ex. 19 at 204:16-21, sent an email to Scott Harmel, Cypress' SRAM Product Marketing Manager,

3

summarizing a lunch meeting with Ra on December 21, 1999, and relaying details regarding Samsung's volume of business, revenue and pricing. Id., Ex. 17. Scotch wrote, "Samsung is actively trying to hold pricing, and has withdrawn previously proposed price decreases." Id. Scotch also wrote, "Some of this info is extremely sensitive so please treat it as such . . . It may be best not to save this on your hard disk." Id.

Ra, in turn, reported details from the same meeting to W.M. Lee, including information about Cypress' production volume, volume supplied to Intel, and pricing for SRAM. London Dec., Ex. 16. Ra indicated that Cypress was planning to produce 1 to 1.5 million units of 4M low power SRAM (LPSRAM) per month, mostly for Intel, and provided Cypress' Q100 and Q200 pricing to Intel for 2M and 4M LPSRAM. Id.

On April 27, 2000, John Bugee, who served as SSI's Worldwide Account Manager for Intel and Cisco accounts from 1998 to 2001, id., Ex. 14 at 10:12-18, provided to his Samsung colleagues, including W.M. Lee and Ra, details regarding Cypress' current pricing. Id., Ex. 51. Bugee also stated, "Intel is applying great pressure for Cypress to reduce their pricing . . . I encouraged Cypress to significantly increase (not decrease) their price." Id.

On August 10, 2000, Scotch told Antonio Alvarez, Vice President of Cypress' Memory Products Division, and Thomas Surrette, Cypress' Business Unit Manager of LPSRAM, that he "spoke

United States District Court
For the Northern District of California

**United States District Court**
For the Northern District of California

to a Samsung source yesterday" and "they are shipping 50k 8M (.25 micron I think) in Aug, around $17."  Id., Ex. 4.  On the same date, Bugee informed W.M. Lee and other Samsung managers by email that Cypress signed a LPSRAM Purchase Agreement with Intel and was required to give Intel six-months notice of any price increase. London Dec., Exs. 18 & 14 (Bugee Dep. 10:12-18).  Bugee reported that, effective Q101, Cypress would increase its price for 2M LPSRAM from $2.50 to $3.00 and for 4M LPSRAM from $5.00 to $6.00. Id., Ex. 18.

In an email on May 17, 2001, Mario Martinez, Cypress' Director for Strategic Marketing, informed Ra, Alvarez and Ahmad Chatila of Cypress that Samsung had agreed to exchange with Cypress historical and forecast numbers regarding SRAM revenue and volume.  London Dec., Ex. 86.  The email included information about Samsung's SRAM revenue and volume.

There is also evidence that Cypress exchanged anticompetitive information with firms other than Samsung, though the trail of documentation is less extensive.  On December 26, 2000, Chatila reported to Harmel a host of SRAM-related pricing and production information that he had gathered from a director at IDT.  Id., Ex. 55.  Harmel responded that he "used to hold similar conversations with 4-5 competitors/month (roughly one per week).  Samsung, IDT, Micron, and ISSI were my prime choices  . . ."  Id.

On June 25, 2001, Ra, who no longer worked for Samsung, but had moved to Cypress, received an email from Hee Sang Yoon, Sr.,

**United States District Court**
For the Northern District of California

Manager of Strategic Marketing for SRAM at Hynix.  Yoon invited Ra
to attend a meeting of suppliers to address supply and demand
issues in the SRAM market.  Id., Ex. 37.  Yoon stated, "As you may
know, market situation is decided by two side, demand and supply.
That means, suppliers can control the market situation if they
have accurate information on customer and market demand in
general."  Id.  Ra forwarded the invitation to Alvarez,
questioning whether the meeting was legal unless all SRAM
manufacturers were invited.  Alvarez asked Cypress counsel whether
the meeting was legal.  Winter's Reply Dec., Ex. 3.  Counsel
responded that the meeting "[s]ounds questionable at best, illegal
at worst."  Id.  Ra did not accept the invitation, but replied to
Yoon that he would like to discuss "the supply/demand issue and
way to survive under tough market for SRAM world," and asked Yoon
to "stay in touch."  London Dec., Ex. 37.

In turn, an email from Ra to Steve Weber, Cypress' Motorola
Account Manager, and Surrette on March 21, 2002, suggests that Ra
had gained access to some information about Hynix's pricing and
was coordinating price increases with various SRAM suppliers.  Ra
wrote:

> Just before I discuss this matter with Tom [Surrette],
> will give you a flexable [sic] price at $1.00 but
> please do not release this to disty [sic] yet.
> Lately, I've been talking to several suppliers as to
> rasing [sic] the prices for SRAMs.  I don't think
> Hynix will drop further.  Id., Ex. 44.

6

An email from Scotch in April, 2002 indicates that he spoke with Etron, and gathered details about its pricing and production volume. Id., Ex. 47.

On April 23, 2002 Scotch reported speaking with Etron, and relayed Etron pricing information. Id., Ex. 47. Scotch also stated that Etron failed prequalification requirements to supply parts to Intel, and that development could benefit Cypress. In a March 6, 2002 email exchange regarding negotiations for the sale of SRAM, Chatila of Cypress wrote, "We will not take this business at this time. This kind of price 20 percent lower than lowest customer will cause trouble for all players in industry." Id., Ex. 55.

At Cypress, Alvarez and Surrette had pricing authority. London Dec., Ex. 12 (Alvarez Dep. 68:23-71:20); see also, Ra Dep. 87:22-25. Scotch did not have "ultimate price authority," though he did have input in regard to pricing with Intel, negotiated prices with buyers within limits, and regularly discussed pricing with Alvarez, Surrette, Chatila, Ra, Bien Irace and Ralph Schmitt. Alvarez Dep. 68:23-71:20; Scotch Dep. 204:16-206:1. Scotch considered discussing pricing with them a basic job responsibility. London Dec., Ex. 19 at 34:6-35:19.

In the early 1990s Cypress had a relatively small share of the SRAM market. In 1994, Cypress estimated its share at six percent. Declaration of Gary A. Winters (Winters Dec.), Ex. 49. By 2000, Cypress had grown from the ninth-largest to the second-

United States District Court
For the Northern District of California

largest in the SRAM market in terms of market share.  See Winters
Dec, Exs. 49 & 14 (Semico Report at 23, 25).  Cypress gained
market share throughout the period of the alleged conspiracy.
Semico Report at 23, 25.  According to Alvarez, in the 1990s,
Cypress sought to become a leading player in the market for SRAM.
Winters Dec., Ex. 48.  In the early 2000s SRAM profits shrank, and
many manufacturers either consolidated with other companies or
exited the SRAM business.  Semico Report at 18-20.  Cypress
purchased Galvan, Inc. in 2000, and Cascade Semiconductors in
2003.  Id.  In 2003, Micron exited the SRAM business, selling its
SRAM product offering to Cypress.  Id. at 19.

Alvarez testified that he authorized employees in the Cypress
Memory Division to collect competitor data to assist with
calculating overall market share.  London Dec., Ex. 48 (Alvarez
Dep. 28:18-23).  He continued that the revenue data made public by
third-party publications, such as Isuppli and Gartner, was often
nine months old and subject to revisions.  Id. at 30:10-22.
Isuppli and WSTS were third-parties that received volume
information directly from SRAM manufacturers. London Dec., Ex. 38
(Surrette Dep. 195:3-196:19).  According to Alvarez, the
information allowed Cypress to determine whether the company was
meeting its goal to increase market share.  Surrette testified
that WSTS information influenced production planning, and "in the
interest of getting information sooner, there were times when we

United States District Court
For the Northern District of California

would exchange such information with competitors." Id. at 197:12-198:19.

Additional information was exchanged at technical meetings of the Quad Data Rate (QDR) consortium (composed of Cypress, Samsung, NEC, Renesas, IDT and Micron). London Dec., Ex. 22 (Arcoleo Dep. at 54:21-59:1, 61:23-70:25) & Ex. 23. The information exchanged comprised revenue amounts, and sales capacities and trends with respect to various products in the SRAM market. Id. Cypress' technical representative to the QDR meetings forwarded this information to Alvarez and Surrette. London Dec., Ex. 23 & Arcoleo Dep. at 67:10-20, 110:21-116:20.

On the other hand, Samsung personnel complained on numerous occasions amongst themselves about Cypress' low SRAM prices, and described Cypress' pricing as aggressive, even extremely aggressive. Winters Dec., Exs. 51-53. In 1998, one senior manager at SEC, Il Ung Kim, described Cypress as "either dum [sic] or non-profit organization." Id., Ex. 53. Kim complained, "I just don't understand why they have to sell those low density SRAM so cheap, especially when they do not have to do [sic] in U.S. markets." Id. In 2002, Mike McCarthy, a director of sales at SSI, questioned in reference to Cypress whether "those guys like being unprofitable." Id., Ex. 52.

Dr. Noll and Dr. Levy, whose expert reports are described in greater detail in the Court's prior orders, determined that the SRAM industry exhibited several characteristics that facilitate

collusion.  Noll Dec., Ex. A (Noll Report at 19-37); Micheletti Dec., Exs. 1 (Harris Report at ¶¶ 40-43, 49, 64-67, 73-76, 80). According to these experts, the SRAM market is highly concentrated, with significant barriers to entry due to the substantial expense and time required for plant construction and maintenance.  SRAM is generally standardized, and thus largely substitutable.  Cypress' CEO has referred to SRAM as a commodity. Micheletti Dec., Ex. 3 (Harris Reply Report at ¶ 42).  Inelastic demand and contractual terms common in the SRAM market ease the enforcement of price-fixing agreements, increasing the effectiveness of collusion.

LEGAL STANDARD

Summary judgment is properly granted when no genuine and disputed issues of material fact remain, and when, viewing the evidence most favorably to the non-moving party, the movant is clearly entitled to prevail as a matter of law.  Fed. R. Civ. P. 56.  Celotex Corp. v. Catrett, 477 U.S. 317, 322-23 (1986); Eisenberg v. Ins. Co. of N. Am., 815 F.2d 1285, 1289 (9th Cir. 1987).  The court must draw all reasonable inferences in favor of the party against whom summary judgment is sought.  Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 587 (1986); Intel Corp. v. Hartford Accident & Indem. Co., 952 F.2d 1551, 1558 (9th Cir. 1991).

Material facts which would preclude entry of summary judgment are those which, under applicable substantive law, may affect the

outcome of the case.  The substantive law will identify which

facts are material.  <u>Anderson v. Liberty Lobby, Inc.</u>, 477 U.S.

242, 248 (1986).

"In antitrust cases, these general standards are applied even

more stringently and summary judgment granted more sparingly."

<u>Beltz Travel Serv. Inc. v. Int'l Air Transport Ass'n</u>, 620 F.2d

1360, 1364 (9th Cir. 1980).  "[I]n complex antitrust litigation

where motive and intent play leading roles, the proof is largely

in the hands of the alleged conspirators, and hostile witnesses

thicken the plot.  It is only when the witnesses are present and

subject to cross examination that their credibility and the weight

to be given their testimony can be appraised."  <u>Id.</u> (quoting

<u>Poller v. Columbia Broad. Sys. Inc.</u>, 368 U.S. 464, 473 (1962)).

Nevertheless, the Ninth Circuit has held, that

> where an antitrust plaintiff relies entirely upon
> circumstantial evidence of conspiracy, a defendant
> will be entitled to summary judgment if it can be
> shown that (1) the defendant's conduct is consistent
> with other plausible explanations, and (2) permitting
> an inference of conspiracy would pose a significant
> deterrent to beneficial procompetitive behavior. Once
> the defendant has made such a showing, the plaintiff
> must come forward with other evidence that is
> sufficiently unambiguous and tends to exclude the
> possibility that the defendant acted lawfully.

<u>In re Coordinated Pretrial Proceedings in Petroleum Prods.</u>

<u>Antitrust Litig.</u>, 906 F.2d 432, 440 (9th Cir. 1990).

This framework derives from the Supreme Court's decision in

<u>Matsushita</u>, 475 U.S. at 594.  In <u>Matsushita</u> the Court "warned that

permitting the inference of conspiratorial behavior from evidence

United States District Court
For the Northern District of California

consistent with both lawful and unlawful conduct would deter pro-competitive conduct--an especially pernicious danger in light of the fact that the very purpose of the antitrust laws is to promote competition." In re Citric Acid Litig., 191 F.3d 1090, 1094 (9th Cir. 1999).  Thus, "conduct as consistent with permissible competition as with illegal conspiracy does not, standing alone, support an inference of antitrust conspiracy." Matsushita, 475 U.S. at 588 (citing Monsanto Co. v. Spray-Rite Service Corp., 465 U.S. 752, 764 (1984)).

A court should not "tightly compartmentalize[e]" the non-movant's evidence. Continental Ore Co. v. Union Carbide & Carbon Corp., 370 U.S. 690, 699 (1962).  Rather, a court should examine the evidence as a whole to determine whether it reasonably supports an inference that the defendant engaged in a price fixing conspiracy. In re Citric Acid Litig., 191 F.3d at 1097.  "As a general rule, summary judgment is inappropriate where an expert's testimony supports the nonmoving party's case." Southland Sod Farms v. Stover Seed Co., 108 F.3d 1134, 1144 (9th Cir. 1997).

DISCUSSION

I. Existence of a Conspiracy

In this case, as in most an antitrust conspiracy cases, the crucial question is whether Cypress' conduct was the result of the company's independent decisions or due to an agreement, tacit or express, with other conspirators. Theatre Enters., Inc. v. Paramount Film Distrib. Corp., 346 U.S. 537, 540 (1954).

12

"[B]usiness behavior is admissible circumstantial evidence from which the fact finder may infer agreement." Id. Nevertheless, parallel business behavior alone does not constitute an antitrust violation. Id. "The exchange of price data and other information among competitors does not invariably have anticompetitive effects; indeed such practices can in certain circumstances increase economic efficiency and render markets more, rather than less, competitive." United States v. United States Gypsum Co., 438 U.S. 422, 441 n.16 (1978). A number of factors, including most prominently the nature of the information exchanged and the structure of the industry involved, are generally considered in divining the pro-competitive or anticompetitive effects of this type of inter-seller communication. Id. Information exchanges help to establish an antitrust violation when the exchange indicates the existence of an express or tacit agreement to fix or stabilize prices. In re Coordinated Pretrial Proceedings, 906 F.2d at 447 n.13.

Cypress contends that there is insufficient evidence that it entered into an agreement to fix prices. At the outset, Cypress argues that information was exchanged only among low-level employees without pricing authority. Scotch appears to have been the primary conduit of information about pricing and production. Though Scotch did not have "ultimate pricing authority," Alvarez, a Cypress executive with such authority, admitted that Scotch was involved in setting prices. Scotch relayed regular reports about

13

competitors' pricing and production directly to pricing authorities--Surrette and Alvarez--as well as to other Cypress personnel, who appear to have played roles in setting prices, such as Ra and Chatila.  Scotch considered this a basic part of his job responsibilities.  Even without final pricing authority, Scotch did negotiate pricing directly with buyers within limits.  While Surrette and Alvarez describe Scotch as a low level "sales representative," Scotch was a senior strategic account manager, with greater authority than other sales managers.  He exchanged information with other high level managers from competitor firms, and exercised direct influence over the prices that buyers paid for SRAM.  These facts evidence that Cypress executives and other managers with influence or ultimate authority over pricing had knowledge of competitive price and production information.  From this evidence, a reasonable factfinder could infer that the information impacted pricing.

In these respects, the present case differs from In re Baby Food Antitrust Litigation, 166 F.3d 112, 124-126 (3rd Cir. 1999). The plaintiffs in Baby Food produced evidence that a sales representative and a district sales manager for the defendants exchanged pricing information with the defendants' competitors. In addition, the defendants had memoranda in their files that contained competitors' pricing information.  The court found that the district court appropriately disregarded the sales managers' testimony because it was given in another proceeding which did not

involve the product in dispute in the litigation at issue.  Id. at 126.  The court discounted the salesman's testimony because of his self-described status as "a little mouse," who exchanged information with other sales representatives, and had no pricing authority.  Id. at 125-26.  There was no indication that the salesman communicated the information directly to pricing authorities at the firm, or participated in any discussions to decide what prices would be set.  The court declined to infer the existence of even a tacit agreement to fix prices based on the salesman's exchange of price information.

The present case more closely resembles In re Flat Glass Antitrust Litigation, 385 F.3d 350, 364-69 (3rd Cir. 2004).  In that case, the plaintiffs produced evidence that executives and managers were involved in the anticompetitive exchange of price information.  The court found that such information exchanges "at a higher level of the flat glass producers' structural hierarchy," compared to Baby Food, created a reasonable basis for inferring that "the exchanges of information had an impact on pricing decisions."  385 F.3d at 369 (internal quotations and citations removed).  see also, Rosefield v. Falcon Jet Corp., 701 F. Supp. 1053, 1064 (D.N.J. 1988) (testimony that executives "were aware of the price information exchange and considered the data obtained by sales engineers to set the price of business jets" persuaded the court to find that defendants had "an anticompetitive objective to enter [an] agreement" to exchange price information.).

15

United States District Court
For the Northern District of California

Courts may also consider the structure of an industry to determine whether anticompetitive collusion likely occurred.  Here Plaintiffs present evidence that the conditions in the SRAM market facilitate price fixing.[2]  Case law has recognized the susceptibility of certain industries to collusion due to prevailing market conditions.  See e.g., United States v. Container Corp. of America, 393 U.S. 333, 337 (1969); Todd v. Exxon Corp., 275 F.3d 191, 208 (9th Cir. 2001) ("Generally speaking, the possibility of anticompetitive collusive practices is most realistic in concentrated industries.").

In Container Corp. the plaintiffs presented no evidence of an agreement to adhere to a price schedule, and no statistical report on the average costs.  The Court found concerted action on the part of the defendants based on reciprocal exchanges of price information concerning specific sales to identified customers.  393 U.S. at 334-35.  The Court then considered market conditions, and found a sufficient basis upon which to infer that the exchanges of information were anticompetitive.  "[T]he corrugated

---

[2] The Court overrules Cypress' objections to Dr. Noll and Dr. Harris' expert testimony.  Cypress has objected to their testimony that (1) there are high entry barriers, (2) collusion is easier to monitor because there are frequent SRAM orders, and (3) contractual terms in the SRAM industry enable Defendants to monitor pricing.  Cypress objects under Federal Rule of Evidence 702, on the ground that the opinions are not "based on sufficient facts or data."  The Court finds that the testimony is sufficiently supported by the citations to Cypress' 1999 annual report, academic and industry news reports, and accompanying exhibits.

container industry is dominated by relatively few sellers.  The product is fungible and the competition for sales is price.  The demand is inelastic, as buyers place orders only for immediate, short-run needs . . . The inferences are irresistible that the exchange of price information has had an anticompetitive effect in the industry, chilling the vigor of price competition." Id. at 337.  The reciprocal exchange of information and the market conditions in the present case are substantially similar.

However, the exchange of price and other business information is not invariably anticompetitive.  Gypsum Co., 438 U.S. at 441 n.16.  Without more, the exchange of price information does not raise an inference of a collusive agreement to fix prices.  Under Matsushita and Monsanto Co. Spray-Rite Serv. Corp., 465 U.S. 752 (1984), a court must consider a defendant's pro-competitive explanation for its exchange of price and other critical business information when a plaintiff relies on circumstantial evidence. In re Coordinated Pretrial Proceedings, 906 F.2d at 440. Plaintiffs have not produced direct evidence of an agreement to fix prices, but only evidence from which a reasonable fact finder could infer the existence of a conspiracy to do so.

Cypress executives have testified that the exchange of critical business information, including price, was necessary to calculate its market share, and thus assess its progress toward becoming a leading SRAM manufacturer.  This explanation is tempered by evidence that one of Cypress' own senior managers

17

United States District Court
For the Northern District of California

believed a competitor's pricing, volume of business and revenue information was "extremely sensitive" and possibly should not be saved to his colleagues' hard disks.  In 2002, while working for Cypress, Ra, a former Senior Marketing Manager for Samsung, indicated in an email that he had spoken with suppliers about raising prices.[3]

Other evidence indicates that Cypress' information exchanges were intended to facilitate price collusion.  Cypress, principally through Scotch, communicated extensively with Samsung, the conspiracy's apparent leader.  Cypress and Samsung agreed to exchange forecast information, including details about SRAM revenue and volume.  They exchanged pricing information as well. In addition, Cypress exchanged such information with other competitors.  Alvarez and Surrette testified that this exchange of information with competitors allowed Cypress to access critical information more quickly and more accurately than was otherwise possible.  According to W.M. Lee, production volume, even more than pricing, was critical to controlling prices.  Yoon of Hynix also indicated that manufacturers could control the market by controlling supply.  Cypress has not shown that the information it exchanged with competitors was materially different from the

---

[3] The Court is not persuaded to disregard this email due to Ra's purported difficulty with the English language.  Ra was not provided with an interpreter at his deposition, and numerous emails in the record indicated that Ra regularly conducted business in English without interpreter assistance.  This suggests that Ra reliably communicated in English when he wrote the email.

information exchanged at the White Board meetings.  Even if the information helped Cypress determine its market share, a reasonable fact finder could also infer that the information exchange served to facilitate price fixing by Cypress.  That Cypress exchanged this information in concert with other competitors tends to show that it was not acting independently.

Expert evidence also undermines Cypress' asserted rationale. Dr. Noll testified, "There's no pro-competitive effect that can emanate from this kind of exchange of information.  This is simply applying standard antitrust economics."  London Dec., Ex. 67.  Dr. Levy agreed, writing that "the exchange of current and future price and sales information about specific customers has no plausible pro-competitive benefit and benefits a firm that provides such information to its competitors only if it facilitates collusion."  Noll Dec., Ex. B (Noll Reply Report at 5).

Notwithstanding Cypress' purported motive for sharing crucial price and business information, Plaintiffs' evidence is "sufficiently unambiguous" and tends to exclude the possibility that Cypress acted lawfully.  See In re Coordinated Pretrial Proceedings, 906 F.2d at 440.  Plaintiff's evidence raises a material dispute of fact as to whether Cypress agreed to join a conspiracy to fix SRAM prices.

Nor does evidence that Cypress sold SRAM at prices lower than its competitors disprove that it conspired to fix prices.

United States District Court
For the Northern District of California

Container Corp., 393 U.S. at 337 ("The continuation of some competition is not fatal" to a Section 1 Sherman Act case.)  That Cypress may have cheated on the alleged conspiracy, angering other competitors, still leaves open the possibility that it would have sold SRAM at even lower prices absent critical knowledge about competitors' pricing and production.

Cypress further argues, that because there is no evidence it communicated with competitors apart from Samsung and Etron, there is insufficient proof that it agreed to engage in a market-wide conspiracy.  Cypress' characterization of the record overlooks some evidence that tends to show that it communicated with Defendant competitors other than Samsung or Etron.  Furthermore, Plaintiffs need not produce evidence that Cypress communicated with many or all Defendant competitors to show that it engaged in a conspiracy to fix prices in the SRAM market.  There is evidence that Samsung played a substantial role in leading the conspiracy, and that Cypress exchanged critical price and production information with Samsung.

In the alternative, Cypress seeks partial summary judgment with regard to (1) DP Plaintiffs' claims for damages other than those incurred by class member Intel, and (2) IP Plaintiffs' claims insofar as they seek damages for sales to end-user purchasers of SRAM-containing products that were not sold by Intel.  Cypress asserts that Plaintiffs lack evidence supporting the existence of a market-wide conspiracy to fix prices beyond its

United States District Court
For the Northern District of California

pricing to Intel.  The Court is not persuaded.  Though Cypress insists that it sold a unique SRAM product to Intel, outside of this litigation Cypress' CEO has characterized SRAM as a commodity.  Furthermore, there is evidence that an oversupply of SRAM for Intel could lead Samsung to reduce supply and divert production to another type of SRAM, potentially affecting the price or reducing competition as to another product.  For these reasons, the Court declines to limit Plaintiffs' case against Cypress to the sale of SRAM and products containing SRAM related to Intel.

II. Claims Based on Fast SRAM

In its reply brief, Cypress seeks summary judgment on all claims pertaining to the sales of fast SRAM.  Because this argument was not raised in Cypress' opening brief, the Court declines to consider it.

III. Injury

Cypress argues that it is entitled to summary judgment on DP Plaintiffs' claims because they have failed to produce evidence of injury caused by the alleged conspiracy.  Cypress' argument is based on the fact that Dr. Levy's analysis of overcharges was limited to a damages subperiod within the class period.  The Court rejects this argument, which mirrors arguments in several other motions filed by Cypress and Samsung in the present action.  See Order Denying Defendants' Joint Motions to Decertify Plaintiff

Classes and To Exclude Expert Opinions of Dr. Levy and Dr. Dwyer, December 7, 2010.

As discussed in that order, DP Plaintiffs have proffered evidence of injury through their expert witnesses: Dr. Roger Noll on liability, and Dr. Armando Levy on damages.  Dr. Noll opined that Defendants' activities were indeed collusive and most likely resulted in injury to purchasers in the SRAM market.  Dr. Levy, in turn, provided additional evidence of injury through his damages calculations.  That Dr. Levy's estimate of damages was limited to a subperiod when the conspiracy was deemed most effective does not negate the existence of injury or the causal connection between the alleged conspiracy and injury outside of the damages subperiod.

Because DP Plaintiffs have sufficiently established injury, summary judgment based on this argument is unwarranted.

IV. IP Plaintiffs' State Law Claims

Cypress moves for summary judgment on a number of IP Plaintiffs' state law claims, joining arguments made in Parts III and IV of Samsung's Motion for Summary Judgment and/or Partial Summary Judgment in the Indirect Purchaser Actions.  The Court has ruled on these arguments in an order issued on December 8, 2010.

//

//

//

//

22

**United States District Court**
For the Northern District of California

CONCLUSION

The Court denies Cypress' motion for summary judgment or, in the alternative, partial summary judgment.  Docket No. 1068.

IT IS SO ORDERED.

Dated: 12/10/2010

_____
CLAUDIA WILKEN
United States District Judge